**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| JUN LI, *et al.*,<br><br>Appellants,<br><br>v.<br><br>WALL007, LLC, *et al.*,<br><br>*Appellees.* | Case No. 3:20-cv-03388-X |

**APPENDIX IN SUPPORT OF APPELLANTS' EMERGENCY MOTION FOR STAY PENDING APPEAL**

Appellants Jun Li, Yunding Kang, Cunxiang Ji, Jin Wang, Peng Guo, Lin Zhou, Qu Chen, Kai Tian, Yijing Wu, Xuegeng Gong, Jin Wang, Weijia Kong, Heng Zhang, Hong Guo, Pei Guan, Yue Xu, Mai Ye, Chenchen Jiang, Qiuying Li, Ruinian Wu, Lin Zhou, Liying Yang, Yan Zhang, Wenjun Wang, Lan Ji, Ying Zhou, Lin Li, Li Jiang, Rufeng Ding, Cunxiang Ji, Lin Gao, Qiao Qin, Yue Zhang, Xiaodong Hao, Tianqing Song, Li Jiang, Weisi Wang, Xiaoquan Dai, Feng Yan, Heng Zhang, Ou Jiang, Jinzhe Wu, Yadan Liu, Wanwan Li, Wenjuan Yin, Jiancheng Chen, Yi Tang, Ying Zhang, Pengfei Dong, Kangying Mao, Yijing Wu, Li Jiang, Qin Chu, Yulan Chen, Sicheng Zhan, Pei Guan, Jingqiu Tang, Di Tang, Jun Zeng, Kui Wang, Yue Zhang, Jun Wang, Xiaomin Fan, Di Tang, Jialin Hu, Qin Chu, Jiaxiang Lu, Fuqing Chen, Hanjiang Fu, Aiguo Luo, Fang Ding, Xiangdong Zhu, Wai Ying, Yuan Yuan, Chao Xu, Guoqin Zhou , and Yijing Wu, file this Appendix in Support of their Emergency Motion for Stay Pending Appeal, which is being filed contemporaneously herewith. The Appendix consists of the following exhibits:

| APP. NO. | DESCRIPTION |
|---|---|
| 1 | Order Directing Compliance with Prior Orders. [Bankr. Dkt. No. 287]. |

| | |
|---|---|
| 2 | 11/9/2020 Email from Jenni Bergreen Courtroom Deputy to Hon. Harlin D. Hale. |
| 3 | Third Motion of Alleged Debtors to Dismiss Involuntary Petition with Prejudice and Opposition of Petitioning Creditors to the Third Motion of Alleged Debtors to Dismiss Involuntary Petitions with Prejudice. [Bankr. Dkt. No. 182]. |
| 4 | Motion for Leave to Appeal [Bankr. Dkt. No. 221]. |
| 5 | Motion for Leave to Appeal [Bankr. Dkt. No. 226]. |
| 6 | Motion for Leave to Appeal [Bankr. Dkt. No. 231]. |
| 7 | Motion for Leave to Appeal [Bankr. Dkt. No. 236]. |
| 8 | Motion for Leave to Appeal [Bankr. Dkt. No. 241]. |
| 9 | Order Granting in Part the Alleged Debtor's Motion to Compel Discovery Related to Wet Signatures [Dkt. No. 101] [Bankr. Dkt. No. 165]. |
| 10 | Order Granting in Part the Petitioners' Motion to Compel Discovery [Dkt. Nos. 92 & 129] [Bankr. Dkt. No. 167]. |
| 11 | Order Granting in Part the Alleged Debtor's Motion to Quash Petitioners' Deposition Notice [Dkt. No. 133] [Bankr. Dkt. No. 168]. |
| 12 | Order Granting in Part the Alleged Debtor's Second Motion to Compel Discovery Responses from Petitioners [Dkt. No. 105] [Bankr. Dkt. No. 169]. |
| 13 | Motion of the Petitioning Creditors for (I) Reconsideration of Discovery Orders; and (II) Related Relief [Bankr. Dkt. No. 175]. |
| 14 | Order Denying Motion for Reconsideration of Discovery Orders [Bankr. Dkt. No. 202]. |
| 15 | Motion of Alleged Debtor to Dismiss Involuntary Petition, Request for Substitution of Real Party-in-Interest, Request for Bond, and Request for Award of Fees, Costs and Damages or in the Alternative to Abstain Under Bankruptcy Code § 305 [Bankr. Dkt. No. 18]. |
| 16 | Brief in Support of the Motions of Alleged Debtors to Dismiss Involuntary Petitions, Request for Substitution of Real Party-in-Interest, Request for Bond, and Request for Award of Fees, Costs and Damages or in the Alternative to Abstain Under Bankruptcy Code § 305 [Bankr. Dkt. No. 19]. |
| 17 | Motion of Southern Star Capital, LLC d/b/a Reliance Mortgage Company for Relief from Automatic Stay [Bankr. Dkt. No. 173]. |

18. FDRE and Tamamoi Amended Motion for Relief from Stay [Bankr. Dkt. No. 179].

19 Movant's Affidavit in Support of its Motion for Relief from Automatic Stay [Bankr. Dkt. No. 87].

20 Petitioning Creditors' Motion to Compel Responses to Petitioning Creditors' First Request for Production of Documents and First Set of Interrogatories [Bankr. Dkt. No. 92].

21 Transcripts of 8/17/2020 and 8/19/2020 Hearings.

22 Opposition to Motion to Continue [Bankr. Dkt. No. 201].

23 Order Granting, in Part, the Petitioning Creditors' Emergency Motion (I) to Quash or Modify the Alleged Debtors' Rule 45 Subpoenas Upon Petitioning Creditors, Jin Wang and Yijing Wu and Third Parties; (II) for an Order Scheduling a Discovery Conference and Settin8g a Discovery Schedule; (III) Requiring the Alleged Debtors to Abide by the Discovery Order and Adjourn Depositions of Third Party Witnesses and (IV) for Sanctions Against Counsel for the Alleged Debtors and Timothy Barton for Violations of Discovery Rules and Witness Intimidation [Bankr. Dkt. No. 48].

24 Motion for an Order (I) Holding Timothy Barton in Contempt for Failure to Comply with the Court's Order (II) Imposing Sanctions Against Timothy Barton and Awarding the Petitioning Creditors Attorney's Fees and (III) Requiring Barton to Appear Before the Court Concerning the Imposition of Additional Sanctions Against Him and/or the Debtor [Bankr. Dkt. No. 83].

Dated: November 25, 2020

Respectfully submitted,

/s/ *Jiangang Ou*
Jiangang Ou
Nguyen & Chen LLP
11200 Westheimer Road Suite 120
Houston, TX 77042
Tel: 832-767-0339
Email: jou@nguyen-chen.com

Stephen M. Packman
Archer & Greiner, P.C.
Three Logan Square
1717 Arch St., Suite 3500
Philadelphia, PA 19103

Tel: 215-246-3147
Email: spackman@archerlaw.com

*Counsel for the Appellants*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 25, 2020, I caused to be served a copy of the foregoing by electronic mail upon all parties receiving notice through the Court's CM/ECF Noticing System and upon Joyce Lindauer, Esquire via electronic mail at joyce@joycelindauer.com.

*/s/ Stephen M Packman*
Stephen M. Packman, Esquire

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed November 23, 2020**

**United States Bankruptcy Judge**

---

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Chapter 7** |
| | § | |
| **WALL007 LLC, *et al.*,** | § | **Case No. 20-31131 (HDH)** |
| | § | |
| **Alleged Debtors.** | § | **(Jointly Administered)** |

**ORDER DIRECTING COMPLIANCE WITH PRIOR ORDERS**

On August 19, 2020, this Court issued an oral ruling disposing of four outstanding discovery motions. As part of that ruling, the Court held that the petitioning creditors in the above-captioned cases (the "Petitioning Creditors")—who are Chinese nationals residing in mainland China—must appear for depositions to be taken in person, in the United States. Because the willingness of the Petitioning Creditors to attend in-person depositions will affect several threshold issues, including the ability of the Petitioning Creditors to carry their evidentiary burdens with regard to the validity of the involuntary petitions, the Court required that there be an agreement signed by counsel for the Petitioning Creditors that the Petitioning Creditors will appear for live depositions in the United States (a "Deposition Agreement") before any other discovery or motion

practice would continue. The Court's oral ruling was memorialized in a series of written orders that were entered on September 4, 2020 (the "Discovery Orders").[1]

The Petitioning Creditors have not filed a Deposition Agreement. On September 15, 2020, the Petitioning Creditors filed a motion to reconsider the Discovery Orders,[2] which this Court denied.[3] On November 3, 2020, the Petitioning Creditors filed notices of appeal for the Discovery Orders and the order denying the motion to reconsider,[4] along with motions for leave to file interlocutory appeals of those orders.[5] Both the Notices of Appeal and the Motions for Leave have been transferred to the District Court for consideration.

While the Petitioning Creditors are required to file a Deposition Agreement before these cases can progress, the Court neglected to set a deadline in the Discovery Orders for the Deposition Agreement to be filed. As a result, the above-captioned alleged debtors (the "Alleged Debtors") are stuck in an involuntary bankruptcy that is not only affecting them but other parties as well. For the reasons explained in more detail below, the Court believes it is necessary to order that the Alleged Debtors' bankruptcy cases will be dismissed without prejudice if, by the end of the day on December 4, 2020, the Petitioning Creditors have not either (1) filed the required Deposition Agreement or (2) obtained a stay of the Discovery Orders pending appeal.

---

[1] The Discovery Orders consist of four orders: *Order Granting in Part the Alleged Debtor's Motion to Compel Discovery Related to Wet Signatures [Dkt. No. 101]* [Docket No. 165]; *Order Granting in Part the Petitioners' Motion to Compel Discovery [Dkt. Nos. 92 & 129]* [Docket No. 167]; *Order Granting in Part the Alleged Debtor's Motion to Quash Petitioners' Deposition Notice [Dkt. No. 133]* [Docket No. 168]; *Order Granting in Part the Alleged Debtor's Second Motion to Compel Discovery Responses from Petitioners [Dkt. No. 105]* [Docket No. 169].

[2] *Motion of the Petitioning Creditors for (I) Reconsideration of Discovery Orders; and (II) Related Relief* [Docket No. 175].

[3] *Order Denying Motion for Reconsideration of Discovery Orders* [Docket No. 202].

[4] Docket Nos. 218, 223, 228, 233, and 238 (the "Notices of Appeal").

[5] Docket Nos. 221, 226, 231, 236, and 241 (the "Motions for Leave").

Involuntary bankruptcy is a particularly severe remedy. *Credit Union Liquidity Servs., LLC v. Green Hills Dev. Co., LLC (In re Green Hills Dev. Co., LLC)*, 741 F.3d 651, 655 (5th Cir. 2014). Even before a bankruptcy court is able to determine the propriety of the relief, just the filing of an involuntary bankruptcy petition against an entity is a serious action that can have consequences not only for the alleged debtor but for other parties as well. *See In re Landmark Distribs., Inc.*, 189 B.R. 290, 306 (Bankr. D.N.J. 1995) ("The filing of an involuntary petition by a creditor must be carefully scrutinized by the Court because such action is extreme in nature and carries with it serious consequences to the alleged debtor, examples of which include loss of credit standing, interference with general business affairs and public embarrassment."). Upon the filing of an involuntary petition, certain provisions of the Bankruptcy Code immediately go into effect. The alleged debtor is then allowed to challenge the petition on its merits. In order to obtain an order for relief that initiates a full-fledged bankruptcy, the petitioners must satisfy several requirements. Among other things, the petitioners must show that the alleged debtor is not generally paying its debts as they become due and that each petitioning creditor holds a claim against the alleged debtor that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount. The time between the filing of the involuntary petition and the adjudication of the merits of the petition is commonly referred to as a "gap period" and can be a period of significant uncertainty. In this case, the gap period has already lasted much longer than usual.

To understand why the gap period has lasted for so long, why the Court believes it is necessary for the Petitioning Creditors to go through the difficulty and inconvenience of appearing for depositions in person, and why the Court believes there should be a deadline for agreeing to do so, it is helpful to understand some of the history of these cases and the dispute between the parties. The Alleged Debtors are in the business of acquiring land in order to construct

improvements necessary to create a subdivision—streets, water utilities, sewers, sidewalks, and residential lots—with the objective of selling residential lots to home builders. The Petitioning Creditors claim that the relevant details of the debts they assert against the Alleged Debtors are straightforward. They claim they each individually entered into loan agreements with the Alleged Debtors for the purpose of providing the Alleged Debtors with funding for the purchase and development of land, and the Alleged Debtors failed to pay the loans back as and when required under the loan documents.

The Alleged Debtors, on the other hand, claim that there is far more going on than meets the eye. They claim the financing at issue was arranged by an individual named Michael Fu who located the Petitioning Creditors, engaged them to provide co-lending through his own entities, organized the transfer of funds, and acted as an agent on behalf of all of the Petitioning Creditors. The pooled loans, therefore, were part of a single partnership amongst the Petitioning Creditors as co-lenders with Mr. Fu and/or his entities as the unified designated agent. The Alleged Debtors also claim that they have received remittances from unknown persons and entities in China but do not know if any of those funds came from the Petitioning Creditors. The Alleged Debtors assert that this may have all been orchestrated by Mr. Fu to engage in financial practices that may violate the laws of both China and the United States, and the Petitioning Creditors may have been misled by Mr. Fu. Specifically, the Alleged Debtors stated in a filing with the Court in early May:

> Upon information and belief, the Alleged Debtors assert that some or all of named Petitioners are: (i) not voluntarily participating in this Bankruptcy Case; (ii) not aware that the Involuntary Petition was filed in their name; and/or (iii) not real persons. The docu-signed documents that make up the Involuntary Petitions cast serious doubt on their authenticity. Further many of the Petitioners who reside in

> China have no contact information. It may become impossible to learn whether these persons actually exist or exist merely as masks for Fu or others.[6]

The concerns raised by the Alleged Debtors are of great concern to this Court because they raise a number of questions, including whether a fraud is being perpetrated on this Court, whether the Petitioning Creditors are aware of and properly authorized the relief sought in this proceeding, and, even if nothing nefarious is going on, whether the Petitioning Creditors can satisfy the requirement for filing of an involuntary petition of each holding their own individual claim against the Alleged Debtors.

The parties and the Court have spent a great deal of time and effort trying to find a satisfactory method of verifying the identity and the genuine participation of the Petitioning Creditors, but the efforts have fallen short. Initially, these efforts centered around obtaining proof that the Petitioning Creditors had actually signed the involuntary petitions. The Alleged Debtors filed a motion to dismiss the involuntary petitions on May 14, 2020 complaining that the involuntary petitions were electronically signed and the attorneys for the Petitioning Creditors had not filed a certification of receipt and maintenance of their clients' "wet signatures."[7] On May 29, 2020, the Petitioning Creditors filed a response asserting that the wet ink signature requirement had been suspended by General Order 2020-15 due to the pandemic but also representing that they were working to obtain the wet ink signatures from all of the Petitioning Creditors and would file an attorney certification attesting to the requirement as soon as practically possible.[8] Counsel for the Petitioning Creditors filed a declaration in support of that response about two weeks later, once

---

[6] *Brief in Support of the Motions of Alleged Debtors to Dismiss Involuntary Petitions, Request for Substitution of Real Party-In-Interest, Request for Bond, and Request for Award of Fees, Costs and Damages or in the Alternative to Abstain Under Bankruptcy Code § 305* at ¶ 13 [Docket No. 19].

[7] *Second Motion of Alleged Debtor to Dismiss Involuntary Petition Without Prejudice for Procedural Deficiencies* at ¶ 9 [Docket No. 27].

[8] *Response of Petitioning Creditors to Alleged Debtors' Second Motions to Dismiss* at ¶ 46 [Docket No. 37].

again affirming that "counsel is working on obtaining the 'wet-ink' signatures from the Petitioning Creditors."[9] On June 15, 2020, the Court held a hearing on the Alleged Debtors' motion to dismiss, at which counsel for the Petitioning Creditors said he would be happy to provide wet ink signatures but believed doing so in the next ten days, as the Alleged Debtors requested, might be difficult, so the Court ordered the Petitioning Creditors to provide their wet ink signatures to counsel for the Alleged Debtors by no later than July 6, 2020.[10] On the day of the deadline, counsel for the Petitioning Creditors filed a certification stating that he was in possession of wet ink signature petitions from all but three of the Petitioning Creditors.[11] This, however, did not end the inquiry. On July 27, 2020, the Alleged Debtors filed a motion to compel production of additional evidence that would permit verification of the authenticity of the signatures.[12] As an exhibit to the motion to compel, the Alleged Debtors attached a chart showing the signatures of the Petitioning Creditors from various documents, including loan agreements, passports, and the involuntary petitions. The chart showed that the Petitioning Creditors' signatures from various sources did not resemble each other in all cases. In response, counsel for the Petitioning Creditors filed a series of declarations purporting to attach e-mails from each of the Petitioning Creditors verifying that the wet signatures appearing on the petitions and declarations in the bankruptcy are their original signatures.[13] These declarations, however, did not provide a method for verifying the e-mails came from the actual

---

[9] *Declaration of Jorge Garcia, Esquire in Further Support of Petitioning Creditors' Response to Alleged Debtors Second Motions to Dismiss* at ¶ 13 [Docket No. 62].

[10] A written order memorializing this oral ruling was entered on June 23, 2020. *Order on Second Motion of Alleged Debtors to Dismiss Involuntary Petition Without Prejudice for Procedural Deficiencies* [Docket No. 81].

[11] *Certification of Jiangang Ou, Esquire Regarding Receipt of Original "Wet-Signature" Petitions and Declarations from Petitioning Creditors* [Docket No. 84].

[12] *Alleged Debtors' Motion to Compel Production of Documentary Evidence Permitting Verification of Electronic Signatures and Stay All Additional Discovery of Non-Dispositive Issues, or in the Alternative to Invalidate the Involuntary Petition and to Schedule Hearing in Conjunction with Creditors' Motion to Compel* [Docket No. 101].

[13] Docket Nos. 111, 112, 113, 114, 115, 116, and 117.

Petitioning Creditors. The e-mails were generally in Chinese, and the e-mail addresses were widely varied, some of which bore some resemblance to the name of a Petitioning Creditor and some of which did not. Ultimately, signatures have been provided, but concerns remain. A more reliable way of verifying the identity of the Petitioning Creditors that has been requested by the Alleged Debtors, would be to take their depositions.

While the Court believes it is almost always true that a party that files an involuntary bankruptcy petition must be prepared to be deposed in order to provide evidentiary support for the petition, the factual issues with regard to the structure and mechanics of the financing transactions and the identity concerns that have persisted in these cases make the argument in favor of depositions of the Petitioning Creditors even more compelling.[14] At a hearing held on June 3, 2020, counsel for the Alleged Debtors raised the additional concern that it may be necessary to conduct the depositions live in the United States because taking the depositions by video while the Petitioning Creditors are in China may be illegal.[15] Counsel for the Petitioning Creditors only responded to this argument to say they would waive admissibility objections to the use of the deposition transcripts.[16] The Alleged Debtors followed up on this illegality argument after the hearing with a letter to the Court giving further support for their concern that conducting depositions of Chinese nationals in China or Hong Kong may be illegal.[17] The Petitioning Creditors responded to the Alleged Debtors' letter on June 4 but did not take the opportunity to

[14] While there has not been much in the way of proof that the Petitioning Creditors are not who they say they are, the difficulty in obtaining signatures from the Petitioning Creditors and the differences between their signatures on different documents is of concern. The Alleged Debtors have also identified other reasons for why they remain concerned about this issue. *See, e.g.*, Transcript of Hearing Held June 3, 2020 at 21:2-20 [Docket No. 71]; Transcript of Hearing Held August 17, 2020 at 8:23-9:24, 20:4-21:12 [Docket No. 172].

[15] Transcript of Hearing Held June 3, 2020 at 10:14-11:3 [Docket No. 71].

[16] *Id.* at 19:5-18.

[17] *Memorandum on Conducting Depositions of Chinese Nationals in China* [Docket No. 45].

respond to the legality argument and instead argued that the Alleged Debtors should be required to make an in-depth showing before being allowed to conduct any depositions of the Petitioning Creditors at all, by video or otherwise.[18] The parties filed a joint discovery plan on June 17, 2020[19] providing that the parties could conduct no more than one deposition of each party without further leave of Court and that those depositions would be concluded no later than July 31, 2020, but the parties did not state whether depositions would be live or by video in that plan.

On August 11, 2020, the Alleged Debtors placed the issue squarely in front of the Court by filing a motion asking, among other things, that the Court prohibit depositions from taking place in China and require that all further depositions take place in the United States.[20] In that motion, the Alleged Debtors gave a thorough and persuasive argument, with supporting legal authority, for why conducting in-person or video depositions in China would be illegal both for the deponents and the attorneys.[21] In their responsive brief, the Petitioning Creditors did not attempt to argue that their suggestion of video depositions would be legal but still called it a "reasonable accommodation offered by the Petitioning Creditors."[22] The Alleged Debtors continued to urge this argument at a hearing held on their discovery motions on August 17, 2020, specifically stating that they had identified ten or twelve individuals they wished to depose.[23]

Based on determinations that (1) depositions of the Petitioning Creditors are necessary in these cases, (2) conducting the depositions in the United States would be difficult, but possible,

[18] *Letter Filed by Petitioning Creditors* [Docket No. 47].

[19] *Joint Discovery Plan* [Docket No. 72].

[20] *Motion to Quash Petitioners' Deposition Notices* [Docket No. 133].

[21] *See Motion to Quash Petitioners' Deposition Notices* at 12-16 [Docket No. 133].

[22] *Petitioning Creditors' Opposition to the Alleged Debtors', Timothy Barton's, Venkat Murugan's, and Hongpeng Lin's Motion to Quash Petitioners' Deposition Notices* at ¶ 36-37 [Docket No. 140].

[23] Transcript of Hearing Held August 17, 2020 at 7:19-8:14 [Docket No. 172].

(3) conducting the depositions in China, even by video, may be illegal, and (4) proceeding with other discovery or motions would be fruitless if the Petitioning Creditors are not willing to appear for depositions, the Court granted the Alleged Debtors' motion and required that before any other discovery or motion practice would continue, counsel for the Petitioning Creditors must sign and file an agreement that the Petitioning Creditors will appear for live depositions in the United States. This ruling was memorialized in the Discovery Orders. As previously noted, the Petitioning Creditors filed a motion to reconsider the Discovery Orders,[24] and the Court rejected the grounds for reconsideration identified in that motion for the reasons explained in the *Order Denying Motion for Reconsideration of Discovery Orders* [Docket No. 202].

In the time since the Court imposed the requirement for the Petitioning Creditors to file a Deposition Agreement, progress in the cases has halted, but the impact on third parties has not. The Alleged Debtors are involved in multiple real estate projects. In one of them, one of the Alleged Debtors holds title to raw land that it intends to develop. During this involuntary proceeding, the promissory note secured by that property matured. The creditor holding that note wishes to pursue its rights with regard to its collateral but is prevented from doing so by the automatic stay. While section 303(f) of the Bankruptcy Code permits an alleged debtor to continue to operate its business as if an involuntary case had not been commenced, this does not require third parties to continue to work with the alleged debtor as they normally would. At a hearing on the creditor's motion for relief from the automatic stay,[25] the principal of the Alleged Debtor testified that he cannot refinance the debt as he normally would because third party lenders do not wish to extend credit to an entity in bankruptcy. Being in an extended gap period complicates the

[24] *Motion of the Petitioning Creditors for (I) Reconsideration of Discovery Orders; and (II) Related Relief* [Docket No. 175].

[25] *Amended Motion for Relief from Stay* [Docket No. 179].

Court's consideration of matters such as these, where the Court would normally try to determine, among other things, whether the property at issue is necessary to an effective reorganization. Without knowing whether the Alleged Debtor should be in bankruptcy, let alone what its plan would be if it were in bankruptcy, it is difficult to make meaningful determinations. In the meantime, however, both the Alleged Debtors and other creditors have limited options and limited rights. In fact, they are being adversely impacted while these cases remain parked.

The Court has now entered interim orders on that creditor's motion for relief from the automatic stay twice, granting it adequate protection until there is more clarity on what will become of the Alleged Debtors.[26] This holding pattern as to the rights of other creditors is not a sustainable solution though, and the Court has set a hearing in the coming weeks on a similar motion filed by yet another secured creditor.[27]

While the Court has sympathy for the burden the Deposition Agreement requirement puts on the Petitioning Creditors, some of the burden is of their own making. When they chose to initiate a new proceeding in this Court, the global pandemic had already begun to affect the United States, and the travel restrictions they complain about were already in place. They also chose to have seventy-seven petitioners when not nearly that many were required. Bankruptcy Code section 303(b)(2) requires at most three petitioners for each petition, but on average, they used eleven petitioners for each Alleged Debtor in these cases. Even accounting for Petitioning

---

[26] *Interim Order on Motion for Relief from Stay* [Docket No. 152]; *Order Conditioning the Automatic Stay* [Docket No. 268].

[27] *Motion of Southern Star Capital, LLC d/b/a Reliance Mortgage Company for Relief from Automatic Stay* [Docket No. 173].

Creditors who appear to have signed multiple petitions,[28] there are still sixty-five unique petitioners, which is far more than were required.

None of this is meant to disparage the efforts of counsel for the Petitioning Creditors or to accuse them of intentionally causing delay. They have certainly spent a great deal of time and effort attempting to allay the identity concerns without the need for in-person depositions, but this is a difficult problem and the Court simply does not believe they have found a satisfactory alternative to in-person depositions in the United States. In the meantime, the Alleged Debtors and other parties have felt the impact of having an extended gap period for these involuntary cases. Some of the Petitioning Creditors and the Alleged Debtors were engaged in state court litigation when these cases were commenced, and the dispute may need to return to state court. This Court has allowed time for the parties to explore alternatives to holding live depositions in the United States, but these bankruptcy cases need to either move forward or come to an end. If the Petitioning Creditors are unwilling to file a Deposition Agreement in compliance with the Discovery Orders, dismissal without prejudice is appropriate under Federal Rules of Civil Procedure 37(b)(2) and 41(b), made applicable to this matter by Federal Rules of Bankruptcy Procedure 7037, 7041, and 9014. Accordingly, the Court believes it is necessary to impose a deadline for the Petitioning Creditors to file the required Deposition Agreement or obtain a stay of the Discovery Orders.

Under Federal Rule of Bankruptcy Procedure 8007, parties must normally present a motion for a stay pending appeal to the bankruptcy court first. The Petitioning Creditors are relieved from that obligation in this case because it would be impracticable to do so under the time constraints[29]

[28] It is difficult to tell with certainty which of the Petitioning Creditors signed multiple petitions because even when names and signatures appear to match, the passport numbers used to identify the individual sometimes differ.

[29] Federal Rule of Bankruptcy Procedure 8007(b)(2)(A).

and the Court affirms it would likely deny such a motion[30] because the Court does not believe the Petitioning Creditors are likely to succeed on the merits of their appeal, the issuance of a stay is likely to substantially harm other parties, and the public interest does not favor a stay. *See Nken v. Holder*, 556 U.S. 418, 426 (2009) (stating the factors to consider for a stay pending appeal).

**IT IS THEREFORE ORDERED** that the Alleged Debtors' bankruptcy cases will be dismissed without prejudice if, by the end of the day on December 4, 2020, the Petitioning Creditors have not either (1) filed the required Deposition Agreement or (2) obtained a stay of the Discovery Orders pending appeal.

###End of Order###

[30] Federal Rule of Bankruptcy Procedure 8007(b)(2)(B).

**Huber, Amy M.**

| | |
|---|---|
| **From:** | Jenni Bergreen <Jenni_Bergreen@txnb.uscourts.gov> |
| **Sent:** | Monday, November 9, 2020 4:19 PM |
| **To:** | Huber, Amy M. |
| **Cc:** | TXNB Hdh_Settings |
| **Subject:** | [EXT MAIL] Re: In re: WALL007, LLC, et al.; Chapter 7 Case No. 20-31131-HDH |

You're welcome. Please shoot me an email after it's been filed because it won't show up on my report until Monday, and most likely after the hearing has already started or ended.

Thank you.

Jenni.

Jenni Bergreen
Courtroom Deputy to the
Honorable Harlin D. Hale
U.S. Bankruptcy Court
Northern District of Texas
214-753-2071

---

**From:** Huber, Amy M. <ahuber@archerlaw.com>
**Sent:** Monday, November 9, 2020 3:15 PM
**To:** Jenni Bergreen <Jenni_Bergreen@txnb.uscourts.gov>
**Subject:** RE: In re: WALL007, LLC, et al.; Chapter 7 Case No. 20-31131-HDH

**CAUTION - EXTERNAL:**

Jenni,

The hearing is Monday, 11/30 at 2:30 so I've calendared Friday, 11/27 at 2:30 as the filing deadline. Thank you for all of your help. It is truly appreciated.

**Amy M. Huber**
*Bankruptcy Administrative Assistant/Paralegal*
Stephen M. Packman, Esq.
Douglas G. Leney, Esq.
Tanneika A. Minott, Esq.
Jorge Garcia, Esq.

Archer & Greiner P.C.
Three Logan Square
1717 Arch Street, Suite 3500
Philadelphia, PA 19103
215-963-3300 (Ext. 5436)
ahuber@archerlaw.com
www.archerlaw.com

**From:** Jenni Bergreen <Jenni_Bergreen@txnb.uscourts.gov>
**Sent:** Monday, November 9, 2020 3:59 PM
**To:** Packman, Stephen M. <spackman@archerlaw.com>; Huber, Amy M. <ahuber@archerlaw.com>; TXNB Hdh_Settings <hdh_settings@txnb.uscourts.gov>
**Subject:** [EXT MAIL] Re: In re: WALL007, LLC, et al.; Chapter 7 Case No. 20-31131-HDH

Mr. Packman, Amy just let me know that there was no deadline stated on the record. Up to 24 hours prior to the hearing would be okay; however, if you file it that close to the hearing date, please let me know so that I may bring it to the judge's and law clerks' attention.

Thanks, sir.

Jenni

Jenni Bergreen
Courtroom Deputy to the
Honorable Harlin D. Hale
U.S. Bankruptcy Court
Northern District of Texas
214-753-2071

---

**From:** Packman, Stephen M. <spackman@archerlaw.com>
**Sent:** Monday, November 9, 2020 2:01 PM
**To:** Jenni Bergreen <Jenni_Bergreen@txnb.uscourts.gov>; Huber, Amy M. <ahuber@archerlaw.com>; TXNB Hdh_Settings <hdh_settings@txnb.uscourts.gov>
**Subject:** RE: In re: WALL007, LLC, et al.; Chapter 7 Case No. 20-31131-HDH

**CAUTION - EXTERNAL:**

thx

---

**From:** Jenni Bergreen <Jenni_Bergreen@txnb.uscourts.gov>
**Sent:** Monday, November 9, 2020 2:59 PM
**To:** Packman, Stephen M. <spackman@archerlaw.com>; Huber, Amy M. <ahuber@archerlaw.com>; TXNB Hdh_Settings <hdh_settings@txnb.uscourts.gov>
**Subject:** [EXT MAIL] Re: In re: WALL007, LLC, et al.; Chapter 7 Case No. 20-31131-HDH

So sorry for the delay. Our system is mostly down, and I've been limping along today without all the tools I need to be able to reply to your inquiry. I'm still working on this one, and just want you to know I haven't forgotten about it.

Jenni

Jenni Bergreen
Courtroom Deputy to the
Honorable Harlin D. Hale
U.S. Bankruptcy Court
Northern District of Texas
214-753-2071

---

**From:** Packman, Stephen M. <spackman@archerlaw.com>
**Sent:** Monday, November 9, 2020 7:38 AM
**To:** Huber, Amy M. <ahuber@archerlaw.com>; TXNB Hdh_Settings <hdh_settings@txnb.uscourts.gov>
**Subject:** RE: In re: WALL007, LLC, et al.; Chapter 7 Case No. 20-31131-HDH

**CAUTION - EXTERNAL:**

Thanks for you anticipated response today Ms. Bergreen.

---

**From:** Huber, Amy M. <ahuber@archerlaw.com>
**Sent:** Friday, November 6, 2020 3:18 PM
**To:** hdh_settings@txnb.uscourts.gov
**Cc:** Packman, Stephen M. <spackman@archerlaw.com>
**Subject:** In re: WALL007, LLC, et al.; Chapter 7 Case No. 20-31131-HDH

Dear Ms. Bergreen:

As a follow up to my voicemail to you of this morning, kindly advise us of the objection deadline Judge Hale has set for *Third Motion of Alleged Debtors to Dismiss Involuntary Petition With Prejudice* [DI 182]. Thank you.

**Amy M. Huber**
*Bankruptcy Administrative Assistant/Paralegal*
Stephen M. Packman, Esq.
Douglas G. Leney, Esq.
Tanneika A. Minott, Esq.
Jorge Garcia, Esq.

Archer & Greiner P.C.
Three Logan Square
1717 Arch Street, Suite 3500
Philadelphia, PA 19103
215-963-3300 (Ext. 5436)
ahuber@archerlaw.com
www.archerlaw.com

INFORMATION CONTAINED IN THIS E-MAIL TRANSMISSION IS PRIVILEGED AND CONFIDENTIAL. IF YOU ARE NOT THE INTENDED RECIPIENT OF THIS EMAIL, DO NOT READ, DISTRIBUTE OR REPRODUCE THIS TRANSMISSION (INCLUDING ANY ATTACHMENTS). IF YOU HAVE RECEIVED THIS E-MAIL IN ERROR, PLEASE IMMEDIATELY NOTIFY THE SENDER BY TELEPHONE OR EMAIL REPLY.

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

INFORMATION CONTAINED IN THIS E-MAIL TRANSMISSION IS PRIVILEGED AND CONFIDENTIAL. IF YOU ARE NOT THE INTENDED RECIPIENT OF THIS EMAIL, DO NOT READ, DISTRIBUTE OR REPRODUCE THIS TRANSMISSION (INCLUDING ANY ATTACHMENTS). IF YOU HAVE RECEIVED THIS E-MAIL IN ERROR, PLEASE IMMEDIATELY NOTIFY THE SENDER BY TELEPHONE OR EMAIL REPLY.

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

Joyce W. Lindauer
State Bar No. 21555700
Kerry S, Alleyne
State Bar No. 24066090
Guy H. Holman
State Bar No. 24095171
Joyce W. Lindauer Attorney, PLLC
1412 Main St., Suite 500
Dallas, Texas 75202
Telephone: (972) 503-4033
Facsimile: (972) 503-4034
Attorneys for Alleged Debtors

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | **Chapter 7** |
| | § | |
| **WALL007 LLC, *et al.*[1],** | § | **Case No. 20-31131-hdh7** |
| | § | **(Jointly Administered)** |
| **Alleged Debtors.** | § | |

**THIRD MOTION OF ALLEGED DEBTORS TO**
**DISMISS INVOLUNTARY PETITION WITH PREJUDICE**

**TO THE HONORABLE UNITED STATES BANKRUPTCY COURT:**

COME NOW WALL007, LLC *et al.* ("Alleged Debtors"), Alleged Debtors in the above-styled and numbered bankruptcy case, and, due to the Petitioners' willful failure to comply with the Court's Orders, file this their *Third Motion of Alleged Debtors to Dismiss Involuntary Petition with Prejudice* (the "Motion"), and in support thereof would respectfully show the Court:

1. As a preface to the Alleged Debtors' Motion, the Alleged Debtors call the following to the attention of the Court from the oral ruling on August 19, 2020:

- "The Petitioning Creditors did not really respond to Alleged Debtors' legality argument. Instead, the Petitioners claim that the difficulties associated with the

[1] The Alleged Debtors in these cases are: WALL007 LLC, WALL009 LLC, WALL010 LLC, WALL011 LLC, WALL012 LLC, WALL016 LLC, and WALL017 LLC.

COVID-19 crisis should excuse them from traveling to the United States for in-person depositions. During the hearing, counsel for the Petitioners did not specifically say there was a travel ban on Chinese nationals entering the United States. Rather, counsel argued that his clients would have to quarantine for 14 days upon entry to the United States and that doing so would be a great inconvenience."

- "The Court also believes that litigants who seek the benefit of the United States law must follow its process. And here, a serious concern has been raised that taking video depositions would violate Chinese law. While traveling to the US may be a great inconvenience and difficulty at this time, the Court believes it is necessary in this case to address both the legality issues and the identity concerns raised by the Alleged Debtors."
- "Because the willingness of the Petitioners to attend in-person depositions will affect several threshold issues, including the ability of the Petitioning Creditors to carry their evidentiary burdens and the identity concerns raised by the Alleged Debtors, **the Court will require that there is an agreement signed by counsel for the Petitioning Creditors that the Petitioning Creditors will appear for live depositions in the United States before any other discovery or motion practice will continue**."

All of the foregoing are contained in each of the Orders issued on September 4, 2020, requiring that:

- No discovery or motions practice shall continue unless and until a live deposition agreement signed by counsel for Petitioners is filed with the Court...;

- Petitioners are required to sign their answers to their interrogatories with their own "wet signatures" as opposed to the signature of Petitioners' counsel;
- Petitioners will provide Alleged Debtors with copies of passports of all of the Petitioners, upon request and that such passports will be submitted to the Court for in-camera inspection, upon request;
- Petitioners depositions shall be required to be taken in person in the United States, at a time and place agreeable to the Parties;
- Petitioners are required to produce all documents concerning transfers of funds from Chinese accounts to the Alleged Debtors that underlie the Petitioners' claims; and
- Petitioners are required to produce all documents concerning communications between Petitioners and Michael Fu.

## I. ARGUMENTS

### A. *When one party fails to comply with a court order, the other party may seek dismissal of the case.*

FED. R. CIV. P. 41(b) is applied to bankruptcy cases by FED. R. BANKR. P. 7041 and permits a court to dismiss a legal action or claim against an Alleged Debtor after a motion by said party if the Petitioner fails to prosecute or to comply with the Federal Rules of Civil Procedure or a court order. "The established Rule in the Fifth Circuit is that failure to comply with an order of the court is grounds for dismissal under Rule 41(b) only where there is a clear record of delay or non-compliance, and lesser sanctions would not serve the best interests of justice. *Hargest v. Horizon Auto. Grp., LLC (In re Hargest)*, Nos. 12-30360, 12-03024, 2012 Bankr. LEXIS 4936 at *7 (Bankr. S.D. Tex. 2012) (citing *Houston Citizens Bank & Trust Co. v. Dolleslager (In the Matter of Dolleslager)*, 618 F.2d 322, 324 (5th Cir. 1980)). The Court's authority to dismiss pursuant to

Rule 41(b) "flows from the court's inherent power to control its docket and prevent undue delays in the disposition of pending cases." *Elliott v. Sunrise Care*, No. 2:00-CV-86 (DF), 2006 U.S. Dist. LEXIS 2163 at *5 (E.D. Tex. 2006). To help the Court in its decision to invoke its powers under Rule 41(b), it may consider the extent to which the plaintiff (rather than counsel) was responsible for the delay, the degree to which the defendant endures actual prejudice, and whether the delay by the plaintiff has resulted from intentional conduct. *Rogers v. Kroger Co.*, 669 F.2d 317, 320 (5th Cir. 1982). When a party demonstrates a stubborn resistance to the Court's authority, dismissal with prejudice is justified. *Cotulla Style Pit Bar B Q, Inc. v. City of Laredo (In re Cotulla Style Pit Bar B Q, Inc.)*, No. L-09-14, 2009 U.S. Dist. LEXIS 55045 at *3-4 (S.D. Tex. 2009).

FED. R. CIV. P. 37(b)(2) is applied to bankruptcy cases by FED. R. BANKR. P. 7037 and permits the court where an action is pending to issue severe sanctions for a party's (or its representative's) failure to obey an order to provide or permit discovery. Such sanctions encompass the issuance of "further just orders" that may include, among other things, (i) prohibiting the disobedient party from supporting designated claims, or from introducing designated matters in evidence; (ii) dismissing the action or proceeding in whole or in part; or (iii) rendering a default judgment against the disobedient party. FED. R. CIV. P. 37(b)(2)(a)(ii), (v), and (vi). Dismissal under this rule is authorized when the failure to comply with the court's order results from a party's "willfulness or bad faith, accompanied by a clear record of delay or contumacious conduct, and not from the inability to comply." *Romero v. ABC Ins. Co*, 320 F.R.D. 36, 40 (W.D. La. 2017). Stated differently, dismissal is appropriate where a party's failure to comply with discovery has involved either repeated refusals or an indication of full understanding of discovery obligations coupled with a bad faith refusal to comply. *Griffin v. ALCOA*, 564 F.2d 1171, 1172 (5th Cir.1977). Dismissal is proper in situations where the deterrent value of Rule 37

cannot be substantially achieved by the use of less drastic sanctions. *Batson v. Neal Spelce Associates, Inc*., 765 F.2d 511, 514 (5th Cir.1985). It is further appropriate when the party's misconduct substantially prejudices the other party's preparation for trial. *Id*.

**B. The Petitioners have failed to take action required of them pursuant to multiple Court Orders resulting in purposeful delay and an inability to further prosecute this case.**

Here, both the Alleged Debtors and the Petitioners were in attendance at a hearing on August 19, 2020 wherein the Court informed them of its decision regarding several dispositive motions before it. Written Orders (Docket Numbers 165, 166, 167, 168, and 169) were entered by the Court on September 4, 2020. Orders issued by the Court and outlined *supra* were direct, understandable, and easy to follow. Yet, after more than seven weeks, Petitioners have failed to adhere to *any* of the requirements established by the Court.

Despite the Court's requirement that all discovery and motions practice shall be suspended until the receipt of a signed and filed live deposition agreement, the Petitioners inexplicably filed a Motion to Reconsider each of the Court's Orders without producing the mandated signed and filed Live Deposition Agreement. As such, that Motion to Reconsider was in direct contravention to several of the Court's Orders. Also, no interrogatories bearing the Petitioner's "wet signatures" have yet been produced as ordered. Such is required to ensure that the persons purported to be Petitioners are indeed claiming such status. Further, no copies of passports have been produced as requested, and which must be submitted to the Court to establish the existence and identity of persons claiming to be Petitioners (arguably a critical matter in this case). Despite the Alleged Debtor's repeated struggle to arrange face-to-face depositions of the Petitioners to be conducted in the United States, counsel for the Petitioners has failed to cooperate in this endeavor. Finally, no document production from Petitioners on certain matters (i.e. that concerning transfers of funds

from Chinese accounts to the Alleged Debtors and communications between and among the purported Petitioners and Michael Fu) has been provided.

Each of these documents is critical to the proper prosecution of this case by both sides. At the very least, they underlie the Petitioners' case and form the basis of each and every claim made against the Alleged Debtors. The failure of the Petitioners to produce them severely prejudices the Alleged Debtors since, without them, they have no ability to prepare their case for trial. Regardless of whether the failure to do so is the result of inaction on the part of the Petitioners or their counsel is irrelevant since the prejudicial effect on the Alleged Debtors is the same.

Either the purported Petitioners have the required documentation to give to their counsel or they do not. If they have done so, counsel for the Petitioners has offered no explanation for its delay in producing it. Regardless of the reason for the failure after seven weeks of delay (1) to sign and file the Live Deposition Agreement; (2) to produce the Petitioners' wet signatures on the petition; (3) to provide copies of the Petitioners' passports for review; (4) to submit documentation regarding funds transfers from Chinese accounts to the Alleged Debtors; (5) to present the communications between the Petitioners and Michael Fu; and (6) to cooperate in arranging for the deposition of selected Petitioners, it is apparent that such constitutes a willful refusal to comply with the Court's Orders, thereby demonstrating bad faith on the part of the Petitioners. This unexplained, yet apparently deliberate, delay has served to do nothing but stall these proceedings.

## II. CONCLUSION

Neither motions practice nor depositions may occur until the Petitioners comply with the Court's Orders, and yet they have demonstrated an unwillingness to do so, or to cooperate in any way that is constructive to the proper and timely prosecution of this case. Despite their clear understanding of the requirements enumerated in the aforementioned Court Orders, Petitioners

have demonstrated no intent to carry out such obligations in good faith. The Petitioners are responsible for this delay; they have actively and intentionally acted to create such delay; and the Alleged Debtors are clearly prejudiced by such delay (both by making it impossible for them to prepare a case in response to the Petitioners' claims and by causing undue and ongoing harm to their business in the form of other creditors unnecessarily seeking protections in an involuntary bankruptcy case that should never have been filed in the first place). As such, the conditions permitting the Court to dismiss this case with prejudice exist under the terms of both FED. R. CIV. P. 41(b) and FED. R. CIV. P. 37(b)(2).

## III. PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, WALL007, LLC et al. request that this Court enter an order dismissing this case with prejudice, and for such other and further relief to which it may be justly entitled.

Dated: October 12, 2020.

Respectfully submitted,

*/s/ Joyce W. Lindauer*

Joyce W. Lindauer
State Bar No. 21555700
Kerry S, Alleyne
State Bar No. 24066090
Guy H. Holman
State Bar No. 24095171
Joyce W. Lindauer Attorney, PLLC
1412 Main St., Suite 500
Dallas, Texas 75202
Telephone: (972) 503-4033
Facsimile: (972) 503-4034
Attorneys for Alleged Debtors
Email: joyce@joycelindauer.com
guy@joycelindauer.com
kerry@joycelindauer.com
Attorneys for Alleged Debtors

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on October 12, 2020, a true and correct copy of the foregoing document was served via email pursuant to the Court's ECF system upon all parties receiving electronic notice in this case.

*/s/ Joyce W. Lindauer*
Joyce W. Lindauer

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>WALL007 LLC, *et al.*,[1]<br><br>Alleged Debtors. | Chapter 7<br><br>Case No. 20-31131 (HDH)<br>(Jointly Administered) |

**OPPOSITION OF PETITIONING CREDITORS TO THE THIRD MOTION OF ALLEGED DEBTORS TO DISMISS INVOLUNTARY PETITIONS WITH PREJUDICE**

The Petitioning Creditors, Jun Li, Yunding Kang, Cunxiang Ji, Jin Wang, Peng Guo, Lin Zhou, Qu Chen, Kai Tian, Yijing Wu, Xuegeng Gong, Jin Wang, Weijia Kong, Heng Zhang, Hong Guo, Pei Guan, Yue Xu, Mai Ye, Chenchen Jiang, Qiuying Li, Ruinian Wu, Lin Zhou, Liying Yang, Yan Zhang, Wenjun Wang, Lan Ji, Ying Zhou, Lin Li, Li Jiang, Rufeng Ding, Cunxiang Ji, Lin Gao, Qiao Qin, Yue Zhang, Xiaodong Hao, Tianqing Song, Li Jiang, Weisi Wang, Xiaoquan Dai, Feng Yan, Heng Zhang, Ou Jiang, Jinzhe Wu, Yadan Liu, Wanwan Li, Wenjuan Yin, Jiancheng Chen, Yi Tang, Ying Zhang, Pengfei Dong, Kangying Mao, Yijing Wu, Li Jiang, Qin Chu, Yulan Chen, Sicheng Zhan, Pei Guan, Jingqiu Tang, Di Tang, Jun Zeng, Kui Wang, Yue Zhang, Jun Wang, Xiaomin Fan, Di Tang, Jialin Hu, Qin Chu, Jiaxiang Lu, Fuqing Chen, Hanjiang Fu, Aiguo Luo, Fang Ding, Xiangdong Zhu, Wai Ying, Yuan Yuan, Chao Xu, Guoqin Zhou, Yijing Wu (collectively, "Petitioning Creditors"), by and through their undersigned counsel, file this opposition (the "Third Opposition") to the Alleged Debtors', WALL007 LLC, WALL009 LLC, WALL010 LLC, WALL011 LLC, WALL012 LLC, WALL016 LLC, WALL017 LLC ("Alleged Debtors"), third motion to dismiss (the "Third MTD") the Involuntary Petitions (hereinafter, at times, the "Petitions" or the "Cases"). The Petitioning Creditors respectfully aver as follows:

[1] The Alleged Debtors in these cases are: WALL007 LLC, WALL009 LLC, WALL010 LLC, WALL011 LLC, WALL012 LLC, WALL016 LLC, WALL017 LLC. The Alleged Debtors' federal tax identification numbers are unknown to the Petitioning Creditors sat this time.

**INTRODUCTION**

The Alleged Debtors' Third MTD alleges principally that the Petitioning Creditors have not provided certain Court ordered documents to the Alleged Debtors and willfully failed to agree to produce certain Petitioning Creditors for "live depositions" in the United States. For the reasons set forth herein, the Third MTD should be denied or, at a minimum, continued until at least a time after the Motions for Leave to Appeal are heard by the U.S. District Court.

At the outset, it is noted that the Alleged Debtors' First Motion to Dismiss ("First MTD") is apparently pending for a hearing on the merits of the Petitions on December 30, 2020 (the "First MTD Hearing"). The First MTD Hearing was, according to the Clerk's office, unilaterally scheduled by Alleged Debtors' counsel. This date for a plenary hearing was scheduled by counsel without consulting with counsel for Petitioning Creditors. The date unilaterally scheduled is highly inconvenient for everyone in light of the holiday. However, the Petitioning Creditors and counsel are fully prepared to present their case in support of entry of the Petitions on a date to be set by the Court after the holidays.

The fact is that counsel for the Alleged Debtors has been in possession, since July of 2020, of documents from Petitioning Creditors (a) containing many admissions by the Alleged Debtors which refute their "identity" of the Petitioning Creditors' allegations and (b) clearly demonstrating Petitioning Creditors' proof in support of the Petitions. Despite what the Alleged Debtors state in their Third MTD, these documents contain, inter alia, communications between the Alleged Debtors, the Petitioning Creditors and Mr. Fu's agents as more fully set forth herein. They are also replete with proof of each of the Alleged Debtors' receipts of the loan monies from the Petitioning Creditors, acknowledgments of same given to each of the Petitioning Creditors and communications back and forth between the parties (many through Fu's agents) regarding why the funds have not been repaid and endless promises by the Alleged Debtors to repay them.

At trial of this matter, only three Petitioning Creditors for each Alleged Debtor entity must initially show that they hold claims against each of the respective Alleged Debtors that are not contingent as to liability or the subject of a bona fide dispute and which aggregate at least $10,000 more than the

value of any lien on property of the Alleged Debtor securing such claims held by the holders of such claims. Petitioning Creditors can easily demonstrate this to the Court based solely on the documents provided to Alleged Debtors' counsel as more fully set forth herein. Petitioning Creditors can further show, based on such documentation and admissions by the Alleged Debtors in those documents and in these Cases, that the Alleged Debtors are not paying their undisputed debts when due.

There are so many admissions regarding the validity of the asserted debts in the documents provided to Alleged Debtors' counsel (and the pleadings filed by the Alleged Debtors and other creditors in these Cases) that the Petitioning Creditors believe, in good faith, that their testimony is not necessary at trial to prove their case. This is why the Petitioning Creditors planned on filing Motions for Summary Judgment and would still do so if the Court permits it. They believe these Cases can be disposed of by the Court in summary fashion.

The Alleged Debtors' Second Motion to Dismiss (the "Second MTD") was decided by the Court on June 23, 2020, in favor of the Petitioning Creditors and denied. *See Docket No. 81*. The Second MTD also alleged an array of supposed procedural deficiencies which were all rendered moot by the time of the hearing.

The Third MTD is, like the Second MTD, solely a procedural motion as it is based on alleged failures of the Petitioning Creditors to comply with this Court's discovery orders ("Discovery Orders"). The Petitioning Creditors have not willfully failed to comply with the Discovery Orders. As to production of documents under the Discovery Orders, or as otherwise required by this Court (ie., "wet signatures" and passports), Petitioning Creditors have, in their view, fully complied with the Discovery Orders and other mandates of this Court.

As to the "live" depositions of certain of the noticed Petitioning Creditors, Petitioning Creditors' position is well known to the Court. Due to COVID-19 and the current travel ban in place, Petitioning Creditors have not authorized their counsel at this time to enter into a "Live Deposition Agreement" but have offered and continue to offer various reasonable alternatives to such depositions. Petitioning Creditors first address the document allegations herein and then the issue raised of the live depositions.

## PROCEDURAL HISTORY & STATEMENT OF FACTS

### *A. The Documents Requested have been Produced by Petitioning Creditors*

In the Third MTD, the Alleged Debtors identify the following discovery which they allege the Petitioning Creditors have not produced and which, according to them, warrant the draconian relief of dismissal of the Petitions:

1. Petitioning Creditors' "wet signatures" to the petitions. *See Third MTD, pg. 6*.
2. Petitioning Creditors' "wet signatures" to their answers to interrogatories. *Id. at pg. 3*.
3. Copies of Petitioning Creditors' passports. *Id*.
4. All documents concerning communications between Petitioning Creditors and Michael Fu. *Id*.
5. All documents concerning transfers of funds from Chinese accounts to the Alleged Debtors. *Id*.

The Alleged Debtors state as follows in their brief in support of the Third MTD:

> Either the purported Petitioners have the required documentation to give to their counsel or they do not. If they have done so, counsel for the Petitioners has offered no explanation for its delay in producing it. Regardless of the reason for the failure after seven weeks of delay (1) to sign and file the Live Deposition Agreement; (2) to produce the Petitioners' wet signatures on the petition; (3) to provide copies of the Petitioners' passports for review; (4) to submit documentation regarding funds transfers from Chinese accounts to the Alleged Debtors; (5) to present the communications between the Petitioners and Michael Fu; and (6) to cooperate in arranging for the deposition of selected Petitioners, it is apparent that such constitutes a willful refusal to comply with the Court's Orders, thereby demonstrating bad faith on the part of the Petitioners. This unexplained, yet apparently deliberate, delay has served to do nothing but stall these proceedings.

However, quite contrary to the statements to this Court above, the Petitioning Creditors have produced the required documents to counsel as follows.

1. As set forth in the Certification of Jiangang Ou, Esquire (the "Ou Certification") [*Docket No. 84*], Petitioning Creditors provided their original "wet signatures" relative to the Petitions. On July 7, 2020, Petitioning Creditors provided Alleged Debtors' counsel with a DropBox link containing copies of their "wet signatures" relative to the Petitions. A redacted copy of the July 7, 2020, email to Joyce Lindauer is attached hereto as Exhibit "A".

2. As set forth in the Declarations of Amy M. Huber (the "Huber Declarations") [*Docket Nos. 111, 112, 113, 114, 115, 116 and 117*], the Petitioning Creditors confirmed the validity of their "wet signatures" appearing on the Petitions.

3. Petitioning Creditors provided their discovery "wet signatures" to the Court and Alleged Debtors as set forth in the Declaration of Stephen M. Packman ("Packman Declaration") [*Docket No. 213*] and Supplemental Declaration of Stephen M. Packman ("Supplemental Packman Declaration", collectively with the Packman Declaration, the "Packman Declarations") [*Docket No. 244*] on October 30, 2020 and November 5, 2020, respectively.

4. On August 27, 2020, Petitioning Creditors provided Alleged Debtors' counsel with emails containing all of their passports, except for Lin Li, a lender of WALL011, LLC, who gave his Chinese I.D. card. Additionally, on October 30, 2020, Petitioning Creditors' provided all of their passports and the Chinese I.D. card to the Court and the Alleged Debtors via DropBox link contained in the Packman Declaration. *See Packman Declaration*. Copies of the August 27 2020 emails to Joyce Lindauer and the redacted October 30, 2020 email to the Court are attached as Exhibits "B" and "C", respectively.

5. Copies of all communications between Petitioning Creditors and Mr. Fu's employees and agents were produced as part of the Petitioning Creditors' responses to Alleged Debtors' First Set of Discovery Requests ("Discovery Responses"), on July 13, 2020 and July 29, 2020. [*Docket No. 119 at para. 19*]. A redacted copy of the July 13, 2020 and July 29, 2020 emails to Joyce Lindauer providing the DropBox link to the documents are attached as Exhibit "D". Separately, the Petitioning Creditors are submitting to the Court the DropBox link for privacy reasons.

6. As contained in the DropBox link, copies of the Alleged Debtors' acknowledgements of the loan funds, wire receipts, bank account snapshots and other proof of funding from Petitioning Creditors to the Alleged Debtors (**and the Alleged Debtors' receipt thereof**) was also provided to counsel for the Alleged Debtors on July 13, 2020 and July 29, 2020. *Id*.

The Court is respectfully urged to review the documents produced by Petitioning Creditors to Ms. Lindauer on July 13 2020 and July 29, 2020, before ruling on the Third MTD. Counsel for the Alleged Debtors has been in possession of these responsive documents for over four months but now seemingly represents to this Court that the Alleged Debtors did not receive them. Annexed as Exhibit "E" are a sampling of some of the relevant documents from the subject DropBox link counsel received on July 13, 2020 and July 29, 2020. As the Court can plainly surmise, the documents included communications between Petitioning Creditors and Mr. Fu's agents (@yding.cn), communications between the Petitioning Creditors and the Alleged Debtors and Mr. Barton and Ms. Lindauer, proof of wire transfers from the Petitioning Creditors to the Alleged Debtors, proof of receipt of the loan proceeds, acknowledgment that the funds have not been repaid and many other documents which the Alleged Debtors demanded.

Further, Petitioning Creditors have provided counsel and the Court with copies of all of their passports and "wet signatures" on their petitions and discovery certifications as reflected by the Ou Certification, Huber Declarations and Packman Declarations as aforesaid. The Alleged Debtors' assertion that Petitioning Creditors have not complied with this Court's orders and mandates relative to documents and signatures is not true.

***B. The Live Depositions are the Subject of Petitioning Creditors' Interlocutory Appeal***

On November 3, 2020, Petitioning Creditors filed their Motions (A) for Leave to File an Interlocutory Appeal and (B) Requesting Certification to the United States Court of Appeals for the Fifth Circuit [*Docket Nos. 221, 226, 231, 236, and 241*]. On November 17, 2020, via letter from Stephen Manz, Law Clerk to the Honorable Harlin D. Hale, this Honorable Court advised that the Petitioning Creditors' Motions for Leave to Appeal ("Motions for Leave") should be heard by the United States District Court for the Northern District of Texas ("District Court"). The District Court has not yet scheduled the Motions for Leave for hearing or other consideration. The Petitioning Creditors believe, as set forth herein, that the District Court must rule on the Motions for Leave prior to this Court ruling on the Third MTD. However, even if this Court disagrees, there are less egregious alternatives than dismissal if the Petitioning Creditors cannot travel here to appear for depositions prior to a hearing or trial on the First MTD.

## LEGAL ARGUMENT

***A. The Alleged Debtors Have Produced no Evidence of Bad Faith or Willful Intent by Petitioning Creditors which Would Support Dismissal of the Petitions***

The Alleged Debtors attempt to divert the Court's attention from the real, substantive issues for adjudication in these Cases by advancing misleading allegations regarding Petitioning Creditors' compliance with the Discovery Orders and the mandates of this Court. There is no basis to dismiss the Petitions under F.R.B.P. 41(b).

As noted by the Alleged Debtors, F.R.C.P. 41(b) is applied to bankruptcy cases by F.R.B.P. 7041, and permits a court to dismiss a legal action or claim against an Alleged Debtor after a motion by said

party if the Petitioner fails to prosecute or to comply with the Federal Rules of Civil Procedure or a court order. Importantly, dismissal under the subject Rule is authorized when the failure to comply with the court's order results from a party's **"willfulness or bad faith, accompanied by a clear record of delay or contumacious conduct, and not from the inability to comply**." *Romero v. ABC Ins. Co,* 320 F.R.D. 36, 40 (W.D. La. 2017)[*emphasis supplied*]. Dismissal is only appropriate where a party's failure to comply with discovery has involved either repeated refusals or an indication of full understanding of discovery obligations coupled with a bad faith refusal to comply. *Griffin v. ALCOA,* 564 F.2d 1171, 1172 (5th Cir.1977). Dismissal is proper in situations where the deterrent value of Rule 37 cannot be substantially achieved by the use of less drastic sanctions. *Batson v. Neal Spelce Associates, Inc.,* 765 F.2d 511, 514 (5th Cir.1985).

The United States Court of Appeals for the Fifth Circuit has stated quite clearly that the "death penalty" of dismissal should be applied only in extreme circumstances and requires a heightened standard of inquiry by the trial court.

> Our case law imposes a heighted standard for litigation-ending sanctions (sometimes called "death penalty" sanctions). For a lesser sanction, we broadly require the district court to determine the sanctions are "just" and "related to the particular 'claim' which was at issue in the order to provide discovery." Compaq Comput. Corp. v. Ergonome Inc., 387 F.3d 403, 413 (5th Cir. 2004) (quoting Ins. Corp. of Ir. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 707 (1982)). **But the district court must make four additional findings to impose a litigation-ending sanction: (1) the discovery violation was committed willfully or in bad faith; (2) the client, rather than counsel, is responsible for the violation; (3) the violation "substantially prejudice[d] the opposing party"; and (4) a lesser sanction would not "substantially achieve the desired deterrent effect." FDIC v. Conner, 20 F.3d 1376, 1380-81 (5th Cir. 1994) [*emphasis supplied*]**.
>
> Rule 37 empowers the district court to compel compliance with Federal discovery procedures through a broad choice of remedies and penalties, including dismissal with prejudice. Griffin's unexcused failure to appear for deposition rendered him liable for a sanction. Although the district court has wide latitude in framing orders and in penalizing failure to comply, that discretion has limits. B. F. Goodrich Tire Co. v. Lyster, 328 F.2d 411, 415 (5th Cir. 1964). Dismissal of a complaint with prejudice is such a drastic remedy that a district court should apply it only in extreme circumstances. Bon Air Hotel, Inc. v. Time, Inc., 376 F.2d 118, 121 (5th Cir. 1967). See also Emerick v. Fenick Industries, Inc., 539 F.2d 1379, 1381 (5th Cir. 1976).
>
> Our function as an appellate court is not to determine whether this court would have dismissed the complaint as an original matter, but whether the district court abused its discretion in doing so. National Hockey League v. Metropolitan Hockey Club, 427 U.S. 639, 641, 96 S. Ct. 2778, 2780, 49 L. Ed. 2d 747, 750 (1976). Central to this review of

> discretion is whether the district court could have fashioned an equally effective but less drastic remedy. Diaz v. Southern Drilling Co., 427 F.2d 1118, 1126-27 (5th Cir. 1970). *Law Funder, LLC v. Munoz*, 924 F. 3d 753 (5th Cir. 2019).

The Fifth Circuit Court has provided guidance on what the term "bad faith" means in the discovery context. In *Vick v. Texas Employment Commission*, 514 F.2d 734 (5th Cir. 1975), the Fifth Circuit Court of Appeals explained that an adverse inference drawn from the destruction of records must be predicated on bad conduct, which was absent in that defendant's actions. *Id*. The Court went on to explain that "bad faith" would be demonstrated by destructive actions driven by "consciousness of a weak case." *Id*. at 737. Thus, in Vick, the Court described bad faith as conduct demonstrating an intent to remove evidence because it could harm the spoliator's case.

### *1. The Document Production Allegations*

First, the Alleged Debtors ask this Court to dismiss the Petitions based on allegations that the Petitioning Creditors have not complied with this Court's Discovery Orders and mandates. The Alleged Debtors have made absolutely no showing of such non-compliance or of any bad faith or willful intent by Petitioning Creditors to avoid compliance with this Court's orders.

As to the paper discovery allegations by the Alleged Debtors, counsel states as follows:

> Also, no interrogatories bearing the Petitioner's "wet signatures" have yet been produced as ordered. Such is required to ensure that the persons purported to be Petitioners are indeed claiming such status. Further, no copies of passports have been produced as requested, and which must be submitted to the Court to establish the existence and identity of persons claiming to be Petitioners (arguably a critical matter in this case). Despite the Alleged Debtor's repeated struggle to arrange face-to-face depositions of the Petitioners to be conducted in the United States, counsel for the Petitioners has failed to cooperate in this endeavor. Finally, no document production from Petitioners on certain matters (i.e. that concerning transfers of funds from Chinese accounts to the Alleged Debtors and communications between and among the purported Petitioners and Michael Fu) has been provided.

As thoroughly detailed herein, and the attachments hereto, these statements are simply incorrect and border on being outright false. Petitioning Creditors twice produced "wet signatures." Petitioning Creditors twice produced Passports to counsel for the Alleged Debtors. The Petitioning Creditors produced documents relative to funding and communications to counsel on July 13, 2020 and July 29, 2020. The Alleged Debtors have done everything but make it easy upon the Petitioning Creditors to arrange for

depositions of Timothy Barton, Murugan Venkat, Saskya Bedoya and Hongpeng Lin, despite their names being plastered upon the documents produced by the Petitioning Creditors to the Alleged Debtors' counsel on July 13 and 19, 2020 (and the numerous damaging admissions therein).

The evidence demonstrates that Petitioning Creditors have fully complied with the Discovery Orders as to document production. *See pages 5-6, supra*. The evidence of record in these Cases demonstrates that Petitioning Creditors have **twice** produced "wet signatures," once relative to the Petitions and then as ordered regarding written discovery responses. *Id. at page 5*. The evidence demonstrates that Petitioning Creditors **twice** provided their Passports to the Alleged Debtors' counsel, once in August and then again more recently on October 30, 2020. *Id. at page 5*. The Alleged Debtors' counsel simply ignores the evidence and, instead, creates allegations to support a request for the most drastic remedy this Court could fashion, dismissal of the Petitions.

Dismissal is surely not the least onerous alternative here. After considering all of the true evidence, if the Court believes that Petitioning Creditors have not complied with the Discover Orders relative to documents, the Court can certainly fashion relief for the Alleged Debtors short of outright dismissal of the Petitions.

Discovery compliance has come at a great cost in this Case for the Petitioning Creditors. It is not an easy task for the Petitioning Creditors (in China) or their counsel here in the U.S., to constantly jump through the endless procedural hoops and road blocks advanced by the Alleged Debtors to avoid litigation of the actual merits of the Petitions. Yet, Petitioning Creditors have tried, in good faith, to comply with this Court's orders during this entire proceeding despite the COVID-19 pandemic, the language barriers, the time differences and the Alleged Debtors' protestations to the contrary.

The Alleged Debtors, on the other hand, have not been so compliant. They have, collectively, produced only forty nine (49) pages of documents, far short of what has been requested. They have yet to produce Mr. Barton, Mr. Venkat, Ms. Bedoya (no evidence of a doctor's note as ordered by the Court has been provided), and Mr. Lin. The documents in the DropBox Link are full of communications on behalf of the Alleged Debtors between these individuals and the Petitioning Creditors and/or Fu's agents. Mr.

Venkat has evaded service after repeated attempts by Petitioning Creditors to serve him. Ms. Bedoya stated to this Court that she cannot appear for medical reasons yet nothing has been produce by her to that effect and as the Court has ordered. No deposition date for Mr. Barton has been suggested or set. And, Mr. Lin has retained separate counsel who also has not suggested or set a deposition date. There has been no cooperation by them or their counsel in these Cases.

### *2. The "Live Deposition" Allegations*

On September 4, 2020, the Court ordered the following:

> ORDERED that the petitioners' depositions shall be required to be taken in person, in the United States, at a time and place agreeable to the Parties; it is further
>
> ORDERED that the Court requires that counsel for the Petitioners shall sign an agreement that the petitioners will appear for live depositions in the United States, and that Counsel for the Petitioners shall file such agreement ("Live Deposition Agreement") with the Court. *Docket No. 168.*

The Petitioning Creditors have not intentionally or willfully refused to submit to depositions as maintained by the Alleged Debtors. The Alleged Debtors assert that the Petitioning Creditors were prohibited by the Court from filing a Motion for Reconsideration but how else procedurally were the Petitioning Creditors supposed to protect their rights to disagree with the Court and ask the Court to consider an alternative method for the depositions (such as via video in Macau)? On reconsideration, the Petitioning Creditors asked this Court to take into account that counsel for the Petitioning Creditors was wrong about the Petitioners being able to quarantine in the United States. Petitioning Creditors asked this Court to take into consideration the partial "opening up" of Macau to travel by mainland Chinese. The Court disagreed with the Petitioning Creditors and the matter of Live Deposition Agreement is now on appeal before the District Court.

Petitioning Creditors have not intentionally delayed these proceedings or refused to submit to "live" depositions in the United States. Their position on appeal is quite simply that they cannot travel to the United States at this time for legal and health reasons. Given the circumstances of this Case and the worsening global pandemic, Petitioning Creditors and their counsel believe, **<u>in good faith</u>**, that the "live" depositions are not warranted. The Petitioning Creditors are not refusing to be deposed. There is no

willful intent or bad faith motive here by Petitioning Creditors. If the Petitioning Creditors could travel here directly for what will amount to short depositions they would do so.

The fact is that they cannot travel here at this time and there are less harsh alternatives to address the "identity" verification issue raised by the Alleged Debtors. The availability of lesser alternatives is one of the issues which Petitioning Creditors have raised on appeal. The Alleged Debtors somehow extrapolate bad faith or willful refusal from these facts. Petitioning Creditors have offered various alternatives to "live depositions" which would serve the purpose intended (identifying the Petitioning Creditors as the lenders).

First, the Petitioning Creditors offered depositions by video from China. The Alleged Debtors refused that offer arguing that the depositions were "likely illegal." Second, the Petitioning Creditors then provided written discovery to the Alleged Debtors, including thousands of pages of documents which, in the Petitioning Creditors view, establish clearly that they are the lenders and that their identity and their loan money has been acknowledged repeatedly in writing by the Alleged Debtors. The Alleged Debtors' own loan documents and communications with Petitioning Creditors, will conclusively estop them from arguing otherwise.

Second, the Petitioning Creditors offered to appear for video depositions in Macau now that the travel ban of mainland Chinese to Macau has been eased. This too was rejected by the Alleged Debtors although depositions of Chinese citizens are permitted to be taken there. Contrary to the Court's prior determination, mainland Chinese (with very limited exceptions for special and remote regions) can travel to Macau provided that they have a COVID-19 test result demonstrating that they are not infected within 7 days of their travel:




https://news.gov.mo/detail/en/N20KXUd4P1;jsessionid=8B00BD2915298EA95B1EA26BBEDFE26D.app01?0 *See also* https://www.worldaware.com/covid-19-alert-macau-china-maintains-existing-restrictions.

Third, the Petitioning Creditors noticed **will agree** to travel here for depositions when the travel ban imposed by the Presidential Proclamation is lifted and it is safe to do so (i.e., there is a vaccine available to them). Until then, Petitioning Creditors cannot travel here. It is has nothing to do with their willful refusal to be deposed or bad faith intent as argued by the Alleged Debtors without any evidence thereof.

Petitioning Creditors are just as eager as the Alleged Debtors to have this matter adjudicated. However, they ask the Court to adjudicate this case on the merits. The Court can easily make a

determination at trial whether or not the Petitioning Creditors are, in fact, the lenders from the loan documents, from their testimony should it be required (subject to cross-examination) and from the testimony of the Alleged Debtors and third-party witnesses. There are clearly various less severe alternatives available here short of dismissal of the Petitions.

The Court has previously indicated that if the Petitioning Creditors cannot appear for depositions, the Court will consider what, if any, negative inferences might be drawn therefrom. *See, e.g., the Joint Discovery Plan, para. 9*. The Court did not pre-determine that the Petitions would be dismissed if the Petitioning Creditors could not presently travel here for live depositions. Petitioners will make themselves available by video for trial if necessary and the issue of what, if any, limitations will be inferred as to that testimony is a trial issue which is not before the Court at present. Petitioning Creditors ask this Court to deny the Third MTD and then schedule a hearing or trial on the Petitions and First MTD at the Court's first opportunity.

### B. Petitioning Creditors Submit that the Court Should Not Consider the Third MTD until the District Court Rules on the Motions for Leave

From a procedural perspective, a critical issue is whether or not the Court is going to consider the Third MTD prior to the District Court's consideration of the Motions for Leave. Petitioning Creditors submit that the current procedural posture of these Cases warrants the Court to refrain from deciding the Third MTD until the District Court renders a decision on the Motions for Leave. The District Court has not yet scheduled the Motions for Leave for consideration.

If the District Court grants leave to appeal, this Court will then either certify the "live deposition" issue to the Fifth Circuit, or not. Then the requisite appellate court will hear the matter. The appeal, if granted, **will not take years to decide**. The appeal concerns a discrete discovery issue (the "Live Depositions") which is of first impression and has great current importance given the Presidential Proclamation and the worsening global pandemic. The underlying issue has already been extensively briefed by both sides on the Motions for Leave. The delay will not be significant. The Court can still schedule the hearing or trial on the Petitions and First MTD for after the holidays and, in fact, the

scheduling of same in later January or February would give the appellate courts the impetus to decide the matter expeditiously.

The Petitioning Creditors request that the Court deny the Third MTD or, at the least, adjourn it until such time as the District Court renders a decision on the Motions for Leave. Petitioning Creditors submit that procedurally this makes the most sense at this time for the Cases to move forward in a logical, orderly fashion.

## CONCLUSION

Based on the foregoing, the Petitioning Creditors respectfully request that the Third MTD be denied in its entirety or, alternatively, that the Court adjourn consideration of same until the District Court determines the Motions for Leave.

Dated: November 24, 2020

/s/ *Stephen M. Packman*
Jiangang Ou
Nguyen & Chen LLP
11200 Westheimer Road Suite 120
Houston, TX 77042
Tel: 832-767-0339
Email: jou@nguyen-chen.com

Stephen M. Packman
Archer & Greiner, P.C.
Three Logan Square
1717 Arch St., Suite 3500
Philadelphia, PA 19103
Tel: 215-246-3147
Email: spackman@archerlaw.com

*Counsel for the Petitioning Creditors*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 24, 2020, I caused to be served a copy of the foregoing by electronic mail upon all parties receiving notice through the Court's CM/ECF Noticing System

*/s/ Stephen M Packman*
Stephen M. Packman, Esquire

219811164v1

# EXHIBIT "A"

**Huber, Amy M.**

**From:** Joyce Lindauer <joyce@joycelindauer.com>
**Subject: RE: Wall - Certification re: Wet-Signatures**
**Date:** July 7, 2020 at 2:45:13 PM CDT
**To:** jou nguyen-chen.com <jou@nguyen-chen.com>

Thank you

---

**From:** jou nguyen-chen.com <jou@nguyen-chen.com>
**Sent:** Tuesday, July 7, 2020 1:10 PM
**To:** Joyce Lindauer <joyce@joycelindauer.com>
**Cc:** Jorge Garcia <jgarcia@archerlaw.com>; Stephen Packman <spackman@archerlaw.com>
**Subject:** Re: Wall - Certification re: Wet-Signatures

[redacted]

We received Liying Yang's early today so only two are pending.

On Jul 7, 2020, at 11:11 AM, Joyce Lindauer <joyce@joycelindauer.com> wrote:

Could you also provide us copies of the wet signatures – thank you

---

**From:** Garcia, Jorge <jgarcia@archerlaw.com>
**Sent:** Monday, July 6, 2020 8:53 PM
**To:** Joyce Lindauer <joyce@joycelindauer.com>
**Cc:** Packman, Stephen <spackman@archerlaw.com>; jou nguyen-chen.com <jou@nguyen-chen.com>
**Subject:** Wall - Certification re: Wet-Signatures

Ms. Lindauer:

Attached is the Certification of Jiangang Ou, Esquire regarding Receipt of Original "Wet-Signature" Petitions and Declarations from Petitioning Creditors that I filed today. We filed this with the Court earlier today, docket no. 85 and 86, but apparently there is a technical issue and the filings do not show up on the docket or on PACER. I will be contacting the Court regarding this issue tomorrow morning, but wanted to get this to you today due to the Court's deadline.

If you have any questions, please let me know.

Thanks,
Jorge

**Jorge Garcia, Esq.**

Archer & Greiner P.C.
Three Logan Square
1717 Arch Street, Suite 3500
Philadelphia, PA 19103
215-246-3102
jgarcia@archerlaw.com
www.archerlaw.com

<~WRD3490.jpg>

INFORMATION CONTAINED IN THIS E-MAIL TRANSMISSION IS PRIVILEGED AND CONFIDENTIAL. IF YOU ARE NOT THE INTENDED RECIPIENT OF THIS EMAIL, DO NOT READ, DISTRIBUTE OR REPRODUCE THIS TRANSMISSION (INCLUDING ANY ATTACHMENTS). IF YOU HAVE RECEIVED THIS E-MAIL IN ERROR, PLEASE IMMEDIATELY NOTIFY THE SENDER BY TELEPHONE OR EMAIL REPLY.

# EXHIBIT "B"

**Huber, Amy M.**

| | |
|---|---|
| **From:** | jou nguyen-chen.com <jou@nguyen-chen.com> |
| **Sent:** | Monday, November 23, 2020 7:32 PM |
| **To:** | Huber, Amy M. |
| **Cc:** | Packman, Stephen M. |
| **Subject:** | [EXT MAIL] Fwd: contact information for the Chinese Lenders |
| **Attachments:** | wall 007.zip; wall 009.zip; wall 012.zip |

Begin forwarded message:

**From:** jou nguyen-chen.com <jou@nguyen-chen.com>
**Subject: Fwd: contact information for the Chinese Lenders**
**Date:** August 27, 2020 at 10:08:27 AM CDT
**To:** Joyce Lindauer <joyce@joycelindauer.com>
**Cc:** Stephen Packman <spackman@archerlaw.com>

Joyce,

FYI. —The original email and the three(3) zipped documents attached thereto proving passports of lenders were sent to the Alleged Debtors at their request.

Please let us know the names of the Petitioning Creditors of whom the Alleged Debtors allege do not have a copy of passport so we can verify and double check and help save the Court's time and efforts. Please be noted that our roles are not only clients' lawyers but also the court's officers.

Jiangang "James" Ou
Attorney at Law

Nguyen & Chen, LLP
11200 Westheimer Suite 120
Houston, Texas 77042
(832)767-0339
(832)767-0669 (fax)
jou@nguyen-chen.com

CONFIDENTIALITY NOTICE: The information in this electronic message may be privileged and confidential and is intended for the use of the individual or entity named above. If you are not the intended recipient, you are on notice that any unauthorized disclosure, copying, distribution, or taking of any action in reliance on the contents of this message is prohibited.

------------------ Original ------------------
**From:** "樊玲"<tidy@yding.cn>;
**Date:** Tue, Jun 18, 2019 04:51 PM
**To:** "Murugan Venkat"<mvenkat.jmj@gmail.com>;
**Cc:** "Tim Barton"<tbarton@jmjdevelopment.com>; "周霖"<lynn@yding.cn>; "Sohail Quraeshi"<sqpolo@gmail.com>; "Hongpeng Lin"<HLin@jmjdevelopment.com>; "Allen Zhang"<allen.zhang@yding.cn>;
**Subject:** Re: contact information for the Chinese Lenders

Hi Ven,
Kindly to check attachment as passport pictures for WALL007/WALL009/WA012, we are wait the last 4 from clients, after we received , we will send to you immediately.
About the WeChat ID, we will provide all list to Hong today.

------------------
Tidy Fan
tidy@yding.cn
+86-13918867172

------------------ Original ------------------
**From:** "Murugan Venkat"<mvenkat.jmj@gmail.com>;
**Date:** Mon, Jun 17, 2019 11:00 PM
**To:** "樊玲"<tidy@yding.cn>;
**Cc:** "Tim Barton"<tbarton@jmjdevelopment.com>; "周霖"<lynn@yding.cn>; "Sohail Quraeshi"<sqpolo@gmail.com>; "Hongpeng Lin"<HLin@jmjdevelopment.com>; "Allen Zhang"<allen.zhang@yding.cn>;
**Subject:** Re: contact information for the Chinese Lenders

Hello Tidy
Please send the copy of the passports for all these investors ASAP
**Thanks & regards**
**Murugan Venkat**
On Mon, Jun 17, 2019 at 8:19 AM 樊玲 <tidy@yding.cn> wrote:

> Hi, Tim,
> Kindly to check attachment as client list with name/cell number/address/passport or ID number on Wall007,Wall009,Wall012, we will add wechat ID information after we collect everyone, try to update tomorrow.
> ------------------
> Tidy Fan
> tidy@yding.cn
> +86-13918867172

**Huber, Amy M.**

| | |
|---|---|
| **From:** | jou nguyen-chen.com <jou@nguyen-chen.com> |
| **Sent:** | Thursday, August 27, 2020 11:16 AM |
| **To:** | Joyce Lindauer |
| **Cc:** | Packman, Stephen |
| **Subject:** | [EXT MAIL] Fwd: wall 010 011 护照 |
| **Attachments:** | wall 010.zip; wall 011.zip |

Joyce,

FYI. —The original email and zipped documents attached thereto proving passports of lenders were sent to the Alleged Debtors at their request.

Please let us know the names of the Petitioning Creditors of whom the Alleged Debtors allege do not have a copy of passport so we can verify and double check ***and help save the Court's time and efforts. Please be noted that our roles are not only clients' lawyers but also the court's officers.***

Jiangang "James" Ou
Attorney at Law

Nguyen & Chen, LLP
11200 Westheimer Suite 120
Houston, Texas 77042
(832)767-0339
(832)767-0669 (fax)
jou@nguyen-chen.com

CONFIDENTIALITY NOTICE: The information in this electronic message may be privileged and confidential and is intended for the use of the individual or entity named above. If you are not the intended recipient, you are on notice that any unauthorized disclosure, copying, distribution, or taking of any action in reliance on the contents of this message is prohibited.

------------------ Original ------------------

**From:** "樊玲"<tidy@yding.cn>;
**Date:** Wed, Jun 19, 2019 08:18 PM
**To:** "Hongpeng Lin"<hlin@jmjdevelopment.net>; "Hongpeng Lin"<hlin@jmjdevelopment.com>;
**Subject:** wall 010 011 护照

**今天**发的护照照片太大了，我怕万一收不到，再分成两份邮件发给你

-----------------

Tidy Fan
tidy@yding.cn
+86-13918867172

**Huber, Amy M.**

**From:** jou nguyen-chen.com <jou@nguyen-chen.com>
**Sent:** Thursday, August 27, 2020 11:17 AM
**To:** Joyce Lindauer
**Cc:** Packman, Stephen
**Subject:** [EXT MAIL] Fwd: wall 016 017 护照
**Attachments:** wall 016.zip; wall 017.zip

Joyce,

FYI. —The original email and zipped documents attached thereto proving passports of lenders were sent to the Alleged Debtors at their request.

Please let us know the names of the Petitioning Creditors of whom the Alleged Debtors allege do not have a copy of passport so we can verify and double check ***and help save the Court's time and efforts. Please be noted that our roles are not only clients' lawyers but also the court's officers.***

Jiangang "James" Ou
Attorney at Law

Nguyen & Chen, LLP
11200 Westheimer Suite 120
Houston, Texas 77042
(832)767-0339
(832)767-0669 (fax)
jou@nguyen-chen.com

CONFIDENTIALITY NOTICE: The information in this electronic message may be privileged and confidential and is intended for the use of the individual or entity named above. If you are not the intended recipient, you are on notice that any unauthorized disclosure, copying, distribution, or taking of any action in reliance on the contents of this message is prohibited.

**From:** "樊玲"<tidy@yding.cn>;
**Date:** Wed, Jun 19, 2019 08:19 PM
**To:** "Hongpeng Lin"<hlin@jmjdevelopment.net>; "Hongpeng Lin"<hlin@jmjdevelopment.com>;
**Subject:** Re:wall 016 017 护照

这是016和017的

------------------
Tidy Fan
tidy@yding.cn
+86-13918867172

------------------ Original ------------------
**From:** "樊玲"<tidy@yding.cn>;
**Date:** Wed, Jun 19, 2019 08:18 PM
**To:** "Hongpeng Lin"<hlin@jmjdevelopment.net>; "Hongpeng Lin"<hlin@jmjdevelopment.com>;
**Subject:** wall 010 011 护照

今天发的护照照片太大了，我怕万一收不到，再分成两份邮件发给你

------------------
Tidy Fan
tidy@yding.cn
+86-13918867172

# EXHIBIT "C"

**Huber, Amy M.**

| | |
|---|---|
| **From:** | Huber, Amy M. <ahuber@archerlaw.com> |
| **Sent:** | Friday, October 30, 2020 3:23 PM |
| **To:** | hdh_settings@txnb.uscourts.gov |
| **Cc:** | Packman, Stephen M.; joyce@joycelindauer.com; Jiangang "James" Ou (jou@nguyen-chen.com) |
| **Subject:** | In re WALL007, LLC, et al., Chapter 7 Bankruptcy Case No. 20-31131 (HDH) (Bankr. N.D. Tex.) |
| **Attachments:** | (219647693 – 3) - 2020.10.30 - Letter to Jennie Bergreen, Judge Hale_s Courtroom Deputy enclosing Declration of Stephen M. Packman (COMPLETE).PDF |

Dear Ms. Bergreen:

On behalf of Stephen M. Packman, Esquire, please review the attached correspondence. Thank you.

**Amy M. Huber**
*Bankruptcy Administrative Assistant/Paralegal*
Stephen M. Packman, Esq.
Douglas G. Leney, Esq.
Tanneika A. Minott, Esq.
Jorge Garcia, Esq.

Archer & Greiner P.C.
Three Logan Square
1717 Arch Street, Suite 3500
Philadelphia, PA 19103
215-963-3300 (Ext. 5436)
ahuber@archerlaw.com
www.archerlaw.com

INFORMATION CONTAINED IN THIS E-MAIL TRANSMISSION IS PRIVILEGED AND CONFIDENTIAL. IF YOU ARE NOT THE INTENDED RECIPIENT OF THIS EMAIL, DO NOT READ, DISTRIBUTE OR REPRODUCE THIS TRANSMISSION (INCLUDING ANY ATTACHMENTS). IF YOU HAVE RECEIVED THIS E-MAIL IN ERROR, PLEASE IMMEDIATELY NOTIFY THE SENDER BY TELEPHONE OR EMAIL REPLY.

ARCHER
ATTORNEYS AT LAW

**Stephen M. Packman**
*Fellow of INSOL*
*Also Member of Pennsylvania and New York Bar*
spackman@archerlaw.com
215-246-3147 (Ext. 5147) Direct

Archer & Greiner, P.C.
Three Logan Square
1717 Arch Street, Suite 3500
Philadelphia, PA 19103-2739
215-963-3300 Main
215-963-9999 Fax
www.archerlaw.com

October 30, 2020

**VIA EMAIL**

Jenni Bergreen, Courtroom Deputy to the
Honorable Harlin D. Hale
U.S. Bankruptcy Court
Northern District of Texas
Earle Cabell Federal Building
1100 Commerce Street, 14th Floor
Courtroom #3
Dallas, TX 75242-1496
hdh_settings@txnb.uscourts.gov

Re: In re WALL007, LLC, et al.[1]
Chapter 7 Bankruptcy Case No. 20-31131 (HDH) (Bankr. N.D. Tex.)
Our File No. WAL347-00961

Dear Ms. Bergreen:

Enclosed please find the Declaration of Stephen M. Packman (the "Declaration") regarding the Petitioning Creditors' passports and wet signatures verifying their responses to the Alleged Debtors' discovery requests. Please note, in order to protect the Petitioning Creditors' privacy, the Declaration is being submitted directly to you and is not, at present being filed on the docket. Petitioning Creditors are also filing a Motion for a protective order.

Thank you for your time and consideration in this matter.

Respectfully,

*/s/ Stephen M. Packman*
STEPHEN M. PACKMAN

SMP:amh
Enclosure
cc: Joyce Lindauer, Esq. (via email) (w/enc.)
James Ou, Esq. (via email) (w/enc.)

219647693v1

[1] The Alleged Debtors in these cases are: WALL007 LLC, WALL009 LLC, WALL010 LLC, WALL011 LLC, WALL012 LLC, WALL016 LLC, WALL017 LLC.

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 7 |
| WALL007 LLC, *et al.*,[1] | Case No. 20-31131 (HDH) |
| Alleged Debtor. | |

**DECLARATION OF STEPHEN M. PACKMAN**

Stephen M. Packman, counsel for the Petitioning Creditors, hereby declare as follows:

**PETITIONERS' PASSPORTS**

1. The Petitioning Creditors' ("Petitioners") passports are accessible via the following Dropbox link: [redacted] ("Link").

2. The Petitioning Creditors' passports contain confidential, personal information and, therefore, they request permission to file this pleading on the docket in this case with the Link **redacted** from the public.

**WET SIGNATURES**

3. Attached hereto as Exhibit "A" are true and correct copies of forty five (45) Petitioners' wet signatures for the "Verifications" to their Responses and Objections to the First

[1] The Alleged Debtors in these cases are: WALL007 LLC, WALL009 LLC, WALL010 LLC, WALL011 LLC, WALL012 LLC, WALL016 LLC, WALL017 LLC. The Alleged Debtors' federal tax identification numbers are unknown to the Petitioning Creditors at this time.

Set of Request for Production of Documents, First Set of Interrogatories, and First Set of Request for Admissions of the Alleged Debtors.

4. The remaining Verifications will be provided to the Court on or before November 6, 2020.

I declare under penalty of perjury, that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: October 30, 2020

/s/ *Stephen M. Packman*
Archer & Greiner, P.C.
Three Logan Square
1717 Arch St., Suite 3500
Philadelphia, PA 19103
215-963-3300
Email: spackman@archerlaw.com

# EXHIBIT "A"

DocuSign Envelope ID: DC4B47B8-188E-4705-9966-C2FC487F3A73

**VERIFICATION**

I, Jin Wang, verify that I have read the foregoing Responses and Objections to the First Set of Request for Production of Documents, First Set of Interrogatories, and First Set of Request for Admissions of Alleged Debtor WALL007, LLC and that the answers contained therein are true and correct to the best of my knowledge, information and belief.

I verify under the penalty of perjury that the foregoing is true and correct.

Executed on July 6, 2020

Wang Jin Wang Jin
Jin Wang

**VERIFICATION**

I, Jun Li, verify that I have read the foregoing Responses and Objections to the First Set of Request for Production of Documents, First Set of Interrogatories, and First Set of Request for Admissions of Alleged Debtor WALL007, LLC and that the answers contained therein are true and correct to the best of my knowledge, information and belief.

I verify under the penalty of perjury that the foregoing is true and correct.

Executed on July 6, 2020

Li, Jun 李军 LI JUN

Jun Li

**VERIFICATION**

I, Lin Zhou, verify that I have read the foregoing Responses and Objections to the First Set of Request for Production of Documents, First Set of Interrogatories, and First Set of Request for Admissions of Alleged Debtor WALL007, LLC and that the answers contained therein are true and correct to the best of my knowledge, information and belief.

I verify under the penalty of perjury that the foregoing is true and correct.

Executed on July 6, 2020

Lin Zhou Lin Zhou

Lin Zhou

周霖

DocuSign Envelope ID: E6A7A6BD-BB4D-47F6-9A8B-32DE6AFD92D2

# VERIFICATION

I, Qu Chen, verify that I have read the foregoing Responses and Objections to the First Set of Request for Production of Documents, First Set of Interrogatories, and First Set of Request for Admissions of Alleged Debtor WALL007, LLC and that the answers contained therein are true and correct to the best of my knowledge, information and belief.

I verify under the penalty of perjury that the foregoing is true and correct.

Executed on July 6, 2020

QU CHEN

Qu Chen

陈曲 CHEN QU

DocuSign Envelope ID: 41867A33-CA7A-4E8A-AE45-31477D858540

**VERIFICATION**

I, Yunding Kang, verify that I have read the foregoing Responses and Objections to the First Set of Request for Production of Documents, First Set of Interrogatories, and First Set of Request for Admissions of Alleged Debtor WALL007, LLC and that the answers contained therein are true and correct to the best of my knowledge, information and belief.

I verify under the penalty of perjury that the foregoing is true and correct.

Executed on July 6, 2020

Yunding kang yun ding Kang

Yunding Kang

DocuSign Envelope ID: B573B92A-DDF0-4A73-A36E-C60AA1CBE40A

**VERIFICATION**

I, Kai Tian, verify that I have read the foregoing Responses and Objections to the First Set of Request for Production of Documents, First Set of Interrogatories, and First Set of Request for Admissions of Alleged Debtor WALL007, LLC and that the answers contained therein are true and correct to the best of my knowledge, information and belief.

I verify under the penalty of perjury that the foregoing is true and correct.

Executed on July 6, 2020

Kai Tian 田凯 Kai Tian

Kai Tian

DocuSign Envelope ID: 5B981BE9-AB44-439D-A80B-35877150AD4E

**VERIFICATION**

I, Jin Wang, verify that I have read the foregoing Responses and Objections to the First Set of Request for Production of Documents, First Set of Interrogatories, and First Set of Request for Admissions of Alleged Debtor WALL009, LLC and that the answers contained therein are true and correct to the best of my knowledge, information and belief.

I verify under the penalty of perjury that the foregoing is true and correct.

Executed on July 6, 2020

Wang Jin 王瑾 Wang Jin

Jin Wang

DocuSign Envelope ID: E0D24174-4F43-464B-A6BC-516EC2FC3781

**VERIFICATION**

I, Weijia Kong, verify that I have read the foregoing Responses and Objections to the First Set of Request for Production of Documents, First Set of Interrogatories, and First Set of Request for Admissions of Alleged Debtor WALL009, LLC and that the answers contained therein are true and correct to the best of my knowledge, information and belief.

I verify under the penalty of perjury that the foregoing is true and correct.

Executed on July 6, 2020

Weijia Kong Weijia kong 孔维佳

Weijia Kong

DocuSign Envelope ID: 95D5E67C-AFFE-45E3-B737-F19680484FD7

**VERIFICATION**

I, Mai Ye, verify that I have read the foregoing Responses and Objections to the First Set of Request for Production of Documents, First Set of Interrogatories, and First Set of Request for Admissions of Alleged Debtor WALL009, LLC and that the answers contained therein are true and correct to the best of my knowledge, information and belief.

I verify under the penalty of perjury that the foregoing is true and correct.

Executed on July 6, 2020

Mai Ye Mai Ye

Mai Ye

DocuSign Envelope ID: 20A68210-ADBE-47CE-B64C-A33414845168

**VERIFICATION**

I, Lin Zhou, verify that I have read the foregoing Responses and Objections to the First Set of Request for Production of Documents, First Set of Interrogatories, and First Set of Request for Admissions of Alleged Debtor WALL009, LLC and that the answers contained therein are true and correct to the best of my knowledge, information and belief.

I verify under the penalty of perjury that the foregoing is true and correct.

Executed on July 6, 2020

Lin Zhou

DocuSign Envelope ID: 517CA8A4-B6E3-47BE-8AFD-AACE15376EC3

## VERIFICATION

I, Qiuying LI, verify that I have read the foregoing Responses and Objections to the First Set of Request for Production of Documents, First Set of Interrogatories, and First Set of Request for Admissions of Alleged Debtor WALL009, LLC and that the answers contained therein are true and correct to the best of my knowledge, information and belief.

I verify under the penalty of perjury that the foregoing is true and correct.

Executed on July 6, 2020

________________________
Qiuying Li

DocuSign Envelope ID: FBE0000F-DC50-41FC-94A0-B5F0216AD808

**VERIFICATION**

I, Yue Xu, verify that I have read the foregoing Responses and Objections to the First Set of Request for Production of Documents, First Set of Interrogatories, and First Set of Request for Admissions of Alleged Debtor WALL009, LLC and that the answers contained therein are true and correct to the best of my knowledge, information and belief.

I verify under the penalty of perjury that the foregoing is true and correct.

Executed on July 6, 2020

Yue Xu

Yue Xu

DocuSign Envelope ID: DB03AB0A-49B0-4E01-BD8F-F402D89E6E46

**VERIFICATION**

I, Wenjun Wang, verify that I have read the foregoing Responses and Objections to the First Set of Request for Production of Documents, First Set of Interrogatories, and First Set of Request for Admissions of Alleged Debtor WALL010, LLC and that the answers contained therein are true and correct to the best of my knowledge, information and belief.

I verify under the penalty of perjury that the foregoing is true and correct.

Executed on July 6, 2020

Wenjun Wang
Wenjun Wang
Wenjun Wang 王文君

**VERIFICATION**

I, Tianqing Song, verify that I have read the foregoing Responses and Objections to the First Set of Request for Production of Documents, First Set of Interrogatories, and First Set of Request for Admissions of Alleged Debtor WALL010, LLC and that the answers contained therein are true and correct to the best of my knowledge, information and belief.

I verify under the penalty of perjury that the foregoing is true and correct.

Executed on July 6, 2020

Song tianqing

Song Tianqing

Tianqing Song

DocuSign Envelope ID: CAA4FEAE-DC29-44E7-BA54-87448F403916

## VERIFICATION

I, Liying Yang, verify that I have read the foregoing Responses and Objections to the First Set of Request for Production of Documents, First Set of Interrogatories, and First Set of Request for Admissions of Alleged Debtor WALL010, LLC and that the answers contained therein are true and correct to the best of my knowledge, information and belief.

I verify under the penalty of perjury that the foregoing is true and correct.

Executed on July 6, 2020

Liying Yang

DocuSign Envelope ID: 080216C6-8976-4CD7-825E-DA958C624FA3

**VERIFICATION**

I, Yan Zhang, verify that I have read the foregoing Responses and Objections to the First Set of Request for Production of Documents, First Set of Interrogatories, and First Set of Request for Admissions of Alleged Debtor WALL010, LLC and that the answers contained therein are true and correct to the best of my knowledge, information and belief.

I verify under the penalty of perjury that the foregoing is true and correct.

Executed on July 6, 2020

Zhang Yan 张雁

Yan Zhang Yan Zhang

DocuSign Envelope ID: 5A88C14E-6364-4053-94D3-9EF74075DBAB

## VERIFICATION

I, Li Jiang, verify that I have read the foregoing Responses and Objections to the First Set of Request for Production of Documents, First Set of Interrogatories, and First Set of Request for Admissions of Alleged Debtor WALL011, LLC and that the answers contained therein are true and correct to the best of my knowledge, information and belief.

I verify under the penalty of perjury that the foregoing is true and correct.

Executed on July 6, 2020

li jiang LiJiang

Li Jiang

**VERIFICATION**

I, Tianqing Song, verify that I have read the foregoing Responses and Objections to the First Set of Request for Production of Documents, First Set of Interrogatories, and First Set of Request for Admissions of Alleged Debtor WALL011, LLC and that the answers contained therein are true and correct to the best of my knowledge, information and belief.

I verify under the penalty of perjury that the foregoing is true and correct.

Executed on July 6, 2020

Song Tianqing

Song Tianqing 宋天清

Tianqing Song

DocuSign Envelope ID: B0B6CFFF-AFDC-4D30-A9AC-717EE8A47055

**VERIFICATION**

I, Rufeng Ding, verify that I have read the foregoing Responses and Objections to the First Set of Request for Production of Documents, First Set of Interrogatories, and First Set of Request for Admissions of Alleged Debtor WALL011, LLC and that the answers contained therein are true and correct to the best of my knowledge, information and belief.

I verify under the penalty of perjury that the foregoing is true and correct.

Executed on July 6, 2020

Rufeng Ding

_______________________________
Rufeng Ding

Rufeng Ding 丁瑞丰

DocuSign Envelope ID: 7CC1F38E-F843-4C3D-80E8-A74E36D54EBC

**VERIFICATION**

I, Lin Li, verify that I have read the foregoing Responses and Objections to the First Set of Request for Production of Documents, First Set of Interrogatories, and First Set of Request for Admissions of Alleged Debtor WALL011, LLC and that the answers contained therein are true and correct to the best of my knowledge, information and belief.

I verify under the penalty of perjury that the foregoing is true and correct.

Executed on July 6, 2020

Li Lin Li Lin 李林

Lin Li

DocuSign Envelope ID: 546464D3-231E-48D4-89F6-88ACABB31BBE

**VERIFICATION**

I, Li Jiang, verify that I have read the foregoing Responses and Objections to the First Set of Request for Production of Documents, First Set of Interrogatories, and First Set of Request for Admissions of Alleged Debtor WALL012, LLC and that the answers contained therein are true and correct to the best of my knowledge, information and belief.

I verify under the penalty of perjury that the foregoing is true and correct.

Executed on July 6, 2020

li jiang Li Jiang 姜丽
Li Jiang

DocuSign Envelope ID: BF25A537-59B2-4BB0-AE69-22D9884456A0

**VERIFICATION**

I, Ou Jiang, verify that I have read the foregoing Responses and Objections to the First Set of Request for Production of Documents, First Set of Interrogatories, and First Set of Request for Admissions of Alleged Debtor WALL012, LLC and that the answers contained therein are true and correct to the best of my knowledge, information and belief.

I verify under the penalty of perjury that the foregoing is true and correct.

Executed on July 6, 2020

Ou Jiang

DocuSign Envelope ID: 71693EBD-9E99-4C9E-9FC7-0B9E1A6C5F54

**VERIFICATION**

I, Yi Tang, verify that I have read the foregoing Responses and Objections to the First Set of Request for Production of Documents, First Set of Interrogatories, and First Set of Request for Admissions of Alleged Debtor WALL012, LLC and that the answers contained therein are true and correct to the best of my knowledge, information and belief.

I verify under the penalty of perjury that the foregoing is true and correct.

Executed on July 6, 2020

Tang Yi

Yi Tang

唐艺 TANG YI

2020.10.24.

DocuSign Envelope ID: 150A1AB0-4279-4CED-B53C-6C18ACC7D87E

## VERIFICATION

I, Pengfei Dong, verify that I have read the foregoing Responses and Objections to the First Set of Request for Production of Documents, First Set of Interrogatories, and First Set of Request for Admissions of Alleged Debtor WALL012, LLC and that the answers contained therein are true and correct to the best of my knowledge, information and belief.

I verify under the penalty of perjury that the foregoing is true and correct.

Executed on July 6, 2020

董鹏飞
Pengfei Dong Pengfei Dong
Pengfei Dong

DocuSign Envelope ID: 89B9EFD4-BF46-4B1B-ACC8-5013154FACA9

**VERIFICATION**

I, Jinzhe Wu, verify that I have read the foregoing Responses and Objections to the First Set of Request for Production of Documents, First Set of Interrogatories, and First Set of Request for Admissions of Alleged Debtor WALL012, LLC and that the answers contained therein are true and correct to the best of my knowledge, information and belief.

I verify under the penalty of perjury that the foregoing is true and correct.

Executed on July 6, 2020

Wu Jinzhe
吴津喆
Jinzhe Wu

Jinzhe Wu

DocuSign Envelope ID: 5D38DFDD-CB11-42EE-B7F0-E3B661003A7F

**VERIFICATION**

I, Wenjuan Yin, verify that I have read the foregoing Responses and Objections to the First Set of Request for Production of Documents, First Set of Interrogatories, and First Set of Request for Admissions of Alleged Debtor WALL012, LLC and that the answers contained therein are true and correct to the best of my knowledge, information and belief.

I verify under the penalty of perjury that the foregoing is true and correct.

Executed on July 6, 2020

Wenjuan Yin 殷文娟 Wenjuan Yin
Wenjuan Yin

DocuSign Envelope ID: 49B9D557-3055-41EF-AEC2-EE16CBDC64F2

**VERIFICATION**

I, Xiaoquan Dai, verify that I have read the foregoing Responses and Objections to the First Set of Request for Production of Documents, First Set of Interrogatories, and First Set of Request for Admissions of Alleged Debtor WALL012, LLC and that the answers contained therein are true and correct to the best of my knowledge, information and belief.

I verify under the penalty of perjury that the foregoing is true and correct.

Executed on July 6, 2020

Xiaoquan Dai

Xiaoquan Dai

DocuSign Envelope ID: D6E4AD2F-7FE2-41AA-8199-B52DFE1C6E3D

## VERIFICATION

I, Jiancheng Chen, verify that I have read the foregoing Responses and Objections to the First Set of Request for Production of Documents, First Set of Interrogatories, and First Set of Request for Admissions of Alleged Debtor WALL012, LLC and that the answers contained therein are true and correct to the best of my knowledge, information and belief.

I verify under the penalty of perjury that the foregoing is true and correct.

Executed on July 6, 2020

Jiancheng Chen

Jiancheng Chen

陈建成 jiancheng chen

DocuSign Envelope ID: A0E4CB9F-38D4-44E9-B9E4-C7EE7C68D6AC

**VERIFICATION**

I, Wanwan Li, verify that I have read the foregoing Responses and Objections to the First Set of Request for Production of Documents, First Set of Interrogatories, and First Set of Request for Admissions of Alleged Debtor WALL012, LLC and that the answers contained therein are true and correct to the best of my knowledge, information and belief.

I verify under the penalty of perjury that the foregoing is true and correct.

Executed on July 6, 2020

李弯弯 Wan Wan Li Wanwan Li

Wanwan Li

DocuSign Envelope ID: 669FA492-D6A1-42B3-A768-23A7E789B194

**VERIFICATION**

I, Feng Yan, verify that I have read the foregoing Responses and Objections to the First Set of Request for Production of Documents, First Set of Interrogatories, and First Set of Request for Admissions of Alleged Debtor WALL012, LLC and that the answers contained therein are true and correct to the best of my knowledge, information and belief.

I verify under the penalty of perjury that the foregoing is true and correct.

Executed on July 6, 2020

Feng Yan
Feng Yan

DocuSign Envelope ID: 7E060550-5E77-4CED-951D-E3B07B8D8112

**VERIFICATION**

I, Li Jiang, verify that I have read the foregoing Responses and Objections to the First Set of Request for Production of Documents, First Set of Interrogatories, and First Set of Request for Admissions of Alleged Debtor WALL016, LLC and that the answers contained therein are true and correct to the best of my knowledge, information and belief.

I verify under the penalty of perjury that the foregoing is true and correct.

Executed on July 6, 2020

li jiang Li Jiang 姜丽

Li Jiang

DocuSign Envelope ID: 1A58B0C1-7B51-4611-97E3-D795BC356698

**VERIFICATION**

I, Sicheng Zhan, verify that I have read the foregoing Responses and Objections to the First Set of Request for Production of Documents, First Set of Interrogatories, and First Set of Request for Admissions of Alleged Debtor WALL016, LLC and that the answers contained therein are true and correct to the best of my knowledge, information and belief.

I verify under the penalty of perjury that the foregoing is true and correct.

Executed on July 6, 2020

Sicheng Zhan

**VERIFICATION**

I, Yulan Chen, verify that I have read the foregoing Responses and Objections to the First Set of Request for Production of Documents, First Set of Interrogatories, and First Set of Request for Admissions of Alleged Debtor WALL016, LLC and that the answers contained therein are true and correct to the best of my knowledge, information and belief.

I verify under the penalty of perjury that the foregoing is true and correct.

Executed on July 6, 2020

Yulan Chen

**VERIFICATION**

I, Jun Zeng, verify that I have read the foregoing Responses and Objections to the First Set of Request for Production of Documents, First Set of Interrogatories, and First Set of Request for Admissions of Alleged Debtor WALL016, LLC and that the answers contained therein are true and correct to the best of my knowledge, information and belief.

I verify under the penalty of perjury that the foregoing is true and correct.

Executed on July 6, 2020

Zeng Jun Zeng Jun 曾军

Jun Zeng

## VERIFICATION

I, Di Tang, verify that I have read the foregoing Responses and Objections to the First Set of Request for Production of Documents, First Set of Interrogatories, and First Set of Request for Admissions of Alleged Debtor WALL016, LLC and that the answers contained therein are true and correct to the best of my knowledge, information and belief.

I verify under the penalty of perjury that the foregoing is true and correct.

Executed on July 6, 2020

Di Tang

Tang: 唐

DocuSign Envelope ID: 5518DAE7-100C-410F-8762-7739D6A0ABC7

**VERIFICATION**

I, Fang Ding, verify that I have read the foregoing Responses and Objections to the First Set of Request for Production of Documents, First Set of Interrogatories, and First Set of Request for Admissions of Alleged Debtor WALL017, LLC and that the answers contained therein are true and correct to the best of my knowledge, information and belief.

I verify under the penalty of perjury that the foregoing is true and correct.

Executed on July 6, 2020

Ding Fang Ding Fang 丁芳

Fang Ding

DocuSign Envelope ID: 695098EA-FB5D-4C9B-9473-1E6BD33480D9

## VERIFICATION

I, Yuan Yuan, verify that I have read the foregoing Responses and Objections to the First Set of Request for Production of Documents, First Set of Interrogatories, and First Set of Request for Admissions of Alleged Debtor WALL017, LLC and that the answers contained therein are true and correct to the best of my knowledge, information and belief.

I verify under the penalty of perjury that the foregoing is true and correct.

Executed on July 6, 2020

Yuan Yuan

Yuan Yuan

Yuan Yuan

苑媛

DocuSign Envelope ID: 8003E74D-B31A-40EF-AC76-B97337291527

**VERIFICATION**

I, Jialin Hu, verify that I have read the foregoing Responses and Objections to the First Set of Request for Production of Documents, First Set of Interrogatories, and First Set of Request for Admissions of Alleged Debtor WALL017, LLC and that the answers contained therein are true and correct to the best of my knowledge, information and belief.

I verify under the penalty of perjury that the foregoing is true and correct.

Executed on July 6, 2020

Hu Jialin Hu Jialin

Jialin Hu

# VERIFICATION

I, Di Tang, verify that I have read the foregoing Responses and Objections to the First Set of Request for Production of Documents, First Set of Interrogatories, and First Set of Request for Admissions of Alleged Debtor WALL017, LLC and that the answers contained therein are true and correct to the best of my knowledge, information and belief.

I verify under the penalty of perjury that the foregoing is true and correct.

Executed on July 6, 2020

Di Tang

DocuSign Envelope ID: 67E4F9D8-68E2-4B71-905B-403960904222

**VERIFICATION**

I, Wai Ying, verify that I have read the foregoing Responses and Objections to the First Set of Request for Production of Documents, First Set of Interrogatories, and First Set of Request for Admissions of Alleged Debtor WALL017, LLC and that the answers contained therein are true and correct to the best of my knowledge, information and belief.

I verify under the penalty of perjury that the foregoing is true and correct.

Executed on July 6, 2020

Wai Ying

Wai Ying

Wai Ying.

DocuSign Envelope ID: 9BBEE656-56AD-4F3F-9514-9E6441F40149

## VERIFICATION

I, Xiangdong Zhu, verify that I have read the foregoing Responses and Objections to the First Set of Request for Production of Documents, First Set of Interrogatories, and First Set of Request for Admissions of Alleged Debtor WALL017, LLC and that the answers contained therein are true and correct to the best of my knowledge, information and belief.

I verify under the penalty of perjury that the foregoing is true and correct.

Executed on July 6, 2020

Xiangdong Zhu

DocuSign Envelope ID: C1C9D75D-DEE3-4440-93BF-A5C8EA009C40

**VERIFICATION**

I, Jiaxiang Lu, verify that I have read the foregoing Responses and Objections to the First Set of Request for Production of Documents, First Set of Interrogatories, and First Set of Request for Admissions of Alleged Debtor WALL017, LLC and that the answers contained therein are true and correct to the best of my knowledge, information and belief.

I verify under the penalty of perjury that the foregoing is true and correct.

Executed on July 6, 2020

Jiaxiang Lu Jiaxiang Lu 陆加祥
Jiaxiang Lu



DocuSign Envelope ID: DF146606-F07F-4340-9473-DFC46E245B70

**VERIFICATION**

I, Aiguo Luo, verify that I have read the foregoing Responses and Objections to the First Set of Request for Production of Documents, First Set of Interrogatories, and First Set of Request for Admissions of Alleged Debtor WALL017, LLC and that the answers contained therein are true and correct to the best of my knowledge, information and belief.

I verify under the penalty of perjury that the foregoing is true and correct.

Executed on July 6, 2020

Aiguo Luo



DocuSign Envelope ID: A694B8FD-FC40-4BA3-8D8F-CA3DEF781770

**VERIFICATION**

I, Chao Xu, verify that I have read the foregoing Responses and Objections to the First Set of Request for Production of Documents, First Set of Interrogatories, and First Set of Request for Admissions of Alleged Debtor WALL017, LLC and that the answers contained therein are true and correct to the best of my knowledge, information and belief.

I verify under the penalty of perjury that the foregoing is true and correct.

Executed on July 6, 2020

Xu Chao Xu Chao 许超

Chao Xu

DocuSign Envelope ID: 7636FDBD-0DD3-4F2C-A1DF-9C925E91F71A

**VERIFICATION**

I, Xiaomin Fan, verify that I have read the foregoing Responses and Objections to the First Set of Request for Production of Documents, First Set of Interrogatories, and First Set of Request for Admissions of Alleged Debtor WALL017, LLC and that the answers contained therein are true and correct to the best of my knowledge, information and belief.

I verify under the penalty of perjury that the foregoing is true and correct.

Executed on July 6, 2020

Xiaomin Fan Xiaomin Fan

Xiaomin Fan

# EXHIBIT "D"

**Huber, Amy M.**

| | |
|---|---|
| **From:** | jou nguyen-chen.com <jou@nguyen-chen.com> |
| **Sent:** | Monday, July 13, 2020 6:34 PM |
| **To:** | Packman, Stephen |
| **Cc:** | Joyce Lindauer; Garcia, Jorge |
| **Subject:** | [EXT MAIL] Re: Wall |

Joyce,

Please click the below DropBox web link and download the documents in response to the Alleged Debtors's Request for Production of Documents, which are being produced on rolling basis.

[redacted]

Jiangang "James" Ou
Attorney at Law

Nguyen & Chen, LLP
11200 Westheimer Suite 120
Houston, Texas 77042
(832)767-0339
(832)767-0669 (fax)
jou@nguyen-chen.com

CONFIDENTIALITY NOTICE: The information in this electronic message may be privileged and confidential and is intended for the use of the individual or entity named above. If you are not the intended recipient, you are on notice that any unauthorized disclosure, copying, distribution, or taking of any action in reliance on the contents of this message is prohibited.

On Jul 11, 2020, at 1:32 PM, Packman, Stephen <spackman@archerlaw.com> wrote:

Joyce:

Per our call yesterday, we will look over the alleged debtors' discovery responses again and advise what objections we have to those responses. If we cannot resolve those issues early next week, we will ask the Court to intervene. We categorically disagree with your statement yesterday during our call that the alleged debtors' financial records are irrelevant to these proceedings. Based upon defenses asserted by the alleged debtors those document are highly relevant. If the alleged debtors have no corporate or financial records, then that needs to be stated in your responses. We find that hard to believe since the alleged debtors have asserted in this litigation that the alleged debtors are in fact bona fide separate companies with assets and liabilities. Perhaps that is not the case?

James will begin production of documents to you by Petitioning Creditors on a rolling basis on Monday.

If you wish to convey any settlement offers, please convey them to me and James in writing.

Thanks.

**Huber, Amy M.**

> Begin forwarded message:
>
> From: Jiangang Ou <jou@nguyen-chen.com<mailto:jou@nguyen-chen.com>>
> Subject: Re: Wall
> Date: July 29, 2020 at 8:22:49 AM CDT
> To: Joyce Lindauer <joyce@joycelindauer.com<mailto:joyce@joycelindauer.com>>
> Cc: Stephen Packman <spackman@archerlaw.com<mailto:spackman@archerlaw.com>>, Jorge Garcia
<jgarcia@archerlaw.com<mailto:jgarcia@archerlaw.com>>
>
> Joyce,
>
> Here is the first supplemental production: [redacted]
>
> Please let me know immediately should you have any problem in viewing or downloading same.
>

>
> Jiangang "James" Ou
> Attorney at Law
>
> Nguyen & Chen, LLP
> 11200 Westheimer Suite 120
> Houston, Texas 77042
> (832)767-0339
> (832)767-0669 (fax)
> jou@nguyen-chen.com<mailto:jou@nguyen-chen.com>
>
> CONFIDENTIALITY NOTICE: The information in this electronic message may be privileged and confidential and is intended for the use of the individual or entity named above. If you are not the intended recipient, you are on notice that any unauthorized disclosure, copying, distribution, or taking of any action in reliance on the contents of this message is prohibited.
>
>
>
> On Jul 13, 2020, at 5:34 PM, jou [redacted] <jou@nguyen-chen.com<mailto:jou@nguyen-chen.com>> wrote:
>
> Joyce,
>
> Please click the below DropBox web link and download the documents in response to the Alleged Debtors's Request for Production of Documents, which are being produced on rolling basis.
>
> [redacted]
>
> Jiangang "James" Ou
> Attorney at Law
>
> Nguyen & Chen, LLP
> 11200 Westheimer Suite 120
> Houston, Texas 77042
> (832)767-0339
> (832)767-0669 (fax)
> jou@nguyen-chen.com<mailto:jou@nguyen-chen.com>
>
> CONFIDENTIALITY NOTICE: The information in this electronic message may be privileged and confidential and is intended for the use of the individual or entity named above. If you are not the intended recipient, you are on notice that any unauthorized disclosure, copying, distribution, or taking of any action in reliance on the contents of this message is prohibited.

>
>
>
> On Jul 11, 2020, at 1:32 PM, Packman, Stephen <spackman@archerlaw.com<mailto:spackman@archerlaw.com>> wrote:
>
> Joyce:
>
> Per our call yesterday, we will look over the alleged debtors' discovery responses again and advise what objections we have to those responses. If we cannot resolve those issues early next week, we will ask the Court to intervene. We categorically disagree with your statement yesterday during our call that the alleged debtors' financial records are irrelevant to these proceedings. Based upon defenses asserted by the alleged debtors those document are highly relevant. If the alleged debtors have no corporate or financial records, then that needs to be stated in your responses. We find that hard to believe since the alleged debtors have asserted in this litigation that the alleged debtors are in fact bona fide separate companies with assets and liabilities. Perhaps that is not the case?
>
> James will begin production of documents to you by Petitioning Creditors on a rolling basis on Monday.
>
> If you wish to convey any settlement offers, please convey them to me and James in writing.
>
> Thanks.
>
>
>

# EXHIBIT "E"

# AGENCY AND LOAN AGREEMENT

THIS AGREEMENT is dated _July 28___, 2018, and is between ____Zeng Jun___ (Passport No: ___[redacted]__), ("Co-Lender,"), PLATINUM INVESTMENT CORPORATION ("Agent") and WALL 016, LLC ("Borrower").

## ARTICLE ONE

## The Loan

1.1 The Loan. Co-Lender, together with other lenders ("Additional Co-Lenders"), upon the terms and subject to the conditions hereinafter set forth and on the date of this Agreement, agrees to make a loan to Borrower (the "Loan") for the purpose as set forth herein.

(a) Agency: Co-Lender, hereby appoints Agent, who will act as agent for Co-Lender and the Additional Co-Lenders for the purpose of entering into the loan documents for the Loan. Co-Lender acknowledges that Agent has no liability for the repayment of the Loan, and that such obligation will be the responsibility of Borrower.

(b) Terms of Lender Commitment: Co-Lender agrees to lend $ __100,000_____of the total loan amount of $3,880,000 ("Commitment"). Co-Lender acknowledges that a condition of the Loan being made is that the Additional Co-Lenders fund sufficient amounts ("Additional Loans") to total the Commitment. If the Loan is funded, interest and principal shall be paid by Borrower to Co-Lender as follows:

Principal and interest:

Principal: USD $_100,000_____-__One Hundred Thousand_ and No/100 Dollars

Interest: Interest amount equal to ___Ten_____ percent (_10_%) per annum commencing on ___August 1st, 2018_____, or such later date that the Loan is funded to Borrower. The first year's interest will be due to the Lender, within ten (10) business days after __August 1st, 2019___. The second year's interest, together with the total principal shall be paid to the Lender within ten (10) business days of ___August 1st, 2020__. Sums not paid by such times, shall bear interest at the rate of __Twelve___ percent (_12__%) per annum from the dates payments were due.

Agent shall serve as administrator on behalf of the Co-Lender and Additional Co-Lenders, in the administration of the Loan and Additional Loans. Agent's fee for such services shall be paid by Borrower. Wherever this Agreement requires payment to Co-Lender, such payments shall be made to Agent on behalf of Co-Lender and the Additional Co-Lenders.

(c) Loan Purpose:

(i) The Loan shall be evidenced by this Agreement. The Loans and the Additional Loans shall be used to acquire 160 acres located in in Ft Worth ETJ, Parker County, State of Texas for residential lot development known as Lyons Ranch ("Property"). The Property has a purchase price of $4,850,000 and the balance of funds will be provided by Borrower.

(ii) No Commitment for Additional/Permanent Financing: **BORROWER ACKNOWLEDGES AND AGREES THAT LENDER HAS NOT MADE ANY COMMITMENTS EITHER EXPRESS OR IMPLIED, TO EXTEND THE TERM OF THE LOAN PAST ITS STATED MATURITY DATE OR TO PROVIDE BORROWER WITH PERMANENT FINANCING ONCE THE INITIAL TERM OF THE LOAN HAS EXPIRED OR WITH ANY ADDITIONAL FINANCING WHICH BORROWER MAY NEED.**

1.2. Pre-payment. Borrower may prepay the Loan in part or in full without penalty at any time before final maturity, by cash or check. Prepayment in full shall consist of payment of the remaining unpaid principal balance together with all accrued and unpaid interest to the date of repayment and all other amounts, costs and expenses for which Borrower is responsible under any other agreement with Lender pertaining to the Loan, and in no event will Borrower ever be required to pay any unearned interest. Any prepayments shall be applied first to charges for which Borrower is responsible, then to interest and then to principal. Prepayments shall be applied to payments next due under the Loan.

## ARTICLE TWO

## Representations of Borrower

Borrower represents, covenants, and warrants that:

2.1 Representations. All representations and warranties made by Borrower pursuant to this Loan Agreement are true and correct.

2.2 Power and Authority: Borrower is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Texas and is duly qualified to do business and in good standing in all states in which the conduct of its operations or the ownership of its properties requires such qualification. The execution, delivery and performance by Borrower of this Agreement and all other Loan Papers to which it is a party have been duly authorized by all necessary corporate action and they have full power and authority to conduct their business and to carry out all of the terms and conditions hereof.

2.3 Violation of Law; Breach of Agreements. The execution, delivery and performance by Borrower of the Loan Papers do not and will not:

(a) Violate any provision of any law, rule, regulation, order, judgment, injunction, or determination presently in effect having applicability to Borrower; or

(b) Result in the breach of or constitute a default under the certificate of incorporation, bylaws, any indenture, agreement, or instrument to which Borrower is a party or by which its properties may be bound or affected.

2.4 Enforceability. The Loan Papers constitute legal, valid, and binding obligations of Borrower, enforceable against Borrower, in accordance with their respective terms, except to the extent that such enforcement may be limited by applicable Bankruptcy, insolvency, and other similar laws affecting creditors' rights generally.

2.5 Taxes. All Federal and State tax returns of Borrower have been appropriately filed and the taxes paid except those for which extensions have been obtained.

## ARTICLE THREE

## Affirmative Covenants of Borrower

3.1 Covenants

(a) Borrower shall not effectuate a change in its businesses as is conducted on the date of this Agreement.

(b) All financial information prepared by Borrower and delivered to Lender, shall be prepared in accordance with sound accounting principles, consistently applied.

(c) Without limiting the terms of this Agreement or any of the other Loan Papers, to the extent not prohibited by applicable law, Borrower will pay all reasonable costs and expenses and reimburse Lender for any and all reasonable out-of-pocket expenditures incurred or expended from time to time, in connection with expenses relating to Lender's exercising any of its rights and remedies under the Loan Papers or at law, including, without limitation, all filing fees, taxes, Uniform Commercial Code search fees, other fees and expenses incident to title searches, reports and security interests, escrow fees, reasonable attorneys' fees, reasonable legal expenses, court costs, fees and expenses incurred in connection with any complete or partial liquidation of such property, and all fees and expenses for any professional service relating to such property or any operations conducted in connection with it.

3.2 Borrower shall immediately notify Lender upon the occurrence of any condition, event or act that would constitute a Default or any Event of Default under this Agreement or upon the occurrence of any change in the condition (financial or otherwise) of Borrower that would materially affect Borrower's ability to repay the indebtedness created hereby.

3.3 Borrower will pay the Loan according to its terms and will do and perform every act and discharge all of the obligations provided to be performed and discharged under this Agreement and any and all of the instruments referred to or mentioned herein at the time or times and in the manner herein specified.

3.4 Borrower will promptly cure any defects in the execution and delivery of this Agreement and any other instrument or instruments referred to or mentioned herein and will immediately execute and deliver to Lender, upon request, any instrument required to accomplish the covenants and agreements of Borrower.

3.5 Borrower will, in the Event of Default, upon request, within ten (10) days from said request, reimburse Lender for all amounts extended, advanced or incurred by Lender to satisfy any obligation of Borrower under this Agreement, or to protect the properties, assets or business of Borrower or to enforce the rights of Lender under this Agreement or any other instrument referred to or mentioned herein or executed or to be executed in connection herewith, which amounts will include all court costs, reasonable attorney's fees, reasonable fees of auditors and accountants, and investigation expenses reasonably incurred by Lender in connection with any such matters, together with interest at the contract rate on each such amount from the date that the same is due and payable to Lender until the date it is repaid to Lender.

3.6 Borrower will maintain its legal existence, remain in good standing in each jurisdiction in which it is required to be qualified, maintain all franchises and licenses necessary in its business, and comply with all valid and applicable statutes, rules and regulations, and it will maintain or cause to be maintained its properties and equipment in good and workable condition at all times.

## ARTICLE FOUR
## Default and Acceleration

4.1 Events of Default. An event of default shall exist if any one or more of the following events (hereinafter collectively referred to as "Events of Default") shall occur and be continuing:

(a) Failure to pay any principal or interest on any Indebtedness to Lender when due or declared due and such failure shall continue for fifteen (15) days following written notice of such failure is given by Lender to Borrower.

(b) Default in the observance or performance of any of the covenants, terms or agreements of this Agreement or any other document or instrument executed by Borrower, and such failure shall continue for thirty (30) days following written notice of such failure is given by Lender to Borrower.

4.2 Optional Acceleration. Upon the occurrence of any Event of Default, at Lender's option, all or any part of this Indebtedness owing to Lender shall forthwith become due and payable, without prior presentment, demand, notice of default, notice of acceleration, or notice of any kind, all of which are hereby waived.

4.3 Automatic Acceleration. All Indebtedness owing to Lender shall automatically and immediately become due and payable in full, without notice or demand, upon the appointment of a receiver or a liquidator for benefit of creditors, whether voluntary or involuntary, for Borrower, or surety or for any of their property or upon the commencement of any proceeding under any Bankruptcy or insolvency law by or against Borrower or surety for Borrower.

4.4 Right of Set Off. Upon the occurrence and during the continuance of any Event of Default, the Lender is hereby authorized at any time and from time to time, without notice to the Borrower to set off and apply any and all deposits of Borrower at any time held and other indebtedness at any time owing by the Lender to or for the credit or the account of the Borrower against any and all of the obligations of the Borrower now or hereafter existing under this Agreement, irrespective of whether or not the Lender shall have made any demand under this Agreement and although such obligations may be unmatured. The Lender agrees promptly to notify the Borrower after any such set off and application, provided that the failure to give such notice shall not affect the validity of such set off and application or otherwise result in liability to the secured party. The rights of the Lender under this paragraph are in addition to other rights and remedies (including without limitation other rights of set off) which the Lender may have.

4.5 Progress Reporting. Borrower shall agree to provide quarterly progress reports to Lender outlining the ongoing status of the development, which shall include: the platting, design, engineering, and construction drawings, all of which shall constitute "activity" to the land prior to actual physical development of the land.

## ARTICLE FIVE

## Miscellaneous

5.1 Definitions. Indebtedness as used in this Loan Agreement means all present and future debt, obligations and liabilities of Borrower to Lender presently existing or which may in any manner or means hereafter be incurred or evidenced, including but not limited to notes, advances, overdrafts, bookkeeping entries, renewals, extensions, endorsements, and guaranties, plus costs and expenses to obtain, preserve and enforce this Loan Agreement and all agreements and instruments, and to collect the Indebtedness and to secure, maintain, preserve, and dispose of collateral, together with all interest and reasonable attorneys' fees.

5.2 Construing Loan Papers. This Loan Agreement, and all other loan documents, papers and instruments ("Loan Papers") collectively constitute the evidence of Indebtedness owing to Lender and the rights and obligations of the parties hereto, and are to be construed as supplemental to each other.

5.3 Renewals and Extensions. This Loan Agreement shall also apply to any and all renewals and extensions, loans and advancements to Borrower.

5.4 Texas Law. This Loan Agreement, and the other Loan Papers shall be construed under the laws of the State of Texas.

5.5 Maximum Rate of Interest. The terms of this Loan Agreement have been made on the assumption that all payments will be made as scheduled. In the event any interest paid to Lender is in excess of the maximum non-usurious rate permitted by the usury laws of Texas and the United States as construed by courts having jurisdiction thereof, whether by reason of prepayment, acceleration or otherwise, such interest shall be considered for all purposes as payment on principal and so credited to the Loan. The right to demand any such excess interest shall be and is hereby waived and any payment of any amount in excess of the legal rate shall be considered a mistake with the excess being applied to the principal of the Loan, and if all Indebtedness is paid, the excess shall be refunded to Maker.

5.6 Collateral. 100% of the membership interests in Borrower ("Collateral") shall be pledged to secure the Loan and the Additional Loans pursuant to a Pledge Agreement ("Pledge Agreement") that will be given to Agent on behalf of the Lender and Co-Lenders. Each of the Lender and Co-Lenders shall share pro rata in the Collateral pursuant to the Pledge Agreement.

5.7 Guarantee. JMJ Holdings, as Guarantor, hereby provides a corporate guarantee up to the principal loan amount in the event of default by Borrower.

5.8 Notice. Unless otherwise provided herein, all notices, requests, consents and demands shall be in writing and shall be mailed, postage prepaid, addressed as follows:

TO AGENT:
Platinum Investment Corporation
Attn: Michael Fu
B4-1015 West Lake International
Hangzhou
Michael@yding.cn
281-318-8611

TO BORROWER:
Wall 016, LLC
c/o Tim Barton
1755 Wittington Place, Suite 340
Dallas, TX 75234
tbarton@jmjdevelopment.net
972-385-9934 (office)

TO CO-LENDER:
Zeng Jun
Room 232, No.21 Er Wei Rd., Shen He District,
Shenyang City, Liao Ning Province, China
zjun2@126.com
(86)13704272071

5.9 Place of Payment. All sums payable hereunder to Lender shall be payable at the offices of Lender at the address indicated above or such other place as the owner shall hereafter designate by written notice to Borrower.

5.10 Representations Survive. All covenants, agreements, representations and warranties made herein shall survive the execution and delivery of this Agreement in the making of the Loan. All statements contained in any certificate or other instrument delivered by Borrower, hereunder shall be deemed to constitute representation and warranties made by Borrower.

5.11 No Waiver. No waiver or consent by Lender with respect to any act or omission of Borrower on one occasion shall constitute a waiver or consent with respect to any other act or omission by Borrower on the same or any other occasion, and no failure on the part of Lender to exercise and no delay in exercising any right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise by Lender of any right hereunder preclude any other or further right of exercise thereof or the exercise of any other right.

5.12 Confidentiality. The Lender agrees to keep the contents of all financial documents and other information delivered to Lender as part of this agreement confidential and to request its agents and representatives to keep such information confidential provided that nothing contained in this Agreement shall prohibit disclosure of any matter to the extent required by law or order of any court or administrative agency. The provisions of the Section shall survive Closing or any termination of this Agreement.

**THIS WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.**

**THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

*[Signatures appear on following page]*

**"CO-LENDER"**

DocuSigned by:
Zeng Jun
863965F351CA495...
______________________________

**"BORROWER"**

WALL 016, LLC

DocuSigned by:
Tim Barton
By: ______________________________
55E2C214E42B42F...
Tim Barton as President of Carnegie Development, LLC,
The Managing Member of Wall 016, LLC

**"AGENT"**

PLATINUM INVESTMENT CORPORATION

DocuSigned by:
Michael Fu
By: ______________________________
86EE266F063C423...
Name: Michael Fu
Title: Chief Executive Officer

# Wall016, LLC

August 6, 2018

Zeng Jun
Passport Number: E21730486
Room 232, No.21 Er Wei Rd., Shen He District,
Shenyang City, Liao Ning Province, China
zjun2@126.com
(86) 13704272071

Dear Zeng Jun:

This letter will serve as confirmation by Wall016, LLC that we have received the amount of USD 100,000.00 by wire transfer into our account at Wells Fargo Bank on August 2, 2018.

The loan proceeds stated above will be paid with interest to the original sending account in accordance with the time, terms and conditions of the Loan Agreement.

Please contact the undersigned immediately if you have any questions regarding this receipt.

Sincerely,
Wall016, LLC

By: Timothy Barton
President of Carnegie Development LLC
The Managing Member of Wall016 LLC

13901 Midway Road, Suite 102
Dallas, TX 75244
(PH) 972-385-9934 (Fax) 972-241-44[illegible]

**已成功提交银行处理，请您准确记录业务编号（TT开头），以便核实交易状态，后续银行工作人员可能会与您联系**

电子银行交易序号[redacted]6279

业务编号：[redacted]1656

扣款账户：长城电子借记卡[redacted]*2192长城电子借记卡 辽宁

汇款币种：美元

收款银行SWIFT代码：WFBIUS6SXXX

收款银行全称：WELLS FARGO BANK, N.A.

收款人名称（英文或拼音）：Tim Barton

收款人账号：[redacted]2748

收款人详细地址（英文或拼音）：13901Midway Rd Suite 102,LB243Dallas,TX75244(PH)972-385-9934

汇款人名称：李百贺

汇款人名称（英文或拼音）：LI BAIHE

汇款人地址（英文或拼音）：No.201Xingsheng Street,Xinglongtai Dis,Panjin,Liaoning,CHINA

汇款人邮政编码：[redacted]4114

汇款人联系电话：[redacted]1457

钞/汇：现汇

汇款金额：28,000.00

基准费用：341.49 （手续费191.49 电讯费150.00）

优惠后费用：307.34 （手续费172.34 电讯费135.00）

国内外费用承担方式：SHA 共同承担

付费币种：人民币元

给收款方的汇款附言：short travel,deposit,Zeng Jun

收款人常驻国家（地区）：美国

汇款用途：其他私人旅行

汇款用途详细说明：美国西部旅游押金

跨境汇款资金来源承诺：本人确认本笔汇出汇款的资金来源于购汇，且汇款用途购汇用途一致，原《个人购汇申请书》填报时如有不一致处已进行修改。

WALL016-JUN ZENG-0010
**APPELLANT 116**

汇款方式：快速汇款（中银全球智汇）

中银全球智汇，快速汇款，收费透明，进程可见

是否保证全额汇至收款行：否

WALL016-JUN ZENG-0011
**APPELLANT 117**

**中国建设银行网上银行外汇汇款电子回单**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 凭证号 | [redacted]7137 | 日期 | 2018-07-31 | 金额 | **24,060.00** | 币种 | 美元 |
| 付款人 | 姓名地址 | wanghuimin No.2029,Xinglonggou Village,Jianping Xian,Liaoning Pro vince ChaoYang CHINA | | 收款人 | 姓名地址 | Tim Barton 13901 Midway Rd Sui te 102,LB243Dallas,TX75244 (PH)972-3 85-9934 Dallas USA | |
| 付款人 | 账 号 | [redacted]2 589 | | 收款人 | 账 号 | [redacted]27 48 | |
| 付款人 | 开户行 | 中国建设银行股份有限公司 | | 收款人 | 开户行 | WELLS FARGO BANK, N.A. | |
| 收款人SWIFT代码 | WFBIUS6SXXX | 收款人开户行地址 | 420 MON #TGOMERY STREET SAN FRANCISCO,CA UNI #TED STATES OF AMERICA | | | | |
| 备注 | | | | 附言 | Short travel,deposit,Zeng Jun | | |

**重要提示：本回单不作为收付方交易确认的最终依据。**
您可登录个人网上银行，通过我的账户->更多服务->验证电子凭证菜单，输入凭证号验证回单真实性。

WALL016-JUN ZENG-0012
**APPELLANT 118**



Confirmation Number: 47140196

From: Regular Savings [illegible]

To: YIDING (Chase Bank)

Delivery speed: 3 Business Days

Delivery method: ACH

Amount: $37,070.00

Fee: $5.00

Frequency: One time on [illegible]

Start on date: 09/27/2018

Estimated arrival date: 10/02/2018

Make Another Transfer

**Date : 7/1/2020 7:32:16 AM**
**From : "曾军"**
**To : shouhouusa@yding.cn**
**Subject : JMJ发给我的邮件**
**Attachment : Message from Gov Gregg Abbott;Latest update on the bankruptcy petitions filed by Michael FU representing some of you as;Wall016 LLC - Loan Forbearance and extension;\;Recorded message from Michael FU's lawyer, saying, how Michael FU got the rights from all the lenders;Re: Conference Call;Re: Conference Call;JMJ Project Updates;RE: Conference Call Update;CONFIDENTIAL: WALL LENDERS CONFERENCE CALL Tuesday 7 January 2020 9:00am CHINA STANDARD TIME;RE: Zeng Jun asking JMJ to follow the contract terms;RE: Zeng Jun asking JMJ to follow the contract terms;Zeng Jun asking JMJ to follow the contract terms;RE: Re:Negated Option to Convert-股权转换即将关闭;Negated Option to Convert-股权转换即将关闭;Wall016 - Zeng Jun- $100k;Message from JMJ- JMJ的一封信;Letter from JMJ, 来自JMJ的一封信;**

**Date : 3/28/2020 12:10:15 AM**
**From : "Murugan Venkat"**
**To : "Murugan Venkat" , "Saif Sachwani"**
**Cc : "Tim Barton"**
**Subject : "Stay Home" order in Dallas and the update on the meeting with the plaintiff's lawyers on 19th March 2020**

**To**

**All Wall Lenders;**

**Please be advised that on** Sunday 22nd March 2020, the Dallas County Judge Clay Jenkins issued a countywide shelter-in-place order, marking the most expansive action yet from a Texas official to combat the new corona virus continuing to spread across the state https://www.kbtx.com/content/news/Dallas-County-orders-residents-to-shelter-in-place-as-coronavirus-cases-there-spread-569014421.html

The "Stay Home Stay Safe" order, effective as of 11:59 p.m. on March 23, will continue through April 3. And it comes hours after Gov. Greg Abbott declined to issue a statewide shelter-in-place, though the state's top elected official noted he would applaud local leaders if they decided to take more sweeping actions for their jurisdictions. **The** Dallas County Judge Clay Jenkins further said that he expected his authority to keep the order in place would extend beyond April 3, if necessary.

As such, our offices remain closed per state and federal guidelines due to Corona virus pandemic.

**Meeting on 19th March 2020 to finalize the structure and procedures required to effectuate payments Chinese lenders** **On 19th March 2020, Jamyang, the** Chinese interpreter traveled from Los Angeles, California to Texas for a meeting with plaintiff's attorney. Mr. Barton, Steve Wall and Jamyang risked their lives and drove for several hours from Dallas to Houston, especially when Jamyang was exposed so much in his flight from LA to Dallas, and was in the car from Dallas to Houston, along with Mr. Barton and Steve Wall.

**The Houston attorneys representing the plaintiffs** were present, while the attorneys from the New York law firm cited Corona virus as the reason for nonattendance.

**The purpose of the meeting is** to finalize the structure and procedures required to effectuate payments to the Chinese lenders.

**While the plaintiff's lawyers were in agreement with our legal team, regretfully Michael Fu's behavior was so belligerent displaying fits of anger, and rage that his attorneys were unable to contain the situation as Michael Fu spewed a litany of profanities directed at the attorney representing the Wall entities.** Michael Fu screamed and yelled at our lawyer and us, demanding the lawyer to do what he says. He yelled many bad words and said to do what he says or get out. The meeting was ultimately terminated by the lawyers before any of the parties can discuss RESOLUTION.

**It is apparent that Michael Fu who has already been paid millions of dollars by the Wall entities continues to BLOCK any and all actions by US that would result in satisfaction of loans to Wall Lenders.**

**However, we continue to do our best and we will update as soon as the situation improves**

**Sincerely**

至

**所有**墙贷款人；

请注意，在**2020年3月22日星期日**，**达拉斯**县法官克莱·**詹金斯**(Clay Jenkins)发布了一项全县范围内的就地庇护令，这是德克萨斯州官员迄今为止为打击新的日冕病毒而采取的最广泛的行动https: //www.kbtx.com/content/news/Dallas-County-orders-residents-to-shelter-in-place-as-coronavirus-cases-there-spread-569014421.html

**"保持家庭安全"命令于下午**11:59**生效。3月23日将持**续到**4月3日。在州**长格雷格·**雅培**(Greg Abbott)**拒**绝发布全州范围内的庇护所数小时后，尽管该州最高当选官员表示，他将为当地领导人决定采取更多全面行动表示赞赏。为他们的管辖范围。达拉斯县法官克莱·**詹金斯**进一步表示，他希望保持命令到位的权限将在必要时延长至**4月3日之后。**

**因此**，**由于**电晕病毒大流行，我们的办公室根据州和联邦指南保持关闭状态。

**于2020年3月19日**举行会议，以最终确定实现中国贷方付款所需的结构和程序。**2020年3月19日**，**中国口**译员Jamyang**从加利福尼**亚州洛杉矶到达德克萨斯州，**与原告律**师会晤。巴顿先生，史蒂夫·**沃**尔和詹扬冒着生命危险，从达拉斯到休斯敦开车了几个小时，尤其是当詹扬在从洛杉矶飞往达拉斯的飞行中被暴露得如此之多，并与达拉斯先生一起从达拉斯到休斯敦的汽车中。巴顿和史蒂夫·**沃**尔。

**代表原告的休斯**顿律师在场，而纽约律师事务所的律师则以电晕病毒为原因。

**会**议的目的是最终确定向中国贷方付款的结构和程序。

**当原告的律**师与我们的法律团队达成协议时，令人遗憾的是，迈克尔·**傅的行**为如此好战，表现出愤怒和怒火，以至于他的律师无法遏制这种情况，因为迈克尔·**傅吐出了一**连串的亵渎语直指代**表**华尔街的律师实体。傅伟（Michael Fu)对我们和我们的律师大喊大叫，要求律师按照他说的去做。他大声喊了许多坏话，说了做他说的话或滚蛋。会议最终被律师终止，随后任何一方都可以讨论决议。

显然，已经由Wall实体支付了数百万美元的Michael Fu**将**继续阻止美国采取的所有行动，以使向Wall Lenders**的**贷款得到满足。

**但是**，**我**们会继续努力，并会在情况改善后立即进行更新

**真**诚**的**

Zhì

suǒyǒu qiáng dàikuǎn rén;

qǐng zhùyì, zài 2020 nián 3 yuè 22 rì xīngqírì, dálāsī xiàn fǎguān kè lái·zhānjīnsī (Clay Jenkins) fābùle yī xiàng quánxiàn fànwéi nèi de jiù dì bìhù lìng, zhè shì dé kè sà sī zh

"bǎochí jiātíng ānquán" mìnglìng yú xiàwǔ 11:59 Shēngxiào. 3 Yuè 23 rì jiāng chíxù dào 4 yuè 3 rì. Zài zhōu cháng géléi gé·yǎpéi (Greg Abbott) jùjué fābù quán zhōu fànwéi nèi de b

Yīncǐ, yóuyú diàn yūn bìngdú dà liúxíng, wǒmen de bàngōngshì gēnjù zhōu hé liánbāng zhǐnán bǎochí guānbì zhuàngtài.

Yú 2020 nián 3 yuè 19 rì jǔ háng huìyì, yǐ zuìzhōng quèdìng shíxiàn zhōngguó dàifāng fùkuǎn suǒ xū de jiégòu hé chéngxù.2020 Nián 3 yuè 19 rì, zhōngguó kǒuyì yuán Jamyang cóng jiā

Dàibiǎo yuángào de xiūsīdùn lǜshī zàichǎng, ér niǔyuē lǜshī shìwù suǒ de lǜshī zé yǐ diàn yūn bìngdú wèi yuányīn.

Huìyì de mùdì shì zuìzhōng quèdìng xiàng zhōngguó dàifāng fùkuǎn de jiégòu hé chéngxù.

Dāng yuángào de lǜshī yǔ wǒmen de fǎlǜ tuánduì dáchéng xiéyì shí, lìng rén yíhàn de shì, màikè'ěr·fù de xíngwéi rúcǐ hào zhàn, biǎoxiàn chū fènnù hé nùhuǒ, yǐ zhìyú tā de lǜshī wu

Xiǎnrán, yǐjīng yóu Wall shítǐ zhīfùle shù bǎi wàn měiyuán de Michael Fu jiāng jìxù zǔzhǐ měiguó cǎiqǔ de suǒyǒu xíngdòng, yǐ shǐ xiàng Wall Lenders de dàikuǎn dédào mǎnzú.

Dànshì, wǒmen huì jìxù nǔlì, bìng huì zài qíngkuàng gǎishàn hòu lìjí jìnxíng gēngxīn

zhēnchéng de

**Thanks & regards**
**Murugan Venkat**

**Date : 12/25/2019 9:02:04 AM**
**From : "Murugan Venkat"**
**To : "Murugan Venkat"**
**Cc : "Tim Barton" , "Hongpeng Lin"**
**Subject : CONFIDENTIAL: WALL LENDERS CONFERENCE CALL Tuesday 7 January 2020 9:00am CHINA STANDARD TIME**

Dear WALL Lenders,

We shall conduct a WALL LENDERS call on Tuesday, 7th January 2020 to provide an update on the pending lawsuit initiated by Michael Fu against the WALL companies.

As a result of this unexpected lawsuit by broker Michael Fu who is seeking additional commissions, all activities on the WALL companies are presently under review by litigation counsel, including the repayment of Lender loans and other related matters arising from this dispute with Michael Fu.

Please respond via email by January 3, 2010 that you will be participating on this Lenders call on January 7, 2020 and a CODE will be sent to you confirming that you shall join the Lenders call with Timothy L. Barton.

Accordingly, kindly email your reply to mvenkat@jmjdevelopment.net

**Thanks & regards**
**Murugan Venkat**

**Date : 1/7/2020 12:26:52 AM**
**From : "Murugan Venkat"**
**To : "Murugan Venkat"**
**Cc : "Tim Barton" , "Hongpeng Lin"**
**Subject : JMJ Project Updates**
**Attachment : Lender U.pdf;**

Hello to every one

Please see the Project Status Update in the attachment

**Thanks & regards**
**Murugan Venkat**

# LENDER UPDATE

## 2019 Q4

PRESENTED
6TH JAN 2020 MONDAY



# WALL ENTITIES

Wall Entities

# LENDER UPDATE



The purpose of this document is to provide a 4th Quarter status update to the various lenders (the "Lenders") in the following single purpose entities ("SPE's"):

**WALL007, LLC**
----
Orchard Village
Fort Worth, TX
144 Acres

**WALL009, LLC**
----
Venus Ridge & Northstar
Venus, TX
100 Acres

**WALL010, LLC**
----
Lost Creek
Fort Worth, TX
170.44 Acres

**WALL011, LLC**
----
Khoury
Venus, TX
128 Acres

**WALL012, LLC**
----
Lyons Ranch Phase 1
Aledo, TX
332 Acres

**WALL016, LLC**
----
Lyons Ranch Phase 2
Aledo, TX
160 Acres

**WALL017, LLC**
----
Windmill Farms
Forney, TX
200 Acres

**WALL018, LLC**
----
Griffin
Venus, TX
157 Acres

**WALL019, LLC**
----
Bear Creek
Parker County, TX
100 Acres

## GENERAL BACKGROUND

During 2017 and 2018 the SPE's raised capital from the Lenders to acquire, entitle and develop the various parcels of land that are currently held by the respective SPE's. Following the closing and acquisition of the various parcels of land, we have set forth on a plan to work with the various city officials and engineers in an effort to plan, permit and secure the capital required to install the sewer, water, streets, sidewalks, green space, entry monuments, amenity features, etc. for each development.

Once these plans were created, we set out to secure various homebuilders in which to sell the finished single-family lots such that the homebuilders could start construction of the homes, and ultimately market and sell the homes to the ultimate homeowners. As these lots are sold, the cash proceeds are then used to pay off the construction lender, fees, interest expense, etc., and then ultimately, after all the obligations are paid, the net proceeds are used to pay back the Lenders.

Although each of the SPE's is at varying levels of development, all of the SPE's appear to be tracking with the initial Wall Entities development plans. The current status update for each of these SPE's is as follows:

WALL016-JUN ZENG-0020
**APPELLANT 126**

| ENTITY NAME | PROJECT NAME | LOCATION | LAND DETAILS |
|---|---|---|---|
| WALL007, LLC | ORCHARD VILLAGE | FORT WORTH, TX | 144 ACRES |

Orchard Village is a 144 +/- acre residential development located approximately 11 miles south of Downtown Fort Worth, Texas. The development Is located in one of the most desired submarkets in the Dallas-Fort Worth area.

Housing demand in the submarket remains stable as homebuyers flock to the top-rated schools while still desiring to remain close to major thoroughfares and employment hubs.

Following its acquisition in 2017, we commenced to plat the property into four separate and distinct phases. Following the city platting process, we then secured a contract and in 2018 the SPE sold an initial phase (approximately 330-lots) to Legend Homes, a national U.S. homebuilder.

At the present time, the grading activities are taking place for the entire development, and we have secured a second homebuilder contract to acquire lots in phase 1A and 3 and build a “for rent” housing product for approximately 512 homes. Plans for these lots have already been approved by the city of Fort Worth, and a pre-construction meeting has been requested and is pending approval. The final plat is presently being revised by the Wall Entities engineer and surveyor with respect to a “zero-lot line” zoning per the builder.

Once these items are submitted, it is estimated that the process will take approximately two weeks for the Community Facilities Agreement to be approved and a pre-construction meeting to take place. Following this meeting, construction of the lots will commence, and it is estimated that it will take approximately 10-months to complete the lots, weather permitting.

As the lots are delivered to the home builder, they will start construction immediately, and are scheduled to deliver the finished homes at a rate of 50 homes per quarter, or about 2 1/2 years to complete the development.

The final phase of 1B will be 131-lots that will be developed and ultimately sold to a homebuilder. We have received offers and proposed contracts by two U.S. National homebuilders … DR Horton and Lennar Homes … and we are presently evaluating its options.




## PROJECT STATUS | AS OF 2019 Q4

| # | DETAILS | COMPLETED | IN PROGRESS | NOT DUE YET |
|---|---|---|---|---|
| 1 | First site inspection | ✓ | | |
| 2 | Preliminary evaluation | ✓ | | |
| 3 | Offering and negotiations | ✓ | | |
| 4 | Due diligence | ✓ | | |
| 5 | Contract | ✓ | | |
| 6 | Escrow payment | ✓ | | |
| 7 | Appraisal | ✓ | | |
| 8 | Cost estimate | ✓ | | |
| 9 | Preliminary Design - Water | ✓ | | |
| 10 | Preliminary Design - Power | ✓ | | |
| 11 | Preliminary Design - Drainage | ✓ | | |
| 12 | Preliminary Design - Paving | ✓ | | |
| 13 | Preliminary Design - Platting | ✓ | | |
| 14 | Preliminary Design - Grading | ✓ | | |
| 15 | Records to the bank | ✓ | | |
| 16 | Final Design / Permit | ✓ | | |
| 17 | Title Insurance | ✓ | | |
| 18 | Closing | ✓ | | |
| 19 | Construction | | ✓ | |
| 20 | Sale of paper lots | | ✓ | |

| ENTITY NAME | PROJECT NAME | LOCATION | LAND DETAILS |
|---|---|---|---|
| WALL009, LLC | VENUS RIDGE & NORTHSTAR | VENUS, TX | 100 ACRES |

Venus, Texas is located approximately 45-minutes southwest of Dallas, and about 30-minutes southeast of Fort Worth and has an unemployment rate of 3.5%, and is predicted to have job growth in excess of 40% over the next 10-years, which is well above the national average of 33%.

We have assembled a significant holding of property in the Venus market as a result of the popular Venus Independent School District, which has an elementary, middle and high school all within a 1-mile distance from the two sites.

Venus Ridge was the first property to be acquired in Venus, and as such, is the most developed of all the Wall projects. Following its acquisition of the Venus Ridge land in 2017, we set out to plan, entitle, plat and develop the 33 single family estate lots. As the lots were being developed, we secured a home builder (Carnegie Homes) to commit to purchase all 33 of the lots. As the lots have been sold to Carnegie Homes in 2018 and 2019. The sales proceeds have been used to pay off the construction loan which was secured to develop the lots. As of the 3rd quarter, Carnegie Homes has sold 20 out of the total 33 homes.

Northstar was an additional land assemblage. Although divided into three phases, the Phase 1 plans have already been approved by the city of Venus and the special water district. We have already held pre-construction meetings and plans have been issued for construction. The final plat for Phase 1 has been approved by the City Council and will be recorded once the final construction has been completed.

In addition to the on-site activities, offsite sanitary sewer plans are currently being reviewed by the city and are pending approval. The final approval of these plans will not hold back construction of Phase 1 although final acceptance will not be granted until the offsite sewer has been completed.

With respect to the lot sales, we have solicited offers from various homebuilders and it is presently negotiating final purchase and sale agreements with Carnegie Homes and Lillian Homes.




## PROJECT STATUS | AS OF 2019 Q4

| # | DETAILS | COMPLETED | IN PROGRESS | NOT DUE YET |
|---|---|---|---|---|
| 1 | First site inspection | ✓ | | |
| 2 | Preliminary evaluation | ✓ | | |
| 3 | Offering and negotiations | ✓ | | |
| 4 | Due diligence | ✓ | | |
| 5 | Contract | ✓ | | |
| 6 | Escrow payment | ✓ | | |
| 7 | Appraisal | ✓ | | |
| 8 | Cost estimate | ✓ | | |
| 9 | Preliminary Design - Water | ✓ | | |
| 10 | Preliminary Design - Power | ✓ | | |
| 11 | Preliminary Design - Drainage | ✓ | | |
| 12 | Preliminary Design - Paving | ✓ | | |
| 13 | Preliminary Design - Platting | ✓ | | |
| 14 | Preliminary Design - Grading | ✓ | | |
| 15 | Records to the bank | ✓ | | |
| 16 | Final Design / Permit | ✓ | | |
| 17 | Title Insurance | ✓ | | |
| 18 | Closing | ✓ | | |
| 19 | Construction | | ✓ | |
| 20 | Sale of paper lots | | ✓ | |



WALL016-JUN ZENG-0022
APPELLANT 128

| ENTITY NAME | PROJECT NAME | LOCATION | LAND DETAILS |
|---|---|---|---|
| WALL010, LLC | LOST CREEK | FORT WORTH, TX | 170.44 ACRES |




Lost Creek is located southwest of Fort Worth with easy access to I-20. We have finished the Master Plan for the Project and are working on utility services for the project.

The project is challenging, but we are diligently working on getting access to be approved by the city and Fire Marshall. Additionally, work has been done to acquire access which would meet city regulations.

Once city approvals can be met, there are many home builders who have shown interest.

## SAMPLE EXTERIORS





## PROJECT STATUS | AS OF 2019 Q4

| # | DETAILS | COMPLETED | IN PROGRESS | NOT DUE YET |
|---|---|---|---|---|
| 1 | First site inspection | ✓ | | |
| 2 | Preliminary evaluation | ✓ | | |
| 3 | Offering and negotiations | ✓ | | |
| 4 | Due diligence | ✓ | | |
| 5 | Contract | ✓ | | |
| 6 | Escrow payment | ✓ | | |
| 7 | Appraisal | ✓ | | |
| 8 | Cost estimate | ✓ | | |
| 9 | Preliminary Design - Water | ✓ | | |
| 10 | Preliminary Design - Power | ✓ | | |
| 11 | Preliminary Design - Drainage | ✓ | | |
| 12 | Preliminary Design - Paving | ✓ | | |
| 13 | Preliminary Design - Platting | ✓ | | |
| 14 | Preliminary Design - Grading | ✓ | | |
| 15 | Records to the bank | ✓ | | |
| 16 | Final Design / Permit | ✓ | | |
| 17 | Title Insurance | ✓ | | |
| 18 | Closing | ✓ | | |
| 19 | Construction | | ✓ | |
| 20 | Sale of paper lots | | ✓ | |

WALL016-JUN ZENG-0023
APPELLANT 129

| ENTITY NAME | PROJECT NAME | LOCATION | LAND DETAILS |
|---|---|---|---|
| WALL011, LLC | KHOURY | VENUS, TX | 128 ACRES |

This Project is ongoing. Two master plans have been completed and the utilities are being negotiated with the city. Negotiations are also underway for support from the city for utility costs and the conversation is moving positively.

There continues to be high residential demand in the area and purchase contracts from home builders are being negotiated.



SAMPLE EXTERIOR AND INTERIOR





## PROJECT STATUS | AS OF 2019 Q4

| # | DETAILS | COMPLETED | IN PROGRESS | NOT DUE YET |
|---|---|---|---|---|
| 1 | First site inspection | ✓ | | |
| 2 | Preliminary evaluation | ✓ | | |
| 3 | Offering and negotiations | ✓ | | |
| 4 | Due diligence | ✓ | | |
| 5 | Contract | ✓ | | |
| 6 | Escrow payment | ✓ | | |
| 7 | Appraisal | ✓ | | |
| 8 | Cost estimate | ✓ | | |
| 9 | Preliminary Design - Water | ✓ | | |
| 10 | Preliminary Design - Power | ✓ | | |
| 11 | Preliminary Design - Drainage | ✓ | | |
| 12 | Preliminary Design - Paving | ✓ | | |
| 13 | Preliminary Design - Platting | ✓ | | |
| 14 | Preliminary Design - Grading | ✓ | | |
| 15 | Records to the bank | ✓ | | |
| 16 | Final Design / Permit | ✓ | | |
| 17 | Title Insurance | ✓ | | |
| 18 | Closing | ✓ | | |
| 19 | Construction | | ✓ | |
| 20 | Sale of paper lots | | ✓ | |



WALL016-JUN ZENG-0024
APPELLANT 130

| ENTITY NAME | PROJECT NAME | LOCATION | LAND DETAILS |
|---|---|---|---|
| WALL012, LLC | LYONS RANCH PHASE 1 | ALEDO, TX | 332 ACRES |



We have contracted to acquire approximately 469 acres +/- of land in the popular Eastern Parker County area, within the City of Fort Worth Extra-Territorial Jurisdiction ("ETJ"), for the Development of a Single-Family Subdivision. The Subdivision will be built in four total phases, and upon full build-out, will consist of up to 300-Single-Family Estate Lots and will be named "Lyons Ranch." Lyons Ranch is located at the intersection of White Settlement and Farmer Road, just north of Interstate 20.

Lyons Ranch is currently in the preliminary stage at the city of Fort Worth entitlement process. Phase 1 of the development will take place on approximately 103-acres and consist of a total of 61-single family estate lots. In addition to the development of the streets, water, lighting, wayfinding, utilities, etc., phase 1 will also consist of the development of entryway features, signage, amenity lakes, detention facilities and green space. It is envisioned that Phase I will commence construction following the final approval of the Preliminary Plat, which will require the submission of the Integrated Storm Water Management (ISWM) and Traffic Impact Assessment (TIA), and the preliminary engineered plans and specifications.

The ISWM and TIA are presently being revised by our engineers per the comments received by the city of Fort Worth. Once the studies have been approved, then the preliminary plat can be submitted for review by the Fort Worth Planning and Zoning Committee. Once the preliminary plat is approved, then the project will go into final design phase and approval by the city of Fort Worth and Parker County. The Phase 1 Lots are projected to break ground during Q2 of 2020.

## PROJECT STATUS | AS OF 2019 Q4

| # | DETAILS | COMPLETED | IN PROGRESS | NOT DUE YET |
|---|---|---|---|---|
| 1 | First site inspection | ✓ | | |
| 2 | Preliminary evaluation | ✓ | | |
| 3 | Offering and negotiations | ✓ | | |
| 4 | Due diligence | ✓ | | |
| 5 | Contract | ✓ | | |
| 6 | Escrow payment | ✓ | | |
| 7 | Appraisal | ✓ | | |
| 8 | Cost estimate | | ✓ | |
| 9 | Preliminary Design - Water | | ✓ | |
| 10 | Preliminary Design - Power | | ✓ | |
| 11 | Preliminary Design - Drainage | | ✓ | |
| 12 | Preliminary Design - Paving | | | ✓ |
| 13 | Preliminary Design - Platting | | ✓ | |
| 14 | Preliminary Design - Grading | | ✓ | |
| 15 | Records to the bank | | | ✓ |
| 16 | Final Design / Permit | | | ✓ |
| 17 | Title Insurance | | | ✓ |
| 18 | Closing | | | ✓ |
| 19 | Construction | | | ✓ |
| 20 | Sale of paper lots | | | ✓ |

| ENTITY NAME | PROJECT NAME | LOCATION | LAND DETAILS |
|---|---|---|---|
| WALL016, LLC | LYONS RANCH PHASE 2 | ALEDO, TX | 160 ACRES |

We have finalized easements for road and utility access for Lyons Ranch Phase 2. A water plant is being designed and permits for such is in process. The master plan has been completed. Once water permits and city permits are approved, construction will start the following quarter.



SAMPLE EXTERIOR AND INTERIOR





PROJECT STATUS | AS OF 2019 Q4

| # | DETAILS | COMPLETED | IN PROGRESS | NOT DUE YET |
|---|---|---|---|---|
| 1 | First site inspection | ✓ | | |
| 2 | Preliminary evaluation | | ✓ | |
| 3 | Offering and negotiations | | | ✓ |
| 4 | Due diligence | | | ✓ |
| 5 | Contract | | | ✓ |
| 6 | Escrow payment | | | ✓ |
| 7 | Appraisal | | | ✓ |
| 8 | Cost estimate | | | ✓ |
| 9 | Preliminary Design - Water | | | ✓ |
| 10 | Preliminary Design - Power | | | ✓ |
| 11 | Preliminary Design - Drainage | | | ✓ |
| 12 | Preliminary Design - Paving | | | ✓ |
| 13 | Preliminary Design - Platting | | | ✓ |
| 14 | Preliminary Design - Grading | | | ✓ |
| 15 | Records to the bank | | | ✓ |
| 16 | Final Design / Permit | | | ✓ |
| 17 | Title Insurance | | | ✓ |
| 18 | Closing | | | ✓ |
| 19 | Construction | | | ✓ |
| 20 | Sale of paper lots | | | ✓ |

WALL016-JUN ZENG-0026
**APPELLANT 132**

| ENTITY NAME | PROJECT NAME | LOCATION | LAND DETAILS |
|---|---|---|---|
| WALL017, LLC | WINDMILL FARMS | FORNEY, TX | 200 ACRES |

Negotiations are ongoing for access to utilities and permits from the city. We are revising the previous master plan to accommodate additional density.

After the road plan is approved and permits are released, construction will start the following quarter.




SAMPLE EXTERIOR AND INTERIOR





## PROJECT STATUS | AS OF 2019 Q4

| # | DETAILS | COMPLETED | IN PROGRESS | NOT DUE YET |
|---|---|---|---|---|
| 1 | First site inspection | ✓ | | |
| 2 | Preliminary evaluation | ✓ | | |
| 3 | Offering and negotiations | | ✓ | |
| 4 | Due diligence | | | |
| 5 | Contract | ✓ | | |
| 6 | Escrow payment | ✓ | | |
| 7 | Appraisal | ✓ | | |
| 8 | Cost estimate | | ✓ | |
| 9 | Preliminary Design - Water | | ✓ | |
| 10 | Preliminary Design - Power | | ✓ | |
| 11 | Preliminary Design - Drainage | | ✓ | |
| 12 | Preliminary Design - Paving | | ✓ | |
| 13 | Preliminary Design - Platting | | ✓ | |
| 14 | Preliminary Design - Grading | | ✓ | |
| 15 | Records to the bank | | ✓ | |
| 16 | Final Design / Permit | | | ✓ |
| 17 | Title Insurance | | ✓ | |
| 18 | Closing | | ✓ | |
| 19 | Construction | | | ✓ |
| 20 | Sale of paper lots | | | ✓ |

WALL016-JUN ZENG-0027
APPELLANT 133

| ENTITY NAME | PROJECT NAME | LOCATION | LAND DETAILS |
|---|---|---|---|
| WALL018, LLC | GRIFFIN | VENUS, TX | 157 ACRES |

The Project Master Plan is complete. We are waiting for new utility plan from the City. The City is active in creating a plan to support costs on infrastructure. We expect to have all predevelopment issues resolved by next quarter.



SAMPLE EXTERIOR AND INTERIOR





PROJECT STATUS | AS OF 2019 Q4

| # | DETAILS | COMPLETED | IN PROGRESS | NOT DUE YET |
|---|---|---|---|---|
| 1 | First site inspection | ✓ | | |
| 2 | Preliminary evaluation | ✓ | | |
| 3 | Offering and negotiations | ✓ | | |
| 4 | Due diligence | ✓ | | |
| 5 | Contract | ✓ | | |
| 6 | Escrow payment | ✓ | | |
| 7 | Appraisal | ✓ | | |
| 8 | Cost estimate | | ✓ | |
| 9 | Preliminary Design - Water | | ✓ | |
| 10 | Preliminary Design - Power | | ✓ | |
| 11 | Preliminary Design - Drainage | | ✓ | |
| 12 | Preliminary Design - Paving | | ✓ | |
| 13 | Preliminary Design - Platting | | ✓ | |
| 14 | Preliminary Design - Grading | | ✓ | |
| 15 | Records to the bank | | ✓ | |
| 16 | Final Design / Permit | | ✓ | |
| 17 | Title Insurance | ✓ | | |
| 18 | Closing | ✓ | | |
| 19 | Construction | | | ✓ |
| 20 | Sale of paper lots | | | ✓ |



WALL016-JUN ZENG-0028
APPELLANT 134

| ENTITY NAME | PROJECT NAME | LOCATION | LAND DETAILS |
|---|---|---|---|
| WALL019, LLC | BEAR CREEK | PARKER COUNTY, TX | 100 ACRES |

Bear Creek was awarded full rights as a utility district and work is currently ongoing to get utility system in place.

There is strong demand from home builders and the project continues to garner interest as Bear Creek is part of the overall development that will open up the City of Aledo. There will be several more months of predevelopment before project start.



SAMPLE EXTERIOR





PROJECT STATUS | AS OF 2019 Q4

| # | DETAILS | COMPLETED | IN PROGRESS | NOT DUE YET |
|---|---|---|---|---|
| 1 | First site inspection | ✓ | | |
| 2 | Preliminary evaluation | ✓ | | |
| 3 | Offering and negotiations | ✓ | | |
| 4 | Due diligence | ✓ | | |
| 5 | Contract | ✓ | | |
| 6 | Escrow payment | | | ✓ |
| 7 | Appraisal | ✓ | | |
| 8 | Cost estimate | | ✓ | |
| 9 | Preliminary Design - Water | | | ✓ |
| 10 | Preliminary Design - Power | | | ✓ |
| 11 | Preliminary Design - Drainage | | | ✓ |
| 12 | Preliminary Design - Paving | | | ✓ |
| 13 | Preliminary Design - Platting | | | ✓ |
| 14 | Preliminary Design - Grading | | | ✓ |
| 15 | Records to the bank | | | ✓ |
| 16 | Final Design / Permit | | | ✓ |
| 17 | Title Insurance | ✓ | | |
| 18 | Closing | ✓ | | |
| 19 | Construction | | | ✓ |
| 20 | Sale of paper lots | | | ✓ |

As noted in this Lender Update, much activity and progress has taken place. However, much more is still to come. It is our belief that this update is self-explanatory, however, in the event that any Lender requires additional information, please feel free to contact a our representative by calling at 972-385-9934.

**13901 Midway Road**
**Dallas, Texas 75244**

**Phone: 972.385.9934**
**Fax: 972.241.4484**



This brochure contains various performance estimates, targets and/or projections that are based upon and subject to various assumptions made as of the date such estimates, targets and/or projections were developed. All estimates are unaudited and calculated on a pro forma basis. Estimates are provided for informational purposes only. While such estimates, targets and/or projections are believed to be reasonable approximations based upon available information, no guarantee or assurances can be provided as to their accuracy. Consequently, the inclusion of the estimates, targets and/or projections herein should not be regarded as any representation that such estimates, targets and/or projections will be achieved.

This brochure makes use of stock photography. Some photography is for illustrative purposes only and persons/renderings depicted are models/examples. They are representative in nature and subject to change.

**Date : 4/27/2020 4:09:28 AM**
**From : "Murugan Venkat"**
**To : "Murugan Venkat"**
**Cc : "Saif Sachwani" , "Tim Barton"**
**Subject : Latest update on the bankruptcy petitions filed by Michael FU representing some of you as "Co-Lenders"**
**Attachment : Letter .docx;WALL011_.pdf;WALL012_.pdf;WALL016_.pdf;WALL017_.pdf;WALL007_.pdf;WALL009_.pdf;WALL010_.pdf;List of .txt;image001.png;**

Dear Lender

Please find the attached letter from the attorney representing the Wall entities, seeking to dismiss the series of involuntary bankruptcies filed in the court what Mr. Fu and Mr. Jang have organized recently.

Also, see the copies of the Bankruptcy petitions in the attachments, which gives the names and your address, as the petitioner

#20-31135-sgj7 for Wall011 LLC
#20-31136-hdh7 for Wall012 LLC
#20-31138-bjh7 for Wall016 LLC
#20-31139-hdh7 for Wall017 LLC
#20-31131-hdh7 for Wall007 LLC
#20-31133-sgj7 for Wall009 LLC
#20-31134-bjh7 for Wall010 LLC

This action is to stop our development progress and force us to sell the assets the Wall entities have.

This action if approved by the court will require us to sell the assets under duress of a court ordered sale and in the middle of the Virus forced crisis. This will certainly cause a loss for all of us.

In a sale the first money will pay the contraction loan and all legal cost that we have spent. The next funds will pay any other debt owed for construction.

They will also pay the court and real estate broker fee.

Then the law firm that Mr. Fu hired will take his 30% or what ever he is owed

Then what ever is left will pay back the loan to you

You will most likely never get your interest or original fund back.

If you see your name in the bankruptcy petitions, then we will consider you have joined Mr. Fu in this case and will be responsible for any damage it causes to all the lenders and the Wall company

It is important that you check your names in the bankruptcy petitions [attached]. If you see your name and have not signed with the lawyer to join this case, please contact us at once.

If you see you name and have not signed a letter with the Lawyer, then you need to tell us so we can remove your name

Once again Mr. Fu has his own interest before lender. He and Mr. Jang have put this in the Newspaper to harm us and this has damaged us very badly and hence we are not able to work and get funds for the project.

We wait for your reply email

**Thanks & regards**
**Murugan Venkat**

---

**From:** Joyce Lindauer
**Sent:** Friday, 24 April 2020 7:01 PM
**To:** Tim Barton;
**Subject:** Letter

---

Letter

**PLEASE NOTE OUR NEW ADDRESS IN DOWNTOWN DALLAS**

Joyce Lindauer
Joyce W. Lindauer Attorney, PLLC
1412 Main Street
Suite 500
Dallas, TX 75202
PH 972-503-4033
FAX 972-503-4034
CEL 214-957-8039

List of Petitioners in the Bankruptcy Case

Note: Please check the copies of the court filiings to check your names

Jun Li

Yunding Kang

Cunxiang Ji

Jin Wang

Peng Guo

Lin Zhou

Qu Chen

Kai Tian

Yijing Wu

Xuegeng Gong

Jin Wang

Weijia Kong

Heng Zhang

Hong Guo

Pei Guan

Yue Xu

Mai Ye

Chenchen Jiang

Qiuying Li

Ruinian Wu

Lin Zhou

Liying Yang

Yan Zhang

Wenjun Wang

Lan Ji

Ying Zhou

Lin Li

Li Jiang

Rufeng Ding

Cunxiang Ji

Lin Gao

Qiao Qin

Yue Zhang

Xiaodong Hao

Tianqing Song

Li Jiang

Weisi Wang

Xiaoquan Dai

Feng Yan

Heng Zhang

Ou Jiang

Jinzhe Wu

Yadan Liu

Wanwan Li

Wenjuan Yin

Jiancheng Chen

Yi Tang

Ying Zhang

Pengfei Dong

Kangying Mao

Yijing Wu

Li Jiang

Qin Chu

Yulan Chen

Sicheng Zhan

Pei Guan

Jingqiu Tang

Di Tang

Jun Zeng

Kui Wang

Yue Zhang

Jun Wang

Xiaomin Fan

Di Tang

Jialin Hu

Qin Chu

Jiaxiang Lu

Fuqing Chen

Hanjiang Fu

Aiguo Luo

Fang Ding

Xiangdong Zhu

Wai Ying

Yuan Yuan

Chao Xu

Guoqin Zhou

Yijing Wu

**Date : 10/25/2019 11:06:42 PM**
**From : "Hongpeng Lin"**
**To : "zjun2@126.com"**
**Subject : Letter from JMJ, 来自JMJ的一封信**

**Greetings Jun Zeng**

**For and on behalf of Tim Barton, Chairman of the JMJ group of entities in Dallas, Texas, USA. We hope to find you in good health and prosperity. This letter is to provide you with an update on the steps we have taken to find resolution for the issues presented in reference to the loan you have provided. Please understand, communicating directly with you has been difficult and restricted due to the involvement of Michael Fu and his Chinese owned company, PIC. We appreciate and thank you for your support in our U.S. based projects. Over the past two years Our company has had extensive growth which we have happily welcomed. Through this period of growth, we have continued to progress in business and employment of qualified individuals to assist in the growth. The JMJ entities have worked diligently to prepare this summary for your knowledge and response.**

**The Lenders from 2017, were paid the interest for the first year, during 2018. During the first quarter of 2019, the Tax returns for 2018 were filed, at that time certain non-compliance issues were brought to our attention as well as the consequent penalty and the possible criminal prosecution. The compliance issues include but are not limited to,**

- **Tax withholding on the interest payment**
- **Sending the payments back to the same bank account where it came from.**

**These details were highlighted in each receipt we issued to you upon receiving the wire transfer from you.**

**Since April 2019, the following steps have been put in place in order to proceed without having additional compliance issues.**

- **All funds have been kept in a JMJ entity bank account so as to send the appropriate wire-transfer to each lender accordingly.**
- **We needed to communicate with each of the lenders regarding the Mandatory Tax withholdings, therefore we asked Michael Fu and his staff to communicate with all the lenders to explain the various options.**

**We understand the value of hard-earned money for all the Chinese lenders. Hence, we would like to help as much as we can within the legal framework possible. Between the months of April and June, the money was maintained in the JMJ entity bank accounts. During the exponential growth of the company during this same time period, funds were needed to finance our growth. In June one of our managers, travelled to Singapore as well as to Hong Kong to engage the employees of PIC since we had not received sufficient communication from them on behalf of the Chinese Lenders. Since April 2019 and until now, Michael Fu and his company, PIC, have been telling us that most of the Chinese Lenders, cannot receive the funds back into the same bank account the initial wires had been sent out from. Michael Fu and his company also provided information stating that withholding of taxes was not acceptable. Since then, Michael Fu has engaged an attorney and we began working with his attorney. In the first week of September 2019, Michael Fu signed a non-binding agreement and since then, he has been reaching out to you. During the months of April through June of 2019 we did not see any progress on the part of Michael Fu. He also stopped us in reaching out to you directly and then made the decision to give up in communicating with each of the Chinese Lenders.**

**In the past few weeks, Michael Fu has informed us that it is becoming more expensive for him to be our agent in China. Since 2018, the JMJ entities have paid US$ 1.8 millions in commissions to Michael Fu and his company. He has invested a fraction of his commission in the name of his employees, family members, etc. where we are paying interest. Therefore, he has made a significant amount of funds during his tenure as our Chines Agent.**

**As a summary, here is what we would like to help, each and every one of you:**

**During the mediation process, which some of the Chinese lenders participated in about 3-4 months ago, Three different options were decided upon.**

- **Option One is to comply with the legal framework by doing the following,**
  - **Provide Interest payments after deducting tax withholdings**
  - **Interest payments must be sent to the same bank account where it originated from.**

    - **Discharge the loan document [if it is past 2 years]**
    - **Provide the copy of the Original Wire Transfer**
    - **Provide the tax ID with the IRS/USA**
    - **We are ready to send the interest within 30 days, from the date of verification of all the documents**
    - **In the following 90 days from the payment of Interest, we will remit the loan amount**
- **Option Two**
  - **Since shares in a publicly traded company are recognized as negotiable throughout the world, you can convert the loan into shares for which, we provide the buy-back guarantee and you can get paid through this process as per rules**
- **Option three**
  - **We can consult the experts and can customize a resolution to meet your individual needs. In this option we are asking you to pay 10% towards the expenses.**

**Since this is our first attempt to communicate with you directly, we hope you can understand we are working diligently to help and assist in resolving any issues with each of the Chinese Lenders. We are happy to answer all your questions and would like to provide you the best service possible. Two of our employees in our corporate office in Dallas, TX are originally from China and are available to communicate with you at your convenience. We believe there will not be any issues in our direct communications with you going forward. Please provide us with your speedy response.**

**Sincerely**

**Manager [Asia operations]**
**JMJ Group of Entities**
**Dallas, TX**

**Translation in Chinese is for easy understanding of our communication and for any error in translations, English version is binding and legal**

**中文翻译是为了易于理解我们的沟通，如果翻译中有任何错误，英语版本具有约束力和法律效力**

**您好，**

**谨代表美国德克萨斯州达拉斯的JMJ集团主席Tim Barton先生，我们希望您身体健康，生意兴荣。 这封信是为了向您提供我们在解决贷款相关问题的进展。 请您理解，由于Michael Fu以及其中国公司逸鼎的介入，与您的直接沟通变得异常困难与艰辛。我们十分感激与感谢您对我们在美国项目的支持。 在过去的两年中，我们公司取得了长足的发展，我们对此感到十分高兴。**

**在这期间，我们继续扩展我们的业务以及雇佣合适的人才以协助我们公司成长。 JMJ集团特别准备这份摘要给您知晓与响应。**

自**2017**年起开始计算，借款方于**2018**年支付了第一年的利息。 **2018**年的税表于**2019**年的第一季度提交， 我们注意到一些不符合法规的问题以及可能面临的处罚与刑事诉讼。 这些问题包括但不限于以下几点：

- 利息的预扣税
- 将付款发回原账户

这些在我们发给您的收据上都有注明。

自**2019**年**4**月份以来，我们已经采取以下措施来避免将来出现同样的问题。

- 所有资金已经放在**JMJ**集团的银行账户中，以便可以电汇给各个贷款方
- 我们需要向每个贷款方沟通预扣税的问题， 因此我们请**Michael Fu**及其工作人员联系每个贷款方进行沟通，解释各种选择。

我们了解以及明白所有中国贷款方的血汗钱是十分重要的。 因此，我们希望在法律框架内尽可能多的提供帮助。 从**4**月到**6**月之间，这笔钱存在**JMJ**集团的银行账户中。 于此同时，我们公司在快速增长，而大量的资金也需要来协助我们增长。由于从逸鼎没有收到有效的贷款人的沟通，我们的一位经理在**6**月份的时候前往新加坡和香港与逸鼎的员工进行面谈。 自**2019**年**4**月份至今，**Michael Fu**和他的公司逸鼎一直在告诉我们，大多数中国贷款人无法将资金退回到原始汇款账户中。**Michael Fu**与他的公司还声称不接受预扣税。 从那以后，**Michael Fu**聘请了一位律师，我们开始与这位律师沟通。 在**2019**年**9**月的第一周，**Michael Fu**签署了一份无约束力的协议， 也是从那时起，他一直在联系您。 从**2019**年**4**月到**6**月， 我们没有在**Michael Fu**身上看到任何的进展。 他还阻止我们直接与您联系， 最后决定放弃与每个中国的贷款人进行沟通。

在过去的几周里，**Michael Fu**告诉我们，作为我们在中国的代理商，成本变得越来越高了。 自**2018**年以来，**JMJ**集团已经向**Michael Fu**及其公司支付了**180**万美金的佣金。 我们每年还需要支付利息给他以员工，家人等名义投资的一部分赚取的佣金。 所以，他在担任我们中国代理期间**,**已经赚了一大笔钱。

作为总结，我们希望为大家提供以下帮助：

在大约**3-4**个月之前， 我们与一部分贷款人调解的过程中，决定了三种不同的选择。

- ○ 方案一是通过完成下列要求来遵守法律框架的要求
  - 扣除预扣税部分后返还剩余利息
  - 利息支付必须返回原始汇款账户
  - 解除贷款协议（如果两年期满）
  - 提供原汇款单的复印件
  - 提供美国国税局提供的税号
  - 我们准备好在认证完所有文件的**30**天内汇出利息
  - 在利息支付后的**90**天内，我们将汇出本金
- ○ 方案二
  - 由于上市公司的股票在全国范围内都是可转让的，因此您可以将贷款转换为股票，我们将提供回购担保， 这样您就可以按照这个流程来获得付款。
- ○ 方案三
  - 我们可以咨询专家来为根据您的需求来定制一个方案， 在这个情况下，我们要求您支付**10%** 的费用

鉴于这是我们第一次尝试与您直接沟通，因此希望您能理解我们正在努力工作，帮助和协助解决每个中国贷款人有关的任何问题。 我们很乐意回答您的所有问题并希望为您提供最好的服务。 我们位于德克萨斯州达拉斯办公室的两位来自中国的员工可以在您方便的时候与您联系。 我们相信，今后与您的直接沟通不会有任何问题。 请尽快给我们答复。

**谢谢!**

经理**[**亚洲业务**]**

**JMJ**集团

德克萨斯州达拉斯

**Date : 4/27/2020 3:46:26 PM**
**From : "Murugan Venkat"**
**To : "Murugan Venkat"**
**Cc : "Saif Sachwani" , "Tim Barton"**
**Subject : Message from Gov Gregg Abbott**

http://epaper.dallasnews.com/infinity/article_popover_share.aspx?guid=c306ff0d-0cd1-4130-84d1-320ba0981b6a

GROMER JEFFERS JR.Open for business? Be ready for a clash

# GROMER JEFFERS JR.

# Open for business? Be ready for a clash




**Dallas County Judge Clay Jenkins** is among those advocating for opening businesses in three phases, with the first phase for businesses where there's less risk of spreading the virus. (Ben Torres/Special Contributor)

Image 1 of 2

NEXT IMAGE

ov. Greg Abbott on Monday is expected to give guidance on how and when Texas should reopen businesses that have been closed or restricted to help mitigate the spread of COVID-19.

Abbott's announcement, which is expected to involve reopening much of the state sooner rather than later, will likely put him at loggerheads with local officials, most notably Dallas County Judge Clay Jenkins.

Jenkins wants areas like Dallas and Harris counties to be classified as places with significant spread of the novel coronavirus. That would necessitate that businesses in those areas come back on line considerably later than the rest of the state.

If the governor's plan is as I expect, Texas businesses could start coming back on line days after his order. It's unclear what he has planned for Dallas County, but it's a safe bet Jenkins won't like it.

Last week Abbott told WBAP in Dallas-Fort Worth that he and his advisers have been talking to businesses in detail about safe ways to reopen. "They're saying they need about a week, to ... go back in and clean up their facilities, and whether it be a movie theater ... or a restaurant to get everything organized to make sure they have all the supplies they need," he said.

"But this is going to be happening in the first couple of days in May, where you're going to be able to go back and go dining under safe standards, you're going to be able to get a haircut, you're going to be able to go to a hair salon, you're going to be able to start doing some things that people have been been long wanting to do."

The governor has formed a 39-member panel to help guide his decisions, though he's being criticized by some analysts because more than half of the panelists are Abbott campaign donors.

What Abbott says about big counties like Dallas and Harris is critical to how much resistance he gets from local and even business leaders.

Since the beginning of the pandemic, the politics surrounding the fight against COVID-19 have resulted in disparate views on when an area is safe for businesses to reopen and people to start gathering again. As more people lose jobs and businesses start to collapse, the debate has boiled down to getting to an ideal level of virus mitigation versus stopping the economic slide.

Statements by Lt. Gov. Dan Patrick about there being "more important things than living" in calling for businesses to restart and rallies led by fringe figures have obscured a tortuous debate by political leaders, business owners and average Americans.

When is it truly safe to go back?

According to *Fortune* magazine, the "real unemployment rate" is above 20% and 26.5 million U.S. jobs have been lost. Texas has seen 1.5 million claims for unemployment pay since March 15. The biggest job losses occurred in the restaurant industry, as well as in health care and retail sectors.

Though not at the rate of states like New York, the coronavirus has wreaked havoc on Texas. There have been 24,631 positive cases in Texas as of Sunday afternoon, with 648 deaths.

As of Sunday, Dallas County had more than 3,000 positive cases and 82 deaths.

Rural counties with meat processing plants seem to be coronavirus hot spots.

At the end of last week, Moore County had 8.53 cases per 1,000 residents. Potter had 1.83 per 1,000; and Randall had 1.03.

For comparison, Harris County, the state's most populous, had 1.16 cases per 1,000 people and Dallas County had 1.07.

While Abbott's goal has been to keep Texans safe, he's under pressure to begin the process of getting Texans back to work and restoring the state's usually roaring economy.

Places like Pecos County in West Texas, where at the beginning of the month there was only one confirmed coronavirus case, will likely be allowed to open with no restrictions.

Controversy could unfold when Abbott calls for businesses in Dallas County to reopen. If he classifies the Dallas area in the same way as most Texas counties, including nearby Ellis County, that would go against Jenkins' science-based approach.

Many scientists believe areas should consider reopening after two consecutive weeks of reduced spread of the virus. Last week was the first time Dallas County saw a reduction in new transmissions from one week to the next. Another week of positive case reductions would put an initial phase of reopening in May.

Dallas County has a stay-at-home-order in place until May 15, but Abbott could override it.

How should businesses reopen?

Jenkins and others would like to have a process in three phases. Some businesses with less risk of spreading the virus would open first. They would be heavily monitored and testing for the virus would be ramped to higher levels than currently exist. Then close-contact businesses like tattoo shops and hair salons would go next. The last cluster would be movie theaters and other places that attract masses of people in confined spaces.

It's unclear when it would be safe to attend a Texas Rangers game at the team's new stadium or to jam into a music concert.

Abbott has the power to dictate his plan, and Jenkins is preparing to make a case against whatever aspect of the policy with which he disagrees, while backing up his objections with science.

Last week there was a preview of a Jenkins-Abbott clash, when the county judge disagreed with the governor's order that elective surgeries and other procedures could begin as early as April 22.

"I have, again, looked to the experts, the science, and the data," Jenkins wrote in a statement that called for an incremental approach.

"Such a carefully planned and phased approach will best ensure patient, provider and public safety," he said.

Some elected leaders are hoping for the best.

State Rep. Victoria Neave, D-Dallas, says she's working directly with the Strike Force to Open Texas to identify businesses owned by women, veterans and people of color.

"A solutions-focused approach to this challenge is necessary as we move forward with the governor's first phase of safely and strategically reigniting our economy," Neave said.

But expect more disagreements between Abbott and Jenkins, with area businesses caught in the middle.

It's similar to what's happening in states like Georgia, where last week Gov. Brian Kemp ordered the reopening of parts of the Peach State economy, including close-contact businesses like nail salons, barbershops and massage parlors.

Kemp's decision was counter to federal guidelines backed by President Donald Trump.

Throughout the pandemic there's been a lack of unity between federal, state and local officials.

The lack of a vaccine, which could take 18 months or more to develop, makes the thought of venturing out somewhat scary.

The ultimate choice to reopen or patronize a business will be made by Texas residents or executives. It's the people who will decide whether to go back to work, church, the movies or the bar.

*Twitter: @gromerjeffers*

**Date : 10/30/2019 11:01:47 PM**
**From : "Hongpeng Lin"**
**To : "zjun2@126.com"**
**Subject : Message from JMJ- JMJ的一封信**

The translation is provided for making it easy & comfortable to read by the lenders. However, translation errors may be there. Hence, the English version shall be used as official version

中文翻译是为了方便贷款人阅读和理解，但是翻译可能存在错误，我们不对翻译中的错误负责，因此请以英语版本为准。

Kind Attn: Zeng Jun

贷款人您好，

For Wall007 LLC, the interest payment was due on April 17th, 2019.

Wall007 LLC的利息应于2019年4月17日到期支付。

Quiet ahead of time, we notified PIC to provide the bank details of all the lenders and the US federal tax ID

我们在此之前就已经通知逸鼎提供所有贷款人的银行详细信息以及美国国税局的税号。

Since then, PIC was saying that PIC is representing all the Chinese lenders and stopped us in sending the payment by giving various reasons

从那以后，逸鼎一直在说他们代表了所有的中国客户，并通过各种理由阻止我们支付到期款项。

We therefore tried to reach out to each and every Chinese lender via WeChat as well as by email

因此，我们尝试通过微信以及电子邮件的方式与每个中国贷款人联系。

At that point of time, PIC engaged an attorney in US and put us into mediation process

那时，逸鼎在美国聘请了律师，并将我们带入了调解程序。

As part of the mediation, we signed a term sheet with PIC

作为调解的一部分，我们与逸鼎签署了条款协议。

While we received the options of the lenders, we received a notice from a new attorney representing PIC and some of the lenders

当我们收到贷款人的选择意向时，我们又收到一封律师通知信，这次是一个新律师，自称代表逸鼎和一些贷款人。

Then we received an another notice from an another attorney representing 14 lenders

然后，我们收到了一个另一位律师的通知，自称代表了14位贷款人。

When an another attorney is representing 14 lenders, it clearly indicates that PIC is no longer representing the Chinese lenders

然而当这位律师代表了14位贷款人时，则清楚地表明逸鼎不再代表中国的贷款人。

We therefore require the copy of the authorization what you have given to PIC. If you have not given any such authorization to PIC, we would like to reach out to you directly

因此，我们需要您提供您授权给逸鼎的授权副本，如果您没有给逸鼎任何授权的话，我们希望能直接跟您联系。

Here in our Dallas, we have two employees who are Chinese and can fluently speak your language. We strongly believe that these two employees would serve your needs better by communicating via WeChat and/or email

在我们达拉斯办公室，有两位来自中国的员工，他们可以说流利的中文。我们坚信，通过微信和/或电子邮件进行交流，着两位员工将更好的满足您的需求。

By this, we can certainly avoid any further delays

这样我们可以避免进一步的延误。

Please let us know

静待佳音

Signed by Manager [Asia Operations] by S Quraeshi

由亚洲运营部经理S Quraeshi签名

**Date : 11/8/2019 1:42:03 AM**
**From : "Hongpeng Lin"**
**To : "zjun2@126.com"**
**Cc : "Tim Barton" , "Murugan Venkat"**
**Subject : Negated Option to Convert-股权转换即将关闭**

Hi Zeng Jun

Because any unaccepted options to convert the loans into shares of the public company creates outstanding and indefinite liabilities on the books of the company and would negatively impact the financials in future years, any offer to permit the lenders to convert into shares shall expire within 30 days of this notice if such offer is not otherwise accepted in writing by the Lender as delivered to the borrower. After such period, the lenders shall have no further right to convert the loans into shares of the company although the company may continue to permit such option on a case by case basis in its sole discretion. All other options described under the Terms shall remain unaffected.

由于开放将借款转为上市公司股票这个选项会在上市公司的账簿上产生未清偿和无限期负债，并且会对未来几年的财务产生负面的影响。 因此, 如果借款人在30天内没有收到贷款人以书面形式来表达转换意愿的话，那么借款转换为股票的这个选项将会关闭。 在这之后，贷款人将无权再将借款转换为公司股票。 尽管公司可以继续根据具体情况自行决定是否允许这种转换的发生。 其他条款均不受影响。

S. Quareshi

S. 古雷西

Manager

经理

JMJ Asia Operations

JMJ亚洲部

The translation is provided for making it easy & comfortable to read by the lenders. However, translation errors may be there. Hence, the English version shall be used as official version

中文翻译是为了方便贷款人阅读和理解，但是翻译可能存在错误，我们不对翻译中的错误负责，因此请以英语版本为准。

**Date : 1/5/2020 7:19:16 AM**
**From : "Murugan Venkat"**
**To : "Murugan Venkat"**
**Cc : "Hongpeng Lin" , "Tim Barton"**
**Subject : RE: Conference Call Update**

To
The Wall016 lenders

With regards to the Conference Call on Monday, January 6, 2020, at 7:00 pm CST / Tuesday, January 7th at 9am China time, we wish to inform that you will be receiving the Conference Call details for the Monday/Tuesday call as soon as we resolve some technical issues with the IT Department's ability to accommodate all of the Lenders.

关于2020年1月6日星期一晚上7点（中国时间1月7日星期二）的电话会议，我们希望通知您，一旦我们解决了IT部门容纳所有贷款人的能力，你将立即收到星期一/星期二电话会议的电话会议详情。

guān yú 2020 nián 1 yuè 6 rì xīng qī yì wǎn shàng 7 diǎn （ zhōng guó shí jiān 1 yuè 7 rì xīng qī èr ） de diàn huà huì yì ， wǒ men xī wàng tōng zhī nín ， yí dàn wǒ men jiě jué le IT bù mén róng nà suǒ yǒu dài kuǎn rén de néng lì ， nǐ jiāng lì jí shōu dào xīng qī yī / xīng qī èr diàn huà huì yì de diàn huà huì yì xiáng qíng。

Thank you,
Vance McMurry
Attorney at Law
McMurry Law, PLLC
508 W. Lookout Dr., Ste. 14-74
Richardson, Texas 75080

P.S.: We used google translator. The purpose of translation is to provide the reading comfort in Chinese language. Errors in translation is regretted. For all practical purposes, the English version prevails

P.S.：我们使用谷歌翻译。 翻译的目的是提供汉语的阅读舒适。 翻译错误是令人遗憾的。 出于所有实际目的，英文版以

P.S.： wǒ men shǐ yòng gǔ gē fān yì。 fān yì de mù de shì tí gòng hàn yǔ de yuè dú shū shì。 fān yì cuò wù shì lìng rén yí hàn de。 chū yú suǒ yǒu shí jì mù dì ， yīng wén bǎn yǐ

The information contained in this message is intended only for the personal and confidential use of the designated recipients named above. This message may be an attorney-client communication and, as such, is privileged and confidential. If the reader of this message is not the intended recipient, you are hereby notified that you have received this document in error, and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone at 972-746-9656 and return the message to us by email (vance@mcmurrylegal.com). Thank you.

**Date : 1/7/2020 1:04:40 AM**
**From : "Murugan Venkat"**
**To : "Murugan Venkat"**
**Cc : "Tim Barton" , "Hongpeng Lin"**
**Subject : Re: Conference Call**

Dear Lenders,

We have sent you the Wall Entities Lender Projects Update for Q4 2019 for your perusal in advance of today's call.

Unfortunately, we are still experiencing technical difficulties so today's conference call is being rescheduled and our Technical Team will send you the new call in details for this week.

We look forward to speaking with you soon.

Thank you

**Thanks & regards**
**Murugan Venkat**

---

**From:** Murugan Venkat <MVenkat@jmjdevelopment.com>
**Date:** Monday, January 6, 2020 at 6:26 PM
**To:** Murugan Venkat <MVenkat@jmjdevelopment.com>
**Cc:** Tim Barton <tbarton@jmjdevelopment.com>, Hongpeng Lin <HLin@jmjdevelopment.com>
**Subject:** JMJ Project Updates

Hello to every one
Please see the Project Status Update in the attachment
**Thanks & regards**
**Murugan Venkat**

**Date : 1/8/2020 1:58:34 AM**
**From : "Murugan Venkat"**
**To : "Murugan Venkat"**
**Cc : "Tim Barton" , "Hongpeng Lin"**
**Subject : Re: Conference Call**

**All Lenders of WALL Entities**

In continuation of my earlier email dated Monday, January 6, 2020, at 7:04 PM CST, kindly note that the Conference Call which was originally scheduled for Tuesday, January 7, 2020, at 9:00 am [Chinese time], was not held due to technical difficulties. Therefore it is now being held as follows:

1. Thursday, January 9, 2020, at 9:00 am [Chinese time]

2. Tuesday, January 14, 2020, at 10:00 pm [Chinese Time] since the morning time was not convenient for some Lenders

Please let me know which date you prefer to call-in, and we will have a Mandarin-speaking Translator for both these Conference Calls. As you know, the purpose of the Lender Conference Call is to provide an update on the WALL Projects and share some recent developments. And, you should all have received the WALL Entities Lender Updates for Q4 2019; if you have not received it, let me know and I will email it to you.

Because of the Confidentiality provisions of our agreements, we are therefore planning to have One-to-One individual Lender Calls to respond to individual Lender queries with the Translator present. These One-to-One individual Lender Calls will be held on January 15, 16, 17 and 18, 2020; please let me know the date and time you wish to schedule the One-to-One Telephone Call, thank you.

We look forward to your participation and continued support,

**Thanks & regards**
**Murugan Venkat**

---

**From:** Murugan Venkat <MVenkat@jmjdevelopment.com>
**Date:** Monday, January 6, 2020 at 7:04 PM
**To:** Murugan Venkat <MVenkat@jmjdevelopment.com>
**Cc:** Tim Barton <tbarton@jmjdevelopment.com>, Hongpeng Lin <HLin@jmjdevelopment.com>
**Subject:** Re: Conference Call

Dear Lenders,

We have sent you the Wall Entities Lender Projects Update for Q4 2019 for your perusal in advance of today's call.

Unfortunately, we are still experiencing technical difficulties so today's conference call is being rescheduled and our Technical Team will send you the new call in details for this week.

We look forward to speaking with you soon.

Thank you

**Thanks & regards**
**Murugan Venkat**

---

**From:** Murugan Venkat <MVenkat@jmjdevelopment.com>
**Date:** Monday, January 6, 2020 at 6:26 PM
**To:** Murugan Venkat <MVenkat@jmjdevelopment.com>
**Cc:** Tim Barton <tbarton@jmjdevelopment.com>, Hongpeng Lin <HLin@jmjdevelopment.com>
**Subject:** JMJ Project Updates

Hello to every one
Please see the Project Status Update in the attachment
**Thanks & regards**
**Murugan Venkat**

**Date : 11/12/2019 4:28:55 PM**
**From : "Hongpeng Lin"**
**To : "曾军"**
**Cc : "Murugan Venkat" , "Tim Barton" , "Tim Barton" , "Murugan Venkat"**
**Subject : RE: Re:Negated Option to Convert-股权转换即将关闭**

Hi Zeng Jun,

Please allow me to walk you through the stock conversion process.

The stock option works great by bringing a higher value to the investors.

Investments in shares are risky. However, the conversion option comes with buy back guaranteed so that the Chinese investors, do not loose even a penny

The term sheet provides the time line for conversion

Here are the steps

Step 1 Your choice for the conversion

Step 2 Amended contract

Step 3 Processing the request and recording the conversion for compliances

You should receive the payment or shares in 15 days.
您好，
请允许我跟您讲解一下股票转换的过程。
转换股票的选项对投资者来说更有利，因为能带来更高的收益。
投资股票自然有风险，但是，转换股权的选项自带回购保证， 因此， 中国投资人不会损失一分钱。
条款列表提供了转换的时间
步骤如下：
第一步， 您选择要转换
第二步， 修改合同
第三步， 处理请求并合规地记录转换

您应该在15天内收到付款或股份。

Thanks,
Hongpeng Lin
JMJ Development, Inc.
1755 Wittington Place
Suite 340
Dallas, TX 75234
P: 972.385.9934
F: 972.241.4484
HLin@jmjdevelopment.com
www.jmjdevelopment.net
The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and / or privileged material. Any review, retransmission, dissemination or other use of, or taking action of any action in reliance upon this information by persons or entities other than the intended recipient is prohibited. If you received this message in error, please contact the sender and delete the material from all computers.

**From:** 曾军 <zjun2@126.com>
**Sent:** Monday, November 11, 2019 12:01 AM
**To:** Hongpeng Lin <HLin@jmjdevelopment.com>
**Cc:** chandler@yding.cn
**Subject:** Re:Negated Option to Convert-股权转换即将关闭

你好！
可以详细说明股权转换方案吗？

曾军

在 2019-11-08 09:42:03，"Hongpeng Lin" <HLin@jmjdevelopment.com> 写道：

> Hi Zeng Jun
> Because any unaccepted options to convert the loans into shares of the public company creates outstanding and indefinite

liabilities on the books of the company and would negatively impact the financials in future years, any offer to permit the lenders to convert into shares shall expire within 30 days of this notice if such offer is not otherwise accepted in writing by the Lender as delivered to the borrower. After such period, the lenders shall have no further right to convert the loans into shares of the company although the company may continue to permit such option on a case by case basis in its sole discretion. All other options described under the Terms shall remain unaffected.
由于开放将借款转为上市公司股票这个选项会在上市公司的账簿上产生未清偿和无限期负债，并且会对未来几年的财务产生负面的影响。 因此, 如果借款人在30天内没有收到贷款人以书面形式来表达转换意愿的话，那么借款转换为股票的这个选项将会关闭。 在这之后，贷款人将无权再将借款转换为公司股票。 尽管公司可以继续根据具体情况自行决定是否允许这种转换的发生。 其他条款均不受影响。

S. Quareshi
S. 古雷西
Manager
经理
JMJ Asia Operations
JMJ亚洲部
The translation is provided for making it easy & comfortable to read by the lenders. However, translation errors may be there. Hence, the English version shall be used as official version
中文翻译是为了方便贷款人阅读和理解，但是翻译可能存在错误，我们不对翻译中的错误负责，因此请以英语版本为准。

**Date : 11/13/2019 4:57:46 PM**
**From : "Hongpeng Lin"**
**To : "Murugan Venkat" , "曾军 "**
**Cc : "Tim Barton" , "chandler@yding.cn"**
**Subject : RE: Zeng Jun asking JMJ to follow the contract terms**

Hi Ven,

He was asking about the conversion. If you put the email from him below "可以详细说明股权转换方案吗？" into Google Translate, you will get "Can you elaborate on the equity conversion plan?" therefore, I reply the detail to him.

Thanks,
Hongpeng Lin
JMJ Development, Inc.
1755 Wittington Place
Suite 340
Dallas, TX 75234
P: 972.385.9934
F: 972.241.4484
HLin@jmjdevelopment.com
www.jmjdevelopment.net
The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and / or privileged material. Any review, retransmission, dissemination or other use of, or taking action of any action in reliance upon this information by persons or entities other than the intended recipient is prohibited. If you received this message in error, please contact the sender and delete the material from all computers.

---

**From:** Murugan Venkat <MVenkat@jmjdevelopment.com>
**Sent:** Wednesday, November 13, 2019 10:52 AM
**To:** 曾军 <zjun2@126.com>; Hongpeng Lin <HLin@jmjdevelopment.com>
**Cc:** Tim Barton <tbarton@jmjdevelopment.com>; chandler@yding.cn
**Subject:** Zeng Jun asking JMJ to follow the contract terms

Hello Hong
If Zeng Jun is asking us to follow the contract terms, I do not understand why then you were writing about conversion
Is it wrong in your translation?

**Thanks & regards**
**Murugan Venkat**
Here is the translation of what Zeng Jun wrote on Wednesday, November 13, 2019 2:05 AM

Hello there! I do not accept the equity plan, please pay according to the contract agreement signed before

**From:** 曾军 <zjun2@126.com>
**Sent:** Wednesday, November 13, 2019 2:05 AM
**To:** Hongpeng Lin <HLin@jmjdevelopment.com>
**Cc:** Murugan Venkat <MVenkat@jmjdevelopment.com>; Tim Barton <tbarton@jmjdevelopment.com>; chandler@yding.cn
**Subject:** Re:RE: Re:Negated Option to Convert-股权转换即将关闭

你好！
我不接受股权方案，请按之前签署的合同协议来打款。

在 2019-11-13 00:28:55，"Hongpeng Lin" <HLin@jmjdevelopment.com> 写道：

> Hi Zeng Jun,
>
> Please allow me to walk you through the stock conversion process.
>
> The stock option works great by bringing a higher value to the investors.
>
> Investments in shares are risky. However, the conversion option comes with buy back guaranteed so that the Chinese investors, do not loose even a penny
>
> The term sheet provides the time line for conversion
>
> Here are the steps
>
> Step 1 Your choice for the conversion
>
> Step 2 Amended contract

Step 3 Processing the request and recording the conversion for compliances

You should receive the payment or shares in 15 days.
您好，
请允许我跟您讲解一下股票转换的过程。
转换股票的选项对投资者来说更有利，因为能带来更高的收益。
投资股票自然有风险，但是，转换股权的选项自带回购保证，因此，中国投资人不会损失一分钱。
条款列表提供了转换的时间
步骤如下：
第一步，您选择要转换
第二步，修改合同
第三步，处理请求并合规地记录转换

您应该在15天内收到付款或股份。

Thanks,
Hongpeng Lin
JMJ Development, Inc.
1755 Wittington Place
Suite 340
Dallas, TX 75234
P: 972.385.9934
F: 972.241.4484
HLin@jmjdevelopment.com
www.jmjdevelopment.net
The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and / or privileged material. Any review, retransmission, dissemination or other use of, or taking action of any action in reliance upon this information by persons or entities other than the intended recipient is prohibited. If you received this message in error, please contact the sender and delete the material from all computers.

**From:** 曾军 <zjun2@126.com>
**Sent:** Monday, November 11, 2019 12:01 AM
**To:** Hongpeng Lin <HLin@jmjdevelopment.com>
**Cc:** chandler@yding.cn
**Subject:** Re:Negated Option to Convert-股权转换即将关闭

你好！
可以详细说明股权转换方案吗？

曾军

在 2019-11-08 09:42:03，"Hongpeng Lin" <HLin@jmjdevelopment.com> 写道：

> Hi Zeng Jun
> Because any unaccepted options to convert the loans into shares of the public company creates outstanding and indefinite liabilities on the books of the company and would negatively impact the financials in future years, any offer to permit the lenders to convert into shares shall expire within 30 days of this notice if such offer is not otherwise accepted in writing by the Lender as delivered to the borrower. After such period, the lenders shall have no further right to convert the loans into shares of the company although the company may continue to permit such option on a case by case basis in its sole discretion. All other options described under the Terms shall remain unaffected.
> 由于开放将借款转为上市公司股票这个选项会在上市公司的账簿上产生未清偿和无限期负债，并且会对未来几年的财务产生负面的影响。因此，如果借款人在30天内没有收到贷款人以书面形式来表达转换意愿的话，那么借款转换为股票的这个选项将会关闭。在这之后，贷款人将无权再将借款转换为公司股票。尽管公司可以继续根据具体情况自行决定是否允许这种转换的发生。其他条款均不受影响。
>
> S. Quareshi
> S. 古雷西
> Manager
> 经理
> JMJ Asia Operations
> JMJ亚洲部
> The translation is provided for making it easy & comfortable to read by the lenders. However, translation errors may be there. Hence, the English version shall be used as official version
> 中文翻译是为了方便贷款人阅读和理解，但是翻译可能存在错误，我们不对翻译中的错误负责，因此请以英语版本为准。

**Date : 11/13/2019 5:08:33 PM**
**From : "Murugan Venkat"**
**To : "Hongpeng Lin" , "曾军"**
**Cc : "Tim Barton" , "chandler@yding.cn"**
**Subject : RE: Zeng Jun asking JMJ to follow the contract terms**

Hello Hong

Your below email reminds me either of the following:

- When Zeng Jun asked about conversion, I guess, we failed to explain him the benefits. We need to review what we are writing as our answers to the Chinese Lenders. Perhaps, you can help me with the Chinese style of communication. I am aware that the schools in USA has "Writing Skills" Similarly, we need to provide the answers in the Chinese traditions. Please convey my apologies to Zeng Jun, for the constraints in communication. The Conversion brings higher value by minimizing the risk to zero with buy back guarantee. It is the outcome of a professional experts
- Alternatively, if Zeng Jun changed his mind, we have to accept what this valuable Chinese lender wants

**Thanks & regards**
**Murugan Venkat**

---

**From:** Hongpeng Lin <HLin@jmjdevelopment.com>
**Sent:** Wednesday, November 13, 2019 10:58 AM
**To:** Murugan Venkat <MVenkat@jmjdevelopment.com>; 曾军 <zjun2@126.com>
**Cc:** Tim Barton <tbarton@jmjdevelopment.com>; chandler@yding.cn
**Subject:** RE: Zeng Jun asking JMJ to follow the contract terms

Hi Ven,

He was asking about the conversion. If you put the email from him below "可以详细说明股权转换方案吗？" into Google Translate, you will get "Can you elaborate on the equity conversion plan?" therefore, I reply the detail to him.

Thanks,

Hongpeng Lin
JMJ Development, Inc.
1755 Wittington Place
Suite 340
Dallas, TX 75234
P: 972.385.9934
F: 972.241.4484
HLin@jmjdevelopment.com
www.jmjdevelopment.net

The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and / or privileged material. Any review, retransmission, dissemination or other use of, or taking action of any action in reliance upon this information by persons or entities other than the intended recipient is prohibited. If you received this message in error, please contact the sender and delete the material from all computers.

---

**From:** Murugan Venkat <MVenkat@jmjdevelopment.com>
**Sent:** Wednesday, November 13, 2019 10:52 AM
**To:** 曾军 <zjun2@126.com>; Hongpeng Lin <HLin@jmjdevelopment.com>
**Cc:** Tim Barton <tbarton@jmjdevelopment.com>; chandler@yding.cn
**Subject:** Zeng Jun asking JMJ to follow the contract terms

Hello Hong
If Zeng Jun is asking us to follow the contract terms, I do not understand why then you were writing about conversion
Is it wrong in your translation?

**Thanks & regards**
**Murugan Venkat**
Here is the translation of what Zeng Jun wrote on Wednesday, November 13, 2019 2:05 AM

Hello there! I do not accept the equity plan, please pay according to the contract agreement signed before

**From:** 曾军 <zjun2@126.com>
**Sent:** Wednesday, November 13, 2019 2:05 AM
**To:** Hongpeng Lin <HLin@jmjdevelopment.com>
**Cc:** Murugan Venkat <MVenkat@jmjdevelopment.com>; Tim Barton <tbarton@jmjdevelopment.com>; chandler@yding.cn
**Subject:** Re:RE: Re:Negated Option to Convert-股权转换即将关闭

你好！

我不接受股权方案，请按之前签署的合同协议来打款。

在 2019-11-13 00:28:55，"Hongpeng Lin" <HLin@jmjdevelopment.com> 写道：

Hi Zeng Jun,

Please allow me to walk you through the stock conversion process.

The stock option works great by bringing a higher value to the investors.

Investments in shares are risky. However, the conversion option comes with buy back guaranteed so that the Chinese investors, do not loose even a penny

The term sheet provides the time line for conversion

Here are the steps

Step 1 Your choice for the conversion

Step 2 Amended contract

Step 3 Processing the request and recording the conversion for compliances

You should receive the payment or shares in 15 days.
您好，
请允许我跟您讲解一下股票转换的过程。
转换股票的选项对投资者来说更有利，因为能带来更高的收益。
投资股票自然有风险，但是，转换股权的选项自带回购保证，因此，中国投资人不会损失一分钱。
条款列表提供了转换的时间
步骤如下：
第一步， 您选择要转换
第二步， 修改合同
第三步， 处理请求并合规地记录转换

您应该在15天内收到付款或股份。

Thanks,
Hongpeng Lin
JMJ Development, Inc.
1755 Wittington Place
Suite 340
Dallas, TX 75234
P: 972.385.9934
F: 972.241.4484
HLin@jmjdevelopment.com
www.jmjdevelopment.net
The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and / or privileged material. Any review, retransmission, dissemination or other use of, or taking action of any action in reliance upon this information by persons or entities other than the intended recipient is prohibited. If you received this message in error, please contact the sender and delete the material from all computers.

**From:** 曾军 <zjun2@126.com>
**Sent:** Monday, November 11, 2019 12:01 AM
**To:** Hongpeng Lin <HLin@jmjdevelopment.com>
**Cc:** chandler@yding.cn
**Subject:** Re:Negated Option to Convert-股权转换即将关闭

你好！
可以详细说明股权转换方案吗？

曾军

在 2019-11-08 09:42:03，"Hongpeng Lin" <HLin@jmjdevelopment.com> 写道：

Hi Zeng Jun
Because any unaccepted options to convert the loans into shares of the public company creates outstanding and indefinite liabilities on the books of the company and would negatively impact the financials in future years, any offer to permit the lenders to convert into shares shall expire within 30 days of this notice if such offer is not otherwise accepted in writing by the Lender as delivered to the borrower. After such period, the lenders shall have no further right to convert the loans into shares of the company although the company may continue to permit such option on a case by case basis in its sole discretion. All other options described under the Terms shall remain unaffected.

由于开放将借款转换为公司股票这个选项会在上市公司的账簿上产生未清偿和无限期负债，并且会对未来几年的财务产生负面的影响。因此，如果借款人在30天内没有收到贷款人以书面形式来表达转换意愿的话，那么借款转换为股票的这个选项将会关闭。 在这之后，贷款人将无权再将借款转换为公司股票。 尽管公司可以继续根据具体情况自行决定是否允许这种转换的发生。 其他条款均不受影响。

S. Quareshi
S. 古雷西
Manager
经理
JMJ Asia Operations
JMJ亚洲部
The translation is provided for making it easy & comfortable to read by the lenders. However, translation errors may be there. Hence, the English version shall be used as official version
中文翻译是为了方便贷款人阅读和理解，但是翻译可能存在错误，我们不对翻译中的错误负责，因此请以英语版本为准。

**Date : 1/20/2020 1:57:16 PM**
**From : "Murugan Venkat"**
**To : "Murugan Venkat"**
**Cc : "Hongpeng Lin"**
**Subject : Recorded message from Michael FU's lawyer, saying, how Michael FU got the rights from all the lenders**
**Attachment : 2-6 h+u.pdf;119 MP3 .mp3;**

Dear Lender;

Attorney James Ou of Nguyen and Chen, the law firm in Houston, engaged by Michael Fu to represent Silverland and Platinum Investment Corporations to recoup his commissions while having your loans with interest paid directly to HIM, NOT YOU through both Silverland and Platinum Investment Corporations

Please listen to the recording on 30 December 2019, where in attorney James Ou of Nguyen and Chen, is explaining how Michael FU has the right from all the lenders

Mr. Ou states emphatically that Michael Fu is forfeiting his commissions in support of the lenders.

But if you can read the extract of the plaintiff's statement, the lawsuit claims are totally different. Enclosed herein, is a copy of the lawsuit filed in Texas State Court (Dallas) and it is evident in the first five pages that Michael Fu is suing for his commissions and intends for the court to direct all funds to Silverland and Platinum Investment Corporations not to YOU.

**Thanks & regards**
**Murugan Venkat**

6-CIT ATTY / JURY

FILED
DALLAS COUNTY
11/15/2019 12:51 PM
FELICIA PITRE
DISTRICT CLERK

Kayla Buckley

CAUSE NO. DC-19-18361

| | | |
|---|---|---|
| **SILVERLAND FINANCE LTD., PLATINUM INVESTMENT CORPORATION, LIN ZHOU, JIN WANG, AND LI JUN,** | § | **IN THE DISTRICT COURT** |
| **Plaintiffs,** | § | |
| **VS.** | § | B-44TH **JUDICIAL DISTRICT** |
| **WALL007, LLC, WALL009, LLC, TIMOTHY BARTON, SADA CUMBER, CARNEGIE DEVELOPMENT, INC, AND JMJ DEVELOPMENT, LLC,** | § | |
| **Defendants.** | § | **DALLAS COUNTY, TEXAS** |

**PLAINTIFFS' ORIGINAL PETITION**

**TO THE HONORABLE JUDGE OF SAID COURT:**

COMES NOW, Plaintiffs **SILVERLAND FINANCE LTD., PLATINUM INVESTMENT CORPORATION, LIN ZHOU, JIN WANG,** and **LI JUN,** to file this Original Petition against Defendants **WALL007, LLC, WALL009, LLC, TIMOTHY BARTON, SADA CUMBER, CARNEGIE DEVELOPMENT, INC,** and **JMJ DEVELOPMENT, LLC,** and would respectfully show unto the Court the following:

**I.**

**DISCOVERY AND DAMAGES**

Plaintiffs intend to conduct discovery under level 3 of Rule 190 of the Texas Civil Rules of Civil Procedure. Damages are over $1,000,000.

**II.**

**PARTIES**

Plaintiff Silverland Finance Ltd. is a foreign corporation incorporated under the laws of the Marshall Islands.

Plaintiff Platinum Investment Corporation is a foreign corporation incorporated under the laws of China.

Plaintiff Lin Zhou is an individual who resides in China.

Plaintiff Jin Wang is an individual who resides in Harris County, Texas.

Plaintiff Li Jun is an individual who resides in China.

Defendant WALL007 LLC is a Texas limited liability company

## III.
## JURISDICTION AND VENUE

Jurisdiction is proper because the amount in controversy exceeds the minimum jurisdictional limits of this Court. Venue is proper pursuant to Texas Civil Practice and Remedies Code § 15.002 because Dallas County, Texas is Defendants' county of residence and/or principal office in this state.

## IV.
## FACTS

In or around 2017, WALL007, LLC ("WALL007") and WALL009, LLC ("WALL009") began acquiring loans from a group of foreign lenders (the "Co-Lenders") to be used in connection with two residential housing development projects in Texas.

The loans were collected by Platinum Investment Corporation ("PIC") and/or Silverland Finance Ltd. ("SFL"), acting as agent(s) or intermediaries for the Co-Lenders, and provided to WALL007 and WALL009.

WALL007 received a total of two million seven hundred sixty thousand dollars and zero cents ($2,760,000.00) in loans from the Co-Lenders for use on its residential housing development project in Fort Worth, Texas.

WALL009 received a total of two million three hundred twenty thousand dollars and zero cents ($2,320,000.00) in loans from the Co-Lenders for use on its residential housing development project in Venus, Texas.

*007 Commission Agreement*

On or about April [illegible], Silverland [illegible] ("Silverland") [illegible] Service and Commission Agreement with WALL007 LLC (the "007 Commission Agreement"). Exhibit A.

[illegible] signed the 007 Commission Agreement [illegible] Carnegie Development, LLC, which is the managing member of WALL007. *See id.*

[illegible] signed the 007 Commission Agreement on behalf of Silverland. *See id.*

[illegible] the 007 Commission Agreement, Silverland was [illegible] WALL007 [illegible] housing development project. *Id.* [illegible]

In exchange for the services Silverland [illegible] the 007 Commission Agreement, Silverland was [illegible] WALL007 [illegible]

In the event of WALL007's default under the 007 Commission Agreement, Silverland "shall have the immediate right to assume control of [WALL007], except for any outstanding indebtedness of [WALL007]." *Id.* at ¶3.

WALL007 has defaulted on the 007 Commission Agreement by failing to make any payments to Silverland when they were due. As a result of WALL007's default, Silverland had a Notice of Default sent to WALL007 on or about July 18, 2019. *See* Exhibit B.

009 Commission Agreement

On or about April [illegible], 2017, Silverland [illegible] entered into [illegible] Agreement with WALL009 LLC (the "009 Commission Agreement"). Exhibit C.

Timothy Barton signed the 009 Commission Agreement as the President of Carnegie Development LLC, which is the managing member of WALL009. *See id.*

[illegible] signed the 009 Commission Agreement on behalf of [illegible].

Per the 009 Commission Agreement, Silverland was to act as an agent and intermediary for a group of foreign lenders that loaned WALL009 money for a residential housing development project. *Id.* at ¶1.

In exchange for the services Silverland provided per the 009 Commission Agreement, Silverland was to receive [illegible] (i) [illegible] and (ii) 20% per annum for the principal of the loan made to WALL009 by the foreign lenders. *Id.* at ¶2.

In the event of WALL009's default under the 009 Commission Agreement, Silverland "shall have the immediate right to assume control of [WALL009], except for any outstanding indebtedness of [WALL009]." *Id.* at ¶3.

WALL009 has defaulted on the 009 Commission Agreement by failing to make any payments to Silverland when they were due. As a result of WALL009's default, Silverland had a Notice of Default sent to WALL009 on or about July 18, 2019. *See* Exhibit D.

**Date : 11/6/2019 6:02:43 PM**
**From : "Hongpeng Lin"**
**To : "曾军"**
**Subject : Wall016 - Zeng Jun- $100k**

Hi,

We value your trust on us. We are committed to do the best to you as well as to all other lenders and we are here to honor the contract terms. We initiate action much ahead of the due dates. Since April 2019, PIC did not allow us to do anything as per the contract terms. We regret the delay cause by PIC. That is the reason why we are now reaching out to you directly.

- For Wall016 borrowing from you, $100k commence on Aug 1st ,2018 Interest due on Aug 1st 2019 for amount of $10,000.

By relying on PIC's email, we sent certain payments which happened to be a wire fraud and we lost heavily. We are therefore, very cautious now. For interest payment, we need to withhold taxes, we also worked out alternative options to save on tax withholdings. Please let us know what you want to do.

Thanks,
Hongpeng Lin
JMJ Development, Inc.
1755 Wittington Place
Suite 340
Dallas, TX 75234
P: 972.385.9934
F: 972.241.4484
HLin@jmjdevelopment.com
www.jmjdevelopment.net

The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and / or privileged material. Any review, retransmission, dissemination or other use of, or taking action of any action in reliance upon this information by persons or entities other than the intended recipient is prohibited. If you received this message in error, please contact the sender and delete the material from all computers.

**From:** 曾军 <zjun2@126.com>
**Sent:** Wednesday, November 6, 2019 6:20 AM
**To:** Hongpeng Lin <HLin@jmjdevelopment.com>
**Cc:** chandler@yding.cn
**Subject:** Re:Letter from JMJ, 来自JMJ的一封信

你好!
我想知道，你们什么时候支付利息，已经过去3个月了。

曾军

在 2019-10-26 07:00:42，"Hongpeng Lin" <HLin@jmjdevelopment.com> 写道：

> **Greetings Jun Zeng**
>
> **For and on behalf of Tim Barton, Chairman of the JMJ group of entities in Dallas, Texas, USA. We hope to find you in good health and prosperity. This letter is to provide you with an update on the steps we have taken to find resolution for the issues presented in reference to the loan you have provided. Please understand, communicating directly with you has been difficult and restricted due to the involvement of Michael Fu and his Chinese owned company, PIC. We appreciate and thank you for your support in our U.S. based projects. Over the past two years Our company has had extensive growth which we have happily welcomed. Through this period of growth, we have continued to progress in business and employment of qualified individuals to assist in the growth. The JMJ entities have worked diligently to prepare this summary for your knowledge and response.**
>
> **The Lenders from 2017, were paid the interest for the first year, during 2018. During the first quarter of 2019, the Tax returns for 2018 were filed, at that time certain non-compliance issues were brought to our attention as well as the consequent penalty and the possible criminal prosecution. The compliance issues include but are not limited to,**
>
> - **Tax withholding on the interest payment**

- **Sending the payments back to the same bank account where it came from.**

**These details were highlighted in each receipt we issued to you upon receiving the wire transfer from you.**

**Since April 2019, the following steps have been put in place in order to proceed without having additional compliance issues.**

- **All funds have been kept in a JMJ entity bank account so as to send the appropriate wire-transfer to each lender accordingly.**
- **We needed to communicate with each of the lenders regarding the Mandatory Tax withholdings, therefore we asked Michael Fu and his staff to communicate with all the lenders to explain the various options.**

**We understand the value of hard-earned money for all the Chinese lenders. Hence, we would like to help as much as we can within the legal framework possible. Between the months of April and June, the money was maintained in the JMJ entity bank accounts. During the exponential growth of the company during this same time period, funds were needed to finance our growth. In June one of our managers, travelled to Singapore as well as to Hong Kong to engage the employees of PIC since we had not received sufficient communication from them on behalf of the Chinese Lenders. Since April 2019 and until now, Michael Fu and his company, PIC, have been telling us that most of the Chinese Lenders, cannot receive the funds back into the same bank account the initial wires had been sent out from. Michael Fu and his company also provided information stating that withholding of taxes was not acceptable. Since then, Michael Fu has engaged an attorney and we began working with his attorney. In the first week of September 2019, Michael Fu signed a non-binding agreement and since then, he has been reaching out to you. During the months of April through June of 2019 we did not see any progress on the part of Michael Fu. He also stopped us in reaching out to you directly and then made the decision to give up in communicating with each of the Chinese Lenders.**

**In the past few weeks, Michael Fu has informed us that it is becoming more expensive for him to be our agent in China. Since 2018, the JMJ entities have paid US$ 1.8 millions in commissions to Michael Fu and his company. He has invested a fraction of his commission in the name of his employees, family members, etc. where we are paying interest. Therefore, he has made a significant amount of funds during his tenure as our Chines Agent.**

**As a summary, here is what we would like to help, each and every one of you:**

**During the mediation process, which some of the Chinese lenders participated in about 3-4 months ago, Three different options were decided upon.**

- **Option One is to comply with the legal framework by doing the following,**
  - **Provide Interest payments after deducting tax withholdings**
  - **Interest payments must be sent to the same bank account where it originated from.**

- **Discharge the loan document [if it is past 2 years]**
- **Provide the copy of the Original Wire Transfer**
- **Provide the tax ID with the IRS/USA**
- **We are ready to send the interest within 30 days, from the date of verification of all the documents**

- **In the following 90 days from the payment of Interest, we will remit the loan amount**

  - **Option Two**

    - **Since shares in a publicly traded company are recognized as negotiable throughout the world, you can convert the loan into shares for which, we provide the buy-back guarantee and you can get paid through this process as per rules**

  - **Option three**

    - **We can consult the experts and can customize a resolution to meet your individual needs. In this option we are asking you to pay 10% towards the expenses.**

**Since this is our first attempt to communicate with you directly, we hope you can understand we are working diligently to help and assist in resolving any issues with each of the Chinese Lenders. We are happy to answer all your questions and would like to provide you the best service possible. Two of our employees in our corporate office in Dallas, TX are originally from China and are available to communicate with you at your convenience. We believe there will not be any issues in our direct communications with you going forward. Please provide us with your speedy response.**

**Sincerely**

**Manager [Asia operations]**
**JMJ Group of Entities**
**Dallas, TX**

**Translation in Chinese is for easy understanding of our communication and for any error in translations, English version is binding and legal**
**中文翻译是为了易于理解我们的沟通，如果翻译中有任何错误，英语版本具有约束力和法律效力**

**您好，**

**谨代表美国德克萨斯州达拉斯的JMJ集团主席Tim Barton先生，我们希望您身体健康，生意兴荣。 这封信是为了向您提供我们在解决贷款相关问题的进展。 请您理解，由于Michael Fu以及其中国公司逸鼎的介入，与您的直接沟通变得异常困难与艰辛。我们十分感激与感谢您对我们在美国项目的支持。 在过去的两年中，我们公司取得了长足的发展，我们对此感到十分高兴。**

在这期间，我们继续扩展我们的业务以及雇佣合适的人才以协助我们公司成长。**JMJ**集团特别准备这份摘要给您知晓与响应。

自**2017**年起开始计算，借款方于**2018**年支付了第一年的利息。 **2018**年的税表于**2019**年的第一季度提交， 我们注意到一些不符合法规的问题以及可能面临的处罚与刑事诉讼。 这些问题包括但不限于以下几点：

- 利息的预扣税
- 将付款发回原账户

这些在我们发给您的收据上都有注明。

自**2019**年**4**月份以来，我们已经采取以下措施来避免将来出现同样的问题。

- 所有资金已经放在**JMJ**集团的银行账户中，以便可以电汇给各个贷款方
- 我们需要向每个贷款方沟通预扣税的问题， 因此我们请**Michael Fu**及其工作人员联系每个贷款方进行沟通，解释各种选择。

我们了解以及明白所有中国贷款方的血汗钱是十分重要的。 因此，我们希望在法律框架内尽可能多的提供帮助。 从**4**月到**6**月之间，这笔钱存在**JMJ**集团的银行账户中。 于此同时，我们公司在快速增长，而大量的资金也需要来协助我们增长。由于从逸鼎没有收到有效的贷款人的沟通，我们的一位经理在**6**月份的时候前往新加坡和香港与逸鼎的员工进行面谈。 自**2019**年**4**月份至今，**Michael Fu**和他的公司逸鼎一直在告诉我们，大多数中国贷款人无法将资金退回到原始汇款账户中。**Michael Fu**与他的公司还声称不接受预扣税。 从那以后，**Michael Fu**聘请了一位律师，我们开始与这位律师沟通。 在**2019**年**9**月的第一周，**Michael Fu**签署了一份无约束力的协议， 也是从那时起，他一直在联系您。 从**2019**年**4**月到**6**月， 我们没有在**Michael Fu**身上看到任何的进展。 他还阻止我们直接与您联系， 最后决定放弃与每个中国的贷款人进行沟通。

在过去的几周里，**Michael Fu**告诉我们，作为我们在中国的代理商，成本变得越来越高了。 自**2018**年以来，**JMJ**集团已经向**Michael Fu**及其公司支付了**180**万美金的佣金。 我们每年还需要支付利息给他以员工，家人等名义投资的一部分赚取的佣金。 所以，他在担任我们中国代理期间**,** 已经赚了一大笔钱。

作为总结，我们希望为大家提供以下帮助：

在大约**3-4**个月之前， 我们与一部分贷款人调解的过程中，决定了三种不同的选择。

- ○ 方案一是通过完成下列要求来遵守法律框架的要求
  - 扣除预扣税部分后返还剩余利息
  - 利息支付必须返回原始汇款账户
  - 解除贷款协议（如果两年期满）
  - 提供原汇款单的复印件
  - 提供美国国税局提供的税号
  - 我们准备好在认证完所有文件的**30**天内汇出利息
  - 在利息支付后的**90**天内，我们将汇出本金
- ○ 方案二
  - 由于上市公司的股票在全国范围内都是可转让的，因此您可以将贷款转换为股票，我们将提供回购担保， 这样您就可以按照这个流程来获得付款。
- ○ 方案三
  - 我们可以咨询专家来为根据您的需求来定制一个方案， 在这个情况下，我们要求您支付**10%** 的费用

鉴于这是我们第一次尝试与您直接沟通，因此希望您能理解我们正在努力工作，帮助和协助解决每个中国贷款人有关的任何问题。 我们很乐意回答您的所有问题并希望为您提供最好的服务。 我们位于德克萨斯州达拉斯办公室的两位来自中国的员工可以在您方便的时候与您联系。

我们相信，今后与您的直接沟通不会有任何问题。请尽快给我们答复。

**谢谢!**

**经理[亚洲业务]**

**JMJ集团**

**德克萨斯州达拉斯**

**Date : 4/2/2020 4:03:11 AM**
**From : "Murugan Venkat"**
**To : "zjun2@126.com"**
**Cc : "Tim Barton" , "Saif Sachwani"**
**Subject : Wall016 LLC - Loan Forbearance and extension**
**Attachment : 1 Page 1.pdf;**

Please keep the attachment for your records

**Thanks & regards**
**Murugan Venkat**

# WALL016 LLC

To

31st March 2020

Jun Wang
Email zjun2@126.com

RE: Loan Forbearance ⇔ Extension regarding WALL016, LLC

Dear Jun,

As a result of the recent global outbreak of the novel corona virus (COVID-19), which has been declared a national emergency in the United States and has been declared a pandemic by the World Health Organization and by the United States Center of Disease Control, various local and state orders and mandates have been entered, in compliance with federal guidance, ordering the closure of businesses (other than "essential businesses", as defined in the respective orders and mandates). Entry of these orders and mandates have significantly impacted the business of WALL016, LLC given the current state of the capital markets globally. While we have been working diligently to adhere to the payments scheduled as outlined in our Loan Agreement, the unforeseen world health crises has completely shut down the financial markets and has put an indefinite hold on any attempts to secure additional capital to comply with the current scheduled payment requirements.

WALL016, LLC has diligently continued, meaningful discussion with both debt and equity sources who have been underwriting our various projects for capital infusion, yet all parties have stated they are on an indefinite hold on any capital advancements to the construction industry. Throughout most of Texas, we are under various mandatory "shelter-in-place" or "stay-at-home" decrees with most businesses shut down by law. Nationally, the United States President has declared a National Emergency and has advised most businesses to close consistent with the local mandates and orders that have been entered in Texas. Given this local and national shutdown and unforeseen act of God, which would be construed as a "force majeure" event, that has made business performance impossible, we apply a 18-months forbearance, effective as of today, on any amount due [either as interest or otherwise, due now or past due or in the forbearance period] for this loan. While we are confident that the financial markets eventually will return to some level of normalcy, we cannot predict the exact timing for the reasons set forth in this letter. We, therefore, request this payment modification in good faith to allow us the time necessary to adjust to this unprecedented and unforeseen global health and financial crises.

Current Loan Information

**Borrower**: WALL016, LLC ⇔ **Loan Amount**: US $50000

Sincerely,
Sohail Quraeshi
Vice President [Asia Operations]
WALL016 LLC

**Date : 11/13/2019 4:51:50 PM**
**From : "Murugan Venkat"**
**To : "曾军" , "Hongpeng Lin"**
**Cc : "Tim Barton" , "chandler@yding.cn"**
**Subject : Zeng Jun asking JMJ to follow the contract terms**

Hello Hong
If Zeng Jun is asking us to follow the contract terms, I do not understand why then you were writing about conversion
Is it wrong in your translation?

**Thanks & regards**
**Murugan Venkat**
Here is the translation of what Zeng Jun wrote on Wednesday, November 13, 2019 2:05 AM

Hello there! I do not accept the equity plan, please pay according to the contract agreement signed before

**From:** 曾军 <zjun2@126.com>
**Sent:** Wednesday, November 13, 2019 2:05 AM
**To:** Hongpeng Lin <HLin@jmjdevelopment.com>
**Cc:** Murugan Venkat <MVenkat@jmjdevelopment.com>; Tim Barton <tbarton@jmjdevelopment.com>; chandler@yding.cn
**Subject:** Re:RE: Re:Negated Option to Convert-股权转换即将关闭

你好！
我不接受股权方案，请按之前签署的合同协议来打款。

在 2019-11-13 00:28:55，"Hongpeng Lin" <HLin@jmjdevelopment.com> 写道：

> Hi Zeng Jun,
>
> Please allow me to walk you through the stock conversion process.
>
> The stock option works great by bringing a higher value to the investors.
>
> Investments in shares are risky. However, the conversion option comes with buy back guaranteed so that the Chinese investors, do not loose even a penny
>
> The term sheet provides the time line for conversion
>
> Here are the steps
>
> Step 1 Your choice for the conversion
>
> Step 2 Amended contract
>
> Step 3 Processing the request and recording the conversion for compliances
>
> You should receive the payment or shares in 15 days.
> 您好，
> 请允许我跟您讲解一下股票转换的过程。
> 转换股票的选项对投资者来说更有利，因为能带来更高的收益。
> 投资股票自然有风险，但是，转换股权的选项自带回购保证，因此，中国投资人不会损失一分钱。
> 条款列表提供了转换的时间
> 步骤如下：
> 第一步，您选择要转换
> 第二步，修改合同
> 第三步，处理请求并合规地记录转换
>
> 您应该在15天内收到付款或股份。
>
> Thanks,
> Hongpeng Lin
> JMJ Development, Inc.
> 1755 Wittington Place
> Suite 340
> Dallas, TX 75234
> P: 972.385.9934
> F: 972.241.4484

HLin@jmjdevelopment.com
www.jmjdevelopment.net

The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and / or privileged material. Any review, retransmission, dissemination or other use of, or taking action of any action in reliance upon this information by persons or entities other than the intended recipient is prohibited. If you received this message in error, please contact the sender and delete the material from all computers.

**From:** 曾军 <zjun2@126.com>
**Sent:** Monday, November 11, 2019 12:01 AM
**To:** Hongpeng Lin <HLin@jmjdevelopment.com>
**Cc:** chandler@yding.cn
**Subject:** Re:Negated Option to Convert-股权转换即将关闭

你好！
可以详细说明股权转换方案吗？

曾军

在 2019-11-08 09:42:03，"Hongpeng Lin" <HLin@jmjdevelopment.com> 写道：

> Hi Zeng Jun
> Because any unaccepted options to convert the loans into shares of the public company creates outstanding and indefinite liabilities on the books of the company and would negatively impact the financials in future years, any offer to permit the lenders to convert into shares shall expire within 30 days of this notice if such offer is not otherwise accepted in writing by the Lender as delivered to the borrower. After such period, the lenders shall have no further right to convert the loans into shares of the company although the company may continue to permit such option on a case by case basis in its sole discretion. All other options described under the Terms shall remain unaffected.
> 由于开放将借款转为上市公司股票这个选项会在上市公司的账簿上产生未清偿和无限期负债，并且会对未来几年的财务产生负面的影响。因此，如果借款人在30天内没有收到贷款人以书面形式来表达转换意愿的话，那么借款转换为股票的这个选项将会关闭。 在这之后，贷款人将无权再将借款转换为公司股票。 尽管公司可以继续根据具体情况自行决定是否允许这种转换的发生。 其他条款均不受影响。
>
> S. Quareshi
> S. 古雷西
> Manager
> 经理
> JMJ Asia Operations
> JMJ亚洲部
> The translation is provided for making it easy & comfortable to read by the lenders. However, translation errors may be there. Hence, the English version shall be used as official version
> 中文翻译是为了方便贷款人阅读和理解，但是翻译可能存在错误，我们不对翻译中的错误负责，因此请以英语版本为准。

**Date : 7/1/2020 7:38:16 AM**
**From : "曾军"**
**To : shouhouusa@yding.cn**
**Subject : 我回复JMJ的邮件**
**Attachment : Re:RE: Re:Negated Option to Convert-股权转换即将关闭;Re:Negated Option to Convert-股权转换即将关闭;Re:Wall016 - Zeng Jun- $100k;Re:Letter from JMJ, 来自JMJ的一封信;**

**Date : 11/6/2019 12:20:21 PM**
**From : "曾军"**
**To : "Hongpeng Lin"**
**Cc : chandler@yding.cn**
**Subject : Re:Letter from JMJ, 来自JMJ的一封信**

你好!
我想知道，你们什么时候支付利息，已经过去3个月了。

曾军

在 2019-10-26 07:00:42, "Hongpeng Lin" <HLin@jmjdevelopment.com> 写道:

**Greetings Jun Zeng**

**For and on behalf of Tim Barton, Chairman of the JMJ group of entities in Dallas, Texas, USA. We hope to find you in good health and prosperity. This letter is to provide you with an update on the steps we have taken to find resolution for the issues presented in reference to the loan you have provided. Please understand, communicating directly with you has been difficult and restricted due to the involvement of Michael Fu and his Chinese owned company, PIC. We appreciate and thank you for your support in our U.S. based projects. Over the past two years Our company has had extensive growth which we have happily welcomed. Through this period of growth, we have continued to progress in business and employment of qualified individuals to assist in the growth. The JMJ entities have worked diligently to prepare this summary for your knowledge and response.**

**The Lenders from 2017, were paid the interest for the first year, during 2018. During the first quarter of 2019, the Tax returns for 2018 were filed, at that time certain non-compliance issues were brought to our attention as well as the consequent penalty and the possible criminal prosecution. The compliance issues include but are not limited to,**

- **Tax withholding on the interest payment**
- **Sending the payments back to the same bank account where it came from.**

**These details were highlighted in each receipt we issued to you upon receiving the wire transfer from you.**

**Since April 2019, the following steps have been put in place in order to proceed without having additional compliance issues.**

- **All funds have been kept in a JMJ entity bank account so as to send the appropriate wire-transfer to each lender accordingly.**
- **We needed to communicate with each of the lenders regarding the Mandatory Tax withholdings, therefore we asked Michael Fu and his staff to communicate with all the lenders to explain the various options.**

**We understand the value of hard-earned money for all the Chinese lenders. Hence, we would like to help as much as we can within the legal framework possible. Between the months of April and June, the money was maintained in the JMJ entity bank accounts. During the exponential growth of the company during this same time period, funds were needed to finance our growth. In June one of our managers, travelled to Singapore as**

**well as to Hong Kong to engage the employees of PIC since we had not received sufficient communication from them on behalf of the Chinese Lenders. Since April 2019 and until now, Michael Fu and his company, PIC, have been telling us that most of the Chinese Lenders, cannot receive the funds back into the same bank account the initial wires had been sent out from. Michael Fu and his company also provided information stating that withholding of taxes was not acceptable. Since then, Michael Fu has engaged an attorney and we began working with his attorney. In the first week of September 2019, Michael Fu signed a non-binding agreement and since then, he has been reaching out to you. During the months of April through June of 2019 we did not see any progress on the part of Michael Fu. He also stopped us in reaching out to you directly and then made the decision to give up in communicating with each of the Chinese Lenders.**

**In the past few weeks, Michael Fu has informed us that it is becoming more expensive for him to be our agent in China. Since 2018, the JMJ entities have paid US$ 1.8 millions in commissions to Michael Fu and his company. He has invested a fraction of his commission in the name of his employees, family members, etc. where we are paying interest. Therefore, he has made a significant amount of funds during his tenure as our Chines Agent.**

**As a summary, here is what we would like to help, each and every one of you:**

**During the mediation process, which some of the Chinese lenders participated in about 3-4 months ago, Three different options were decided upon.**

- **Option One is to comply with the legal framework by doing the following,**
    - **Provide Interest payments after deducting tax withholdings**
    - **Interest payments must be sent to the same bank account where it originated from.**

        - **Discharge the loan document [if it is past 2 years]**
        - **Provide the copy of the Original Wire Transfer**
        - **Provide the tax ID with the IRS/USA**
        - **We are ready to send the interest within 30 days, from the date of verification of all the documents**
        - **In the following 90 days from the payment of Interest, we will remit the loan amount**
- **Option Two**
    - **Since shares in a publicly traded company are recognized as negotiable throughout the world, you can convert the loan into shares for which, we provide the buy-back guarantee and you can get paid through this process as per rules**
- **Option three**
    - **We can consult the experts and can customize a resolution to meet your individual needs. In this option we are asking you to pay 10% towards the expenses.**

**Since this is our first attempt to communicate with you directly, we hope you can understand we are working diligently to help and assist in resolving any issues with each of the Chinese Lenders. We are happy to answer all your questions and would like to provide you the best service possible. Two of our employees in our corporate office in Dallas, TX are originally from China and are available to communicate with you at your**

**convenience. We believe there will not be any issues in our direct communications with you going forward.**

**Please provide us with your speedy response.**

**Sincerely**

**Manager [Asia operations]**

**JMJ Group of Entities**

**Dallas, TX**

**Translation in Chinese is for easy understanding of our communication and for any error in translations, English version is binding and legal**

**中文翻译是为了易于理解我们的沟通，如果翻译中有任何错误，英语版本具有约束力和法律效力**

**您好，**

**谨代表美国德克萨斯州达拉斯的JMJ集团主席Tim Barton先生，我们希望您身体健康，生意兴荣。 这封信是为了向您提供我们在解决贷款相关问题的进展。 请您理解，由于Michael Fu以及其中国公司逸鼎的介入，与您的直接沟通变得异常困难与艰辛。我们十分感激与感谢您对我们在美国项目的支持。 在过去的两年中，我们公司取得了长足的发展，我们对此感到十分高兴。**

**在这期间，我们继续扩展我们的业务以及雇佣合适的人才以协助我们公司成长。 JMJ集团特别准备这份摘要给您知晓与响应**

自**2017**年起开始计算，借款方于**2018**年支付了第一年的利息。 **2018**年的税表于**2019**年的第一季度提交， 我们注意到一些不符合法规的问题以及可能面临的处罚与刑事诉讼。 这些问题包括但不限于以下几点：

利息的预扣税

将付款发回原账户

这些在我们发给您的收据上都有注明。

自**2019**年**4**月份以来，我们已经采取以下措施来避免将来出现同样的问题。

所有资金已经放在**JMJ**集团的银行账户中，以便可以电汇给各个贷款方

我们需要向每个贷款方沟通预扣税的问题， 因此我们请**Michael Fu**及其工作人员联系每个贷款方进行沟通，解释各种选择。

我们了解以及明白所有中国贷款方的血汗钱是十分重要的。 因此，我们希望在法律框架内尽可能多的提供帮助。 从**4**月到**6**月之间，这笔钱存在**JMJ**集团的银行账户中。 于此同时，我们公司在快速增长，而大量的资金也需要来协助我们增长。由于从逸鼎没有收到有效的贷款人的沟通，我们的一位经理在**6**月份的时候前往新加坡和香港与逸鼎的员工进行面谈。 自**2019**年**4**月份至今，**Michael Fu**和他的公司逸鼎一直在告诉我们，大多数中国贷款人无法将资金退回到原始汇款账户中。**Michael Fu**与他的公司还声称不接受预扣税。 从那以后，**Michael Fu**聘请了一位律师，我们开始与这位律师沟通。 在**2019**年**9**月的第一周，**Michael Fu**签署了一份无约束力的协议， 也是从那时起，他一直在联系您。 从**2019**年**4**月到**6**月， 我们没有在**Michael Fu**身上看到任何的进展。 他还阻止我们直接与您联系， 最后决定放弃与每个中国的贷款人进行沟通。

在过去的几周里，**Michael Fu**告诉我们，作为我们在中国的代理商，成本变得越来越高了。 自**2018**年以来，**JMJ**集团已经向**Michael Fu**及其公司支付了**180**万美金的佣金。 我们每年还需要支付利息给他以员工，家人等名义投资的一部分赚取的佣金。 所以，他在担任我们中国代理期间**,** 已经赚了一大笔钱。

作为总结，我们希望为大家提供以下帮助：

在大约**3-4**个月之前， 我们与一部分贷款人调解的过程中，决定了三种不同的选择。

- 方案一是通过完成下列要求来遵守法律框架的要求
    - 扣除预扣税部分后返还剩余利息
    - 利息支付必须返回原始汇款账户
    - 解除贷款协议（如果两年期满）
    - 提供原汇款单的复印件
    - 提供美国国税局提供的税号
    - 我们准备好在认证完所有文件的**30**天内汇出利息
    - 在利息支付后的**90**天内，我们将汇出本金
- 方案二
    - 由于上市公司的股票在全国范围内都是可转让的，因此您可以将贷款转换为股票，我们将提供回购担保， 这样您就可以按照这个流程来获得付款。
- 方案三
    - 我们可以咨询专家来为根据您的需求来定制一个方案， 在这个情况下，我们要求您支付**10%** 的费用

鉴于这是我们第一次尝试与您直接沟通，因此希望您能理解我们正在努力工作，帮助和协助解决每个中国贷款人有关的任何问题。 我们很乐意回答您的所有问题并希望为您提供最好的服务。 我们位于德克萨斯州达拉斯办公室的两位来自中国的员工可以在您方便的时候与您联系。我们相信，今后与您的直接沟通不会有任何问题。 请尽快给我们答复。

谢谢!

经理[亚洲业务]

**JMJ**集团

德克萨斯州达拉斯

**Date : 11/11/2019 6:00:34 AM**
**From : "曾军"**
**To : "Hongpeng Lin"**
**Cc : "chandler@yding.cn"**
**Subject : Re:Negated Option to Convert-股权转换即将关闭**

**你好！**

**可以**详细说**明股**权转换**方案**吗？

**曾**军

**在** 2019-11-08 09:42:03, "Hongpeng Lin" <HLin@jmjdevelopment.com> **写道**:

Hi Zeng Jun

Because any unaccepted options to convert the loans into shares of the public company creates outstanding and indefinite liabilities on the books of the company and would negatively impact the financials in future years, any offer to permit the lenders to convert into shares shall expire within 30 days of this notice if such offer is not otherwise accepted in writing by the Lender as delivered to the borrower. After such period, the lenders shall have no further right to convert the loans into shares of the company although the company may continue to permit such option on a case by case basis in its sole discretion. All other options described under the Terms shall remain unaffected.

由于开放将借款转为上市公司股票这个选项会在上市公司的账簿上产生未清偿和无限期负债，并且会对未来几年的财务产生负面的影响。 因此, 如果借款人在30天内没有收到贷款人以书面形式来表达转换意愿的话，那么借款转换为股票的这个选项将会关闭。 在这之后，贷款人将无权再将借款转换为公司股票。 尽管公司可以继续根据具体情况自行决定是否允许这种转换的发生。 其他条款均不受影响。

S. Quareshi

S. 古雷西

Manager

经理

JMJ Asia Operations

JMJ亚洲部

The translation is provided for making it easy & comfortable to read by the lenders. However, translation errors may be there. Hence, the English version shall be used as official version

中文翻译是为了方便贷款人阅读和理解，但是翻译可能存在错误，我们不对翻译中的错误负责，因此请以英语版本为准。

**Date : 11/13/2019 8:04:48 AM**
**From : "曾军"**
**To : "Hongpeng Lin"**
**Cc : "Murugan Venkat" , "Tim Barton" , "chandler@yding.cn"**
**Subject : Re:RE: Re:Negated Option to Convert-股权转换即将关闭**

**你好！**
**我不接受股权方案，请按之前签署的合同协议来打款。**

在 2019-11-13 00:28:55, "Hongpeng Lin" <HLin@jmjdevelopment.com> 写道：

Hi Zeng Jun,

Please allow me to walk you through the stock conversion process.

The stock option works great by bringing a higher value to the investors.

Investments in shares are risky. However, the conversion option comes with buy back guaranteed so that the Chinese investors, do not loose even a penny

The term sheet provides the time line for conversion

Here are the steps

Step 1 Your choice for the conversion

Step 2 Amended contract

Step 3 Processing the request and recording the conversion for compliances

You should receive the payment or shares in 15 days.

您好，

请允许我跟您讲解一下股票转换的过程。

转换股票的选项对投资者来说更有利，因为能带来更高的收益。

投资股票自然有风险，但是，转换股权的选项自带回购保证， 因此，中国投资人不会损失一分钱。

条款列表提供了转换的时间

步骤如下：

第一步，您选择要转换

第二步， 修改合同

第三步， 处理请求并合规地记录转换

您应该在15天内收到付款或股份。

Thanks,

Hongpeng Lin

JMJ Development, Inc.

1755 Wittington Place

Suite 340

Dallas, TX 75234

P: 972.385.9934

F: 972.241.4484

HLin@jmjdevelopment.com

www.jmjdevelopment.net

The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and / or privileged material. Any review, retransmission, dissemination or other use of, or taking action of any action in reliance upon this information by persons or entities other than the intended recipient is prohibited. If you received this message in error, please contact the sender and delete the material from all computers.

**From:** 曾军 <zjun2@126.com>
**Sent:** Monday, November 11, 2019 12:01 AM
**To:** Hongpeng Lin <HLin@jmjdevelopment.com>
**Cc:** chandler@yding.cn
**Subject:** Re:Negated Option to Convert-股权转换即将关闭

**你好！**

**可以**详细说**明股**权转换**方案**吗？

曾军

在 2019-11-08 09:42:03, "Hongpeng Lin" <HLin@jmjdevelopment.com> 写道：

Hi Zeng Jun

Because any unaccepted options to convert the loans into shares of the public company creates outstanding and indefinite liabilities on the books of the company and would negatively impact the financials in future years, any offer to permit the lenders to convert into shares shall expire within 30 days of this notice if such offer is not otherwise accepted in writing by the Lender as delivered to the borrower. After such period, the lenders shall have no further right to convert the loans into shares of the company although the company may continue to permit such option on a case by case basis in its sole discretion. All other options described under the Terms shall remain unaffected.

由于开放将借款转为上市公司股票这个选项会在上市公司的账簿上产生未清偿和无限期负债，并且会对未来几年的财务产生负面的影响。因此，如果借款人在30天内没有收到贷款人以书面形式来表达转换意愿的话，那么借款转换为股票的这个选项将会关闭。 在这之后，贷款人将无权再将借款转换为公司股票。 尽管公司可以继续根据具体情况自行决定是否允许这种转换的发生。 其他条款均不受影响。

S. Quareshi

S. 古雷**西**

Manager

经理

JMJ Asia Operations

JMJ亚洲部

The translation is provided for making it easy & comfortable to read by the lenders. However, translation errors may be there. Hence, the English version shall be used as official version

中文翻译是为了方便贷款人阅读和理解，但是翻译可能存在错误，我们不对翻译中的错误负责，因此请以英语版本为准。

**Date : 11/11/2019 5:50:15 AM**
**From : "曾军"**
**To : "Hongpeng Lin"**
**Cc : "chandler@yding.cn"**
**Subject : Re:Wall016 - Zeng Jun- $100k**

**你好！**
**我的**钱**是**汇**到Tim私人**账户**的，**请问这样**的情况利息**该**怎么回款？**

**曾**军

At 2019-11-07 02:02:43, "Hongpeng Lin" <HLin@jmjdevelopment.com> wrote:

Hi,

We value your trust on us. We are committed to do the best to you as well as to all other lenders and we are here to honor the contract terms. We initiate action much ahead of the due dates. Since April 2019, PIC did not allow us to do anything as per the contract terms. We regret the delay cause by PIC. That is the reason why we are now reaching out to you directly.

- For Wall016 borrowing from you, $100k commence on Aug 1st ,2018 Interest due on Aug 1st 2019 for amount of $10,000.

By relying on PIC's email, we sent certain payments which happened to be a wire fraud and we lost heavily. We are therefore, very cautious now. For interest payment, we need to withhold taxes, we also worked out alternative options to save on tax withholdings. Please let us know what you want to do.

Thanks,

Hongpeng Lin

JMJ Development, Inc.

1755 Wittington Place

Suite 340

Dallas, TX 75234

P: 972.385.9934

F: 972.241.4484

HLin@jmjdevelopment.com

www.jmjdevelopment.net

The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and / or privileged material. Any review, retransmission, dissemination or other use of, or taking action of any action in reliance upon this information by persons or entities other than the intended recipient is prohibited. If you received this message in error, please contact the sender and delete the material from all computers.

**From:** 曾军 <zjun2@126.com>
**Sent:** Wednesday, November 6, 2019 6:20 AM

**To:** Hongpeng Lin <HLin@jmjdevelopment.com>
**Cc:** chandler@yding.cn
**Subject:** Re:Letter from JMJ, 来自JMJ的一封信

你好!

我想知道，你们什么时候支付利息，已经过去3个月了。

曾军

在 2019-10-26 07:00:42，"Hongpeng Lin" <HLin@jmjdevelopment.com> 写道：

**Greetings Jun Zeng**

**For and on behalf of Tim Barton, Chairman of the JMJ group of entities in Dallas, Texas, USA. We hope to find you in good health and prosperity. This letter is to provide you with an update on the steps we have taken to find resolution for the issues presented in reference to the loan you have provided. Please understand, communicating directly with you has been difficult and restricted due to the involvement of Michael Fu and his Chinese owned company, PIC. We appreciate and thank you for your support in our U.S. based projects. Over the past two years Our company has had extensive growth which we have happily welcomed. Through this period of growth, we have continued to progress in business and employment of qualified individuals to assist in the growth. The JMJ entities have worked diligently to prepare this summary for your knowledge and response.**

**The Lenders from 2017, were paid the interest for the first year, during 2018. During the first quarter of 2019, the Tax returns for 2018 were filed, at that time certain non-compliance issues were brought to our attention as well as the consequent penalty and the possible criminal prosecution. The compliance issues include but are not limited to,**

- **Tax withholding on the interest payment**
- **Sending the payments back to the same bank account where it came from.**

**These details were highlighted in each receipt we issued to you upon receiving the wire transfer from you.**

**Since April 2019, the following steps have been put in place in order to proceed without having additional compliance issues.**

- **All funds have been kept in a JMJ entity bank account so as to send the appropriate wire-transfer to each lender accordingly.**
- **We needed to communicate with each of the lenders regarding the Mandatory Tax withholdings, therefore we asked Michael Fu and his staff to communicate with all the lenders to explain the various options.**

**We understand the value of hard-earned money for all the Chinese lenders. Hence, we would like to help as much as we can within the legal framework possible. Between the months of April and June, the money was**

**maintained in the JMJ entity bank accounts. During the exponential growth of the company during this same time period, funds were needed to finance our growth. In June one of our managers, travelled to Singapore as well as to Hong Kong to engage the employees of PIC since we had not received sufficient communication from them on behalf of the Chinese Lenders. Since April 2019 and until now, Michael Fu and his company, PIC, have been telling us that most of the Chinese Lenders, cannot receive the funds back into the same bank account the initial wires had been sent out from. Michael Fu and his company also provided information stating that withholding of taxes was not acceptable. Since then, Michael Fu has engaged an attorney and we began working with his attorney. In the first week of September 2019, Michael Fu signed a non-binding agreement and since then, he has been reaching out to you. During the months of April through June of 2019 we did not see any progress on the part of Michael Fu. He also stopped us in reaching out to you directly and then made the decision to give up in communicating with each of the Chinese Lenders.**

**In the past few weeks, Michael Fu has informed us that it is becoming more expensive for him to be our agent in China. Since 2018, the JMJ entities have paid US$ 1.8 millions in commissions to Michael Fu and his company. He has invested a fraction of his commission in the name of his employees, family members, etc. where we are paying interest. Therefore, he has made a significant amount of funds during his tenure as our Chines Agent.**

**As a summary, here is what we would like to help, each and every one of you:**

**During the mediation process, which some of the Chinese lenders participated in about 3-4 months ago, Three different options were decided upon.**

- **Option One is to comply with the legal framework by doing the following,**
  - **Provide Interest payments after deducting tax withholdings**
  - **Interest payments must be sent to the same bank account where it originated from.**

    - **Discharge the loan document [if it is past 2 years]**
    - **Provide the copy of the Original Wire Transfer**
    - **Provide the tax ID with the IRS/USA**
    - **We are ready to send the interest within 30 days, from the date of verification of all the documents**
    - **In the following 90 days from the payment of Interest, we will remit the loan amount**
- **Option Two**
  - **Since shares in a publicly traded company are recognized as negotiable throughout the world, you can convert the loan into shares for which, we provide the buy-back guarantee and you can get paid through this process as per rules**
- **Option three**
  - **We can consult the experts and can customize a resolution to meet your individual needs. In this option we are asking you to pay 10% towards the expenses.**

**Since this is our first attempt to communicate with you directly, we hope you can understand we are working diligently to help and assist in resolving any issues with each of the Chinese Lenders. We are happy to answer**

**all your questions and would like to provide you the best service possible. Two of our employees in our corporate office in Dallas, TX are originally from China and are available to communicate with you at your convenience. We believe there will not be any issues in our direct communications with you going forward. Please provide us with your speedy response.**

**Sincerely**

**Manager [Asia operations]**

**JMJ Group of Entities**

**Dallas, TX**

**Translation in Chinese is for easy understanding of our communication and for any error in translations, English version is binding and legal**

**中文翻译是为了易于理解我们的沟通，如果翻译中有任何错误，英语版本具有约束力和法律效力**

**您好，**

**谨代表美国德克萨斯州达拉斯的JMJ集团主席Tim Barton先生，我们希望您身体健康，生意兴荣。这封信是为了向您提供我们在解决贷款相关问题的进展。请您理解，由于Michael Fu以及其中国公司逸鼎的介入，与您的直接沟通变得异常困难与艰辛，我们十分**

**感激与感谢您对我们在美国项目的支持。在过去的两年中，我们公司取得了长足的发展，我们对此感到十分高兴。**

**在这期间，我们继续扩展我们的业务以及雇佣合适的人才以协助我们公司成长。JMJ集团特别准备这份摘要给您知晓与响应。**

自**2017**年起开始计算，借款方于**2018**年支付了第一年的利息。 **2018**年的税表于**2019**年的第一季度提交， 我们注意到一些不符合法规的问题以及可能面临的处罚与刑事诉讼。 这些问题包括但不限于以下几点：

- 利息的预扣税
- 将付款发回原账户

这些在我们发给您的收据上都有注明。

自**2019**年**4**月份以来，我们已经采取以下措施来避免将来出现同样的问题。

- 所有资金已经放在**JMJ**集团的银行账户中，以便可以电汇给各个贷款方
- 我们需要向每个贷款方沟通预扣税的问题， 因此我们请**Michael Fu**及其工作人员联系每个贷款方进行沟通，解释各种选择。

我们了解以及明白所有中国贷款方的血汗钱是十分重要的。 因此，我们希望在法律框架内尽可能多的提供帮助。 从**4**月到**6**月之间，这笔钱存在**JMJ**集团的银行账户中。 于此同时，我们公司在快速增长，而大量的资金也需要来协助我们增长。由于从逸鼎没有收到有效的贷款人的沟通，我们的一位经理在**6**月份的时候前往新加坡和香港与逸鼎的员工进行面谈。 自**2019**年**4**月份至今，**Michael Fu**和他的公司逸鼎一直在告诉我们，大多数中国贷款人无法将资金退回到原始汇款账户中。**Michael Fu**与他的公司还声称不接受预扣税。 从那以后，**Michael Fu**聘请了一位律师，我们开始与这位律师沟通。 在**2019**年**9**月的第一周，**Michael Fu**签署了一份无约束力的协议， 也是从那时起，他一直在联系您。 从**2019**年**4**月到**6**月， 我们没有在**Michael Fu**身上看到任何的进展。 他还阻止我们直接与您联系， 最后决定放弃与每个中国的贷款人进行沟通。

在过去的几周里，**Michael Fu**告诉我们，作为我们在中国的代理商，成本变得越来越高了。 自**2018**年以来，**JMJ**集团已经向**Michael Fu**及其公司支付了**180**万美金的佣金。 我们每年还需要支付利息给他以员工，家人等名义投资的一部分赚取的佣金。 所以，他在担任我们中国代理期间，已经赚了一大笔钱。

作为总结，我们希望为大家提供以下帮助：

在大约**3-4**个月之前， 我们与一部分贷款人调解的过程中，决定了三种不同的选择。

- 方案一是通过完成下列要求来遵守法律框架的要求
  - 扣除预扣税部分后返还剩余利息
  - 利息支付必须返回原始汇款账户
  - 解除贷款协议（如果两年期满）
  - 提供原汇款单的复印件
  - 提供美国国税局提供的税号
  - 我们准备好在认证完所有文件的**30**天内汇出利息
  - 在利息支付后的**90**天内，我们将汇出本金
- 方案二
  - 由于上市公司的股票在全国范围内都是可转让的，因此您可以将贷款转换为股票，我们将提供回购担保， 这样您就可以按照这个流程来获得付款。
- 方案三

- 我们可以咨询专家来为根据您的需求来定制一个方案， 在这个情况下，我们要求您支付**10%** 的费用

鉴于这是我们第一次尝试与您直接沟通，因此希望您能理解我们正在努力工作，帮助和协助解决每个中国贷款人有关的任何问题。 我们很乐意回答您的所有问题并希望为您提供最好的服务。 我们位于德克萨斯州达拉斯办公室的两位来自中国的员工可以在您方便的时候与您联系。 我们相信，今后与您的直接沟通不会有任何问题。 请尽快给我们答复。

**谢谢!**

**经理[亚洲业务]**

**JMJ集团**

**德克萨斯州达拉斯**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>WALL007 LLC, *et al.*,[1]<br><br>Alleged Debtors. | Chapter 7<br><br>Case No. 20-31131 (HDH)<br>(Jointly Administered) |

**MOTION OF PETITIONING CREDITORS (A) FOR LEAVE TO FILE AN INTERLOCUTORY APPEAL AND (B) REQUESTING CERTIFICATION TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT**

**TO: THE HONORABLE HARLIN D. HALE**:

The Petitioning Creditors, Jun Li, Yunding Kang, Cunxiang Ji, Jin Wang, Peng Guo, Lin Zhou, Qu Chen, Kai Tian, Yijing Wu, Xuegeng Gong, Jin Wang, Weijia Kong, Heng Zhang, Hong Guo, Pei Guan, Yue Xu, Mai Ye, Chenchen Jiang, Qiuying Li, Ruinian Wu, Lin Zhou, Liying Yang, Yan Zhang, Wenjun Wang, Lan Ji, Ying Zhou, Lin Li, Li Jiang, Rufeng Ding, Cunxiang Ji, Lin Gao, Qiao Qin, Yue Zhang, Xiaodong Hao, Tianqing Song, Li Jiang, Weisi Wang, Xiaoquan Dai, Feng Yan, Heng Zhang, Ou Jiang, Jinzhe Wu, Yadan Liu, Wanwan Li, Wenjuan Yin, Jiancheng Chen, Yi Tang, Ying Zhang, Pengfei Dong, Kangying Mao, Yijing Wu, Li Jiang, Qin Chu, Yulan Chen, Sicheng Zhan, Pei Guan, Jingqiu Tang, Di Tang, Jun Zeng, Kui Wang, Yue Zhang, Jun Wang, Xiaomin Fan, Di Tang, Jialin Hu, Qin Chu, Jiaxiang Lu, Fuqing Chen, Hanjiang Fu, Aiguo Luo, Fang Ding, Xiangdong Zhu, Wai Ying, Yuan Yuan, Chao Xu, Guoqin Zhou, Yijing Wu (collectively, the "Petitioning Creditors"), hereby file this motion (the "Motion") seeking (i) leave, pursuant to Bankruptcy Appellate Rule 8004(a)(2), to

[1] The Alleged Debtors in these cases are: WALL007 LLC, WALL009 LLC, WALL010 LLC, WALL011 LLC, WALL012 LLC, WALL016 LLC, WALL017 LLC. The Alleged Debtors' federal tax identification numbers are unknown to the Petitioning Creditors sat this time.

appeal (this "Appeal") and (ii) certification by this Honorable Court ("Bankruptcy Court") of the appeal, pursuant to Bankruptcy Appellate Rule 8006(f)(1), directly to the United States Court of Appeals for the Fifth Circuit (the "Appeals Court"); or, if certification is not granted, to the United States District Court for the Northern District of Texas, from the following Orders of the Bankruptcy Court entered in the above-captioned proceedings ("Case"): (i) Order Granting in Part the Alleged Debtors' Motion for Discovery Related to Wet Signatures [Dkt. No. 101] (Dkt. No. 165) entered on September 4, 2020; (ii) Order Granting in Part the Petitioners' Motion to Compel Discovery [Dkt. Nos. 92 & 129] (Dkt. No. 167) entered on September 4, 2020; (iii) Order Granting in Part the Alleged Debtor's Motion to Quash Petitioners' Deposition Notice [Dkt. 133] (Dkt. No. 168) entered on September 4, 2020; (iv) Order Granting in Part the Alleged Debtor's Second Motion to Compel Discovery Responses from Petitioners [Dkt. No. 105] (Dkt. No. 169) entered on September 4, 2020; and (v) October 22, 2020 Order Denying Motion for Reconsideration of Discovery Orders (Dkt. No. 202) entered on September 4, 2020 (collectively, the "Orders").

## INTRODUCTION

The Petitioning Creditors most respectfully disagree with the Bankruptcy Court's rulings in the Orders which would require the Petitioning Creditors to enter into an agreement to travel to the United States for "live," in person depositions prior to the Petitioning Creditors being permitted to proceed with further discovery or motion practice in the Case and, therefore, risk dismissal of the Case. As such, with all due respect to the Bankruptcy Court, Petitioning Creditors have filed a "Notice of Appeal" of the Orders with the Clerk of the Bankruptcy Court and a Request for Certification ("Request for Certification") directly to the Court of Appeals, and a Statement of Issues and Designation of Record ("Designation"), contemporaneously with the filing of this Motion. The Petitioning Creditors believe the Orders are interlocutory and therefor

seek leave from the Bankruptcy Court to appeal the Orders and further request certification to bring this appeal directly to the Appeals Court.

## PRELIMINARY STATEMENT

Respectfully, in the Orders, the Bankruptcy Court erred as a matter of law (i) in determining that the Petitioning Creditors must enter into an agreement to travel from mainland China to the United States for live depositions; (ii) in staying Petitioning Creditors' discovery and all motion practice in the Case, pending Petitioning Creditors' agreement to travel here from mainland China to the United States for live depositions; and (iii) in denying Petitioning Creditors' Motion for Reconsideration in light of a recent change in the law permitting Chinese nationals to resume travel to Macau.

As argued to the Bankruptcy Court twice by Petitioning Creditors, the Petitioning Creditors are Chinese nationals who cannot enter directly into the United States at this time under President Trump's travel ban. Further, given the surge in the COVID-19 pandemic, even if Petitioning Creditors could somehow bypass the President's travel ban and gain entry into the United States to sit for live depositions, they would risk their health and potentially the health of others merely for the sake of a "live" deposition on U.S. soil. The penalty for their inability to agree to travel here: Dismissal of the Case as early as November 30, 2020. However, Petitioning Creditors are now permitted to enter another country which is not subject to such travel limitations on Chinese nationals, namely, Macau, where their depositions could be taken, either live by counsel or via video from the United States.

Petitioning Creditors have more fully set forth herein the underlying facts and legal arguments supporting why leave to appeal should be granted and further why the Bankruptcy

Court should certify these important, unsettled issues of public policy directly to the Court of Appeals.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY OF THE CASE

The Petitioning Creditors filed involuntary chapter 7 bankruptcy petitions (collectively, the "Petitions") against each Alleged Debtor on April 8, 2020. See [Dkt. No. 1 in 20-31131]; [Dkt. No. 1 in 20-31133]; [Dkt. No. 1 in 20-31134]; [Dkt. No. 1 in 20-31135]; [Dkt. No. 1 in 20-31136]; [Dkt. No. 1 in 20-31138]; and, [Dkt. No. 1 in 20-31139].

On April 24, 2020, the Bankruptcy Court entered an Order granting the Petitioning Creditors' motions to jointly administer the bankruptcy cases (the "Cases") under the lead case WALL007 LLC [Dkt. No. 11 in 20-31131] (the "Lead Case").

On May 7, 2020, each Alleged Debtor filed Motions to Dismiss. See [Dkt. Nos. 18–19 in 20-31131]; [Dkt. Nos. 15–16 in 20-31133]; [Dkt. Nos. 14–15 in 20-31134]; [Dkt. Nos. 14–15 in 20-31135]; [Dkt. Nos. 14–15 in 20-31136]; [Dkt. Nos. 14–15 in 20-31138]; and, [Dkt. Nos. 14–15 in 20-31139] (collectively, the " Main Motions to Dismiss"). The Main Motions to Dismiss have not yet been heard by the Bankruptcy Court but the Alleged Debtors have unilaterally sought to schedule hearings thereon for December 30, 2020 [Dkt. No. 210].

The Alleged Debtors filed a third motion to dismiss ("Third Motion to Dismiss") on October 12, 2020 [Dkt. No. 182], arguing that if the Petitioning Creditors refuse to travel to the United States to be deposed live, the Court must dismiss the Case. The Third Motion to Dismiss has been set for hearing on November 30, 2020, making a determination on this Appeal of utmost importance to the Petitioning Creditors and the Case. Effectively, if the Petitioning Creditors cannot agree to travel to the United States for live depositions by November 30, 2020, the Alleged Debtors have asked the Bankruptcy Court to dismiss the Case.

The Main Motions to Dismiss seek dismissal of the Petitions alleging, *inter alia*, that: (1) there are an insufficient number of Petitioning Creditors to support the filing of the Petitions against the Alleged Debtors; (2) the Petitioning Creditors' claims are in bona fide dispute; (3) the Alleged Debtors are generally paying their respective debts; and (4) the Petitions are not in the best interests of each of the Alleged Debtors and their creditors. See Main Motions to Dismiss.

On June 1, 2020, the Petitioning Creditors sent a First Set of Interrogatories ("Interrogatories") and First Request for Production of Documents ("Document Requests") (collectively, the "Requests") to each of the Alleged Debtors. On June 20, 2020, the Court entered a Joint Discovery Plan setting forth, among other matters, discovery deadlines. Paper discovery was exchanged between the parties.

On July 10, 2020, at the repeated request of counsel for the Petitioning Creditors, the Petitioning Creditors' and the Alleged Debtors' counsel discussed the Alleged Debtors' responses to the Requests (the "Responses") in a failed attempt to amicably resolve the Petitioning Creditors' objections to the Responses. Back and forth regarding potential resolutions to the various discovery disputes between the parties occurred for most of the month of July and into August 2020.

On July 27, 2020, the Petitioning Creditors filed a Motion to Compel [Dkt. No. 92] requesting that the Alleged Debtors produce paper discovery in the case. On August 10, 2020, the Petitioning Creditors filed an amendment to the Motion to Compel [Dkt. No. 129] (the "Amended Motion to Compel") requesting that the Alleged Debtors produce for deposition (i) Timothy Barton; (ii) Venkat Murugan; (iii) Hongpeng Lin; and (iv) Saskya Bedoya.

In the Amended Motion to Compel, the Petitioning Creditors specifically referenced to the Court, President Trump's proclamation issued on January 31, 2020 (the "Presidential

Proclamation") which remains in effect. See Amended Motion to Compel [Dkt. No. 129], Exhibit "D" thereto; See also https://www.whitehouse.gov/presidential-actions/proclamation-suspension-entry-immigrants-nonimmigrants-persons-pose-risk-transmitting-2019-novel-coronavirus/.

The Presidential Proclamation (number 9984) states, in pertinent part:

> NOW, THEREFORE, I, DONALD J. TRUMP, President of the United States, by the authority vested in me by the Constitution and the laws of the United States of America, including sections 212(f) and 215(a) of the Immigration and Nationality Act (INA), 8 U.S.C. 1182(f) and 1185(a), and section 301 of title 3, United States Code, hereby find that the unrestricted entry into the United States of persons described in section 1 of this proclamation would, except as provided for in section 2 of this proclamation, be detrimental to the interests of the United States, and that their entry should be subject to certain restrictions, limitations, and exceptions. I therefore hereby proclaim the following:
>
> Section 1. Suspension and Limitation on Entry. The entry into the United States, as immigrants or nonimmigrants, of all aliens who were physically present within the People's Republic of China, excluding the Special Administrative Regions of Hong Kong and Macau, during the 14-day period preceding their entry or attempted entry into the United States is hereby suspended and limited subject to section 2 of this proclamation.

The Alleged Debtors' Motions to Compel argued that the Petitioning Creditors had not met their paper discovery obligations. Nowhere in the Alleged Debtors' Motions to Compel do the Alleged Debtors seek relief relative to the noticed depositions of certain of the Petitioning Creditors.

On August 5, 2020, counsel for the Alleged Debtors served notices of deposition subpoenas ("Debtor Deposition Notices") on counsel for the following Petitioning Creditors (the

"Petitioner Deponents"): Fang Ding, Guoqin Zhou, Jialin Hu, Jiancheng Chen, Jingqiu Tang, Jun Zeng, Kui Wang, Wenjun Wang, Xiangdong Zhu, Xiaoquan Dai, Qin Chu, Li Jiang, Weisi Wang, Ying Zhou, Di Tang, Kangying Mao, Jiaxiang Lu, Jin Wang, Wanwan Li, Yijing Wu, Heng Zhang.

In the Motion to Quash, the Alleged Debtors inserted language requesting, *inter alia*, that the depositions of the Petitioner Deponents be taken in the United States before any depositions are taken of the Alleged Debtors' representatives or further motion practices proceeds in the Case. Procedurally, the Alleged Debtors never filed a motion or other application requesting enforcement of their Debtor Deposition Notices on the Petitioner Deponents.

On August 13, 2020, the Petitioning Creditors filed their opposition to the Motion to Quash (the "Quash Opposition") and reiterated that the Petitioning Creditors, who are Chinese nationals and reside in mainland China, were unable to enter into the United States due to the ongoing COVID-19 pandemic and specifically because of the travel restrictions imposed by President Trump.

Paragraph 34 of the Quash Opposition states as follows:

> "However, as set forth in the Amended Motion to Compel, Petitioning Creditors <u>cannot enter into the United States</u> due to the ongoing COVID-19 pandemic and travel and quarantine restrictions imposed by both China and the United States."

On August 17, 2020, the Court held a hearing on the multiple contested discovery matters, including the Discovery Motions. At the August 17th hearing, counsel for the Petitioning Creditors and the Court briefly discussed the implications of the travel ban to the U.S. from China due to the ongoing COVID-19 pandemic. In particular, the following discourse occurred:

Why don't you address the ability of your approach to be deposed, just as Ms. Lindauer did in her's. She's saying she needs 10 to 12 depositions.

MR. PACKMAN: And we're happy to provide those by video, Your Honor. I do not believe, based on COVID and the restrictions on travel both from China and into the United States, which would require a 14-day quarantine, that we can do these depositions live in the United States. If we could, we would. We think it's a little bit overkill to have 11 or 12 of these petitioning creditors to have to travel here. But if we would, we could -- if we could, we would. We can only produce them now --

* * *

THE COURT: Yeah. What is the travel situation in China? I just know enough to be dangerous, just from reading in the paper. Are we still under a travel quarantine from China? I don't know what the status is right now.

MR. PACKMAN: Your Honor, based on what the most current information we have from the U.S. government website, there appears to still be a 14-day quarantine requirement for a Chinese national coming into the United States.

THE COURT: Uh-huh.

MR. PACKMAN: So I do agree with Ms. Lindauer that it's a predicament. It would be very expensive and costly for these petitioning creditors to come here. But I don't disagree with Ms. Lindauer that they have some right to ask them questions and prepare for the trial. I don't disagree with that. I just don't know what else to do right now. I just don't know what else to do.

THE COURT: Okay.

MR. PACKMAN: But we will make them available by video.

THE COURT: All right. Okay.

As far as the petitioning creditors' depositions. We will do everything possible to make them available for depositions so they can answer whatever relevant questions Ms. Lindauer has. But as I said, they are just not permitted to travel here at this moment, without being quarantined for at least two weeks. I think that would be unfair to require them to do that.

Tr. at 15:14–16:22; 28:8–28:14, August 17, 2020.

Despite the foregoing, and the travel ban pursuant to the Presidential Proclamation, the Court determined that the Petitioner Deponents would be required to enter into the United States for live depositions and stated, in pertinent part, as follows:

The petitioning creditors did not really respond to alleged debtors' legality argument. Instead, the petitioners claim that the difficulties associated with the COVID-19 crisis should excuse them from traveling to the United States for in-person depositions. During the hearing, counsel for the petitioners did not specifically say there was a travel ban on Chinese nationals entering the United States. Rather, counsel argued that his clients would have to quarantine for 14 days upon entry to the United States and that doing so would be a great inconvenience.

The Court understands the great difficulty travel poses during the current pandemic. However, the Court also believes that litigants who seek the benefit of the United States law must follow its process. And here, a serious concern has been raised that taking video depositions would violate Chinese law. While traveling to the U.S. may be a great inconvenience and difficulty at this time, the Court believes it is necessary in this case to address both the legality issues and the identity concerns raised by the





alleged debtors. Accordingly, the motion to quash at docket number 133 is granted in part to require the petitioning creditors' depositions to be taken in-person, in the United States, at a time and place agreeable to the parties.

Tr. at 4:7–5:4, August 19, 2020.

At the time of the hearing on the Discovery Motions, the Bankruptcy Court did not address counsel for Petitioning Creditors' statement or legal position in its supporting brief, arguing that they cannot enter directly into the U.S. pursuant to the President's travel ban. Petitioning Creditors cannot enter directly into the U.S. for any purpose if they are foreign nationals of China under the Presidential Proclamation absent an exception being recognized under Section 2 of the law as set forth herein. No direct entry of a Chinese national into the U.S. is permitted absent the application of discrete exceptions.

Section 2 of the Presidential Proclamation contains various exceptions to the direct travel ban in Section 1. As noted to the Bankruptcy Court, none of those exceptions apply here. In fact, the Bankruptcy Court has not ruled that the depositions of the Petitioning Creditors fall under any specific exception listed in Section 2 to the direct travel ban. Put simply, the Petitioning Creditors cannot legally (under U.S. Law) travel directly here and enter the United States for any reason at this time.

Just as the Alleged Debtors were concerned about violating Chinese law (by conducting video depositions in China, Petitioning Creditors would violate U.S. law by seeking direct entry into the U.S. and, in fact, would not be permitted to enter the country. The substance of the Presidential Proclamation was clearly attached to the Amended Motion to Compel and was not fully considered or understood prior to the Bankruptcy Court's ruling.

To be clear, the President has banned the Petitioners (who are Chinese nationals) from directly entering the United States pursuant to the Presidential Proclamation. However, there is now a legal alternative to the "live" U.S. depositions which was not previously available in the Case and which runs directly contrary to prior arguments by counsel for the Alleged Debtors.

Pursuant to their Motion for Reconsideration [Dkt. No. 175], the Petitioning Creditors sought the Bankruptcy Court's reconsideration of, *inter alia*, the Orders entered on the Amended Motion to Compel (the "Petitioners Compel Order"), the Alleged Debtors "Motion to Quash" [Dkt. No. 133] (the "Quash Order") and the Orders entered on the Alleged Debtors First and Second Motions to Compel [Dkt. Nos. 165 and 169] (the "Alleged Debtor Compel Orders"). The discovery motions and orders may, at times, be referenced herein collectively as the "Discovery Motions" and the "Discovery Orders" or the "Orders for Reconsideration;" and those discovery orders, together with the Order denying the Motion for Reconsideration, may hereinafter be referred to collectively as the "Orders."

In prior arguments during the Case, Alleged Debtors' counsel maintained that taking depositions in China are illegal and that the depositions could not be taken there or even in other territories. See Alleged Debtors' Motion to Quash Petitioners' Deposition Notices [Dkt. No. 133]; correspondence from Alleged Debtors' counsel Joyce Lindauer to the Court dated June 3, 2020 with the subject line "Memorandum on Conducting Depositions of Chinese Nationals in China" [Dkt. No. 45].

However, as noted to the Court in the Motion for Reconsideration, that is not currently the case, as the government of Macau Special Administrative Region is now, most recently permitting Chinese nationals, such as the Petitioning Creditors, to travel to Macau where their depositions can be taken, either live by counsel or via video. See https://www.worldaware.com/covid-19-alert-macau-allows-tourists-zhuhai-china-aug-12. "Macau residents and passengers from Taiwan and mainland China can enter the special administrative region provided they have not traveled to other countries or territories within 14 days. Individuals arriving from mainland China, Hong Kong, or Taiwan are subject to health

questionnaires and screenings. Travelers who have visited "high-risk" countries, including the Schengen Area, the UK, the US, Australia, South Korea, and Japan, within 14 days of arrival must undergo mandatory quarantine at designated hotels." Id.

There is a history of remote depositions which have taken place in Hong Kong, Macau and elsewhere. See Dagen v. CFC Grp. Holdings, 00 Civ. 5682, 2003 U.S. Dist. LEXIS 20029, 2003 WL 22533425, at *2 (S.D.N.Y. Nov. 7, 2003) (permitting testimony by telephone of witnesses based in Hong Kong); see also Jordan Outdoor Enters., Ltd. v. Hubei Wild Trees Textiles Co., 2014 BL 99734 (M.D. Ga. Apr. 09, 2014) (Chinese national deposed in Hong Kong in Georgia litigation).

A proposal for related Court reporting and interpreter services for video depositions in Macau which was presented to the Bankruptcy Court reflects that the reporting service conducts depositions (including those of Chinese nationals) in Macau and Hong Kong frequently and the cost is not prohibitive.

Pursuant to F.R.C.P. 29(a), "[u]nless the court orders otherwise, the parties may stipulate that: (a) a deposition may be taken before any person, at any time or place, on any notice, and in the manner specified—in which event it may be used in the same way as any other deposition."

This change in the foreign law (regarding direct travel from China's mainland to Macau) was not known to Petitioning Creditors' counsel at the time of the Discovery Motions as it had only been enacted days prior to argument on the Discovery Motions. As noted in the Motion for Reconsideration, there is now a viable legal option for the Alleged Debtors to depose the Petitioner Deponents in Macau which was not an option at the time of the Motion to Quash due to travel restrictions. Despite this change in the law, and ability of the Alleged Debtors to depose

the Petitioner Deponents in Macau live or via video, the Bankruptcy Court denied Petitioning Creditor' Motion for Reconsideration.

In sum, the Bankruptcy Court is nevertheless requiring Petitioning Creditors to agree to travel to the United States despite the Presidential Proclamation. Although they cannot travel directly to the U.S., the Petitioning Creditors must somehow find a way to gain entry into the U.S. by agreeing to travel here at great expense from China and, in the process, obviously risking their potential contraction of COVID-19 (and exposing others to it) or, alternatively, risk dismissal of the Case within 30 days.

## QUESTIONS PRESENTED FOR THE APPELLATE COURT

**1.** Did the Bankruptcy Court err as a matter of law in determining that the Petitioning Creditors must agree to travel from mainland China to the United States for live depositions?

2. Did the Bankruptcy Court err as a matter of law in staying Petitioning Creditors' discovery and all motion practice in the Case pending Petitioning Creditors' agreement to travel here from mainland China to the United States for live depositions?

3. Did the Bankruptcy Court err as a matter of law in denying Petitioning Creditors' Motion for Reconsideration in light of a recent change in the law permitting travel of Chines nationals to resume to Macau?

## RELIEF REQUESTED

Petitioning Creditors Request that the Bankruptcy Court grant them leave to take this Appeal and certify the appeal directly to the Appeals Court.

## ARGUMENT

### A. Leave to Appeal

A district court has jurisdiction to hear an interlocutory appeal from a bankruptcy court order. 28 U.S.C. § 158(a). Section 158(a) provides, in relevant part, that "[t]he district courts of the United States shall have jurisdiction to hear appeals . . . with leave of the court, from

interlocutory orders and decrees, of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under section 157 of this title." Id. Courts apply the approach set forth in 28 U.S.C. § 1292(b), which governs interlocutory appeals from a district court to a court of appeals, in considering appeals under 28 U.S.C. § 158(a).

Section 1292(b) provides: "When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order." 28 U.S.C. § 1292(b).

Accordingly, to warrant a Section 1292(b) certification, the moving party "must show that there is (1) a controlling question of law, (2) as to which there is substantial ground for difference of opinion, and (3) an immediate appeal may materially advance the ultimate termination of the litigation." Ryan v. Flowserve Corp., 444 F. Supp 2d 718, 723 (N.D. Tex. 2006); In re Barsan Contractors, 2010 WL 3907116 at *3 (D. N.J. Sept. 30, 2010). "The decision to grant certification is within the district court's discretion, even if all three criteria are present." The moving party "must also show that exceptional circumstances justify a departure from the basic policy of postponing the review until after the entry of final judgment." Id. (internal quotation and citation omitted).

As set forth below, the Petitioning Creditors meet all three requirements of section 1292(b) for leave to appeal the Orders.

**1. This Appeal Presents Multiple Controlling Questions of Law**

Courts have held that what is a controlling question of law — "although not consistently defined — at the very least means a question of law the resolution of which could materially advance the ultimate termination of the litigation — thereby saving time and expense for the

court and the litigants. WRIGHT MILLER, *supra,* § 3930 at 426 n. 25 (2d ed. 1996 Supp. 2005) (citing *S.E.C. v. Credit Bancorp, Ltd.*, 103 F. Supp. 2d 223, 227 (S.D.N.Y. 2000))." Ryan v. Flowserve Corp., 444 F. Supp 2d 718, 723 (N.D. Tex. 2006) (citing Strougo v. Scudder, Stevens & Clark, Inc., No. 96 CIV. 2136 (RWS), 1997 WL 473566, at *7 (S.D.N.Y. Aug. 18, 1997); (Klinghoffer v. S.N.C. Achille Lauro, 921 F.2d 21, 24 (2d Cir. 1990)) (other citations omitted).

"A controlling question of law must encompass at the very least every order which, if erroneous, would be reversible error on final appeal." Katz v. Carte Blanche Corp., 496 F.2d 747, 755 (3d Cir. 1974). It is not required that reversal of the order terminate the litigation or that the order be on the claim's merits. Id. "Controlling" means "serious to the conduct of the litigation, either practically or legally." Id. From a practical standpoint, saving the district court's time and the litigants' expenses is "a highly relevant factor." Id.; see also Barsan, 2010 WL 3907116 at *3.

The Bankruptcy Court's decision requires the Petitioning Creditors to appear in the United States for live depositions despite the Presidential Proclamation's travel ban and the ongoing, daily worsening COVID-19 pandemic. In light of a recent change in the law permitting travel by Chinese nationals to resume to Macau, all of the issues presented are in fact controlling issues of law. These issues do not go to the merits of the case but they do seriously impact the conduct of the litigation given the pending Third Motion to Dismiss on November 30, 2020. If the Orders are reversed as to the "live depositions in the U.S. requirement," not only will the parties save considerable time and expense in conducting the depositions of the Petitioner Deponents by video in Macau, but the courts will save time and expense of the ensuing litigation and appeals should Petitioning Creditors be unable to agree to travel here amidst the worst pandemic of our lifetime and the Case is then dismissed as a result.

**2. There Are Substantial Grounds for Difference of Opinion as to the Orders**

A difference of opinion "must arise out of genuine doubt as to the correct legal standard." Barsan, 2010 WL 3907116 at *3 (internal quotation and citation omitted). Courts have found substantial ground for difference of opinion where:

> a trial court rules in a manner which appears contrary to the rulings of all Courts of Appeals which have reached the issue, if the circuits are in dispute on the questions and the Court of Appeals of the Circuit has not spoken on the point, *if complicated questions arise under foreign law, or if novel and difficult questions of first impression are presented* (emphasis supplied).

Ryan v. Flowserve Corp., 444 F. Supp 2d at 723-25 (citation omitted); see also United States ex rel Minge v. Hawker Beechcraft Corp. (In re Hawker Beechcraft, Inc.), 2013 WL6673607, at *5 (S.D.N.Y. Dec. 18, 2013) (substantial ground for difference of opinion exists where (1) there is conflicting authority on the issue, or (2) the issue is particularly difficult and of first impression).

Here, the issues are particularly difficult and, likely of first impression, given the COVID-19 pandemic has largely only been with us in the U.S. since February or March of 2020. There are no cases the Petitioning Creditors have found dealing directly with the issue of foreigners who are subject to travel restrictions being required by a U.S. Court to travel here during the pandemic solely for purposes of sitting for depositions or suffer dismissal of their Case.

Petitioning Creditors believe the issues presented are of "first impression" and should be decided directly by the Appeals Court as set forth below or, if not, by the U.S. District Court.

**3. An Interlocutory Appeal Will Materially Advance the Litigation**

Importantly, an interlocutory appeal from the Orders materially advances the ultimate termination of the litigation. Ichinose v. Homer National Bank (In re Ichinose), 946 F.2d 1169, 1177 (5th Cir. 1991) (citing In re Neshaminy Office Bldg. Assoc., 81 B.R. 301, 303 (E.D. Pa.

1987)) (other citation omitted). The granting of leave to appeal under section 1292(b) materially advances the litigation's ultimate termination where the interlocutory appeal will eliminate the need for trial, complex issues, or issues that make discovery more difficult and more expensive. L.R. v. Manheim Twp. Sch. Dist., 540 F. Supp. 2d 603, 613 (E.D. Pa. 2008).

Granting leave to appeal here, and ensuring immediate review by the Appeals Court, will materially advance this litigation. If leave to appeal is not granted and the Bankruptcy Court's Orders are kept in place, the Case could very well be dismissed on November 30, in which case the Appeals Court will be faced with the same issues in about 30 days or so that are now being presented to it. Hearing the appeal now will save everyone time and expense and potentially avoid dismissal of the Case on a procedural issues, albeit important issues, but not on the merits of the Case. Further, if the Appeals Court determines that the Bankruptcy Court erred on the law raised by the Petitioning Creditors in their Motion for Reconsideration, and the depositions of the Petitioning Creditors should be conducted in Macau via video, it will save everyone involved considerable time and expense.

**B. Exceptional Circumstances Warrant Granting Leave to Appeal**

Courts in the Fifth Circuit have held that section 1292(b) appeals are appropriate only under exceptional circumstances. See, e.g., Ryan, 444 F. Supp 2d at 721-22 (citing Clark-Dietz and Associates-Engineers v. Basic Constr. Co., 702 F.2d 67, 69 (5th Cir. 1983)) (other citations omitted). If the moving party proves all of the other section 1292(b) factors, the moving party "must also show that exceptional circumstances justify a departure from the basic policy of postponing the review until after the entry of final judgment." Barsan, 2010 WL 3907116 at *3 (internal quotation and citation omitted). "Exceptional circumstances" are proved by "establish[ing] an urgency that sets this case apart from the typical case." Matter of Magic Restaurants, Inc., 202 B.R. 24, 26 (D. Del. 1996).

Exceptional and exigent circumstances quite clearly exist here given the import of the Orders juxtaposed to the reality of the Presidential Proclamation and the COVID-19 pandemic. The Petitioning Creditors respectfully submit that there needs to be some balancing of the equities here in order to accomplish the purpose of discovery in this Case. Discovery requirements are not interposed by our Federal Rules for purposes of placing the litigants at extreme health risk, particularly where the President of the United States has proclaimed as much. Leave to appeal should be granted based upon the importance of the discovery issues presented in this Case. The issues here are not "run of the mill" discovery issues. They touch directly on the meaning and effect of the Presidential Proclamation and the very purpose of discovery in the face of a pandemic which, by most accounts, is worsening here in the United States every day.

**C. The Appeal Should be Certified Directly to the Appeals Court**

Section (d)(2)(A) of 28 U.S.C. 158, which governs certification of appeals by the Bankruptcy Court directly to the Court of Appeals, provides as follows:

> The appropriate court of appeals shall have jurisdiction of appeals described in the first sentence of subsection (a) if the bankruptcy court, the district court, or the bankruptcy appellate panel involved, acting on its own motion or on the request of a party to the judgment, order, or decree described in such first sentence, or all the appellants and appellees (if any) acting jointly, certify that—
> (i) the judgment, order, or decree involves a question of law as to which there is no controlling decision of the court of appeals for the circuit or of the Supreme Court of the United States, or involves a matter of public importance;
> (ii) the judgment, order, or decree involves a question of law requiring resolution of conflicting decisions; or
> (iii) an immediate appeal from the judgment, order, or decree may materially advance the progress of the case or proceeding in which the appeal is taken; and if the court of appeals authorizes the direct appeal of the judgment, order, or decree.

28 U.S.C. § (d)(2)(A).

Here, multiple grounds exist for certification of the appeal by the Bankruptcy Court directly to the Appeals Court. The Orders require interpretation and application of the Presidential Proclamation and the balancing of interests of the litigants during this horrible COVID-19 pandemic. To the knowledge of Petitioning Creditors there are no controlling decisions within this Circuit or from the United States Supreme Court on the issues presented. Although the issues do not stem from conflicting decisions, the decisions of the Bankruptcy Court is, in the Petitioning Creditors' respectful view, at odds with the Presidential Proclamation and the realities of the COVID-19 pandemic. The decisions also seemingly ignore the simple solution of requiring the Petitioning Creditors to appear for depositions in Macau, something that could be accomplished fairly quickly and at much less expense and inconvenience to all of the parties. Finally, a direct appeal and decision by the Appeals Court will materially advance the litigation which, presently, is scheduled for a hearing on the Third Motion to Dismiss on November 30, 2020.

The Petitioning Creditors believe the issues presented are issues of first impression and inherently involve matters of public importance. As discussed above, granting leave to appeal and ensuring immediate review by the Appeals Court will materially advance this litigation.

**CONCLUSION**

For the reasons set forth above, the Bankruptcy Court should grant (i) the Petitioning Creditors Motion for (a) Leave to File an Interlocutory Appeal and (b) Certification of the

Appeal to the United States Court of Appeals for the Fifth Circuit; and (ii) such other and further relief as is just and proper.

Dated: November 3, 2020

*/s/ Stephen M. Packman*
Jiangang Ou
Nguyen & Chen LLP
11200 Westheimer Road Suite 120
Houston, TX 77042
(832) 767-0339
Fax : (832) 767-0669
Email: jou@nguyen-chen.com

Stephen M. Packman
Archer & Greiner, P.C.
Three Logan Square
1717 Arch St., Suite 3500
Philadelphia, PA 19103
215-246-3147
Email: spackman@archerlaw.com

*Counsel for the Petitioning Creditors*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>WALL007 LLC, *et al.*,[1]<br><br>Alleged Debtors. | Chapter 7<br><br>Case No. 20-31131 (HDH)<br>(Jointly Administered) |

**MOTION OF PETITIONING CREDITORS (A) FOR LEAVE TO FILE AN INTERLOCUTORY APPEAL AND (B) REQUESTING CERTIFICATION TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT**

**TO: THE HONORABLE HARLIN D. HALE**:

The Petitioning Creditors, Jun Li, Yunding Kang, Cunxiang Ji, Jin Wang, Peng Guo, Lin Zhou, Qu Chen, Kai Tian, Yijing Wu, Xuegeng Gong, Jin Wang, Weijia Kong, Heng Zhang, Hong Guo, Pei Guan, Yue Xu, Mai Ye, Chenchen Jiang, Qiuying Li, Ruinian Wu, Lin Zhou, Liying Yang, Yan Zhang, Wenjun Wang, Lan Ji, Ying Zhou, Lin Li, Li Jiang, Rufeng Ding, Cunxiang Ji, Lin Gao, Qiao Qin, Yue Zhang, Xiaodong Hao, Tianqing Song, Li Jiang, Weisi Wang, Xiaoquan Dai, Feng Yan, Heng Zhang, Ou Jiang, Jinzhe Wu, Yadan Liu, Wanwan Li, Wenjuan Yin, Jiancheng Chen, Yi Tang, Ying Zhang, Pengfei Dong, Kangying Mao, Yijing Wu, Li Jiang, Qin Chu, Yulan Chen, Sicheng Zhan, Pei Guan, Jingqiu Tang, Di Tang, Jun Zeng, Kui Wang, Yue Zhang, Jun Wang, Xiaomin Fan, Di Tang, Jialin Hu, Qin Chu, Jiaxiang Lu, Fuqing Chen, Hanjiang Fu, Aiguo Luo, Fang Ding, Xiangdong Zhu, Wai Ying, Yuan Yuan, Chao Xu, Guoqin Zhou, Yijing Wu (collectively, the "Petitioning Creditors"), hereby file this motion (the "Motion") seeking (i) leave, pursuant to Bankruptcy Appellate Rule 8004(a)(2), to

[1] The Alleged Debtors in these cases are: WALL007 LLC, WALL009 LLC, WALL010 LLC, WALL011 LLC, WALL012 LLC, WALL016 LLC, WALL017 LLC. The Alleged Debtors' federal tax identification numbers are unknown to the Petitioning Creditors sat this time.

appeal (this "Appeal") and (ii) certification by this Honorable Court ("Bankruptcy Court") of the appeal, pursuant to Bankruptcy Appellate Rule 8006(f)(1), directly to the United States Court of Appeals for the Fifth Circuit (the "Appeals Court"); or, if certification is not granted, to the United States District Court for the Northern District of Texas, from the following Orders of the Bankruptcy Court entered in the above-captioned proceedings ("Case"): (i) Order Granting in Part the Alleged Debtors' Motion for Discovery Related to Wet Signatures [Dkt. No. 101] (Dkt. No. 165) entered on September 4, 2020; (ii) Order Granting in Part the Petitioners' Motion to Compel Discovery [Dkt. Nos. 92 & 129] (Dkt. No. 167) entered on September 4, 2020; (iii) Order Granting in Part the Alleged Debtor's Motion to Quash Petitioners' Deposition Notice [Dkt. 133] (Dkt. No. 168) entered on September 4, 2020; (iv) Order Granting in Part the Alleged Debtor's Second Motion to Compel Discovery Responses from Petitioners [Dkt. No. 105] (Dkt. No. 169) entered on September 4, 2020; and (v) October 22, 2020 Order Denying Motion for Reconsideration of Discovery Orders (Dkt. No. 202) entered on September 4, 2020 (collectively, the "Orders").

## **INTRODUCTION**

The Petitioning Creditors most respectfully disagree with the Bankruptcy Court's rulings in the Orders which would require the Petitioning Creditors to enter into an agreement to travel to the United States for "live," in person depositions prior to the Petitioning Creditors being permitted to proceed with further discovery or motion practice in the Case and, therefore, risk dismissal of the Case. As such, with all due respect to the Bankruptcy Court, Petitioning Creditors have filed a "Notice of Appeal" of the Orders with the Clerk of the Bankruptcy Court and a Request for Certification ("Request for Certification") directly to the Court of Appeals, and a Statement of Issues and Designation of Record ("Designation"), contemporaneously with the filing of this Motion. The Petitioning Creditors believe the Orders are interlocutory and therefor

seek leave from the Bankruptcy Court to appeal the Orders and further request certification to bring this appeal directly to the Appeals Court.

**PRELIMINARY STATEMENT**

Respectfully, in the Orders, the Bankruptcy Court erred as a matter of law (i) in determining that the Petitioning Creditors must enter into an agreement to travel from mainland China to the United States for live depositions; (ii) in staying Petitioning Creditors' discovery and all motion practice in the Case, pending Petitioning Creditors' agreement to travel here from mainland China to the United States for live depositions; and (iii) in denying Petitioning Creditors' Motion for Reconsideration in light of a recent change in the law permitting Chinese nationals to resume travel to Macau.

As argued to the Bankruptcy Court twice by Petitioning Creditors, the Petitioning Creditors are Chinese nationals who cannot enter directly into the United States at this time under President Trump's travel ban. Further, given the surge in the COVID-19 pandemic, even if Petitioning Creditors could somehow bypass the President's travel ban and gain entry into the United States to sit for live depositions, they would risk their health and potentially the health of others merely for the sake of a "live" deposition on U.S. soil. The penalty for their inability to agree to travel here: Dismissal of the Case as early as November 30, 2020. However, Petitioning Creditors are now permitted to enter another country which is not subject to such travel limitations on Chinese nationals, namely, Macau, where their depositions could be taken, either live by counsel or via video from the United States.

Petitioning Creditors have more fully set forth herein the underlying facts and legal arguments supporting why leave to appeal should be granted and further why the Bankruptcy

Court should certify these important, unsettled issues of public policy directly to the Court of Appeals.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY OF THE CASE

The Petitioning Creditors filed involuntary chapter 7 bankruptcy petitions (collectively, the "Petitions") against each Alleged Debtor on April 8, 2020. See [Dkt. No. 1 in 20-31131]; [Dkt. No. 1 in 20-31133]; [Dkt. No. 1 in 20-31134]; [Dkt. No. 1 in 20-31135]; [Dkt. No. 1 in 20-31136]; [Dkt. No. 1 in 20-31138]; and, [Dkt. No. 1 in 20-31139].

On April 24, 2020, the Bankruptcy Court entered an Order granting the Petitioning Creditors' motions to jointly administer the bankruptcy cases (the "Cases") under the lead case WALL007 LLC [Dkt. No. 11 in 20-31131] (the "Lead Case").

On May 7, 2020, each Alleged Debtor filed Motions to Dismiss. See [Dkt. Nos. 18–19 in 20-31131]; [Dkt. Nos. 15–16 in 20-31133]; [Dkt. Nos. 14–15 in 20-31134]; [Dkt. Nos. 14–15 in 20-31135]; [Dkt. Nos. 14–15 in 20-31136]; [Dkt. Nos. 14–15 in 20-31138]; and, [Dkt. Nos. 14–15 in 20-31139] (collectively, the " Main Motions to Dismiss"). The Main Motions to Dismiss have not yet been heard by the Bankruptcy Court but the Alleged Debtors have unilaterally sought to schedule hearings thereon for December 30, 2020 [Dkt. No. 210].

The Alleged Debtors filed a third motion to dismiss ("Third Motion to Dismiss") on October 12, 2020 [Dkt. No. 182], arguing that if the Petitioning Creditors refuse to travel to the United States to be deposed live, the Court must dismiss the Case. The Third Motion to Dismiss has been set for hearing on November 30, 2020, making a determination on this Appeal of utmost importance to the Petitioning Creditors and the Case. Effectively, if the Petitioning Creditors cannot agree to travel to the United States for live depositions by November 30, 2020, the Alleged Debtors have asked the Bankruptcy Court to dismiss the Case.

The Main Motions to Dismiss seek dismissal of the Petitions alleging, *inter alia*, that: (1) there are an insufficient number of Petitioning Creditors to support the filing of the Petitions against the Alleged Debtors; (2) the Petitioning Creditors' claims are in bona fide dispute; (3) the Alleged Debtors are generally paying their respective debts; and (4) the Petitions are not in the best interests of each of the Alleged Debtors and their creditors. See Main Motions to Dismiss.

On June 1, 2020, the Petitioning Creditors sent a First Set of Interrogatories ("Interrogatories") and First Request for Production of Documents ("Document Requests") (collectively, the "Requests") to each of the Alleged Debtors. On June 20, 2020, the Court entered a Joint Discovery Plan setting forth, among other matters, discovery deadlines. Paper discovery was exchanged between the parties.

On July 10, 2020, at the repeated request of counsel for the Petitioning Creditors, the Petitioning Creditors' and the Alleged Debtors' counsel discussed the Alleged Debtors' responses to the Requests (the "Responses") in a failed attempt to amicably resolve the Petitioning Creditors' objections to the Responses. Back and forth regarding potential resolutions to the various discovery disputes between the parties occurred for most of the month of July and into August 2020.

On July 27, 2020, the Petitioning Creditors filed a Motion to Compel [Dkt. No. 92] requesting that the Alleged Debtors produce paper discovery in the case. On August 10, 2020, the Petitioning Creditors filed an amendment to the Motion to Compel [Dkt. No. 129] (the "Amended Motion to Compel") requesting that the Alleged Debtors produce for deposition (i) Timothy Barton; (ii) Venkat Murugan; (iii) Hongpeng Lin; and (iv) Saskya Bedoya.

In the Amended Motion to Compel, the Petitioning Creditors specifically referenced to the Court, President Trump's proclamation issued on January 31, 2020 (the "Presidential

Proclamation") which remains in effect. See Amended Motion to Compel [Dkt. No. 129], Exhibit "D" thereto; See also https://www.whitehouse.gov/presidential-actions/proclamation-suspension-entry-immigrants-nonimmigrants-persons-pose-risk-transmitting-2019-novel-coronavirus/.

The Presidential Proclamation (number 9984) states, in pertinent part:

> NOW, THEREFORE, I, DONALD J. TRUMP, President of the United States, by the authority vested in me by the Constitution and the laws of the United States of America, including sections 212(f) and 215(a) of the Immigration and Nationality Act (INA), 8 U.S.C. 1182(f) and 1185(a), and section 301 of title 3, United States Code, hereby find that the unrestricted entry into the United States of persons described in section 1 of this proclamation would, except as provided for in section 2 of this proclamation, be detrimental to the interests of the United States, and that their entry should be subject to certain restrictions, limitations, and exceptions. I therefore hereby proclaim the following:
>
> Section 1. Suspension and Limitation on Entry. The entry into the United States, as immigrants or nonimmigrants, of all aliens who were physically present within the People's Republic of China, excluding the Special Administrative Regions of Hong Kong and Macau, during the 14-day period preceding their entry or attempted entry into the United States is hereby suspended and limited subject to section 2 of this proclamation.

The Alleged Debtors' Motions to Compel argued that the Petitioning Creditors had not met their paper discovery obligations. Nowhere in the Alleged Debtors' Motions to Compel do the Alleged Debtors seek relief relative to the noticed depositions of certain of the Petitioning Creditors.

On August 5, 2020, counsel for the Alleged Debtors served notices of deposition subpoenas ("Debtor Deposition Notices") on counsel for the following Petitioning Creditors (the

"Petitioner Deponents"): Fang Ding, Guoqin Zhou, Jialin Hu, Jiancheng Chen, Jingqiu Tang, Jun Zeng, Kui Wang, Wenjun Wang, Xiangdong Zhu, Xiaoquan Dai, Qin Chu, Li Jiang, Weisi Wang, Ying Zhou, Di Tang, Kangying Mao, Jiaxiang Lu, Jin Wang, Wanwan Li, Yijing Wu, Heng Zhang.

In the Motion to Quash, the Alleged Debtors inserted language requesting, *inter alia*, that the depositions of the Petitioner Deponents be taken in the United States before any depositions are taken of the Alleged Debtors' representatives or further motion practices proceeds in the Case. Procedurally, the Alleged Debtors never filed a motion or other application requesting enforcement of their Debtor Deposition Notices on the Petitioner Deponents.

On August 13, 2020, the Petitioning Creditors filed their opposition to the Motion to Quash (the "Quash Opposition") and reiterated that the Petitioning Creditors, who are Chinese nationals and reside in mainland China, were unable to enter into the United States due to the ongoing COVID-19 pandemic and specifically because of the travel restrictions imposed by President Trump.

Paragraph 34 of the Quash Opposition states as follows:

> "However, as set forth in the Amended Motion to Compel, Petitioning Creditors cannot enter into the United States due to the ongoing COVID-19 pandemic and travel and quarantine restrictions imposed by both China and the United States."

On August 17, 2020, the Court held a hearing on the multiple contested discovery matters, including the Discovery Motions. At the August 17th hearing, counsel for the Petitioning Creditors and the Court briefly discussed the implications of the travel ban to the U.S. from China due to the ongoing COVID-19 pandemic. In particular, the following discourse occurred:

Why don't you address the ability of your approach to be deposed, just as Ms. Lindauer did in her's. She's saying she needs 10 to 12 depositions.

MR. PACKMAN: And we're happy to provide those by video, Your Honor. I do not believe, based on COVID and the restrictions on travel both from China and into the United States, which would require a 14-day quarantine, that we can do these depositions live in the United States. If we could, we would. We think it's a little bit overkill to have 11 or 12 of these petitioning creditors to have to travel here. But if we would, we could -- if we could, we would. We can only produce them now --

* * *

THE COURT: Yeah. What is the travel situation in China? I just know enough to be dangerous, just from reading in the paper. Are we still under a travel quarantine from China? I don't know what the status is right now.

MR. PACKMAN: Your Honor, based on what the most current information we have from the U.S. government website, there appears to still be a 14-day quarantine requirement for a Chinese national coming into the United States.

THE COURT: Uh-huh.

MR. PACKMAN: So I do agree with Ms. Lindauer that it's a predicament. It would be very expensive and costly for these petitioning creditors to come here. But I don't disagree with Ms. Lindauer that they have some right to ask them questions and prepare for the trial. I don't disagree with that. I just don't know what else to do right now. I just don't know what else to do.

THE COURT: Okay.

MR. PACKMAN: But we will make them available by video.

THE COURT: All right. Okay.

As far as the petitioning creditors' depositions. We will do everything possible to make them available for depositions so they can answer whatever relevant questions Ms. Lindauer has. But as I said, they are just not permitted to travel here at this moment, without being quarantined for at least two weeks. I think that would be unfair to require them to do that.

Tr. at 15:14–16:22; 28:8–28:14, August 17, 2020.

Despite the foregoing, and the travel ban pursuant to the Presidential Proclamation, the Court determined that the Petitioner Deponents would be required to enter into the United States for live depositions and stated, in pertinent part, as follows:

The petitioning creditors did not really respond to alleged debtors' legality argument. Instead, the petitioners claim that the difficulties associated with the COVID-19 crisis should excuse them from traveling to the United States for in-person depositions. During the hearing, counsel for the petitioners did not specifically say there was a travel ban on Chinese nationals entering the United States. Rather, counsel argued that his clients would have to quarantine for 14 days upon entry to the United States and that doing so would be a great inconvenience.

The Court understands the great difficulty travel poses during the current pandemic. However, the Court also believes that litigants who seek the benefit of the United States law must follow its process. And here, a serious concern has been raised that taking video depositions would violate Chinese law. While traveling to the U.S. may be a great inconvenience and difficulty at this time, the Court believes it is necessary in this case to address both the legality issues and the identity concerns raised by the

CINDY SUMNER, CSR (214) 802-7196

5

alleged debtors. Accordingly, the motion to quash at docket number 133 is granted in part to require the petitioning creditors' depositions to be taken in-person, in the United States, at a time and place agreeable to the parties.

Tr. at 4:7–5:4, August 19, 2020.

At the time of the hearing on the Discovery Motions, the Bankruptcy Court did not address counsel for Petitioning Creditors' statement or legal position in its supporting brief, arguing that they cannot enter directly into the U.S. pursuant to the President's travel ban. Petitioning Creditors cannot enter directly into the U.S. for any purpose if they are foreign nationals of China under the Presidential Proclamation absent an exception being recognized under Section 2 of the law as set forth herein. No direct entry of a Chinese national into the U.S. is permitted absent the application of discrete exceptions.

Section 2 of the Presidential Proclamation contains various exceptions to the direct travel ban in Section 1. As noted to the Bankruptcy Court, none of those exceptions apply here. In fact, the Bankruptcy Court has not ruled that the depositions of the Petitioning Creditors fall under any specific exception listed in Section 2 to the direct travel ban. Put simply, the Petitioning Creditors cannot legally (under U.S. Law) travel directly here and enter the United States for any reason at this time.

Just as the Alleged Debtors were concerned about violating Chinese law (by conducting video depositions in China, Petitioning Creditors would violate U.S. law by seeking direct entry into the U.S. and, in fact, would not be permitted to enter the country. The substance of the Presidential Proclamation was clearly attached to the Amended Motion to Compel and was not fully considered or understood prior to the Bankruptcy Court's ruling.

To be clear, the President has banned the Petitioners (who are Chinese nationals) from directly entering the United States pursuant to the Presidential Proclamation. However, there is now a legal alternative to the "live" U.S. depositions which was not previously available in the Case and which runs directly contrary to prior arguments by counsel for the Alleged Debtors.

Pursuant to their Motion for Reconsideration [Dkt. No. 175], the Petitioning Creditors sought the Bankruptcy Court's reconsideration of, *inter alia*, the Orders entered on the Amended Motion to Compel (the "Petitioners Compel Order"), the Alleged Debtors "Motion to Quash" [Dkt. No. 133] (the "Quash Order") and the Orders entered on the Alleged Debtors First and Second Motions to Compel [Dkt. Nos. 165 and 169] (the "Alleged Debtor Compel Orders"). The discovery motions and orders may, at times, be referenced herein collectively as the "Discovery Motions" and the "Discovery Orders" or the "Orders for Reconsideration;" and those discovery orders, together with the Order denying the Motion for Reconsideration, may hereinafter be referred to collectively as the "Orders."

In prior arguments during the Case, Alleged Debtors' counsel maintained that taking depositions in China are illegal and that the depositions could not be taken there or even in other territories. See Alleged Debtors' Motion to Quash Petitioners' Deposition Notices [Dkt. No. 133]; correspondence from Alleged Debtors' counsel Joyce Lindauer to the Court dated June 3, 2020 with the subject line "Memorandum on Conducting Depositions of Chinese Nationals in China" [Dkt. No. 45].

However, as noted to the Court in the Motion for Reconsideration, that is not currently the case, as the government of Macau Special Administrative Region is now, most recently permitting Chinese nationals, such as the Petitioning Creditors, to travel to Macau where their depositions can be taken, either live by counsel or via video. See https://www.worldaware.com/covid-19-alert-macau-allows-tourists-zhuhai-china-aug-12. "Macau residents and passengers from Taiwan and mainland China can enter the special administrative region provided they have not traveled to other countries or territories within 14 days. Individuals arriving from mainland China, Hong Kong, or Taiwan are subject to health

questionnaires and screenings. Travelers who have visited "high-risk" countries, including the Schengen Area, the UK, the US, Australia, South Korea, and Japan, within 14 days of arrival must undergo mandatory quarantine at designated hotels." Id.

There is a history of remote depositions which have taken place in Hong Kong, Macau and elsewhere. See Dagen v. CFC Grp. Holdings, 00 Civ. 5682, 2003 U.S. Dist. LEXIS 20029, 2003 WL 22533425, at *2 (S.D.N.Y. Nov. 7, 2003) (permitting testimony by telephone of witnesses based in Hong Kong); see also Jordan Outdoor Enters., Ltd. v. Hubei Wild Trees Textiles Co., 2014 BL 99734 (M.D. Ga. Apr. 09, 2014) (Chinese national deposed in Hong Kong in Georgia litigation).

A proposal for related Court reporting and interpreter services for video depositions in Macau which was presented to the Bankruptcy Court reflects that the reporting service conducts depositions (including those of Chinese nationals) in Macau and Hong Kong frequently and the cost is not prohibitive.

Pursuant to F.R.C.P. 29(a), "[u]nless the court orders otherwise, the parties may stipulate that: (a) a deposition may be taken before any person, at any time or place, on any notice, and in the manner specified—in which event it may be used in the same way as any other deposition."

This change in the foreign law (regarding direct travel from China's mainland to Macau) was not known to Petitioning Creditors' counsel at the time of the Discovery Motions as it had only been enacted days prior to argument on the Discovery Motions. As noted in the Motion for Reconsideration, there is now a viable legal option for the Alleged Debtors to depose the Petitioner Deponents in Macau which was not an option at the time of the Motion to Quash due to travel restrictions. Despite this change in the law, and ability of the Alleged Debtors to depose

the Petitioner Deponents in Macau live or via video, the Bankruptcy Court denied Petitioning Creditor' Motion for Reconsideration.

In sum, the Bankruptcy Court is nevertheless requiring Petitioning Creditors to agree to travel to the United States despite the Presidential Proclamation. Although they cannot travel directly to the U.S., the Petitioning Creditors must somehow find a way to gain entry into the U.S. by agreeing to travel here at great expense from China and, in the process, obviously risking their potential contraction of COVID-19 (and exposing others to it) or, alternatively, risk dismissal of the Case within 30 days.

## QUESTIONS PRESENTED FOR THE APPELLATE COURT

**1.** Did the Bankruptcy Court err as a matter of law in determining that the Petitioning Creditors must agree to travel from mainland China to the United States for live depositions?

2. Did the Bankruptcy Court err as a matter of law in staying Petitioning Creditors' discovery and all motion practice in the Case pending Petitioning Creditors' agreement to travel here from mainland China to the United States for live depositions?

3. Did the Bankruptcy Court err as a matter of law in denying Petitioning Creditors' Motion for Reconsideration in light of a recent change in the law permitting travel of Chines nationals to resume to Macau?

## RELIEF REQUESTED

Petitioning Creditors Request that the Bankruptcy Court grant them leave to take this Appeal and certify the appeal directly to the Appeals Court.

## ARGUMENT

### A. Leave to Appeal

A district court has jurisdiction to hear an interlocutory appeal from a bankruptcy court order. 28 U.S.C. § 158(a). Section 158(a) provides, in relevant part, that "[t]he district courts of the United States shall have jurisdiction to hear appeals . . . with leave of the court, from

interlocutory orders and decrees, of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under section 157 of this title." Id. Courts apply the approach set forth in 28 U.S.C. § 1292(b), which governs interlocutory appeals from a district court to a court of appeals, in considering appeals under 28 U.S.C. § 158(a).

Section 1292(b) provides: "When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order." 28 U.S.C. § 1292(b).

Accordingly, to warrant a Section 1292(b) certification, the moving party "must show that there is (1) a controlling question of law, (2) as to which there is substantial ground for difference of opinion, and (3) an immediate appeal may materially advance the ultimate termination of the litigation." Ryan v. Flowserve Corp., 444 F. Supp 2d 718, 723 (N.D. Tex. 2006); In re Barsan Contractors, 2010 WL 3907116 at *3 (D. N.J. Sept. 30, 2010). "The decision to grant certification is within the district court's discretion, even if all three criteria are present." The moving party "must also show that exceptional circumstances justify a departure from the basic policy of postponing the review until after the entry of final judgment." Id. (internal quotation and citation omitted).

As set forth below, the Petitioning Creditors meet all three requirements of section 1292(b) for leave to appeal the Orders.

**1. This Appeal Presents Multiple Controlling Questions of Law**

Courts have held that what is a controlling question of law — "although not consistently defined — at the very least means a question of law the resolution of which could materially advance the ultimate termination of the litigation — thereby saving time and expense for the

court and the litigants. WRIGHT MILLER, *supra,* § 3930 at 426 n. 25 (2d ed. 1996 Supp. 2005) (citing *S.E.C. v. Credit Bancorp, Ltd.,* 103 F. Supp. 2d 223, 227 (S.D.N.Y. 2000))." Ryan v. Flowserve Corp., 444 F. Supp 2d 718, 723 (N.D. Tex. 2006) (citing Strougo v. Scudder, Stevens & Clark, Inc., No. 96 CIV. 2136 (RWS), 1997 WL 473566, at *7 (S.D.N.Y. Aug. 18, 1997); (Klinghoffer v. S.N.C. Achille Lauro, 921 F.2d 21, 24 (2d Cir. 1990)) (other citations omitted).

"A controlling question of law must encompass at the very least every order which, if erroneous, would be reversible error on final appeal." Katz v. Carte Blanche Corp., 496 F.2d 747, 755 (3d Cir. 1974). It is not required that reversal of the order terminate the litigation or that the order be on the claim's merits. Id. "Controlling" means "serious to the conduct of the litigation, either practically or legally." Id. From a practical standpoint, saving the district court's time and the litigants' expenses is "a highly relevant factor." Id.; see also Barsan, 2010 WL 3907116 at *3.

The Bankruptcy Court's decision requires the Petitioning Creditors to appear in the United States for live depositions despite the Presidential Proclamation's travel ban and the ongoing, daily worsening COVID-19 pandemic. In light of a recent change in the law permitting travel by Chinese nationals to resume to Macau, all of the issues presented are in fact controlling issues of law. These issues do not go to the merits of the case but they do seriously impact the conduct of the litigation given the pending Third Motion to Dismiss on November 30, 2020. If the Orders are reversed as to the "live depositions in the U.S. requirement," not only will the parties save considerable time and expense in conducting the depositions of the Petitioner Deponents by video in Macau, but the courts will save time and expense of the ensuing litigation and appeals should Petitioning Creditors be unable to agree to travel here amidst the worst pandemic of our lifetime and the Case is then dismissed as a result.

**2. There Are Substantial Grounds for Difference of Opinion as to the Orders**

A difference of opinion "must arise out of genuine doubt as to the correct legal standard." Barsan, 2010 WL 3907116 at *3 (internal quotation and citation omitted). Courts have found substantial ground for difference of opinion where:

> a trial court rules in a manner which appears contrary to the rulings of all Courts of Appeals which have reached the issue, if the circuits are in dispute on the questions and the Court of Appeals of the Circuit has not spoken on the point, *if complicated questions arise under foreign law, or if novel and difficult questions of first impression are presented* (emphasis supplied).

Ryan v. Flowserve Corp., 444 F. Supp 2d at 723-25 (citation omitted); see also United States ex rel Minge v. Hawker Beechcraft Corp. (In re Hawker Beechcraft, Inc.), 2013 WL6673607, at *5 (S.D.N.Y. Dec. 18, 2013) (substantial ground for difference of opinion exists where (1) there is conflicting authority on the issue, or (2) the issue is particularly difficult and of first impression).

Here, the issues are particularly difficult and, likely of first impression, given the COVID-19 pandemic has largely only been with us in the U.S. since February or March of 2020. There are no cases the Petitioning Creditors have found dealing directly with the issue of foreigners who are subject to travel restrictions being required by a U.S. Court to travel here during the pandemic solely for purposes of sitting for depositions or suffer dismissal of their Case.

Petitioning Creditors believe the issues presented are of "first impression" and should be decided directly by the Appeals Court as set forth below or, if not, by the U.S. District Court.

**3. An Interlocutory Appeal Will Materially Advance the Litigation**

Importantly, an interlocutory appeal from the Orders materially advances the ultimate termination of the litigation. Ichinose v. Homer National Bank (In re Ichinose), 946 F.2d 1169, 1177 (5th Cir. 1991) (citing In re Neshaminy Office Bldg. Assoc., 81 B.R. 301, 303 (E.D. Pa.

1987)) (other citation omitted). The granting of leave to appeal under section 1292(b) materially advances the litigation's ultimate termination where the interlocutory appeal will eliminate the need for trial, complex issues, or issues that make discovery more difficult and more expensive. L.R. v. Manheim Twp. Sch. Dist., 540 F. Supp. 2d 603, 613 (E.D. Pa. 2008).

Granting leave to appeal here, and ensuring immediate review by the Appeals Court, will materially advance this litigation. If leave to appeal is not granted and the Bankruptcy Court's Orders are kept in place, the Case could very well be dismissed on November 30, in which case the Appeals Court will be faced with the same issues in about 30 days or so that are now being presented to it. Hearing the appeal now will save everyone time and expense and potentially avoid dismissal of the Case on a procedural issues, albeit important issues, but not on the merits of the Case. Further, if the Appeals Court determines that the Bankruptcy Court erred on the law raised by the Petitioning Creditors in their Motion for Reconsideration, and the depositions of the Petitioning Creditors should be conducted in Macau via video, it will save everyone involved considerable time and expense.

**B. Exceptional Circumstances Warrant Granting Leave to Appeal**

Courts in the Fifth Circuit have held that section 1292(b) appeals are appropriate only under exceptional circumstances. See, e.g., Ryan, 444 F. Supp 2d at 721-22 (citing Clark-Dietz and Associates-Engineers v. Basic Constr. Co., 702 F.2d 67, 69 (5th Cir. 1983)) (other citations omitted). If the moving party proves all of the other section 1292(b) factors, the moving party "must also show that exceptional circumstances justify a departure from the basic policy of postponing the review until after the entry of final judgment." Barsan, 2010 WL 3907116 at *3 (internal quotation and citation omitted). "Exceptional circumstances" are proved by "establish[ing] an urgency that sets this case apart from the typical case." Matter of Magic Restaurants, Inc., 202 B.R. 24, 26 (D. Del. 1996).

Exceptional and exigent circumstances quite clearly exist here given the import of the Orders juxtaposed to the reality of the Presidential Proclamation and the COVID-19 pandemic. The Petitioning Creditors respectfully submit that there needs to be some balancing of the equities here in order to accomplish the purpose of discovery in this Case. Discovery requirements are not interposed by our Federal Rules for purposes of placing the litigants at extreme health risk, particularly where the President of the United States has proclaimed as much. Leave to appeal should be granted based upon the importance of the discovery issues presented in this Case. The issues here are not "run of the mill" discovery issues. They touch directly on the meaning and effect of the Presidential Proclamation and the very purpose of discovery in the face of a pandemic which, by most accounts, is worsening here in the United States every day.

**C. The Appeal Should be Certified Directly to the Appeals Court**

Section (d)(2)(A) of 28 U.S.C. 158, which governs certification of appeals by the Bankruptcy Court directly to the Court of Appeals, provides as follows:

> The appropriate court of appeals shall have jurisdiction of appeals described in the first sentence of subsection (a) if the bankruptcy court, the district court, or the bankruptcy appellate panel involved, acting on its own motion or on the request of a party to the judgment, order, or decree described in such first sentence, or all the appellants and appellees (if any) acting jointly, certify that—
> (i) the judgment, order, or decree involves a question of law as to which there is no controlling decision of the court of appeals for the circuit or of the Supreme Court of the United States, or involves a matter of public importance;
> (ii) the judgment, order, or decree involves a question of law requiring resolution of conflicting decisions; or
> (iii) an immediate appeal from the judgment, order, or decree may materially advance the progress of the case or proceeding in which the appeal is taken; and if the court of appeals authorizes the direct appeal of the judgment, order, or decree.

28 U.S.C. § (d)(2)(A).

Here, multiple grounds exist for certification of the appeal by the Bankruptcy Court directly to the Appeals Court. The Orders require interpretation and application of the Presidential Proclamation and the balancing of interests of the litigants during this horrible COVID-19 pandemic. To the knowledge of Petitioning Creditors there are no controlling decisions within this Circuit or from the United States Supreme Court on the issues presented. Although the issues do not stem from conflicting decisions, the decisions of the Bankruptcy Court is, in the Petitioning Creditors' respectful view, at odds with the Presidential Proclamation and the realities of the COVID-19 pandemic. The decisions also seemingly ignore the simple solution of requiring the Petitioning Creditors to appear for depositions in Macau, something that could be accomplished fairly quickly and at much less expense and inconvenience to all of the parties. Finally, a direct appeal and decision by the Appeals Court will materially advance the litigation which, presently, is scheduled for a hearing on the Third Motion to Dismiss on November 30, 2020.

The Petitioning Creditors believe the issues presented are issues of first impression and inherently involve matters of public importance. As discussed above, granting leave to appeal and ensuring immediate review by the Appeals Court will materially advance this litigation.

## CONCLUSION

For the reasons set forth above, the Bankruptcy Court should grant (i) the Petitioning Creditors Motion for (a) Leave to File an Interlocutory Appeal and (b) Certification of the

Appeal to the United States Court of Appeals for the Fifth Circuit; and (ii) such other and further relief as is just and proper.

Dated: November 3, 2020

*/s/ Stephen M. Packman*

Jiangang Ou
Nguyen & Chen LLP
11200 Westheimer Road Suite 120
Houston, TX 77042
(832) 767-0339
Fax : (832) 767-0669
Email: jou@nguyen-chen.com

Stephen M. Packman
Archer & Greiner, P.C.
Three Logan Square
1717 Arch St., Suite 3500
Philadelphia, PA 19103
215-246-3147
Email: spackman@archerlaw.com

*Counsel for the Petitioning Creditors*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>WALL007 LLC, *et al.*,[1]<br><br>Alleged Debtors. | Chapter 7<br><br>Case No. 20-31131 (HDH)<br>(Jointly Administered) |

**MOTION OF PETITIONING CREDITORS (A) FOR LEAVE TO FILE AN INTERLOCUTORY APPEAL AND (B) REQUESTING CERTIFICATION TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT**

**TO: THE HONORABLE HARLIN D. HALE**:

The Petitioning Creditors, Jun Li, Yunding Kang, Cunxiang Ji, Jin Wang, Peng Guo, Lin Zhou, Qu Chen, Kai Tian, Yijing Wu, Xuegeng Gong, Jin Wang, Weijia Kong, Heng Zhang, Hong Guo, Pei Guan, Yue Xu, Mai Ye, Chenchen Jiang, Qiuying Li, Ruinian Wu, Lin Zhou, Liying Yang, Yan Zhang, Wenjun Wang, Lan Ji, Ying Zhou, Lin Li, Li Jiang, Rufeng Ding, Cunxiang Ji, Lin Gao, Qiao Qin, Yue Zhang, Xiaodong Hao, Tianqing Song, Li Jiang, Weisi Wang, Xiaoquan Dai, Feng Yan, Heng Zhang, Ou Jiang, Jinzhe Wu, Yadan Liu, Wanwan Li, Wenjuan Yin, Jiancheng Chen, Yi Tang, Ying Zhang, Pengfei Dong, Kangying Mao, Yijing Wu, Li Jiang, Qin Chu, Yulan Chen, Sicheng Zhan, Pei Guan, Jingqiu Tang, Di Tang, Jun Zeng, Kui Wang, Yue Zhang, Jun Wang, Xiaomin Fan, Di Tang, Jialin Hu, Qin Chu, Jiaxiang Lu, Fuqing Chen, Hanjiang Fu, Aiguo Luo, Fang Ding, Xiangdong Zhu, Wai Ying, Yuan Yuan, Chao Xu, Guoqin Zhou, Yijing Wu (collectively, the "Petitioning Creditors"), hereby file this motion (the "Motion") seeking (i) leave, pursuant to Bankruptcy Appellate Rule 8004(a)(2), to

[1] The Alleged Debtors in these cases are: WALL007 LLC, WALL009 LLC, WALL010 LLC, WALL011 LLC, WALL012 LLC, WALL016 LLC, WALL017 LLC. The Alleged Debtors' federal tax identification numbers are unknown to the Petitioning Creditors sat this time.

appeal (this "Appeal") and (ii) certification by this Honorable Court ("Bankruptcy Court") of the appeal, pursuant to Bankruptcy Appellate Rule 8006(f)(1), directly to the United States Court of Appeals for the Fifth Circuit (the "Appeals Court"); or, if certification is not granted, to the United States District Court for the Northern District of Texas, from the following Orders of the Bankruptcy Court entered in the above-captioned proceedings ("Case"): (i) Order Granting in Part the Alleged Debtors' Motion for Discovery Related to Wet Signatures [Dkt. No. 101] (Dkt. No. 165) entered on September 4, 2020; (ii) Order Granting in Part the Petitioners' Motion to Compel Discovery [Dkt. Nos. 92 & 129] (Dkt. No. 167) entered on September 4, 2020; (iii) Order Granting in Part the Alleged Debtor's Motion to Quash Petitioners' Deposition Notice [Dkt. 133] (Dkt. No. 168) entered on September 4, 2020; (iv) Order Granting in Part the Alleged Debtor's Second Motion to Compel Discovery Responses from Petitioners [Dkt. No. 105] (Dkt. No. 169) entered on September 4, 2020; and (v) October 22, 2020 Order Denying Motion for Reconsideration of Discovery Orders (Dkt. No. 202) entered on September 4, 2020 (collectively, the "Orders").

## INTRODUCTION

The Petitioning Creditors most respectfully disagree with the Bankruptcy Court's rulings in the Orders which would require the Petitioning Creditors to enter into an agreement to travel to the United States for "live," in person depositions prior to the Petitioning Creditors being permitted to proceed with further discovery or motion practice in the Case and, therefore, risk dismissal of the Case. As such, with all due respect to the Bankruptcy Court, Petitioning Creditors have filed a "Notice of Appeal" of the Orders with the Clerk of the Bankruptcy Court and a Request for Certification ("Request for Certification") directly to the Court of Appeals, and a Statement of Issues and Designation of Record ("Designation"), contemporaneously with the filing of this Motion. The Petitioning Creditors believe the Orders are interlocutory and therefor

seek leave from the Bankruptcy Court to appeal the Orders and further request certification to bring this appeal directly to the Appeals Court.

**PRELIMINARY STATEMENT**

Respectfully, in the Orders, the Bankruptcy Court erred as a matter of law (i) in determining that the Petitioning Creditors must enter into an agreement to travel from mainland China to the United States for live depositions; (ii) in staying Petitioning Creditors' discovery and all motion practice in the Case, pending Petitioning Creditors' agreement to travel here from mainland China to the United States for live depositions; and (iii) in denying Petitioning Creditors' Motion for Reconsideration in light of a recent change in the law permitting Chinese nationals to resume travel to Macau.

As argued to the Bankruptcy Court twice by Petitioning Creditors, the Petitioning Creditors are Chinese nationals who cannot enter directly into the United States at this time under President Trump's travel ban. Further, given the surge in the COVID-19 pandemic, even if Petitioning Creditors could somehow bypass the President's travel ban and gain entry into the United States to sit for live depositions, they would risk their health and potentially the health of others merely for the sake of a "live" deposition on U.S. soil. The penalty for their inability to agree to travel here: Dismissal of the Case as early as November 30, 2020. However, Petitioning Creditors are now permitted to enter another country which is not subject to such travel limitations on Chinese nationals, namely, Macau, where their depositions could be taken, either live by counsel or via video from the United States.

Petitioning Creditors have more fully set forth herein the underlying facts and legal arguments supporting why leave to appeal should be granted and further why the Bankruptcy

Court should certify these important, unsettled issues of public policy directly to the Court of Appeals.

**STATEMENT OF FACTS AND PROCEDURAL HISTORY OF THE CASE**

The Petitioning Creditors filed involuntary chapter 7 bankruptcy petitions (collectively, the "Petitions") against each Alleged Debtor on April 8, 2020. See [Dkt. No. 1 in 20-31131]; [Dkt. No. 1 in 20-31133]; [Dkt. No. 1 in 20-31134]; [Dkt. No. 1 in 20-31135]; [Dkt. No. 1 in 20-31136]; [Dkt. No. 1 in 20-31138]; and, [Dkt. No. 1 in 20-31139].

On April 24, 2020, the Bankruptcy Court entered an Order granting the Petitioning Creditors' motions to jointly administer the bankruptcy cases (the "Cases") under the lead case WALL007 LLC [Dkt. No. 11 in 20-31131] (the "Lead Case").

On May 7, 2020, each Alleged Debtor filed Motions to Dismiss. See [Dkt. Nos. 18–19 in 20-31131]; [Dkt. Nos. 15–16 in 20-31133]; [Dkt. Nos. 14–15 in 20-31134]; [Dkt. Nos. 14–15 in 20-31135]; [Dkt. Nos. 14–15 in 20-31136]; [Dkt. Nos. 14–15 in 20-31138]; and, [Dkt. Nos. 14–15 in 20-31139] (collectively, the " Main Motions to Dismiss"). The Main Motions to Dismiss have not yet been heard by the Bankruptcy Court but the Alleged Debtors have unilaterally sought to schedule hearings thereon for December 30, 2020 [Dkt. No. 210].

The Alleged Debtors filed a third motion to dismiss ("Third Motion to Dismiss") on October 12, 2020 [Dkt. No. 182], arguing that if the Petitioning Creditors refuse to travel to the United States to be deposed live, the Court must dismiss the Case. The Third Motion to Dismiss has been set for hearing on November 30, 2020, making a determination on this Appeal of utmost importance to the Petitioning Creditors and the Case. Effectively, if the Petitioning Creditors cannot agree to travel to the United States for live depositions by November 30, 2020, the Alleged Debtors have asked the Bankruptcy Court to dismiss the Case.

The Main Motions to Dismiss seek dismissal of the Petitions alleging, *inter alia*, that: (1) there are an insufficient number of Petitioning Creditors to support the filing of the Petitions against the Alleged Debtors; (2) the Petitioning Creditors' claims are in bona fide dispute; (3) the Alleged Debtors are generally paying their respective debts; and (4) the Petitions are not in the best interests of each of the Alleged Debtors and their creditors. See Main Motions to Dismiss.

On June 1, 2020, the Petitioning Creditors sent a First Set of Interrogatories ("Interrogatories") and First Request for Production of Documents ("Document Requests") (collectively, the "Requests") to each of the Alleged Debtors. On June 20, 2020, the Court entered a Joint Discovery Plan setting forth, among other matters, discovery deadlines. Paper discovery was exchanged between the parties.

On July 10, 2020, at the repeated request of counsel for the Petitioning Creditors, the Petitioning Creditors' and the Alleged Debtors' counsel discussed the Alleged Debtors' responses to the Requests (the "Responses") in a failed attempt to amicably resolve the Petitioning Creditors' objections to the Responses. Back and forth regarding potential resolutions to the various discovery disputes between the parties occurred for most of the month of July and into August 2020.

On July 27, 2020, the Petitioning Creditors filed a Motion to Compel [Dkt. No. 92] requesting that the Alleged Debtors produce paper discovery in the case. On August 10, 2020, the Petitioning Creditors filed an amendment to the Motion to Compel [Dkt. No. 129] (the "Amended Motion to Compel") requesting that the Alleged Debtors produce for deposition (i) Timothy Barton; (ii) Venkat Murugan; (iii) Hongpeng Lin; and (iv) Saskya Bedoya.

In the Amended Motion to Compel, the Petitioning Creditors specifically referenced to the Court, President Trump's proclamation issued on January 31, 2020 (the "Presidential

Proclamation") which remains in effect. See Amended Motion to Compel [Dkt. No. 129], Exhibit "D" thereto; See also https://www.whitehouse.gov/presidential-actions/proclamation-suspension-entry-immigrants-nonimmigrants-persons-pose-risk-transmitting-2019-novel-coronavirus/.

The Presidential Proclamation (number 9984) states, in pertinent part:

> NOW, THEREFORE, I, DONALD J. TRUMP, President of the United States, by the authority vested in me by the Constitution and the laws of the United States of America, including sections 212(f) and 215(a) of the Immigration and Nationality Act (INA), 8 U.S.C. 1182(f) and 1185(a), and section 301 of title 3, United States Code, hereby find that the unrestricted entry into the United States of persons described in section 1 of this proclamation would, except as provided for in section 2 of this proclamation, be detrimental to the interests of the United States, and that their entry should be subject to certain restrictions, limitations, and exceptions. I therefore hereby proclaim the following:
>
> Section 1. Suspension and Limitation on Entry. The entry into the United States, as immigrants or nonimmigrants, of all aliens who were physically present within the People's Republic of China, excluding the Special Administrative Regions of Hong Kong and Macau, during the 14-day period preceding their entry or attempted entry into the United States is hereby suspended and limited subject to section 2 of this proclamation.

The Alleged Debtors' Motions to Compel argued that the Petitioning Creditors had not met their paper discovery obligations. Nowhere in the Alleged Debtors' Motions to Compel do the Alleged Debtors seek relief relative to the noticed depositions of certain of the Petitioning Creditors.

On August 5, 2020, counsel for the Alleged Debtors served notices of deposition subpoenas ("Debtor Deposition Notices") on counsel for the following Petitioning Creditors (the

"Petitioner Deponents"): Fang Ding, Guoqin Zhou, Jialin Hu, Jiancheng Chen, Jingqiu Tang, Jun Zeng, Kui Wang, Wenjun Wang, Xiangdong Zhu, Xiaoquan Dai, Qin Chu, Li Jiang, Weisi Wang, Ying Zhou, Di Tang, Kangying Mao, Jiaxiang Lu, Jin Wang, Wanwan Li, Yijing Wu, Heng Zhang.

In the Motion to Quash, the Alleged Debtors inserted language requesting, *inter alia*, that the depositions of the Petitioner Deponents be taken in the United States before any depositions are taken of the Alleged Debtors' representatives or further motion practices proceeds in the Case. Procedurally, the Alleged Debtors never filed a motion or other application requesting enforcement of their Debtor Deposition Notices on the Petitioner Deponents.

On August 13, 2020, the Petitioning Creditors filed their opposition to the Motion to Quash (the "Quash Opposition") and reiterated that the Petitioning Creditors, who are Chinese nationals and reside in mainland China, were unable to enter into the United States due to the ongoing COVID-19 pandemic and specifically because of the travel restrictions imposed by President Trump.

Paragraph 34 of the Quash Opposition states as follows:

> "However, as set forth in the Amended Motion to Compel, Petitioning Creditors <u>cannot enter into the United States</u> due to the ongoing COVID-19 pandemic and travel and quarantine restrictions imposed by both China and the United States."

On August 17, 2020, the Court held a hearing on the multiple contested discovery matters, including the Discovery Motions. At the August 17th hearing, counsel for the Petitioning Creditors and the Court briefly discussed the implications of the travel ban to the U.S. from China due to the ongoing COVID-19 pandemic. In particular, the following discourse occurred:

Why don't you address the ability of your approach to be deposed, just as Ms. Lindauer did in her's. She's saying she needs 10 to 12 depositions.

MR. PACKMAN: And we're happy to provide those by video, Your Honor. I do not believe, based on COVID and the restrictions on travel both from China and into the United States, which would require a 14-day quarantine, that we can do these depositions live in the United States. If we could, we would. We think it's a little bit overkill to have 11 or 12 of these petitioning creditors to have to travel here. But if we would, we could -- if we could, we would. We can only produce them now --

* * *

THE COURT: Yeah. What is the travel situation in China? I just know enough to be dangerous, just from reading in the paper. Are we still under a travel quarantine from China? I don't know what the status is right now.

MR. PACKMAN: Your Honor, based on what the most current information we have from the U.S. government website, there appears to still be a 14-day quarantine requirement for a Chinese national coming into the United States.

THE COURT: Uh-huh.

MR. PACKMAN: So I do agree with Ms. Lindauer that it's a predicament. It would be very expensive and costly for these petitioning creditors to come here. But I don't disagree with Ms. Lindauer that they have some right to ask them questions and prepare for the trial. I don't disagree with that. I just don't know what else to do right now. I just don't know what else to do.

THE COURT: Okay.

MR. PACKMAN: But we will make them available by video.

THE COURT: All right. Okay.

As far as the petitioning creditors' depositions. We will do everything possible to make them available for depositions so they can answer whatever relevant questions Ms. Lindauer has. But as I said, they are just not permitted to travel here at this moment, without being quarantined for at least two weeks. I think that would be unfair to require them to do that.

Tr. at 15:14–16:22; 28:8–28:14, August 17, 2020.

Despite the foregoing, and the travel ban pursuant to the Presidential Proclamation, the Court determined that the Petitioner Deponents would be required to enter into the United States for live depositions and stated, in pertinent part, as follows:

The petitioning creditors did not really respond to alleged debtors' legality argument. Instead, the petitioners claim that the difficulties associated with the COVID-19 crisis should excuse them from traveling to the United States for in-person depositions. During the hearing, counsel for the petitioners did not specifically say there was a travel ban on Chinese nationals entering the United States. Rather, counsel argued that his clients would have to quarantine for 14 days upon entry to the United States and that doing so would be a great inconvenience.

The Court understands the great difficulty travel poses during the current pandemic. However, the Court also believes that litigants who seek the benefit of the United States law must follow its process. And here, a serious concern has been raised that taking video depositions would violate Chinese law. While traveling to the U.S. may be a great inconvenience and difficulty at this time, the Court believes it is necessary in this case to address both the legality issues and the identity concerns raised by the

CINDY SUMNER, CSR (214) 802-7196

5

alleged debtors. Accordingly, the motion to quash at docket number 133 is granted in part to require the petitioning creditors' depositions to be taken in-person, in the United States, at a time and place agreeable to the parties.

Tr. at 4:7–5:4, August 19, 2020.

At the time of the hearing on the Discovery Motions, the Bankruptcy Court did not address counsel for Petitioning Creditors' statement or legal position in its supporting brief, arguing that they cannot enter directly into the U.S. pursuant to the President's travel ban. Petitioning Creditors cannot enter directly into the U.S. for any purpose if they are foreign nationals of China under the Presidential Proclamation absent an exception being recognized under Section 2 of the law as set forth herein. No direct entry of a Chinese national into the U.S. is permitted absent the application of discrete exceptions.

Section 2 of the Presidential Proclamation contains various exceptions to the direct travel ban in Section 1. As noted to the Bankruptcy Court, none of those exceptions apply here. In fact, the Bankruptcy Court has not ruled that the depositions of the Petitioning Creditors fall under any specific exception listed in Section 2 to the direct travel ban. Put simply, the Petitioning Creditors cannot legally (under U.S. Law) travel directly here and enter the United States for any reason at this time.

Just as the Alleged Debtors were concerned about violating Chinese law (by conducting video depositions in China, Petitioning Creditors would violate U.S. law by seeking direct entry into the U.S. and, in fact, would not be permitted to enter the country. The substance of the Presidential Proclamation was clearly attached to the Amended Motion to Compel and was not fully considered or understood prior to the Bankruptcy Court's ruling.

To be clear, the President has banned the Petitioners (who are Chinese nationals) from directly entering the United States pursuant to the Presidential Proclamation. However, there is now a legal alternative to the "live" U.S. depositions which was not previously available in the Case and which runs directly contrary to prior arguments by counsel for the Alleged Debtors.

Pursuant to their Motion for Reconsideration [Dkt. No. 175], the Petitioning Creditors sought the Bankruptcy Court's reconsideration of, *inter alia*, the Orders entered on the Amended Motion to Compel (the "Petitioners Compel Order"), the Alleged Debtors "Motion to Quash" [Dkt. No. 133] (the "Quash Order") and the Orders entered on the Alleged Debtors First and Second Motions to Compel [Dkt. Nos. 165 and 169] (the "Alleged Debtor Compel Orders"). The discovery motions and orders may, at times, be referenced herein collectively as the "Discovery Motions" and the "Discovery Orders" or the "Orders for Reconsideration;" and those discovery orders, together with the Order denying the Motion for Reconsideration, may hereinafter be referred to collectively as the "Orders."

In prior arguments during the Case, Alleged Debtors' counsel maintained that taking depositions in China are illegal and that the depositions could not be taken there <u>or even in other territories</u>. <u>See</u> Alleged Debtors' Motion to Quash Petitioners' Deposition Notices [Dkt. No. 133]; correspondence from Alleged Debtors' counsel Joyce Lindauer to the Court dated June 3, 2020 with the subject line "Memorandum on Conducting Depositions of Chinese Nationals in China" [Dkt. No. 45].

However, as noted to the Court in the Motion for Reconsideration, that is not currently the case, as the government of Macau Special Administrative Region is now, most recently permitting Chinese nationals, such as the Petitioning Creditors, to travel to Macau where their depositions can be taken, either live by counsel or via video. <u>See</u> https://www.worldaware.com/covid-19-alert-macau-allows-tourists-zhuhai-china-aug-12. "Macau residents <u>and passengers from Taiwan and mainland China</u> can enter the special administrative region provided they have not traveled to other countries or territories within 14 days. Individuals arriving from mainland China, Hong Kong, or Taiwan are subject to health

questionnaires and screenings. Travelers who have visited "high-risk" countries, including the Schengen Area, the UK, the US, Australia, South Korea, and Japan, within 14 days of arrival must undergo mandatory quarantine at designated hotels." Id.

There is a history of remote depositions which have taken place in Hong Kong, Macau and elsewhere. See Dagen v. CFC Grp. Holdings, 00 Civ. 5682, 2003 U.S. Dist. LEXIS 20029, 2003 WL 22533425, at *2 (S.D.N.Y. Nov. 7, 2003) (permitting testimony by telephone of witnesses based in Hong Kong); see also Jordan Outdoor Enters., Ltd. v. Hubei Wild Trees Textiles Co., 2014 BL 99734 (M.D. Ga. Apr. 09, 2014) (Chinese national deposed in Hong Kong in Georgia litigation).

A proposal for related Court reporting and interpreter services for video depositions in Macau which was presented to the Bankruptcy Court reflects that the reporting service conducts depositions (including those of Chinese nationals) in Macau and Hong Kong frequently and the cost is not prohibitive.

Pursuant to F.R.C.P. 29(a), "[u]nless the court orders otherwise, the parties may stipulate that: (a) a deposition may be taken before any person, at any time or place, on any notice, and in the manner specified—in which event it may be used in the same way as any other deposition."

This change in the foreign law (regarding direct travel from China's mainland to Macau) was not known to Petitioning Creditors' counsel at the time of the Discovery Motions as it had only been enacted days prior to argument on the Discovery Motions. As noted in the Motion for Reconsideration, there is now a viable legal option for the Alleged Debtors to depose the Petitioner Deponents in Macau which was not an option at the time of the Motion to Quash due to travel restrictions. Despite this change in the law, and ability of the Alleged Debtors to depose

the Petitioner Deponents in Macau live or via video, the Bankruptcy Court denied Petitioning Creditor' Motion for Reconsideration.

In sum, the Bankruptcy Court is nevertheless requiring Petitioning Creditors to agree to travel to the United States despite the Presidential Proclamation. Although they cannot travel directly to the U.S., the Petitioning Creditors must somehow find a way to gain entry into the U.S. by agreeing to travel here at great expense from China and, in the process, obviously risking their potential contraction of COVID-19 (and exposing others to it) or, alternatively, risk dismissal of the Case within 30 days.

## QUESTIONS PRESENTED FOR THE APPELLATE COURT

**1.** Did the Bankruptcy Court err as a matter of law in determining that the Petitioning Creditors must agree to travel from mainland China to the United States for live depositions?

2. Did the Bankruptcy Court err as a matter of law in staying Petitioning Creditors' discovery and all motion practice in the Case pending Petitioning Creditors' agreement to travel here from mainland China to the United States for live depositions?

3. Did the Bankruptcy Court err as a matter of law in denying Petitioning Creditors' Motion for Reconsideration in light of a recent change in the law permitting travel of Chines nationals to resume to Macau?

## RELIEF REQUESTED

Petitioning Creditors Request that the Bankruptcy Court grant them leave to take this Appeal and certify the appeal directly to the Appeals Court.

## ARGUMENT

### A. Leave to Appeal

A district court has jurisdiction to hear an interlocutory appeal from a bankruptcy court order. 28 U.S.C. § 158(a). Section 158(a) provides, in relevant part, that "[t]he district courts of the United States shall have jurisdiction to hear appeals . . . with leave of the court, from

interlocutory orders and decrees, of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under section 157 of this title." Id. Courts apply the approach set forth in 28 U.S.C. § 1292(b), which governs interlocutory appeals from a district court to a court of appeals, in considering appeals under 28 U.S.C. § 158(a).

Section 1292(b) provides: "When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order." 28 U.S.C. § 1292(b).

Accordingly, to warrant a Section 1292(b) certification, the moving party "must show that there is (1) a controlling question of law, (2) as to which there is substantial ground for difference of opinion, and (3) an immediate appeal may materially advance the ultimate termination of the litigation." Ryan v. Flowserve Corp., 444 F. Supp 2d 718, 723 (N.D. Tex. 2006); In re Barsan Contractors, 2010 WL 3907116 at *3 (D. N.J. Sept. 30, 2010). "The decision to grant certification is within the district court's discretion, even if all three criteria are present." The moving party "must also show that exceptional circumstances justify a departure from the basic policy of postponing the review until after the entry of final judgment." Id. (internal quotation and citation omitted).

As set forth below, the Petitioning Creditors meet all three requirements of section 1292(b) for leave to appeal the Orders.

**1. This Appeal Presents Multiple Controlling Questions of Law**

Courts have held that what is a controlling question of law — "although not consistently defined — at the very least means a question of law the resolution of which could materially advance the ultimate termination of the litigation — thereby saving time and expense for the

court and the litigants. WRIGHT MILLER, *supra,* § 3930 at 426 n. 25 (2d ed. 1996 Supp. 2005) (citing *S.E.C. v. Credit Bancorp, Ltd.*, 103 F. Supp. 2d 223, 227 (S.D.N.Y. 2000))." Ryan v. Flowserve Corp., 444 F. Supp 2d 718, 723 (N.D. Tex. 2006) (citing Strougo v. Scudder, Stevens & Clark, Inc., No. 96 CIV. 2136 (RWS), 1997 WL 473566, at *7 (S.D.N.Y. Aug. 18, 1997); (Klinghoffer v. S.N.C. Achille Lauro, 921 F.2d 21, 24 (2d Cir. 1990)) (other citations omitted).

"A controlling question of law must encompass at the very least every order which, if erroneous, would be reversible error on final appeal." Katz v. Carte Blanche Corp., 496 F.2d 747, 755 (3d Cir. 1974). It is not required that reversal of the order terminate the litigation or that the order be on the claim's merits. Id. "Controlling" means "serious to the conduct of the litigation, either practically or legally." Id. From a practical standpoint, saving the district court's time and the litigants' expenses is "a highly relevant factor." Id.; see also Barsan, 2010 WL 3907116 at *3.

The Bankruptcy Court's decision requires the Petitioning Creditors to appear in the United States for live depositions despite the Presidential Proclamation's travel ban and the ongoing, daily worsening COVID-19 pandemic. In light of a recent change in the law permitting travel by Chinese nationals to resume to Macau, all of the issues presented are in fact controlling issues of law. These issues do not go to the merits of the case but they do seriously impact the conduct of the litigation given the pending Third Motion to Dismiss on November 30, 2020. If the Orders are reversed as to the "live depositions in the U.S. requirement," not only will the parties save considerable time and expense in conducting the depositions of the Petitioner Deponents by video in Macau, but the courts will save time and expense of the ensuing litigation and appeals should Petitioning Creditors be unable to agree to travel here amidst the worst pandemic of our lifetime and the Case is then dismissed as a result.

**2. There Are Substantial Grounds for Difference of Opinion as to the Orders**

A difference of opinion "must arise out of genuine doubt as to the correct legal standard." Barsan, 2010 WL 3907116 at *3 (internal quotation and citation omitted). Courts have found substantial ground for difference of opinion where:

> a trial court rules in a manner which appears contrary to the rulings of all Courts of Appeals which have reached the issue, if the circuits are in dispute on the questions and the Court of Appeals of the Circuit has not spoken on the point, *if complicated questions arise under foreign law, or if novel and difficult questions of first impression are presented* (emphasis supplied).

Ryan v. Flowserve Corp., 444 F. Supp 2d at 723-25 (citation omitted); see also United States ex rel Minge v. Hawker Beechcraft Corp. (In re Hawker Beechcraft, Inc.), 2013 WL6673607, at *5 (S.D.N.Y. Dec. 18, 2013) (substantial ground for difference of opinion exists where (1) there is conflicting authority on the issue, or (2) the issue is particularly difficult and of first impression).

Here, the issues are particularly difficult and, likely of first impression, given the COVID-19 pandemic has largely only been with us in the U.S. since February or March of 2020. There are no cases the Petitioning Creditors have found dealing directly with the issue of foreigners who are subject to travel restrictions being required by a U.S. Court to travel here during the pandemic solely for purposes of sitting for depositions or suffer dismissal of their Case.

Petitioning Creditors believe the issues presented are of "first impression" and should be decided directly by the Appeals Court as set forth below or, if not, by the U.S. District Court.

**3. An Interlocutory Appeal Will Materially Advance the Litigation**

Importantly, an interlocutory appeal from the Orders materially advances the ultimate termination of the litigation. Ichinose v. Homer National Bank (In re Ichinose), 946 F.2d 1169, 1177 (5th Cir. 1991) (citing In re Neshaminy Office Bldg. Assoc., 81 B.R. 301, 303 (E.D. Pa.

1987)) (other citation omitted). The granting of leave to appeal under section 1292(b) materially advances the litigation's ultimate termination where the interlocutory appeal will eliminate the need for trial, complex issues, or issues that make discovery more difficult and more expensive. L.R. v. Manheim Twp. Sch. Dist., 540 F. Supp. 2d 603, 613 (E.D. Pa. 2008).

Granting leave to appeal here, and ensuring immediate review by the Appeals Court, will materially advance this litigation. If leave to appeal is not granted and the Bankruptcy Court's Orders are kept in place, the Case could very well be dismissed on November 30, in which case the Appeals Court will be faced with the same issues in about 30 days or so that are now being presented to it. Hearing the appeal now will save everyone time and expense and potentially avoid dismissal of the Case on a procedural issues, albeit important issues, but not on the merits of the Case. Further, if the Appeals Court determines that the Bankruptcy Court erred on the law raised by the Petitioning Creditors in their Motion for Reconsideration, and the depositions of the Petitioning Creditors should be conducted in Macau via video, it will save everyone involved considerable time and expense.

**B. Exceptional Circumstances Warrant Granting Leave to Appeal**

Courts in the Fifth Circuit have held that section 1292(b) appeals are appropriate only under exceptional circumstances. See, e.g., Ryan, 444 F. Supp 2d at 721-22 (citing Clark-Dietz and Associates-Engineers v. Basic Constr. Co., 702 F.2d 67, 69 (5th Cir. 1983)) (other citations omitted). If the moving party proves all of the other section 1292(b) factors, the moving party "must also show that exceptional circumstances justify a departure from the basic policy of postponing the review until after the entry of final judgment." Barsan, 2010 WL 3907116 at *3 (internal quotation and citation omitted). "Exceptional circumstances" are proved by "establish[ing] an urgency that sets this case apart from the typical case." Matter of Magic Restaurants, Inc., 202 B.R. 24, 26 (D. Del. 1996).

Exceptional and exigent circumstances quite clearly exist here given the import of the Orders juxtaposed to the reality of the Presidential Proclamation and the COVID-19 pandemic. The Petitioning Creditors respectfully submit that there needs to be some balancing of the equities here in order to accomplish the purpose of discovery in this Case. Discovery requirements are not interposed by our Federal Rules for purposes of placing the litigants at extreme health risk, particularly where the President of the United States has proclaimed as much. Leave to appeal should be granted based upon the importance of the discovery issues presented in this Case. The issues here are not "run of the mill" discovery issues. They touch directly on the meaning and effect of the Presidential Proclamation and the very purpose of discovery in the face of a pandemic which, by most accounts, is worsening here in the United States every day.

**C. The Appeal Should be Certified Directly to the Appeals Court**

Section (d)(2)(A) of 28 U.S.C. 158, which governs certification of appeals by the Bankruptcy Court directly to the Court of Appeals, provides as follows:

> The appropriate court of appeals shall have jurisdiction of appeals described in the first sentence of subsection (a) if the bankruptcy court, the district court, or the bankruptcy appellate panel involved, acting on its own motion or on the request of a party to the judgment, order, or decree described in such first sentence, or all the appellants and appellees (if any) acting jointly, certify that—
> (i) the judgment, order, or decree involves a question of law as to which there is no controlling decision of the court of appeals for the circuit or of the Supreme Court of the United States, or involves a matter of public importance;
> (ii) the judgment, order, or decree involves a question of law requiring resolution of conflicting decisions; or
> (iii) an immediate appeal from the judgment, order, or decree may materially advance the progress of the case or proceeding in which the appeal is taken; and if the court of appeals authorizes the direct appeal of the judgment, order, or decree.

28 U.S.C. § (d)(2)(A).

Here, multiple grounds exist for certification of the appeal by the Bankruptcy Court directly to the Appeals Court. The Orders require interpretation and application of the Presidential Proclamation and the balancing of interests of the litigants during this horrible COVID-19 pandemic. To the knowledge of Petitioning Creditors there are no controlling decisions within this Circuit or from the United States Supreme Court on the issues presented. Although the issues do not stem from conflicting decisions, the decisions of the Bankruptcy Court is, in the Petitioning Creditors' respectful view, at odds with the Presidential Proclamation and the realities of the COVID-19 pandemic. The decisions also seemingly ignore the simple solution of requiring the Petitioning Creditors to appear for depositions in Macau, something that could be accomplished fairly quickly and at much less expense and inconvenience to all of the parties. Finally, a direct appeal and decision by the Appeals Court will materially advance the litigation which, presently, is scheduled for a hearing on the Third Motion to Dismiss on November 30, 2020.

The Petitioning Creditors believe the issues presented are issues of first impression and inherently involve matters of public importance. As discussed above, granting leave to appeal and ensuring immediate review by the Appeals Court will materially advance this litigation.

**CONCLUSION**

For the reasons set forth above, the Bankruptcy Court should grant (i) the Petitioning Creditors Motion for (a) Leave to File an Interlocutory Appeal and (b) Certification of the

Appeal to the United States Court of Appeals for the Fifth Circuit; and (ii) such other and further relief as is just and proper.

Dated: November 3, 2020

*/s/ Stephen M. Packman*

Jiangang Ou
Nguyen & Chen LLP
11200 Westheimer Road Suite 120
Houston, TX 77042
(832) 767-0339
Fax : (832) 767-0669
Email: jou@nguyen-chen.com

Stephen M. Packman
Archer & Greiner, P.C.
Three Logan Square
1717 Arch St., Suite 3500
Philadelphia, PA 19103
215-246-3147
Email: spackman@archerlaw.com

*Counsel for the Petitioning Creditors*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>WALL007 LLC, *et al.*,[1]<br><br>Alleged Debtors. | Chapter 7<br><br>Case No. 20-31131 (HDH)<br>(Jointly Administered) |

**MOTION OF PETITIONING CREDITORS (A) FOR LEAVE TO FILE AN INTERLOCUTORY APPEAL AND (B) REQUESTING CERTIFICATION TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT**

**TO: THE HONORABLE HARLIN D. HALE**:

The Petitioning Creditors, Jun Li, Yunding Kang, Cunxiang Ji, Jin Wang, Peng Guo, Lin Zhou, Qu Chen, Kai Tian, Yijing Wu, Xuegeng Gong, Jin Wang, Weijia Kong, Heng Zhang, Hong Guo, Pei Guan, Yue Xu, Mai Ye, Chenchen Jiang, Qiuying Li, Ruinian Wu, Lin Zhou, Liying Yang, Yan Zhang, Wenjun Wang, Lan Ji, Ying Zhou, Lin Li, Li Jiang, Rufeng Ding, Cunxiang Ji, Lin Gao, Qiao Qin, Yue Zhang, Xiaodong Hao, Tianqing Song, Li Jiang, Weisi Wang, Xiaoquan Dai, Feng Yan, Heng Zhang, Ou Jiang, Jinzhe Wu, Yadan Liu, Wanwan Li, Wenjuan Yin, Jiancheng Chen, Yi Tang, Ying Zhang, Pengfei Dong, Kangying Mao, Yijing Wu, Li Jiang, Qin Chu, Yulan Chen, Sicheng Zhan, Pei Guan, Jingqiu Tang, Di Tang, Jun Zeng, Kui Wang, Yue Zhang, Jun Wang, Xiaomin Fan, Di Tang, Jialin Hu, Qin Chu, Jiaxiang Lu, Fuqing Chen, Hanjiang Fu, Aiguo Luo, Fang Ding, Xiangdong Zhu, Wai Ying, Yuan Yuan, Chao Xu, Guoqin Zhou, Yijing Wu (collectively, the "Petitioning Creditors"), hereby file this motion (the "Motion") seeking (i) leave, pursuant to Bankruptcy Appellate Rule 8004(a)(2), to

---

[1] The Alleged Debtors in these cases are: WALL007 LLC, WALL009 LLC, WALL010 LLC, WALL011 LLC, WALL012 LLC, WALL016 LLC, WALL017 LLC. The Alleged Debtors' federal tax identification numbers are unknown to the Petitioning Creditors sat this time.

appeal (this "Appeal") and (ii) certification by this Honorable Court ("Bankruptcy Court") of the appeal, pursuant to Bankruptcy Appellate Rule 8006(f)(1), directly to the United States Court of Appeals for the Fifth Circuit (the "Appeals Court"); or, if certification is not granted, to the United States District Court for the Northern District of Texas, from the following Orders of the Bankruptcy Court entered in the above-captioned proceedings ("Case"): (i) Order Granting in Part the Alleged Debtors' Motion for Discovery Related to Wet Signatures [Dkt. No. 101] (Dkt. No. 165) entered on September 4, 2020; (ii) Order Granting in Part the Petitioners' Motion to Compel Discovery [Dkt. Nos. 92 & 129] (Dkt. No. 167) entered on September 4, 2020; (iii) Order Granting in Part the Alleged Debtor's Motion to Quash Petitioners' Deposition Notice [Dkt. 133] (Dkt. No. 168) entered on September 4, 2020; (iv) Order Granting in Part the Alleged Debtor's Second Motion to Compel Discovery Responses from Petitioners [Dkt. No. 105] (Dkt. No. 169) entered on September 4, 2020; and (v) October 22, 2020 Order Denying Motion for Reconsideration of Discovery Orders (Dkt. No. 202) entered on September 4, 2020 (collectively, the "Orders").

## INTRODUCTION

The Petitioning Creditors most respectfully disagree with the Bankruptcy Court's rulings in the Orders which would require the Petitioning Creditors to enter into an agreement to travel to the United States for "live," in person depositions prior to the Petitioning Creditors being permitted to proceed with further discovery or motion practice in the Case and, therefore, risk dismissal of the Case. As such, with all due respect to the Bankruptcy Court, Petitioning Creditors have filed a "Notice of Appeal" of the Orders with the Clerk of the Bankruptcy Court and a Request for Certification ("Request for Certification") directly to the Court of Appeals, and a Statement of Issues and Designation of Record ("Designation"), contemporaneously with the filing of this Motion. The Petitioning Creditors believe the Orders are interlocutory and therefor

seek leave from the Bankruptcy Court to appeal the Orders and further request certification to bring this appeal directly to the Appeals Court.

## PRELIMINARY STATEMENT

Respectfully, in the Orders, the Bankruptcy Court erred as a matter of law (i) in determining that the Petitioning Creditors must enter into an agreement to travel from mainland China to the United States for live depositions; (ii) in staying Petitioning Creditors' discovery and all motion practice in the Case, pending Petitioning Creditors' agreement to travel here from mainland China to the United States for live depositions; and (iii) in denying Petitioning Creditors' Motion for Reconsideration in light of a recent change in the law permitting Chinese nationals to resume travel to Macau.

As argued to the Bankruptcy Court twice by Petitioning Creditors, the Petitioning Creditors are Chinese nationals who cannot enter directly into the United States at this time under President Trump's travel ban. Further, given the surge in the COVID-19 pandemic, even if Petitioning Creditors could somehow bypass the President's travel ban and gain entry into the United States to sit for live depositions, they would risk their health and potentially the health of others merely for the sake of a "live" deposition on U.S. soil. The penalty for their inability to agree to travel here: Dismissal of the Case as early as November 30, 2020. However, Petitioning Creditors are now permitted to enter another country which is not subject to such travel limitations on Chinese nationals, namely, Macau, where their depositions could be taken, either live by counsel or via video from the United States.

Petitioning Creditors have more fully set forth herein the underlying facts and legal arguments supporting why leave to appeal should be granted and further why the Bankruptcy

Court should certify these important, unsettled issues of public policy directly to the Court of Appeals.

**STATEMENT OF FACTS AND PROCEDURAL HISTORY OF THE CASE**

The Petitioning Creditors filed involuntary chapter 7 bankruptcy petitions (collectively, the "Petitions") against each Alleged Debtor on April 8, 2020. See [Dkt. No. 1 in 20-31131]; [Dkt. No. 1 in 20-31133]; [Dkt. No. 1 in 20-31134]; [Dkt. No. 1 in 20-31135]; [Dkt. No. 1 in 20-31136]; [Dkt. No. 1 in 20-31138]; and, [Dkt. No. 1 in 20-31139].

On April 24, 2020, the Bankruptcy Court entered an Order granting the Petitioning Creditors' motions to jointly administer the bankruptcy cases (the "Cases") under the lead case WALL007 LLC [Dkt. No. 11 in 20-31131] (the "Lead Case").

On May 7, 2020, each Alleged Debtor filed Motions to Dismiss. See [Dkt. Nos. 18–19 in 20-31131]; [Dkt. Nos. 15–16 in 20-31133]; [Dkt. Nos. 14–15 in 20-31134]; [Dkt. Nos. 14–15 in 20-31135]; [Dkt. Nos. 14–15 in 20-31136]; [Dkt. Nos. 14–15 in 20-31138]; and, [Dkt. Nos. 14–15 in 20-31139] (collectively, the " Main Motions to Dismiss"). The Main Motions to Dismiss have not yet been heard by the Bankruptcy Court but the Alleged Debtors have unilaterally sought to schedule hearings thereon for December 30, 2020 [Dkt. No. 210].

The Alleged Debtors filed a third motion to dismiss ("Third Motion to Dismiss") on October 12, 2020 [Dkt. No. 182], arguing that if the Petitioning Creditors refuse to travel to the United States to be deposed live, the Court must dismiss the Case. The Third Motion to Dismiss has been set for hearing on November 30, 2020, making a determination on this Appeal of utmost importance to the Petitioning Creditors and the Case. Effectively, if the Petitioning Creditors cannot agree to travel to the United States for live depositions by November 30, 2020, the Alleged Debtors have asked the Bankruptcy Court to dismiss the Case.

The Main Motions to Dismiss seek dismissal of the Petitions alleging, *inter alia*, that: (1) there are an insufficient number of Petitioning Creditors to support the filing of the Petitions against the Alleged Debtors; (2) the Petitioning Creditors' claims are in bona fide dispute; (3) the Alleged Debtors are generally paying their respective debts; and (4) the Petitions are not in the best interests of each of the Alleged Debtors and their creditors. See Main Motions to Dismiss.

On June 1, 2020, the Petitioning Creditors sent a First Set of Interrogatories ("Interrogatories") and First Request for Production of Documents ("Document Requests") (collectively, the "Requests") to each of the Alleged Debtors. On June 20, 2020, the Court entered a Joint Discovery Plan setting forth, among other matters, discovery deadlines. Paper discovery was exchanged between the parties.

On July 10, 2020, at the repeated request of counsel for the Petitioning Creditors, the Petitioning Creditors' and the Alleged Debtors' counsel discussed the Alleged Debtors' responses to the Requests (the "Responses") in a failed attempt to amicably resolve the Petitioning Creditors' objections to the Responses. Back and forth regarding potential resolutions to the various discovery disputes between the parties occurred for most of the month of July and into August 2020.

On July 27, 2020, the Petitioning Creditors filed a Motion to Compel [Dkt. No. 92] requesting that the Alleged Debtors produce paper discovery in the case. On August 10, 2020, the Petitioning Creditors filed an amendment to the Motion to Compel [Dkt. No. 129] (the "Amended Motion to Compel") requesting that the Alleged Debtors produce for deposition (i) Timothy Barton; (ii) Venkat Murugan; (iii) Hongpeng Lin; and (iv) Saskya Bedoya.

In the Amended Motion to Compel, the Petitioning Creditors specifically referenced to the Court, President Trump's proclamation issued on January 31, 2020 (the "Presidential

Proclamation") which remains in effect. See Amended Motion to Compel [Dkt. No. 129], Exhibit "D" thereto; See also https://www.whitehouse.gov/presidential-actions/proclamation-suspension-entry-immigrants-nonimmigrants-persons-pose-risk-transmitting-2019-novel-coronavirus/.

The Presidential Proclamation (number 9984) states, in pertinent part:

> NOW, THEREFORE, I, DONALD J. TRUMP, President of the United States, by the authority vested in me by the Constitution and the laws of the United States of America, including sections 212(f) and 215(a) of the Immigration and Nationality Act (INA), 8 U.S.C. 1182(f) and 1185(a), and section 301 of title 3, United States Code, hereby find that the unrestricted entry into the United States of persons described in section 1 of this proclamation would, except as provided for in section 2 of this proclamation, be detrimental to the interests of the United States, and that their entry should be subject to certain restrictions, limitations, and exceptions. I therefore hereby proclaim the following:
>
> Section 1. Suspension and Limitation on Entry. The entry into the United States, as immigrants or nonimmigrants, of all aliens who were physically present within the People's Republic of China, excluding the Special Administrative Regions of Hong Kong and Macau, during the 14-day period preceding their entry or attempted entry into the United States is hereby suspended and limited subject to section 2 of this proclamation.

The Alleged Debtors' Motions to Compel argued that the Petitioning Creditors had not met their paper discovery obligations. Nowhere in the Alleged Debtors' Motions to Compel do the Alleged Debtors seek relief relative to the noticed depositions of certain of the Petitioning Creditors.

On August 5, 2020, counsel for the Alleged Debtors served notices of deposition subpoenas ("Debtor Deposition Notices") on counsel for the following Petitioning Creditors (the

"Petitioner Deponents"): Fang Ding, Guoqin Zhou, Jialin Hu, Jiancheng Chen, Jingqiu Tang, Jun Zeng, Kui Wang, Wenjun Wang, Xiangdong Zhu, Xiaoquan Dai, Qin Chu, Li Jiang, Weisi Wang, Ying Zhou, Di Tang, Kangying Mao, Jiaxiang Lu, Jin Wang, Wanwan Li, Yijing Wu, Heng Zhang.

In the Motion to Quash, the Alleged Debtors inserted language requesting, *inter alia*, that the depositions of the Petitioner Deponents be taken in the United States before any depositions are taken of the Alleged Debtors' representatives or further motion practices proceeds in the Case. Procedurally, the Alleged Debtors never filed a motion or other application requesting enforcement of their Debtor Deposition Notices on the Petitioner Deponents.

On August 13, 2020, the Petitioning Creditors filed their opposition to the Motion to Quash (the "Quash Opposition") and reiterated that the Petitioning Creditors, who are Chinese nationals and reside in mainland China, were unable to enter into the United States due to the ongoing COVID-19 pandemic and specifically because of the travel restrictions imposed by President Trump.

Paragraph 34 of the Quash Opposition states as follows:

> "However, as set forth in the Amended Motion to Compel, Petitioning Creditors <u>cannot enter into the United States</u> due to the ongoing COVID-19 pandemic and travel and quarantine restrictions imposed by both China and the United States."

On August 17, 2020, the Court held a hearing on the multiple contested discovery matters, including the Discovery Motions. At the August 17th hearing, counsel for the Petitioning Creditors and the Court briefly discussed the implications of the travel ban to the U.S. from China due to the ongoing COVID-19 pandemic. In particular, the following discourse occurred:

Why don't you address the ability of your approach to be deposed, just as Ms. Lindauer did in her's. She's saying she needs 10 to 12 depositions.

MR. PACKMAN: And we're happy to provide those by video, Your Honor. I do not believe, based on COVID and the restrictions on travel both from China and into the United States, which would require a 14-day quarantine, that we can do these depositions live in the United States. If we could, we would. We think it's a little bit overkill to have 11 or 12 of these petitioning creditors to have to travel here. But if we would, we could -- if we could, we would. We can only produce them now --

* * *

THE COURT: Yeah. What is the travel situation in China? I just know enough to be dangerous, just from reading in the paper. Are we still under a travel quarantine from China? I don't know what the status is right now.

MR. PACKMAN: Your Honor, based on what the most current information we have from the U.S. government website, there appears to still be a 14-day quarantine requirement for a Chinese national coming into the United States.

THE COURT: Uh-huh.

MR. PACKMAN: So I do agree with Ms. Lindauer that it's a predicament. It would be very expensive and costly for these petitioning creditors to come here. But I don't disagree with Ms. Lindauer that they have some right to ask them questions and prepare for the trial. I don't disagree with that. I just don't know what else to do right now. I just don't know what else to do.

THE COURT: Okay.

MR. PACKMAN: But we will make them available by video.

THE COURT: All right. Okay.

As far as the petitioning creditors' depositions. We will do everything possible to make them available for depositions so they can answer whatever relevant questions Ms. Lindauer has. But as I said, they are just not permitted to travel here at this moment, without being quarantined for at least two weeks. I think that would be unfair to require them to do that.

Tr. at 15:14–16:22; 28:8–28:14, August 17, 2020.

Despite the foregoing, and the travel ban pursuant to the Presidential Proclamation, the Court determined that the Petitioner Deponents would be required to enter into the United States for live depositions and stated, in pertinent part, as follows:

The petitioning creditors did not really respond to alleged debtors' legality argument. Instead, the petitioners claim that the difficulties associated with the COVID-19 crisis should excuse them from traveling to the United States for in-person depositions. During the hearing, counsel for the petitioners did not specifically say there was a travel ban on Chinese nationals entering the United States. Rather, counsel argued that his clients would have to quarantine for 14 days upon entry to the United States and that doing so would be a great inconvenience.

The Court understands the great difficulty travel poses during the current pandemic. However, the Court also believes that litigants who seek the benefit of the United States law must follow its process. And here, a serious concern has been raised that taking video depositions would violate Chinese law. While traveling to the U.S. may be a great inconvenience and difficulty at this time, the Court believes it is necessary in this case to address both the legality issues and the identity concerns raised by the

CINDY SUMNER, CSR (214) 802-7196

5

alleged debtors. Accordingly, the motion to quash at docket number 133 is granted in part to require the petitioning creditors' depositions to be taken in-person, in the United States, at a time and place agreeable to the parties.

Tr. at 4:7–5:4, August 19, 2020.

At the time of the hearing on the Discovery Motions, the Bankruptcy Court did not address counsel for Petitioning Creditors' statement or legal position in its supporting brief, arguing that they cannot enter directly into the U.S. pursuant to the President's travel ban. Petitioning Creditors cannot enter directly into the U.S. for any purpose if they are foreign nationals of China under the Presidential Proclamation absent an exception being recognized under Section 2 of the law as set forth herein. No direct entry of a Chinese national into the U.S. is permitted absent the application of discrete exceptions.

Section 2 of the Presidential Proclamation contains various exceptions to the direct travel ban in Section 1. As noted to the Bankruptcy Court, none of those exceptions apply here. In fact, the Bankruptcy Court has not ruled that the depositions of the Petitioning Creditors fall under any specific exception listed in Section 2 to the direct travel ban. Put simply, the Petitioning Creditors cannot legally (under U.S. Law) travel directly here and enter the United States for any reason at this time.

Just as the Alleged Debtors were concerned about violating Chinese law (by conducting video depositions in China, Petitioning Creditors would violate U.S. law by seeking direct entry into the U.S. and, in fact, would not be permitted to enter the country. The substance of the Presidential Proclamation was clearly attached to the Amended Motion to Compel and was not fully considered or understood prior to the Bankruptcy Court's ruling.

To be clear, the President has banned the Petitioners (who are Chinese nationals) from directly entering the United States pursuant to the Presidential Proclamation. However, there is now a legal alternative to the "live" U.S. depositions which was not previously available in the Case and which runs directly contrary to prior arguments by counsel for the Alleged Debtors.

Pursuant to their Motion for Reconsideration [Dkt. No. 175], the Petitioning Creditors sought the Bankruptcy Court's reconsideration of, *inter alia*, the Orders entered on the Amended Motion to Compel (the "Petitioners Compel Order"), the Alleged Debtors "Motion to Quash" [Dkt. No. 133] (the "Quash Order") and the Orders entered on the Alleged Debtors First and Second Motions to Compel [Dkt. Nos. 165 and 169] (the "Alleged Debtor Compel Orders"). The discovery motions and orders may, at times, be referenced herein collectively as the "Discovery Motions" and the "Discovery Orders" or the "Orders for Reconsideration;" and those discovery orders, together with the Order denying the Motion for Reconsideration, may hereinafter be referred to collectively as the "Orders."

In prior arguments during the Case, Alleged Debtors' counsel maintained that taking depositions in China are illegal and that the depositions could not be taken there or even in other territories. See Alleged Debtors' Motion to Quash Petitioners' Deposition Notices [Dkt. No. 133]; correspondence from Alleged Debtors' counsel Joyce Lindauer to the Court dated June 3, 2020 with the subject line "Memorandum on Conducting Depositions of Chinese Nationals in China" [Dkt. No. 45].

However, as noted to the Court in the Motion for Reconsideration, that is not currently the case, as the government of Macau Special Administrative Region is now, most recently permitting Chinese nationals, such as the Petitioning Creditors, to travel to Macau where their depositions can be taken, either live by counsel or via video. See https://www.worldaware.com/covid-19-alert-macau-allows-tourists-zhuhai-china-aug-12. "Macau residents and passengers from Taiwan and mainland China can enter the special administrative region provided they have not traveled to other countries or territories within 14 days. Individuals arriving from mainland China, Hong Kong, or Taiwan are subject to health

questionnaires and screenings. Travelers who have visited "high-risk" countries, including the Schengen Area, the UK, the US, Australia, South Korea, and Japan, within 14 days of arrival must undergo mandatory quarantine at designated hotels." Id.

There is a history of remote depositions which have taken place in Hong Kong, Macau and elsewhere. See Dagen v. CFC Grp. Holdings, 00 Civ. 5682, 2003 U.S. Dist. LEXIS 20029, 2003 WL 22533425, at *2 (S.D.N.Y. Nov. 7, 2003) (permitting testimony by telephone of witnesses based in Hong Kong); see also Jordan Outdoor Enters., Ltd. v. Hubei Wild Trees Textiles Co., 2014 BL 99734 (M.D. Ga. Apr. 09, 2014) (Chinese national deposed in Hong Kong in Georgia litigation).

A proposal for related Court reporting and interpreter services for video depositions in Macau which was presented to the Bankruptcy Court reflects that the reporting service conducts depositions (including those of Chinese nationals) in Macau and Hong Kong frequently and the cost is not prohibitive.

Pursuant to F.R.C.P. 29(a), "[u]nless the court orders otherwise, the parties may stipulate that: (a) a deposition may be taken before any person, at any time or place, on any notice, and in the manner specified—in which event it may be used in the same way as any other deposition."

This change in the foreign law (regarding direct travel from China's mainland to Macau) was not known to Petitioning Creditors' counsel at the time of the Discovery Motions as it had only been enacted days prior to argument on the Discovery Motions. As noted in the Motion for Reconsideration, there is now a viable legal option for the Alleged Debtors to depose the Petitioner Deponents in Macau which was not an option at the time of the Motion to Quash due to travel restrictions. Despite this change in the law, and ability of the Alleged Debtors to depose

the Petitioner Deponents in Macau live or via video, the Bankruptcy Court denied Petitioning Creditor' Motion for Reconsideration.

In sum, the Bankruptcy Court is nevertheless requiring Petitioning Creditors to agree to travel to the United States despite the Presidential Proclamation. Although they cannot travel directly to the U.S., the Petitioning Creditors must somehow find a way to gain entry into the U.S. by agreeing to travel here at great expense from China and, in the process, obviously risking their potential contraction of COVID-19 (and exposing others to it) or, alternatively, risk dismissal of the Case within 30 days.

## QUESTIONS PRESENTED FOR THE APPELLATE COURT

**1.** Did the Bankruptcy Court err as a matter of law in determining that the Petitioning Creditors must agree to travel from mainland China to the United States for live depositions?

2. Did the Bankruptcy Court err as a matter of law in staying Petitioning Creditors' discovery and all motion practice in the Case pending Petitioning Creditors' agreement to travel here from mainland China to the United States for live depositions?

3. Did the Bankruptcy Court err as a matter of law in denying Petitioning Creditors' Motion for Reconsideration in light of a recent change in the law permitting travel of Chines nationals to resume to Macau?

## RELIEF REQUESTED

Petitioning Creditors Request that the Bankruptcy Court grant them leave to take this Appeal and certify the appeal directly to the Appeals Court.

## ARGUMENT

### A. Leave to Appeal

A district court has jurisdiction to hear an interlocutory appeal from a bankruptcy court order. 28 U.S.C. § 158(a). Section 158(a) provides, in relevant part, that "[t]he district courts of the United States shall have jurisdiction to hear appeals . . . with leave of the court, from

interlocutory orders and decrees, of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under section 157 of this title." Id. Courts apply the approach set forth in 28 U.S.C. § 1292(b), which governs interlocutory appeals from a district court to a court of appeals, in considering appeals under 28 U.S.C. § 158(a).

Section 1292(b) provides: "When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order." 28 U.S.C. § 1292(b).

Accordingly, to warrant a Section 1292(b) certification, the moving party "must show that there is (1) a controlling question of law, (2) as to which there is substantial ground for difference of opinion, and (3) an immediate appeal may materially advance the ultimate termination of the litigation." Ryan v. Flowserve Corp., 444 F. Supp 2d 718, 723 (N.D. Tex. 2006); In re Barsan Contractors, 2010 WL 3907116 at *3 (D. N.J. Sept. 30, 2010). "The decision to grant certification is within the district court's discretion, even if all three criteria are present." The moving party "must also show that exceptional circumstances justify a departure from the basic policy of postponing the review until after the entry of final judgment." Id. (internal quotation and citation omitted).

As set forth below, the Petitioning Creditors meet all three requirements of section 1292(b) for leave to appeal the Orders.

**1. This Appeal Presents Multiple Controlling Questions of Law**

Courts have held that what is a controlling question of law — "although not consistently defined — at the very least means a question of law the resolution of which could materially advance the ultimate termination of the litigation — thereby saving time and expense for the

court and the litigants. WRIGHT MILLER, *supra,* § 3930 at 426 n. 25 (2d ed. 1996 Supp. 2005) (citing *S.E.C. v. Credit Bancorp, Ltd.*, 103 F. Supp. 2d 223, 227 (S.D.N.Y. 2000))." Ryan v. Flowserve Corp., 444 F. Supp 2d 718, 723 (N.D. Tex. 2006) (citing Strougo v. Scudder, Stevens & Clark, Inc., No. 96 CIV. 2136 (RWS), 1997 WL 473566, at *7 (S.D.N.Y. Aug. 18, 1997); (Klinghoffer v. S.N.C. Achille Lauro, 921 F.2d 21, 24 (2d Cir. 1990)) (other citations omitted).

"A controlling question of law must encompass at the very least every order which, if erroneous, would be reversible error on final appeal." Katz v. Carte Blanche Corp., 496 F.2d 747, 755 (3d Cir. 1974). It is not required that reversal of the order terminate the litigation or that the order be on the claim's merits. Id. "Controlling" means "serious to the conduct of the litigation, either practically or legally." Id. From a practical standpoint, saving the district court's time and the litigants' expenses is "a highly relevant factor." Id.; see also Barsan, 2010 WL 3907116 at *3.

The Bankruptcy Court's decision requires the Petitioning Creditors to appear in the United States for live depositions despite the Presidential Proclamation's travel ban and the ongoing, daily worsening COVID-19 pandemic. In light of a recent change in the law permitting travel by Chinese nationals to resume to Macau, all of the issues presented are in fact controlling issues of law. These issues do not go to the merits of the case but they do seriously impact the conduct of the litigation given the pending Third Motion to Dismiss on November 30, 2020. If the Orders are reversed as to the "live depositions in the U.S. requirement," not only will the parties save considerable time and expense in conducting the depositions of the Petitioner Deponents by video in Macau, but the courts will save time and expense of the ensuing litigation and appeals should Petitioning Creditors be unable to agree to travel here amidst the worst pandemic of our lifetime and the Case is then dismissed as a result.

**2. There Are Substantial Grounds for Difference of Opinion as to the Orders**

A difference of opinion "must arise out of genuine doubt as to the correct legal standard." Barsan, 2010 WL 3907116 at *3 (internal quotation and citation omitted). Courts have found substantial ground for difference of opinion where:

> a trial court rules in a manner which appears contrary to the rulings of all Courts of Appeals which have reached the issue, if the circuits are in dispute on the questions and the Court of Appeals of the Circuit has not spoken on the point, ***if complicated questions arise under foreign law, or if novel and difficult questions of first impression are presented*** (emphasis supplied).

Ryan v. Flowserve Corp., 444 F. Supp 2d at 723-25 (citation omitted); see also United States ex rel Minge v. Hawker Beechcraft Corp. (In re Hawker Beechcraft, Inc.), 2013 WL6673607, at *5 (S.D.N.Y. Dec. 18, 2013) (substantial ground for difference of opinion exists where (1) there is conflicting authority on the issue, or (2) the issue is particularly difficult and of first impression).

Here, the issues are particularly difficult and, likely of first impression, given the COVID-19 pandemic has largely only been with us in the U.S. since February or March of 2020. There are no cases the Petitioning Creditors have found dealing directly with the issue of foreigners who are subject to travel restrictions being required by a U.S. Court to travel here during the pandemic solely for purposes of sitting for depositions or suffer dismissal of their Case.

Petitioning Creditors believe the issues presented are of "first impression" and should be decided directly by the Appeals Court as set forth below or, if not, by the U.S. District Court.

**3. An Interlocutory Appeal Will Materially Advance the Litigation**

Importantly, an interlocutory appeal from the Orders materially advances the ultimate termination of the litigation. Ichinose v. Homer National Bank (In re Ichinose), 946 F.2d 1169, 1177 (5th Cir. 1991) (citing In re Neshaminy Office Bldg. Assoc., 81 B.R. 301, 303 (E.D. Pa.

1987)) (other citation omitted). The granting of leave to appeal under section 1292(b) materially advances the litigation's ultimate termination where the interlocutory appeal will eliminate the need for trial, complex issues, or issues that make discovery more difficult and more expensive. L.R. v. Manheim Twp. Sch. Dist., 540 F. Supp. 2d 603, 613 (E.D. Pa. 2008).

Granting leave to appeal here, and ensuring immediate review by the Appeals Court, will materially advance this litigation. If leave to appeal is not granted and the Bankruptcy Court's Orders are kept in place, the Case could very well be dismissed on November 30, in which case the Appeals Court will be faced with the same issues in about 30 days or so that are now being presented to it. Hearing the appeal now will save everyone time and expense and potentially avoid dismissal of the Case on a procedural issues, albeit important issues, but not on the merits of the Case. Further, if the Appeals Court determines that the Bankruptcy Court erred on the law raised by the Petitioning Creditors in their Motion for Reconsideration, and the depositions of the Petitioning Creditors should be conducted in Macau via video, it will save everyone involved considerable time and expense.

**B. Exceptional Circumstances Warrant Granting Leave to Appeal**

Courts in the Fifth Circuit have held that section 1292(b) appeals are appropriate only under exceptional circumstances. See, e.g., Ryan, 444 F. Supp 2d at 721-22 (citing Clark-Dietz and Associates-Engineers v. Basic Constr. Co., 702 F.2d 67, 69 (5th Cir. 1983)) (other citations omitted). If the moving party proves all of the other section 1292(b) factors, the moving party "must also show that exceptional circumstances justify a departure from the basic policy of postponing the review until after the entry of final judgment." Barsan, 2010 WL 3907116 at *3 (internal quotation and citation omitted). "Exceptional circumstances" are proved by "establish[ing] an urgency that sets this case apart from the typical case." Matter of Magic Restaurants, Inc., 202 B.R. 24, 26 (D. Del. 1996).

Exceptional and exigent circumstances quite clearly exist here given the import of the Orders juxtaposed to the reality of the Presidential Proclamation and the COVID-19 pandemic. The Petitioning Creditors respectfully submit that there needs to be some balancing of the equities here in order to accomplish the purpose of discovery in this Case. Discovery requirements are not interposed by our Federal Rules for purposes of placing the litigants at extreme health risk, particularly where the President of the United States has proclaimed as much. Leave to appeal should be granted based upon the importance of the discovery issues presented in this Case. The issues here are not "run of the mill" discovery issues. They touch directly on the meaning and effect of the Presidential Proclamation and the very purpose of discovery in the face of a pandemic which, by most accounts, is worsening here in the United States every day.

**C. The Appeal Should be Certified Directly to the Appeals Court**

Section (d)(2)(A) of 28 U.S.C. 158, which governs certification of appeals by the Bankruptcy Court directly to the Court of Appeals, provides as follows:

> The appropriate court of appeals shall have jurisdiction of appeals described in the first sentence of subsection (a) if the bankruptcy court, the district court, or the bankruptcy appellate panel involved, acting on its own motion or on the request of a party to the judgment, order, or decree described in such first sentence, or all the appellants and appellees (if any) acting jointly, certify that—
> (i) the judgment, order, or decree involves a question of law as to which there is no controlling decision of the court of appeals for the circuit or of the Supreme Court of the United States, or involves a matter of public importance;
> (ii) the judgment, order, or decree involves a question of law requiring resolution of conflicting decisions; or
> (iii) an immediate appeal from the judgment, order, or decree may materially advance the progress of the case or proceeding in which the appeal is taken; and if the court of appeals authorizes the direct appeal of the judgment, order, or decree.

28 U.S.C. § (d)(2)(A).

Here, multiple grounds exist for certification of the appeal by the Bankruptcy Court directly to the Appeals Court. The Orders require interpretation and application of the Presidential Proclamation and the balancing of interests of the litigants during this horrible COVID-19 pandemic. To the knowledge of Petitioning Creditors there are no controlling decisions within this Circuit or from the United States Supreme Court on the issues presented. Although the issues do not stem from conflicting decisions, the decisions of the Bankruptcy Court is, in the Petitioning Creditors' respectful view, at odds with the Presidential Proclamation and the realities of the COVID-19 pandemic. The decisions also seemingly ignore the simple solution of requiring the Petitioning Creditors to appear for depositions in Macau, something that could be accomplished fairly quickly and at much less expense and inconvenience to all of the parties. Finally, a direct appeal and decision by the Appeals Court will materially advance the litigation which, presently, is scheduled for a hearing on the Third Motion to Dismiss on November 30, 2020.

The Petitioning Creditors believe the issues presented are issues of first impression and inherently involve matters of public importance. As discussed above, granting leave to appeal and ensuring immediate review by the Appeals Court will materially advance this litigation.

**CONCLUSION**

For the reasons set forth above, the Bankruptcy Court should grant (i) the Petitioning Creditors Motion for (a) Leave to File an Interlocutory Appeal and (b) Certification of the

Appeal to the United States Court of Appeals for the Fifth Circuit; and (ii) such other and further relief as is just and proper.

Dated: November 3, 2020

*<u>/s/ Stephen M. Packman</u>*

Jiangang Ou
Nguyen & Chen LLP
11200 Westheimer Road Suite 120
Houston, TX 77042
(832) 767-0339
Fax : (832) 767-0669
Email: jou@nguyen-chen.com

Stephen M. Packman
Archer & Greiner, P.C.
Three Logan Square
1717 Arch St., Suite 3500
Philadelphia, PA 19103
215-246-3147
Email: spackman@archerlaw.com

*Counsel for the Petitioning Creditors*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>WALL007 LLC, *et al.*,[1]<br><br>Alleged Debtors. | Chapter 7<br><br>Case No. 20-31131 (HDH)<br>(Jointly Administered) |

**MOTION OF PETITIONING CREDITORS (A) FOR LEAVE TO FILE AN INTERLOCUTORY APPEAL AND (B) REQUESTING CERTIFICATION TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT**

**TO: THE HONORABLE HARLIN D. HALE**:

The Petitioning Creditors, Jun Li, Yunding Kang, Cunxiang Ji, Jin Wang, Peng Guo, Lin Zhou, Qu Chen, Kai Tian, Yijing Wu, Xuegeng Gong, Jin Wang, Weijia Kong, Heng Zhang, Hong Guo, Pei Guan, Yue Xu, Mai Ye, Chenchen Jiang, Qiuying Li, Ruinian Wu, Lin Zhou, Liying Yang, Yan Zhang, Wenjun Wang, Lan Ji, Ying Zhou, Lin Li, Li Jiang, Rufeng Ding, Cunxiang Ji, Lin Gao, Qiao Qin, Yue Zhang, Xiaodong Hao, Tianqing Song, Li Jiang, Weisi Wang, Xiaoquan Dai, Feng Yan, Heng Zhang, Ou Jiang, Jinzhe Wu, Yadan Liu, Wanwan Li, Wenjuan Yin, Jiancheng Chen, Yi Tang, Ying Zhang, Pengfei Dong, Kangying Mao, Yijing Wu, Li Jiang, Qin Chu, Yulan Chen, Sicheng Zhan, Pei Guan, Jingqiu Tang, Di Tang, Jun Zeng, Kui Wang, Yue Zhang, Jun Wang, Xiaomin Fan, Di Tang, Jialin Hu, Qin Chu, Jiaxiang Lu, Fuqing Chen, Hanjiang Fu, Aiguo Luo, Fang Ding, Xiangdong Zhu, Wai Ying, Yuan Yuan, Chao Xu, Guoqin Zhou, Yijing Wu (collectively, the "Petitioning Creditors"), hereby file this motion (the "Motion") seeking (i) leave, pursuant to Bankruptcy Appellate Rule 8004(a)(2), to

---

[1] The Alleged Debtors in these cases are: WALL007 LLC, WALL009 LLC, WALL010 LLC, WALL011 LLC, WALL012 LLC, WALL016 LLC, WALL017 LLC. The Alleged Debtors' federal tax identification numbers are unknown to the Petitioning Creditors sat this time.

appeal (this "Appeal") and (ii) certification by this Honorable Court ("Bankruptcy Court") of the appeal, pursuant to Bankruptcy Appellate Rule 8006(f)(1), directly to the United States Court of Appeals for the Fifth Circuit (the "Appeals Court"); or, if certification is not granted, to the United States District Court for the Northern District of Texas, from the following Orders of the Bankruptcy Court entered in the above-captioned proceedings ("Case"): (i) Order Granting in Part the Alleged Debtors' Motion for Discovery Related to Wet Signatures [Dkt. No. 101] (Dkt. No. 165) entered on September 4, 2020; (ii) Order Granting in Part the Petitioners' Motion to Compel Discovery [Dkt. Nos. 92 & 129] (Dkt. No. 167) entered on September 4, 2020; (iii) Order Granting in Part the Alleged Debtor's Motion to Quash Petitioners' Deposition Notice [Dkt. 133] (Dkt. No. 168) entered on September 4, 2020; (iv) Order Granting in Part the Alleged Debtor's Second Motion to Compel Discovery Responses from Petitioners [Dkt. No. 105] (Dkt. No. 169) entered on September 4, 2020; and (v) October 22, 2020 Order Denying Motion for Reconsideration of Discovery Orders (Dkt. No. 202) entered on September 4, 2020 (collectively, the "Orders").

## INTRODUCTION

The Petitioning Creditors most respectfully disagree with the Bankruptcy Court's rulings in the Orders which would require the Petitioning Creditors to enter into an agreement to travel to the United States for "live," in person depositions prior to the Petitioning Creditors being permitted to proceed with further discovery or motion practice in the Case and, therefore, risk dismissal of the Case. As such, with all due respect to the Bankruptcy Court, Petitioning Creditors have filed a "Notice of Appeal" of the Orders with the Clerk of the Bankruptcy Court and a Request for Certification ("Request for Certification") directly to the Court of Appeals, and a Statement of Issues and Designation of Record ("Designation"), contemporaneously with the filing of this Motion. The Petitioning Creditors believe the Orders are interlocutory and therefor

seek leave from the Bankruptcy Court to appeal the Orders and further request certification to bring this appeal directly to the Appeals Court.

**PRELIMINARY STATEMENT**

Respectfully, in the Orders, the Bankruptcy Court erred as a matter of law (i) in determining that the Petitioning Creditors must enter into an agreement to travel from mainland China to the United States for live depositions; (ii) in staying Petitioning Creditors' discovery and all motion practice in the Case, pending Petitioning Creditors' agreement to travel here from mainland China to the United States for live depositions; and (iii) in denying Petitioning Creditors' Motion for Reconsideration in light of a recent change in the law permitting Chinese nationals to resume travel to Macau.

As argued to the Bankruptcy Court twice by Petitioning Creditors, the Petitioning Creditors are Chinese nationals who cannot enter directly into the United States at this time under President Trump's travel ban. Further, given the surge in the COVID-19 pandemic, even if Petitioning Creditors could somehow bypass the President's travel ban and gain entry into the United States to sit for live depositions, they would risk their health and potentially the health of others merely for the sake of a "live" deposition on U.S. soil. The penalty for their inability to agree to travel here: Dismissal of the Case as early as November 30, 2020. However, Petitioning Creditors are now permitted to enter another country which is not subject to such travel limitations on Chinese nationals, namely, Macau, where their depositions could be taken, either live by counsel or via video from the United States.

Petitioning Creditors have more fully set forth herein the underlying facts and legal arguments supporting why leave to appeal should be granted and further why the Bankruptcy

Court should certify these important, unsettled issues of public policy directly to the Court of Appeals.

**STATEMENT OF FACTS AND PROCEDURAL HISTORY OF THE CASE**

The Petitioning Creditors filed involuntary chapter 7 bankruptcy petitions (collectively, the "Petitions") against each Alleged Debtor on April 8, 2020. See [Dkt. No. 1 in 20-31131]; [Dkt. No. 1 in 20-31133]; [Dkt. No. 1 in 20-31134]; [Dkt. No. 1 in 20-31135]; [Dkt. No. 1 in 20-31136]; [Dkt. No. 1 in 20-31138]; and, [Dkt. No. 1 in 20-31139].

On April 24, 2020, the Bankruptcy Court entered an Order granting the Petitioning Creditors' motions to jointly administer the bankruptcy cases (the "Cases") under the lead case WALL007 LLC [Dkt. No. 11 in 20-31131] (the "Lead Case").

On May 7, 2020, each Alleged Debtor filed Motions to Dismiss. See [Dkt. Nos. 18–19 in 20-31131]; [Dkt. Nos. 15–16 in 20-31133]; [Dkt. Nos. 14–15 in 20-31134]; [Dkt. Nos. 14–15 in 20-31135]; [Dkt. Nos. 14–15 in 20-31136]; [Dkt. Nos. 14–15 in 20-31138]; and, [Dkt. Nos. 14–15 in 20-31139] (collectively, the " Main Motions to Dismiss"). The Main Motions to Dismiss have not yet been heard by the Bankruptcy Court but the Alleged Debtors have unilaterally sought to schedule hearings thereon for December 30, 2020 [Dkt. No. 210].

The Alleged Debtors filed a third motion to dismiss ("Third Motion to Dismiss") on October 12, 2020 [Dkt. No. 182], arguing that if the Petitioning Creditors refuse to travel to the United States to be deposed live, the Court must dismiss the Case. The Third Motion to Dismiss has been set for hearing on November 30, 2020, making a determination on this Appeal of utmost importance to the Petitioning Creditors and the Case. Effectively, if the Petitioning Creditors cannot agree to travel to the United States for live depositions by November 30, 2020, the Alleged Debtors have asked the Bankruptcy Court to dismiss the Case.

The Main Motions to Dismiss seek dismissal of the Petitions alleging, *inter alia*, that: (1) there are an insufficient number of Petitioning Creditors to support the filing of the Petitions against the Alleged Debtors; (2) the Petitioning Creditors' claims are in bona fide dispute; (3) the Alleged Debtors are generally paying their respective debts; and (4) the Petitions are not in the best interests of each of the Alleged Debtors and their creditors. See Main Motions to Dismiss.

On June 1, 2020, the Petitioning Creditors sent a First Set of Interrogatories ("Interrogatories") and First Request for Production of Documents ("Document Requests") (collectively, the "Requests") to each of the Alleged Debtors. On June 20, 2020, the Court entered a Joint Discovery Plan setting forth, among other matters, discovery deadlines. Paper discovery was exchanged between the parties.

On July 10, 2020, at the repeated request of counsel for the Petitioning Creditors, the Petitioning Creditors' and the Alleged Debtors' counsel discussed the Alleged Debtors' responses to the Requests (the "Responses") in a failed attempt to amicably resolve the Petitioning Creditors' objections to the Responses. Back and forth regarding potential resolutions to the various discovery disputes between the parties occurred for most of the month of July and into August 2020.

On July 27, 2020, the Petitioning Creditors filed a Motion to Compel [Dkt. No. 92] requesting that the Alleged Debtors produce paper discovery in the case. On August 10, 2020, the Petitioning Creditors filed an amendment to the Motion to Compel [Dkt. No. 129] (the "Amended Motion to Compel") requesting that the Alleged Debtors produce for deposition (i) Timothy Barton; (ii) Venkat Murugan; (iii) Hongpeng Lin; and (iv) Saskya Bedoya.

In the Amended Motion to Compel, the Petitioning Creditors specifically referenced to the Court, President Trump's proclamation issued on January 31, 2020 (the "Presidential

Proclamation") which remains in effect. See Amended Motion to Compel [Dkt. No. 129], Exhibit "D" thereto; See also https://www.whitehouse.gov/presidential-actions/proclamation-suspension-entry-immigrants-nonimmigrants-persons-pose-risk-transmitting-2019-novel-coronavirus/.

The Presidential Proclamation (number 9984) states, in pertinent part:

> NOW, THEREFORE, I, DONALD J. TRUMP, President of the United States, by the authority vested in me by the Constitution and the laws of the United States of America, including sections 212(f) and 215(a) of the Immigration and Nationality Act (INA), 8 U.S.C. 1182(f) and 1185(a), and section 301 of title 3, United States Code, hereby find that the unrestricted entry into the United States of persons described in section 1 of this proclamation would, except as provided for in section 2 of this proclamation, be detrimental to the interests of the United States, and that their entry should be subject to certain restrictions, limitations, and exceptions. I therefore hereby proclaim the following:
>
> Section 1. Suspension and Limitation on Entry. The entry into the United States, as immigrants or nonimmigrants, of all aliens who were physically present within the People's Republic of China, excluding the Special Administrative Regions of Hong Kong and Macau, during the 14-day period preceding their entry or attempted entry into the United States is hereby suspended and limited subject to section 2 of this proclamation.

The Alleged Debtors' Motions to Compel argued that the Petitioning Creditors had not met their paper discovery obligations. Nowhere in the Alleged Debtors' Motions to Compel do the Alleged Debtors seek relief relative to the noticed depositions of certain of the Petitioning Creditors.

On August 5, 2020, counsel for the Alleged Debtors served notices of deposition subpoenas ("Debtor Deposition Notices") on counsel for the following Petitioning Creditors (the

"Petitioner Deponents"): Fang Ding, Guoqin Zhou, Jialin Hu, Jiancheng Chen, Jingqiu Tang, Jun Zeng, Kui Wang, Wenjun Wang, Xiangdong Zhu, Xiaoquan Dai, Qin Chu, Li Jiang, Weisi Wang, Ying Zhou, Di Tang, Kangying Mao, Jiaxiang Lu, Jin Wang, Wanwan Li, Yijing Wu, Heng Zhang.

In the Motion to Quash, the Alleged Debtors inserted language requesting, *inter alia*, that the depositions of the Petitioner Deponents be taken in the United States before any depositions are taken of the Alleged Debtors' representatives or further motion practices proceeds in the Case. Procedurally, the Alleged Debtors never filed a motion or other application requesting enforcement of their Debtor Deposition Notices on the Petitioner Deponents.

On August 13, 2020, the Petitioning Creditors filed their opposition to the Motion to Quash (the "Quash Opposition") and reiterated that the Petitioning Creditors, who are Chinese nationals and reside in mainland China, were unable to enter into the United States due to the ongoing COVID-19 pandemic and specifically because of the travel restrictions imposed by President Trump.

Paragraph 34 of the Quash Opposition states as follows:

> "However, as set forth in the Amended Motion to Compel, Petitioning Creditors <u>cannot enter into the United States</u> due to the ongoing COVID-19 pandemic and travel and quarantine restrictions imposed by both China and the United States."

On August 17, 2020, the Court held a hearing on the multiple contested discovery matters, including the Discovery Motions. At the August 17th hearing, counsel for the Petitioning Creditors and the Court briefly discussed the implications of the travel ban to the U.S. from China due to the ongoing COVID-19 pandemic. In particular, the following discourse occurred:

Why don't you address the ability of your approach to be deposed, just as Ms. Lindauer did in her's. She's saying she needs 10 to 12 depositions.

MR. PACKMAN: And we're happy to provide those by video, Your Honor. I do not believe, based on COVID and the restrictions on travel both from China and into the United States, which would require a 14-day quarantine, that we can do these depositions live in the United States. If we could, we would. We think it's a little bit overkill to have 11 or 12 of these petitioning creditors to have to travel here. But if we would, we could -- if we could, we would. We can only produce them now --

* * *

THE COURT: Yeah. What is the travel situation in China? I just know enough to be dangerous, just from reading in the paper. Are we still under a travel quarantine from China? I don't know what the status is right now.

MR. PACKMAN: Your Honor, based on what the most current information we have from the U.S. government website, there appears to still be a 14-day quarantine requirement for a Chinese national coming into the United States.

THE COURT: Uh-huh.

MR. PACKMAN: So I do agree with Ms. Lindauer that it's a predicament. It would be very expensive and costly for these petitioning creditors to come here. But I don't disagree with Ms. Lindauer that they have some right to ask them questions and prepare for the trial. I don't disagree with that. I just don't know what else to do right now. I just don't know what else to do.

THE COURT: Okay.

MR. PACKMAN: But we will make them available by video.

THE COURT: All right. Okay.

As far as the petitioning creditors' depositions. We will do everything possible to make them available for depositions so they can answer whatever relevant questions Ms. Lindauer has. But as I said, they are just not permitted to travel here at this moment, without being quarantined for at least two weeks. I think that would be unfair to require them to do that.

Tr. at 15:14–16:22; 28:8–28:14, August 17, 2020.

Despite the foregoing, and the travel ban pursuant to the Presidential Proclamation, the Court determined that the Petitioner Deponents would be required to enter into the United States for live depositions and stated, in pertinent part, as follows:

The petitioning creditors did not really respond to alleged debtors' legality argument. Instead, the petitioners claim that the difficulties associated with the COVID-19 crisis should excuse them from traveling to the United States for in-person depositions. During the hearing, counsel for the petitioners did not specifically say there was a travel ban on Chinese nationals entering the United States. Rather, counsel argued that his clients would have to quarantine for 14 days upon entry to the United States and that doing so would be a great inconvenience.

The Court understands the great difficulty travel poses during the current pandemic. However, the Court also believes that litigants who seek the benefit of the United States law must follow its process. And here, a serious concern has been raised that taking video depositions would violate Chinese law. While traveling to the U.S. may be a great inconvenience and difficulty at this time, the Court believes it is necessary in this case to address both the legality issues and the identity concerns raised by the

CINDY SUMNER, CSR (214) 802-7196

5

alleged debtors. Accordingly, the motion to quash at docket number 133 is granted in part to require the petitioning creditors' depositions to be taken in-person, in the United States, at a time and place agreeable to the parties.

Tr. at 4:7–5:4, August 19, 2020.

At the time of the hearing on the Discovery Motions, the Bankruptcy Court did not address counsel for Petitioning Creditors' statement or legal position in its supporting brief, arguing that they cannot enter directly into the U.S. pursuant to the President's travel ban. Petitioning Creditors cannot enter directly into the U.S. for any purpose if they are foreign nationals of China under the Presidential Proclamation absent an exception being recognized under Section 2 of the law as set forth herein. No direct entry of a Chinese national into the U.S. is permitted absent the application of discrete exceptions.

Section 2 of the Presidential Proclamation contains various exceptions to the direct travel ban in Section 1. As noted to the Bankruptcy Court, none of those exceptions apply here. In fact, the Bankruptcy Court has not ruled that the depositions of the Petitioning Creditors fall under any specific exception listed in Section 2 to the direct travel ban. Put simply, the Petitioning Creditors cannot legally (under U.S. Law) travel directly here and enter the United States for any reason at this time.

Just as the Alleged Debtors were concerned about violating Chinese law (by conducting video depositions in China, Petitioning Creditors would violate U.S. law by seeking direct entry into the U.S. and, in fact, would not be permitted to enter the country. The substance of the Presidential Proclamation was clearly attached to the Amended Motion to Compel and was not fully considered or understood prior to the Bankruptcy Court's ruling.

To be clear, the President has banned the Petitioners (who are Chinese nationals) from directly entering the United States pursuant to the Presidential Proclamation. However, there is now a legal alternative to the "live" U.S. depositions which was not previously available in the Case and which runs directly contrary to prior arguments by counsel for the Alleged Debtors.

Pursuant to their Motion for Reconsideration [Dkt. No. 175], the Petitioning Creditors sought the Bankruptcy Court's reconsideration of, *inter alia*, the Orders entered on the Amended Motion to Compel (the "Petitioners Compel Order"), the Alleged Debtors "Motion to Quash" [Dkt. No. 133] (the "Quash Order") and the Orders entered on the Alleged Debtors First and Second Motions to Compel [Dkt. Nos. 165 and 169] (the "Alleged Debtor Compel Orders"). The discovery motions and orders may, at times, be referenced herein collectively as the "Discovery Motions" and the "Discovery Orders" or the "Orders for Reconsideration;" and those discovery orders, together with the Order denying the Motion for Reconsideration, may hereinafter be referred to collectively as the "Orders."

In prior arguments during the Case, Alleged Debtors' counsel maintained that taking depositions in China are illegal and that the depositions could not be taken there <u>or even in other territories</u>. <u>See</u> Alleged Debtors' Motion to Quash Petitioners' Deposition Notices [Dkt. No. 133]; correspondence from Alleged Debtors' counsel Joyce Lindauer to the Court dated June 3, 2020 with the subject line "Memorandum on Conducting Depositions of Chinese Nationals in China" [Dkt. No. 45].

However, as noted to the Court in the Motion for Reconsideration, that is not currently the case, as the government of Macau Special Administrative Region is now, most recently permitting Chinese nationals, such as the Petitioning Creditors, to travel to Macau where their depositions can be taken, either live by counsel or via video. <u>See</u> https://www.worldaware.com/covid-19-alert-macau-allows-tourists-zhuhai-china-aug-12. "Macau residents <u>and passengers from Taiwan and mainland China</u> can enter the special administrative region provided they have not traveled to other countries or territories within 14 days. Individuals arriving from mainland China, Hong Kong, or Taiwan are subject to health

questionnaires and screenings. Travelers who have visited "high-risk" countries, including the Schengen Area, the UK, the US, Australia, South Korea, and Japan, within 14 days of arrival must undergo mandatory quarantine at designated hotels." Id.

There is a history of remote depositions which have taken place in Hong Kong, Macau and elsewhere. See Dagen v. CFC Grp. Holdings, 00 Civ. 5682, 2003 U.S. Dist. LEXIS 20029, 2003 WL 22533425, at *2 (S.D.N.Y. Nov. 7, 2003) (permitting testimony by telephone of witnesses based in Hong Kong); see also Jordan Outdoor Enters., Ltd. v. Hubei Wild Trees Textiles Co., 2014 BL 99734 (M.D. Ga. Apr. 09, 2014) (Chinese national deposed in Hong Kong in Georgia litigation).

A proposal for related Court reporting and interpreter services for video depositions in Macau which was presented to the Bankruptcy Court reflects that the reporting service conducts depositions (including those of Chinese nationals) in Macau and Hong Kong frequently and the cost is not prohibitive.

Pursuant to F.R.C.P. 29(a), "[u]nless the court orders otherwise, the parties may stipulate that: (a) a deposition may be taken before any person, at any time or place, on any notice, and in the manner specified—in which event it may be used in the same way as any other deposition."

This change in the foreign law (regarding direct travel from China's mainland to Macau) was not known to Petitioning Creditors' counsel at the time of the Discovery Motions as it had only been enacted days prior to argument on the Discovery Motions. As noted in the Motion for Reconsideration, there is now a viable legal option for the Alleged Debtors to depose the Petitioner Deponents in Macau which was not an option at the time of the Motion to Quash due to travel restrictions. Despite this change in the law, and ability of the Alleged Debtors to depose

the Petitioner Deponents in Macau live or via video, the Bankruptcy Court denied Petitioning Creditor' Motion for Reconsideration.

In sum, the Bankruptcy Court is nevertheless requiring Petitioning Creditors to agree to travel to the United States despite the Presidential Proclamation. Although they cannot travel directly to the U.S., the Petitioning Creditors must somehow find a way to gain entry into the U.S. by agreeing to travel here at great expense from China and, in the process, obviously risking their potential contraction of COVID-19 (and exposing others to it) or, alternatively, risk dismissal of the Case within 30 days.

## QUESTIONS PRESENTED FOR THE APPELLATE COURT

**1.** Did the Bankruptcy Court err as a matter of law in determining that the Petitioning Creditors must agree to travel from mainland China to the United States for live depositions?

2. Did the Bankruptcy Court err as a matter of law in staying Petitioning Creditors' discovery and all motion practice in the Case pending Petitioning Creditors' agreement to travel here from mainland China to the United States for live depositions?

3. Did the Bankruptcy Court err as a matter of law in denying Petitioning Creditors' Motion for Reconsideration in light of a recent change in the law permitting travel of Chines nationals to resume to Macau?

## RELIEF REQUESTED

Petitioning Creditors Request that the Bankruptcy Court grant them leave to take this Appeal and certify the appeal directly to the Appeals Court.

## ARGUMENT

### A. Leave to Appeal

A district court has jurisdiction to hear an interlocutory appeal from a bankruptcy court order. 28 U.S.C. § 158(a). Section 158(a) provides, in relevant part, that "[t]he district courts of the United States shall have jurisdiction to hear appeals . . . with leave of the court, from

interlocutory orders and decrees, of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under section 157 of this title." Id. Courts apply the approach set forth in 28 U.S.C. § 1292(b), which governs interlocutory appeals from a district court to a court of appeals, in considering appeals under 28 U.S.C. § 158(a).

Section 1292(b) provides: "When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order." 28 U.S.C. § 1292(b).

Accordingly, to warrant a Section 1292(b) certification, the moving party "must show that there is (1) a controlling question of law, (2) as to which there is substantial ground for difference of opinion, and (3) an immediate appeal may materially advance the ultimate termination of the litigation." Ryan v. Flowserve Corp., 444 F. Supp 2d 718, 723 (N.D. Tex. 2006); In re Barsan Contractors, 2010 WL 3907116 at *3 (D. N.J. Sept. 30, 2010). "The decision to grant certification is within the district court's discretion, even if all three criteria are present." The moving party "must also show that exceptional circumstances justify a departure from the basic policy of postponing the review until after the entry of final judgment." Id. (internal quotation and citation omitted).

As set forth below, the Petitioning Creditors meet all three requirements of section 1292(b) for leave to appeal the Orders.

**1. This Appeal Presents Multiple Controlling Questions of Law**

Courts have held that what is a controlling question of law — "although not consistently defined — at the very least means a question of law the resolution of which could materially advance the ultimate termination of the litigation — thereby saving time and expense for the

court and the litigants. WRIGHT MILLER, *supra,* § 3930 at 426 n. 25 (2d ed. 1996 Supp. 2005) (citing *S.E.C. v. Credit Bancorp, Ltd.*, 103 F. Supp. 2d 223, 227 (S.D.N.Y. 2000))." Ryan v. Flowserve Corp., 444 F. Supp 2d 718, 723 (N.D. Tex. 2006) (citing Strougo v. Scudder, Stevens & Clark, Inc., No. 96 CIV. 2136 (RWS), 1997 WL 473566, at *7 (S.D.N.Y. Aug. 18, 1997); (Klinghoffer v. S.N.C. Achille Lauro, 921 F.2d 21, 24 (2d Cir. 1990)) (other citations omitted).

"A controlling question of law must encompass at the very least every order which, if erroneous, would be reversible error on final appeal." Katz v. Carte Blanche Corp., 496 F.2d 747, 755 (3d Cir. 1974). It is not required that reversal of the order terminate the litigation or that the order be on the claim's merits. Id. "Controlling" means "serious to the conduct of the litigation, either practically or legally." Id. From a practical standpoint, saving the district court's time and the litigants' expenses is "a highly relevant factor." Id.; see also Barsan, 2010 WL 3907116 at *3.

The Bankruptcy Court's decision requires the Petitioning Creditors to appear in the United States for live depositions despite the Presidential Proclamation's travel ban and the ongoing, daily worsening COVID-19 pandemic. In light of a recent change in the law permitting travel by Chinese nationals to resume to Macau, all of the issues presented are in fact controlling issues of law. These issues do not go to the merits of the case but they do seriously impact the conduct of the litigation given the pending Third Motion to Dismiss on November 30, 2020. If the Orders are reversed as to the "live depositions in the U.S. requirement," not only will the parties save considerable time and expense in conducting the depositions of the Petitioner Deponents by video in Macau, but the courts will save time and expense of the ensuing litigation and appeals should Petitioning Creditors be unable to agree to travel here amidst the worst pandemic of our lifetime and the Case is then dismissed as a result.

**2. There Are Substantial Grounds for Difference of Opinion as to the Orders**

A difference of opinion "must arise out of genuine doubt as to the correct legal standard." Barsan, 2010 WL 3907116 at *3 (internal quotation and citation omitted). Courts have found substantial ground for difference of opinion where:

> a trial court rules in a manner which appears contrary to the rulings of all Courts of Appeals which have reached the issue, if the circuits are in dispute on the questions and the Court of Appeals of the Circuit has not spoken on the point, *if complicated questions arise under foreign law, or if novel and difficult questions of first impression are presented* (emphasis supplied).

Ryan v. Flowserve Corp., 444 F. Supp 2d at 723-25 (citation omitted); see also United States ex rel Minge v. Hawker Beechcraft Corp. (In re Hawker Beechcraft, Inc.), 2013 WL6673607, at *5 (S.D.N.Y. Dec. 18, 2013) (substantial ground for difference of opinion exists where (1) there is conflicting authority on the issue, or (2) the issue is particularly difficult and of first impression).

Here, the issues are particularly difficult and, likely of first impression, given the COVID-19 pandemic has largely only been with us in the U.S. since February or March of 2020. There are no cases the Petitioning Creditors have found dealing directly with the issue of foreigners who are subject to travel restrictions being required by a U.S. Court to travel here during the pandemic solely for purposes of sitting for depositions or suffer dismissal of their Case.

Petitioning Creditors believe the issues presented are of "first impression" and should be decided directly by the Appeals Court as set forth below or, if not, by the U.S. District Court.

**3. An Interlocutory Appeal Will Materially Advance the Litigation**

Importantly, an interlocutory appeal from the Orders materially advances the ultimate termination of the litigation. Ichinose v. Homer National Bank (In re Ichinose), 946 F.2d 1169, 1177 (5th Cir. 1991) (citing In re Neshaminy Office Bldg. Assoc., 81 B.R. 301, 303 (E.D. Pa.

1987)) (other citation omitted). The granting of leave to appeal under section 1292(b) materially advances the litigation's ultimate termination where the interlocutory appeal will eliminate the need for trial, complex issues, or issues that make discovery more difficult and more expensive. L.R. v. Manheim Twp. Sch. Dist., 540 F. Supp. 2d 603, 613 (E.D. Pa. 2008).

Granting leave to appeal here, and ensuring immediate review by the Appeals Court, will materially advance this litigation. If leave to appeal is not granted and the Bankruptcy Court's Orders are kept in place, the Case could very well be dismissed on November 30, in which case the Appeals Court will be faced with the same issues in about 30 days or so that are now being presented to it. Hearing the appeal now will save everyone time and expense and potentially avoid dismissal of the Case on a procedural issues, albeit important issues, but not on the merits of the Case. Further, if the Appeals Court determines that the Bankruptcy Court erred on the law raised by the Petitioning Creditors in their Motion for Reconsideration, and the depositions of the Petitioning Creditors should be conducted in Macau via video, it will save everyone involved considerable time and expense.

**B. Exceptional Circumstances Warrant Granting Leave to Appeal**

Courts in the Fifth Circuit have held that section 1292(b) appeals are appropriate only under exceptional circumstances. See, e.g., Ryan, 444 F. Supp 2d at 721-22 (citing Clark-Dietz and Associates-Engineers v. Basic Constr. Co., 702 F.2d 67, 69 (5th Cir. 1983)) (other citations omitted). If the moving party proves all of the other section 1292(b) factors, the moving party "must also show that exceptional circumstances justify a departure from the basic policy of postponing the review until after the entry of final judgment." Barsan, 2010 WL 3907116 at *3 (internal quotation and citation omitted). "Exceptional circumstances" are proved by "establish[ing] an urgency that sets this case apart from the typical case." Matter of Magic Restaurants, Inc., 202 B.R. 24, 26 (D. Del. 1996).

Exceptional and exigent circumstances quite clearly exist here given the import of the Orders juxtaposed to the reality of the Presidential Proclamation and the COVID-19 pandemic. The Petitioning Creditors respectfully submit that there needs to be some balancing of the equities here in order to accomplish the purpose of discovery in this Case. Discovery requirements are not interposed by our Federal Rules for purposes of placing the litigants at extreme health risk, particularly where the President of the United States has proclaimed as much. Leave to appeal should be granted based upon the importance of the discovery issues presented in this Case. The issues here are not "run of the mill" discovery issues. They touch directly on the meaning and effect of the Presidential Proclamation and the very purpose of discovery in the face of a pandemic which, by most accounts, is worsening here in the United States every day.

**C. The Appeal Should be Certified Directly to the Appeals Court**

Section (d)(2)(A) of 28 U.S.C. 158, which governs certification of appeals by the Bankruptcy Court directly to the Court of Appeals, provides as follows:

> The appropriate court of appeals shall have jurisdiction of appeals described in the first sentence of subsection (a) if the bankruptcy court, the district court, or the bankruptcy appellate panel involved, acting on its own motion or on the request of a party to the judgment, order, or decree described in such first sentence, or all the appellants and appellees (if any) acting jointly, certify that—
> (i) the judgment, order, or decree involves a question of law as to which there is no controlling decision of the court of appeals for the circuit or of the Supreme Court of the United States, or involves a matter of public importance;
> (ii) the judgment, order, or decree involves a question of law requiring resolution of conflicting decisions; or
> (iii) an immediate appeal from the judgment, order, or decree may materially advance the progress of the case or proceeding in which the appeal is taken; and if the court of appeals authorizes the direct appeal of the judgment, order, or decree.

28 U.S.C. § (d)(2)(A).

Here, multiple grounds exist for certification of the appeal by the Bankruptcy Court directly to the Appeals Court. The Orders require interpretation and application of the Presidential Proclamation and the balancing of interests of the litigants during this horrible COVID-19 pandemic. To the knowledge of Petitioning Creditors there are no controlling decisions within this Circuit or from the United States Supreme Court on the issues presented. Although the issues do not stem from conflicting decisions, the decisions of the Bankruptcy Court is, in the Petitioning Creditors' respectful view, at odds with the Presidential Proclamation and the realities of the COVID-19 pandemic. The decisions also seemingly ignore the simple solution of requiring the Petitioning Creditors to appear for depositions in Macau, something that could be accomplished fairly quickly and at much less expense and inconvenience to all of the parties. Finally, a direct appeal and decision by the Appeals Court will materially advance the litigation which, presently, is scheduled for a hearing on the Third Motion to Dismiss on November 30, 2020.

The Petitioning Creditors believe the issues presented are issues of first impression and inherently involve matters of public importance. As discussed above, granting leave to appeal and ensuring immediate review by the Appeals Court will materially advance this litigation.

## CONCLUSION

For the reasons set forth above, the Bankruptcy Court should grant (i) the Petitioning Creditors Motion for (a) Leave to File an Interlocutory Appeal and (b) Certification of the

Appeal to the United States Court of Appeals for the Fifth Circuit; and (ii) such other and further relief as is just and proper.

Dated: November 3, 2020

*/s/ Stephen M. Packman*

Jiangang Ou
Nguyen & Chen LLP
11200 Westheimer Road Suite 120
Houston, TX 77042
(832) 767-0339
Fax : (832) 767-0669
Email: jou@nguyen-chen.com

Stephen M. Packman
Archer & Greiner, P.C.
Three Logan Square
1717 Arch St., Suite 3500
Philadelphia, PA 19103
215-246-3147
Email: spackman@archerlaw.com

*Counsel for the Petitioning Creditors*

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed September 4, 2020**

**United States Bankruptcy Judge**

---

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | **Chapter 7** |
| | § | |
| **WALL007 LLC, *et al.*,** | § | **Case No. 20-31131-hdh7** |
| | § | **(Jointly Administered)** |
| **Alleged Debtors.** | § | |

**ORDER GRANTING IN PART THE ALLEGED DEBTOR'S MOTION TO COMPEL DISCOVERY RELATED TO WET SIGNATURES [DKT. NO. 101]**

UPON CONSIDERATION OF the *Alleged Debtors Motion to Compel Production of Documentary Evidence Permitting Verification of Electronic Signatures and Stay All Additional Discovery of Non-Dispositive Issues, or in the Alternative to Invalidate the Involuntary Petition* (the "Motion") (Dkt. No. 101) filed by Alleged Debtors Wall007, *et al*. and all related filings, and having considered the arguments of counsel at the hearing conducted on August 17, 2020 and the Court's oral ruling on August 19, 2020, it is hereby

ORDERED that the Motion is GRANTED in part and DENIED in part as provided herein; it is further

ORDERED that no discovery or motions practice shall continue unless and until a live deposition agreement signed by counsel for Petitioners is filed with the Court, as required by the Court's ruling on the Alleged Debtors Motion to Quash Deposition Notices (Docket No. 133); it is further

ORDERED that, subject to the above limitations, Petitioners are required to sign their answers to their interrogatories with their own "wet signatures," as opposed to the signature of Petitioners Counsel; it is further

ORDERED that, subject to the above limitations, Petitioners will provide Alleged Debtors with copies of passports of all the Petitioners upon request, and that such passports will be submitted to the Court for in-camera inspection upon request; it is further

ORDERED that the Motion is DENIED in part with respect to the remaining relief requested.

# # # END OF ORDER # # #



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed September 4, 2020**

**United States Bankruptcy Judge**

---

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | **Chapter 7** |
| | § | |
| **WALL007 LLC, *et al.*,** | § | **Case No. 20-31131-hdh7** |
| | § | **(Jointly Administered)** |
| **Alleged Debtors.** | § | |

**ORDER GRANTING IN PART THE PETITIONERS' MOTION COMPEL DISCOVERY [DKT. NOS. 92 & 129]**

**TO THE HONORABLE UNITED STATES BANKRUPTCY COURT:**

UPON CONSIDERATION OF the *Motion to Compel* (the "Motion," originally filed at Dkt. No 92 and subsequently amended at Dkt. No. 129) filed by Petitioners Jun Li, Yunding Kang, Cunxiang Ji, Jin Wang, Peng Guo, Lin Zhou, Qu Chen, Kai Tian, Yijing Wu, Xuegeng Gong, Jin Wang, Weijia Kong, Heng Zhang, Hong Guo, Pei Guan, Yue Xu, Mai Ye, Chenchen Jiang, Qiuying Li, Ruinian Wu, Lin Zhou, Liying Yang, Yan Zhang, Wenjun Wang, Ying Zhou, Lin Li, Li Jiang, Rufeng Ding, Cunxiang Ji, Lin Gao, Qiao Qin, Yue Zhang, Xiaodong Hao, Tianqing

Song, Li Jiang, Weisi Wang, Xiaoquan Dai, Feng Yan, Heng Zhang, Ou Jiang, Jinzhe Wu, Yadan Liu, Wanwan Li, Wenjuan Yin, Jiancheng Chen, Yi Tang, Ying Zhang, Pengfei Dong, Kangying Mao, Yijing Wu, Li Jiang, Qin Chu, Yulan Chen, Sicheng Zhan, Pei Guan, Jingqiu Tang, Di Tang, Jun Zeng, Kui Wang, Yue Zhang, Jun Wang, Xiaomin Fan, Di Tang, Jialin Hu, Qin Chu, Jiaxiang Lu, Fuqing Chen, Hanjiang Fu, Aiguo Luo, Fang Ding, Xiangdong Zhu, Wai Ying, Yuan, Chao Xu, Guoqin Zhou, Yijing Wu (collectively, the "Petitioners") and all related filings, and having considered the arguments of counsel at the hearing conducted on August 17, 2020 and the Court's oral ruling on August 19, 2020, it is hereby

ORDERED that the Motion is GRANTED in part and DENIED in part as provided herein; it is further

ORDERED that no discovery or motions practice shall continue unless and until a live deposition agreement signed by counsel for Petitioners is filed with the Court, as required by the Court's ruling on the Alleged Creditors' Motion to Quash Deposition Notices (Docket No. 133); it is further

ORDERED that discovery is limited in topic to only those matters relevant to all elements of Section 303 of the Bankruptcy Code and the relevant factors under Section 305(a) and 707(a) of the Bankruptcy Code that were raised by the Alleged Debtors; it is further

ORDERED that, subject to the above limitations, the Alleged Debtors will provide a supplemental response to Interrogatory No. 2 as outlined in the Motion and the Court DENIES the Motion to Compel as to Interrogatories No. 7, 8. 9, 10, 11, and 12 as written; it is further

ORDERED that, subject to the above limitations, the Alleged Debtors will produce or supplement documents responsive to Petitioner's First Request for Production of Documents Nos. 5, 8, 9, 16, 20, 21 and 30; it is further

ORDERED that, subject to the above limitations, the Alleged Debtors will produce Timothy Barton and Hongpeng Lin for depositions at a time agreeable to the Parties; it is further

ORDERED that, subject to the above limitations, Ms. Saskya Bedoya is excused from sitting for a deposition if she provides the Petitioners with a note from her doctor stating that doing so, even by video, would be unsafe; it is further

ORDERED that the Motion to Compel is DENIED in part with respect to the remaining relief requested.

# # # END OF ORDER # # #

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed September 4, 2020**

**United States Bankruptcy Judge**

---

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | **Chapter 7** |
| | § | |
| **WALL007 LLC, *et al.*,** | § | **Case No. 20-31131-hdh7** |
| | § | **(Jointly Administered)** |
| **Alleged Debtors.** | § | |

**ORDER GRANTING IN PART THE ALLEGED DEBTOR'S**
**<u>MOTION TO QUASH PETITIONERS' DEPOSITION NOTICE [DKT. NO. 133]</u>**

**TO THE HONORABLE UNITED STATES BANKRUPTCY COURT:**

UPON CONSIDERATION OF the *Motion to Quash Petitioners' Deposition Notices* (the "Motion") (Dkt. No. 133) filed by Alleged Debtors Wall007, et al., Timothy Barton, Murugan Venkat, and Hongpeng Lin, in their individual capacities, and all related filings, and having considered the arguments of counsel at the hearing conducted on August 17, 2020 and the Court's oral ruling on August 19, 2020, it is hereby

ORDERED that the Motion is GRANTED in part and DENIED in part as provided herein; it is further

ORDERED that the petitioners' depositions shall be required to be taken in person, in the United States, at a time and place agreeable to the Parties; it is further

ORDERED that the Court requires that counsel for the Petitioners shall sign an agreement that the petitioners will appear for live depositions in the United States, and that Counsel for the Petitioners shall file such agreement ("Live Deposition Agreement") with the Court; it is further

ORDERED that such agreement shall be signed by counsel for Petitioners' and filed with the Court before any other discovery or motion practice will continue; it is further

ORDERED that discovery is limited in topic only to those matters relevant to all elements of Section 303 of the Bankruptcy Code and the relevant factors under Section 305(a) and 707(a) of the Bankruptcy Code that were raised by the Alleged Debtors; it is further

ORDERED that the Motion to Quash is DENIED in part with respect to the remaining relief requested.

# # # END OF ORDER # # #

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed September 4, 2020**

**United States Bankruptcy Judge**

---

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | **Chapter 7** |
| | § | |
| **WALL007 LLC, *et al.*,** | § | **Case No. 20-31131-hdh7** |
| | § | **(Jointly Administered)** |
| **Alleged Debtors.** | § | |

**ORDER GRANTING IN PART THE ALLEGED DEBTOR'S**
**<u>SECOND MOTION TO COMPEL DISCOVERY RESPONSES FROM PETITIONERS</u>**
**<u>[DKT. NO. 105]</u>**

UPON CONSIDERATION OF the *Alleged Debtors Second Motion to Compel Discovery Responses Filed in the Alternative to Alleged Debtor's Motion to Compel Production of Documentary Evidence Permitting Verification of Electronic Signatures and Stay All Additional Discovery of Non-Dispositive Issues, or in the Alternative to Invalidate the Voluntary Petition and to Schedule Hearing in Conjunction with Creditors' Motion to Compel* (the "Motion") (Dkt. No. 105) filed by Alleged Debtors Wall007, et al. and all related filings, and having considered the

arguments of counsel at the hearing conducted on August 17, 2020 and the Court's oral ruling on August 19, 2020, it is hereby

ORDERED that the Motion is GRANTED in part and DENIED in part as provided herein; it is further

ORDERED that no discovery or motions practice shall continue unless and until a live deposition agreement signed by counsel for Petitioners is filed with the Court, as required by the Court's ruling on Alleged Debtors Motion to Quash Deposition Notices (Docket No. 133); it is further

ORDERED that, subject to the above limitations, Petitioners are required to produce all documents concerning the underlying transfer of funds to the Alleged Debtors from Chinese accounts; it is further

ORDERED that, subject to the above limitations, Petitioners are required to produce all documents concerning communications between the Petitioners and Mr. Michael Fu; it is further

ORDERED that Petitioners are required to sign their answers to their interrogatories with their own "wet signatures," as opposed to the signature of Petitioners Counsel; it is further

ORDERED that the Motion to Compel is DENIED in part with respect to the remaining relief requested.

# # # END OF ORDER # # #

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>WALL007 LLC, *et al.*,[1]<br><br>Alleged Debtors. | Chapter 7<br><br>Case No. 20-31131 (HDH)<br>(Jointly Administered) |

**MOTION OF THE PETITIONING CREDITORS FOR (I) RECONSIDERATION OF DISCOVERY ORDERS; AND (II) RELATED RELIEF**

Jun Li, Yunding Kang, Cunxiang Ji, Jin Wang, Peng Guo, Lin Zhou, Qu Chen, Kai Tian, Yijing Wu, Xuegeng Gong, Jin Wang, Weijia Kong, Heng Zhang, Hong Guo, Pei Guan, Yue Xu, Mai Ye, Chenchen Jiang, Qiuying Li, Ruinian Wu, Lin Zhou, Liying Yang, Yan Zhang, Wenjun Wang, Lan Ji, Ying Zhou, Lin Li, Li Jiang, Rufeng Ding, Cunxiang Ji, Lin Gao, Qiao Qin, Yue Zhang, Xiaodong Hao, Tianqing Song, Li Jiang, Weisi Wang, Xiaoquan Dai, Feng Yan, Heng Zhang, Ou Jiang, Jinzhe Wu, Yadan Liu, Wanwan Li, Wenjuan Yin, Jiancheng Chen, Yi Tang, Ying Zhang, Pengfei Dong, Kangying Mao, Yijing Wu, Li Jiang, Qin Chu, Yulan Chen, Sicheng Zhan, Pei Guan, Jingqiu Tang, Di Tang, Jun Zeng, Kui Wang, Yue Zhang, Jun Wang, Xiaomin Fan, Di Tang, Jialin Hu, Qin Chu, Jiaxiang Lu, Fuqing Chen, Hanjiang Fu, Aiguo Luo, Fang Ding, Xiangdong Zhu, Wai Ying, Yuan Yuan, Chao Xu, Guoqin Zhou, Yijing Wu, (collectively, the "Petitioning Creditors"), by and through their undersigned counsel, hereby move this Honorable Court for the entry of orders (i) reconsidering the discovery orders as set forth herein and (ii) for related relief (the "Motion"). In support of this Motion, the Petitioning Creditors (at times the "Petitioners") respectfully state as follows:

[1]The Alleged Debtors in these cases are: WALL007 LLC, WALL009 LLC, WALL010 LLC, WALL011 LLC, WALL012 LLC, WALL016 LLC, WALL017 LLC. The Alleged Debtors' federal tax identification numbers are unknown to the Petitioning Creditors sat this time.

## JURISDICTION AND VENUE

1. The Court has jurisdiction over the subject matter of this proceeding pursuant to 28 U.S.C. §§ 157, 1331 and 1334.

2. This proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

3. Venue of this action is proper in this Court pursuant to 28 U.S.C. § 1409.

## RELEVANT PROCEDURAL BACKGROUND

4. The Petitioning Creditors filed involuntary chapter 7 bankruptcy petitions (collectively, the "Petitions") against each Alleged Debtor on April 8, 2020. See [Dkt. No. 1 in 20-31131]; [Dkt. No. 1 in 20-31133]; [Dkt. No. 1 in 20-31134]; [Dkt. No. 1 in 20-31135]; [Dkt. No. 1 in 20-31136]; [Dkt. No. 1 in 20-31138]; and, [Dkt. No. 1 in 20-31139].

5. On April 24, 2020, this Court entered an Order granting the Petitioning Creditors' motions to jointly administer the bankruptcy cases (the "Cases") under the lead case WALL007 LLC [Dkt. No. 11 in 20-31131] (the "Lead Case").

6. On May 7, 2020, each Alleged Debtor filed Motions to Dismiss. See [Dkt. Nos. 18–19 in 20-31131]; [Dkt. Nos. 15–16 in 20-31133]; [Dkt. Nos. 14–15 in 20-31134]; [Dkt. Nos. 14–15 in 20-31135]; [Dkt. Nos. 14–15 in 20-31136]; [Dkt. Nos. 14–15 in 20-31138]; and, [Dkt. Nos. 14–15 in 20-31139] (collectively, the "Motions to Dismiss").

7. The Motions to Dismiss seek dismissal of the Petitions alleging, *inter alia*, that: (1) there are an insufficient number of Petitioning Creditors to support the filing of the Petitions against the Alleged Debtors; (2) the Petitioning Creditors' claims are in bona fide dispute; (3) the Alleged Debtors are generally paying their respective debts; and (4) the Petitions are not in the best interests of each of the Alleged Debtors and their creditors. See Motions to Dismiss.

8. On June 1, 2020, the Petitioning Creditors sent a First Set of Interrogatories ("Interrogatories") and First Request for Production of Documents ("Document Requests") (collectively, the "Requests") to each of the Alleged Debtors.

9. On June 20, 2020, the Court entered a Joint Discovery Plan setting forth, among other matters, discovery deadlines.

10. Paper discovery was exchanged between the parties.

11. On July 10, 2020, at the repeated request of counsel for the Petitioning Creditors, the Petitioning Creditors' and the Alleged Debtors' counsel discussed the Alleged Debtors' responses to the Requests (the "Responses") in a failed attempt to amicably resolve the Petitioning Creditors' objections to the Responses.

12. Back and forth regarding potential resolutions to the various discovery disputes between the parties occurred for most of the month of July and into August, 2020.

13. On July 27, 2020, the Petitioning Creditors filed a Motion to Compel [Dkt. No. 92] requesting that the Alleged Debtors produce paper discovery in the case. On August 10, 2020, the Petitioning Creditors filed an amendment to the Motion to Compel [Dkt. No. 129] (the "Amended Motion to Compel") requesting that the Alleged Debtors produce for deposition (i) Timothy Barton; (ii) Venkat Murugan; (iii) Hongpeng Lin; and (iv) Saskya Bedoya.

14. Petitioning Creditors now seek the Court's reconsideration of, inter alia, the Orders entered on the Amended Motion to Compel (the "Petitioners Compel Order") and the Alleged Debtors "Motion to Quash" [Dkt. No. 133] (the "Quash Order) as set forth herein.

15. For consistency of the record, the Petitioning Creditors also seek reconsideration of the Orders entered on the Alleged Debtors First and Second Motions to Compel [Dkt. Nos. 165 and 169] ( the "Alleged Debtor Compel Orders") as explained more fully herein.

16. The aforesaid discovery motions and orders may, at times, be referenced herein collectively as the "Discovery Motions" and the "Discovery Orders" or the "Orders for Reconsideration".

**RELEVANT FACTUAL BACKGROUND**

17. In the Amended Motion to Compel, the Petitioning Creditors specifically referenced to the Court, President Trump's proclamation issued on January 31, 2020 (the "Presidential Proclamation"). See Amended Motion to Compel, Exhibit "D" thereto.

18. The Presidential Proclamation (number 9984) states, in pertinent part:

> NOW, THEREFORE, I, DONALD J. TRUMP, President of the United States, by the authority vested in me by the Constitution and the laws of the United States of America, including sections 212(f) and 215(a) of the Immigration and Nationality Act (INA), 8 U.S.C. 1182(f) and 1185(a), and section 301 of title 3, United States Code, hereby find that the unrestricted entry into the United States of persons described in section 1 of this proclamation would, except as provided for in section 2 of this proclamation, be detrimental to the interests of the United States, and that their entry should be subject to certain restrictions, limitations, and exceptions. I therefore hereby proclaim the following:
>
> Section 1. Suspension and Limitation on Entry. The entry into the United States, as immigrants or nonimmigrants, of all aliens who were physically present within the People's Republic of China, excluding the Special Administrative Regions of Hong Kong and Macau, during the 14-day period preceding their entry or attempted entry into the United States is hereby suspended and limited subject to section 2 of this proclamation.

See Exhibit "A" hereto for the full text of the Presidential Proclamation.

19. The Alleged Debtors' Motions to Compel argued that the Petitioning Creditors had not met their paper discovery obligations.

20. Nowhere in the Alleged Debtors' Motions to Compel do the Alleged Debtors seek relief relative to the noticed depositions of certain of the Petitioning Creditors.

21. On August 5, 2020, counsel for the Alleged Debtors served notices of deposition subpoenas ("Debtor Deposition Notices") on counsel for the following Petitioning Creditors (the "Petitioner Deponents"): Fang Ding, Guoqin Zhou, Jialin Hu, Jiancheng Chen, Jingqiu Tang, Jun Zeng, Kui Wang, Wenjun Wang, Xiangdong Zhu, Xiaoquan Dai, Qin Chu, Li Jiang, Weisi Wang, Ying Zhou, Di Tang, Kangying Mao, Jiaxiang Lu, Jin Wang, Wanwan Li, Yijing Wu, Heng Zhang.

22. In the Motion to Quash, the Alleged Debtors inserted language requesting, *inter alia*, that the depositions of the Petitioner Deponents be taken in the United States before any depositions are taken of the Alleged Debtors' representatives or further motion practices proceeds in the Case.

23. Procedurally, the Alleged Debtors never filed a motion or other application requesting enforcement of their Debtor Deposition Notices on the Petitioner Deponents.

24. On August 13, 2020, the Petitioning Creditors filed their opposition to the Motion to Quash (the "Quash Opposition") and reiterated that the Petitioning Creditors, who are Chinese nationals and reside in mainland China, were unable to enter into the United States due to the ongoing COVID-19 pandemic and specifically because of the travel restrictions imposed by President Trump.

25. Paragraph 34 of the Quash Opposition states as follows:

> "However, as set forth in the Amended Motion to Compel, Petitioning Creditors cannot enter into the United States due to the ongoing COVID-19 pandemic and travel and quarantine restrictions imposed by both China and the United States."

26. On August 17, 2020, the Court held a hearing on the multiple contested discovery matters, including the Discovery Motions.

27. At the August 17th hearing, counsel for the Petitioning Creditors and the Court briefly discussed the implications of the travel ban to the U.S. from China due to the ongoing COVID-19 pandemic. In particular, the following discourse occurred:

```
     Why don't you address the ability of your approach to be deposed, just as Ms. Lindauer did in her's.  She's saying she needs 10 to 12 depositions.
               MR. PACKMAN:  And we're happy to provide those by video, Your Honor.  I do not believe, based on COVID and the restrictions on travel both from China and into the United States, which would require a 14-day quarantine, that we can do these depositions live in the United States.  If we could, we would.  We think it's a little bit overkill to have 11 or 12 of these petitioning creditors to have to travel here.  But if we would, we could -- if we could, we would.  We can only produce them now --
```

THE COURT: Yeah. What is the travel situation in China? I just know enough to be dangerous, just from reading in the paper. Are we still under a travel quarantine from China? I don't know what the status is right now.

MR. PACKMAN: Your Honor, based on what the most current information we have from the U.S. government website, there appears to still be a 14-day quarantine requirement for a Chinese national coming into the United States.

THE COURT: Uh-huh.

MR. PACKMAN: So I do agree with Ms. Lindauer that it's a predicament. It would be very expensive and costly for these petitioning creditors to come here. But I don't disagree with Ms. Lindauer that they have some right to ask them questions and prepare for the trial. I don't disagree with that. I just don't know what else to do right now. I just don't know what else to do.

THE COURT: Okay.

MR. PACKMAN: But we will make them available by video.

THE COURT: All right. Okay.

As far as the petitioning creditors' depositions. We will do everything possible to make them available for depositions so they can answer whatever relevant questions Ms. Lindauer has. But as I said, they are just not permitted to travel here at this moment, without being quarantined for at least two weeks. I think that would be unfair to require them to do that.

Tr. at 15:14–16:22; 28:8–28:14, August 17, 2020 (attached as Exhibit "B").

28. Despite the foregoing, and the travel ban pursuant to the Presidential Proclamation, the Court determined that the Petitioner Deponents would be required to enter into the United States for depositions and stated, in pertinent part, as follows:

The petitioning creditors did not really respond to alleged debtors' legality argument. Instead, the petitioners claim that the difficulties associated with the COVID-19 crisis should excuse them from traveling to the United States for in-person depositions. During the hearing, counsel for the petitioners did not specifically say there was a travel ban on Chinese nationals entering the United States. Rather, counsel argued that his clients would have to quarantine for 14 days upon entry to the United States and that doing so would be a great inconvenience.

The Court understands the great difficulty travel poses during the current pandemic. However, the Court also believes that litigants who seek the benefit of the United States law must follow its process. And here, a serious concern has been raised that taking video depositions would violate Chinese law. While traveling to the U.S. may be a great inconvenience and difficulty at this time, the Court believes it is necessary in this case to address both the legality issues and the identity concerns raised by the

CINDY SUMNER, CSR (214) 802-7196

5

alleged debtors. Accordingly, the motion to quash at docket number 133 is granted in part to require the petitioning creditors' depositions to be taken in-person, in the United States, at a time and place agreeable to the parties.

Tr. at 4:7–5:4, August 19, 2020 (attached as Exhibit "C").

29. The Court does not address counsel for Petitioners' statement or legal position in the corresponding brief, arguing that the Petitioners cannot enter directly into the U.S. pursuant to the travel ban.

30. Petitioners cannot enter directly into the U.S. for any purpose if they are foreign nationals of China under the Presidential Proclamation absent an exception being recognized under Section 2 of the law as set forth herein.

31. At the time of the hearing, Petitioners' counsel thought that Petitioners might potentially quarantine in the U.S. for 14 days but that is not legally the case under the Presidential Proclamation. No direct entry of a Chinese national into the U.S. is permitted to quarantine absent discrete exceptions.

32. Section 2 contains various exceptions to the direct travel ban in Section 1 which do not appear to apply here. Absent an Order by this Court deeming that the depositions of the Petitioners fall under a specific exception under Section 2 to the direct travel ban and, further, approval of such Order by the relevant federal authorities as a recognized exception to the direct travel ban, Petitioners simply cannot legally (under U.S. Law) travel directly here and enter the United States for any reason at this time.

33. Just as the Alleged Debtors were concerned about violating Chinese law (by conducting video depositions in China-addressed herein in more detail), Petitioners would violate U.S. law by seeking direct entry into the U.S. and, in fact, would not be permitted to enter the country.

34. Perhaps the law should have been discussed in greater detail at the hearing but the substance of the Presidential Proclamation was clearly attached to the Amended Motion to

Compel and apparently was inadvertently not fully considered or understood prior to the Court's ruling.

35. To be clear, the President has banned the Petitioners (who are Chinese nationals) from directly entering the United States pursuant to the Presidential Proclamation.

36. Fortunately, there is now a legal alternative which was not previously available and which runs directly contrary to prior arguments by counsel for the Alleged Debtors.

37. In her prior arguments, Ms. Lindauer posited that taking depositions in China are illegal and that the depositions could not be taken there or even in other territories. See Alleged Debtors' Motion to Quash Petitioners' Deposition Notices [Dkt. No. 133]; correspondence from Alleged Debtors' counsel Joyce Lindauer to the Court dated June 3, 2020 with the subject line "Memorandum On Conducting Depositions of Chinese Nationals in China" [Dkt. No. 45].

38. However, that is not the case as the government of Macau Special Administrative Region is now permitting Chinese nationals, such as the Petitioners, to travel to Macau where their depositions can be taken, either live by counsel or via video. See https://www.worldaware.com/covid-19-alert-macau-allows-tourists-zhuhai-china-aug-12.

39. Petitioners suspect that Hong Kong will follow suit in allowing direct travel by mainland nationals to Hong Kong soon but it has not yet.

40. There is a history of remote depositions which have taken place in Hong Kong, Macau and elsewhere. See Dagen v. CFC Grp. Holdings, 00 Civ. 5682, 2003 U.S. Dist. LEXIS 20029, 2003 WL 22533425, at *2 (S.D.N.Y. Nov. 7, 2003) (permitting testimony by telephone of witnesses based in Hong Kong); see also Jordan Outdoor Enters., Ltd. v. Hubei Wild Trees Textiles Co., 2014 BL 99734 (M.D. Ga. Apr. 09, 2014) (Chinese national deposed in Hong

Kong in Georgia litigation). See Exhibit "D" for a recent U.S. case ruling on the issue of video depositions in locations such as Hong Kong and Macau.

41. Also annexed as part of Exhibit "D" is a proposal for related Court reporting and interpreter services for video depositions in Macau. The reporting service conducts depositions (including those of Chinese nationals) in Macau and Hong Kong frequently and the cost is not prohibitive.

42. Pursuant to F.R.C.P. 29(a), "[u]nless the court orders otherwise, the parties may stipulate that: (a) a deposition may be taken before any person, at any time or place, on any notice, and in the manner specified—in which event it may be used in the same way as any other deposition."

43. This change in the foreign law (regarding direct travel from China's mainland to Macau) was not known to Petitioning Creditors' counsel at the time of the Discovery Motions as it had only been enacted days prior to argument on the Discovery Motions.

44. There, is therefore, now a viable, legal option for the Alleged Debtors to depose the Petitioner Deponents in Macau which was not an option at the time of the Motion to Quash due to travel restrictions.

45. Based on the change in circumstances and law, the Court should reconsider its prior Discovery Orders.

**UNAUTHORIZED TRANSFER BY THE ALLEGED DEBTOR WALL010**

46. The Court should also be aware of a recent, unauthorized and possibly fraudulent conveyance, which was transacted by the Alleged Debtor, Wall010.

47. Annexed hereto as Exhibit "E" is a deed conveying an interest in real property ("Property") in which Wall010 maintained an interest as of the Petition Date (the "Deed").

48. The Deed, dated August 3, 2020, conveys the interests of the Alleged Debtor, Wall010 in the Property to an entity known as LC Aledo Texas, LLC ("Grantee"). See ¶ 7 of the Deed.

49. The Alleged Debtors did not seek Court approval for this post-petition transfer and it is not clear what consideration, if any, the Alleged Debtor received for such transfer of its interests.

50. The entity taking the Deed in Trust as grantee is seemingly related to the Alleged Debtor and Mr. Barton. See documents annexed as part of Exhibit "E."

51. The Alleged Debtors previously requested that this Court limit discovery so that the Petitioners cannot delve into such undisclosed transfers.

52. The Court noted in its opinion on August 19, 2020, as follows:

> as they become due are appropriate. That said, the petitioners are not entitled to seek written discovery or ask questions in depositions that delve into issues beyond the scope of Sections 303, 305(a), and 707(a). Along those lines, I do not see how the use of the loan proceeds received by the alleged debtors is relevant to these issues unless there is an allegation that their use gave rise to a preference or fraudulent transfer cause of action. Accordingly, the motion to quash at docket number 133 is denied in this respect.

Tr. at 6:4–6:8, August 19, 2020 (attached as Exhibit "C") (emphasis added).

53. At this time, given the Deed, the Petitioners request that the Court modify the Discovery Orders and allow the Petitioners to ask questions of the deponents regarding the use

of the proceeds of the Loans from the Petitioners and any transfers of interests of the Alleged Debtors both pre and post-petition.

## RELIEF REQUESTED AND BASIS THEREFOR

### I. Rule 9023 is Satisfied on the Motion to Reconsider

54. Federal Rule of Civil Procedure 59(e) (as applied to bankruptcy cases by Federal Rule of Bankruptcy Procedure 9023) permits a court to alter or amend a judgment after its entry. Fed. R. Civ. P. 59(e). Federal Rule 59(e) covers a broad range of motions, and the only real limitation on the type of the motion permitted is that it must request a substantive alteration of the judgment. Id.

55. Federal Rule 59(e) includes motions for reconsideration. Edward H. Bohlin Co. v. Banning Co., 6 F.3d 350, 355 (5th Cir. 1993). Since specific grounds for a motion to amend or alter are not listed in the rule, the Court enjoys considerable discretion in granting or denying the motion. Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. New York State Dep't of Envtl. Conservation, 831 F. Supp. 57, 61 (N.D.N.Y. 1993), aff'd in part, rev'd in part, 17 F.3d 521 (2d Cir. 1994) (finding that a motion for reconsideration will be granted only when the court has overlooked matters or controlling decisions that might have materially influenced earlier decision).

56. There are four independent grounds upon which Rule 59(e) motion may be granted, three of which apply in this case. First, the movant may demonstrate that the motion is necessary to correct manifest errors of law or facts upon which the judgment is based. Second, the motion may be granted so that the moving party may present newly discovered or previously unavailable evidence. Third, the motion will be granted if necessary to prevent manifest injustice. See 11 U.S.C. § 59(e); 11 Charles Alan Wright et al., Federal Practice and

Procedure § 2810.1, at 150-162 (3d ed. 2020) (outlining the grounds for amendment or alteration of judgment under Rule 59(e)).

57. A Federal Rule of Civil Procedure 59(e) motion "calls into question the correctness of a judgment" In re Transtexas Gas Corp., 303 F.3d 571, 581 (5th Cir. 2002).

58. Applying the three relevant Rule 9023 factors here, **respectfully**:

(a) The Court overlooked or incorrectly decided the matter contrary to the Presidential Proclamation;

(b) The relevant law was recently changed only a few short days prior to oral argument and counsel was unaware of this new development until recently;

(c) Since there is a fair and equitable solution at this point, the Court should allow the depositions of the Petitioner Deponents by video in Macau.

59. This provides the Alleged Debtors with their desired "face time" with the Petitioner Deponents and there will be no violations of U.S. or Chinese law to the knowledge of Petitioners.

60. Counsel for the Petitioner Deponents believe that such video (or live depositions in Macau if travel is preferred by Ms. Lindauer) can be agreed to by Petitioner Deponents and arranged within the next 30 days.

## II. Rule 9024 is Satisfied on the Motion to Reconsider

61. In the alternative, Federal Rule of Civil Procedure 60(b)(6) (as applied to bankruptcy cases by Federal Rule of Bankruptcy Procedure 9024) provides that among the grounds for relief from a final judgment, order, or proceeding is "any other reason justifying relief." Fed. R. Civ. P. 60(b)(6).

62. This "catchall" provision of the rule allows the Court to use its equitable power to prevent injustice in a wide range of circumstances and should be used utilized where extraordinary circumstances prevent a party from taking timely action to prevent or correct an erroneous judgment. In re Weisband, No. BAP AZ-10-1239, 2011 WL 3303453, at *8 (B.A.P. 9th Cir. June 13, 2011).

63. As discussed above, the Presidential Proclamation precludes the Petitioners, as a matter of law, from traveling directly into the United States at this time. However, there is a legal option now available to satisfy the concerns of the Court.

64. The depositions may be conducted in Macau, China by video or live if that is what counsel prefers.

65. The Court is further, respectfully, requested to revisit the Petitioners Compel Order which would limit their ability to ask questions of the Alleged Debtors regarding use of the Loan Proceeds and otherwise delve into assets of the Alleged Debtors which may have been transferred pre and post-petition by the Alleged Debtors.

66. Finally, in light of the Petitioners providing the Alleged Debtors with a legal option to depose the Petitioner Deponents, the Court is requested to modify the Discovery Orders so that Petitioners can proceed now, without further delay, in their discovery and motion practice.

Dated: September 15, 2020

/s/ *Stephen M. Packman*
Jiangang Ou
Nguyen & Chen LLP
11200 Westheimer Road Suite 120
Houston, TX 77042
(832) 767-0339
Fax : (832) 767-0669
Email: jou@nguyen-chen.com

Stephen M. Packman
Archer & Greiner, P.C.
Three Logan Square
1717 Arch St., Suite 3500
Philadelphia, PA 19103
215-246-3147
Email: spackman@archerlaw.com

*Counsel for the Petitioning Creditors*

219313350v2

**CERTIFICATE OF SERVICE**

I hereby certify that on September 15, 2020, I caused to be served a copy of the foregoing by electronic mail upon all parties receiving notice through the Court's CM/ECF Noticing System.

/s/ Stephen M. Packman
Stephen M. Packman, Esq.

# EXHIBIT "A"

PROCLAMATIONS

# Proclamation on Suspension of Entry as Immigrants and Nonimmigrants of Persons who Pose a Risk of Transmitting 2019 Novel Coronavirus

HEALTHCARE

Issued on: **January 31, 2020**

★ ★ ★

The United States has confirmed cases of individuals who have a severe acute respiratory illness caused by a novel (new) coronavirus ("2019-nCoV") ("the virus") first detected in Wuhan, Hubei Province, People's Republic of China ("China"). The virus was discovered in China in December 2019. As of January 31, 2020, Chinese health officials have reported approximately 10,000 confirmed cases of 2019-nCoV in China, more than the number of confirmed cases of Severe Acute Respiratory Syndrome (SARS) during its 2003 outbreak. An additional 114 cases have been confirmed across 22 other countries; in several of these cases, the infected individuals had not visited China. More than 200 people have died from the virus, all in China.

Coronaviruses are a large family of viruses. Some cause illness in people and others circulate among animals, including camels, cats, and bats. Animal coronaviruses are capable of evolving to infect people and subsequently spreading through human-to-human transmission. This occurred with both Middle East Respiratory Syndrome and SARS. Many of the individuals with the earliest confirmed cases of 2019-nCoV in Wuhan, China had some link to a large seafood and live animal market, suggesting animal-to-human transmission. Later, a growing number of infected individuals reportedly did not have exposure to animal markets, indicating human-to-human transmission. Chinese officials now report that sustained human-to-human transmission of the virus is occurring in China. Manifestations of severe disease have included severe pneumonia, acute respiratory distress syndrome, septic shock, and multi-organ failure.

Neighboring jurisdictions have taken swift action to protect their citizens by closing off travel between their territories and China. On January 30, 2020, the World Health Organization declared the 2019-nCoV outbreak a public health emergency of international concern.

Outbreaks of novel viral infections among people are always of public health concern, and older adults and people with underlying health conditions may be at increased risk. Public health experts are still learning about the severity of 2019-nCoV. An understanding of the key attributes of this novel virus, including its transmission dynamics, incubation period, and severity, is critical to assessing the risk it poses to the American public. Nonetheless, the Centers for Disease Control and Prevention (CDC) has determined that the virus presents a serious public health threat.

The CDC is closely monitoring the situation in the United States, is conducting enhanced entry screening at 5 United States airports where the majority of travelers from Wuhan arrive, and is enhancing illness response capacity at the 20 ports of entry where CDC medical screening stations are located. The CDC is also supporting States in conducting contact investigations of confirmed 2019-nCoV cases identified within the United States. The CDC has confirmed that the virus has spread between two people in the United States, representing the first instance of person-to-person transmission of the virus within the United States. The CDC, along with state and local health departments, has limited resources and the public health system could be overwhelmed if sustained human-to-human transmission of the virus occurred in the United States. Sustained human-to-human transmission has the potential to have cascading public health, economic, national security, and societal consequences.

During Fiscal Year 2019, an average of more than 14,000 people traveled to the United States from China each day, via both direct and indirect flights. The United States Government is unable to effectively evaluate and monitor all of the travelers continuing to arrive from China. The potential for widespread transmission of the virus by infected individuals seeking to enter the United States threatens the security of our transportation system and infrastructure and the national security. Given the importance of protecting persons within the United States from the threat of this harmful communicable disease, I have determined that it is in the interests of the United States to take action to restrict and suspend the entry into the United States, as immigrants or nonimmigrants, of all aliens who were physically present within the People's Republic of China, excluding the Special Administrative Regions of Hong Kong and Macau, during the 14-day period preceding their entry or attempted entry into the United States. I have also determined that the United States should take all necessary and appropriate measures to facilitate orderly medical screening and, where

appropriate, quarantine of persons allowed to enter the United States who may have been exposed to this virus.

NOW, THEREFORE, I, DONALD J. TRUMP, President of the United States, by the authority vested in me by the Constitution and the laws of the United States of America, including sections 212(f) and 215(a) of the Immigration and Nationality Act (INA), 8 U.S.C. 1182(f) and 1185(a), and section 301 of title 3, United States Code, hereby find that the unrestricted entry into the United States of persons described in section 1 of this proclamation would, except as provided for in section 2 of this proclamation, be detrimental to the interests of the United States, and that their entry should be subject to certain restrictions, limitations, and exceptions. I therefore hereby proclaim the following:

Section 1. Suspension and Limitation on Entry. The entry into the United States, as immigrants or nonimmigrants, of all aliens who were physically present within the People's Republic of China, excluding the Special Administrative Regions of Hong Kong and Macau, during the 14-day period preceding their entry or attempted entry into the United States is hereby suspended and limited subject to section 2 of this proclamation.

Sec. 2. Scope of Suspension and Limitation on Entry.

(a) Section 1 of this proclamation shall not apply to:

(i) any lawful permanent resident of the United States;

(ii) any alien who is the spouse of a U.S. citizen or lawful permanent resident;

(iii) any alien who is the parent or legal guardian of a U.S. citizen or lawful permanent resident, provided that the U.S. citizen or lawful permanent resident is unmarried and under the age of 21;

(iv) any alien who is the sibling of a U.S. citizen or lawful permanent resident, provided that both are unmarried and under the age of 21;

(v) any alien who is the child, foster child, or ward of a U.S. citizen or lawful permanent resident, or who is a prospective adoptee seeking to enter the United States pursuant to the IR-4 or IH-4 visa classifications;

(vi) any alien traveling at the invitation of the United States Government for a purpose related to containment or mitigation of the virus;

(vii) any alien traveling as a nonimmigrant under section 101(a)(15)(C) or (D) of the INA, 8 U.S.C. 1101(a)(15)(C) or (D), as a crewmember or any alien otherwise traveling to the United States as air or sea crew;

(viii) any alien seeking entry into or transiting the United States pursuant to an A-1, A-2, C-2, C-3 (as a foreign government official or immediate family member of an official), G-1, G-2, G-3, G-4, NATO-1 through NATO-4, or NATO-6 visa;

(ix) any alien whose entry would not pose a significant risk of introducing, transmitting, or spreading the virus, as determined by the CDC Director, or his designee;

(x) any alien whose entry would further important United States law enforcement objectives, as determined by the Secretary of State, the Secretary of Homeland Security, or their respective designees based on a recommendation of the Attorney General or his designee; or

(xi) any alien whose entry would be in the national interest, as determined by the Secretary of State, the Secretary of Homeland Security, or their designees.

(b) Nothing in this proclamation shall be construed to affect any individual's eligibility for asylum, withholding of removal, or protection under the regulations issued pursuant to the legislation implementing the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, consistent with the laws and regulations of the United States.

Sec. 3. Implementation and Enforcement. (a) The Secretary of State shall implement this proclamation as it applies to visas pursuant to such procedures as the Secretary of State, in consultation with the Secretary of Homeland Security, may establish. The Secretary of Homeland Security shall implement this proclamation as it applies to the entry of aliens pursuant to such procedures as the Secretary of Homeland Security, in consultation with the Secretary of State, may establish.

(b) Consistent with applicable law, the Secretary of State, the Secretary of Transportation, and the Secretary of Homeland Security shall ensure that any alien subject to this proclamation does not

board an aircraft traveling to the United States.

(c) The Secretary of Homeland Security may establish standards and procedures to ensure the application and implementation of this proclamation at United States seaports and in between all ports of entry.

(d) An alien who circumvents the application of this proclamation through fraud, willful misrepresentation of a material fact, or illegal entry shall be a priority for removal by the Department of Homeland Security.

Sec. 4. Orderly Medical Screening and Quarantine. The Secretary of Homeland Security shall take all necessary and appropriate steps to regulate the travel of persons and aircraft to the United States to facilitate the orderly medical screening and, where appropriate, quarantine of persons who enter the United States and who may have been exposed to the virus. Such steps may include directing air carriers to restrict and regulate the boarding of such passengers on flights to the United States.

Sec. 5. Termination. This proclamation shall remain in effect until terminated by the President. The Secretary of Health and Human Services shall, as circumstances warrant and no more than 15 days after the date of this order and every 15 days thereafter, recommend that the President continue, modify, or terminate this proclamation.

Sec. 6. Effective Date. This proclamation is effective at 5:00 p.m. eastern standard time on February 2, 2020.

Sec. 7. Severability. It is the policy of the United States to enforce this proclamation to the maximum extent possible to advance the national security, public safety, and foreign policy interests of the United States. Accordingly:

(a) if any provision of this proclamation, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this proclamation and the application of its provisions to any other persons or circumstances shall not be affected thereby; and

(b) if any provision of this proclamation, or the application of any provision to any person or circumstance, is held to be invalid because of the lack of certain procedural requirements, the

relevant executive branch officials shall implement those procedural requirements to conform with existing law and with any applicable court orders.

Sec. 8. General Provisions. (a) Nothing in this proclamation shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This proclamation shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

IN WITNESS WHEREOF, I have hereunto set my hand this thirty-first day of January, in the year of our Lord two thousand twenty, and of the Independence of the United States of America the two hundred and forty-fourth.

DONALD J. TRUMP

# EXHIBIT "B"

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

IN RE: ) BK. NO: 20-31131-HDH-7
)
WALL007 LLC )
D E B T O R. )

* * * * * * * * * *

TRANSCRIPT OF PROCEEDINGS

* * * * * * * * * *

BE IT REMEMBERED, that on the 17th day of August, 2020, before the HONORABLE HARLIN D. HALE, United States Bankruptcy Judge at Dallas, Texas, the above styled and numbered cause came on for hearing, and the following constitutes the transcript of such proceedings as hereinafter set forth:

P R O C E E D I N G S

THE COURT: Good morning. I'll take appearances in Wall007 LLC.

MS. LINDAUER: Your Honor, Joyce Lindauer for the alleged debtors.

THE COURT: Welcome.

MS. LINDAUER: Thank you, Your Honor.

MR. PACKMAN: Good morning, Your Honor. Stephen Packman, Archer Greiner, and James Ou for the petitioning creditors.

THE COURT: Welcome to you.

MR. METZGER: Your Honor, Steve Metzger on behalf of interested party Timothy Barton, Hang Lin, as well.

THE COURT: Welcome.

MR. WALJI: Good morning, Your Honor, Khudabuksh Walji, counsel for Carnegie Development, Inc., the managing member for the Wall entities.

Thank you.

THE COURT: Welcome.

Anyone else wish to make an appearance?

MR. OU: Yes, Your Honor, James Ou, co-counsel for the petitioning creditors.

THE COURT: Welcome to you.

MR. OU: Thank you, Your Honor.

THE COURT: We have a lot of things on the

docket this morning. I think what I would like to do is hear generally from both sides on what it is you're actually wanting, what it is you think that I can do. And my intentions are then to recess the hearing. My law clerks and I will get together. And then we're going to come up with a plan of action for you that gets you toward a resolution of your disputes. So there's no magic in the order.

So, Lindauer, why don't you go first --

MS. LINDAUER: Sure.

THE COURT: -- and Packman go second.

But, you know, you have a whole slew of things on the docket. It's really unclear to me what all it is that you're wanting, what it is that you think I can do, how this further the ball down the court, what our goal is, how we're going to get this resolved, things like that. So you go first and Mr. Packman can go second. Again, there's no magic to the first and second on this.

MS. LINDAUER: Okay. Well, thank you, Your Honor.

We did file -- I know your clerk has probably had a chance to look at it, you may have, as well, a status report.

THE COURT: I have. I've had a chance to look at it.

MS. LINDAUER: Okay.

And we tried to -- because you're right, there are a

number of things pending. We tried to sort of boil it down into kind of what we view as the major disagreements here. The parties moved forward with discovery, both sides, written discovery. There has been exchanges of documents on both sides. There were answers provided to written discovery. Obviously our written discovery was a lot more extensive than their's, just because of the number of people involved on their side. You've got some 66 petitioning creditors. So obviously we had a lot more requests for information.

After doing the written discovery, I think both sides felt that the responses were somewhat inadequate, and so that's what launched sort of these motions to compel. We have since provided further discovery. I think they've provided some further discovery. But we're still missing what we view as some critical paper documents, in particular, from the petitioning creditors. While they've provided receipts that they claim of funds that were sent in, they have never provided us with, I don't think, the underlying actual transfer of funds from whatever account in China that the funds came from. We haven't been provided with complete information on each of these petitioning creditors, such as passports and identification of each of these people.

And then, as well, there were some communications provided, but we don't think as many as should have been provided, in particular, communications between the

petitioning creditors and a gentleman named Michael Fu, who has claimed to be the agent for the petitioning creditors. We've seen very little documentation on that.

As a result of exchanging written discovery, we did take two depositions. We took Michael Fu's and Mr. Yang's depositions. And then Mr. Packman scheduled some depositions of people on our side, and then we scheduled some depositions of people on their side. And what it boiled down to, Your Honor, is that with regard to the people on our side, Mr. Packman indicated that he did not want to go forward with depositions of people on our side, unless he could take, what he calls, I think a complete deposition. And what I mean by that is he wanted to get into not only questions about the involuntary requirements, disputed claims, unliquidated claims, those issues, but also questions about the finances of each of the alleged debtors. It was at that point that we drew the line and said, wait a minute. We view the determination of whether these petitioning creditors are actually proper creditors for the filing of an involuntary to be a fundamental issue that should be decided first, before we start launching into what I would view as sort of fishing expeditions on the finances of each of these entities.

THE COURT: Hey, can I --

MS. LINDAUER: So we --

THE COURT: Can I just stop you here?

MS. LINDAUER: Sure.

THE COURT: And I don't want to step on. But do finances include whether the debtors are generally paying their debts as they become due?

MS. LINDAUER: I think that that information is available. I think we didn't draw a line on that. What we drew a line on is, is we would like balance sheets. We would like to see profit and loss statements. We'd like to see, you know, any kind of valuation information, those kinds of things. And that's where we sort of drew the line and said, wait a minute, we don't think this should be a fishing expedition on finances. As far as paying your bills as they come due, you know, those are fair questions to ask. And so, I mean, I do think they have the right to make that inquiry, Your Honor. But whether, in fact, we actually -- if you read some of their discovery it was like, let's talk about fraudulent transfers. Let's talk about preferences. Let's talk about those kinds of things. And I think those are not open for discussion at this point. So, you know, did our money go to another entity, that kind of thing. So those questions we thought really were not appropriate at this stage. They may be appropriate at some point in the future. But at least not at this stage.

So we said, look, you know, we'll produce people for depositions. But we don't think that they should have to

talk about things beyond the involuntary petition requirements. And the first requirement we believe is for you to establish that you're actually creditors of these entities. And, in fact, valid creditors with liquidated, non-contingent, non-disputed claims. So that's one box, if you will, of issues that arose was this question about what finances are the alleged debtors required to provide.

The second big issue that came up was our request to determine the validity and extent of the claims of the petitioning creditors, because we did get some written discovery. But I can tell you, we've analyzed that written discovery pretty careful and provided, you know, charts and things. But without getting into the minutia on that bottom line is, we didn't feel that we had adequate information from the petitioning creditors in order to analyze things like disputed, contingent, unliquidated, those types of issues. So we asked to take some depositions. And that's where the wheels fell of.

The alleged debtors' position, Your Honor, is that if you come to the United States and you file an involuntary petition in bankruptcy, you need to present yourself for a deposition in the United States. Every bit of research that we have done to date, and we've provided the Court with a lot of this information, leads us to conclude that taking depositions in China is likely illegal. And the other

problem we run into is simply, Chinese persons, Chinese nationals don't follow our rules of litigation. So asking them to swear to the truth of the matters that they're going to testify about, we're not certain what that really means. How are you going to enforce that as far as those people who do show up? But we've told Mr. Packman over and over that we believe that his clients -- and we've narrowed the pool. There's about, I think, 10 or 12 of them that we've asked to depose. For particular reasons we've selected those. And we've asked that they be required to come to the United States. And I know that's problematic with COVID and all of the other things going on in the world. But maybe this just isn't the time to file an involuntary bankruptcy, if you can't make your people available to be asked questions.

Let me explain why asking those questions becomes important. We've raised questions about their signatures, whether their signatures are, in fact, authentic. Whether they actually signed a number of these pieces of paper that are relevant to this case. And we, to date, have not been satisfied that that information has really been accurate, correct, and fully vetted to really move forward in this case. So that's one issue.

The second issue, Your Honor, is our records seem to indicate that some of this money that came into the United States exceeded the limits provided by law, which means

that -- you're limited to $50,000, and some of these people transferred way, way more than 50,000. The problem is is that the money, in many instances, did not come from the people who actually signed loan agreements, we believe. And, in fact, in some instances, we have no dollars attached to a loan agreement. So there are questions about who actually sent the money, whose money is this, and who the actual borrower, if you will, really is, because we believe it may not be the person on the loan agreement.

When we took Mr. Fu's deposition, the other thing we found out was that Mr. Fu, in some instances, kept some of the money coming in on these loans to apply against a commission he claimed he was due. And that may explain in part why some of these loans have zero money funded to them. But, again, the only way we're going to get the real answer to some of those questions is to ask these people who funded the money, did you fund the money, or did somebody else fund the money? And if somebody else funded the money, then that's a bigger problem, because we have no loan agreement with that someone else. So a lot of our time, and you can see based on the attachments, has been spent trying to determine who the petitioners are, are they actually creditors, is someone else actually the creditor and not these people.

So the other big issue is taking of depositions and how

we're going to do that with regard to the petitioning creditors. And the other piece of that is their request to take depositions, as I mentioned. We do have two people that they've asked to depose that have particular issues. I don't believe Mr. Bencat (phonetic) has ever been served with his subpoena, so that's an issue. Mr. Metzger represents Mr. Barton and Mr. Lin. And then there's a woman named Saskia Badoya (phonetic) who has worked for JMJ Development, which is an underlying company. And she is now 7 1/2 months pregnant. She's had two prior miscarriages. And she's under a doctor's care. So we told Mr. Packman, we don't feel comfortable presenting her for a deposition, given her health situation. We don't want to be responsible for causing any kind of problem with her health. So those are the four witnesses they've asked for at this point. Two of them are available. Two of them have some issues.

THE COURT: Which two are available?

MS. LINDAUER: Mr. Barton and Mr. Lin.

Now, let me bring up an issue, or I'll let Mr. Metzger bring it up, but I can mention it. The Court's heard some of this previously where there's been these claims that people have threatened each other. Apparently, Mr. Lin believes his family in China has been threatened, as a result of this case and the taking of his deposition. So he has some additional concerns about actually giving his deposition and what might

happen. And I'll let -- Mr. Metzger has actually visited with him and he can probably explain this in better detail than I can. But apparently Mr. Lin has some concerns about appearing because of some threats that have been made to his family in China. And some of these people that we're dealing with in the United States do have family back in China, so there are some connections there.

So I think at the end of the day, I wanted to kind of hit the high points, which are the things that we're most concerned about, which is dealing with depositions, dealing with who these people are that we're dealing with, and then this question of finances of the alleged debtors. If you boil down all of the papers that have been filed, I think for the most part they fall into one of those categories that I've covered with the Court.

So Mr. Packman and I have done a fairly decent job of trying to exchange things and work together. But we just hit an impasse on these issues, and so that's why we asked to go ahead and go forward with the hearing this morning. Because I do think we need some direction from the Court how we proceed on these issues.

THE COURT: Okay.

MS. LINDAUER: And so that's why we're here.

THE COURT: I'm hoping that in a day or so, I can provide that to you.

Mr. Packman, why don't you go next, Mr. Packman. This is fresh off from Lindauer.

MR. PACKMAN: Thank you, Your Honor. Can you hear me?

THE COURT: I can hear you fine. Thank you.

MR. PACKMAN: Your Honor, in terms of the discovery requests by the petitioning creditors, we have some written discovery requests that have yet to be responded to, both in terms of document production, as well as answers to interrogatories. And we've detailed that probably more than the Court would care to read in our papers, which consists of the motion to compel. And then there's probably reference to it in responses to the alleged debtors' motions, including the motions to compel, which I'll get to in a second, and the motion to quash.

I think the responses to the interrogatories should be fairly simple, Your Honor. And I'm not going to repeat each of the requests that we feel have not been sufficiently responded to or which they didn't respond to at all. But, essentially, they're litigation questions to help us prepare for trial, such as, have any requests for -- have any admissions been made against interests? Have there been any statements against interests? Have you taken any statements from anyone? These are typical litigation questions, which I think they should answer. I don't think there's any

difficult in answering those. And to the extent there are any such statements or declarations, they should just say so.

So moving to the request for production of documents. I think that Ms. Lindauer is sort of glossing over the issue of certain of these documents that we're requesting. We are not seeking to do a deep 2004 dive, yet, into the alleged debtors and their assets and business. However, to the extent that the alleged debtors are maintaining now, after having acknowledged receipt of the loan proceeds from these petitioning creditors without exception, that for some reason there's a discrepancy as to whether they are now legitimate lenders, again, after having taken their loan money and used it, or allegedly used it for the stated purpose of the loan agreements, which is to purchase land for each of the alleged debtors and to horizontally develop the land to the point where it could be sold, that we are entitled to delve into that in our discovery, including depositions of the president, of the treasurer/secretary, which is Ms. Badoya, and of these third-party witnesses who either worked for the debtor, Mr. Lin, who worked for the debtor recently or for one of the entities on behalf of the debtor, and Mr. Bencat, who has done, I believe, financial work for the debtors, and may still do so.

So we want to delve into these questions about where did the loan proceeds go? Once you took the petitioning

creditors' money, alleged debtors, what did you do with it and why do you now dispute that these debts, these loan claims are legitimate? Why are you now saying, after you took $33 million, including $20 million from the petitioning creditors, that there is a dispute -- and acknowledging receipt of those funds by Mr. Barton in writing, that there is now a dispute as to whether these debts are owed? Whether they're contingent or not, whether there's some bona fide dispute, and why it is that it is not in the best interest of the alleged debtors and the petitioning creditors to have a Chapter 7 Trustee look at what it is that happened with these loan proceeds. Because I can tell you, Your Honor, what's going to come out in the evidence is that not all of these entities, the alleged debtors, owned the land they said they were going to purchase.

And I think you've seen some of that in one of the motions for stay relief from one of the lenders. And that we believe that these loan proceeds may not even be with the alleged debtors. We don't even know if they came in properly to the alleged debtors and now they want to say that these petitions are not -- it's their defense, Your Honor -- that these petitions are not in the best interest of the alleged debtors and the creditors, but, you petitioning creditors cannot ask us questions about any of these topics during the depositions of the president of the debtor, Mr. Barton; the

treasurer or secretary, Ms. Badoya; the financial controller or outside person auditor, Mr. Bencat; Mr. Lin, who had communications with a lot of these petitioning creditors, you cannot delve into any of this. All you can ask them about are the topics that we, alleged debtors, raised in our motion to dismiss where we dispute, now, that you are real lenders or creditors. And we don't even think you exist, even though all of those petitioning creditors have provided copies of those passports to Mr. Lin. But you can't ask any questions of these witnesses about these topics. We think that is grossly improper and unfair.

Thank you.

THE COURT: Thank you.

Why don't you address the ability of your approach to be deposed, just as Ms. Lindauer did in her's. She's saying she needs 10 to 12 depositions.

MR. PACKMAN: And we're happy to provide those by video, Your Honor. I do not believe, based on COVID and the restrictions on travel both from China and into the United States, which would require a 14-day quarantine, that we can do these depositions live in the United States. If we could, we would. We think it's a little bit overkill to have 11 or 12 of these petitioning creditors to have to travel here. But if we would, we could -- if we could, we would. We can only produce them now --

THE COURT: Yeah. What is the travel situation in China? I just know enough to be dangerous, just from reading in the paper. Are we still under a travel quarantine from China? I don't know what the status is right now.

MR. PACKMAN: Your Honor, based on what the most current information we have from the U.S. government website, there appears to still be a 14-day quarantine requirement for a Chinese national coming into the United States.

THE COURT: Uh-huh.

MR. PACKMAN: So I do agree with Ms. Lindauer that it's a predicament. It would be very expensive and costly for these petitioning creditors to come here. But I don't disagree with Ms. Lindauer that they have some right to ask them questions and prepare for the trial. I don't disagree with that. I just don't know what else to do right now. I just don't know what else to do.

THE COURT: Okay.

MR. PACKMAN: But we will make them available by video.

THE COURT: All right. Okay.

Mr. Metzger, I see you on my screen. I'm picking out names right now. Why don't you go next.

MR. METZGER: Your Honor, what I would like to

really report to you is on behalf of Mr. Lin, who I represent. He is a young fellow who essentially had the job of interpretation from Chinese, Mandarin Chinese to English in connection with all of this. He really only spoke with, according to him, folks who were located in China, but who had a relationship to Michael Fu. And I don't know whether they worked for him or what. But they communicated on behalf of Michael Fu information.

Mr. Lin, when this originally came up and he was served with a subpoena, he and I talked and he was happy to testify. The next weekend, on Sunday, he spoke with his mother, who is still in China along with others of his family, Mr. Lin being currently a permanent resident of the United States, advised me that he was now quite concerned, because his mother had apparently received certain information -- he did not tell me how -- that indicated that Mr. Lin best testify in a manner favorable to the petitioners, or his family is at risk in China.

THE COURT: Where is Mr. Lin? Is he in Houston?

MR. METZGER: No, Your Honor. He is -- he resides in Frisco.

THE COURT: Frisco, okay.

MR. METZGER: Yes, sir.

THE COURT: All right. And then on Barton's

deposition, the scope that Lindauer described, that's the problem that you all have with his, right? Barton is available for deposition, right?

MR. METZGER: He can be made available for deposition. He also had a scheduling problem with the original date. He had an invitation from another Court to do something else at the same time.

THE COURT: That's a very nice way of describing things, Mr. Metzger, an invitation.

Well, I would -- you and Mr. Packman can find a date, I think, just depending on how we're going to handle this.

Anything else you want to tell me?

MR. METZGER: No, Your Honor. I'm fine with that. And I'm sure we can find a date.

THE COURT: Yeah. Let me ask, before we return -- I'm going to let Lindauer and Packman have a second bite at the apple. But anyone else on the call want to tell me anything about discovery process, that sort of thing? Because, as I said, we're going to recess this hearing for a day or so and then I'm going to come back with some guidance for everyone.

Okay. Ms. Lindauer, hearing none, you get to go second. This will be your last pass, though. Okay?

MS. LINDAUER: Fine, Your Honor.

One document I will call the Court's attention to, it's

on your docket, it's docket 64, the declaration of Tim Barton dated June 15th. That declaration addresses the receipt issue that Mr. Packman has raised. And specifically it says that -- Mr. Barton says that he believes that Mr. Fu, who I know you've heard that name. You'll hear it a lot more, I'm sure, before we're done. That Mr. Fu may have provided some misleading and false information regarding the information provided on the receipts.

So this whole situation right now with the economic situation we're facing is problematic for a lot of reasons, as the Court is gathering. The relationships between the United States and China are not particularly good right now. As well as the COVID-19 situation.

You know, our suggestion, Your Honor, is this case isn't going anywhere real quick. And it may be in everybody's best interest, frankly, just to slide things off a while and see if things get better. I am concerned about taking depositions with people in China. I do think -- I really don't want the State Department coming to my office to talk to me about why we may have broken Chinese law, as well as U.S. law right now. So we've tried to provide you some information on those issues in the briefing that we've done, Your Honor, so you can see what the concerns are. But -- and I hate to be mean to Mr. Packman but, you know, honestly, Chinese investors in the United States face a lot of hurdles.

And one of them right now, unfortunately, is the inability, perhaps, to come to the United States to support their claims.

The problem that we have with their claims, multiple problems, but one are signatures; two, identity of these people; three, how do you swear them in under U.S. law to tell the truth, nothing but the truth, so help you God, when they don't recognize our U.S. laws. So granted you can say, well, you know, maybe that falls on them and maybe their case gets dismissed, but it does create some troubling situations for us in trying to identify these people.

Let me give you a practical problem. So by law, you can transfer $50,000 to the United States, right? That's the limit. And what we have in this situation is we have some of these people that transferred hundreds of thousands of dollars, a few millions of dollars to the United States. And what we discovered in the depositions we have taken is that in many instances, they did that using the identity of other people, because that's the only way they could do it. So while you have a $50,000 limit, you might have to have six or seven people involved in transferring that money to the United States.

Now, as a U.S. company, the flip side is, is when we go to pay it back, we're supposed to pay it back to the account the money came from. And the problem we face there is, if

the money didn't come from the people that signed the loan agreements, it's not their banks that the money came from, then you can see the problem.

The other problem we ran into, and Mr. Fu was very good about describing this for us, is you have IRS issues when you transfer money back, and withholding money, and having proper accounting for those dollars. Again, another huge, big problem. So there are reasons to ask these people some questions about what they did, how they did it, who these people are, and in some instances, some of these people we show no receipts at all, which means that I think what happened was maybe Mr. Fu took their money for a commission.

So, again, when you're -- if this were a typical voluntary case, I'm not sure you would have all of these problems. But with an involuntary case where the fundamental question is, is are these undisputed, non-contingent, liquidated claims that are being asserted to support these filings to put these companies into bankruptcy, we get to, unfortunately, you have to delve into these types of questions. Are these legitimate creditors, or is the person that actually put up the money in China, the actual creditor? And so we have a myriad of those problems.

When we started to dig into questions about signatures, verifications, again, more questions popped up. So counsel went and got an affidavit from -- their paralegal went and

got an affidavit saying, yes, these are wet signatures. The problem with that affidavit is we don't know what the people were shown. Some of the responses are in Chinese.

And what's a little troubling is some of the return email addresses were to Mr. Fu and not to some other person, somebody at Mr. Fu's office. And so the Court knows, Mr. Fu was the Chinese person who raised a lot of this money and then took a several million dollar commission off of raising the money. A lot of the money was funneled through illegally his accounts. And so there's all of those issues. Now, we've deposed him. He was in Houston and we deposed him. I believe he's gone back to China now. But he was here and we were able to get some information from him. But needless to say, I think our biggest issue is trying to depose these people and get some answers.

And we've even toyed with sending them written questions for depositions. Again, you run into all of the same problems, is identifying these people who -- we raised this with Mr. Packman. You know, granted you say, well, I got these emails from these people saying, yes, I gave a wet signature. You know, we don't know who is on the other end of that email. I don't know if that was actually that person or someone else. I mean, so again, you get into all of these very technical issues which if these were voluntary cases, we probably wouldn't be going down this road. But with an

involuntary where you're talking about Chinese nationals putting American companies into bankruptcy, you know, I feel like they have an obligation, if they want to go down -- lest you forget, lest everyone forget, there was state court litigation here. And one of the things we did file with our motion to dismiss was a request to abstain. They may have a better remedy in state court than they have in bankruptcy court. Maybe they don't have to get into all of the unliquidated, non-contingent, non-disputed issues that you run into with bankruptcy. But the problem that we have is because of the requirements for an involuntary -- and an involuntary petition, as the Court knows, is a harsh remedy, putting a company in bankruptcy. So that being said, that's why all of this discovery, at least from our standpoint, becomes very, very important. And like I said, maybe the answer is is that we simply push all of this off until a time when maybe we can better do what we're asking to do.

With regard to our people's discovery and particularly Mr. Barton, Mr. Metzger addressed some of this, is some of those questions we just think are not appropriate at this juncture; whether there's been fraudulent transfers, whether funds were transferred to other companies, where the money went. We're focused on where did the money come from originally. They're wanting to focus on where did the money go. And to me that's not what you do on an involuntary. On

an involuntary you've got to establish there's a reason to put these people in bankruptcy first. Then once you prove that, then you get to the questions of fraudulent transfers, or whatever else might exist out there.

And personally, I don't know. I haven't traced the dollars, because it just doesn't become an issue yet. I don't think it's an issue. I think we have to get through the fundamental requirements of bankruptcy requirements first.

What we had suggested, Your Honor, and I don't think Mr. Packman is in agreement, though, is if we get passed the discovery issues that we're dealing with right now, is looking at maybe bifurcating this case a bit to say, okay, let's deal with these standing issues. Let's deal with who are these people that have put these companies into bankruptcy. Can they sustain motions to dismiss? Now, you've got, you know, what, seven or eight companies here. So maybe you get one, maybe you don't get the other one. Maybe you get two, I don't know. I don't know how ultimately it shakes out. Some of these have more petitioning creditors than others. But at the end of the day, I think we get through the fundamental standing questions first and then we deal with things like, okay, we've met that obligation. Now, are you paying your bills as they come due? Is this in the best interest of the creditors, assuming you are a creditor?

And those types of issues. And those, to me, seem to come second.

And then, Your Honor, you have the whole big issue of if we prevail and have the cases dismissed, what damages are we entitled to receive as the result of the dismissal of the case? So we had suggested, and I still think it's a good position, to maybe bifurcate this thing a little bit and deal with standing. Whether these, in fact, are truly creditors and ge that issue out there, before we go down the road with, you know, other fraudulent transfers or these other types of issues.

So I want to be sure I've hit everything. But I would call the Court's -- there's been several declarations filed by different people on the record. I'm looking at those. It might be worth some time to go back and read some of those. I think the Court would get a flavor. They're not just our's. They filed some, too. But get a flavor for some of the back and forth on some of these issues.

So I will tell you this is a unique case. I don't think I've seen anything like this. I don't know if the Court's seen anything like this. Especially with what we're dealing with right now. But our suggestion, Your Honor, maybe -- and I don't think anybody is prejudiced by this -- is possibly pushing some things off. We can get a little further down the road and hopefully maybe some of these COVID

issues settle down a bit. I think once we get past the election, things may change quite a bit, as to some of these problems that we're dealing with now.

So in any event, those are the issues. I think both of us have put them out there for you, Your Honor. They were the things that we couldn't resolve just working with each other, which is why we brought them to you.

THE COURT: Okay. Thank you.

MS. LINDAUER: Thank you, Your Honor.

THE COURT: Thank you.

Mr. Packman, you get the last word.

MR. PACKMAN: Thank you, Your Honor.

We're kind of confused by the explanation from Ms. Lindauer as to the dispute regarding the petitioning creditors' claims. On the one hand what I heard was that the alleged debtors don't know who to pay back and that there may or may not be tax withholding issues when they go to pay back the money. So to me, that's the quintessential problem here with their defense.

On the one hand what they say is, well, you know, we do owe the money to someone, but we're just not sure we owe it to the petitioning creditors who signed the loan agreements that we accepted, who we sent documents to, or a document that said, we've received your money and presumably we're going to use it for what we told you we were going to use it

for. And, more so, we don't want you to look at our books and records to see how we booked your loan, to see whether we booked it under your name or not. Now, I understand they want to say that when there's other participants in a loan that somehow, according to Ms. Lindauer, that renders the loan agreement invalid. I don't agree with that. I've been involved in many cases where there's a loan agreement and there's a lender, or more than one, and there's other participants who contribute to the loan, but there's one lender that gets paid back. So if it's a matter of who they need to pay back, I think we could deal with that. If it's a matter of whether they want release, global releases when they pay the money back, we can deal with that.

But what I think is going on here is, they're trying to delay this as long as possible, Your Honor, so they don't have to maybe ever pay the money back because they don't want to explain where the money went. And I do agree with Ms. Lindauer that there is some -- some of these issues are for a Chapter 7 Trustee, not for the petitioning creditors or Your Honor to decide. But to suggest that there should be some limitation on discovery to get to the bottom here of how the debtors booked these loans and whether or not they paid back interest payments on some of the early loans, which they did, and how their books and records reflect that, that goes to the heart of these matters and their defenses, as well as

the petitioning creditors' claims that Your Honor, I think, respectfully needs to hear at the time of trial on this matter.

Your Honor, we're going to try and short-circuit this case by filing a summary judgment motion immediately after these depositions. But we would like to take these depositions.

As far as the petitioning creditors' depositions. We will do everything possible to make them available for depositions so they can answer whatever relevant questions Ms. Lindauer has. But as I said, they are just not permitted to travel here at this moment, without being quarantined for at least two weeks. I think that would be unfair to require them to do that.

That's all I have, Your Honor. Thank you.

THE COURT: Thank you.

All right. So I get a sense of both sides. We're going to get together in my chambers -- by the way, we had looked at everything before I came out here. Obviously you know your stuff better than I do, but we had a chance to look at everything. So expect for us either to reconvene or send you something in the next day or so.

Thank you very much. We'll be in recess.

(End of Proceedings.)

C E R T I F I C A T E

I, CINDY SUMNER, do hereby certify that the foregoing constitutes a full, true, and complete transcription of the proceedings as heretofore set forth in the above-captioned and numbered cause in typewriting before me.

CINDY SUMNER, CSR #5832
Expires 10-31-2022
Cindy Sumner, CSR
5001 Vineyard Lane
McKinney, Texas 75070
214 802-7196

# EXHIBIT "C"

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

IN RE: ) BK. NO: 20-31131-HDH
)
WALL007 LLC )
D E B T O R. )

* * * * * * * * * *

TRANSCRIPT OF PROCEEDINGS

* * * * * * * * * *

BE IT REMEMBERED, that on the 19th day of August, 2020, before the HONORABLE HARLIN D. HALE, United States Bankruptcy Judge at Dallas, Texas, the above styled and numbered cause came on for hearing, and the following constitutes the transcript of such proceedings as hereinafter set forth:

P R O C E E D I N G S

THE COURT: Let me take appearances in WALL007 LLC, and then I'll read the ruling into the record.

MR. PACKMAN: Good morning, Your Honor. Stephen Packman for the petitioning creditors.

THE COURT: Welcome back.

MR. PACKMAN: Thank you.

MS. LINDAUER: Your Honor, Joyce Lindauer for the alleged debtors.

THE COURT: Welcome back to you.

MS. LINDAUER: Thank you, Your Honor.

MR. METZGER: Your Honor, Steve Metzger on behalf of Timothy Barton, individually, and Hung Fang Lin.

THE COURT: Welcome back to you.

MR. METZGER: Thank you.

MR. WALJI: Good morning, Your Honor, Khudabuksh Walji on behalf of the Carnegie Development.

THE COURT: Welcome back to you.

MR. WALJI: Thank you, sir.

THE COURT: I guess before I start the ruling -- well, let me go ahead and preface this. This is my oral ruling in WALL007, et al. Case number 20-31131. I was just visiting with my law clerks behind the scenes.

We always struggle with these discovery issues that you have, because Courts aren't 100 percent sure what's going on

in your litigation, and we struggle to figure out what's important and what's not important. And we always try to come up with something that's fair within the rules. And the ruling I'm about to give is going to be disappointing, I think, to both sides. But it is with my intent to be fair, but to also comport with the Federal Rules of Civil Procedure and the Bankruptcy Rules. So with that, let me read this into the record. Just to warn you, it's 2 1/2 single-spaced pages, so it's going to take a little while. Also, there's no need to take copious notes on this. We'll send you -- my law clerk will send you, after the second hearing is over, we'll just send you this transcript. It's the unofficial transcript, but there's going to be some order drafting by you all. So that way you don't have to just write down everything that I say.

Before the Court are a number of discovery motions. During the hearing on August 17, the Court asked the parties to narrow down the issues so that it could hopefully provide a clearer path for this case. The Court will address each discovery dispute by topic, starting with what the Court believes to be the biggest issue so far.

With respect to the process and manner of depositions, the alleged debtors contend that conducting video depositions with the deponents abroad would violate Chinese law and, accordingly, certain petitioning creditors currently noticed

for deposition should be required to sit for depositions in the United States. Along these lines, the alleged debtors maintain there is a serious dispute over the identity of the petitioning creditors and the authenticity of their wet signatures. The alleged debtors argue that requiring in-person depositions would address some of these concerns.

The petitioning creditors did not really respond to alleged debtors' legality argument. Instead, the petitioners claim that the difficulties associated with the COVID-19 crisis should excuse them from traveling to the United States for in-person depositions. During the hearing, counsel for the petitioners did not specifically say there was a travel ban on Chinese nationals entering the United States. Rather, counsel argued that his clients would have to quarantine for 14 days upon entry to the United States and that doing so would be a great inconvenience.

The Court understands the great difficulty travel poses during the current pandemic. However, the Court also believes that litigants who seek the benefit of the United States law must follow its process. And here, a serious concern has been raised that taking video depositions would violate Chinese law. While traveling to the U.S. may be a great inconvenience and difficulty at this time, the Court believes it is necessary in this case to address both the legality issues and the identity concerns raised by the

alleged debtors. Accordingly, the motion to quash at docket number 133 is granted in part to require the petitioning creditors' depositions to be taken in-person, in the United States, at a time and place agreeable to the parties.

Because the willingness of the petitioning creditors to attend in-person depositions will affect several threshold issues, including the ability of the petitioning creditors to carry their evidentiary burdens and the identity concerns raised by the alleged debtors, the Court will require that there is an agreement signed by counsel for the petitioning creditors that the petitioning creditors will appear for live depositions in the United States before any other discovery or motion practice will continue. The depositions do not need to have been completed before other matters may continue, but the agreement I just described must be signed and filed with the Court.

With respect to the content of discovery being conducted at this stage, the Court does not believe the topics should be bifurcated so that only questions about standing are allowed. The Court believes the petitioning creditors have the right to discovery pertaining to all elements of Section 303 of the Bankruptcy Code and the relevant factors under Section 305(a) and 707(a) that were raised by the alleged debtors; for example, questions as to whether the alleged debtors are generally paying their debts

as they become due are appropriate. That said, the petitioners are not entitled to seek written discovery or ask questions in depositions that delve into issues beyond the scope of Sections 303, 305(a), and 707(a). Along those lines, I do not see how the use of the loan proceeds received by the alleged debtors is relevant to these issues unless there is an allegation that their use gave rise to a preference or fraudulent transfer cause of action. Accordingly, the motion to quash at docket number 133 is denied in this respect.

As to the motion to compel certain depositions filed by the petitioning creditors at docket number 129, that is granted in part. There were four individuals discussed in the motion. Counsel for the alleged debtors argued that requiring Ms. Bedoya to sit for a deposition, even a video deposition, would pose an undue risk to her health at this time. The Court will excuse Ms. Bedoya from sitting for a deposition if she is able to provide the petitioning creditors with a note from her doctor stating that doing so, even by video, would be unsafe. If a note is not provided or there are any issues with the content of the note, the petitioning creditors may re-urge their motion.

Counsel did indicate, however, that both Mr. Lin and Mr. Barton are available for depositions. There was a suggestion during the hearing that Mr. Lin's family may have

been threatened, but there was very little detail and no evidence provided. Accordingly, the depositions of Mr. Lin and Mr. Barton must be taken at a time and place agreeable to the parties, with the scope of the depositions as I've just described.

A fourth individual, Mr. Venkat, was also discussed in the motion, but since he is an individual who has not been served with a subpoena, the Court will not order him to appear for a deposition, at this time.

Turning to document requests and interrogatory responses, both the petitioning creditors and the alleged debtors have filed a number of motions to compel.

During the hearing, counsel for the alleged debtors argued that while she has received a large production of documents, she seeks additional document production from the petitioning creditors concerning (1) the underlying transfer of funds to the alleged debtors from the Chinese accounts (2) communications between the petitioning creditors and Mr. Fu. The Court believes this is within the reasonable scope of production and, accordingly, the debtors' motion to compel at docket number 105 is granted in part as to these requests.

In accordance with the Federal Rules of Civil Procedure, and in light of some of the identity concerns that have been raised, the Court believes that the petitioners should sign their answers to interrogatories with wet

signatures as opposed to the signature of their counsel. These signatures, along with the signatures that have already been produced, should further address the identity issue raised by the alleged debtors. Any other relief sought in the alleged debtors' motions to compel at docket number 101 and 105 is denied. I want to be clear that the denial of the remaining relief sought in docket number 101 is based on the requirement of wet signatures for interrogatories and representations from Mr. Packman in paragraph 53 of docket number 140 that the alleged debtors are currently in possession of passports for all petitioning creditors and also that passports for all petitioning creditors can be submitted to the Court for in-camera inspection upon request.

The petitioning creditors have supplemented the discovery requests in their motion to compel at docket number 129. While the petitioners have received some additional documents from the alleged debtors, they seek production of a number of documents, including the alleged debtors' financials, books and records, corporate documents, et cetera. As I just discussed, the Court will not bifurcate the issues as the alleged debtor requests, and many of these document requests fall within the proper scope of discovery at this time. Accordingly, the petitioners' motion to compel is granted as to those additional, outstanding document requests, and to the extent the parties still need additional

guidance on specific requests, even after this guidance, we'll just have to come back and specify which requests are still in dispute.

I might parenthetically say that that's not really encouraged, so you all ought to be able to work some of this out.

With respect to interrogatories, the Court is not entirely clear which interrogatories remain outstanding. But it appears the petitioners still seek answers to interrogatories from requests made in their earlier motion to compel at docket number 92. The Court disagrees that these requests were straightforward and routine and denies the motion to compel as to Interrogatories 7, 8, 9, 10, 11, and 12 as written. They appear quite broad and burdensome. Interrogatory Number 2 should be answered more fully by the alleged debtors if they have not already done so.

My hope is that this ruling provides you all with the guidance for how to move forward from here, and that you will be able to work out another joint discovery plan to get this production in order. But if you need the Court's assistance, please let us know.

If counsel for both sides would upload orders on their pending motions after circulating to each other, I will sign them upon receipt.

Like I said, this was a long ruling with a lot of

subparts to it. We'll go ahead and send it out after this second 9:00 hearing is done. And that should, I think, help you in preparation of your orders.

Thank you very much.

(End of Proceedings.)

C E R T I F I C A T E

I, CINDY SUMNER, do hereby certify that the foregoing constitutes a full, true, and complete transcription of the proceedings as heretofore set forth in the above-captioned and numbered cause in typewriting before me.

_______________________________

CINDY SUMNER, CSR #5832
Expires 10-31-2022
Cindy Sumner, CSR
5001 Vineyard Lane
McKinney, Texas 75070
214 802-7196

# EXHIBIT "D"