UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ZHIZHENG WANG,

Plaintiff,

v.

BRUCE HULL,

Defendant.

---

DECATHLON ALPHA III, L.P.,

Intervenor Plaintiff,

v.

ZHIZHENG WANG.

Intervenor Defendant.

NO. C18-1220RSL

ORDER GRANTING DEFENDANT'S MOTION TO COMPEL AND STAYING CASE

This matter comes before the Court on "Defendant's Motion to Compel the Deposition of Plaintiff Zhizheng Wang." Dkt. # 87. While attempting to schedule plaintiff's video deposition, defense counsel learned that "China does not permit attorneys to take depositions in China for use in foreign courts" and that "taking depositions, whether voluntary or compelled, and obtaining other evidence in China for use in foreign courts may, as a general matter, only be

accomplished through requests to its Central Authority under the Hague Evidence Convention." U.S. Dep't of State Bureau of Consular Affairs China Judicial Assistance Information (2019), https://travel.state.gov/content/travel/en/legal/Judicial-Assistance-Country-Information/China.html (last visited June 19, 2020). The Chinese law on which the State Department advisory is based, Article 277 of the Chinese Civil Law, provides that, except when coordinated in conformity with international treaties to which China is a party, "no foreign authority or individual is allowed to serve process, conduct investigation, or obtain evidence within the borders of People's Republic of China without permission" from the country's Central Authority.

Defendant, concerned that deposing plaintiff at his home in Beijing could expose defendant, his attorneys, and support staff to sanctions under Chinese law, notified plaintiff that the video deposition could not occur as previously contemplated and requested assistance in formulating another plan. Plaintiff refused, arguing that defendant was bound by his prior agreement to depose plaintiff at his home, that plaintiff's testimony has only limited relevance to this case, that defendant's interpretation of Chinese law is in error, that defendant's change of heart is harassment designed to inconvenience plaintiff, and that forcing plaintiff, a 69 year old man, to travel puts him at risk of COVID-19. Having reviewed the memoranda, declarations, and exhibits submitted by the parties, the Court finds as follows:

Defendant's interpretation of Chinese law is reasonable given the language of Article 277, the State Department's advisory, and U.S. case law regarding Article 277. While there is certainly a possibility that the Chinese authorities would construe the law narrowly so that it does not apply to foreign individuals who do not set foot within the borders of the People's

Case 2:18-cv-01220-RSL Document 109 Filed 06/22/20 Page 3 of 4

Republic of China and who have the cooperation of the Chinese citizen being deposed (*see* Dkt. # 92 at 2), the Court will not require defendant to bet on that outcome. *See Ji v. Jling, Inc.*, 2019 WL 1441130, at *2, 4, and 6 (E.D.N.Y. Mar. 31, 2019) (having previously required plaintiff to appear for deposition outside of China, the court struck his video-link trial testimony when it was revealed on cross-examination that he was physically located in China because the proceeding exposed the defense to legal sanctions).

Most of plaintiff's other arguments are likewise rejected. Defendant will not be held to a prior agreement which unknowingly put him, his counsel, the court reporter, and other participating foreigners in legal jeopardy. Nor can refusing to participate in a proceeding which appears to violate Chinese law reasonably be considered harassment, especially where defendant could have insisted that plaintiff appear in person in the jurisdiction where he chose to file this lawsuit but is instead seeking only a location that is indisputably lawful. And, finally, plaintiff has relevant information regarding at least two issues, standing and communications with defendant, making his deposition appropriate.

With regards to the current health crisis caused by the novel coronavirus, defendant is not demanding, and the Court will not require, that plaintiff board a flight for Seattle, Hong Kong, Macau, Seoul, or Taipei immediately. But plaintiff will not be permitted to refuse to be deposed while offering his declarations as evidence when it suits him. The Court recently denied plaintiff's motion for summary judgment, leaving unresolved the standing issue and noting that "[t]his determination is without prejudice to a motion for summary judgment directed at the issue" of standing. Dkt. # 108 at 4. The dispositive motion deadline is July 7, 2020, and defendant will not be required to file his motion until he has a chance to depose plaintiff without

fear of criminal entanglements in China.

For all of the foregoing reasons, defendant's motion to compel plaintiff to appear for deposition at a place where the parties can take his testimony without fear of reprisal by the People's Republic of China - such as Seattle, Hong Kong, Macau, Seoul, or Taipei - and using video conferencing software used commercially by court reporters is GRANTED. This matter is hereby STAYED until the deposition can occur. If the parties are able to reach agreement and conduct the deposition by July 1, 2020, the current case management schedule will be reinstated. The parties shall submit a joint status report upon completion of the deposition.

Dated this 22nd day of June, 2020.

Robert S. Lasnik
United States District Judge

**From:** Brooke Tredwell <international@planetdepos.com>
**Date:** September 14, 2020 at 9:53:04 AM EDT
**To:** "Packman, Stephen" <spackman@archerlaw.com>
**Subject: Re: [EXT MAIL] Depositions in Macau**
**Reply-To:** international@planetdepos.com

Good morning Steve,

Planet Depos is very active in Asia, and has been conducting remote (videoconference) depositions in both Hong Kong and Macau specifically for many years. We have completed hundreds of depositions in Hong Kong and Macau with our highly qualified Asian reporting teams - reporters, videographers, technicians, interpreters, videoconferencing suites and local printing services to name a few resources - many specifically located in Hong Kong.

Due to the difficulties posed by COVID-19 (ie., heightened travel regulations), most, if not all, depositions to Hong Kong and Macau are going forward via mobile videoconference. Our recommended software is Zoom due to its ease of use, high quality video/audio and stable connection.

So while most parties may be remote, we also understand there may still be need to supply a location for the deponent(s) to go to, where they will require a device equipped with webcam and microphone, and ideally a speaker phone. This can be where our local videoconferencing suite and location contacts in Hong Kong and Macau can be of assistance, and help to ensure an overall successful proceeding. We are also happy to work with our resources so that for any in-person services required, that they account for and meet pandemic safety precautions (ie., distancing and sanitizing).

There has been some instability in Hong Kong amid recent political protests; however we are still scheduling depositions locally there. In the wake of the demonstrations there may be decreased reliability and consistency with on-the-ground transportation, delayed or reduced opening times for offices and meeting spaces, temporary airport shutdowns, and potential flight delays. Of course there is the Macau option, and we also cover in nearby Taiwan and South Korea if these matters are of substantial concern.

We look forward to hearing more about your upcoming depositions in either Hong Kong or Macau. Please let us know if you have any further questions.

Kindly,

**"Due to COVID-19 we are offering remote deposition services, including both teleconference and mobile videoconference. To learn more, please click here."**

**Brooke Tredwell** | Planet Depos
International Scheduling Case Manager
Worldwide Court Reporting & Litigation Technology
t 888.433.3767 | f 888.503.3767
International@planetdepos.com | planetdepos.com

**Did we Make It Happen for you today? Please tell us about your experience**

On September 14, 2020, 7:48 AM EDT spackman@archerlaw.com wrote:

**[EXTERNAL]**

Brooke, thanks. Would you please also send me something indicating your companies experience with video depositions in Macau and Hong Kong? It doesn't have to be long

**From:** Brooke Tredwell <international@planetdepos.com>
**Sent:** Friday, September 11, 2020 2:48 PM
**To:** Packman, Stephen <spackman@archerlaw.com>
**Subject:** [EXT MAIL] Depositions in Macau

Hello Steve,

Thank you for reaching out to Planet Depos for your deposition needs to Macau! Per our phone conversation today please see attached a Rate Sheet outlining

the potential costs, please let us know if you have any questions regarding these rates.

Please note the witness(es), or the location that we may provide for you in Macau, will need to supply a computer with a webcam and microphone. An Ethernet cable and speaker phone are also recommended, but per our phone chat, we are happy to look into Macau locations to which the witnesses could report, and possibly receive some level of onsite IT assistance. When you have your dates, we will work with you to ensure the location is sufficient for our needs.

When you are prepared to begin the scheduling process, please provide the following details:

• Full case name and number:
• Dates of depositions:
• How many depositions (and durations) do you anticipate?
• Will all the participating witnesses, in fact, be located in Macau?
• Noted your need for a remote reporter, videographer, and Mandarin interpreter. (A remote videoconference technician will be provided separately).

We look forward to hearing from you soon and working with you!

**Due to COVID-19 we are offering remote deposition services, including both teleconference and mobile videoconference. To learn more, please click **here**.**

**Brooke Tredwell** | Planet Depos
International Scheduling Case Manager
Worldwide Court Reporting & Litigation Technology
t 888.433.3767 | f 888.503.3767
International@planetdepos.com | planetdepos.com

**Did we Make It Happen for you today? Please tell us about your experience**

[illegible] *The information contained in this e-mail transmission and any attachments hereto constitutes confidential and/or privileged information. This information is intended for the sole use of the individual or entity to whom it is addressed. If you are not the intended recipient of this e-mail, you are hereby notified that any disclosure, copying, forwarding, distribution, or the taking of any action in reliance on this information, is strictly prohibited. If you have received this e-mail in error, please immediately notify us by telephone 888.433.3767 or by mail at 451 Hungerford Drive Suite 400, Rockville, MD 20850, to arrange for the return of this e-mail and contents.*

Planet Depos
We Make It Happen™

1100 Connecticut Avenue, NW
Suite 950
Washington DC 20036

**COURT REPORTING, VIDEOGRAPHY, INTERPRETATION, VIDEOCONFERENCING & CONFERENCE ROOM SERVICES RATE SHEET for ARCHER & GREINER, PC**
**MACAU**
**DATES TBD**
**TWO (2) DEPO DAYS**

***** Please note we are unable to hold dates, rates, make reservations or guarantee availability until we receive a signed Retention Agreement for the quoted matter, either from you or from a responsible party at your firm. *****

**COURT REPORTING SERVICES FEES**

| **Delivery** | **Per Page Rate** |
|---|---|
| Regular Delivery - Eight (8) Business Days * | $5.95 USD |
| | |
| Daily Attendance Fee (9a-5p): | $245 per day |

**160 page minimum*

**ADDITIONAL SERVICES**

| | |
|---|---|
| Mandarin Interpreter | $1,400-$2,100 up to 8 hours *(based on availability)* billed at 1.5X after 8 hours. |

**VIDEOGRAPHY**

| | |
|---|---|
| Videographer (9a-5p) - *Includes one set of uploaded MPEG files* | $1,200 USD per day |
| Overtime | $112.50 per half hour |

**CONFERENCE ROOM FEES**

| | |
|---|---|
| Cost Per Day | $1,500-$2,500 USD *(based on availability)* |
| Location | TBD |

**MOBILE VIDEOCONFERENCING SERVICES FEES (REMOTE TECHNICIAN INCLUDED)**

| | |
|---|---|
| Video Stream Setup Fee | $175 (includes first connection) |
| Additional video stream connections | $125 per connection |
| Hourly Rate | $195 per hour (2 hour minimum) |

**CANCELLATION**

| | |
|---|---|
| Court Reporter, Videographer & Videoconferencing | 3-5 business days: 50% of service fees will apply<br>2 or fewer business days: 100% cancellation of service fees will apply |
| Conference Room | *Based on availability* |
| Interpreter | *Based on availability* |

CONFIDENTIAL

# EXHIBIT "E"

Page 1 of 56
D220194030 8/10/2020 9:11 AM PGS 56 Fee: $239.00 Submitter: SIMPLIFILE
Electronically Recorded by Tarrant County Clerk in Official Public Records Mary Louise Nicholson
Mary Louise Nicholson

Unofficial Copy

**SUBSTITUTE TRUSTEE'S DEED AND BILL OF SALE**
(D219077623)

STATE OF TEXAS )
)
COUNTY OF TARRANT )

**RECITALS:**

1. By that certain Deed of Trust (herein "Deed of Trust") dated June 25, 2018, from Somerset-Lostcreek Golf, Ltd., a Texas limited partnership, at times identified Somerset-Lost Creek, Ltd., as Grantor (and at times "Debtor"), conveyed to Timothy Barton, Trustee, for the benefit of WALL010 LLC, a Texas limited liability company, certain real and personal property situated in Tarrant County, Texas, as described therein (collectively, the "Mortgaged Property"), including without limitation that certain real property situated in Tarrant County, Texas and described on Exhibit A attached hereto and made a part hereof for all purposes (the "Property"), to secure the payment of one certain Promissory Note (herein the "Note") therein described in the principal amount of $300,000.00, which Deed of Trust was electronically recorded by Tarrant County Clerk in Official Public Records of Tarrant County, Texas , reference/ clerk's file number D219077623 on April 15, 2019, reference to said Deed of Trust being hereby made for all purposes.

2. Wall010 LLC, as mortgagee, pursuant to the provisions of the Deed of Trust, has designated and appointed the undersigned as Substitute Trustee by that certain Appointment of Substitute Trustee, dated July 14, 2020, to act in the place and stead of the original Trustee.

3. Default has occurred in the payment of the Indebtedness and such default has continued despite notice to Debtor from or on behalf of Wall010 LLC, as the original mortgagee, and an opportunity for Debtor to cure the default. Accordingly, Wall010 LLC, as the original mortgagee, has, because of such default, requested the undersigned, the duly appointed Substitute Trustee under the Deed of Trust, to enforce the trust and sell the Mortgaged Property pursuant to and in accordance with the provisions of the Deed of Trust and the laws of the State of Texas.

4. The undersigned, at the request of the Wall010 LLC, as original mortgagee, did cause (i) to be posted for at least 21 consecutive days prior to the day of sale at the Courthouse door of said Tarrant County, Texas, and (ii) to be filed for at least 21 consecutive days prior to the day of sale with the County Clerk of Tarrant County, Texas, written notice that the Mortgaged Property would be sold pursuant to the Deed of Trust, in public venue to the highest bidder at the area at the County Courthouse designated by the Commissioners Court where sales are to take place, beginning no earlier than 10:00 o'clock a.m., on Tuesday, August 4, 2020, the first Tuesday of August 2020.

5. The undersigned, at the request of Wall010 LLC, as original mortgagee, did cause written notice of the proposed sale to be served by certified mail, return receipt requested, on Debtor and by certified mail, return receipt requested, on every other party obligated to pay the Indebtedness according to the records of Wall010 LLC, as mortgagee, at least 21 days preceding the date of sale, such service having been completed by deposit of the notice enclosed in a prepaid wrapper, properly addressed to each such party at the most recent address of such party as shown by the records of Wall010 LLC, as mortgagee, in a post office or official depository under the care and custody of the United States Postal Service.

6. An affidavit confirming recital numbers 3, 4, and 5 is attached as <u>Exhibit B</u> to this Deed.

7. The Note, Indebtedness and Deed of Trust has been transferred by Wall010 LLC to **LC ALEDO TX, LLC** (aka LC ALEDO, LLC), a Texas limited liability company (hereinafter "Mortgagee") by Assignment of Note and Liens executed by Wall010 LC, as assignor, to Mortgagee dated August 3, 2020, recorded August 4, 2020, at 9:25 a.m., under Instrument D220188044, Official Public Records, Tarrant County, Texas. The Mortgagee, and current holder of the indebtedness and beneficiary of the Deed of Trust has confirmed to me the requests set forth in paragraph 5 here of, and further requested the undersigned to proceed with the subject foreclosure sale of the Mortgaged Property, in accordance with the Deed of Trust.

8. The undersigned on August 4, 2020, commencing at approximately 10:15 o'clock a.m., pursuant to the powers under the Deed of Trust vested in me as Substitute Trustee, did cause the Mortgaged Property to be sold at public venue in the manner required by and as provided in and under the Deed of Trust and by law.

9. The undersigned offered the Property for sale; and in response to that offer, the undersigned sold the Property to **LC ALEDO TX, LLC** (aka LC ALEDO, LLC), a Texas limited liability company ("<u>Grantee</u>"), the best and highest bidder at the sale for the sum of TWO HUNDRED THOUSAND AND NO/100 U. S. DOLLARS ($200,000.00) (the "Bid").

**NOW, THEREFORE**, in consideration of the premises and the payment of the Bid, the receipt of which is hereby acknowledged, I, Randy P. Marx, Substitute Trustee, by virtue of the authority vested in me under the Deed of Trust, have GRANTED, BARGAINED, SOLD, CONVEYED, CONFIRMED and SET OVER and by this Substitute Trustee's Deed and Bill of Sale do hereby GRANT, BARGAIN, SELL, CONVEY, CONFIRM and SET OVER unto Grantee, and its legal representatives, successors and assigns, the Mortgaged Property, subject to those matters of public record, if any, it being expressly understood that I, Randy P. Marx, Substitute Trustee, have made no independent investigation or inquiry concerning the same and do not hereby make any covenant, representation or warranty concerning the same except as hereinafter provided.

Unofficial Copy

**TO HAVE AND TO HOLD** the Mortgaged Property, together with all and singular the rights and appurtenances thereto in anywise belonging, unto Grantee, its legal representatives, successors and assigns forever; and I, Randy P. Marx, Substitute Trustee, do hereby bind the Debtor, its successors and assigns, to WARRANT and FOREVER DEFEND, all and singular, the Mortgaged Property unto Grantee and its legal representatives, successors and assigns, against every person whomsoever lawfully claiming or to claim the same or any part thereof.

This Trustee's Deed covers both real and personal property, any of said personal property which is part of the Mortgaged Property having been sold pursuant to the real property sale to the maximum degree permitted by law, or otherwise pursuant to Section 9.5O1(d) of the Texas Uniform Commercial Code.

The address of the Grantee hereunder is:

2999 Turtle Creek Blvd.
Dallas, Texas 75219

<u>**SIGNATURE(S) ON FOLLOWING PAGE(S)**</u>

Unofficial Copy

Unofficial Copy

**IN WITNESS WHEREOF**, this Substitute Trustee's Deed and Bill of Sale has been executed by Randy P. Marx, Substitute Trustee, in his capacity as such in accordance with and under and pursuant to the provisions, powers and authorities of the Deed of Trust, on this the 5th day of August, 2020.

Randy P. Marx, Substitute Trustee

STATE OF TEXAS )
)
COUNTY OF DALLAS )

Bella D Khusal
My Commission Expires
09/24/2022
ID No. 131734480

This instrument was acknowledged before me on the 5 day of August, 2020 by Randy P. Marx, Substitute Trustee.

Notary Public in and for
the State of Texas

My Commission Expires: 09/24/2022
Printed Name: Bella D Khusal

Exhibit A

Property

(as per the attached)

Unofficial Copy

Unofficial Copy

EXHIBIT "A"

BEING TRACTS 1, 2, 3, 4 & 5 SITUATED IN THE C.E. BURKHAM SURVEY, ABSTRACT NO. 246, THE J. BURLESON SURVEY, ABSTRACT NO. 78 AND THE J.H. BURSEY SURVEY, ABSTRACT NO. 241, TARRANT COUNTY, TEXAS AND BEING PORTIONS OF THE 170.44 ACRE TRACT AS DESCRIBED BY DEED TO LOST CREEK COUNTRY CLUB AND RECORDED IN VOLUME 7142, PAGE 551, COUNTY RECORDS, TARRANT COUNTY, TEXAS AND BEING ALL OF THOSE TRACTS OF LAND DESCRIBED IN EXHIBIT "C" OF THAT CORRECTION DEED TO CLUBCORP GOLF OF TEXAS, L.P., AS RECORDED IN VOLUME 14178, PAGE 455, DEED RECORDS, TARRANT COUNTY, TEXAS, AND BEING PORTIONS OF BLOCKS 12 AND 15 OF LOST CREEK ADDITION, AS RECORDED IN VOLUME 388-123, PAGE 4, PLAT RECORDS, TARRANT COUNTY, TEXAS AND BEING ALL OF LOT A-R-1, BLOCK 11, LOST CREEK ADDITION AS RECORDED IN CABINET A, SLIDE 600, PLAT RECORDS, TARRANT COUNTY, TEXAS AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

TRACT 1:

BEGINNING AT A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET IN THE WEST LINE OF SAID BURKHAM SURVEY, 1480.40 FEET FROM ITS SOUTHWEST CORNER, SAID POINT BEING A WESTERLY SOUTHWEST CORNER OF SAID 170.44 ACRE TRACT;

THENCE N 00 DEGREES 10 MINUTES 15 SECONDS E, 728.77 FEET ALONG THE WEST LINE OF SAID BURKHAM SURVEY AND SAID 170.44 ACRE TRACT TO THE SOUTHWEST CORNER OF LOT 35, BLOCK 3, LOST CREEK ADDITION AS RECORDED IN PLAT VOLUME 388/115, PAGE 97, SAID COUNTY RECORDS;

THENCE ALONG THE SOUTHERLY LINE OF SAID BLOCK 3, LOST CREEK ADDITION, THE FOLLOWING BEARINGS AND DISTANCES:

N 74 DEGREES 25 MINUTES 32 SECONDS E, 207.01 FEET TO A POINT;

N 65 DEGREES 08 MINUTES 00 SECONDS E, 320.06 FEET TO A POINT;

N 56 DEGREES 48 MINUTES 00 SECONDS E, 405.86 FEET TO A POINT;

N 66 DEGREES 37 MINUTES 31 SECONDS E, 100.07 FEET TO THE SOUTHEAST CORNER OF LOT 43, SAID BLOCK 3;

THENCE S 87 DEGREES 01 MINUTES 44 SECONDS E, 50.13 FEET TO AN IRON ROD FOUND;

THENCE N 08 DEGREES 01 MINUTES 55 SECONDS E, 50.00 FEET TO AN IRON ROD FOUND;

THENCE N 82 DEGREES 15 MINUTES 05 SECONDS E, 9.37 FEET TO AN IRON ROD FOUND;

THENCE N 10 DEGREES 55 MINUTES 05 SECONDS E, 29.86 FEET TO AN IRON ROD FOUND;

THENCE N 19 DEGREES 26 MINUTES 05 SECONDS W, 84.02 FEET TO AN IRON ROD FOUND IN THE SOUTHERLY RIGHT-OF-WAY LINE OF BLUE CREEK DRIVE;

THENCE N 85 DEGREES 34 MINUTES 15 SECONDS E, 88.58 FEET ALONG SAID SOUTHERLY RIGHT-OF-WAY LINE TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET IN THE WESTERLY RIGHT-OF-WAY LINE OF LOST CREEK BOULEVARD AS RECORDED IN PLAT VOLUME 388/215, PAGE 86 OF PHASE 2, LOST CREEK ADDITION;

THENCE ALONG THE WESTERLY LINE OF SAID PHASE 2, LOST CREEK ADDITION, THE FOLLOWING BEARINGS AND DISTANCES:

S 00 DEGREES 31 MINUTES 15 SECONDS W, 423.04 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE BEGINNING OF A CURVE TO THE LEFT;

123.20 FEET ALONG THE ARC OF SAID CURVE TO THE LEFT THROUGH A CENTRAL ANGLE OF 14 DEGREES 21 MINUTES 29 SECONDS, A RADIUS OF 492.00 FEET AND A LONG CHORD OF S 06 DEGREES 39 MINUTES 37 SECONDS E, 122.97 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS' SET;

N 90 DEGREES 00 MINUTES 00 SECONDS W, 119.40 FEET TO AN IRON ROD FOUND;

S 60 DEGREES 22 MINUTES 06 SECONDS W, 330.36 FEET TO AN IRON ROD FOUND;

S 61 DEGREES 58 MINUTES 05 SECONDS W, 290.00 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

S 09 DEGREES 29 MINUTES 17 SECONDS W, 130.09 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

S 13 DEGREES 08 MINUTES 53 SECONDS E, 99.98 FEET TO AN IRON ROD FOUND;

S 58 DEGREES 01 MINUTES 05 SECONDS E, 70.64 FEET TO AN IRON ROD FOUND;

S 32 DEGREES 39 MINUTES 05 SECONDS E, 620.74 FEET TO AN IRON ROD FOUND;

S 03 DEGREES 24 MINUTES 57 SECONDS E, 784.56 FEET TO AN IRON ROD FOUND;

S 89 DEGREES 37 MINUTES 25 SECONDS E, 240.00 FEET TO AN IRON ROD FOUND;

N 17 DEGREES 36 MINUTES 13 SECONDS E, 298.11 FEET TO AN IRON ROD FOUND;

N 63 DEGREES 12 MINUTES 13 SECONDS W, 67.41 FEET TO AN IRON ROD FOUND;

N 03 DEGREES 32 MINUTES 28 SECONDS W, 472.49 FEET TO A POINT FROM WHICH AN IRON ROD FOUND BEARS N 71 DEGREES 30 MINUTES 40 SECONDS E, 0.36 FEET;

S 70 DEGREES 15 MINUTES 20 SECONDS E, 302.92 FEET TO AN IRON ROD FOUND;

N 37 DEGREES 46 MINUTES 59 SECONDS E, 611.21 FEET TO AN IRON ROD FOUND IN THE WESTERLY RIGHT-OF-WAY LINE OF LOST CREEK BOULEVARD;

S 44 DEGREES 14 MINUTES 12 SECONDS E, 113.74 FEET ALONG SAID WESTERLY RIGHT-OF-WAY LINE TO AN IRON ROD FOUND;

S 46 DEGREES 21 MINUTES 00 SECONDS W, 115.00 FEET, LEAVING SAID WESTERLY RIGHT-OF-WAY LINE TO AN IRON ROD FOUND;

S 46 DEGREES 25 MINUTES 31 SECONDS E, 284.54 FEET TO AN IRON ROD FOUND;

THENCE S 49 DEGREES 22 MINUTES 20 SECONDS W, 414.35 FEET, LEAVING THE WESTERLY LINE OF SAID PHASE 2, LOST CREEK ADDITION TO AN IRON ROD FOUND AT THE BEGINNING OF A CURVE TO THE LEFT;

THENCE 285.89 FEET ALONG THE ARC OF SAID CURVE TO THE LEFT THROUGH A CENTRAL ANGLE OF 29 DEGREES 32 MINUTES 16 SECONDS, A RADIUS OF 515.77 FEET AND A LONG CHORD OF S 34 DEGREES 36 MINUTES 19 SECONDS W, 282.96 FEET TO AN IRON ROD FOUND;

THENCE S 19 DEGREES 50 MINUTES 12 SECONDS W, 528.98 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE S 41 DEGREES 39 MINUTES 04 SECONDS W, 53.64 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE S 83 DEGREES 30 MINUTES 35 SECONDS W, 81.60 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE N 89 DEGREES 36 MINUTES 29 SECONDS W, 90.00 FEET; TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE S 00 DEGREES 27 MINUTES 44 SECONDS W, 119.28 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE N 89 DEGREES 30 MINUTES 28 SECONDS W, 274.94 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE N 00 DEGREES 11 MINUTES 10 SECONDS E, 119.34 FEET TO AN IRON ROD FOUND;

THENCE N 89 DEGREES 36 MINUTES 29 SECONDS W, 210.00 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE N 00 DEGREES 11 MINUTES 10 SECONDS E, 809.66 FEET TO AN IRON ROD FOUND AT THE BEGINNING OF A NON-TANGENT CURVE TO THE LEFT;

THENCE 298.41 FEET ALONG THE ARC OF SAID CURVE TO THE LEFT THROUGH A CENTRAL ANGLE OF 61 DEGREES 03 MINUTES 50 SECONDS, A RADIUS OF 280.00 FEET AND A LONG CHORD OF N 52 DEGREES 07 MINUTES 56 SECONDS W, 284.49 FEET TO AN IRON ROD FOUND;

THENCE N 00 DEGREES 12 MINUTES 14 SECONDS E, 142.35 FEET TO AN IRON ROD FOUND;

THENCE N 44 DEGREES 49 MINUTES 25 SECONDS W, 99.00 FEET TO AN IRON ROD FOUND;

THENCE N 89 DEGREES 47 MINUTES 35 SECONDS W, 255.13 FEET TO THE POINT OF BEGINNING AND CONTAINING 34.319 ACRES OF LAND, MORE OR LESS.

<u>TRACT 2:</u>

BEGINNING AT AN IRON ROD FOUND AT THE SOUTHEAST CORNER OF PARCEL 7, A 2.6857 ACRE TRACT AS DESCRIBED BY DEED TO INTERWEST SAVINGS ASSOCIATION AS RECORDED IN VOLUME 8167, PAGE 697, SAID COUNTY RECORDS;

THENCE S 00 DEGREES 20 MINUTES 23 SECONDS W, 43.78 FEET TO AN IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE S 34 DEGREES 24 MINUTES 19 SECONDS W, 56.56 FEET TO AN IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE S 13 DEGREES 09 MINUTES 12 SECONDS W, 89.30 FEET TO AN IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE S 03 DEGREES 18 MINUTES 13 SECONDS W, 37.06 FEET TO AN IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE S 02 DEGREES 23 MINUTES 18 SECONDS E, 130.54 FEET TO AN IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE S 12 DEGREES 44 MINUTES 41 SECONDS W, 89.94 FEET TO AN IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE S 09 DEGREES 54 MINUTES 28 SECONDS W, 83.90 FEET TO AN IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE S 00 DEGREES 45 MINUTES 38 SECONDS E, 107.17 FEET TO AN IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE S 89 DEGREES 44 MINUTES 58 SECONDS E, 91.70 FEET TO AN IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE S 06 DEGREES 12 MINUTES 42 SECONDS E, 86.16 FEET TO AN IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE N 89 DEGREES 42 MINUTES 42 SECONDS W, 98.40 FEET TO AN IRON ROD FOUND, THE SOUTHEAST

Unofficial Copy

CORNER OF LOT 3, BLOCK 25, SAID PHASE II LOST CREEK ADDITION;

THENCE ALONG THE SOUTHERLY LINE AND THEN THE EASTERLY LINE OF SAID PHASE II, LOST CREEK ADDITION, ALSO THE EASTERLY RIGHT-OF-WAY LINE OF LOST CREEK BOULEVARD, THE FOLLOWING BEARINGS AND DISTANCES:

N 00 DEGREES 21 MINUTES 50 SECONDS E, 251.94 FEET TO AN IRON ROD FOUND;

N 89 DEGREES 42 MINUTES 42 SECONDS W, 170.02 FEET TO AN IRON ROD FOUND;

S 00 DEGREES 21 MINUTES 50 SECONDS W, 136.05 FEET TO AN IRON ROD FOUND;

N 89 DEGREES 38 MINUTES 50 SECONDS W, 1000.26 FEET TO A SPIKE IN CONCRETE FOUND;

S 60 DEGREES 20 MINUTES 59 SECONDS W, 424.92 FEET TO AN IRON ROD FOUND;

S 64 DEGREES 51 MINUTES 06 SECONDS W, 99.98 FEET TO AN IRON ROD FOUND;

S 43 DEGREES 30 MINUTES 04 SECONDS W, 84.50 FEET TO AN IRON ROD FOUND IN THE EASTERLY RIGHT-OF-WAY LINE OF LOST CREEK BOULEVARD, THE BEGINNING OF A NON-TANGENT CURVE TO THE LEFT;

325.50 FEET ALONG THE ARC OF SAID CURVE TO THE LEFT THROUGH A CENTRAL ANGLE OF 19 DEGREES 37 MINUTES 53 SECONDS, A RADIUS OF 950.00 FEET AND A LONG CHORD OF N 56 DEGREES 14 MINUTES 32 SECONDS W, 323.91 FEET TO AN IRON ROD FOUND;

N 66 DEGREES 03 MINUTES 26 SECONDS W, 31.43 FEET TO AN IRON ROD FOUND AT THE BEGINNING OF A CURVE TO THE RIGHT;

337.42 FEET ALONG THE ARC OF SAID CURVE TO THE RIGHT THROUGH A CENTRAL ANGLE OF 21 DEGREES 49 MINUTES 14 SECONDS, A RADIUS OF 886.00 FEET AND A LONG CHORD OF N 55 DEGREES 08 MINUTES 49 SECONDS W, 335.39 FEET TO AN IRON ROD FOUND;

N 44 DEGREES 14 MINUTES 12 SECONDS W, 249.71 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

N 53 DEGREES 12 MINUTES 36 SECONDS W, 468.06 FEET TO AN IRON ROD FOUND, THE BEGINNING OF A CURVE TO THE RIGHT;

401.37 FEET ALONG THE ARC OF SAID CURVE TO THE RIGHT THROUGH A CENTRAL ANGLE OF 53 DEGREES 43 MINUTES 51 SECONDS, A RADIUS OF 428.00 FEET AND A LONG CHORD OF N 26 DEGREES 20 MINUTES 41 SECONDS W, 386.82 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS SET;

N 00 DEGREES 31 MINUTES 15 SECONDS E, 388.17 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE N 84 DEGREES 08 MINUTES 29 SECONDS E, 45.66 FEET, LEAVING THE EASTERLY LINE OF SAID PHASE II, LOST CREEK ADDITION AND ALSO THE EASTERLY RIGHT-OF-WAY LINE OF SAID LOST CREEK

BOULEVARD, TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE BEGINNING OF A NON-TANGENT CURVE TO THE RIGHT, SAID POINT BEING IN THE WESTERLY LINE OF LOT A-R-1 BLOCK 1, LOST CREEK ADDITION AS RECORDED IN PLAT CABINET A, SLIDE 600, SAID COUNTY RECORDS;

THENCE 24.99 FEET ALONG THE ARC OF SAID CURVE TO THE RIGHT THROUGH A CENTRAL ANGLE OF 03 DEGREES 18 MINUTES 52 SECONDS, A RADIUS OF 432.06 FEET AND A LONG CHORD OF N 24 DEGREES 12 MINUTES 33 SECONDS W, 24.99 FEET TO A POINT IN THE SOUTHERLY RIGHT-OF-WAY LINE OF BLUE CREEK DRIVE TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE BEGINNING OF A NON-TANGENT CURVE TO THE RIGHT;

THENCE ALONG THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID BLUE CREEK DRIVE, THE FOLLOWING BEARINGS AND DISTANCES:

254.07 FEET ALONG THE ARC OF SAID CURVE TO THE RIGHT THROUGH A CENTRAL ANGLE OF 35 DEGREES 30 MINUTES 01 SECONDS, A RADIUS OF 410.05 FEET AND A LONG CHORD OF S 76 DEGREES 40 MINUTES 46 SECONDS E, 250.02 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

S 58 DEGREES 55 MINUTES 45 SECONDS E, 143.74 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE BEGINNING OF A CURVE TO THE LEFT;

101.38 FEET ALONG THE ARC OF SAID CURVE TO THE LEFT THROUGH A CENTRAL ANGLE OF 18 DEGREES 49 MINUTES 29 SECONDS, A RADIUS OF 308.56 FEET AND A LONG CHORD OF S 68 DEGREES 20 MINUTES 30 SECONDS E, 100.92 FEET, TO AN IRON ROD FOUND, THE NORTHWESTERLY CORNER OF LOT 1-R-1, AS RECORDED IN PLAT CABINET A, SLIDE 600;

THENCE S 08 DEGREES 25 MINUTES 54 SECONDS E, 168.77 FEET ALONG THE WESTERLY LINE OF SAID LOT 1-R-1, TO AN IRON ROD FOUND;

THENCE S 24 DEGREES 54 MINUTES 58 SECONDS E, 72.80 FEET ALONG THE SOUTHERLY LINE OF SAID LOT 1-R-1;

THENCE S 65 DEGREES 05 MINUTES 02 SECONDS E, 72.80 FEET ALONG THE SOUTHERLY LINE OF SAID LOT 1-R-1;

THENCE N 40 DEGREES 53 MINUTES 40 SECONDS E, 19.50 FEET ALONG THE SOUTHERLY LINE OF SAID LOT 1- R-1 TO THE SOUTHWEST CORNER OF LOT 2R, BLOCK 11, LOST CREEK ADDITION, AS RECORDED IN PLAT VOLUME 388/122, PAGE 28 OF SAID COUNTY RECORDS;

THENCE ALONG THE SOUTHERLY LINE AND THE EASTERLY LINE OF SAID BLOCK 11, LOST CREEK ADDITION AS RECORDED IN PLAT VOLUME 388/122, PAGE 28 AND 388/115, PAGE 97, THE FOLLOWING BEARINGS AND DISTANCES:

N 73 DEGREES 40 MINUTES 48 SECONDS E, 104.40 FEET TO A POINT;

S 67 DEGREES 49 MINUTES 10 SECONDS E, 107.70 FEET TO A POINT;

Unofficial Copy

Unofficial Copy

S 72 DEGREES 55 MINUTES 18 SECONDS E, 104.40 FEET TO A POINT;

N 80 DEGREES 10 MINUTES 31 SECONDS E, 101.61 FEET TO A POINT;

S 80 DEGREES 31 MINUTES 50 SECONDS E, 101.27 FEET TO A POINT;

S 74 DEGREES 59 MINUTES 29 SECONDS E, 413.37 FEET TO A POINT;

N 79 DEGREES 04 MINUTES 09 SECONDS E, 101.96 FEET TO A POINT;

N 68 DEGREES 39 MINUTES 52 SECONDS E, 256.60 FEET TO A POINT;

N 76 DEGREES 06 MINUTES 52 SECONDS E, 372.52 FEET TO A POINT;

N 00 DEGREES 25 MINUTES 00 SECONDS E, 65.00 FEET TO THE NORTHEAST CORNER OF LOT 13, SAID BLOCK 11, LOST CREEK ADDITION IN THE NORTH LINE OF SAID BURSEY SURVEY AND THE SOUTH LINE OF THE S. PETITT SURVEY, ABSTRACT NO. 1234;

THENCE S 89 DEGREES 35 MINUTES 00 SECONDS E, 650.50 FEET TO A POINT;

THENCE S 00 DEGREES 21 MINUTES 37 SECONDS W, 50.00 FEET TO THE BEGINNING OF A NON-TANGENT CURVE TO THE LEFT;

THENCE 86.54 FEET ALONG THE ARC OF SAID CURVE TO THE LEFT THROUGH A CENTRAL ANGLE OF 99 DEGREES 10 MINUTES 32 SECONDS, A RADIUS OF 50.00 FEET AND A LONG CHORD OF S 46 DEGREES 43 MINUTES 16 SECONDS W, 75.14 FEET;

THENCE S 74 DEGREES 27 MINUTES 23 SECONDS W, 229.87 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE S 87 DEGREES 32 MINUTES 37 SECONDS E, 367.15 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED CARTER & BURGESS SET;

THENCE S 74 DEGREES 52 MINUTES 15 SECONDS E, 217.92 FEET TO THE POINT OF BEGINNING AND CONTAINING 63.606 ACRES OF LAND, OF WHICH 1.228 ACRES ARE WITHIN WHISPERING CREEK STREET, 8.155 ACRES SAVE AND EXCEPT TRACT 1, 2.196 ACRES SAVE AND EXCEPT TRACT VI, LEAVING A NET AREA OF 52.027 ACRES OF LAND, MORE OR LESS.

<u>TRACT 3:</u>

BEGINNING AT AN IRON ROD FOUND AT THE SOUTHWEST CORNER OF LOT 3, BLOCK 4, LOST CREEK ADDITION AS RECORDED IN PLAT VOLUME 368/115, PAGE 97, SAID COUNTY RECORDS;

THENCE N 89 DEGREES 34 MINUTES 00 SECONDS E, 341.68 FEET ALONG THE SOUTH LINE OF SAID BLOCK 4 TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET IN THE WESTERLY RIGHTOF- WAY LINE OF LOST CREEK BOULEVARD;

THENCE S 15 DEGREES 26 MINUTES 00 SECONDS E, 100. 00 FEET ALONG SAID WESTERLY RIGHT-OF -WAY LINE TO AN IRON ROD FOUND, THE NORTHEAST CORNER OF LOT 48, SAID BLOCK 4, LOST CREEK ADDITION;

THENCE S 74 DEGREES 34 MINUTES 00 SECONDS W. 110.00 FEET ALONG THE NORTH LINE OF SAID LOT 48 TO AN IRON ROD FOUND AT ITS NORTHWEST CORNER;

THENCE SOUTHERLY ALONG THE WEST LINE OF SAID BLOCK 4, THE FOLLOWING BEARINGS AND DISTANCES:

S 15 DEGREES 26 MINUTES 00 SECONDS E, 217.74 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE BEGINNING OF A CURVE TO THE RIGHT;

220.85 FEET ALONG THE ARC OF SAID CURVE THROUGH A CENTRAL ANGLE OF 30 DEGREES 00 MINUTES 00 SECONDS , A RADIUS OF 421.60 FEET AND A LONG CHORD OF S 00 DEGREES 26 MINUTES 00 SECONDS E, 218.34 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

S 14 DEGREES 34 MINUTES 00 SECONDS W, 41.69 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE BEGINNING OF A CURVE TO THE LEFT;

332.24 FEET ALONG THE ARC OF SAID CURVE TO THE LEFT THROUGH A CENTRAL ANGLE OF 13 DEGREES 59 MINUTES 49 SECONDS, A RADIUS OF 1360.02 FEET AND A LONG CHORD OF S 07 DEGREES 34 MINUTES 06 SECONDS W, 331.42 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

S 00 DEGREES 34 MINUTES 11 SECONDS W, 1186.90 FEET TO AN IRON ROD FOUND, THE SOUTHWEST CORNER OF LOT 29, SAID BLOCK 4;

THENCE S 89 DEGREES 25 MINUTES 49 SECONDS E, 110.00 FEET TO AN IRON ROD FOUND AT THE SOUTHEAST CORNER OF SAID LOT 29 IN THE WESTERLY RIGHT-OF-WAY LINE OF LOST CREEK BOULEVARD;

THENCE S 00 DEGREES 34 MINUTES 11 SECONDS W, 127.30 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET IN THE NORTHERLY RIGHT-OF-WAY LINE OF BLUE CREEK DRIVE;

THENCE S 89 DEGREES 34 MINUTES 15 SECONDS W, 158.19 FEET, ALONG SAID NORTHERLY RIGHT-OF-WAY LINE TO AN IRON ROD FOUND, THE BEGINNING OF A CURVE TO THE LEFT;

THENCE 20.90 FEET ALONG THE ARC OF SAID CURVE TO THE LEFT THROUGH A CENTRAL ANGLE OF 01 DEGREES 55 MINUTES 28 SECONDS, A RADIUS OF 622.58 FEET AND A LONG CHORD OF S 84 DEGREES 36 MINUTES 33 SECONDS W, 20.90 FEET TO THE SOUTHEAST CORNER OF LOT 28, SAID BLOCK 4 FROM WHICH AN IRON ROD FOUND BEARS N 74 DEGREES 21 MINUTES 22 SECONDS W, 0.95 FEET;

THENCE N 04 DEGREES 25 MINUTES 45 SECONDS W, 110.97 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE NORTHEAST CORNER OF SAID LOT 28, BLOCK 4;

THENCE S 85 DEGREES 34 MINUTES 15 SECONDS W, 200.00 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE NORTHWEST CORNER OF LOT 27 AND THE SOUTHEAST CORNER OF LOT 25, BLOCK 4;

Unofficial Copy

THENCE N 00 DEGREES 34 MINUTES 54 SECONDS E, 2154.51 FEET ALONG THE EAST LINE OF SAID BLOCK 4 TO THE POINT OF BEGINNING, AND CONTAINING 14.677 ACRES OF LAND, SAVE AND EXCEPT TRACT II, 0.333 ACRES DEEDED TO MAX H. EUBANK AND BILLY JOE SMITH IN VOLUME 9111, PAGE 1039, SAID COUNTY RECORDS, AND SAVE AND EXCEPT TRACT V, (LOT 49R) 0.274 ACRES, LEAVING A NET AREA OF 14.270 ACRES OF LAND, MORE OR LESS.

TRACT 4:

BEGINNING AT A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET THE SOUTHWEST CORNER OF LOT 1, BLOCK 2, LOST CREEK ADDITION AS RECORDED IN PLAT VOLUME 388/115,PAGE 97, SAID COUNTY RECORDS, SAID POINT BEING IN THE EASTERLY RIGHT-OF-WAY LINE OF LOST CREEK BOULEVARD;

THENCE N 69 DEGREES 34 MINUTES 00 SECONDS E, 356.41 FEET ALONG THE SOUTH LINE OF SAID BLOCK 2 TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE SOUTHEAST CORNER OF LOT 4;

THENCE N 39 DEGREES 34 MINUTES 00 SECONDS E, 48.69 FEET TO AN IRON ROD FOUND;

THENCE S 50 DEGREES 26 MINUTES 00 SECONDS E, 45.00 FEET TO AN IRON ROD FOUND;

THENCE N 39 DEGREES 34 MINUTES 00 SECONDS E, 150.00 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE N 50 DEGREES 26 MINUTES 00 SECONDS W, 45.00 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET IN THE EASTERLY LINE OF LOT 5, BLOCK 1;

THENCE N 39 DEGREES 34 MINUTES 00 SECONDS E, 168.53 FEET ALONG THE EAST LINE OF SAID LOT 5, BLOCK 1, TO THE NORTHEAST CORNER OF SAME LOT FROM WHICH AN IRON ROD FOUND BEARS S 66 DEGREES 42 MINUTES 37 SECONDS E, 0.49 FEET;

THENCE N 89 DEGREES 34 MINUTES 00 SECONDS E, 906.09 FEET TO AN IRON ROD FOUND IN THE EAST LINE OF SAID 170.44 ACRE TRACT;

THENCE S 00 DEGREES 41 MINUTES 00 SECONDS W, 130.73 FEET ALONG THE EAST LINE OF SAID 170.44 ACRE TRACT TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE NORTHEAST CORNER OF LOT 25, BLOCK 8, LOST CREEK ADDITION AS RECORDED IN PLAT VOLUME 388/122, PAGE 28, SAID COUNTY RECORDS;

THENCE S 84 DEGREES 33 MINUTES 12 SECONDS W, 280.98 FEET ALONG THE NORTH LINE OF LOTS 25 AND 26, SAID BLOCK 8 TO AN IRON ROD FOUND, THE NORTHWEST CORNER OF SAID LOT 26;

THENCE S 00 DEGREES 54 MINUTES 39 SECONDS W, 120.00 FEET TO AN IRON ROD FOUND, THE SOUTHWEST CORNER OF SAID LOT 26, BLOCK 8;

THENCE S 89 DEGREES 19 MINUTES 00 SECONDS E, 59.82 FEET ALONG THE SOUTH LINE OF SAID LOT 26, BLOCK 8 TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE S 00 DEGREES 41 MINUTES 00 SECONDS W, 45.00 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET IN THE NORTH LINE OF LOT 21, BLOCK 7, LOST CREEK ADDITION AS RECORDED IN PLAT VOLUME 388/115, PAGE 97, SAID COUNTY RECORDS;

THENCE N 89 DEGREES 19 MINUTES 00 SECONDS W, 60.00 FEET TO AN IRON ROD FOUND, THE NORTHWEST CORNER OF SAID LOT 21;

THENCE ALONG THE WEST LINE AND THEN THE NORTH LINE OF SAID BLOCK 7, THE FOLLOWING BEARINGS AND DISTANCES:

S 00 DEGREES 53 MINUTES 67 SECONDS W, 1280.09 FEET TO AN IRON ROD FOUND, THE NORTHEAST CORNER OF LOT 8, SAID BLOCK 7;

S 79 DEGREES 24 MINUTES 57 SECONDS W, 75.94 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

N 81 DEGREES 21 MINUTES 00 SECONDS W, 234.58 FEET TO AN IRON ROD FOUND, THE BEGINNING OF A CURVE TO THE RIGHT;

495.14 FEET ALONG THE ARC OF SAID CURVE TO THE RIGHT THROUGH A CENTRAL ANGLE OF 49 DEGREES 58 MINUTES 00 SECONDS, A RADIUS OF 567.77 FEET AND A LONG CHORD OF N 56 DEGREES 22 MINUTES 00 SECONDS W, 479.60 FEET TO AN IRON ROD FOUND, THE NORTHERLY CORNER OF LOT 1, SAID BLOCK 7;

S 58 DEGREES 37 MINUTES 00 SECONDS W, 110.00 FEET TO AN IRON ROD FOUND, THE WESTERLY CORNER OF SAID LOT 1, BLOCK 7, IN THE NORTHERLY RIGHT-OF-WAY LINE OF BEN CREEK COURT;

THENCE N 31 DEGREES 23 MINUTES 00 SECONDS W, 187.54 FEET ALONG SAID NORTHERLY RIGHT-OF-WAY LINE TO THE BEGINNING OF A CURVE TO THE LEFT;

THENCE 299.32 FEET ALONG THE ARC OF SAID CURVE TO THE LEFT AND CONTINUING ALONG SAID NORTHERLY RIGHT-OF-WAY LINE THROUGH A CENTRAL ANGLE OF 58 DEGREES 02 MINUTES 45 SECONDS, A RADIUS OF 295.45 FEET AND A LONG CHORD OF N 60 DEGREES 24 MINUTES 23 SECONDS W, 286.68 FEET TO AN IRON ROD FOUND;

THENCE N 89 DEGREES 25 MINUTES 45 SECONDS W, 3.03 FEET CONTINUING ALONG SAID NORTHERLY RIGHT-OF-WAY LINE TO AN IRON ROD FOUND IN THE EASTERLY RIGHT-OF-WAY LINE OF LOST CREEK BOULEVARD, THE BEGINNING OF A NON-TANGENT CURVE TO THE RIGHT;

THENCE 146.16 FEET ALONG THE ARC OF SAID CURVE TO THE RIGHT AND ALONG THE EASTERLY RIGHT-OFWAY LINE OF LOST CREEK BOULEVARD THROUGH A CENTRAL ANGLE OF 07 DEGREES 00 MINUTES 49 SECONDS, A RADIUS OF 1194.02 FEET AND A LONG CHORD OF N 11 DEGREES 03 MINUTES 35 SECONDS E, 146.07 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE N 14 DEGREES 34 MINUTES 00 SECONDS E, 4.57 FEET ALONG SAID EASTERLY RIGHT-OF-WAY LINE

Unofficial Copy

TO AN IRON ROD FOUND, THE SOUTHWEST CORNER OF LOT 18, BLOCK 5 OF SAID LOST CREEK ADDITION;

THENCE ALONG THE OUTSIDE BOUNDARY LINE OF SAID BLOCK 5, THE FOLLOWING BEARINGS AND DISTANCES:

S 87 DEGREES 26 MINUTES 00 SECONDS E, 30.04 FEET TO AN IRON ROD FOUND AT THE BEGINNING OF A CURVE TO THE RIGHT; 27.02 FEET ALONG THE ARC OF SAID CURVE TO THE RIGHT THROUGH A CENTRAL ANGLE OF 30 DEGREES 00 MINUTES 00 SECONDS, A RADIUS OF 51.60 FEET AND A LONG CHORD OF S 72 DEGREES 26 MINUTES 00 SECONDS E, 26.71 FEET TO AN IRON ROD FOUND;

S 57 DEGREES 26 MINUTES 00 SECONDS E, 142.00 FEET TO AN IRON ROD FOUND, THE BEGINNING OF A CURVE TO THE LEFT;
130.20 FEET ALONG THE ARC OF SAID CURVE TO THE LEFT THROUGH A CENTRAL ANGLE OF 13 DEGREES 00 MINUTES 00 SECONDS, A RADIUS OF 573.84 FEET AND A LONG CHORD OF S 63 DEGREES 56 MINUTES 00 SECONDS E, 129.92 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

S 70 DEGREES 26 MINUTES 00 SECONDS E, 306.51 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE BEGINNING OF A CURVE TO THE LEFT; 429.58 FEET ALONG THE ARC OF SAID CURVE TO THE LEFT THROUGH A CENTRAL ANGLE OF 116 DEGREES 00 MINUTES 00 SECONDS, A RADIUS OF 212.18 FEET AND A LONG CHORD OF N 51 DEGREES 34 MINUTES 00 SECONDS E, 359.86 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

N 06 DEGREES 26 MINUTES 00 SECONDS W, 249.50 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE BEGINNING OF A CURVE TO THE LEFT; 494.00 FEET ALONG THE ARC OF SAID CURVE TO THE LEFT THROUGH A CENTRAL ANGLE OF 122 DEGREES 00 MINUTES 00 SECONDS, A RADIUS OF 232.00 FEET AND A LONG CHORD OF N 67 DEGREES 26 MINUTES 00 SECONDS W, 405.82 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

S 51 DEGREES 34 MINUTES 00 SECONDS W, 227.47 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE BEGINNING OF A CURVE TO THE LEFT; 172.76 FEET ALONG THE ARC OF SAID CURVE TO THE LEFT THROUGH A CENTRAL ANGLE OF 32 DEGREES 00 MINUTES 00 SECONDS, A RADIUS OF 309.37 FEET AND A LONG CHORD OF S 35 DEGREES 34 MINUTES 00 SECONDS W, 170.55 FEET TO AN IRON ROD FOUND;

S 19 DEGREES 34 MINUTES 00 SECONDS W, 2.00 FEET TO AN IRON ROD FOUND AT THE WESTERLY CORNER OF LOT 1, SAID BLOCK 5 IN THE NORTHERLY RIGHT-OF-WAY LINE OF PINE CREEK COURT;

THENCE N 57 DEGREES 26 MINUTES 00 SECONDS W, 47.66 FEET ALONG SAID NORTHERLY RIGHT-OF-WAY LINE OF PINE CREEK COURT TO AN IRON ROD FOUND, THE BEGINNING OF A CURVE TO THE LEFT;

THENCE 110.79 FEET ALONG THE ARC OF SAID CURVE TO THE LEFT AND ALONG SAID NORTHERLY RIGHT-OFWAY LINE THROUGH A CENTRAL ANGLE OF 30 DEGREES 00 MINUTES 00 SECONDS, A RADIUS OF 211.60 FEET AND A LONG CHORD OF N 72 DEGREES 26 MINUTES 00 SECONDS W, 109.53 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE N 87 DEGREES 26 MINUTES 00 SECONDS W, 9.52 FEET ALONG SAID NORTHERLY RIGHT-OF-WAY LIKE TO AN IRON ROD FOUND AT THE EASTERLY RIGHT-OF-WAY LINE OF LOST CREEK BOULEVARD, THE BEGINNING OF A NON-TANGENT CURVE TO THE LEFT;

THENCE 183.19 FEET ALONG THE ARC OF SAID CURVE TO THE LEFT AND ALONG SAID EASTERLY RIGHT-OFWAY LINE OF LOST CREEK BOULEVARD THROUGH A CENTRAL ANGLE OF 17 DEGREES 51 MINUTES 27 SECONDS, A RADIUS OF 587.80 FEET AND A LONG CHORD OF N 06 DEGREES 30 MINUTES 18 SECONDS W, 182.45 FEET TO AN IRON ROD FOUND;

THENCE N 15 DEGREES 26 MINUTES 00 SECONDS W, 302.73 FEET CONTINUING ALONG SAID EASTERLY RIGHT-OF-WAY LINE TO THE POINT OF BEGINNING AND CONTAINING 26.256 ACRES OF LAND, SAVE AND EXCEPT TRACT III 0.487 ACRES DEEDED TO MAX H. EUBANK AND BILLY JOE SMITH IN VOLUME 9111, PAGE 1029, SAID COUNTY RECORDS, LEAVING A NET AREA OF 25.769 ACRES OF LAND, MORE OR LESS.

<u>TRACT 5:</u>

BEGINNING AT AN IRON ROD FOUND AT THE NORTHWEST CORNER OF LOT 14, BLOCK 9, LOST CREEK ADDITION AS RECORDED IN PLAT VOLUME 388/122, PAGE 28, SAID COUNTY RECORDS, SAID POINT BEING IN THE EASTERLY RIGHT-OF-WAY LINE OF LOST CREEK BOULEVARD;

THENCE N 00 DEGREES 34 MINUTES 11 SECONDS E. 682.81 FEET ALONG SAID EASTERLY RIGHT-OF-WAY LINE TO AN IRON ROD FOUND, THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE 95.27 FEET ALONG THE ARC OF SAID CURVE TO THE RIGHT AND ALONG SAID EASTERLY RIGHT-OFWAY LINE THROUGH A CENTRAL ANGLE OF 04 DEGREES 34 MINUTES 17 SECONDS, A RADIUS OF 1194.02 FEET AND A LONG CHORD OF N 02 DEGREES 51 MINUTES 20 SECONDS E, 95.24 FEET TO AN IRON ROD FOUND IN THE SOUTHERLY RIGHT-OF-WAY LINE OF BEN CREEK COURT;

THENCE S 89 DEGREES 25 MINUTES 45 SECONDS E, 8.09 FEET ALONG THE SOUTHERLY RIGHT-OF-WAY LINE OF BEN CREEK COURT TO AN IRON ROD FOUND AT THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE 248.66 FEET ALONG THE ARC OF SAID CURVE TO THE RIGHT AND ALONG SAID SOUTHERLY RIGHTOF- WAY FINE THROUGH A CENTRAL ANGLE OF 58 DEGREES 02 MINUTES 45 SECONDS, A RADIUS OF 245.45 FEET AND A LONG CHORD OF S 60 DEGREES 24 MINUTES 23 SECONDS E, 238.17 FEET TO AN IRON ROD FOUND;

THENCE S 31 DEGREES 23 MINUTES 00 SECONDS E, 187.54 FEET CONTINUING ALONG SAID SOUTHERLY RIGHT-OF-WAY LINE TO AN IRON ROD FOUND, THE BEGINNING OF A CURVE TO THE LEFT;

THENCE 13.49 FEET ALONG THE ARC OF SAID CURVE TO THE LEFT AND CONTINUING ALONG SAID SOUTHERLY RIGHT-OF-WAY LINE THROUGH A CENTRAL ANGLE OF 01 DEGREE 03 MINUTES 43 SECONDS, A RADIUS OF 727.77 FEET AND A LONG CHORD OF S 31 DEGREES 54 MINUTES 52 SECONDS E, 13.49 FEET TO AN IRON ROD FOUND, THE NORTHERLY CORNER OF LOT 1-R, BLOCK 8, LOST CREEK ADDITION AS RECORDED IN PLAT VOLUME 388/122, PAGE 97, SAID COUNTY RECORDS;

THENCE S 19 DEGREES 17 MINUTES 00 SECONDS W. 134.80 FEET TO THE WESTERLY CORNER OF SAID LOT 1- R, BLOCK 8, THE BEGINNING OF A NON-TANGENT CURVE TO THE LEFT;

THENCE 831.17 FEET ALONG THE ARC OF SAID CURVE TO THE LEFT AND ALONG THE SOUTHERLY LINE OF SAID BLOCK 8, THROUGH A CENTRAL ANGLE OF 43 DEGREES 09 MINUTES 58 SECONDS, A RADIUS OF 837.77 FEET AND A LONG CHORD OF S 59 DEGREES 44 MINUTES 53 SECONDS E, 818.35 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE S 81 DEGREES 21 MINUTES 00 SECONDS E, 311.52 FEET CONTINUING ALONG THE SOUTHERLY LINE OF SAID BLOCK 8 TO AN IRON ROD FOUND;

THENCE S 86 DEGREES 16 MINUTES 00 SECONDS E, 321.23 FEET CONTINUING ALONG THE SOUTHERLY LINE OF SAD BLOCK 6 TO AN IRON ROD FOUND, THE SOUTHEAST CORNER OF LOT 10, IN THE EASTERLY LINE OF SAID 170.44 ACRE TRACT;

THENCE S 00 DEGREES 41 MINUTES 00 SECONDS W, 786.54 FEET ALONG SAID EASTERLY LINE TO AN IRON ROD FOUND, THE NORTHEAST CORNER OF LOT 13, BLOCK 10, LOST CREEK ADDITION AS RECORDED IN PLAT VOLUME 388/122, PAGE 28, SAID COUNTY RECORDS;

THENCE N 89 DEGREES 19 MINUTES 00 SECONDS W, 85.95 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE NORTHWEST CORNER OF SAID LOT 13, BLOCK 10;

THENCE S 17 DEGREES 58 MINUTES 05 SECONDS W, 126.10 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE SOUTHWEST CORNER OF SAID LOT 13, BLOCK 10 IN THE NORTH LINE OF BLUE CREEK DRIVE, THE BEGINNING OF A NON-TANGENT CURVE TO THE LEFT;

THENCE ALONG THE NORTHERLY RIGHT-OF-WAY LINE OF SAID BLUE CREEK DRIVE, THE FOLLOWING BEARINGS AND DISTANCES:

50.08 FEET ALONG THE ARC OF SAID NON-TANGENT CURVE TO THE LEFT THROUGH A CENTRAL ANGLE OF 18 DEGREES 31 MINUTES 20 SECONDS, A RADIUS OF 154.94 FEET AND A LONG CHORD OF N 85 DEGREES 20 MINUTES 05 SECONDS W, 49.87 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

S 85 DEGREES 24 MINUTES 15 SECONDS W, 70.00 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE BEGINNING OF A CURVE TO THE RIGHT; 63.14 FEET ALONG THE ARC OF SAID CURVE TO THE RIGHT THROUGH A CENTRAL ANGLE OF 22 DEGREES 40 MINUTES 00 SECONDS, A RADIUS OF 159.61 FEET AND A LONG CHORD OF N 83 DEGREES 15 MINUTES 45 SECONDS W, 62.73 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

N 71 DEGREES 55 MINUTES 45 SECONDS W, 69.44 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE BEGINNING OF A CURVE TO THE LEFT; 109.62 FEET ALONG THE ARC OF SAID CURVE TO THE LEFT THROUGH A CENTRAL ANGLE OF 26 DEGREES 00 MINUTES 00 SECONDS, A RADIUS OF 241.57 FEET AND A LONG CHORD OF N 84 DEGREES 55 MINUTES 45 SECONDS W, 108.68 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

S 82 DEGREES 04 MINUTES 15 SECONDS W, 89.62 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE BEGINNING OF A CURVE TO THE RIGHT; 141.82 FEET ALONG THE ARC OF SAID CURVE TO THE RIGHT THROUGH A CENTRAL ANGLE OF 43 DEGREES 59 MINUTES 47 SECONDS, A RADIUS OF 184.69 FEET AND A LONG CHORD OF N 75 DEGREES 55 MINUTES 49 SECONDS W, 138.37 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE BEGINNING OF A CURVE TO THE LEFT;

117.18 FEET ALONG THE ARC OF SAID CURVE TO THE LEFT THROUGH A CENTRAL ANGLE OF 24 DEGREES 59 MINUTES 52 SECONDS, A RADIUS OF 268.58 FEET AND A LONG CHORD OF N 66 DEGREES 25 MINUTES 49 SECONDS W, 116.25 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

N 78 DEGREES 55 MINUTES 45 SECONDS W, 126.00 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE BEGINNING OF A CURVE TO THE RIGHT; 90.25 FEET ALONG THE ARC OF SAID CURVE TO THE RIGHT THROUGH A CENTRAL ANGLE OF 20 DEGREES 00 MINUTES 00 SECONDS, A RADIUS OF 258.56 FEET AND A LONG CHORD OF N 68 DEGREES 55 MINUTES 45 SECONDS W, 89.80 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

N 58 DEGREES 55 MINUTES 45 SECONDS W, 143.74 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE BEGINNING OF A CURVE TO THE LEFT; 285.04 FEET ALONG THE ARC OF SAID CURVE TO THE LEFT THROUGH A CENTRAL ANGLE OF 35 DEGREES 30 MINUTES 00 SECONDS, A RADIUS OF 460.05 FEET AND A LONG CHORD OF N 76 DEGREES 40 MINUTES 45 SECONDS W, 280.51 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

S 85 DEGREES 34 MINUTES 15 SECONDS W, 13.11 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET IN THE EASTERLY RIGHT-OF-WAY LINE OF LOST CREEK BOULEVARD, THE BEGINNING OF A NON-TANGENT CURVE TO THE RIGHT;

THENCE 122.58 FEET ALONG THE ARC OF SAID NON-TANGENT CURVE TO THE RIGHT AND ALONG THE EASTERLY RIGHT-OF-WAY LINE OF LOST CREEK BOULEVARD THROUGH A CENTRAL ANGLE OF 16 DEGREES 15 MINUTES 20 SECONDS, A RADIUS OF 432.06 FEET AND A LONG CHORD OF N 07 DEGREES 33 MINUTES 29 SECONDS W, 122.17 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE SOUTHWEST CORNER OF LOT 1, BLOCK 10, SAID LOST CREEK ADDITION, THE BEGINNING OF A NONTANGENT CURVE TO THE LEFT;

THENCE ALONG THE SOUTHERLY LINE OF SAID BLOCK 10, THE FOLLOWING BEARINGS AND DISTANCES: 111.72 FEET ALONG THE ARC OF SAID CURVE TO THE LEFT THROUGH A CENTRAL ANGLE OF 11 DEGREES 58 MINUTES 28 SECONDS, A RADIUS OF 534.60 FEET AND A LONG CHORD OF N 84 DEGREES 34 MINUTES 57 SECONDS E, 111.52 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

N 78 DEGREES 34 MINUTES 15 SECONDS E, 243.00 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE BEGINNING OF A CURVE TO THE RIGHT; 208.15 FEET ALONG THE ARC OF SAID CURVE TO THE RIGHT THROUGH A CENTRAL ANGLE OF 35 DEGREES 00 MINUTES 00 SECONDS, A RADIUS OF 340.74 FEET AND A LONG CHORD OF S 83 DEGREES 55 MINUTES 45 SECONDS E, 204.92 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

S 66 DEGREES 25 MINUTES 45 SECONDS E, 20.00 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE BEGINNING OF A CURVE TO THE LEFT; 344.07 FEET ALONG THE ARC OF SAID CURVE TO THE LEFT THROUGH A CENTRAL ANGLE OF 20 DEGREES 00 MINUTES 00 SECONDS, A RADIUS OF 985.69 FEET AND A LONG CHORD OF S 76 DEGREES 25 MINUTES 45 SECONDS E, 342.33 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

Unofficial Copy

S 86 DEGREES 25 MINUTES 45 SECONDS E, 287.06 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE SOUTHEAST CORNER OF LOT 12, SAID BLOCK 10;

THENCE N 03 DEGREES 34 MINUTES 16 SECONDS E, 60.00 FEET ALONG THE EAST LINE OF SAID LOT 12 TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE S 86 DEGREES 25 MINUTES 45 SECONDS E, 45.00 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE N 03 DEGREES 34 MINUTES 15 SECONDS E, 150.00 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE N 86 DEGREES 25 MINUTES 45 SECONDS W, 45.00 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET IN THE EAST LINE OF LOT 12, BLOCK 9, SAID LOST CREEK ADDITION;

THENCE N 03 DEGREES 34 MINUTES 15 SECONDS E, 60.00 FEET ALONG THE EAST LINE OF SAID LOT 12, BLOCK 9 TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE NORTHEAST CORNER OF SAID LOT 12;

THENCE ALONG THE NORTHERLY LINE OF SAID BLOCK 9, THE FOLLOWING BEARINGS AND DISTANCES:

86 DEGREES 25 MINUTES 45 SECONDS W, 287.00 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE BEGINNING OF A CURVE TO THE RIGHT; 249.82 FEET ALONG THE ARC OF SAID CURVE TO THE RIGHT THROUGH CENTRAL ANGLE OF 20 DEGREES 00 MINUTES 00 SECONDS, A RADIUS OF 715.69 FEET AND A LONG CHORD OF N 76 DEGREES 25 MINUTES 45 SECONDS W, 248.56 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

N 66 DEGREES 25 MINUTES 45 SECONDS W, 20.00 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE BEGINNING OF A CURVE TO THE LEFT; 373.06 FEET ALONG THE ARC OF SAID CURVE TO THE LEFT THROUGH A CENTRAL ANGLE OF 35 DEGREES 00 MINUTES 00 SECONDS, A RADIUS OF 610.74 FEET AND A LONG CHORD OF N 83 DEGREES 55 MINUTES 45 SECONDS W, 367.31 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

S 78 DEGREES 34 MINUTES 15 SECONDS W, 299.00 FEET TO AN IRON ROD FOUND AT THE NORTHWEST CORNER OF LOT 1, SAID BLOCK 9 IN THE EASTERLY LINE OF LOST CREEK BOULEVARD;

THENCE N 00 DEGREES 34 MINUTES 11 SECONDS E, 20.00 FEET ALONG SAID EASTERLY RIGHT-OF-WAY LINE TO AN IRON ROD FOUND AT THE SOUTHWEST CORNER OF LOT 13, BLOCK 9, LOST CREEK ADDITION AS RECORDED IN VOLUME 388/122, PAGE 28, SAID COUNTY RECORDS;

THENCE N 78 DEGREES 34 MINUTES 15 SECONDS E, 112.46 FEET ALONG THE SOUTH LINE OF SAID LOT 13, BLOCK 9 TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT ITS SOUTHEAST CORNER.

THENCE N 00 DEGREES 34 MINUTES 11 SECONDS E, 196.62 FEET TO AN IRON ROD FOUND, THE NORTHEAST CORNER OF LOT 14, BLOCK 9;

THENCE N 89 DEGREES 25 MINUTES 49 SECONDS W, 110.00 FEET TO THE POINT OF BEGINNING AND CONTAINING 25.366 ACRES OF LAND.

SAVE & EXCEPT TRACT I:

BEING A TRACT SITUATED IN THE J.H. BURSEY SURVEY, ABSTRACT NO. 241, TARRANT COUNTY, TEXAS AND BEING A PORTION OF THE 170.44 ACRE TRACT AS DESCRIBED BY DEED TO LOST CREEK COUNTRY CLUB AND RECORDED IN VOLUME 7142, PAGE 551, AND A PORTION OF PARCEL "A" AS DESCRIBED BY DEED TO LOST CREEK COUNTY CLUB AS RECORDED IN VOLUME 8167, PAGE 583, SAID COUNTY RECORDS, SAID SAVE AND EXCEPT TRACT BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

BEGINNING AT AN IRON ROD FOUND AT THE MOST SOUTHERLY SOUTHWEST CORNER OF SAID PARCEL "A";

THENCE N 00 DEGREES 21 MINUTES 50 SECONDS E, 127.29 FEET TO A POINT FROM WHICH AN IRON ROD FOUND BEARS N 88 DEGREES 16 MINUTES 29 SECONDS E, 0.37 FEET;

THENCE N 88 DEGREES 28 MINUTES 35 SECONDS W, 1066.18 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE N 01 DEGREES 31 MINUTES 25 SECONDS E, 270.00 FEET TO AN IRON ROD FOUND;

THENCE N 86 DEGREES 24 MINUTES 06 SECONDS E, 1055.56 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE S 11 DEGREES 37 MINUTES 21 SECONDS E, 373.00 FEET TO AN IRON ROD FOUND;

THENCE S 00 DEGREES 21 MINUTES 60 SECONDS W, 127.22 FEET TO AN IRON ROD FOUND;

THENCE N 89 DEGREES 42 MINUTES 42 SECONDS W, 50.00 FEET TO THE POINT OF BEGINNING AND CONTAINING 8.155 ACRES OF LAND, MORE OR LESS.

SAVE & EXCEPT TRACT II:

BEING A TRACT OF LAND SITUATED IN THE J. BURLESON SURVEY, ABSTRACT NO. 78, TARRANT COUNTY, TEXAS AND BEING A PORTION OF THE 170.44 ACRE TRACT AS DESCRIBED BY DEED TO LOST CREEK COUNTRY CLUB AND RECORDED IN VOLUME 7174, PAGE 551, SAID COUNTY RECORDS AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

BEGINNING AT THE SOUTHEAST CORNER OF LOT 29, BLOCK 4, LOST CREEK ADDITION AS RECORDED IN PLAT VOLUME 388/115, PAGE 97, SAID COUNTY RECORDS;

THENCE S 00 DEGREES 34 MINUTES 11 SECONDS W, 127.30 FEET TO A POINT IN THE NORTH RIGHT-OF-WAY LINE OF BLUE CREEK DRIVE;

THENCE S 86 DEGREES 34 MINUTES 15 SECONDS W, 110.41 FEET ALONG SAID NORTH RIGHT-OF-WAY LINE;

Unofficial Copy

THENCE N 00 DEGREES 34 MINUTES 11 SECONDS E, 136.92 FEET TO AN IRON ROD FOUND, THE SOUTHWEST CORNER OF SAID LOT 29, BLOCK 4;

THENCE S 89 DEGREES 25 MINUTES 49 SECONDS E, 110.00 FEET TO THE POINT OF BEGINNING AND CONTAINING 0.333 ACRES OF LAND, MORE OR LESS

SAVE AND EXCEPT TRACT III:

BEING LOTS 1 AND 2, BLOCK 2A, OF LOST CREEK ADDITION, AS RECORDED IN CABINET B, SLIDE 283, PLAT RECORDS OF TARRANT COUNTY, TEXAS, AND BEING A TRACT OF LAND SITUATED IN THE J. BURLESON SURVEY, ABSTRACT NO. 78, TARRANT COUNTY, TEXAS, AND BEING A PORTION OF THE 170.44 ACRE TRACT AS DESCRIBED BY DEED TO LOST CREEK COUNTRY CLUB AND RECORDED IN DEED VOLUME 7174, PAGE 551, SAID COUNTY RECORDS; SAID TRACT BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT THE SOUTHWEST CORNER OF LOT 1, BLOCK 2, LOST CREEK ADDITION AS RECORDED IN PLAT VOLUME 388-115, PAGE 87, SAID COUNTY RECORDS, SAID POINT BEING IN THE EASTERLY RIGHT-OF-WAY LINE OF LOST CREEK BOULEVARD;

THENCE S 15 DEGREES 26 MINUTES 00 SECONDS E, 20.00 FEET ALONG SAID EASTERLY RIGHT-OF-WAY LINE TO THE POINT OF BEGINNING;

THENCE N 89 DEGREES 34 MINUTES 00 SECONDS E, 110.00 FEET;

THENCE S 15 DEGREES 26 MINUTES 00 SECONDS E, 200.00 FEET;

THENCE S 89 DEGREES 34 MINUTES 00 SECONDS W, 110.00 FEET TO A POINT IN THE EASTERLY RIGHT-OF-WAY LINE OF LOST CREEK BOULEVARD;

THENCE N 15 DEGREES 26 MINUTES 00 SECONDS W, 200.00 FEET TO THE POINT OF BEGINNING, AND CONTAINING 0.487 ACRES OF LAND, MORE OR LESS.

SAVE & EXCEPT TRACT V:

BEING A TRACT OF LAND SITUATED IN THE J. BURLESON SURVEY, ABSTRACT NO. 78, TARRANT COUNTY, TEXAS AND BEING ALL OF LOT 49R, BLOCK 4, LOST CREEK ADDITION AS RECORDED IN CABINET B, SLIDE NO. 197 SAID COUNTY RECORDS, AND CONTAINING 0.274 ACRES OF LAND MORE OR LESS.

SAVE & EXCEPT TRACT VI:

BEING LOTS 2, 3, 4, AND 5, BLOCK 15 OF LOST CREEK ADDITION, AS RECORDED IN CABINET B, SLIDE 163, PLAT RECORDS OF TARRANT COUNTY, TEXAS, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT THE SOUTHWEST CORNER OF LOT 39, BLOCK 16, PHASE II, LOST CREEK ADDITION AS RECORDED IN PLAT VOLUME 388/215, PAGE 86, SAID COUNTY RECORDS, SAID POINT BEING IN THE WESTERLY RIGHT-OF-WAY LINE OF LOST CREEK BOULEVARD;

THENCE N 39 DEGREES 20 MINUTES 36 SECONDS E, 64.41 FEET TO THE POINT OF BEGINNING IN THE EASTERLY RIGHT-OF-WAY LINE OF LOST CREEK BOULEVARD;

THENCE N 44 DEGREES 14 MINUTES 12 SECONDS W, 76.72 FEET ALONG SAID EASTERLY RIGHT-OF-WAY LINE;

THENCE N 53 DEGREES 12 MINUTES 36 SECONDS W, 324.22 FEET CONTINUING ALONG SAID EASTERLY RIGHT-OF-WAY LINE;

THENCE N 38 DEGREES 47 MINUTES 24 SECONDS E, 162.02 FEET;

THENCE N 66 DEGREES 47 MINUTES 24 SECONDS E, 21.76 FEET;

THENCE N 36 DEGREES 47 MINUTES 24 SECONDS E, 82.13 FEET;

THENCE S 51 DEGREES 00 MINUTES 02 SECONDS E, 242.15 FEET;

THENCE S 07 DEGREES 24 MINUTES 02 SECONDS E, 74.82 FEET;

THENCE S 53 DEGREES 12 MINUTES 36 SECONDS E, 95.00 FEET;

THENCE S 36 DEGREES 47 MINUTES 24 SECONDS W, 211.97 FEET TO THE POINT OF BEGINNING AND CONTAINING 2.196 ACRES OF LAND, MORE OR LESS.

Unofficial Copy

Exhibit B

Affidavit of Substitute Trustee

Unofficial Copy

(as per the attached)

Unofficial Copy

**FILING, POSTING AND MAILING AFFIDAVIT**

THE STATE OF TEXAS §
§
COUNTY OF TARRANT §

BEFORE ME, the undersigned authority, on this day personally appeared RANDY P. MARX, a person well known to me, who, after being first duly sworn, upon oath stated:

I, RANDY P. MARX, am a person over the age of eighteen (18) years, have never been convicted of a crime and have personal knowledge of the facts set forth herein, all of which are true and correct.

I am the Substitute Trustee appointed to enforce the power of sale contained in that one certain Deed of Trust described as follows:

> One certain Deed of Trust (herein "Deed of Trust") dated June 25, 2018, from Somerset-Lostcreek Golf, Ltd., a Texas limited partnership, at times identified Somerset-Lost Creek, Ltd., as Grantor, conveyed to Timothy Barton, Trustee, for the benefit of WALL010 LLC, a Texas limited liability company, certain real property situated in Tarrant County, Texas, as described therein to secure the payment of one certain Promissory Note (herein the "Note") therein described in the principal amount of $300,000.00, which Deed of Trust was electronically recorded by Tarrant County Clerk in Official Public Records of Tarrant County, Texas , reference/ clerk's file number D219077623 on April 15, 2019, reference to said Deed of Trust being hereby made for all purposes.

which secures that certain Promissory Note described as follows:

> One certain Promissory Note (herein the "Note") dated June 25, 2018 in the principal amount of $300,000.00, made by Somerset-Lostcreek Golf, Ltd., a Texas limited partnership, at times identified Somerset-Lost Creek, Ltd., payable to the order of WALL010 LLC, a Texas limited liability company.

Unofficial Copy

On July 14, 2020, I filed signed copies of an Appointment of Substitute Trustee, a true and correct copy of which is attached hereto as Exhibit "B" and incorporated herein by reference for all purposes (the "Appointment"), with the County Clerk's Office of Tarrant County, Texas, at or about 2:52 p.m. that day.

On July 14, 2020, I further filed copies of a (Corrected) Notice of Substitute Trustee's Sale, a true and correct copy of which is attached hereto as Exhibit "A" and incorporated herein by reference for all purposes (the "Notice"), with the County Clerk's Office of Tarrant County, Texas, at or about 3:25 p.m. that day, and then posted a signed copy thereof at the place designated for such postings, at or about 4:00 p.m. that day; namely in the basement of said building, by the restroom board designated for such foreclosure sale postings.

I further served a true and correct copy of such Notice, along with a copy of Appointment in the form attached hereto as Exhibit "B", upon the following person(s) on July 14, 2020, at or about 5:03 p.m. by depositing the same in a wrapper, postage prepaid, certified mail, return receipt requested, in a post office or official depository under the care and custody of the U.S. Postal Service. The person(s) upon whom such notice was served and their addresses are as follows:

Somerset-Lostcreek, Golf Ltd.
4101 Lost Creek Boulevard
Aledo, Texas 76008

I further served, courtesy/ advance copies of true and correct copy of such Notice, along with a copy of Appointment in the form attached hereto as Exhibit "B", upon the following person(s) on July 15, 2020, at or about 1:45 p.m. by email. The person(s) upon whom such courtesy/advance notice was served and their addresses are as follows:

Somerset-Lostcreek Golf, Ltd., a Texas limited partnership, at times identified Somerset-Lost Creek, Ltd.
4101 Lost Creek Boulevard
Aledo, Texas 76008
ATTN: Rhonda Artz, President, Member & Manager of Somerset-Lost Creek Management, LLC, sole General Partner
rhonda@somersetgolf.com
Rhonda Artz
gr8mermaid@att.net

EXECUTED this 5th day of ~~July~~ August, 2020.

AFFIANT:

RANDY P. MARX

STATE OF TEXAS §
§
COUNTY OF DALLAS §

Bella D Khusal
My Commission Expires
09/24/2022
ID No. 131734450

SUBSCRIBED AND SWORN TO BEFORE ME on this 5 day of ~~July,~~ August 2020by RANDY P. MARX, , Substitute Trustee.

Printed name: Bella D Khusal
My commission expires: 09/24/2022
Notary Public

STATE OF TEXAS §
§
COUNTY OF DALLAS §

This instrument was acknowledged before me on the 5 day of ~~JULY~~ August, 2020, by RANDY P. MARX, , Substitute Trustee.

HERE

Printed name: Bella D Khusal
My commission expires: 09/24/2022
Notary Public

Bella D Khusal
My Commission Expires
09/24/2022
ID No. 131734450

Unofficial Copy

EXHIBIT "A"

Unofficial Copy

Unofficial Copy

COPY

July 14, 2020

Somerset Lostcreek Golf, Ltd., a Texas limited partnership, at times identified Somerset-Lost Creek, Ltd.
4101 Lost Creek Boulevard,
Aledo, Texas 76008
ATTN: Rhonda Artz, President, Member & Manager of Somerset-Lost Creek Management, LLC, sole General Partner
Sent via regular mail, and CMRRR 7020 0640 0000 5785 5856 on this date

(corrected)

**NOTICE OF SUBSTITUTE TRUSTEE'S SALE**

Notice is hereby given that a public sale at auction of the Property (as that term is defined and described below) will be held at the date, time and place specified in this notice.

DATE OF SALE:
Tuesday, the 4th day of August, 2020 (which is the first Tuesday of that month).

TIME OF SALE:
The earliest time at which the sale shall occur is 10:00 a.m. The sale shall begin at that time or not later than three hours after that time.

POSTPONEMENT:
The Deed of Trust permits the Lender to postpone, withdraw, or reschedule the sale for another day. In such case, the Trustee, or the Substitute Trustee, under the Deed of Trust need not appear at the date, time, and place of a scheduled sale to announce the postponement, withdrawal or rescheduling. Notice of the date of any rescheduled foreclosure sale will be reposted and refiled in accordance with the posting and filing requirements of the Texas Property Code and the Deed of Trust. Such reposting or refiling may be after the date originally scheduled for this sale.

PLACE OF SALE:
The foreclosure sale will be conducted at public venue at the area at the Tarrant County Courthouse designated by the Commissioners Court of Tarrant County, Texas, where foreclosure sales are to take place, or if no place is designated by the Commissioner's Court, the sale will be conducted at the area immediately adjacent to the location where the Notice of Trustee's Sale (this notice) was posted. Such designation, in Tarrant County, is as follows: the base of the Courthouse steps on the west side of the building, more particularly described: ______________________________________________. The address of the Tarrant County Courthouse is: 100 ~~East~~ West Weatherford Street, Fort Worth, Texas 76196.

FILED
JUL 14 2020
COUNTY CLERK TARRANT CO. TEXAS
BY ____________ DEPUTY

Unofficial Copy

INFORMATION REGARDING THE NOTE/INDEBTEDNESS SECURED, AND DEED OF TRUST LIEN, AND PROPERTY THAT IS THE SUBJECT OF THIS SALE:

Promissory Note
**One certain Promissory Note (herein the "Note") dated June 25, 2018 in the principal amount of $300,000.00, made by Somerset-Lostcreek Golf, Ltd., a Texas limited partnership, at times identified Somerset-Lost Creek, Ltd., payable to the order of WALL010 LLC, a Texas limited liability company.**

Deed of Trust
**One certain Deed of Trust (herein "Deed of Trust") dated June 25, 2018, from Somerset-Lostcreek Golf, Ltd., a Texas limited partnership, at times identified Somerset-Lost Creek, Ltd., as Grantor, conveyed to Timothy Barton, Trustee, for the benefit of WALL010 LLC, a Texas limited liability company, certain real property situated in Tarrant County, Texas, as described therein to secure the payment of one certain Promissory Note (herein the "Note") therein described in the principal amount of $300,000.00, which Deed of Trust was electronically recorded by Tarrant County Clerk in Official Public Records of Tarrant County, Texas, reference/ clerk's file number D219077623 on April 15, 2019, reference to said Deed of Trust being hereby made for all purposes.**

Grantor/Borrower:
**Somerset-Lostcreek Golf, Ltd., a Texas limited partnership, at times identified Somerset-Lost Creek, Ltd.**

Lender/Beneficiary:
**WALL010 LLC, a Texas limited liability company,** is the current owner and holder of the Promissory Note and the other Loan Documents.

Original Trustee:
**Timothy Barton**

Successor Trustee:
NAME OF DOCUMENT: Appointment of Substitute Trustee
DATE: **July 14, 2020**
NAME OF SUBSTITUTE TRUSTEE: **Randy P. Marx**

Loan Documents:
The Note, the Deed of Trust, and each and every other document executed or delivered in connection therewith.

Loan:
The indebtedness and obligations evidenced by the Loan Documents.

FILED
JUL 14 2020
COUNTY CLERK, TARRANT CO., TEXAS
BY_______________DEPUTY

Unofficial Copy

PROPERTY DESCRIPTION:
The real property located in Tarrant County, Texas, and being more particularly described on Exhibit "A" attached hereto and made a part hereof for all purposes, together with the improvements, fixtures, and other real and personal property described in the Deed of Trust(collectively, the "Property"). The Property will be sold subject to any exceptions referenced in the Deed of Trust to the extent same are still in effect and shall not include any property that has been released from the Deed of Trust.

Default has occurred in the payment of the Note secured by the Deed of Trust. The entire indebtedness evidenced by the Note is now wholly due and payable. The owner and holder of the indebtedness has requested that the undersigned, as Substitute Trustee under the Deed of Trust, sell the Property, the proceeds of such sale to be applied in accordance with the provisions of the Deed of Trust.

The owner and holder of the indebtedness has further requested that the undersigned, as Substitute Trustee under the Deed of Trust, sell all of the components of the Property that are personal property, if any, in accordance with the terms of the Deed of Trust and Article 9 of the Texas Uniform Commercial Code. The sale of the personalty will be held at the same time and place as the above—described real property sale; however, to the extent permitted by Article 9 of the Texas Uniform Commercial Code, the undersigned has been instructed to proceed as to both the real and personal property in accordance with the rights and remedies of the owner and holder of the indebtedness in respect of the real property, i.e., in accordance with the Deed of Trust.

Therefore, at the date, time and place set forth above, the undersigned, as Substitute Trustee, will sell the Property to the highest bidder pursuant to the terms of the Deed of Trust.

**ASSERT AND PROTECT YOUR RIGHTS AS A MEMBER OF THE ARMED FORCES OF THE UNITED STATES. IF YOU ARE OR YOUR SPOUSE IS SERVING ON ACTIVE MILITARY DUTY, INCLUDING ACTIVE MILITARY DUTY AS A MEMBER OF THE TEXAS NATIONAL GUARD OR THE NATIONAL GUARD OF ANOTHER STATE OR AS A MEMBER OF A RESERVE COMPONENT OF THE ARMED FORCES OF THE UNITED STATES, PLEASE SEND WRITTEN NOTICE OF THE ACTIVE MILITARY SERVICE TO THE SENDER OF THIS NOTICE IMMEDIATELY.**

FILED
JUL 14 2020
COUNTY CLERK, TARRANT CO., TEXAS
BY_______________DEPUTY

Unofficial Copy

IN WITNESS WHEREOF this Notice of Substitute Trustee's Sale has been executed on this the **14th day of July, 2020.**

SUBSTITUTE TRUSTEE:

Randy P. Marx

Name and address of Sender of Notice:
Randy P Marx, Attorney
The Marx Firm
2999 Turtle Creek Blvd.
Dallas, Texas 75219
214.360.9343 Office/Direct
214.405.5120 Cell
214.292.8818 Fax
randy@themarxfirm.com
www.themarxfirm.com

FILED
JUL 14 2020
COUNTY CLERK, TARRANT CO., TEXAS
BY_______________DEPUTY

Unofficial Copy

Exhibit A

(as per the attached)

FILED
JUL 14 2020
COUNTY CLERK, TARRANT CO., TEXAS
BY________________DEPUTY

Unofficial Copy



Unofficial Copy

EXHIBIT "A"

BEING TRACTS 1, 2, 3, 4 & 5 SITUATED IN THE C.E. BURKHAM SURVEY, ABSTRACT NO. 146, THE J. BURGESS SURVEY, ABSTRACT NO. 12 AND THE [illegible] SURVEY, ABSTRACT NO. [illegible], TARRANT COUNTY, TEXAS AND BEING PORTIONS OF THE [illegible] ACRE TRACT AS DESCRIBED BY DEED TO LOST CREEK COUNTRY CLUB AND RECORDED IN VOLUME [illegible], PAGE [illegible], COUNTY RECORDS, TARRANT COUNTY, TEXAS AND BEING ALL OF THOSE TRACTS OF LAND DESCRIBED IN EXHIBIT "C" OF THAT CONVEYANCE DEED TO CLUBCORP GOLF OF TEXAS, L.P., AS RECORDED IN VOLUME [illegible], PAGE [illegible], DEED RECORDS, TARRANT COUNTY, TEXAS, AND BEING PORTIONS OF BLOCKS [illegible] AND [illegible] OF LOST CREEK ADDITION, AS RECORDED IN VOLUME [illegible], PAGE [illegible], PLAT RECORDS, TARRANT COUNTY, TEXAS AND BEING ALL OF [illegible], BLOCK 11, LOST CREEK ADDITION AS RECORDED IN CABINET A, SLIDE [illegible], PLAT RECORDS, TARRANT COUNTY, TEXAS AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

TRACT 1:

BEGINNING AT A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET IN THE WEST LINE OF SAID BURKHAM SURVEY, [illegible] FEET FROM ITS SOUTHWEST CORNER, SAID POINT BEING A WESTERLY SOUTHEAST CORNER OF SAID [illegible] ACRE TRACT;

THENCE N 00 DEGREES [illegible] MINUTES [illegible] SECONDS E, [illegible] FEET ALONG THE WEST LINE OF SAID BURKHAM SURVEY AND SAID [illegible] ACRE TRACT TO THE SOUTHWEST CORNER OF LOT [illegible], BLOCK 3, LOST CREEK ADDITION AS RECORDED IN PLAT VOLUME [illegible], PAGE [illegible], SAID COUNTY RECORDS;

THENCE ALONG THE SOUTHERLY LINE OF SAID BLOCK 3, LOST CREEK ADDITION, THE FOLLOWING BEARINGS AND DISTANCES:

N 74 DEGREES 26 MINUTES [illegible] SECONDS E, [illegible] FEET TO A POINT;

N [illegible] DEGREES [illegible] MINUTES [illegible] SECONDS E, [illegible] FEET TO A POINT;

N [illegible] DEGREES [illegible] MINUTES [illegible] SECONDS E, [illegible] FEET TO A POINT;

N [illegible] DEGREES 07 MINUTES [illegible] SECONDS E, [illegible] FEET TO THE SOUTHEAST CORNER OF LOT [illegible], SAID BLOCK 3;

THENCE S [illegible] DEGREES 01 MINUTES [illegible] SECONDS [illegible], [illegible] FEET TO AN IRON ROD FOUND;

THENCE N [illegible] DEGREES [illegible] MINUTES [illegible] SECONDS [illegible], [illegible] FEET TO AN IRON ROD FOUND;

THENCE N [illegible] DEGREES 16 MINUTES [illegible] SECONDS [illegible], [illegible] FEET TO AN IRON ROD FOUND;

THENCE N [illegible] DEGREES [illegible] MINUTES [illegible] SECONDS [illegible], [illegible] FEET TO AN IRON ROD FOUND;

THENCE N [illegible] DEGREES [illegible] MINUTES [illegible] SECONDS W, [illegible] FEET TO AN IRON ROD FOUND IN THE SOUTHERLY RIGHT-OF-WAY LINE OF [illegible];

THENCE N [illegible] DEGREES [illegible] MINUTES [illegible] SECONDS E, [illegible] FEET ALONG SAID SOUTHERLY RIGHT-OF-WAY LINE TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET IN THE WESTERLY RIGHT-OF-WAY LINE OF LOST CREEK BOULEVARD AS RECORDED IN PLAT VOLUME [illegible], PAGE [illegible] OF PHASE 2, LOST CREEK ADDITION;

THENCE ALONG THE [illegible] LINE OF SAID PHASE 2, LOST CREEK ADDITION, THE FOLLOWING BEARINGS AND DISTANCES:

S [illegible] DEGREES [illegible] MINUTES [illegible] SECONDS W, [illegible] FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE BEGINNING OF A CURVE TO THE LEFT;

[illegible] FEET ALONG THE ARC OF SAID CURVE TO THE LEFT THROUGH A CENTRAL ANGLE OF [illegible] DEGREES [illegible] MINUTES [illegible] SECONDS, A RADIUS OF [illegible] FEET AND A LONG CHORD OF S [illegible] DEGREES [illegible] MINUTES [illegible] SECONDS [illegible], [illegible] FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

N [illegible] DEGREES [illegible] MINUTES [illegible] SECONDS W, [illegible] FEET TO AN IRON ROD FOUND;

S 40 DEGREES 32 MINUTES [illegible] SECONDS W, [illegible] FEET TO AN IRON ROD FOUND;

S [illegible] DEGREES 56 MINUTES [illegible] SECONDS W, [illegible] FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

S 09 DEGREES [illegible] MINUTES [illegible] SECONDS W, [illegible] FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

S [illegible] DEGREES [illegible] MINUTES [illegible] SECONDS E, [illegible] FEET TO AN IRON ROD FOUND;

S [illegible] DEGREES [illegible] MINUTES [illegible] SECONDS E, 70.04 FEET TO AN IRON ROD FOUND;

S [illegible] DEGREES [illegible] MINUTES [illegible] SECONDS E, [illegible] FEET TO AN IRON ROD FOUND;

S [illegible] DEGREES 24 MINUTES 57 SECONDS E, [illegible] FEET TO AN IRON ROD FOUND;

S [illegible] DEGREES 31 MINUTES 25 SECONDS E, [illegible] FEET TO AN IRON ROD FOUND;

N 17 DEGREES 30 MINUTES [illegible] SECONDS E, [illegible] FEET TO AN IRON ROD FOUND;

N [illegible] DEGREES 12 MINUTES 13 SECONDS W, [illegible] FEET TO AN IRON ROD FOUND;

N [illegible] DEGREES [illegible] MINUTES [illegible] SECONDS W, [illegible] FEET TO A POINT FROM WHICH AN IRON ROD FOUND BEARS N 71 DEGREES 36 MINUTES [illegible] SECONDS E, 0.36 FEET;

S 70 DEGREES 16 MINUTES 29 SECONDS E, [illegible] FEET TO AN IRON ROD FOUND;

FILED
JUL 14 2020
COUNTY CLERK, TARRANT CO., TEXAS
BY______________DEPUTY

Unofficial Copy



N 37 DEGREES 46 MINUTES 65 SECONDS E, 611.71 FEET TO AN IRON ROD FOUND IN THE WESTERLY RIGHT-OF-WAY LINE OF LOST CREEK BOULEVARD;

S 41 DEGREES 14 MINUTES 12 SECONDS E, 113.74 FEET ALONG SAID WESTERLY RIGHT-OF-WAY LINE TO AN IRON ROD FOUND;

S 46 DEGREES 21 MINUTES 06 SECONDS W, 115.56 FEET, LEAVING SAID WESTERLY RIGHT-OF-WAY LINE TO AN IRON ROD FOUND;

S 46 DEGREES 24 MINUTES 31 SECONDS E, 284.54 FEET TO AN IRON ROD FOUND;

THENCE S 43 DEGREES 23 MINUTES 36 SECONDS W, [illegible] FEET, LEAVING THE WESTERLY LINE OF SAID PHASE 2, LOST CREEK ADDITION TO AN IRON ROD FOUND AT THE BEGINNING OF A CURVE TO THE LEFT;

THENCE 269.41 FEET ALONG THE ARC OF SAID CURVE TO THE LEFT THROUGH A CENTRAL ANGLE OF 20 DEGREES 32 MINUTES 16 SECONDS, A RADIUS OF [illegible] FEET AND A LONG CHORD OF S 34 DEGREES 30 MINUTES 15 SECONDS W, 202.99 FEET TO AN IRON ROD FOUND;

THENCE S 18 DEGREES 50 MINUTES 17 SECONDS W, 130.45 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE S 41 DEGREES 38 MINUTES 44 SECONDS W, [illegible] FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE S 83 DEGREES 30 MINUTES 35 SECONDS W, 41.50 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE N 37 DEGREES 26 MINUTES 27 SECONDS W, 30.07 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE S 63 DEGREES 22 MINUTES 44 SECONDS W, [illegible] FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE N 86 DEGREES 36 MINUTES 20 SECONDS W, [illegible] FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE N 00 DEGREES 17 MINUTES 10 SECONDS W, 519.34 FEET TO AN IRON ROD FOUND;

THENCE N 39 DEGREES 30 MINUTES 27 SECONDS W, 270.90 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE N 04 DEGREES 11 MINUTES [illegible] SECONDS E, 508.24 FEET TO AN IRON ROD FOUND AT THE BEGINNING OF A NON-TANGENT CURVE TO THE LEFT;

THENCE 290.41 FEET ALONG THE ARC OF SAID CURVE TO THE LEFT THROUGH A CENTRAL ANGLE OF 61 DEGREES 03 MINUTES 19 SECONDS, A RADIUS OF 270.00 FEET AND A LONG CHORD OF N 87 DEGREES 07 MINUTES 26 SECONDS W, 264.[illegible] FEET TO AN IRON ROD FOUND;

THENCE N 00 DEGREES 12 MINUTES 14 SECONDS E, 142.35 FEET TO AN IRON ROD FOUND;

THENCE N 44 DEGREES 49 MINUTES 25 SECONDS W, 99.00 FEET TO AN IRON ROD FOUND;

THENCE N 00 DEGREES 47 MINUTES 35 SECONDS W, 255.13 FEET TO THE POINT OF BEGINNING AND CONTAINING 2[illegible].315 ACRES OF LAND, MORE OR LESS.

---

TRACT 2:

BEGINNING AT AN IRON ROD FOUND AT THE NORTHEAST CORNER OF PARCEL 7, A 2.[illegible] ACRE TRACT AS DESCRIBED IN DEED TO INTERWEST SAVINGS ASSOCIATION AS RECORDED IN VOLUME [illegible], PAGE [illegible], SAID COUNTY RECORDS;

THENCE S 00 DEGREES 26 MINUTES 33 SECONDS W, 45.70 FEET TO AN IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE S 34 DEGREES 24 MINUTES 11 SECONDS W, 66.66 FEET TO AN IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE S 13 DEGREES 09 MINUTES 12 SECONDS W, 89.38 FEET TO AN IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE S 03 DEGREES 16 MINUTES 13 SECONDS W, 31.66 FEET TO AN IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE S 02 DEGREES 23 MINUTES 10 SECONDS E, 120.34 FEET TO AN IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE S 12 DEGREES 44 MINUTES 41 SECONDS W, 43.94 FEET TO AN IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE S 09 DEGREES 54 MINUTES 39 SECONDS W, 41.80 FEET TO AN IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE S 08 DEGREES 45 MINUTES 36 SECONDS E, 107.17 FEET TO AN IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE S 18 DEGREES 47 MINUTES 50 SECONDS E, 61.30 FEET TO AN IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE S 45 DEGREES 12 MINUTES 42 SECONDS E, 45.10 FEET TO AN IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE N 89 DEGREES 47 MINUTES 41 SECONDS W, 91.40 FEET TO AN IRON ROD FOUND, THE SOUTHEAST

FILED
JUL 14 2020
COUNTY CLERK, TARRANT CO., TEXAS
BY______________ DEPUTY

Unofficial Copy



CORNER OF LOT 3, BLOCK 25, SAID PHASE II LOST CREEK ADDITION.

THENCE ALONG THE SOUTHERLY LINE AND THEN THE EASTERLY LINE OF SAID PHASE II, LOST CREEK ADDITION, ALSO THE EASTERLY RIGHT-OF-WAY LINE OF LOST CREEK BOULEVARD, THE FOLLOWING BEARINGS AND DISTANCES:

N 00 DEGREES 21 MINUTES 30 SECONDS E, 251.84 FEET TO AN IRON ROD FOUND;

N 61 DEGREES 47 MINUTES 42 SECONDS W, 170.02 FEET TO AN IRON ROD FOUND;

S 80 DEGREES 21 MINUTES 50 SECONDS W, 138.85 FEET TO AN IRON ROD FOUND;

N 80 DEGREES 38 MINUTES 50 SECONDS W, 1000.20 FEET TO A SPIKE [illegible] FOUND;

S 60 DEGREES 20 MINUTES 40 SECONDS W, 424.92 FEET TO AN IRON ROD FOUND;

S 44 DEGREES 51 MINUTES 06 SECONDS W, 55.55 FEET TO AN IRON ROD FOUND;

S 43 DEGREES 34 MINUTES 04 SECONDS W, [illegible] FEET TO AN IRON ROD FOUND IN THE EASTERLY RIGHT-OF-WAY LINE OF LOST CREEK BOULEVARD, THE BEGINNING OF A NON-TANGENT CURVE TO THE LEFT;

336.00 FEET ALONG THE ARC OF SAID CURVE TO THE LEFT THROUGH A CENTRAL ANGLE OF 17 DEGREES 37 MINUTES 53 SECONDS, A RADIUS OF 550.12 FEET AND A LONG CHORD OF N 10 DEGREES 14 MINUTES 37 SECONDS W, 322.81 FEET TO AN IRON ROD FOUND;

N 65 DEGREES 17 MINUTES 26 SECONDS W, 31.43 FEET TO AN IRON ROD FOUND AT THE BEGINNING OF A CURVE TO THE RIGHT;

317.47 FEET ALONG THE ARC OF SAID CURVE TO THE RIGHT THROUGH A CENTRAL ANGLE OF 31 DEGREES 41 MINUTES 14 SECONDS, A RADIUS OF 550.00 FEET AND A LONG CHORD OF N 53 DEGREES [illegible] MINUTES [illegible] SECONDS W, 332.22 FEET TO AN IRON ROD FOUND;

N 44 DEGREES 14 MINUTES 17 SECONDS W, [illegible] FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

N 61 DEGREES 12 MINUTES 78 SECONDS W, [illegible] FEET TO AN IRON ROD FOUND, THE BEGINNING OF A CURVE TO THE RIGHT;

441.37 FEET ALONG THE ARC OF SAID CURVE TO THE RIGHT THROUGH A CENTRAL ANGLE OF 43 DEGREES 43 MINUTES 51 SECONDS, A RADIUS OF [illegible] FEET AND A LONG CHORD OF N 39 DEGREES 38 MINUTES 41 SECONDS W, 306.82 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

N 00 DEGREES 31 MINUTES 45 SECONDS E, [illegible] FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE N 64 DEGREES 45 MINUTES 39 SECONDS E, 48.46 FEET, LEAVING THE EASTERLY LINE OF SAID PHASE II, LOST CREEK ADDITION AND ALONG THE EASTERLY RIGHT-OF-WAY LINE OF SAID LOST CREEK

BOULEVARD, TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE BEGINNING OF A NON-TANGENT CURVE TO THE RIGHT, SAID POINT BEING IN THE WESTERLY LINE OF LOT A-R-1 BLOCK 1, LOST CREEK ADDITION AS RECORDED IN PLAT CABINET A, SLIDE 690, SAID COUNTY RECORDS;

THENCE 34.91 FEET ALONG THE ARC OF SAID CURVE TO THE RIGHT THROUGH A CENTRAL ANGLE OF 03 DEGREES [illegible] MINUTES [illegible] SECONDS, A RADIUS OF 433.00 FEET AND A LONG CHORD OF N 24 DEGREES 12 MINUTES 31 SECONDS W, [illegible] FEET TO A POINT IN THE SOUTHERLY RIGHT-OF-WAY LINE OF BLUE CREEK DRIVE TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE BEGINNING OF A NON-TANGENT CURVE TO THE RIGHT;

THENCE ALONG THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID BLUE CREEK DRIVE, THE FOLLOWING BEARINGS AND DISTANCES:

254.07 FEET ALONG THE ARC OF SAID CURVE TO THE RIGHT THROUGH A CENTRAL ANGLE OF 34 DEGREES 30 MINUTES 01 SECONDS, A RADIUS OF 418.65 FEET AND A LONG CHORD OF S 70 DEGREES 48 MINUTES 48 SECONDS E, 256.02 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

S 59 DEGREES 58 MINUTES 45 SECONDS E, 161.74 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE BEGINNING OF A CURVE TO THE LEFT;

101.38 FEET ALONG THE ARC OF SAID CURVE TO THE LEFT THROUGH A CENTRAL ANGLE OF 18 DEGREES 45 MINUTES 23 SECONDS, A RADIUS OF 304.30 FEET AND A LONG CHORD OF S 61 DEGREES 20 MINUTES 56 SECONDS E, 100.92 FEET, TO AN IRON ROD FOUND, THE NORTHWESTERLY CORNER OF LOT 1-R-1, AS RECORDED IN PLAT CABINET A, SLIDE 690;

THENCE S 06 DEGREES 26 MINUTES 54 SECONDS E, 188.77 FEET ALONG THE WESTERLY LINE OF SAID LOT 1-R-1, TO AN IRON ROD FOUND;

THENCE S 84 DEGREES 44 MINUTES 55 SECONDS E, 12.00 FEET ALONG THE SOUTHERLY LINE OF SAID LOT 1-R-1;

THENCE S 85 DEGREES 05 MINUTES 02 SECONDS E, 72.06 FEET ALONG THE SOUTHERLY LINE OF SAID LOT 1-R-1;

THENCE N 45 DEGREES 33 MINUTES 45 SECONDS E, 99.50 FEET ALONG THE SOUTHERLY LINE OF SAID LOT 1-R-1 TO THE SOUTHWEST CORNER OF LOT 1R, BLOCK 11, LOST CREEK ADDITION, AS RECORDED IN PLAT VOLUME 388/122, PAGE 25 OF SAID COUNTY RECORDS;

THENCE ALONG THE SOUTHERLY LINE AND THE EASTERLY LINE OF SAID BLOCK 11, LOST CREEK ADDITION AS RECORDED IN PLAT VOLUME 388/122, PAGE 25 AND 388/115, PAGE 07, THE FOLLOWING BEARINGS AND DISTANCES:

N 73 DEGREES 40 MINUTES 46 SECONDS E, 104.44 FEET TO A POINT;

S 41 DEGREES 43 MINUTES 16 SECONDS E, 197.20 FEET TO A POINT;

FILED
JUL 14 2020
COUNTY CLERK, TARRANT CO., TEXAS
BY________________ DEPUTY

Unofficial Copy



S 72 DEGREES 55 MINUTES 10 SECONDS E, 184.40 FEET TO A POINT;

N 60 DEGREES 14 MINUTES 51 SECONDS E, 101.6[illegible] FEET TO A POINT;

S 30 DEGREES 51 MINUTES 40 SECONDS E, 101.[illegible] FEET TO A POINT;

S 74 DEGREES 60 MINUTES 2[illegible] SECONDS E, 41[illegible] FEET TO A POINT;

N 79 DEGREES 04 MINUTES 40 SECONDS E, 101.9[illegible] FEET TO A POINT;

N 66 DEGREES 39 MINUTES 57 SECONDS E, 356.6[illegible] FEET TO A POINT;

N 76 DEGREES 04 MINUTES 57 SECONDS E, 372.62 FEET TO A POINT;

N [illegible] DEGREES [illegible] MINUTES [illegible] SECONDS E, [illegible] FEET TO THE NORTHEAST CORNER OF LOT 11, SAID BLOCK 11, LOST CREEK ADDITION IN THE NORTH LINE OF SAID SURVEY [illegible] THE SOUTH LINE OF THE E. PETTIT SURVEY, ABSTRACT NO. 1276;

THENCE S [illegible] DEGREES 36 MINUTES [illegible] SECONDS E, [illegible] FEET TO A POINT;

THENCE S 00 DEGREES 21 MINUTES [illegible] SECONDS W, [illegible] FEET TO THE BEGINNING OF A NON-TANGENT CURVE TO THE LEFT;

THENCE [illegible] FEET ALONG THE ARC OF SAID CURVE TO THE LEFT THROUGH A CENTRAL ANGLE OF [illegible] DEGREES [illegible] MINUTES [illegible] SECONDS, A RADIUS OF [illegible] FEET AND A LONG CHORD OF S 4[illegible] DEGREES [illegible] MINUTES 18 SECONDS W, [illegible] FEET;

THENCE S 74 DEGREES 37 MINUTES 23 SECONDS W, [illegible] FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE S [illegible] DEGREES 03 MINUTES 57 SECONDS E, [illegible] FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED CARTER & BURGESS SET;

THENCE S 74 DEGREES [illegible] MINUTES 13 SECONDS [illegible], [illegible] FEET TO THE POINT OF BEGINNING AND CONTAINING [illegible] ACRES OF LAND, OF WHICH [illegible] ACRES ARE WITHIN TRUSPEDING CREEK STREET, [illegible] ACRES SAVE AND EXCEPT TRACT [illegible] SAVE AND EXCEPT TRACT VI, LEAVING A NET AREA OF [illegible] ACRES OF LAND, MORE OR LESS;

TRACT [illegible]:

BEGINNING AT AN IRON ROD FOUND AT THE SOUTHWEST CORNER OF LOT 3, BLOCK 4, LOST CREEK ADDITION AS RECORDED IN PLAT VOLUME [illegible], PAGE 97, SAID COUNTY RECORDS;

THENCE [illegible] DEGREES [illegible] MINUTES [illegible] SECONDS E, [illegible] FEET ALONG THE SOUTH LINE OF SAID BLOCK 4 TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET IN THE WESTERLY RIGHT-OF-WAY LINE OF LOST CREEK BOULEVARD;

THENCE S 16 DEGREES [illegible] MINUTES 00 SECONDS E, 100.04 FEET ALONG SAID WESTERLY RIGHT-OF-WAY LINE TO AN IRON ROD FOUND AT THE NORTHEAST CORNER OF LOT 46, SAID BLOCK 4, LOST CREEK ADDITION;

THENCE S 74 DEGREES [illegible] MINUTES 00 SECONDS W, 110.00 FEET ALONG THE NORTH LINE OF SAID LOT 46 TO AN IRON ROD FOUND AT ITS NORTHWEST CORNER;

THENCE SOUTHERLY ALONG THE WEST LINE OF SAID BLOCK 4, THE FOLLOWING BEARINGS AND DISTANCES:

S [illegible] DEGREES 36 MINUTES 05 SECONDS E, 217.74 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE BEGINNING OF A CURVE TO THE RIGHT;

220.18 FEET ALONG THE ARC OF SAID CURVE THROUGH A CENTRAL ANGLE OF 30 DEGREES 09 MINUTES 00 SECONDS, A RADIUS OF 421.86 FEET AND A LONG CHORD OF S 06 DEGREES 3[illegible] MINUTES [illegible] SECONDS E, 218.34 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

S 14 DEGREES 34 MINUTES 40 SECONDS W, 41.08 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE BEGINNING OF A CURVE TO THE LEFT;

332.24 FEET ALONG THE ARC OF SAID CURVE TO THE LEFT THROUGH A CENTRAL ANGLE OF 13 DEGREES 49 MINUTES 45 SECONDS, A RADIUS OF 1369.02 FEET AND A LONG CHORD OF S 0[illegible] DEGREES 3[illegible] MINUTES [illegible] SECONDS W, 331.42 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

S 00 DEGREES 34 MINUTES 11 SECONDS W, 1166.99 FEET TO AN IRON ROD FOUND, THE SOUTHWEST CORNER OF LOT 21, SAID BLOCK 4;

THENCE S 89 DEGREES 25 MINUTES 49 SECONDS E, 110.00 FEET TO AN IRON ROD FOUND AT THE SOUTHEAST CORNER OF SAID LOT 21 IN THE WESTERLY RIGHT-OF-WAY LINE OF LOST CREEK BOULEVARD;

THENCE S 00 DEGREES 34 MINUTES 11 SECONDS W, 127.50 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET IN THE NORTHERLY RIGHT-OF-WAY LINE OF BLUE CREEK DRIVE;

THENCE S 85 DEGREES 34 MINUTES 16 SECONDS W, 150.15 FEET, ALONG SAID NORTHERLY RIGHT-OF-WAY LINE TO AN IRON ROD FOUND, THE BEGINNING OF A CURVE TO THE LEFT;

THENCE 76.00 FEET ALONG THE ARC OF SAID CURVE TO THE LEFT THROUGH A CENTRAL ANGLE OF 0[illegible] DEGREES [illegible] MINUTES [illegible] SECONDS, A RADIUS OF [illegible] FEET AND A LONG CHORD OF S 84 DEGREES 3[illegible] MINUTES 33 SECONDS W, [illegible] FEET TO THE SOUTHEAST CORNER OF LOT 2[illegible], SAID BLOCK 4 FROM WHICH AN IRON ROD FOUND BEARS N 74 DEGREES 21 MINUTES 17 SECONDS W, 5.35 FEET;

THENCE N 04 DEGREES 25 MINUTES 43 SECONDS W, 119.97 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE NORTHEAST CORNER OF SAID LOT 23, BLOCK 4;

THENCE S 85 DEGREES 34 MINUTES 13 SECONDS W, 260.00 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE NORTHWEST CORNER OF LOT 23 AND THE SOUTHEAST CORNER OF LOT 21, BLOCK 4;

FILED
JUL 14 2020
COUNTY CLERK, TARRANT CO., TEXAS
BY ____________ DEPUTY

Unofficial Copy



THENCE N 00 DEGREES 3[illegible] MINUTES 34 SECONDS E, [illegible] FEET ALONG THE EAST LINE OF SAID BLOCK 4 TO THE POINT OF BEGINNING, AND CONTAINING [illegible] ACRES OF LAND, SAVE AND EXCEPT TRACT [illegible] ACRES DEEDED TO MAX [illegible] AND [illegible] IN VOLUME [illegible], PAGE [illegible], SAID COUNTY RECORDS, AND SAVE AND EXCEPT TRACT V, [illegible] ACRES, LEAVING [illegible] OF [illegible] ACRES OF LAND, MORE OR LESS.

TRACT 4:

BEGINNING AT A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET THE SOUTHWEST CORNER OF LOT 1, BLOCK 2, LOST CREEK ADDITION AN ADDITION [illegible] PLAT AT VOLUME [illegible], PAGE 37, SAID COUNTY RECORDS, SAID POINT BEING IN THE EASTERLY RIGHT-OF-WAY LINE OF LOST CREEK BOULEVARD;

THENCE N 60 DEGREES 34 MINUTES [illegible] SECONDS E, [illegible] FEET ALONG THE SOUTH LINE OF SAID BLOCK [illegible] TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE SOUTHEAST CORNER OF LOT 4;

THENCE N 30 DEGREES [illegible] MINUTES 00 SECONDS E, [illegible] FEET TO AN IRON ROD FOUND;

THENCE S 60 DEGREES 36 MINUTES [illegible] SECONDS E, 45.00 FEET TO AN IRON ROD FOUND;

THENCE N 30 DEGREES 54 MINUTES 00 SECONDS [illegible] FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE N 30 DEGREES [illegible] MINUTES [illegible] SECONDS [illegible] FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET IN THE EASTERLY LINE OF LOT 5, BLOCK 1;

THENCE N 59 DEGREES 34 MINUTES [illegible] SECONDS E, [illegible] FEET ALONG THE EAST LINE OF SAID LOT 5, BLOCK 1, TO THE NORTHEAST CORNER OF SAID LOT [illegible] WHICH AN IRON ROD FOUND BEARS S 60 DEGREES 42 MINUTES 37 SECONDS W, [illegible] FEET;

THENCE N 85 DEGREES 34 MINUTES 00 SECONDS E, [illegible] FEET TO AN IRON ROD FOUND IN THE EAST LINE OF SAID [illegible] ACRE TRACT;

THENCE S 0[illegible] DEGREES 41 MINUTES [illegible] SECONDS W, 130.[illegible] FEET ALONG THE EAST LINE OF SAID [illegible] ACRE TRACT TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE NORTHEAST CORNER OF LOT [illegible], BLOCK [illegible], LOST CREEK ADDITION AS RECORDED IN PLAT VOLUME [illegible], PAGE 26, SAID COUNTY RECORDS;

THENCE S 84 DEGREES [illegible] MINUTES [illegible] SECONDS W, [illegible] FEET ALONG THE NORTH LINE OF LOTS 25 AND 26, SAID BLOCK 5 TO AN IRON ROD FOUND, THE NORTHWEST CORNER OF SAID LOT 26,

THENCE S 00 DEGREES [illegible] MINUTES 33 SECONDS W, 120.[illegible] FEET TO AN IRON ROD FOUND, THE SOUTHWEST CORNER OF SAID LOT [illegible], BLOCK [illegible]

---

THENCE S 60 DEGREES 19 MINUTES [illegible] SECONDS E, [illegible] FEET ALONG THE SOUTH LINE OF SAID LOT 26, BLOCK [illegible] TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE S 00 DEGREES 41 MINUTES [illegible] SECONDS W, [illegible] FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET IN THE NORTH LINE OF LOT 21, BLOCK 7, LOST CREEK ADDITION AS RECORDED IN PLAT VOLUME [illegible], PAGE 97, SAID COUNTY RECORDS;

THENCE N [illegible] DEGREES 19 MINUTES 03 SECONDS W, 40.00 FEET TO AN IRON ROD FOUND, THE NORTHWEST CORNER OF SAID LOT 21;

THENCE ALONG THE WEST LINE AND THEN THE NORTH LINE OF SAID BLOCK 7, THE FOLLOWING BEARINGS AND DISTANCES;

S 0[illegible] DEGREES 57 MINUTES 47 SECONDS W, 1[illegible] FEET TO AN IRON ROD FOUND, THE NORTHEAST CORNER OF LOT [illegible], SAID BLOCK 7;

S 19 DEGREES 24 MINUTES 57 SECONDS W, 75.04 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

N [illegible] DEGREES 27 MINUTES 40 SECONDS W, 2[illegible] FEET TO AN IRON ROD FOUND, THE BEGINNING OF A CURVE TO THE RIGHT;

[illegible] FEET ALONG THE ARC OF SAID CURVE TO THE RIGHT THROUGH A CENTRAL ANGLE OF 49 DEGREES 54 MINUTES [illegible] SECONDS, A RADIUS OF [illegible] FEET AND A LONG CHORD OF N [illegible] DEGREES [illegible] MINUTES [illegible] SECONDS W, [illegible] FEET TO AN IRON ROD FOUND, THE NORTHERLY CORNER OF LOT 1, SAID BLOCK 7;

S [illegible] DEGREES 27 MINUTES 00 SECONDS W, 110.00 FEET TO AN IRON ROD FOUND, THE WESTERLY CORNER OF SAID LOT 1, BLOCK 7, IN THE NORTHERLY RIGHT-OF-WAY LINE OF BEN CREEK COURT;

THENCE N [illegible] DEGREES 23 MINUTES 00 SECONDS W, 167.54 FEET ALONG SAID NORTHERLY RIGHT-OF-WAY LINE TO THE BEGINNING OF A CURVE TO THE LEFT;

THENCE 2[illegible].32 FEET ALONG THE ARC OF SAID CURVE TO THE LEFT AND CONTINUING ALONG SAID NORTHERLY RIGHT-OF-WAY LINE THROUGH A CENTRAL ANGLE OF [illegible] DEGREES [illegible] MINUTES 45 SECONDS, A RADIUS OF [illegible].45 FEET AND A LONG CHORD OF N 20 DEGREES 24 MINUTES [illegible] SECONDS W, [illegible] FEET TO AN IRON ROD FOUND;

THENCE N [illegible] DEGREES [illegible] MINUTES 45 SECONDS W, [illegible] FEET CONTINUING ALONG SAID NORTHERLY RIGHT-OF-WAY LINE TO AN IRON ROD FOUND IN THE EASTERLY RIGHT-OF-WAY LINE OF LOST CREEK BOULEVARD, THE BEGINNING OF A NON-TANGENT CURVE TO THE RIGHT;

THENCE 146.[illegible] FEET ALONG THE ARC OF SAID CURVE TO THE RIGHT AND ALONG THE EASTERLY RIGHT-OF-WAY LINE OF LOST CREEK BOULEVARD THROUGH A CENTRAL ANGLE OF [illegible] DEGREES [illegible] MINUTES [illegible] SECONDS, A RADIUS OF [illegible] FEET AND A LONG CHORD OF N [illegible] DEGREES [illegible] MINUTES 35 SECONDS E, [illegible] FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE N 14 DEGREES 34 MINUTES 00 SECONDS E, [illegible] FEET ALONG SAID EASTERLY RIGHT-OF-WAY LINE

FILED
JUL 14 2020
COUNTY CLERK, TARRANT CO., TEXAS
BY____________ DEPUTY

Unofficial Copy



TO AN IRON ROD FOUND, THE SOUTHWEST CORNER OF LOT 11, BLOCK 5 OF SAID LOST CREEK ADDITION;

THENCE ALONG THE OUTSIDE BOUNDARY LINE OF SAID BLOCK 5, THE FOLLOWING BEARINGS AND DISTANCES:

N 87 DEGREES 24 MINUTES [illegible] SECONDS E, [illegible] FEET TO AN IRON ROD FOUND AT THE BEGINNING OF A CURVE TO THE RIGHT; [illegible] FEET ALONG THE ARC OF SAID CURVE TO THE RIGHT THROUGH A CENTRAL ANGLE OF [illegible] DEGREES [illegible] MINUTES [illegible] SECONDS, A RADIUS OF [illegible] FEET AND A LONG CHORD OF S 72 DEGREES 20 MINUTES [illegible] SECONDS E, [illegible] FEET TO AN IRON ROD FOUND;

S 67 DEGREES 16 MINUTES 00 SECONDS E, 142.00 FEET TO AN IRON ROD FOUND, THE BEGINNING OF A CURVE TO THE LEFT;
130.30 FEET ALONG THE ARC OF SAID CURVE TO THE LEFT THROUGH A CENTRAL ANGLE OF 13 DEGREES 00 MINUTES 00 SECONDS, A RADIUS OF [illegible] FEET AND A LONG CHORD OF S [illegible] MINUTES 00 SECONDS E, 129.92 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

S 76 DEGREES 16 MINUTES 00 SECONDS E, 188.[illegible] FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE BEGINNING OF A CURVE TO THE LEFT; [illegible] FEET ALONG THE ARC OF SAID CURVE TO THE LEFT THROUGH A CENTRAL ANGLE OF [illegible] DEGREES 00 MINUTES 00 SECONDS, A RADIUS OF [illegible] FEET AND A LONG CHORD OF N [illegible] DEGREES [illegible] MINUTES 00 SECONDS E, [illegible] FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

N [illegible] DEGREES [illegible] MINUTES [illegible] SECONDS W, 240.[illegible] FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE BEGINNING OF A CURVE TO THE LEFT; [illegible] FEET ALONG THE ARC OF SAID CURVE TO THE LEFT THROUGH A CENTRAL ANGLE OF 122 DEGREES 00 MINUTES 00 SECONDS, A RADIUS OF [illegible] FEET AND A LONG CHORD OF N 67 DEGREES 16 MINUTES 00 SECONDS W, [illegible] FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

S 61 DEGREES 44 MINUTES 00 SECONDS W, [illegible] FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE BEGINNING OF A CURVE TO THE LEFT; [illegible] FEET ALONG THE ARC OF SAID CURVE TO THE LEFT THROUGH A CENTRAL ANGLE OF 32 DEGREES 00 MINUTES 00 SECONDS, A RADIUS OF [illegible] FEET AND A LONG CHORD OF S 45 DEGREES 44 MINUTES 00 SECONDS W, [illegible] FEET TO AN IRON ROD FOUND;

S [illegible] DEGREES 44 MINUTES [illegible] SECONDS W, [illegible] FEET TO AN IRON ROD FOUND AT THE WESTERLY CORNER OF LOT 1, SAID BLOCK 5 IN THE NORTHERLY RIGHT-OF-WAY LINE OF PINE CREEK COURT;

THENCE N 67 DEGREES [illegible] MINUTES [illegible] SECONDS W, 47.[illegible] FEET ALONG SAID NORTHERLY RIGHT-OF-WAY LINE OF PINE CREEK COURT TO AN IRON ROD FOUND, THE BEGINNING OF A CURVE TO THE LEFT;

THENCE 110.79 FEET ALONG THE ARC OF SAID CURVE TO THE LEFT AND ALONG SAID NORTHERLY RIGHT-OF-WAY LINE THROUGH A CENTRAL ANGLE OF [illegible] DEGREES [illegible] MINUTES [illegible] SECONDS, A RADIUS OF [illegible] FEET AND A LONG CHORD OF [illegible] DEGREES [illegible] MINUTES [illegible] SECONDS W, 100.[illegible] FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE N [illegible] DEGREES [illegible] MINUTES [illegible] SECONDS W, [illegible] FEET ALONG SAID NORTHERLY RIGHT-OF-WAY LINE TO AN IRON ROD FOUND AT THE EASTERLY RIGHT-OF-WAY LINE OF LOST CREEK BOULEVARD, THE BEGINNING OF A NON-TANGENT CURVE TO THE LEFT;

THENCE [illegible] FEET ALONG THE ARC OF SAID CURVE TO THE LEFT AND ALONG SAID EASTERLY RIGHT-OF-WAY LINE OF LOST CREEK BOULEVARD THROUGH A CENTRAL ANGLE OF [illegible] DEGREES [illegible] MINUTES [illegible] SECONDS, A RADIUS OF [illegible] FEET AND A LONG CHORD OF N [illegible] DEGREES [illegible] MINUTES [illegible] SECONDS W, 182.45 FEET TO AN IRON ROD FOUND;

THENCE [illegible] DEGREES [illegible] MINUTES [illegible] SECONDS W, [illegible] FEET CONTINUING ALONG SAID EASTERLY RIGHT-OF-WAY LINE TO THE POINT OF BEGINNING AND CONTAINING [illegible] ACRES OF LAND, SAVE AND EXCEPT TRACT [illegible] ACRES DEEDED TO MAX H. EUBANK AND BILLY JOE SMITH IN VOLUME [illegible], PAGE [illegible], SAID COUNTY RECORDS, LEAVING A NET AREA OF [illegible] ACRES OF LAND, MORE OR LESS.

TRACT 2

BEGINNING AT AN IRON ROD FOUND AT THE NORTHWEST CORNER OF LOT 14, BLOCK 8, LOST CREEK ADDITION AS RECORDED IN PLAT VOLUME [illegible], PAGE 26, SAID COUNTY RECORDS, SAID POINT BEING IN THE EASTERLY RIGHT-OF-WAY LINE OF LOST CREEK BOULEVARD;

THENCE N 00 DEGREES 24 MINUTES 11 SECONDS E, [illegible] FEET ALONG SAID EASTERLY RIGHT-OF-WAY LINE TO AN IRON ROD FOUND, THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE [illegible] FEET ALONG THE ARC OF SAID CURVE TO THE RIGHT AND ALONG SAID EASTERLY RIGHT-OF-WAY LINE THROUGH A CENTRAL ANGLE OF [illegible] DEGREES [illegible] MINUTES [illegible] SECONDS, A RADIUS OF 1194.92 FEET AND A LONG CHORD OF N [illegible] DEGREES [illegible] MINUTES [illegible] SECONDS E, [illegible] FEET TO AN IRON ROD FOUND IN THE SOUTHERLY RIGHT-OF-WAY LINE OF BEN CREEK COURT;

THENCE S [illegible] DEGREES [illegible] MINUTES [illegible] SECONDS E, [illegible] FEET ALONG THE SOUTHERLY RIGHT-OF-WAY LINE OF BEN CREEK COURT TO AN IRON ROD FOUND AT THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE 240.[illegible] FEET ALONG THE ARC OF SAID CURVE TO THE RIGHT AND ALONG SAID SOUTHERLY RIGHT-OF-WAY LINE THROUGH A CENTRAL ANGLE OF [illegible] DEGREES [illegible] MINUTES [illegible] SECONDS, A RADIUS OF [illegible] FEET AND A LONG CHORD OF S [illegible] DEGREES [illegible] MINUTES [illegible] SECONDS E, [illegible] FEET TO AN IRON ROD FOUND;

THENCE S 31 DEGREES 23 MINUTES [illegible] SECONDS E, 107.[illegible] FEET CONTINUING ALONG SAID SOUTHERLY RIGHT-OF-WAY LINE TO AN IRON ROD FOUND, THE BEGINNING OF A CURVE TO THE LEFT;

THENCE [illegible] FEET ALONG THE ARC OF SAID CURVE TO THE LEFT AND CONTINUING ALONG SAID SOUTHERLY RIGHT-OF-WAY LINE THROUGH A CENTRAL ANGLE OF [illegible] DEGREES [illegible] MINUTES [illegible] SECONDS, A RADIUS OF [illegible] FEET AND A LONG CHORD OF S [illegible] DEGREES [illegible] MINUTES [illegible] SECONDS E, [illegible] FEET TO AN IRON ROD FOUND, THE NORTHERLY CORNER OF LOT [illegible], BLOCK 8, LOST CREEK ADDITION AS RECORDED IN PLAT VOLUME [illegible], PAGE [illegible], SAID COUNTY RECORDS;

THENCE S [illegible] DEGREES [illegible] MINUTES [illegible] SECONDS W, [illegible] FEET TO THE WESTERLY CORNER OF SAID LOT [illegible], BLOCK 8, THE BEGINNING OF A NON-TANGENT CURVE TO THE LEFT;

FILED
JUL 14 2020
COUNTY CLERK, TARRANT CO., TEXAS
BY________________DEPUTY

Unofficial Copy



THENCE [illegible] FEET ALONG THE ARC OF SAID CURVE TO THE LEFT AND ALONG THE SOUTHERLY LINE OF SAID BLOCK 8, THROUGH A CENTRAL ANGLE OF [illegible] DEGREES [illegible] MINUTES [illegible] SECONDS, A RADIUS OF [illegible] FEET AND A LONG CHORD OF [illegible] DEGREES [illegible] MINUTES [illegible] SECONDS E, [illegible] FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE S [illegible] DEGREES 21 MINUTES [illegible] SECONDS E, [illegible] FEET CONTINUING ALONG THE SOUTHERLY LINE OF SAID BLOCK 8 TO AN IRON ROD FOUND;

THENCE [illegible] DEGREES [illegible] MINUTES [illegible] SECONDS [illegible], [illegible] FEET CONTINUING ALONG SAID SOUTHERLY LINE OF SAID BLOCK 8 TO AN IRON ROD FOUND, THE SOUTHEAST CORNER OF LOT [illegible], IN THE [illegible] LINE OF SAID [illegible] TRACT;

THENCE S 00 DEGREES [illegible] MINUTES [illegible] SECONDS W, [illegible] FEET ALONG SAID [illegible] LINE TO AN IRON ROD FOUND, THE NORTHEAST CORNER OF LOT [illegible], BLOCK 10, LOST CREEK ADDITION AS RECORDED IN PLAT VOLUME [illegible], PAGE [illegible], [illegible] COUNTY RECORDS;

THENCE N [illegible] DEGREES [illegible] MINUTES [illegible] SECONDS W, [illegible] FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE NORTHWEST CORNER OF SAID LOT [illegible], BLOCK 10;

THENCE S [illegible] DEGREES [illegible] MINUTES [illegible] SECONDS W, [illegible] FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE SOUTHWEST CORNER OF SAID LOT [illegible], BLOCK 10 IN THE NORTH LINE OF BLUE CREEK DRIVE, THE BEGINNING OF A NON-TANGENT CURVE TO THE LEFT;

THENCE ALONG THE NORTHERLY RIGHT-OF-WAY LINE OF [illegible] CREEK DRIVE, THE FOLLOWING BEARINGS AND DISTANCES:

[illegible] FEET ALONG THE ARC OF SAID NON-TANGENT CURVE TO THE LEFT THROUGH A CENTRAL ANGLE OF [illegible] DEGREES [illegible] MINUTES [illegible] SECONDS, A RADIUS OF [illegible] FEET AND A LONG CHORD OF [illegible] DEGREES [illegible] MINUTES [illegible] SECONDS W, [illegible] FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

S [illegible] DEGREES 24 MINUTES [illegible] SECONDS W, [illegible] FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE BEGINNING OF A CURVE TO THE RIGHT; [illegible] FEET ALONG THE ARC OF SAID CURVE TO THE RIGHT THROUGH A CENTRAL ANGLE OF [illegible] DEGREES [illegible] MINUTES [illegible] SECONDS, A RADIUS OF [illegible] FEET AND A LONG CHORD OF [illegible] DEGREES [illegible] MINUTES [illegible] SECONDS W, [illegible] FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

[illegible] DEGREES [illegible] MINUTES [illegible] SECONDS W, [illegible] FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE BEGINNING OF A CURVE TO THE LEFT; [illegible] FEET ALONG THE ARC OF SAID CURVE TO THE LEFT THROUGH A CENTRAL ANGLE OF [illegible] DEGREES [illegible] MINUTES [illegible] SECONDS, A RADIUS OF [illegible] FEET AND A LONG CHORD OF [illegible] DEGREES [illegible] MINUTES [illegible] SECONDS W, [illegible] FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

[illegible] DEGREES [illegible] MINUTES [illegible] SECONDS W, [illegible] FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE BEGINNING OF A CURVE TO THE RIGHT; [illegible] FEET ALONG THE ARC OF SAID CURVE TO THE RIGHT THROUGH A CENTRAL ANGLE OF [illegible] DEGREES [illegible] MINUTES [illegible] SECONDS, A RADIUS OF [illegible] FEET AND A LONG CHORD OF [illegible] DEGREES [illegible] MINUTES [illegible] SECONDS W, [illegible] FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE BEGINNING OF A CURVE TO THE LEFT;

[illegible] FEET ALONG THE ARC OF SAID CURVE TO THE LEFT THROUGH A CENTRAL ANGLE OF [illegible] DEGREES [illegible] MINUTES [illegible] SECONDS, A RADIUS OF [illegible] FEET AND A LONG CHORD OF [illegible] DEGREES [illegible] MINUTES [illegible] SECONDS W, [illegible] FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

[illegible] DEGREES [illegible] MINUTES [illegible] SECONDS W, [illegible] FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE BEGINNING OF A CURVE TO THE RIGHT; [illegible] FEET ALONG THE ARC OF SAID CURVE TO THE RIGHT THROUGH A CENTRAL ANGLE OF [illegible] DEGREES [illegible] MINUTES [illegible] SECONDS, A RADIUS OF [illegible] FEET AND A LONG CHORD OF [illegible] DEGREES [illegible] MINUTES [illegible] SECONDS W, [illegible] FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

[illegible] DEGREES [illegible] MINUTES [illegible] SECONDS W, [illegible] FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE BEGINNING OF A CURVE TO THE LEFT; [illegible] FEET ALONG THE ARC OF SAID CURVE TO THE LEFT THROUGH A CENTRAL ANGLE OF [illegible] DEGREES [illegible] MINUTES [illegible] SECONDS, A RADIUS OF [illegible] FEET AND A LONG CHORD OF [illegible] DEGREES [illegible] MINUTES [illegible] SECONDS W, [illegible] FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

[illegible] DEGREES [illegible] MINUTES [illegible] SECONDS W, [illegible] FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET IN THE EASTERLY RIGHT-OF-WAY LINE OF LOST CREEK BOULEVARD, THE BEGINNING OF A NON-TANGENT CURVE TO THE RIGHT;

THENCE [illegible] FEET ALONG THE ARC OF SAID NON-TANGENT CURVE TO THE RIGHT AND ALONG THE EASTERLY RIGHT-OF-WAY LINE OF LOST CREEK BOULEVARD THROUGH A CENTRAL ANGLE OF [illegible] DEGREES [illegible] MINUTES [illegible] SECONDS, A RADIUS OF [illegible] FEET AND A LONG CHORD OF [illegible] DEGREES [illegible] MINUTES [illegible] SECONDS W, [illegible] FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE SOUTHWEST CORNER OF LOT 1, BLOCK 10, SAID LOST CREEK ADDITION, THE BEGINNING OF A NON-TANGENT CURVE TO THE LEFT;

THENCE ALONG THE SOUTHERLY LINE OF SAID BLOCK 10, THE FOLLOWING BEARINGS AND DISTANCES: [illegible] FEET ALONG THE ARC OF SAID CURVE TO THE LEFT THROUGH A CENTRAL ANGLE OF [illegible] DEGREES [illegible] MINUTES [illegible] SECONDS, A RADIUS OF [illegible] FEET AND A LONG CHORD OF N [illegible] DEGREES [illegible] MINUTES [illegible] SECONDS E, [illegible] FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

N [illegible] DEGREES [illegible] MINUTES [illegible] SECONDS E, [illegible] FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE BEGINNING OF A CURVE TO THE RIGHT; [illegible] FEET ALONG THE ARC OF SAID CURVE TO THE RIGHT THROUGH A CENTRAL ANGLE OF [illegible] DEGREES [illegible] MINUTES [illegible] SECONDS, A RADIUS OF [illegible] FEET AND A LONG CHORD OF [illegible] DEGREES [illegible] MINUTES [illegible] SECONDS E, [illegible] FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

S [illegible] DEGREES [illegible] MINUTES [illegible] SECONDS E, [illegible] FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE BEGINNING OF A CURVE TO THE LEFT; [illegible] FEET ALONG THE ARC OF SAID CURVE TO THE LEFT THROUGH A CENTRAL ANGLE OF [illegible] DEGREES [illegible] MINUTES [illegible] SECONDS, A RADIUS OF [illegible] FEET AND A LONG CHORD OF S [illegible] DEGREES [illegible] MINUTES [illegible] SECONDS E, [illegible] FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

FILED
JUL 1 4 2020
COUNTY CLERK, TARRANT CO., TEXAS
BY_________________ DEPUTY

Unofficial Copy



S [illegible] DEGREES 25 MINUTES 45 SECONDS E, 257.09 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE SOUTHEAST CORNER OF LOT 12, SAID BLOCK 10;

THENCE N 01 DEGREES 34 MINUTES 15 SECONDS E, [illegible] FEET ALONG THE EAST LINE OF SAID LOT 12 TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE S 88 DEGREES 25 MINUTES 45 SECONDS E, [illegible] FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE N 01 DEGREES 34 MINUTES 15 SECONDS E, [illegible] FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE N 88 DEGREES 25 MINUTES 45 SECONDS W, [illegible] FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET IN THE EAST LINE OF LOT 12, BLOCK [illegible] LOST CREEK ADDITION;

THENCE N 01 DEGREES 34 MINUTES 15 SECONDS E, [illegible] FEET ALONG THE [illegible] LINE OF SAID LOT 12, BLOCK 9 TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE NORTHEAST CORNER OF SAID LOT 12;

THENCE ALONG THE NORTHERLY LINE OF SAID BLOCK 9 THE FOLLOWING BEARINGS AND DISTANCES:

[illegible] DEGREES 25 MINUTES 45 SECONDS W, [illegible] FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE BEGINNING OF A CURVE TO THE RIGHT; [illegible] FEET ALONG THE ARC OF SAID CURVE TO THE RIGHT THROUGH CENTRAL ANGLE OF [illegible] DEGREES [illegible] MINUTES [illegible] SECONDS, A RADIUS OF [illegible] FEET AND A LONG CHORD OF [illegible] DEGREES [illegible] SECONDS W, [illegible] FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

[illegible] DEGREES [illegible] MINUTES 45 SECONDS W, [illegible] FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE BEGINNING OF A CURVE TO THE LEFT; [illegible] FEET ALONG THE ARC OF SAID CURVE TO THE LEFT THROUGH A CENTRAL ANGLE OF [illegible] DEGREES [illegible] MINUTES [illegible] SECONDS, A RADIUS OF [illegible] FEET AND A LONG CHORD OF [illegible] DEGREES [illegible] MINUTES [illegible] SECONDS W, [illegible] FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

S [illegible] DEGREES 34 MINUTES 15 SECONDS W, [illegible] FEET TO AN IRON ROD FOUND AT THE NORTHWEST CORNER OF LOT 1, SAID BLOCK 9 IN THE [illegible] LINE OF LOST CREEK BOULEVARD;

THENCE [illegible] DEGREES [illegible] MINUTES [illegible] SECONDS [illegible] FEET ALONG SAID EASTERLY RIGHT-OF-WAY LINE TO AN IRON ROD FOUND AT THE SOUTHWEST CORNER OF LOT 13, BLOCK 5, LOST CREEK ADDITION AS RECORDED IN VOLUME [illegible], PAGE [illegible], SAID COUNTY RECORDS;

THENCE N 78 DEGREES [illegible] MINUTES [illegible] SECONDS E, [illegible] FEET ALONG THE SOUTH LINE OF SAID LOT 13, BLOCK 5 TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT ITS SOUTHEAST CORNER;

THENCE N [illegible] DEGREES [illegible] MINUTES [illegible] SECONDS E, [illegible] FEET TO AN IRON ROD FOUND, THE NORTHEAST CORNER OF LOT 14, BLOCK [illegible];

THENCE [illegible] DEGREES [illegible] MINUTES [illegible] SECONDS W, 110.00 FEET TO THE POINT OF BEGINNING AND CONTAINING [illegible] ACRES OF LAND.

SAVE & EXCEPT TRACT [illegible]

BEING A TRACT SITUATED IN THE [illegible] BURSEY SURVEY, ABSTRACT NO. 141, TARRANT COUNTY, TEXAS AND BEING A PORTION OF THE [illegible] ACRE TRACT AS DESCRIBED BY DEED TO LOST CREEK COUNTRY CLUB AND RECORDED IN VOLUME [illegible], PAGE [illegible], AND A PORTION OF PARCEL "A" AS DESCRIBED BY DEED TO LOST CREEK COUNTRY CLUB AS RECORDED IN VOLUME [illegible], PAGE 253, SAID COUNTY RECORDS, SAID SAVE AND EXCEPT TRACT BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

BEGINNING AT AN IRON ROD FOUND AT THE MOST SOUTHERLY SOUTHWEST CORNER OF SAID PARCEL "A";

THENCE N [illegible] DEGREES 31 MINUTES [illegible] SECONDS E, [illegible] FEET TO A POINT FROM WHICH AN IRON ROD FOUND BEARS N [illegible] DEGREES [illegible] MINUTES [illegible] SECONDS E, [illegible] FEET;

THENCE N 88 DEGREES 26 MINUTES 25 SECONDS W, [illegible] FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE N 01 DEGREES 31 MINUTES [illegible] SECONDS E, [illegible] FEET TO AN IRON ROD FOUND;

THENCE N [illegible] DEGREES 24 MINUTES 06 SECONDS E, [illegible] FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE S [illegible] DEGREES 37 MINUTES 24 SECONDS E, [illegible] FEET TO AN IRON ROD FOUND;

THENCE S 00 DEGREES 24 MINUTES [illegible] SECONDS W, [illegible] FEET TO AN IRON ROD FOUND;

THENCE N [illegible] DEGREES 42 MINUTES 42 SECONDS W, [illegible] FEET TO THE POINT OF BEGINNING AND CONTAINING [illegible] ACRES OF LAND, MORE OR LESS.

SAVE & EXCEPT TRACT II:

BEING A TRACT OF LAND SITUATED IN THE J. BURLESON SURVEY, ABSTRACT NO. [illegible], TARRANT COUNTY, TEXAS AND BEING A PORTION OF THE [illegible] ACRE TRACT AS DESCRIBED BY DEED TO LOST CREEK COUNTRY CLUB AND RECORDED IN VOLUME [illegible], PAGE [illegible], SAID COUNTY RECORDS AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

BEGINNING AT THE SOUTHEAST CORNER OF LOT [illegible], BLOCK 4, LOST CREEK ADDITION AS RECORDED IN PLAT VOLUME [illegible], PAGE [illegible], SAID COUNTY RECORDS;

THENCE S [illegible] DEGREES [illegible] MINUTES [illegible] SECONDS W, [illegible] FEET TO A POINT IN THE NORTH RIGHT-OF-WAY LINE OF BLUE CREEK DRIVE;

THENCE S [illegible] DEGREES [illegible] MINUTES [illegible] SECONDS W, [illegible] FEET ALONG SAID NORTH RIGHT-OF-WAY LINE;

FILED
JUL 14 2020
COUNTY CLERK, TARRANT CO., TEXAS
BY_______________DEPUTY

Unofficial Copy



THENCE N [illegible] DEGREES 34 MINUTES 41 SECONDS E, [illegible] FEET TO AN IRON ROD FOUND, THE SOUTHWEST CORNER OF SAID LOT 29, BLOCK 4;

THENCE S 89 DEGREES 25 MINUTES 41 SECONDS E, 110.00 FEET TO THE POINT OF BEGINNING AND CONTAINING 0.333 ACRES OF LAND, MORE OR LESS

SAVE AND EXCEPT TRACT [illegible]

BEING LOTS 1 AND 2, BLOCK 24, OF LOST CREEK ADDITION, AS RECORDED IN CABINET [illegible], SLIDE 291, PLAT RECORDS OF TARRANT COUNTY, TEXAS, AND BEING A TRACT OF LAND SITUATED IN THE [illegible] SURVEY, ABSTRACT NO. 75, TARRANT COUNTY, TEXAS, AND BEING A PORTION OF THE [illegible] ACRE TRACT AS DESCRIBED BY DEED TO LOST CREEK COUNTRY CLUB AND RECORDED IN DEED RECORD VOLUME [illegible], PAGE 351, SAID COUNTY RECORDS; SAID TRACT BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT THE SOUTHWEST CORNER OF LOT 1, BLOCK 2, LOST CREEK ADDITION AS RECORDED IN PLAT VOLUME 388-[illegible], PAGE 97, SAID COUNTY RECORDS, SAID POINT BEING IN THE EASTERLY RIGHT-OF-WAY LINE OF LOST CREEK BOULEVARD;

THENCE S 15 DEGREES 20 MINUTES 00 SECONDS E, 21.[illegible] FEET ALONG SAID EASTERLY RIGHT-OF-WAY LINE TO THE POINT OF BEGINNING;

THENCE N 0[illegible] DEGREES 3[illegible] MINUTES 00 SECONDS E, 110.0[illegible] FEET;

THENCE S 1[illegible] DEGREES 2[illegible] MINUTES 00 SECONDS E, 200.00 FEET;

THENCE S 44 DEGREES 3[illegible] MINUTES 00 SECONDS W, [illegible] FEET TO A POINT IN THE EASTERLY RIGHT-OF-WAY LINE OF LOST CREEK BOULEVARD;

THENCE N 15 DEGREES 20 MINUTES 00 SECONDS W, [illegible] FEET TO THE POINT OF BEGINNING, AND CONTAINING 0.[illegible] ACRES OF LAND, MORE OR LESS.

SAVE & EXCEPT TRACT [illegible]

BEING A TRACT OF LAND SITUATED IN THE J. [illegible] SURVEY, ABSTRACT NO. 7[illegible], TARRANT COUNTY, TEXAS AND BEING ALL OF LOT 4[illegible], BLOCK 4, LOST CREEK ADDITION AS RECORDED IN CABINET D, SLIDE NO. 1[illegible] SAID COUNTY RECORDS, AND CONTAINING 0.324 ACRES OF LAND MORE OR LESS.

SAVE & EXCEPT TRACT [illegible]

BEING LOTS 2, 3, 4, AND [illegible] BLOCK 1[illegible] LOST CREEK ADDITION, AS RECORDED IN CABINET [illegible], SLIDE 1[illegible], PLAT RECORDS OF TARRANT COUNTY, TEXAS, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT THE SOUTHWEST CORNER OF LOT 20, BLOCK 1[illegible], PHASE [illegible], LOST CREEK ADDITION AS RECORDED IN PLAT VOLUME 38[illegible], PAGE 6[illegible], SAID COUNTY RECORDS, SAID POINT BEING IN THE WESTERLY RIGHT-OF-WAY LINE OF LOST CREEK BOULEVARD;

THENCE N 5[illegible] DEGREES [illegible] MINUTES 30 SECONDS E, [illegible] FEET TO THE POINT OF BEGINNING IN THE EASTERLY RIGHT-OF-WAY LINE OF LOST CREEK BOULEVARD;

THENCE [illegible] DEGREES [illegible] MINUTES 12 SECONDS W, 74.32 FEET ALONG SAID EASTERLY RIGHT-OF-WAY LINE;

THENCE N 83 DEGREES 1[illegible] MINUTES 36 SECONDS W, 2[illegible] FEET CONTINUING ALONG SAID EASTERLY RIGHT-OF-WAY LINE;

THENCE [illegible] DEGREES 47 MINUTES 24 SECONDS E, 162.02 FEET;

THENCE N 69 DEGREES 47 MINUTES 24 SECONDS E, 21.70 FEET;

THENCE N 36 DEGREES 47 MINUTES 24 SECONDS E, 81.12 FEET;

THENCE S 81 DEGREES 00 MINUTES 02 SECONDS E, 242.15 FEET;

THENCE S 07 DEGREES 24 MINUTES 07 SECONDS E, 74.32 FEET;

THENCE S 61 DEGREES 17 MINUTES 36 SECONDS E, 65.00 FEET;

THENCE S 36 DEGREES 47 MINUTES 24 SECONDS W, 311.87 FEET TO THE POINT OF BEGINNING AND CONTAINING 1.195 ACRES OF LAND, MORE OR LESS.

FILED
JUL 14 2020
COUNTY CLERK, TARRANT CO., TEXAS
BY________________ DEPUTY

Unofficial Copy

**DUPLICATE**

**MARY LOUISE NICHOLSON**
**COUNTY CLERK, TARRANT COUNTY**
**100 W. WEATHERFORD**
**FORT WORTH, TX 76196-0401**

| | | | |
|---|---|---|---|
| Receipt Time: | 07/14/2020 03:25:11 PM | Receipt #: | 4434859 |
| Issued To: | THE MARX FIRM, LLC | | |

**Documents**

| # | Type | # Pages | Quantity | Reference # | Book / Page | Amount |
|---|---|---|---|---|---|---|
| 1 | FCNOTICE | 1 | 1 | | | $16.00 |
| | | | | | **Total :** | $16.00 |

**Payments**

| # | Type | Payment # | Amount | NSF |
|---|---|---|---|---|
| 1 | CHECK | 9449 | $16.00 | |
| | | **Total Payments:** | $16.00 | |

THANK YOU

Mary Louise Nicholson
County Clerk
*Recording life's events since 2011*

EXHIBIT "B"

Unofficial Copy

Unofficial Copy

**APPOINTMENT OF SUBSTITUTE TRUSTEE**

| | |
|---|---|
| THE STATE F TEXAS | KNOW ALL MEN |
| COUNTY OF TARRANT | BY THESE PRESENTS |

A. WHEREAS, by Deed of Trust (herein "Deed of Trust") dated **June 25, 2018, from Somerset-Lostcreek Golf, Ltd., a Texas limited partnership, at times identified Somerset-Lost Creek, Ltd.,** as Grantor, conveyed to **Timothy Barton**, Trustee, for the benefit of **WALL010 LLC, a Texas limited liability company**, certain real property situated in **Tarrant** County, Texas, being described as follows:

> **BEING THAT CERTAIN LOT, TRACT OR PARCEL OF LAND SITUATED IN THE CITY OF ALEDO, TARRANT COUNTY, TEXAS, AND BEINGMORE PARTICULARLY DESRIBED THEREIN (AND HEREIN) BY METES AND BOUNDS ON EXHIBIT "A" ATTACHED THERETO (AND HERETO) AND MADE A PART HEROF FOR ALL PURPOSES, as may be more fully described in the Deed of Trust,**

to secure the payment of one certain Promissory Note (herein the "Note") therein described in the principal amount of **$300,000.00**, which Deed of Trust was **electronically recorded by Tarrant County Clerk in Official Public Records of Tarrant County, Texas , reference/ clerk's file number D219077623 on April 15, 2019,** reference to said Deed of Trust being hereby made for all purposes; and

B. WHEREAS, the owner and holder of the Note described in said Deed of Trust and the Beneficiary in said Deed of Trust desires to appoint a Substitute Trustee.

Unofficial Copy

NOW, THEREFORE, the undersigned, the holder of the Note described in the said Deed of Trust and Beneficiary of said Deed of Trust has named and appointed, and by these presents does name and appoint **Randy P. Marx, of Dallas County, Texas,** Substitute Trustee to act under and by virtue of said Deed of Trust.

WITNESS MY HAND this **14th day of July, 2020.**

**OWNER AND HOLDER OF THE NOTE:**

**WALL010 LLC, a Texas limited liability company**

By: ______________________
Timothy Barton, President

Acknowledgement

THE STATE OF TEXAS §

COUNTY OF DALLAS §

BEFORE ME, the undersigned authority, on this day personally appeared **Timothy Barton, in his capacity as the president of WALL010 LLC, a Texas limited liability company,** known to me to be the person and officer whose name is subscribed to the foregoing instrument, and acknowledged to me that the same was the act of said corporation and that he executed the same as the act of such corporation for the purposes and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this 14th day of July, 2020.

______________________
Notary Public in and for The State of Texas
My Commission Expires: ______

RANDY P. MARX
Notary Public, State of Texas
Comm. Expires 05-03-2023
Notary ID 132001233

**Exhibit A**

(as per the attached)

Unofficial Copy

Unofficial Copy



EXHIBIT "A"

BEING TRACTS 1, 2, 3, 4 & 5 SITUATED IN THE C.E. BURKHAM SURVEY, ABSTRACT NO. 244, THE J. BURLESON SURVEY, ABSTRACT NO. 79 AND THE J.H. BURSEY SURVEY, ABSTRACT NO. 241, TARRANT COUNTY, TEXAS AND BEING PORTIONS OF THE 170.44 ACRE TRACT AS DESCRIBED BY DEED TO LOST CREEK COUNTRY CLUB AND RECORDED IN VOLUME 7141, PAGE 561, COUNTY RECORDS, TARRANT COUNTY, TEXAS AND BEING ALL OF THOSE TRACTS OF LAND DESCRIBED IN EXHIBIT "C" OF THAT CORRECTION DEED TO CLUBCORP GOLF OF TEXAS, L.P., AS RECORDED IN VOLUME 14178, PAGE 455, DEED RECORDS, TARRANT COUNTY, TEXAS, AND BEING PORTIONS OF BLOCKS 12 AND 15 OF LOST CREEK ADDITION, AS RECORDED IN VOLUME 388-122, PAGE 6, PLAT RECORDS, TARRANT COUNTY, TEXAS AND BEING ALL OF LOT A-R-1, BLOCK 11, LOST CREEK ADDITION AS RECORDED IN CABINET A, SLIDE 648, PLAT RECORDS, TARRANT COUNTY, TEXAS AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

TRACT 1:

BEGINNING AT A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET IN THE WEST LINE OF SAID BURKHAM SURVEY, 1469.40 FEET FROM ITS SOUTHWEST CORNER, SAID POINT BEING A WESTERLY SOUTHWEST CORNER OF SAID 170.44 ACRE TRACT;

THENCE N 00 DEGREES 10 MINUTES 15 SECONDS E, 728.[illegible] FEET ALONG THE WEST LINE OF SAID BURKHAM SURVEY AND SAID 170.44 ACRE TRACT TO THE SOUTHWEST CORNER OF LOT 35, BLOCK 3, LOST CREEK ADDITION AS RECORDED IN PLAT VOLUME 388/115, PAGE 27, SAID COUNTY RECORDS;

THENCE ALONG THE SOUTHERLY LINE OF SAID BLOCK 3, LOST CREEK ADDITION, THE FOLLOWING BEARINGS AND DISTANCES:

N 74 DEGREES 25 MINUTES 37 SECONDS E, 307.[illegible] FEET TO A POINT;

N 65 DEGREES 02 MINUTES 02 SECONDS E, 220.06 FEET TO A POINT;

N 56 DEGREES 48 MINUTES 00 SECONDS E, 451.[illegible] FEET TO A POINT;

N 08 DEGREES 37 MINUTES 2[illegible] SECONDS E, 100.[illegible] FEET TO THE SOUTHEAST CORNER OF LOT 42, SAID BLOCK 3;

THENCE S 87 DEGREES 01 MINUTES 44 SECONDS [illegible] [illegible].33 FEET TO AN IRON ROD FOUND;

THENCE N 08 DEGREES 01 MINUTES 15 SECONDS [illegible], 60.44 FEET TO AN IRON ROD FOUND;

THENCE N 82 DEGREES 15 MINUTES 85 SECONDS [illegible], [illegible].37 FEET TO AN IRON ROD FOUND;

THENCE N 10 DEGREES 55 MINUTES 41 SECONDS E, 29.46 FEET TO AN IRON ROD FOUND;

THENCE N 19 DEGREES 2[illegible] MINUTES [illegible] SECONDS W, 44.87 FEET TO AN IRON ROD FOUND IN THE SOUTHERLY RIGHT-OF-WAY LINE OF BLUE CREEK LANE;

THENCE N 85 DEGREES 34 MINUTES [illegible] SECONDS E, 86.56 FEET ALONG SAID SOUTHERLY RIGHT-OF-WAY LINE TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET IN THE WESTERLY RIGHT-OF-WAY LINE OF LOST CREEK BOULEVARD AS RECORDED IN PLAT VOLUME 388/215, PAGE 66 OF PHASE 2, LOST CREEK ADDITION;

THENCE ALONG THE WESTERLY LINE OF SAID PHASE 2, LOST CREEK ADDITION, THE FOLLOWING BEARINGS AND DISTANCES:

S 00 DEGREES 3[illegible] MINUTES 15 SECONDS W, 427.84 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE BEGINNING OF A CURVE TO THE LEFT;

123.26 FEET ALONG THE ARC OF SAID CURVE TO THE LEFT THROUGH A CENTRAL ANGLE OF 14 DEGREES 25 MINUTES 25 SECONDS, A RADIUS OF 452.00 FEET AND A LONG CHORD OF S 66 DEGREES 28 MINUTES 37 SECONDS E, 122.37 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

N 30 DEGREES 41 MINUTES 40 SECONDS W, 118.40 FEET TO AN IRON ROD FOUND;

S 60 DEGREES 22 MINUTES 46 SECONDS W, 315.36 FEET TO AN IRON ROD FOUND;

S 61 DEGREES 46 MINUTES 05 SECONDS W, 290.60 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

S 09 DEGREES 27 MINUTES 17 SECONDS W, 130.02 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

S 11 DEGREES 08 MINUTES 53 SECONDS E, 85.98 FEET TO AN IRON ROD FOUND;

S 51 DEGREES 01 MINUTES 05 SECONDS E, 70.84 FEET TO AN IRON ROD FOUND;

S 32 DEGREES 30 MINUTES 06 SECONDS E, 620.74 FEET TO AN IRON ROD FOUND;

S 43 DEGREES 24 MINUTES 57 SECONDS E, 144.56 FEET TO AN IRON ROD FOUND;

S 88 DEGREES 37 MINUTES 25 SECONDS E, 340.00 FEET TO AN IRON ROD FOUND;

N 17 DEGREES 38 MINUTES 19 SECONDS E, 246.31 FEET TO AN IRON ROD FOUND;

N 63 DEGREES 12 MINUTES 13 SECONDS W, 67.41 FEET TO AN IRON ROD FOUND;

N 03 DEGREES 22 MINUTES 28 SECONDS W, 472.49 FEET TO A POINT FROM WHICH AN IRON ROD FOUND BEARS N 71 DEGREES 36 MINUTES 40 SECONDS E, 0.46 FEET;

S 74 DEGREES 16 MINUTES 20 SECONDS E, 307.92 FEET TO AN IRON ROD FOUND;

Unofficial Copy



N 37 DEGREES 46 MINUTES 39 SECONDS E, 811.21 FEET TO AN IRON ROD FOUND IN THE WESTERLY RIGHT-OF-WAY LINE OF LOST CREEK BOULEVARD;

S 44 DEGREES 14 MINUTES 12 SECONDS E, 113.74 FEET ALONG SAID WESTERLY RIGHT-OF-WAY LINE TO AN IRON ROD FOUND;

S 44 DEGREES 25 MINUTES 00 SECONDS W, 115.00 FEET, LEAVING SAID WESTERLY RIGHT-OF-WAY LINE TO AN IRON ROD FOUND;

S 46 DEGREES 25 MINUTES 31 SECONDS E, 201.54 FEET TO AN IRON ROD FOUND;

THENCE S 49 DEGREES 22 MINUTES 36 SECONDS W, [illegible] FEET, LEAVING THE WESTERLY LINE OF SAID PHASE 2, LOST CREEK ADDITION TO AN IRON ROD FOUND AT THE BEGINNING OF A CURVE TO THE LEFT;

THENCE 265.49 FEET ALONG THE ARC OF SAID CURVE TO THE LEFT THROUGH A CENTRAL ANGLE OF 29 DEGREES 32 MINUTES 16 SECONDS, A RADIUS OF 515.77 FEET AND A LONG CHORD OF S 34 DEGREES 36 MINUTES 11 SECONDS W, 262.96 FEET TO AN IRON ROD FOUND;

THENCE S 19 DEGREES 50 MINUTES 17 SECONDS W, 326.34 FEET TO A [illegible] INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE S 41 DEGREES 2[illegible] MINUTES 04 SECONDS W, 51.[illegible] FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE S 83 DEGREES 30 MINUTES 35 SECONDS W, 41.67 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE N 89 DEGREES 24 MINUTES 25 SECONDS W, 44.00 FEET; TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE S 00 DEGREES 37 MINUTES 44 SECONDS [illegible] FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE N 89 DEGREES 38 MINUTES 28 SECONDS W, 174.[illegible] FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE N 00 DEGREES 11 MINUTES 10 SECONDS [illegible] 34 FEET TO AN IRON ROD FOUND;

THENCE N 89 DEGREES 30 MINUTES 2[illegible] SECONDS W, 210.00 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE N 00 DEGREES 11 MINUTES [illegible] SECONDS E, 800.46 FEET TO AN IRON ROD FOUND AT THE BEGINNING OF A NON-TANGENT CURVE TO THE LEFT;

THENCE 2[illegible] FEET ALONG THE ARC OF SAID CURVE TO THE LEFT THROUGH A CENTRAL ANGLE OF 61 DEGREES 03 MINUTES 33 SECONDS, A RADIUS OF 210.00 FEET AND A LONG CHORD OF N 57 DEGREES 07 MINUTES 56 SECONDS W, 2[illegible] FEET TO AN IRON ROD FOUND;

THENCE N 00 DEGREES 12 MINUTES 14 SECONDS E, 142.35 FEET TO AN IRON ROD FOUND;

THENCE N 44 DEGREES 48 MINUTES 25 SECONDS W, 99.00 FEET TO AN IRON ROD FOUND;

THENCE N 89 DEGREES 47 MINUTES 36 SECONDS W, 255.13 FEET TO THE POINT OF BEGINNING AND CONTAINING 3[illegible] ACRES OF LAND, MORE OR LESS.

TRACT 2:

BEGINNING AT AN IRON ROD FOUND AT THE SOUTHEAST CORNER OF PARCEL 7, A 2.6857 ACRE TRACT AS DESCRIBED BY DEED TO INTERWEST SAVINGS ASSOCIATION AS RECORDED IN VOLUME 6[illegible], PAGE 597, SAID COUNTY RECORDS;

THENCE S 40 DEGREES 20 MINUTES 27 SECONDS W, 43.79 FEET TO AN IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE S 34 DEGREES 24 MINUTES 19 SECONDS W, 56.56 FEET TO AN IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE S 15 DEGREES 09 MINUTES 12 SECONDS W, 89.20 FEET TO AN IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE S 43 DEGREES 18 MINUTES 13 SECONDS W, 37.86 FEET TO AN IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE S 02 DEGREES 23 MINUTES 18 SECONDS E, 130.54 FEET TO AN IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE S 12 DEGREES 44 MINUTES 41 SECONDS W, 89.84 FEET TO AN IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE S 09 DEGREES 56 MINUTES 24 SECONDS W, 83.90 FEET TO AN IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE S 80 DEGREES 45 MINUTES 34 SECONDS E, 107.17 FEET TO AN IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE S 81 DEGREES 44 MINUTES 58 SECONDS E, 91.78 FEET TO AN IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE S 56 DEGREES 12 MINUTES 42 SECONDS E, 86.16 FEET TO AN IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE N 29 DEGREES 42 MINUTES 42 SECONDS W, 58.46 FEET TO AN IRON ROD FOUND, THE SOUTHEAST

Unofficial Copy



CORNER OF LOT 1, BLOCK 23, 2ND PHASE II LOST CREEK ADDITION;

THENCE ALONG THE SOUTHERLY LINE AND THEN THE EASTERLY LINE OF SAID PHASE II, LOST CREEK ADDITION, ALSO THE EASTERLY RIGHT-OF-WAY LINE OF LOST CREEK BOULEVARD, THE FOLLOWING BEARINGS AND DISTANCES:

N 05 DEGREES 21 MINUTES 50 SECONDS E, 251.84 FEET TO AN IRON ROD FOUND;

N 69 DEGREES 42 MINUTES 42 SECONDS W, 170.42 FEET TO AN IRON ROD FOUND;

S 00 DEGREES 21 MINUTES 50 SECONDS W, 136.85 FEET TO AN IRON ROD FOUND;

N 89 DEGREES 34 MINUTES 50 SECONDS W, 1008.26 FEET TO A SPIKE IN CONCRETE FOUND;

S 80 DEGREES 20 MINUTES 59 SECONDS W, 424.12 FEET TO AN IRON ROD FOUND;

S 44 DEGREES 51 MINUTES 00 SECONDS W, 55.86 FEET TO AN IRON ROD FOUND;

S 43 DEGREES 30 MINUTES 04 SECONDS W, 64.53 FEET TO AN IRON ROD FOUND IN THE EASTERLY RIGHT-OF-WAY LINE OF LOST CREEK BOULEVARD, THE BEGINNING OF A NON-TANGENT CURVE TO THE LEFT;

326.50 FEET ALONG THE ARC OF SAID CURVE TO THE LEFT THROUGH A CENTRAL ANGLE OF 19 DEGREES 37 MINUTES 53 SECONDS, A RADIUS OF 953.00 FEET AND A LONG CHORD OF N 56 DEGREES 14 MINUTES 31 SECONDS W, 325.91 FEET TO AN IRON ROD FOUND;

N 66 DEGREES 03 MINUTES 28 SECONDS W, 51.43 FEET TO AN IRON ROD FOUND AT THE BEGINNING OF A CURVE TO THE RIGHT;

377.47 FEET ALONG THE ARC OF SAID CURVE TO THE RIGHT THROUGH A CENTRAL ANGLE OF 21 DEGREES 46 MINUTES 14 SECONDS, A RADIUS OF 950.00 FEET AND A LONG CHORD OF N 55 DEGREES 06 MINUTES 49 SECONDS W, 375.35 FEET TO AN IRON ROD FOUND;

N 44 DEGREES 14 MINUTES 12 SECONDS W, 24.51 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

N 53 DEGREES 12 MINUTES 15 SECONDS W, [illegible] FEET TO AN IRON ROD FOUND, THE BEGINNING OF A CURVE TO THE RIGHT;

481.27 FEET ALONG THE ARC OF SAID CURVE TO THE RIGHT THROUGH A CENTRAL ANGLE OF 53 DEGREES 43 MINUTES 31 SECONDS, A RADIUS OF [illegible] FEET AND A LONG CHORD OF N 26 DEGREES 30 MINUTES 41 SECONDS W, 464.82 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS SET;

N 00 DEGREES 31 MINUTES 15 SECONDS E, [illegible] FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE N 84 DEGREES 06 MINUTES 39 SECONDS E, 45.66 FEET, LEAVING THE EASTERLY LINE OF SAID PHASE II, LOST CREEK ADDITION AND ALSO THE EASTERLY RIGHT-OF-WAY LINE OF SAID LOST CREEK

BOULEVARD, TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE BEGINNING OF A NON-TANGENT CURVE TO THE RIGHT, SAID POINT BEING IN THE WESTERLY LINE OF LOT A-R-1 BLOCK 4, LOST CREEK ADDITION AS RECORDED IN PLAT CABINET A, SLIDE 604, SAID COUNTY RECORDS;

THENCE 66.41 FEET ALONG THE ARC OF SAID CURVE TO THE RIGHT THROUGH A CENTRAL ANGLE OF 07 DEGREES [illegible] MINUTES [illegible] SECONDS, A RADIUS OF 433.86 FEET AND A LONG CHORD OF N 24 DEGREES 17 MINUTES 33 SECONDS W, 66.37 FEET TO A POINT IN THE SOUTHERLY RIGHT-OF-WAY LINE OF BLUE CREEK DRIVE TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE BEGINNING OF A NON-TANGENT CURVE TO THE RIGHT;

THENCE ALONG THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID BLUE CREEK DRIVE, THE FOLLOWING BEARINGS AND DISTANCES:

254.07 FEET ALONG THE ARC OF SAID CURVE TO THE RIGHT THROUGH A CENTRAL ANGLE OF 35 DEGREES 30 MINUTES 01 SECONDS, A RADIUS OF 410.05 FEET AND A LONG CHORD OF S 76 DEGREES 41 MINUTES 45 SECONDS E, 250.42 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

S 58 DEGREES 65 MINUTES 45 SECONDS E, 147.74 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE BEGINNING OF A CURVE TO THE LEFT;

101.38 FEET ALONG THE ARC OF SAID CURVE TO THE LEFT THROUGH A CENTRAL ANGLE OF 18 DEGREES 49 MINUTES 29 SECONDS, A RADIUS OF 308.56 FEET AND A LONG CHORD OF S 68 DEGREES 20 MINUTES 39 SECONDS E, 100.92 FEET, TO AN IRON ROD FOUND, THE NORTHWESTERLY CORNER OF LOT 1-R-1 AS RECORDED IN PLAT CABINET A, SLIDE 600;

THENCE S 06 DEGREES 25 MINUTES 54 SECONDS E, 168.77 FEET ALONG THE WESTERLY LINE OF SAID LOT 1-R-1, TO AN IRON ROD FOUND;

THENCE S 24 DEGREES 64 MINUTES 56 SECONDS E, 12.80 FEET ALONG THE SOUTHERLY LINE OF SAID LOT 1-R-1;

THENCE S 65 DEGREES 05 MINUTES 02 SECONDS E, 12.60 FEET ALONG THE SOUTHERLY LINE OF SAID LOT 1-R-1;

THENCE N 40 DEGREES 53 MINUTES 40 SECONDS E, 19.50 FEET ALONG THE SOUTHERLY LINE OF SAID LOT 1-R-1 TO THE SOUTHWEST CORNER OF LOT 2R, BLOCK 11, LOST CREEK ADDITION, AS RECORDED IN PLAT VOLUME 388/122, PAGE 28 OF SAID COUNTY RECORDS;

THENCE ALONG THE SOUTHERLY LINE AND THE EASTERLY LINE OF SAID BLOCK 11, LOST CREEK ADDITION AS RECORDED IN PLAT VOLUME 388/122, PAGE 28 AND 388/115, PAGE 57, THE FOLLOWING BEARINGS AND DISTANCES:

N 33 DEGREES 40 MINUTES 48 SECONDS E, 104.40 FEET TO A POINT;

S 87 DEGREES 48 MINUTES 10 SECONDS E, 187.70 FEET TO A POINT;

Unofficial Copy



S 72 DEGREES 55 MINUTES 18 SECONDS E, 104.40 FEET TO A POINT;

N 40 DEGREES 10 MINUTES 21 SECONDS E, 101.81 FEET TO A POINT;

S 80 DEGREES 31 MINUTES 50 SECONDS E, 101.27 FEET TO A POINT;

S 74 DEGREES 50 MINUTES 29 SECONDS E, 413.57 FEET TO A POINT;

N 29 DEGREES 04 MINUTES 09 SECONDS E, 101.36 FEET TO A POINT;

N 64 DEGREES 39 MINUTES 52 SECONDS E, 256.40 FEET TO A POINT;

N 74 DEGREES 06 MINUTES 52 SECONDS E, 372.52 FEET TO A POINT;

N 09 DEGREES 25 MINUTES 00 SECONDS E, 15.60 FEET TO THE NORTH[illegible] CORNER OF LOT 13, SAID BLOCK 11, LOST CREEK ADDITION IN THE NORTH LINE OF SAID BURSEY SURVEY AND THE SOUTH LINE OF THE S. PETITT SURVEY, ABSTRACT NO. 1234;

THENCE S 09 DEGREES 35 MINUTES 00 SECONDS E, [illegible] FEET TO A POINT;

THENCE S 00 DEGREES 21 MINUTES 37 SECONDS W, 50.[illegible] FEET TO THE BEGINNING OF A NON-TANGENT CURVE TO THE LEFT;

THENCE 80.54 FEET ALONG THE ARC OF SAID CURVE TO THE LEFT THROUGH A CENTRAL ANGLE OF 89 DEGREES 10 MINUTES 32 SECONDS, A RADIUS OF 50.00 FEET AND A LONG CHORD OF S 46 DEGREES 43 MINUTES 16 SECONDS W, 76.14 FEET;

THENCE S 74 DEGREES 27 MINUTES 33 SECONDS W, [illegible] FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE S 87 DEGREES 32 MINUTES 37 SECONDS E, [illegible] FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED CARTER & BURGESS SET;

THENCE S 74 DEGREES 42 MINUTES 15 SECONDS [illegible] FEET TO THE POINT OF BEGINNING AND CONTAINING 63.806 ACRES OF LAND, OF WHICH 2.275 ACRES ARE WITHIN WHISPERING CREEK STREET, 8.155 ACRES SAVE AND EXCEPT TRACT I, 7.19[illegible] AND EXCEPT TRACT VI, LEAVING A NET AREA OF 52.027 ACRES OF LAND, MORE OR LESS.

TRACT 3:

BEGINNING AT AN IRON ROD FOUND AT THE SOUTHWEST CORNER OF LOT 3, BLOCK 4, LOST CREEK ADDITION AS RECORDED IN PLAT VOLUME 32/115, PAGE 37, SAID COUNTY RECORDS;

THENCE N 80 DEGREES 34 MINUTES 09 SECONDS E, 341.46 FEET ALONG THE SOUTH LINE OF SAID BLOCK 4 TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET IN THE WESTERLY RIGHT-OF-WAY LINE OF LOST CREEK BOULEVARD;

THENCE S 19 DEGREES [illegible] MINUTES 09 SECONDS E, 100.00 FEET ALONG SAID WESTERLY RIGHT-OF-WAY LINE TO AN IRON ROD FOUND AT THE NORTHEAST CORNER OF LOT 46, SAID BLOCK 4, LOST CREEK ADDITION;

THENCE S 74 DEGREES [illegible] MINUTES 09 SECONDS W, 110.00 FEET ALONG THE NORTH LINE OF SAID LOT 46 TO AN IRON ROD FOUND AT ITS NORTHWEST CORNER;

THENCE SOUTHERLY ALONG THE WEST LINE OF SAID BLOCK 4, THE FOLLOWING BEARINGS AND DISTANCES:

S 19 DEGREES 26 MINUTES 00 SECONDS E, 217.74 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE BEGINNING OF A CURVE TO THE RIGHT;

223.45 FEET ALONG THE ARC OF SAID CURVE THROUGH A CENTRAL ANGLE OF 30 DEGREES 00 MINUTES 00 SECONDS, A RADIUS OF 426.60 FEET AND A LONG CHORD OF S 00 DEGREES 26 MINUTES 00 SECONDS E, 216.24 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

S 14 DEGREES 34 MINUTES 00 SECONDS W, 41.69 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE BEGINNING OF A CURVE TO THE LEFT;

322.24 FEET ALONG THE ARC OF SAID CURVE TO THE LEFT THROUGH A CENTRAL ANGLE OF 13 DEGREES 50 MINUTES 48 SECONDS, A RADIUS OF 1360.02 FEET AND A LONG CHORD OF S 07 DEGREES 34 MINUTES 06 SECONDS W, 321.42 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

S 00 DEGREES 34 MINUTES 11 SECONDS W, 1186.50 FEET TO AN IRON ROD FOUND, THE SOUTHWEST CORNER OF LOT 29, SAID BLOCK 4;

THENCE S 89 DEGREES 25 MINUTES 49 SECONDS E, 110.00 FEET TO AN IRON ROD FOUND AT THE SOUTHEAST CORNER OF SAID LOT 29 IN THE WESTERLY RIGHT-OF-WAY LINE OF LOST CREEK BOULEVARD;

THENCE S 00 DEGREES 34 MINUTES 11 SECONDS W, 127.20 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET IN THE NORTHERLY RIGHT-OF-WAY LINE OF BLUE CREEK DRIVE;

THENCE S 83 DEGREES 34 MINUTES 15 SECONDS W, 150.19 FEET, ALONG SAID NORTHERLY RIGHT-OF-WAY LINE TO AN IRON ROD FOUND, THE BEGINNING OF A CURVE TO THE LEFT;

THENCE 20.90 FEET ALONG THE ARC OF SAID CURVE TO THE LEFT THROUGH A CENTRAL ANGLE OF 01 DEGREES 55 MINUTES 20 SECONDS, A RADIUS OF 622.50 FEET AND A LONG CHORD OF S 84 DEGREES 34 MINUTES 33 SECONDS W, 20.90 FEET TO THE SOUTHEAST CORNER OF LOT 28, SAID BLOCK 4 FROM WHICH AN IRON ROD FOUND BEARS N 74 DEGREES 21 MINUTES 33 SECONDS W, 1.35 FEET;

THENCE N 04 DEGREES 25 MINUTES 45 SECONDS W, 110.07 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE NORTHEAST CORNER OF SAID LOT 28, BLOCK 4;

THENCE S 85 DEGREES 34 MINUTES 15 SECONDS W, 200.00 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE NORTHWEST CORNER OF LOT 27 AND THE SOUTHEAST CORNER OF LOT 25, BLOCK 4;

Unofficial Copy



THENCE N 00 DEGREES 34 MINUTES 54 SECONDS E, 2154.31 FEET ALONG THE EAST LINE OF SAID BLOCK 4 TO THE POINT OF BEGINNING, AND CONTAINING 14.472 ACRES OF LAND, SAVE AND EXCEPT TRACT 6, 0.333 ACRES DEEDED TO MAX H. [illegible] AND BILLY JOE SMITH IN VOLUME 1111, PAGE 10[illegible], SAID COUNTY RECORDS, AND SAVE AND EXCEPT TRACT V, (LOT 4[illegible]) 0.274 ACRES, LEAVING [illegible] OF 14.[illegible] ACRES OF LAND, MORE OR LESS.

TRACT 4:

BEGINNING AT A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET THE SOUTHWEST CORNER OF LOT 1, BLOCK 2, LOST CREEK ADDITION A[illegible] RECORDED IN PLAT VOLUME 348/15, PAGE 97, SAID COUNTY RECORDS, SAID POINT BEING IN THE EASTERLY RIGHT-OF-WAY LINE OF LOST CREEK BOULEVARD;

THENCE N 8[illegible] DEGREES 24 MINUTES 00 SECONDS E, 356.7[illegible] FEET ALONG [illegible] SOUTH LINE OF SAID BLOCK 2 TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE SOUTHEAST CORNER OF LOT 4;

THENCE N 39 DEGREES 34 MINUTES 00 SECONDS E, 41.[illegible] FEET TO AN IRON ROD FOUND;

THENCE S 64 DEGREES 26 MINUTES 46 SECONDS E, 45.04 FEET TO AN IRON ROD FOUND;

THENCE N 39 DEGREES 34 MINUTES 00 SECONDS [illegible], 157.00 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE N 50 DEGREES 26 MINUTES 04 SECONDS [illegible] FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET IN THE EAST[illegible] LINE OF LOT 5, BLOCK 1;

THENCE N 39 DEGREES 34 MINUTES 00 SECONDS [illegible] FEET ALONG THE EAST LINE OF SAID LOT 5, BLOCK 1, TO THE NORTHEAST CORNER OF SAME LOT, FROM WHICH AN IRON ROD FOUND BEARS S 8[illegible] DEGREES 42 MINUTES 37 SECONDS E, 0.4[illegible] FEET;

THENCE N 8[illegible] DEGREES 34 MINUTES [illegible] SECONDS E, [illegible] FEET TO AN IRON ROD FOUND IN THE EAST LINE OF SAID 170.44 ACRE TRACT;

THENCE S 0[illegible] DEGREES 41 MINUTES 36 SECONDS W, 150.33 FEET ALONG THE EAST LINE OF SAID 170.44 ACRE TRACT TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE NORTHEAST CORNER OF LOT [illegible], BLOCK [illegible], LOST CREEK ADDITION AS RECORDED IN PLAT VOLUME 338/22, PAGE 26, SAID COUNTY RECORDS;

THENCE S 84 DEGREES 33 MINUTES 22 SECONDS W, [illegible] FEET ALONG THE NORTH LINE OF LOTS 25 AND 26, SAID BLOCK [illegible] TO AN IRON ROD FOUND, THE NORTHWEST CORNER OF SAID LOT 25;

THENCE S 04 DEGREES [illegible] MINUTES 35 SECONDS W, 120.24 FEET TO AN IRON ROD FOUND, THE SOUTHWEST CORNER OF SAID LOT [illegible], BLOCK [illegible];

THENCE S 8[illegible] DEGREES 36 MINUTES 00 SECONDS E, 59.82 FEET ALONG THE SOUTH LINE OF SAID LOT 26, BLOCK [illegible] TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE S 00 DEGREES 41 MINUTES 00 SECONDS W, 41.00 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET IN THE NORTH LINE OF LOT 21, BLOCK 7, LOST CREEK ADDITION AS RECORDED IN PLAT VOLUME 348/15, PAGE 97, SAID COUNTY RECORDS;

THENCE N 89 DEGREES 18 MINUTES 00 SECONDS W, 60.00 FEET TO AN IRON ROD FOUND, THE NORTHWEST CORNER OF SAID LOT 21;

THENCE ALONG THE WEST LINE AND THEN THE NORTH LINE OF SAID BLOCK 7, THE FOLLOWING BEARINGS AND DISTANCES:

S 00 DEGREES 42 MINUTES 07 SECONDS W, 1248.09 FEET TO AN IRON ROD FOUND, THE NORTHEAST CORNER OF LOT 8, SAID BLOCK 7;

S 79 DEGREES 24 MINUTES 57 SECONDS W, 75.94 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

N 81 DEGREES 21 MINUTES 00 SECONDS W, 234.50 FEET TO AN IRON ROD FOUND, THE BEGINNING OF A CURVE TO THE RIGHT;

496.14 FEET ALONG THE ARC OF SAID CURVE TO THE RIGHT THROUGH A CENTRAL ANGLE OF 48 DEGREES 58 MINUTES 00 SECONDS, A RADIUS OF 567.77 FEET AND A LONG CHORD OF N 56 DEGREES 22 MINUTES 00 SECONDS W, 479.80 FEET TO AN IRON ROD FOUND, THE NORTHERLY CORNER OF LOT 1, SAID BLOCK 7;

S 51 DEGREES 37 MINUTES 00 SECONDS W, 110.00 FEET TO AN IRON ROD FOUND, THE WESTERLY CORNER OF SAID LOT 1, BLOCK 7, IN THE NORTHERLY RIGHT-OF-WAY LINE OF REN CREEK COURT;

THENCE N 51 DEGREES 23 MINUTES 00 SECONDS W, 187.54 FEET ALONG SAID NORTHERLY RIGHT-OF-WAY LINE TO THE BEGINNING OF A CURVE TO THE LEFT;

THENCE 299.32 FEET ALONG THE ARC OF SAID CURVE TO THE LEFT AND CONTINUING ALONG SAID NORTHERLY RIGHT-OF-WAY LINE THROUGH A CENTRAL ANGLE OF 58 DEGREES 02 MINUTES 45 SECONDS, A RADIUS OF 295.45 FEET AND A LONG CHORD OF N 80 DEGREES 24 MINUTES 23 SECONDS W, 286.68 FEET TO AN IRON ROD FOUND;

THENCE N 89 DEGREES 25 MINUTES 45 SECONDS W, 3.03 FEET CONTINUING ALONG SAID NORTHERLY RIGHT-OF-WAY LINE TO AN IRON ROD FOUND IN THE EASTERLY RIGHT-OF-WAY LINE OF LOST CREEK BOULEVARD, THE BEGINNING OF A NON-TANGENT CURVE TO THE RIGHT;

THENCE 146.18 FEET ALONG THE ARC OF SAID CURVE TO THE RIGHT AND ALONG THE EASTERLY RIGHT-OF-WAY LINE OF LOST CREEK BOULEVARD THROUGH A CENTRAL ANGLE OF 07 DEGREES 00 MINUTES 49 SECONDS, A RADIUS OF 1194.02 FEET AND A LONG CHORD OF N 11 DEGREES 03 MINUTES 35 SECONDS E, 145.97 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE N 14 DEGREES 34 MINUTES 00 SECONDS E, 4.57 FEET ALONG SAID EASTERLY RIGHT-OF-WAY LINE

Unofficial Copy

Unofficial Copy



TO AN IRON ROD FOUND, THE SOUTHWEST CORNER OF LOT 18, BLOCK 5 OF SAID LOST CREEK ADDITION;

THENCE ALONG THE OUTSIDE BOUNDARY LINE OF SAID BLOCK 5, THE FOLLOWING BEARINGS AND DISTANCES:

S 17 DEGREES 26 MINUTES 03 SECONDS E, 32.64 FEET TO AN IRON ROD FOUND AT THE BEGINNING OF A CURVE TO THE RIGHT; 27.42 FEET ALONG THE ARC OF SAID CURVE TO THE RIGHT THROUGH A CENTRAL ANGLE OF 30 DEGREES 00 MINUTES 00 SECONDS, A RADIUS OF 51.00 FEET AND A LONG CHORD OF S 72 DEGREES 26 MINUTES 00 SECONDS E, 26.11 FEET TO AN IRON ROD FOUND;

S 57 DEGREES 28 MINUTES 00 SECONDS E, 142.00 FEET TO AN IRON ROD FOUND, THE BEGINNING OF A CURVE TO THE LEFT;
130.20 FEET ALONG THE ARC OF SAID CURVE TO THE LEFT THROUGH A CENTRAL ANGLE OF 13 DEGREES 00 MINUTES 00 SECONDS, A RADIUS OF 573.86 FEET AND A LONG CHORD OF S [illegible] DEGREES 56 MINUTES 00 SECONDS E, 129.92 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

S 70 DEGREES 26 MINUTES 00 SECONDS E, 364.58 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE BEGINNING OF A CURVE TO THE LEFT; 429.56 FEET ALONG THE ARC OF SAID CURVE TO THE LEFT THROUGH A CENTRAL ANGLE OF [illegible] DEGREES 00 MINUTES 00 SECONDS, A RADIUS OF 212.18 FEET AND A LONG CHORD OF N 51 DEGREES 34 MINUTES 00 SECONDS E, 359.86 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

N 06 DEGREES 26 MINUTES 00 SECONDS W, 249.58 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE BEGINNING OF A CURVE TO THE LEFT; 484.00 FEET ALONG THE ARC OF SAID CURVE TO THE LEFT THROUGH A CENTRAL ANGLE OF 122 DEGREES 00 MINUTES 00 SECONDS, A RADIUS OF 232.00 FEET AND A LONG CHORD OF N 67 DEGREES 26 MINUTES 00 SECONDS W, 405.82 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

S 51 DEGREES 34 MINUTES 00 SECONDS W, 227.47 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE BEGINNING OF A CURVE TO THE LEFT; 172.76 FEET ALONG THE ARC OF SAID CURVE TO THE LEFT THROUGH A CENTRAL ANGLE OF 32 DEGREES 00 MINUTES 00 SECONDS, A RADIUS OF 309.37 FEET AND A LONG CHORD OF S 35 DEGREES 34 MINUTES 00 SECONDS W, 170.56 FEET TO AN IRON ROD FOUND;

S 19 DEGREES 34 MINUTES 00 SECONDS W, [illegible] FEET TO AN IRON ROD FOUND AT THE WESTERLY CORNER OF LOT 1, SAID BLOCK 5 IN THE NORTHERLY RIGHT-OF-WAY LINE OF PINE CREEK COURT;

THENCE N 57 DEGREES 26 MINUTES 00 SECONDS W, 47.84 FEET ALONG SAID NORTHERLY RIGHT-OF-WAY LINE OF PINE CREEK COURT TO AN IRON ROD FOUND, THE BEGINNING OF A CURVE TO THE LEFT;

THENCE 110.78 FEET ALONG THE ARC OF SAID CURVE TO THE LEFT AND ALONG SAID NORTHERLY RIGHT-OFWAY LINE THROUGH A CENTRAL ANGLE OF 30 DEGREES 00 MINUTES 00 SECONDS, A RADIUS OF 211.66 FEET AND A LONG CHORD OF N [illegible] DEGREES 26 MINUTES 00 SECONDS W, 109.53 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE N 87 DEGREES 26 MINUTES 06 SECONDS W, 1.52 FEET ALONG SAID NORTHERLY RIGHT-OF-WAY LINE TO AN IRON ROD FOUND AT THE EASTERLY RIGHT-OF-WAY LINE OF LOST CREEK BOULEVARD, THE BEGINNING OF A NON-TANGENT CURVE TO THE LEFT;

THENCE 103.15 FEET ALONG THE ARC OF SAID CURVE TO THE LEFT AND ALONG SAID EASTERLY RIGHT-OFWAY LINE OF LOST CREEK BOULEVARD THROUGH A CENTRAL ANGLE OF 17 DEGREES 01 MINUTES 77 SECONDS, A RADIUS OF 347.00 FEET AND A LONG CHORD OF N 06 DEGREES 38 MINUTES 10 SECONDS W, 107.45 FEET TO AN IRON ROD FOUND;

THENCE N [illegible] DEGREES 28 MINUTES 00 SECONDS W, 302.73 FEET CONTINUING ALONG SAID EASTERLY RIGHT-OF-WAY LINE TO THE POINT OF BEGINNING AND CONTAINING 25.256 ACRES OF LAND, SAVE AND EXCEPT TRACT [illegible] .487 ACRES DEEDED TO MAX H. EUBANK AND BILLY JOE SMITH IN VOLUME 8111, PAGE 1078, SAID COUNTY RECORDS, LEAVING A NET AREA OF 25.108 ACRES OF LAND, MORE OR LESS.

TRACT 5

BEGINNING AT AN IRON ROD FOUND AT THE NORTHWEST CORNER OF LOT 14, BLOCK 9, LOST CREEK ADDITION AS RECORDED IN PLAT VOLUME 388/122, PAGE 24, SAID COUNTY RECORDS, SAID POINT BEING IN THE EASTERLY RIGHT-OF-WAY LINE OF LOST CREEK BOULEVARD;

THENCE N 00 DEGREES 34 MINUTES 31 SECONDS E, 982.81 FEET ALONG SAID EASTERLY RIGHT-OF-WAY LINE TO AN IRON ROD FOUND, THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE 55.27 FEET ALONG THE ARC OF SAID CURVE TO THE RIGHT AND ALONG SAID EASTERLY RIGHT-OFWAY LINE THROUGH A CENTRAL ANGLE OF 04 DEGREES 34 MINUTES 17 SECONDS, A RADIUS OF 1184.62 FEET AND A LONG CHORD OF N 02 DEGREES 51 MINUTES 20 SECONDS E, 55.24 FEET TO AN IRON ROD FOUND IN THE SOUTHERLY RIGHT-OF-WAY LINE OF BEN CREEK COURT;

THENCE S 89 DEGREES 25 MINUTES 45 SECONDS E, 8.99 FEET ALONG THE SOUTHERLY RIGHT-OF-WAY LINE OF BEN CREEK COURT TO AN IRON ROD FOUND AT THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE 248.66 FEET ALONG THE ARC OF SAID CURVE TO THE RIGHT AND ALONG SAID SOUTHERLY RIGHTOF-WAY LINE THROUGH A CENTRAL ANGLE OF 58 DEGREES 02 MINUTES 45 SECONDS, A RADIUS OF 245.45 FEET AND A LONG CHORD OF S 60 DEGREES 24 MINUTES 35 SECONDS E, 238.17 FEET TO AN IRON ROD FOUND;

THENCE S 31 DEGREES 23 MINUTES 00 SECONDS E, 187.54 FEET CONTINUING ALONG SAID SOUTHERLY RIGHT-OF-WAY LINE TO AN IRON ROD FOUND, THE BEGINNING OF A CURVE TO THE LEFT;

THENCE 13.49 FEET ALONG THE ARC OF SAID CURVE TO THE LEFT AND CONTINUING ALONG SAID SOUTHERLY RIGHT-OF-WAY LINE THROUGH A CENTRAL ANGLE OF 01 DEGREE 03 MINUTES 43 SECONDS, A RADIUS OF 727.77 FEET AND A LONG CHORD OF S 31 DEGREES 54 MINUTES 52 SECONDS E, 13.49 FEET TO AN IRON ROD FOUND, THE NORTHERLY CORNER OF LOT 1-R, BLOCK 6, LOST CREEK ADDITION AS RECORDED IN PLAT VOLUME 388/122, PAGE 97, SAID COUNTY RECORDS;

THENCE S 19 DEGREES 17 MINUTES 08 SECONDS W, 134.84 FEET TO THE WESTERLY CORNER OF SAID LOT 1-R, BLOCK 6, THE BEGINNING OF A NON-TANGENT CURVE TO THE LEFT;

Unofficial Copy



THENCE 611.17 FEET ALONG THE ARC OF SAID CURVE TO THE LEFT AND ALONG THE SOUTHERLY LINE OF SAID BLOCK 6, THROUGH A CENTRAL ANGLE OF 45 DEGREES 05 MINUTES 56 SECONDS, A RADIUS OF 837.77 FEET AND A LONG CHORD OF S 58 DEGREES 44 MINUTES 31 SECONDS E, 614.35 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE S 81 DEGREES 21 MINUTES 09 SECONDS E, 311.52 FEET CONTINUING ALONG THE SOUTHERLY LINE OF SAID BLOCK 6 TO AN IRON ROD FOUND;

THENCE S 86 DEGREES 10 MINUTES 00 SECONDS E, 321.53 FEET CONTINUING ALONG THE SOUTHERLY LINE OF SAID BLOCK 6 TO AN IRON ROD FOUND, THE SOUTHEAST CORNER OF LOT [illegible], IN THE EASTERLY LINE OF SAID 170.44 ACRE TRACT;

THENCE S 00 DEGREES 41 MINUTES 00 SECONDS W, 786.54 FEET ALONG SAID EASTERLY LINE TO AN IRON ROD FOUND, THE NORTHEAST CORNER OF LOT 13, BLOCK 10, LOST CREEK ADDITION AS RECORDED IN PLAT VOLUME 388/132, PAGE 28, SAID COUNTY RECORDS;

THENCE N 89 DEGREES 19 MINUTES 00 SECONDS W, 85.85 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE NORTHWEST CORNER OF SAID LOT 13, BLOCK 10;

THENCE S 17 DEGREES 58 MINUTES 05 SECONDS W, 1[illegible] FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE SOUTHWEST CORNER OF SAID LOT 13, BLOCK 10 IN THE NORTH LINE OF BLUE CREEK DRIVE, THE BEGINNING OF A NON-TANGENT CURVE TO THE LEFT;

THENCE ALONG THE NORTHERLY RIGHT-OF-WAY LINE OF SAID BLUE CREEK DRIVE, THE FOLLOWING BEARINGS AND DISTANCES:

56.03 FEET ALONG THE ARC OF SAID NON-TANGENT CURVE TO THE LEFT THROUGH A CENTRAL ANGLE OF 18 DEGREES 31 MINUTES 20 SECONDS, A RADIUS OF [illegible] FEET AND A LONG CHORD OF N 85 DEGREES 20 MINUTES 05 SECONDS W, 43.87 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

S 85 DEGREES 24 MINUTES 15 SECONDS W, 7[illegible] FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE BEGINNING OF A CURVE TO THE RIGHT; 63.14 FEET ALONG THE ARC OF SAID CURVE TO THE RIGHT THROUGH A CENTRAL ANGLE OF 22 DEGREES 40 MINUTES 00 SECONDS, A RADIUS OF 159.61 FEET AND A LONG CHORD OF N 83 DEGREES 15 MINUTES 45 SECONDS W, 62.73 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

N 71 DEGREES 55 MINUTES 45 SECONDS W, 69.[illegible] FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE BEGINNING OF A CURVE TO THE LEFT; 105.62 FEET ALONG THE ARC OF SAID CURVE TO THE LEFT THROUGH A CENTRAL ANGLE OF 26 DEGREES 00 MINUTES 00 SECONDS, A RADIUS OF 24[illegible] FEET AND A LONG CHORD OF N 84 DEGREES 55 MINUTES 45 SECONDS W, 105.68 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

S 82 DEGREES 04 MINUTES [illegible] SECONDS W, 60.52 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE BEGINNING OF A CURVE TO THE RIGHT; 141.82 FEET ALONG THE ARC OF SAID CURVE TO THE RIGHT THROUGH A CENTRAL ANGLE OF 42 DEGREES 19 MINUTES 47 SECONDS, A RADIUS OF [illegible] FEET AND A LONG CHORD OF N 75 DEGREES 05 MINUTES 49 SECONDS W, 138.37 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE BEGINNING OF A CURVE TO THE LEFT;

117.10 FEET ALONG THE ARC OF SAID CURVE TO THE LEFT THROUGH A CENTRAL ANGLE OF 24 DEGREES 59 MINUTES 57 SECONDS, A RADIUS OF 268.34 FEET AND A LONG CHORD OF N 66 DEGREES 25 MINUTES 46 SECONDS W, 11[illegible] FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

N 78 DEGREES 55 MINUTES 45 SECONDS W, 126.88 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE BEGINNING OF A CURVE TO THE RIGHT; 56.25 FEET ALONG THE ARC OF SAID CURVE TO THE RIGHT THROUGH A CENTRAL ANGLE OF 30 DEGREES 00 MINUTES 00 SECONDS, A RADIUS OF 238.34 FEET AND A LONG CHORD OF N 68 DEGREES 55 MINUTES 45 SECONDS W, 55.[illegible] FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

N 38 DEGREES [illegible] MINUTES 45 SECONDS W, 443.34 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE BEGINNING OF A CURVE TO THE LEFT; 215.04 FEET ALONG THE ARC OF SAID CURVE TO THE LEFT THROUGH A CENTRAL ANGLE OF 15 DEGREES 30 MINUTES 00 SECONDS, A RADIUS OF 408.55 FEET AND A LONG CHORD OF N 16 DEGREES 40 MINUTES 45 SECONDS W, 208.51 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

S 85 DEGREES 34 MINUTES 15 SECONDS W, 13.19 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET IN THE EASTERLY RIGHT-OF-WAY LINE OF LOST CREEK BOULEVARD, THE BEGINNING OF A NON-TANGENT CURVE TO THE RIGHT;

THENCE 122.58 FEET ALONG THE ARC OF SAID NON-TANGENT CURVE TO THE RIGHT AND ALONG THE EASTERLY RIGHT-OF-WAY LINE OF LOST CREEK BOULEVARD THROUGH A CENTRAL ANGLE OF 16 DEGREES 15 MINUTES 20 SECONDS, A RADIUS OF 432.62 FEET AND A LONG CHORD OF N 07 DEGREES 33 MINUTES 23 SECONDS W, 122.17 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE SOUTHWEST CORNER OF LOT 1, BLOCK 10, SAID LOST CREEK ADDITION, THE BEGINNING OF A NONTANGENT CURVE TO THE LEFT;

THENCE ALONG THE SOUTHERLY LINE OF SAID BLOCK 10, THE FOLLOWING BEARINGS AND DISTANCES: 111.72 FEET ALONG THE ARC OF SAID CURVE TO THE LEFT THROUGH A CENTRAL ANGLE OF 11 DEGREES 58 MINUTES 22 SECONDS, A RADIUS OF 534.00 FEET AND A LONG CHORD OF N 84 DEGREES 34 MINUTES 57 SECONDS E, 111.51 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

N 78 DEGREES 34 MINUTES 15 SECONDS E, 243.60 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE BEGINNING OF A CURVE TO THE RIGHT; 358.15 FEET ALONG THE ARC OF SAID CURVE TO THE RIGHT THROUGH A CENTRAL ANGLE OF 25 DEGREES 00 MINUTES 00 SECONDS, A RADIUS OF 360.15 FEET AND A LONG CHORD OF S 83 DEGREES 51 MINUTES 45 SECONDS E, 354.57 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

S 66 DEGREES 25 MINUTES 45 SECONDS E, 24.00 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE BEGINNING OF A CURVE TO THE LEFT; 344.07 FEET ALONG THE ARC OF SAID CURVE TO THE LEFT THROUGH A CENTRAL ANGLE OF 20 DEGREES 00 MINUTES 00 SECONDS, A RADIUS OF 964.60 FEET AND A LONG CHORD OF S 76 DEGREES 25 MINUTES 45 SECONDS E, 342.33 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

Unofficial Copy



S 88 DEGREES 25 MINUTES 45 SECONDS E, 287.86 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE SOUTHEAST CORNER OF LOT 12, SAID BLOCK 10;

THENCE N 03 DEGREES 34 MINUTES 15 SECONDS E, 50.00 FEET ALONG THE EAST LINE OF SAID LOT 12 TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE S 88 DEGREES 25 MINUTES 45 SECONDS E, 45.60 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE N 03 DEGREES 34 MINUTES 15 SECONDS E, 150.00 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE N 88 DEGREES 25 MINUTES 45 SECONDS W, 45.85 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET IN THE EAST LINE OF LOT 12, BLOCK 3, LOST CREEK ADDITION;

THENCE N 03 DEGREES 34 MINUTES 15 SECONDS E, 50.00 FEET ALONG THE EAST LINE OF SAID LOT 12, BLOCK 3 TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE NORTHEAST CORNER OF SAID LOT 12;

THENCE ALONG THE NORTHERLY LINE OF SAID BLOCK 3 THE FOLLOWING BEARINGS AND DISTANCES:

88 DEGREES 25 MINUTES 45 SECONDS W, 287.89 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE BEGINNING OF A CURVE TO THE RIGHT; 249.82 FEET ALONG THE ARC OF SAID CURVE TO THE RIGHT THROUGH CENTRAL ANGLE OF 20 DEGREES 00 MINUTES 00 SECONDS, A RADIUS OF 715.68 FEET AND A LONG CHORD OF N 76 DEGREES 25 MINUTES 45 SECONDS W, 244.56 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET.

N 66 DEGREES 25 MINUTES 45 SECONDS W, 20.00 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT THE BEGINNING OF A CURVE TO THE LEFT; 373.46 FEET ALONG THE ARC OF SAID CURVE TO THE LEFT THROUGH A CENTRAL ANGLE OF 27 DEGREES 00 MINUTES 00 SECONDS, A RADIUS OF 816.24 FEET AND A LONG CHORD OF N 83 DEGREES 55 MINUTES 45 SECONDS W, 367.31 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

S 76 DEGREES 34 MINUTES 15 SECONDS W, 221.17 FEET TO AN IRON ROD FOUND AT THE NORTHWEST CORNER OF LOT 1, SAID BLOCK 9 IN THE EASTERLY LINE OF LOST CREEK BOULEVARD;

THENCE N 03 DEGREES 34 MINUTES 11 SECONDS [illegible] FEET ALONG SAID EASTERLY RIGHT-OF-WAY LINE TO AN IRON ROD FOUND AT THE SOUTHWEST CORNER OF LOT 13, BLOCK 5, LOST CREEK ADDITION AS RECORDED IN VOLUME 388/122, PAGE [illegible], SAID COUNTY RECORDS;

THENCE N 76 DEGREES 34 MINUTES 15 SECONDS E, 112.46 FEET ALONG THE SOUTH LINE OF SAID LOT 13, BLOCK 5 TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET AT ITS SOUTHEAST CORNER.

THENCE N 88 DEGREES [illegible] MINUTES [illegible] SECONDS E, 198.42 FEET TO AN IRON ROD FOUND, THE NORTHEAST CORNER OF LOT 14, BLOCK [illegible]

THENCE N 88 DEGREES [illegible] MINUTES [illegible] SECONDS W, 110.00 FEET TO THE POINT OF BEGINNING AND CONTAINING 25.386 ACRES OF LAND.

SAVE & EXCEPT TRACT I:

BEING A TRACT SITUATED IN THE J.K. BURSEY SURVEY, ABSTRACT NO. 241, TARRANT COUNTY, TEXAS AND BEING A PORTION OF THE 170.44 ACRE TRACT AS DESCRIBED BY DEED TO LOST CREEK COUNTRY CLUB AND RECORDED IN VOLUME 7142, PAGE 551, AND A PORTION OF PARCEL "A" AS DESCRIBED BY DEED TO LOST CREEK COUNTRY CLUB AS RECORDED IN VOLUME 8167, PAGE 543, SAID COUNTY RECORDS, SAID SAVE AND EXCEPT TRACT BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

BEGINNING AT AN IRON ROD FOUND AT THE MOST SOUTHERLY SOUTHWEST CORNER OF SAID PARCEL "A";

THENCE N [illegible] DEGREES 21 MINUTES 50 SECONDS E, 121.29 FEET TO A POINT FROM WHICH AN IRON ROD FOUND BEARS N 64 DEGREES 16 MINUTES 25 SECONDS E, 0.27 FEET;

THENCE N 88 DEGREES 28 MINUTES 35 SECONDS W, 1066.18 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE N 01 DEGREES 31 MINUTES 25 SECONDS E, 370.94 FEET TO AN IRON ROD FOUND;

THENCE N 86 DEGREES 24 MINUTES 06 SECONDS E, 1055.56 FEET TO A 5/8 INCH IRON ROD WITH PLASTIC CAP STAMPED "CARTER & BURGESS" SET;

THENCE S 11 DEGREES 37 MINUTES 21 SECONDS E, 273.00 FEET TO AN IRON ROD FOUND;

THENCE S 09 DEGREES 21 MINUTES 60 SECONDS W, 127.22 FEET TO AN IRON ROD FOUND;

THENCE N 83 DEGREES 42 MINUTES 42 SECONDS W, 64.00 FEET TO THE POINT OF BEGINNING AND CONTAINING 8.155 ACRES OF LAND, MORE OR LESS.

SAVE & EXCEPT TRACT II:

BEING A TRACT OF LAND SITUATED IN THE J. BURLESON SURVEY, ABSTRACT NO. 76, TARRANT COUNTY, TEXAS AND BEING A PORTION OF THE 170.44 ACRE TRACT AS DESCRIBED BY DEED TO LOST CREEK COUNTRY CLUB AND RECORDED IN VOLUME 7174, PAGE 551, SAID COUNTY RECORDS AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

BEGINNING AT THE SOUTHEAST CORNER OF LOT 23, BLOCK 4, LOST CREEK ADDITION AS RECORDED IN PLAT VOLUME 388/115, PAGE 87, SAID COUNTY RECORDS;

THENCE S 08 DEGREES 34 MINUTES 11 SECONDS W, 127.30 FEET TO A POINT IN THE NORTH RIGHT-OF-WAY LINE OF BLUE CREEK DRIVE;

THENCE S 85 DEGREES 34 MINUTES 15 SECONDS W, 116.41 FEET ALONG SAID NORTH RIGHT-OF-WAY LINE;

Unofficial Copy



THENCE N 89 DEGREES 34 MINUTES 11 SECONDS E, [illegible] FEET TO AN IRON ROD FOUND, THE SOUTHWEST CORNER OF SAID LOT 25, BLOCK 4;

THENCE S 00 DEGREES 25 MINUTES 43 SECONDS E, 110.00 FEET TO THE POINT OF BEGINNING AND CONTAINING 0.333 ACRES OF LAND, MORE OR LESS

SAVE AND EXCEPT TRACT III:

BEING LOTS 1 AND 2, BLOCK 2A, OF LOST CREEK ADDITION, AS RECORDED IN CABINET B, SLIDE 212, PLAT RECORDS OF TARRANT COUNTY, TEXAS, AND BEING A TRACT OF LAND SITUATED IN THE J. BURLESON SURVEY, ABSTRACT NO. 76, TARRANT COUNTY, TEXAS, AND BEING A PORTION OF THE 170.4 ACRE TRACT AS DESCRIBED BY DEED TO LOST CREEK COUNTRY CLUB AND RECORDED IN DEED VOLUME 5174, PAGE 551, SAID COUNTY RECORDS; SAID TRACT BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT THE SOUTHWEST CORNER OF LOT 1, BLOCK 2, LOST CREEK ADDITION AS RECORDED IN PLAT VOLUME 388-115, PAGE 97, SAID COUNTY RECORDS, SAID POINT BEING IN THE EASTERLY RIGHT-OF-WAY LINE OF LOST CREEK BOULEVARD;

THENCE S 15 DEGREES 26 MINUTES 00 SECONDS E, 20.00 FEET ALONG SAID EASTERLY RIGHT-OF-WAY LINE TO THE POINT OF BEGINNING;

THENCE N 84 DEGREES 34 MINUTES 00 SECONDS E, 110.00 FEET;

THENCE S 15 DEGREES 26 MINUTES 00 SECONDS E, 200.00 FEET;

THENCE S 84 DEGREES 34 MINUTES 00 SECONDS W, [illegible] FEET TO A POINT IN THE EASTERLY RIGHT-OF-WAY LINE OF LOST CREEK BOULEVARD;

THENCE N 15 DEGREES 26 MINUTES 00 SECONDS W, [illegible] FEET TO THE POINT OF BEGINNING, AND CONTAINING 0.487 ACRES OF LAND, MORE OR LESS.

SAVE & EXCEPT TRACT V:

BEING A TRACT OF LAND SITUATED IN THE J. BURLESON SURVEY, ABSTRACT NO. 76, TARRANT COUNTY, TEXAS AND BEING ALL OF LOT 4R, BLOCK 4, LOST CREEK ADDITION AS RECORDED IN CABINET B, SLIDE NO. 187 SAID COUNTY RECORDS, AND CONTAINING 0.274 ACRES OF LAND MORE OR LESS.

SAVE & EXCEPT TRACT VI:

BEING LOTS 2, 3, 4, AND 5, BLOCK 1[illegible], LOST CREEK ADDITION, AS RECORDED IN CABINET B, SLIDE 16[illegible], PLAT RECORDS OF TARRANT COUNTY, TEXAS, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

---

COMMENCING AT THE SOUTHWEST CORNER OF LOT 29, BLOCK 11, PHASE I, LOST CREEK ADDITION AS RECORDED IN PLAT VOLUME 388-[illegible]5, PAGE 6[illegible], SAID COUNTY RECORDS, SAID POINT BEING IN THE WESTERLY RIGHT-OF-WAY LINE OF LOST CREEK BOULEVARD;

THENCE N 30 DEGREES [illegible] MINUTES 36 SECONDS E, 44.41 FEET TO THE POINT OF BEGINNING IN THE EASTERLY RIGHT-OF-WAY LINE OF LOST CREEK BOULEVARD;

THENCE [illegible] DEGREES 14 MINUTES 11 SECONDS W, 76.72 FEET ALONG SAID EASTERLY RIGHT-OF-WAY LINE;

THENCE N 61 DEGREES 12 MINUTES 35 SECONDS W, 324.22 FEET CONTINUING ALONG SAID EASTERLY RIGHT-OF-WAY LINE;

THENCE N [illegible] DEGREES 47 MINUTES 24 SECONDS E, 182.02 FEET;

THENCE N 44 DEGREES 47 MINUTES 24 SECONDS E, 21.76 FEET;

THENCE N 35 DEGREES 47 MINUTES 24 SECONDS E, 82.13 FEET;

THENCE S 51 DEGREES 00 MINUTES 02 SECONDS E, 242.15 FEET;

THENCE S 07 DEGREES 24 MINUTES 02 SECONDS E, 74.82 FEET;

THENCE S 53 DEGREES 13 MINUTES 36 SECONDS E, 86.00 FEET;

THENCE S 36 DEGREES 47 MINUTES 24 SECONDS W, 211.07 FEET TO THE POINT OF BEGINNING AND CONTAINING 2.196 ACRES OF LAND, MORE OR LESS.

---

Unofficial Copy

MARY LOUISE NICHOLSON
COUNTY CLERK
100 West Weatherford Fort Worth, TX 76196-0401
PHONE (817) 884-1195

THE MARX FIRM
127 HOWELL ST
DALLAS, TX 75207

Submitter: THE MARX FIRM

***DO NOT DESTROY***
***WARNING - THIS IS PART OF THE OFFICIAL RECORD.***

| | | | | |
|---|---|---|---|---|
| Filed For Registration: | 7/14/2020 2:52 PM | | | |
| Instrument #: | D220167148 | | | |
| | APP | 13 | PGS | $63.00 |

By: Mary Louise Nicholson

D220167148

ANY PROVISION WHICH RESTRICTS THE SALE, RENTAL OR USE OF THE DESCRIBED REAL PROPERTY BECAUSE OF COLOR OR RACE IS INVALID AND UNENFORCEABLE UNDER FEDERAL LAW.

Unofficial Copy

**MARY LOUISE NICHOLSON**
**COUNTY CLERK, TARRANT COUNTY**
**100 W. WEATHERFORD**
**FORT WORTH, TX 76196-0401**

Receipt Time: 07/14/2020 02:52:53 PM Receipt #: 4434762
Issued To: THE MARX FIRM

**Documents**

| # | Type | # Pages | Quantity | Reference # | Book / Page | Amount |
|---|---|---|---|---|---|---|
| 1 | APP | 12 | 1 | D220167148 | | $63.00 |
| | | | | | Total : | $63.00 |

**Payments**

| # | Type | Payment # | Amount | NSF |
|---|---|---|---|---|
| 1 | CHECK | 9448 | $63.00 | |
| | | Total Payments: | $63.00 | |

THANK YOU

Mary Louise Nicholson
County Clerk
*Recording life's events since 2011*

**SENDER: *COMPLETE THIS SECTION***

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Somerset-Lost Creek
Golf, Ltd.
4101 Lost Creek Blvd
Aledo, TX 76008

9590 9402 5929 0049 2335 98

2. Article Number (Transfer from service label)

7020 0640 0000 5785 5856

***COMPLETE THIS SECTION ON DELIVERY***

A. Signature

X ☐ Agent ☐ Addressee

B. Received by *(Printed Name)*

C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053 Domestic Return Receipt

Unofficial Copy




Unofficial Copy

U.S. Postal Service™
CERTIFIED MAIL® RECEIPT
*Domestic Mail Only*

For delivery information, visit our website at www.usps.com®.

ALEDO, TX 76008
OFFICIAL USE

7020 0640 0000 5785 5856

| | | |
|---|---|---|
| Certified Mail Fee | $3.55 | 0202 |
| $ | | 46 |
| Extra Services & Fees (check box, add fee as appropriate) | $2.85 | |
| Return Receipt (hardcopy) | $ $0.00 | |
| Return Receipt (electronic) | $ $0.00 | Postmark Here |
| Certified Mail Restricted Delivery | $ $0.00 | |
| Adult Signature Required | $ | |
| Adult Signature Restricted Delivery | $ | |
| Postage | $2.00 | 07/14/2020 |
| $ | | |
| Total Postage and Fees | $8.40 | |
| $ | | |

Sent To: Somerset - Lost Creek Golf, Ltd.
Street and Apt. No., or PO Box No.: 4101 Lost Creek Blvd.
City, State, ZIP+4®: Aledo TX 76008

PS Form 3800, April 2015 PSN 7530-02-000-9047 See Reverse for Instructions

MAIN OFC DALLAS
401 TOM LANDRY HWY
DALLAS, TX 75260-9996
482200-0202
(800)275-8777
07/14/2020 05:03 PM

| Product | Qty | Unit Price | Price |
|---|---|---|---|
| First-Class Mail® Large Envelope | 1 | $2.00 | $2.00 |
| Domestic ALEDO, TX 76008 Weight:0 Lb 5.10 Oz Estimated Delivery Date Friday 07/17/2020 | | | |
| Certified | | | $3.55 |
| USPS Certified Mail # 70200640000057855856 | | | |
| Return Receipt | | | $2.85 |
| USPS Return Receipt # 9590940259290049233598 | | | |
| Total: | | | $8.40 |

Debit Card Remit'd $8.40
Card Name:VISA
Account #:XXXXXXXXXXXX0863
Approval #
Transaction #:274
Receipt #:038926
Debit Card Purchase:$8.40
Cash Back:$0.00
AID:A0000000980840 Chip
AL:US DEBIT
PIN:Verified

SD

************************************
Due to limited transportation availability as a result of nationwide COVID-19 impacts package delivery times may be extended. Priority Mail Express® service will not change.
************************************

In a hurry? Self-service kiosks offer quick and easy check-out. Any Retail Associate can show you how.

Text your tracking number to 28777 (2USPS) to get the latest status. Standard Message and Data rates may apply. You may also visit www.usps.com USPS Tracking or call 1-800-222-1811.

Preview your Mail
Track your Packages
Sign up for FREE @
www.informeddelivery.com

All sales final on stamps and postage.
Refunds for guaranteed services only.
Thank you for your business.

HELP US SERVE YOU BETTER

TELL US ABOUT YOUR RECENT POSTAL EXPERIENCE

Go to:
https://postalexperience.com/Pos

840-5752-0105-002-00060-05422-02

or scan this code with your mobile device:

or call 1-800-410-7420.

YOUR OPINION COUNTS

Receipt #: 840-57520105-2-6005422-2
Clerk: 46

Unofficial Copy

ALERT: DUE TO LIMITED TRANSPORTATION AVAILABILITY AS A RESULT OF NATIONWIDE CO...

# USPS Tracking®

FAQs >

Track Another Package +

Unofficial Copy

**Tracking Number:** 70200640000057855856

Remove X

Your package will arrive later than expected, but is still on its way. It is currently in transit to the next facility.

## In-Transit

July 19, 2020
In Transit, Arriving Late

Feedback

**Text & Email Updates**

Confirmation - We Received Your Request
70200640000057855856

Your updates will be sent to:

randy@themarxfirm.com

When new tracking activity is available, you'll get notifications based on your selections.

**Tracking History**

July 19, 2020
In Transit, Arriving Late

Unofficial Copy

Your package will arrive later than expected, but is still on its way. It is currently in transit to the next facility.

**July 15, 2020, 10:16 pm**
Departed USPS Regional Facility
FORT WORTH TX DISTRIBUTION CENTER

**July 15, 2020, 9:26 am**
Arrived at USPS Regional Facility
FORT WORTH TX DISTRIBUTION CENTER

**July 14, 2020, 10:42 pm**
Arrived at USPS Regional Facility
COPPELL TX DISTRIBUTION CENTER

**July 14, 2020, 4:59 pm**
USPS in possession of item
DALLAS, TX 75260

Feedback

**Product Information**

**See Less**

## Can't find what you're looking for?

Go to our FAQs section to find answers to your tracking questions.

**FAQs**

ALERT: DUE TO LIMITED TRANSPORTATION AVAILABILITY AS A RESULT OF NATIONWIDE CO...

# USPS Tracking®

FAQs >

Track Another Package +

Unofficial Copy

**Tracking Number:** 70200640000057855856

Remove X

Your package will arrive later than expected, but is still on its way. It is currently in transit to the next facility.

## In-Transit

July 19, 2020
In Transit, Arriving Late

Feedback

**Text & Email Updates**

Confirmation - We Received Your Request
70200640000057855856

Your updates will be sent to:

randy@themarxfirm.com

When new tracking activity is available, you'll get notifications based on your selections.

**Tracking History**

July 19, 2020
In Transit, Arriving Late

Your package will arrive later than expected, but is still on its way. It is currently in transit to the next facility.

**July 15, 2020, 10:16 pm**
Departed USPS Regional Facility
FORT WORTH TX DISTRIBUTION CENTER

**July 15, 2020, 9:26 am**
Arrived at USPS Regional Facility
FORT WORTH TX DISTRIBUTION CENTER

**July 14, 2020, 10:42 pm**
Arrived at USPS Regional Facility
COPPELL TX DISTRIBUTION CENTER

**July 14, 2020, 4:59 pm**
USPS in possession of item
DALLAS, TX 75260

Feedback

**Product Information**

**See Less**

Unofficial Copy

## Can’t find what you’re looking for?

Go to our FAQs section to find answers to your tracking questions.

FAQs

Secretary of State
P.O. Box 13697
Austin, TX 78711-3697
FAX: 512/463-5709

Filing Fee: $300

**Certificate of Formation**
**Limited Liability Company**

**Filed in the Office of the Secretary of State of Texas**
**Filing #: 803711606 08/05/2020**
**Document #: 987676010002**
**Image Generated Electronically for Web Filing**

**Article 1 - Entity Name and Type**

The filing entity being formed is a limited liability company. The name of the entity is:

**LC Aledo TX, LLC**

**Article 2 – Registered Agent and Registered Office**

☑ A. The initial registered agent is an organization (cannot be company named above) by the name of:

**Incorp Services**

**OR**

☐ B. The initial registered agent is an individual resident of the state whose name is set forth below:

C. The business address of the registered agent and the registered office address is:

**Street Address:**
**815 Brazos St, Suite 500 Austin TX 78701**

**Consent of Registered Agent**

☐ A. A copy of the consent of registered agent is attached.

**OR**

☑ B. The consent of the registered agent is maintained by the entity.

**Article 3 - Governing Authority**

☑ A. The limited liability company is to be managed by managers.

**OR**

☐ B. The limited liability company will not have managers. Management of the company is reserved to the members.

The names and addresses of the governing persons are set forth below:

Manager 1: (Business Name) **STL Park, LLC**

Address: **13901 Midway Rd 102-243 Dallas TX, USA 75244-75244**

**Article 4 - Purpose**

The purpose for which the company is organized is for the transaction of any and all lawful business for which limited liability companies may be organized under the Texas Business Organizations Code.

**Supplemental Provisions / Information**

[The attached addendum, if any, is incorporated herein by reference.]

**Organizer**

The name and address of the organizer are set forth below.
**Krista Vassallo** **1755 Wittington Place Suite 340 Dallas TX 75234**

**Effectiveness of Filing**

☑ A. This document becomes effective when the document is filed by the secretary of state.

**OR**

☐ B. This document becomes effective at a later date, which is not more than ninety (90) days from the date of its signing. The delayed effective date is:

**Execution**

The undersigned affirms that the person designated as registered agent has consented to the appointment. The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

**Krista Vassallo**

Signature of Organizer

**FILING OFFICE COPY**

Secretary of State
P.O. Box 13697
Austin, TX 78711-3697
FAX: 512/463-5709

Filing Fee: $300

**Certificate of Formation**
**Limited Liability Company**

**Filed in the Office of the Secretary of State of Texas**
**Filing #: 802734291 05/31/2017**
**Document #: 741272920002**
**Image Generated Electronically for Web Filing**

**Article 1 - Entity Name and Type**

The filing entity being formed is a limited liability company. The name of the entity is:

**Wall010 LLC**

**Article 2 – Registered Agent and Registered Office**

☑ A. The initial registered agent is an organization (cannot be company named above) by the name of:

**TRWF Lodge LLC**

**OR**

☐ B. The initial registered agent is an individual resident of the state whose name is set forth below:

C. The business address of the registered agent and the registered office address is:

**Street Address:**
**13901 Midway Rd**
**Suite 102 Dallas TX 75244**

**Consent of Registered Agent**

☐ A. A copy of the consent of registered agent is attached.

**OR**

☑ B. The consent of the registered agent is maintained by the entity.

**Article 3 - Governing Authority**

☑ A. The limited liability company is to be managed by managers.

**OR**

☐ B. The limited liability company will not have managers. Management of the company is reserved to the members.

The names and addresses of the governing persons are set forth below:

Manager 1: (Business Name) **TRWF LLC**

Address: **13901 Midway Rd Suite 102 Dallas TX, USA 75244**

**Article 4 - Purpose**

The purpose for which the company is organized is for the transaction of any and all lawful business for which limited liability companies may be organized under the Texas Business Organizations Code.

**Supplemental Provisions / Information**

[The attached addendum, if any, is incorporated herein by reference.]

**Organizer**

The name and address of the organizer are set forth below.

**Saskya Bedoya** **13901 Midway Rd Suite 102 Dallas, TX 75244**

**Effectiveness of Filing**

☑ A. This document becomes effective when the document is filed by the secretary of state.

**OR**

☐ B. This document becomes effective at a later date, which is not more than ninety (90) days from the date of its signing. The delayed effective date is:

**Execution**

The undersigned affirms that the person designated as registered agent has consented to the appointment. The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

**Saskya Bedoya**

Signature of Organizer

**FILING OFFICE COPY**

# Guaranty

## Basic Information

Date: September 11, 2019.

Guarantor: Tim Barton.

Guarantor's Mailing Address: 1755 Wittington Place, Suite 340, Dallas, TX 75234

Borrower: WALL009, LLC, a Texas limited liability company.

Borrower's Mailing Address: 1755 Wittington Place, Suite 340, Dallas, TX 75234

Lender: Southern Star Capital, LLC d/b/a Reliance Mortgage Company

Lender's Mailing Address: 5220 Spring Valley Road, Suite 602, Dallas, Texas 75254.

Guaranteed Indebtedness: The debt evidenced by the note dated September 11, 2019, in the original principal amount of $900,000.00, executed by Borrower and payable to the order of Lender, the obligations under the deed of trust executed in connection with the note and any other document executed by Borrower evidencing or securing the note (collectively, the "Loan Documents"), plus all interest, penalties, expenses, attorney's fees, and other collection costs as provided in the Loan Documents.

## Clauses and Covenants

1. Guarantor agrees to pay, when due or declared due, the Guaranteed Indebtedness to Lender at Lender's Mailing Address.

2. Guarantor waives (a) diligence in preserving liability of any person on the Guaranteed Indebtedness and in collecting or bringing suit to collect the Guaranteed Indebtedness; (b) all rights of Guarantor under chapter 43 of the Texas Civil Practice and Remedies Code, section 17.001 of the Texas Civil Practice and Remedies Code, [and] rule 31 of the Texas Rules of Civil Procedure, and sections 51.003, 51.004, and 51.005 of the Texas Property Code]; (c) protest; (d) notice of extensions, increases, renewals, or rearrangements of the Guaranteed Indebtedness; and (e) notice of acceptance of this guaranty, of creation of the Guaranteed Indebtedness, of failure to pay the Guaranteed Indebtedness as it matures, of any other default, of adverse change in Borrower's financial condition, of release or substitution of collateral, of intent to accelerate, of acceleration, and of subordination of Lender's rights in any collateral, and every other notice of every kind. Guarantor's obligations under this guaranty will not be altered nor will Lender be liable to Guarantor because of any action or inaction of Lender in regard to a matter waived or of which notice is waived by Guarantor in the preceding sentence.

3. Guarantor agrees to pay reasonable attorney's fees and other collection costs if an attorney is retained to enforce this guaranty for collection.

4. This guaranty is an absolute, irrevocable, unconditional, and continuing guaranty of payment and performance and not of collection.

5. Lender need not resort to Borrower or any other person or proceed against collateral before pursuing its rights against Guarantor or any other guarantor. Lender's action or inaction with respect to any right of Lender under the law or any agreement will not alter the obligation of Guarantor hereunder. Lender may pursue any remedy against Borrower or any collateral or under any other guaranty without altering the obligations of Guarantor hereunder and without liability to Guarantor, even though Lender's pursuit of such remedy may result in Guarantor's loss of rights of subrogation or to proceed against others for reimbursement of contribution or any other right.

6. Guarantor will remain liable for the Guaranteed Indebtedness even though the Guaranteed Indebtedness may be unenforceable against or uncollectible from Borrower or any other person because of incapacity, lack of power or authority, discharge, or any other reason.

7. Guarantor consents and acknowledges that Guarantor's obligations will not be released by (a) the renewal, extension, or modification of the Guaranteed Indebtedness or any of the Loan Documents; (b) the insolvency, bankruptcy, liquidation, or dissolution of Borrower or any other obligor; (c) the failure of Lender to properly obtain, perfect, or preserve any security interest or lien in any collateral for the Guaranteed Indebtedness; (d) the release, substitution, or addition of any collateral for the Guaranteed Indebtedness; or (e) the failure of Lender to exercise diligence, commercial reasonableness, or reasonable care in the preservation, enforcement, or sale of any of the collateral.

8. Lender need not notify Guarantor that Lender has sued Borrower, but if Lender gives written notice to Guarantor that it has sued Borrower, Guarantor will be bound by any judgment or decree, to the extent permitted by law.

9. Lender may sue any guarantor without impairing Lender's rights against any other guarantor, with or without making Borrower a party. Lender may settle with Borrower or any other guarantor for such amounts as it may elect or may release Borrower or any guarantor or any collateral securing the Guaranteed Indebtedness without impairing Lender's right to collect the Guaranteed Indebtedness from Guarantor.

10. This guaranty binds Guarantor and Guarantor's heirs, successors, and assigns, and it benefits and may be enforced by Lender and Lender's successors in interest. When the context requires, singular nouns and pronouns include the plural. This guaranty will be construed under the laws of the state of Texas, without regard to choice-of-law rules of any jurisdiction. The provisions of this guaranty are severable. If a court of competent jurisdiction finds that any provision of this guaranty is unenforceable, then the remaining provisions will remain in effect without the unenforceable parts.

11. From time to time, at the request of Lender, Guarantor will (i) promptly correct any defect, error or omission which may be discovered in the contents of this Guaranty or in any other Loan Document executed by Guarantor or in the execution or acknowledgment thereof; (ii) execute, acknowledge, deliver and record or file (or cause to be executed, acknowledged, delivered and recorded or filed) such further documents and instruments and perform such further acts and

provide such further assurances as may be necessary, desirable, or proper, in Lender's opinion, (A) to carry out more effectively the purposes of this Guaranty and the other Loan Documents and the transactions contemplated hereunder and thereunder, (B) to confirm the rights created under this Guaranty and the other Loan Documents, (C) to protect and further the validity, priority and enforceability of this Guaranty and the other Loan Documents and the liens and security interests created thereby, and (D) to subject to the Loan Documents any property of Guarantor intended by the terms of any one or more of the Loan Documents to be encumbered by the Loan Documents; and (iii) pay all costs in connection with any of the foregoing.

12. FINAL AGREEMENT: THIS WRITTEN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

______________________________
Tim Barton

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed October 22, 2020**

**United States Bankruptcy Judge**

---

**UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Chapter 7** |
| | § | |
| **WALL007 LLC, *et al.*,** | § | **Case No. 20-31131 (HDH)** |
| | § | |
| **Alleged Debtors.** | § | **(Jointly Administered)** |

**ORDER DENYING MOTION FOR
<u>RECONSIDERATION OF DISCOVERY ORDERS</u>**

On September 15, 2020, the petitioning creditors in the above-captioned case (the "<u>Petitioning Creditors</u>") filed the *Motion of the Petitioning Creditors for (I) Reconsideration of Discovery Orders; and (II) Related Relief* [Docket No. 175] (the "<u>Motion to Reconsider</u>") asking this Court to alter or amend several orders (the "<u>Discovery Orders</u>").[1] The part of the Discovery Orders that the Motion to Reconsider primarily addresses is the Court's requirement that the Petitioning Creditors' depositions be taken in person, in the United States. The Petitioning

---

[1] The Discovery Orders consist of four orders: *Order Granting in Part the Alleged Debtor's Motion to Compel Discovery Related to Wet Signatures [Dkt. No. 101]* [Docket No. 165]; *Order Granting in Part the Petitioners' Motion to Compel Discovery [Dkt. Nos. 92 & 129]* [Docket No. 167]; *Order Granting in Part the Alleged Debtor's Motion to Quash Petitioners' Deposition Notice [Dkt. No. 133]* [Docket No. 168]; *Order Granting in Part the Alleged Debtor's Second Motion to Compel Discovery Responses from Petitioners [Dkt. No. 105]* [Docket No. 169].

Creditors contend both that the Court erred by failing to consider evidence and argument provided by the Petitioning Creditors and that new evidence of an intervening change in law exists that should alter the determination. On September 23, 2020, the Alleged Debtors filed a response to the Motion to Reconsider[2] objecting to the relief sought therein. The Petitioning Creditors did not file a reply to address any of the arguments raised in the Alleged Debtors' Response.

**Applicable Legal Standard**

The parties urge the Court to follow the standard for reconsideration under either Federal Rule of Civil Procedure 59(e), made applicable to this matter by Federal Rule of Bankruptcy Procedure 9023, or Federal Rule of Civil Procedure 60(b), made applicable to this matter by Federal Rule of Bankruptcy Procedure 9024.

There are four basic grounds upon which a Rule 59(e) motion for reconsideration may be granted: (1) if necessary to correct manifest errors of law or fact upon which the judgment is based; (2) so that the moving party may present newly discovered or previously unavailable evidence; (3) if necessary to prevent manifest injustice; and (4) if justified by an intervening change in the controlling law. *Fields v. Pool Offshore, Inc.*, 1998 U.S. Dist. LEXIS 1122, at *7 (E.D. La. Feb. 2, 1998) (internal citations omitted).

Rule 60(b) provides six grounds for relief from a prior judgment, but the Petitioning Creditors have cited Rule 60(b)(6) as the grounds on which they are relying. Rule 60(b)(6) allows for relief from a judgment based on "any other reason justifying relief from the operation of the judgment," but such relief is granted rarely and only under extraordinary circumstances. *Ruiz v. Quarterman*, 504 F.3d 523, 533 (5th Cir. 2007).

---

[2] *Response and Objection to Motion of Petitioning Creditors for (I) Reconsideration of Discovery Orders; and (II) Related Relief* [Docket No. 177] (the "Alleged Debtors' Response").

While not raised by the parties, how courts characterize a motion to reconsider depends on whether it challenges a final or interlocutory order and when it is filed. *See De Olivera Dos Santos v. Bell Helicopter Textron, Inc.*, 651 F. Supp. 2d 550, 553 (N.D. Tex. 2009). When, as here, the court reconsiders an interlocutory order,[3] it does so under Federal Rule of Civil Procedure 54(b), which is made applicable to this contested matter by Federal Rules of Bankruptcy Procedure 7054 and 9014. *Id.* Under this standard, the court may "reconsider and reverse its decision for any reason it deems sufficient." *McClendon v. United States*, 892 F.3d 775, 781 (5th Cir. 2018).

**Discussion**

The Petitioning Creditors make several arguments in their Motion to Reconsider for why the Court should alter the Discovery Orders, including (1) the Petitioning Creditors cannot legally enter the United States; (2) there has been a change in circumstances and law; and (3) there is new evidence of an allegedly fraudulent transfer warranting discovery regarding the Alleged Debtors' use of loan proceeds. The Court will address each argument in turn.

The first argument is generally that the Petitioning Creditors should not be required to appear for depositions in person, in the United States because they are Chinese nationals residing in mainland China and cannot legally enter the United States. The Petitioning Creditors cite their original briefing for a statement of the argument that they believe the Court did not properly consider:

[3] The Court believes the Discovery Orders are interlocutory orders, as they do not finally determine a cause of action but only decide some intervening matter pertaining to the cause and require further steps to be taken in order to enable the court to adjudicate the cause on the merits. *See In re Watson*, 884 F.2d 879, 880 (5th Cir. 1989). However, the arguments made by the Petitioning Creditors in the Motion to Reconsider were directed to the more stringent standard for reconsideration under Federal Rule of Civil Procedure 59(e). As a result, the Court's discussion of the merits of the Motion to Reconsider was not significantly different from a Rule 59(e) analysis even though it was conducted under the lower Rule 54(b) standard.

> However, as set forth in the Amended Motion to Compel, Petitioning Creditors **cannot enter into the United States** due to the ongoing COVID-19 pandemic and travel and quarantine restrictions imposed by both China and the United States.[4]

The Petitioning Creditors also contend that the substance of a Presidential Proclamation that was presented to the Court was not fully considered or understood by the Court prior to the Court issuing its ruling. *See* Pres. Proc. No. 9984, 85 Fed. Reg. 6709 (Jan. 31, 2020) (the "Presidential Proclamation").

Despite the argument in the Petitioning Creditors' briefing and the Presidential Proclamation, the Court essentially found that travel to the United States for depositions would be inconvenient, but not impossible, for the Petitioning Creditors and that it was necessary under the circumstances.[5] There were a few reasons for this finding. The first is that the Petitioning Creditors' argument that the Petitioning Creditors "cannot enter into the United States" was contradicted by counsel for the Petitioning Creditors at the hearing on the underlying motions when he represented to the Court that based on the most current information they had "there appears to still be a 14-day quarantine requirement for a Chinese national coming into the United States" and that "[i]t would be very expensive and costly for these petitioning creditors to come here."[6]

The Petitioning Creditors' argument that they cannot legally enter the United States was also flatly contradicted by the Presidential Proclamation on which they relied. In addition to providing several exceptions to the limitations on entry to the United States,[7] the limitation itself

[4] *See Motion to Reconsider* at ¶ 25 (citing *Petitioning Creditors' Opposition to the Alleged Debtors', Timothy Barton's, Venkat Murugan's, and Hongpeng Lin's Motion to Quash Petitioners' Deposition Notices* at ¶ 34 [Docket No. 140]).

[5] *See* Transcript of Hearing Held August 19, 2020 at 4:17-5:4 [Docket No. 159].

[6] Transcript of Hearing Held August 17, 2020 at 16:6-14 [Docket No. 172].

[7] *See* Pres. Proc. No. 9984, 85 Fed. Reg. at 6710-11. The Alleged Debtors made several arguments regarding these exceptions in the Alleged Debtors' Response, but the Petitioning Creditors did not respond to any of them.

only applies to aliens who were physically present within the People's Republic of China during the fourteen day period preceding their entry into the United States.[8] Thus, based on the evidence that has been presented to this Court, were the Petitioning Creditors not allowed to enter the United States and then quarantine for fourteen days, they could enter another country not subject to travel limitations, quarantine for fourteen days, and then enter the United States. The Petitioning Creditors appear to realize this. The Petitioning Creditors included the original statement that they cannot legally enter the United States in the Motion to Reconsider only as a block quotation but insert the caveat that the Petitioning Creditors cannot currently enter *directly* into the United States whenever the argument is restated in the Motion to Reconsider.[9]

The Court is again led to the conclusion that travel to the United States for depositions would be inconvenient, but not impossible for the Petitioning Creditors and that it is necessary under the circumstances. The Court does not find either a manifest error of law or fact in this conclusion.

The Petitioning Creditors next argue that reconsideration of the requirement that the Petitioning Creditors appear in person, in the United States for depositions is warranted by the discovery of a change of law or circumstances. Specifically, counsel for the Alleged Debtors has argued that taking depositions of Chinese nationals in China or any of its territories may be illegal, but the Petitioning Creditors claim to have found a solution to this because the Macau Special Administrative Region is now permitting Chinese nationals, such as the Petitioning Creditors, to travel to Macau where their depositions can be taken, either live by counsel or via video.

---

[8] *See* Pres. Proc. No. 9984, 85 Fed. Reg. at 6710.

[9] *See* Motion to Reconsider at ¶¶ 29, 30, 32, 33, 35, and 63.

There are a few problems with the Petitioning Creditors' newly discovered evidence of a change of law. The most glaring problem is that the evidence the Petitioning Creditors have presented does not say what they claim it does. The Petitioning Creditors claim in the Motion to Reconsider that Chinese nationals, such as the Petitioning Creditors, can now travel to Macau where their depositions can be taken, but the website they have cited as a source for that information (the "Website Alert") states that authorities in Macau "will allow tourist travel from neighboring Zhuhai, Guangdon Province."[10] It is not clear (1) why the Petitioning Creditors believe this travel allowance extends to non-tourist travel, (2) whether the Petitioning Creditors are in the neighboring province mentioned on the website, and (3) whether travel from other parts of mainland China is permitted if the individuals travel through the neighboring province. Even if the Petitioning Creditors were correct about the meaning of the Website Alert though, there is no indication from the Petitioning Creditors of why the Website Alert is trustworthy or an appropriate source of information regarding the laws and regulations of a foreign country. And even if the Petitioning Creditors were correct about the meaning of the Website Alert and the Website Alert were considered a reliable source, conducting depositions in Macau would not address both the legality[11] and the identity concerns raised by the Alleged Debtors. While the Court continues to acknowledge that requiring the Petitioning Creditors to travel to the United States may be a great inconvenience at this time, the Court also believes that litigants who seek the benefit of United States law must follow its process, and the Court believes it is necessary in this case to address the concerns raised by the Alleged Debtors. The Motion to Reconsider and

[10] COVID-19 Alert: Macau Allows Tourists from Zhuhai, China from Aug. 12, https://www.worldaware.com/covid-19-alert-macau-allows-tourists-zhuhai-china-aug-12 (last visited Oct. 22, 2020).

[11] The Alleged Debtors made several persuasive arguments regarding why they still do not believe the Petitioning Creditors have adequately addressed the issue of whether conducting the depositions in Macau would be legal. The Petitioning Creditors did not respond to these arguments.

the evidence presented in support do not present any newly discovered evidence or an intervening change in the controlling law that would change this conclusion.

Finally, the Petitioning Creditors argue that the Discovery Orders must be altered because there is new evidence of an allegedly fraudulent transfer warranting discovery regarding the Alleged Debtors' use of loan proceeds. The Court will deny this part of the Motion to Reconsider without prejudice to it being raised in a subsequent motion to compel in the event that (1) an agreement signed by counsel for the Petitioning Creditors that the Petitioning Creditors will appear for live depositions in the United States is filed with the Court and (2) the Alleged Debtors refuse to respond to the discovery the Petitioning Creditors are asking for. The Court previously inserted the requirement of a live deposition agreement before motion practice continues into the Discovery Orders because the willingness of the Petitioning Creditors to attend in-person depositions will affect several threshold issues, including the ability of the Petitioning Creditors to carry their evidentiary burdens and the identity concerns raised by the Alleged Debtors, and that ruling is still in effect.

This ruling is not novel and should not be surprising. Whether the Petitioning Creditors meet the requirements for a valid involuntary bankruptcy petition is under legal challenge, and the Petitioning Creditors, with the burden of proof, must prove their case in an American bankruptcy court. The Alleged Debtors are entitled to fair discovery prior to a hearing on the merits, and this ruling allows for that. For the reasons stated above, the Court finds that the Petitioning Creditors have not satisfied the standard for reconsideration of the Discovery Orders under Federal Rules of Civil Procedure 54(b), 59(e), or 60(b).

**IT IS THEREFORE ORDERED** that the Motion to Reconsider is **DENIED**.

###End of Order###

Joyce W. Lindauer
State Bar No. 21555700
Jeffery M. Veteto
State Bar No. 24098548
Guy H. Holman
State Bar No. 24095171
Joyce W. Lindauer Attorney, PLLC
1412 Main Street, Suite 500
Dallas, Texas 75202
Telephone: (972) 503-4033
Facsimile: (972) 503-4034
Attorneys for Alleged Debtor

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | **Chapter 7** |
| | § | |
| **WALL007 LLC,** | § | **Case No. 20-31131-hdh7** |
| | § | **(Jointly Administered)** |
| **Alleged Debtor.** | § | |

**MOTION OF ALLEGED DEBTOR TO DISMISS INVOLUNTARY PETITION, REQUEST FOR SUBSTITUTION OF REAL PARTY-IN-INTEREST, REQUEST FOR BOND, AND REQUEST FOR AWARD OF FEES, COSTS AND DAMAGES OR IN THE ALTERNATIVE TO ABSTAIN UNDER BANKRUPTCY CODE § 305**

TO THE HONORABLE UNITED STATES BANKRUPTCY COURT:

WALL007 LLC, the Alleged Debtor in the above-captioned proceedings (the "**Alleged Debtor**"), by and through its undersigned counsel, hereby moves for dismissal of the involuntary petition [Case No. 20-31131-hdh7, Docket No. 1] (the "**Involuntary Petition**") filed against it by Jun Li, Yunding Kang, Cunxiang Ji, Jin Wang, Peng Guo, Lin Zhou, Qu Chen, and Kai Tian (collectively, the "**Petitioners**") on April 8, 2020 (the "**Involuntary Petition Date**") and now jointly administered with six other involuntary petitions under this Case Number (the "**Involuntary Case**").

1. Through this Motion, the Alleged Debtor requests dismissal of this Involuntary Case pursuant to:

a. 11 U.S.C. § 303(b)(1) because there are an insufficient number of petitioning creditors;

b. 11 U.S.C. § 303(b)(1) because all of Petitioners claims are subject to bona fide disputes, contingent, and disputed;

c. 11 U.S.C. § 303(h)(1) because Alleged Debtor is generally paying its debts as they become due;

d. 11 U.S.C. § 305(a) because the Involuntary Petition is not in the best interest of the Alleged Debtor's creditors or the Alleged Debtor;

e. 11 U.S.C. § 707(a) for good cause shown; and

f. 11 U.S.C. § 305(a) in abstention.

2. In addition, the Alleged Debtor requests that Michael Fu d/b/a Silverland Financial Ltd and Platinum Investment Corporation be substituted for Petitioners as the real party-in-interest.

3. Finally, the Alleged Debtor requests that Petitioners and Michael Fu be required to post a bond pursuant to 11 U.S.C. § 303(e) and, after notice and hearing, be sanctioned pursuant to 11 U.S.C. § 303(i) for the bad faith filing of the Involuntary Petition by order awarding the Alleged Debtor reasonable attorneys' fees, costs, compensatory damages, and punitive damages.

4. In support thereof, the Alleged Debtor contemporaneously files its *Brief in Support* (the "**Brief**") of this *Motion of Alleged Debtor to Dismiss Involuntary Petition, Request for Substitution of Real Party-in-Interest, Request for Bond, and Request for Award of Fees, Costs and Damages or in the Alternative to Abstain Under Bankruptcy Code § 305* (the "**Motion**").

5. The Alleged Debtor anticipates the need to conduct discovery from Petitioners and related third parties within the scope of this Motion. In that respect, the Alleged Debtor further raises additional defenses relating to (i) the standing of the Petitioners; and (ii) service of the summons and Involuntary Petition, subject to such further discovery. The Alleged Debtor expressly reserves the right to amend this Motion and its Brief upon such discovery in this matter.

WHEREFORE, PREMISES CONSIDERED, the Alleged Debtor prays for an order from the Court granting the Motion and (i) substituting Michael Fu for the Petitioners as the real party in interest; (ii) requiring the Petitioners and Michael Fu to post a bond under § 303(e); (iii) dismissing this Involuntary Case under either Bankruptcy Code § 303(b), § 305(a), or under § 707(a) for cause; (iv) awarding the Alleged Debtor compensatory and punitive damages, including reasonable and necessary attorneys' fees, under § 303(i) from all persons and entities involved in the filing and pursuit of the Involuntary Petition, including without limitation the Petitioners, Silverland Financial Ltd., Platinum Investment Corporation, and Michael Fu; and (v) granting such other and further relief to which the Alleged Debtor may show itself entitled at law or in equity.

Dated: May 7, 2020.

Respectfully submitted,

*/s/ Joyce W. Lindauer*

Joyce W. Lindauer
State Bar No. 21555700
Jeffery M. Veteto
State Bar No. 24098548
Guy H. Holman
State Bar No. 24095171
Joyce W. Lindauer Attorney, PLLC
1412 Main Street, Suite 500
Dallas, Texas 75202
Telephone: (972) 503-4033
Facsimile: (972) 503-4034
Attorneys for Alleged Debtor

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on May 7, 2020, a true and correct copy of the foregoing *Motion of Alleged Debtor to Dismiss Involuntary Petition, Request for Substitution of Real Party-in-Interest, Request for Bond, and Request for Award of Fees, Costs and Damages or in the Alternative to Abstain Under Bankruptcy Code § 305* was served upon all parties that are registered to receive electronic service through the court's ECF notice system in the above cases.

*/s/ Joyce W. Lindauer*
Joyce W. Lindauer

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | **Chapter 7** |
| | § | |
| **WALL007 LLC,** | § | **Case No. 20-31131-hdh7** |
| | § | **(Jointly Administered)** |
| **Alleged Debtor.** | § | |

**ORDER DISMISSING INVOLUNTARY PETITION AND ENTERING AWARD OF FEES, COSTS AND DAMAGES**

CAME ON FOR CONSIDERATION the *Motion of Alleged Debtor to Dismiss Involuntary Petition, Request for Substitution of Real Party-in-Interest, Request for Bond, and Request for Award of Fees, Costs and Damages or in the Alternative to Abstain Under Bankruptcy Code § 305* (the "**Motion**") file by Wall007, LLC, the Alleged Debtor in the above-styled and numbered case. The Court having considered the pleadings on file and the arguments of counsel, and for the reasons stated on the record, (1) finds this matter to be a core proceeding pursuant to 28 U.S.C. §

157(b); (2) finds that due and proper notice of the Motion has been provided to all parties in interest; and (3) finds good cause for entry of the following Order.[1] It is therefore,

**ORDERED, ADJUDGED AND DECREED** that the Motion is **GRANTED** as set forth herein; it is further

**ORDERED, ADJUDGED AND DECREED** that Michael Fu /b/a Silverland Financial Ltd and Platinum Investment Corporation is substituted for Petitioners as the real party-in-interest, except as for the purposes expressly set forth herein; it is further

**ORDERED, ADJUDGED AND DECREED** that the Involuntary Petition is hereby dismissed with prejudice; it is further

**ORDERED, ADJUDGED AND DECREED** that pursuant to 11 U.S.C. § 303(e), Terry shall post a bond in the amount of $______________.

**ORDERED, ADJUDGED AND DECREED** that WALL007 LLC shall, within fourteen (14) days from the date of this Order, by way of certification of WALL007 LLC, submit a bill for all of the costs, expenses, and other compensatory damages, including without limitation attorneys' fees, that it has incurred since the filing of this Involuntary Case, including without limitation, those incurred as a result of the filing of the Involuntary Petition, those incurred in defending the Involuntary Petition, and those incurred in the filing and prosecution of the Motion, and serve a copy of such certification of counsel on Petitioners. Petitioners and Fu shall be jointly and severally liable for such costs, expenses, and compensatory damages and shall pay the same to WALL007 LLC within fourteen (14) days after first receipt of the certification of WALL007 LLC; it is further

**ORDERED, ADJUDGED AND DECREED** that punitive damages are hereby awarded to WALL007 LLC in the total amount of $______________. Petitioners and Fu shall be jointly

[1] Capitalized terms not defined herein shall have the meanings attributed to them in the Motion.

and severally liable for such punitive damages and shall pay such punitive damages to WALL007 LLC within fourteen (14) days following the date of entry of this Order; it is further

**ORDERED, ADJUDGED AND DECREED** that the terms and conditions of this Order shall be immediately effective and enforceable upon its entry; it is further

**ORDERED, ADJUDGED AND DECREED** that this Court shall retain jurisdiction with respect to all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

# # # END OF ORDER # # #

Submitted by:
Joyce W. Lindauer
State Bar No. 21555700
Joyce W. Lindauer Attorney, PLLC
1412 Main Street, Suite 500
Dallas, Texas 75202
ATTORNEYS FOR DEBTOR

Joyce W. Lindauer
State Bar No. 21555700
Jeffery M. Veteto
State Bar No. 24098548
Guy H. Holman
State Bar No. 24095171
Joyce W. Lindauer Attorney, PLLC
1412 Main Street, Suite 500
Dallas, Texas 75202
Telephone: (972) 503-4033
Facsimile: (972) 503-4034
Attorneys for Alleged Debtors

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | **Chapter 7** |
| | § | |
| **WALL007 LLC,** | § | **Case No. 20-31131-hdh7** |
| | § | **(Jointly Administered)** |
| **Alleged Debtors.** | § | |

**BRIEF IN SUPPORT OF THE MOTIONS OF ALLEGED DEBTORS TO DISMISS INVOLUNTARY PETITIONS, REQUEST FOR SUBSTITUTION OF REAL PARTY-IN-INTEREST, REQUEST FOR BOND, AND REQUEST FOR AWARD OF FEES, COSTS AND DAMAGES OR IN THE ALTERNATIVE TO ABSTAIN UNDER BANKRUPTCY CODE § 305**

# TABLE OF CONTENTS

I. PRELIMINARY STATEMENT .......... 6

II. JURISDICTION AND VENUE .......... 7

III. BACKGROUND .......... 7

IV. RELIEF REQUESTED AND SUPPORT THEREFORE .......... 10

A. Michael Fu d/b/a Silverland and PIC is the Real Party in Interest and Should be Substituted for the Petitioners .......... 11

B. The Involuntary Petitions Should be Dismissed Under 11 U.S.C. § 303(b)(1) Because There are an Insufficient Number of Petitioners to Support the Filing. . 12

C. The Involuntary Petitions Should be Dismissed Under 11 U.S.C. § 303(b)(1) Because the Claims are Subject to Bona Fide Disputes, Contingent, and Disputed .......... 15

D. This Court Should Dismiss the Involuntary Petitions Under 11 U.S.C. § 303(h) Because the Alleged Debtors are Generally Paying their Respective Debts .......... 16

E. This Court Should Dismiss the Involuntary Petitions Under 11 U.S.C. § 305(a) Because They are not in the Best Interests of Alleged Debtor and Its Creditors.. 17

F. An Award of Compensatory and Punitive Damages and Recovery of Attorneys' Fees is Appropriate Because the Involuntary Petitions Were Filed in Bad Faith. 20

i. The Court Should Award Costs and Reasonable Attorneys' Fees. .......... 22

ii. The Court Also Should Award Compensatory and Punitive Damages Because the Involuntary Petitions Were Filed in Bad Faith. .......... 23

G. Petitioners Should be Required to Post a Bond. .......... 26

H. The Court Should Dismiss this Case under the Abstention Provisions of Under 11 U.S.C. § 305(a) .......... 27

I. The Court Should Dismiss these Cases for Cause under 11 U.S.C. § 707(a).......... 29

V. NOTICE .......... 29

VI. CONCLUSION .......... 30

## TABLE OF AUTHORITIES

### CASES

*Am. Telecom Corp. v. Siemens Info. & Commc'ns Network, Inc.*, 04 C 8053, 2005 WL 5705113, at *4 (N.D. Ill. Sept. 7, 2005) .......... 23
*Credit Union Liquidity Servs., L.L.C. v. Green Hills Dev. Co., L.L.C. (In re Green Hills Dev. Co., L.L.C.)*, 741 F.3d 651 (5th Cir. 2014) .......... 9
*In re 801 S. Wells St. Ltd. P'ship*, 192 B.R. 718 (Bankr. N.D. Ill. 1996) .......... 17
*In re 1701 Commerce, LLC*, 477 B.R. 652 (Bankr. N.D. Tex. 2012) .......... 18, 22
*In re Alcide*, 450 B.R. 526 (Bankr. E.D. Pa. 2011) .......... 10
*In re Allied Riser Commc'ns Corp.*, 283 B.R. 420 (Bankr. N.D. Tex. 2002) .......... 21
*In re Amc Inv'rs, LLC*, 406 B.R. 478 (Bankr. D. Del. 2009) .......... 17, 18
*In re Axi Indus., Inc.*, 127 B.R. 482 (S.D. Fla. 1991) .......... 18
*In re Bates*, 545 B.R. 183 (Bankr. W.D. Tex. 2016) .......... 22
*In re Charon*, 94 B.R. 403 (Bankr. E.D. Va. 1988) .......... 13
*In re Clean Fuel Techs. II, LLC*, 544 B.R. 591 (Bankr. W.D. Tex. 2016) .......... 21
*In re Colonial Ford, Inc.*, 24 B.R. 1014 (Bankr. Utah 1982) .......... 17
*In re CorrLine Int'l, LLC*, 516 B.R. 106 (Bankr. S.D. Tex. 2014) .......... 17
*In re Dinova*, 212 B.R. 437 (2nd Cir. BAP 1997) .......... 28
*In re Ebackpack*, 605 B.R. 126 (Bankr. N.D. Tex. 2019) .......... 14, 15
*In re ELRS Loss Mitigation, LLC*, 325 B.R. 604 (Bankr. N.D. Okla. 2005) .......... 18
*In re Elsub Corp.*, 66 B.R. 189 (Bankr. D.N.J. 1986) .......... 24
*In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328 (3d Cir. 2015) .......... 19, 22, 23
*In re Frailey*, 144 B.R. 972 (Bank. W.D. Penn. 1992) .......... 16
*In re Funnel Sci. Internet Mktg., LLC*, 551 B.R. 262 (E.D. Tex. 2016) .......... 21
*In re Green Hills Dev. Co.*, 741 F.3d 651 (5th Cir. 2014) .......... 15
*In re Hunt*, No. 18-7237, 2019 U.S. Dist. LEXIS 24987, at *7-9 (E.D. La. 2019) .......... 15
*In re Kass*, 114 B.R. 308 (Bankr. S.D. Fla. 1990) .......... 16
*In re Landmark Distribs., Inc.*, 189 B.R. 290 (Bankr. D.N.J. 1995) .......... 9, 21
*McMillan v. Maestri (In re McMillan)*, 543 B.R. 808 (Bankr. N.D. Tex. 2016) .......... 25
*In re Metrogate, LLC*, Case No. 15-12593, 2017 WL 3150177, at * 13 (Bankr. D. Del. May 26, 2016) .......... 22, 25
*In re Mountain Dairies*, 372 B.R. 623 (Bankr. S.D.N.Y. 2007) .......... 18, 20
*In re Murray*, 543 B.R. 484 (Bankr. S.D.N.Y. 2016) .......... 20
*In re Nar-Jor Enters. Corp.*, 6 B.R. 584 (Bankr. S.D. Fla. 1980) .......... 19
*In re Norris*, 114 F.3d 1182, 1997 WL 256808, at *5 (5th Cir. 1997) .......... 14
*In re Paper I Partners, L.P.*, 283 B.R. 661 (Bankr. S.D.N.Y. 2002) .......... 17
*Pleas Doyle & Assocs. v. James Plaza Joint Venture (In re James Plaza Joint Venture)*, 67 B.R. 445 (Bankr. S.D. Tex. 1986) .......... 13
*In re R.N. Salem Corp.*, 29 B.R. 424 (S.D. Ohio 1983) .......... 9
*Schmid v. Yorke* (*In re Reid*), 773 F.2d 945 (7th Cir. 1985) .......... 10
*In re Silverman*, 230 B.R. 46 (Bankr. D.N.J. 1998) .......... 24

*In re Sims*, 994 F.2d 210 (5th Cir. 1993) (quoting *In re Rimell*, 946 F.2d at 1365 (citations omitted)) .......... 14
*Sipple v. Atwood (In re Atwood)*, 124 B.R. 402 (S.D. Ga. 1991) .......... 12
*In re Skyworks Ventures*, 431 B.R. 573 (Bankr. D.N.J. 2010) .......... 24
*In re Smith*, 507 F.3d 64 (2nd Cir. 2007) .......... 28
*In re Spade,* 258 B.R. 221 (Bankr. D. Co. 2001) .......... 26, 27
*In re St. Marie Dev. Corp*., 334 B.R. 663 (Bankr. D. Mont. 2005) .......... 23
*In re Synergistic Techs., Inc.*, 07-31733-SGJ-7, 2007 WL 2264700, at *5 (Bankr. N.D. Tex. Aug. 6, 2007) .......... 21
*In re Tichy Elec. Co., Inc.*, 332 B.R. 364 (Bankr. N.D. Iowa 2005) .......... 12, 22, 23
*In re TRED Holdings, L.P.*, No. 10-40749, 2010 WL 3516171, at *13 (Bankr. E.D. Texas Sept. 3, 2010) .......... 20
*In re Walden*, 781 F.2d 1121 (5th Cir. 1986) .......... 20
*Wilk Auslander LLP v. Murray (In re Murray)*, 900 F.3d 53 (2nd Cir. 2018) .......... 28
*Wolinsky v. Oak Tree Imaging, LP*, 362 B.R. 770 (S.D. Tex. 2007) .......... 22

**STATUTES**

11 U.S.C § 303(h)(1) .......... 17
11 U.S.C. § 101(10)(A) .......... 11
11 U.S.C. § 1141(d)(3)) .......... 28
11 U.S.C. § 303(b) .......... 13
11 U.S.C. § 303(e) .......... 26
11 U.S.C. § 303(i)(2) .......... 21
11 U.S.C. § 303(i)(l) .......... 21
11 U.S.C. § 305(a) .......... 17
11 U.S.C. § 707(a) .......... 29
FED. R. CIV. P. 12(b) .......... 12
TEX. BUS. ORGS. CODE §9.001 .......... 12

**OTHER AUTHORITIES**

2 COLLIER ON BANKRUPTCY ¶ 303.15, at 76 (15th ed. 1988) .......... 13
2 COLLIER ON BANKRUPTCY 303.14 (16th rev. ed. 2013) .......... 12
2 COLLIER ON BANKRUPTCY ¶ 305.02[2][d] (16th rev. ed. 2013) .......... 18
2 *Collier on Bankruptcy* f 305.02[c], [d] at p. 305-9 (16th ed.) .......... 27
30 Cong. Rec. S7618 (daily ed. June 19, 1984) .......... 9
H.R. Rep. No. 95–595, at 323 (1977), *as reprinted in* 1978 U.S.C.C.A.N. 5963, 6279; S. Rep. No. 95–989, at 33 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5787, 5819)) .......... 26

TO THE HONORABLE UNITED STATES BANKRUPTCY COURT:

COME NOW WALL007 LLC, WALL009 LLC, WALL010 LLC, WALL011 LLC, WALL012 LLC, WALL016 LLC, and WALL017 LLC, the Alleged Debtors in the above-captioned proceedings (collectively the "**Alleged Debtors**" or individually "WALL #"), by and through their undersigned counsel, hereby move for dismissal of the involuntary petitions [Case No. 20-31131-hdh7, Docket No. 1; Case No. 20-31133-sgj7, Docket No. 1; Case No. 20-31134-bjh7, Docket No. 1; Case No. 20-31135-sgj7, Docket No. 1; Case No. 20-31136-hdh7, Docket No. 1; Case No. 20-31138-bjh7, Docket No. 1; Case No. 20-31139-hdh7, Docket No. 1] (collectively the "**Involuntary Petitions**") filed against them by Jun Li, Yunding Kang, Cunxiang Ji, Jin Wang, Peng Guo, Lin Zhou, Qu Chen, Kai Tian, Yijing Wu, Xuegeng Gong, Jin Wang, Weijia Kong, Heng Zhang, Hong Guo, Pei Guan, Yue Xu, Mai Ye, Chenchen Jiang, Qiuying Li, Ruinian Wu, Lin Zhou, Liying Yang, Yan Zhang, Wenjun Wang, Lan Ji, Ying Zhou, Lin Li, Li Jiang, Rufeng Ding, Cunxiang Ji, Lin Gao, Qiao Qin, Yue Zhang, Xiaodong Hao, Tianqing Song, Li Jiang, Weisi Wang, Xiaoquan Dai, Feng Yan, Heng Zhang, Ou Jiang, Jinzhe Wu, Yadan Liu, Wanwan Li, Wenjuan Yin, Jiancheng Chen, Yi Tang, Ying Zhang, Pengfei Dong, Kangying Mao, Yijing Wu, Li Jiang, Qin Chu, Yulan Chen, Sicheng Zhan, Pei Guan, Jingqiu Tang, Di Tang, Jun Zeng, Kui Wang, Yue Zhang, Jun Wang, Xiaomin Fan, Di Tang, Jialin Hu, Qin Chu, Jiaxiang Lu, Fuqing Chen, Hanjiang Fu, Aiguo Luo, Fang Ding, Xiangdong Zhu, Wai Ying, Yuan Yuan, Chao Xu, Guoqin Zhou, Yijing Wu, (collectively, the "**Petitioners**") on April 8, 2020 (the "**Involuntary Petition Date**"), and now jointly administered in the above captioned Chapter 7 case, (the "**Involuntary Case**").[1] In support of this Motion, Alleged Debtors respectfully state as follows:

---

[1] In support of the facts contained herein, the Alleged Debtors will present witnesses and exhibits at the hearing on this Motion.

## I. PRELIMINARY STATEMENT

1. This Chapter 7 case and the related cases were filed by Petitioners as a litigation tactic, as a debt collection tactic, and an attempt at forum shopping in the context of a state court dispute with the Alleged Debtors. That conduct is a clear abuse of the Bankruptcy Code's involuntary provisions to gain a tactical advantage in the pending litigation and in the disputes between Petitioners and the Alleged Debtors.

2. As an initial matter, dismissal of the Involuntary Petitions is warranted (i) because the jurisdictional requirements of Section 303 of the Bankruptcy Code have been disregarded; (ii) Michel Fu ("Fu"), who was doing business as Silverland Financial Ltd. ("Silverland") and Platinum Investment Corporation ("PIC"), is the real party-in-interest and he is using the Petitioners as his pawns in this proceeding; and (iii) because the Alleged Debtors have an ongoing dispute with each Petitioner– meaning they do not meet the requirements of Section 303(b)(1) of the Bankruptcy Code. Further the Alleged Debtors contend that they are generally paying their undisputed noncontingent and liquidated debts as they come due. The claims being asserted by the Petitioners are subject to bona fide dispute as to liability and amount.

3. In addition, the underlying subject matter of this case pertains to a dispute currently pending in a non-bankruptcy forum, as Cause No. DC-19-18361 before the District Court of Dallas County for the 44th Judicial District (the "**State Court**") and the Alleged Debtors involved therein have already devoted substantial judicial resources to this dispute and it is an available forum for resolution of all underlying disputes between Alleged Debtors and Petitioners.

4. Finally, Petitioners' actions reek of bad faith and that bad faith should be met with serious consequences. As set forth below, those consequences should include not only dismissal of the Involuntary Cases but also an award of damages (including punitive damages) in Alleged

Debtors' favor under Section 303(i) of the Bankruptcy Code as well as costs and attorney's fees. Regardless of whether the Petitioners' actions are viewed by the Court as constituting bad faith, however, the reality remains that these cases are (i) an inefficient and improper vehicle for resolving the pending disputes between Petitioners' and the Alleged Debtors; and (ii) an improper venue for debt collection.

## II. JURISDICTION AND VENUE

5. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.[2] This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

6. This Court issued summons on each Alleged Debtor on April 10, 2020. Petitioners allege that they served each Alleged Debtor via First Class US Mail on April 14, 2020.[3] *See* FED. R. BANK. P. 1010(a), 7004(b)(3). Pursuant to FED. R. BANK. P. 1011(b) and 9006(f), the Alleged Debtors are afforded twenty-four (24) days to answer or otherwise plead after service by mail, with the deadline thereof being May 8, 2020. Alleged Debtors file this Motion before such deadline.

7. The statutory predicates for the relief sought herein are Sections 303(b), 303(i) and 305(a) of Title 11 of the United States Code (the "**Bankruptcy Code**") and Rule 1011 of the FEDERAL RULES OF BANKRUPTCY PROCEDURE (the "**Bankruptcy Rules**").

## III. BACKGROUND

8. The Alleged Debtors are Texas limited liability companies formed for the purpose of acquiring land in order to construct horizontal improvements thereon as necessary to create a

---

2 Upon information and belief, all Petitioners are Chinese nationals. Despite diligent research, Alleged Debtors have not found law pertinent to their standing to bring an involuntary preceding in United States Courts.

3 Due to COVID-19 related office closures, Alleged Debtors have not been able to confirm receipt of summons at their business office addresses.

subdivision – streets, water utilities, sewers, sidewalks, and residential lots – with the objective of selling residential lots to home builders over a period of time.

9. Each Alleged Debtor entered into a pooled loan agreement with their respective Petitioners through their designated agent Fu, who was doing business as Silverland and PIC (collectively referred to herein as "**Fu**" or collectively the "**Fu Entities**"). Fu located the Petitioners, engaged them to provide **co-lending** through the Fu Entities, organized the transfer of funds, and acted as an agent on behalf of all the co-lending Petitioners. The Fu Entities have asserted they are the agent for the co-lenders in the pooled loan agreements and instruct that the agent shall serve as the administrator on behalf of the co-lenders, and direct all payments be made to the agent. In short, the pooled loans were part of a single partnership amongst the Petitioners as Co-Lenders with Fu and/or his entities as the unified, designated agent. These facts are important because they show that the Co-Lenders along with Fu are a single alleged creditor entity rather than separate entities.

10. The State Court Case was filed on November 15, 2019, for the purpose of debt collection. The Defendants therein filed an answer, a plea in abatement, a motion to dismiss pursuant to Tex. R. Civ. P. 91a, and an anti-SLAPP motion.[4] Instead of responding to these pleadings, Petitioners opted to forum shop and file this involuntary bankruptcy case. The *Plaintiffs' Original Petition* in the State Court Case is salacious and spurious, and nothing more than a shakedown led by Fu to cover for unrelated failed business ventures of Silverland and PIC. PIC and Silverland have asserted entitlement to fees that were not owed, shared confidential information, spread rumors and false information, and defamed the Alleged Debtors to other

[4] All Alleged Debtors had intended, prior to the filing of this case, to consolidate proceedings by joining in and filing permissive counterclaims and third-party claims.

lenders and co-lenders in a concerted and calculated effort to pressure the Alleged Debtors into submission. This involuntary bankruptcy case is but another litigation tactic targeted at applying such pressure – and wrought out of anticipated negative orders in the State Court Case.

11. In addition, the Alleged Debtors assert that the Petitioners have failed to comply with their loan agreements by failing to tender the loaned amounts to the Alleged Debtors either personally or traced through payments by the Fu Entities or Fu. Alleged Debtors further assert that no promissory notes were ever executed as contemplated by the loan agreements. The financial practices of Fu and the Petitioners – as the Alleged Debtors now understand them – were misleading, potentially fraudulent, and potentially violative of both Chinese and U.S. laws. In fact, the Alleged Debtors' attempt to take corrective actions and calling these financial practices into questions is what initiated this ongoing dispute. As such, the liability and amounts owed to the Petitioners remain hotly contested and in dispute.

12. The Alleged Debtors assert that Fu, through the Fu Entities, has continuously mislead the Alleged Debtors and the Petitioners, breached obligations and agreements, interfered and obstructed the Alleged Debtors in performing their obligations and efforts to even remit payments to the Petitioners.

13. Upon information and belief, the Alleged Debtors assert that some or all of named Petitioners are: (i) not voluntarily participating in this Bankruptcy Case; (ii) not aware that the Involuntary Petition was filed in their name; and/or (iii) not real persons. The docu-signed documents that make up the Involuntary Petitions cast serious doubt on their authenticity. Further many of the Petitioners who reside in China have no contact information. It may become impossible to learn whether these persons actually exist or exist merely as masks for Fu or others.

14. For these reasons, the Alleged Debtors assert herein that there exists an ongoing bona fide dispute as to the liabilities and amounts owed that is more efficiently and properly heard before the State Court. Petitioners' claims are not liquidated and are disputed.

## IV. RELIEF REQUESTED AND SUPPORT THEREFORE

15. Alleged Debtors seek entry of an order, substantially in the form attached hereto as Exhibit A: (a) substituting Fu d/b/a Silverland and PIC as the real party in interest; (b) dismissing the Involuntary Petitions because Petitioners cannot satisfy the requirements under Section 303 of the Bankruptcy Code; (c) finding that cause exists, based on the bad faith in filing the Involuntary Petitions, to warrant dismissal; and (d) entering an award of compensatory and punitive damages for costs and recovery of attorneys' fees against the Petitioners and Fu because the Involuntary Petitions were filed in bad faith.

16. The filing of an involuntary petition is considered a "particularly severe remedy." *Credit Union Liquidity Servs., L.L.C. v. Green Hills Dev. Co., L.L.C. (In re Green Hills Dev. Co., L.L.C.)*, 741 F.3d 651, 655 (5th Cir. 2014). In recognition of this fact, "Congress limited the circumstances in which creditors may force a debtor into such a proceeding." *Id.* (citing, *inter alia*, 30 Cong. Rec. S7618 (daily ed. June 19, 1984)); *see In re Landmark Distribs., Inc.*, 189 B.R. 290, 306 (Bankr. D.N.J. 1995) ("The filing of an involuntary petition by a creditor must be carefully scrutinized by the Court because such an action is extreme in nature and carries with it serious consequences to the alleged debtor, examples of which include loss of credit standing, interference with general business affairs and public embarrassment.") (citations omitted). Congress created the Bankruptcy Code to serve "as a shield for debtors, not a sword for creditors," *In re R.N. Salem Corp.*, 29 B.R. 424, 429 (S.D. Ohio 1983), and even the good-faith filing of an involuntary petition creates onerous circumstances for an alleged debtor. *Schmid v. Yorke* (*In re Reid*), 773 F.2d 945,

946 (7th Cir. 1985) (the filing of an involuntary petition is "an extreme remedy with serious consequences to the alleged debtor") (citations omitted).

17. Where, as here, an involuntary petition does not and cannot meet the statutory requirements for commencing an involuntary case under Section 303 of the Bankruptcy Code, the petition should be dismissed. Here, the Involuntary Petitions were not commenced by the requisite number of petitioning creditors holding non-contingent, liquidated and undisputed claims as required by the Bankruptcy Code. Moreover, as demonstrated herein, the Involuntary Petitions were not filed to promote the interests of the Alleged Debtors' creditors generally; to the contrary, the Involuntary Petitions are defective and were filed in bad faith, requiring their dismissal.

**A. Michael Fu d/b/a Silverland and PIC is the Real Party in Interest and Should be Substituted for the Petitioners**

18. A "claim" is defined by 11 U.S.C. § 101(4) as either a "right to payment" or a "right to an equitable remedy[.]" A person, as defined under 11 U.S.C. § 101(30) to include partnership, is a "creditor" only if it "has a claim against the debtor that arose at the time of or before the order for relief." 11 U.S.C. § 101(10)(A). Where another person has been granted the right to payment or enforcement of a debt, that person is the real party in interest. *See generally, In re Alcide*, 450 B.R. 526, 539 (Bankr. E.D. Pa. 2011).

19. Here, the Alleged Debtors entered into a pool of loan agreements organized by Fu, doing business as the Fu Entities. In those pooled loan agreements, the Fu Entities – named as Agent – were delegated by the Petitioners (i) their right to receive all payments; and (ii) the right to administer the pooled loans on behalf of the co-lenders. There is nothing present in the record to indicate a cancellation of any such delegations. Therefore, under the Bankruptcy Code, the Fu Entities would be the only ones holding claims related to the pooled loan agreements.

20. However, upon information and belief, the Alleged Debtors assert that neither Silverland nor PIC are validly formed separate legal entities, but instead lawfully are only assumed names for Fu. In the State Court Case, Silverland alleged that it is an entity formed under the laws of the Marshall Islands and PIC alleges that it is a foreign corporation incorporated under the laws of China. Upon investigation, Silverland is not incorporated in the Marshall Islands and PIC is not actually a Chinese entity, but rather a suspended California corporation. Moreover, neither Silverland or PIC are entities lawfully existing or properly registered to transact business in the State of Texas. *See* TEX. BUS. ORGS. CODE §9.001. Therefore, both Silverland and PIC are merely assumed names under which Fu has been transacting business with the Alleged Debtors and the Petitioners. Fu – alone – is the only person holding a claim, and the real party in interest herein.

21. Upon information and belief, the Alleged Debtors additionally assert that Fu is behind the filing of the Involuntary Petitions and paid all costs for the filing of same. The Alleged Debtors require discovery on these matters to support their present contentions.

22. For the reasons stated above, the Alleged Debtors respectfully request that Fu be substituted as the real party in interest in place of the Petitioners. This substitution may become particularly relevant when these cases are dismissed and damages and fees and sought.

**B. The Involuntary Petitions Should be Dismissed Under 11 U.S.C. § 303(b)(1) Because There are an Insufficient Number of Petitioners to Support the Filing.**

23. Bankruptcy Rule 1011 governs the procedure for responding to an involuntary petition. That Rule provides that all defenses and objections to an involuntary petition must be presented in the manner prescribed by FED. R. CIV. P. 12 of. FED. R. BANKR. P. 1011(b). That Rule allows certain defenses to be asserted in the form of a pre-answer motion. FED. R. CIV. P. 12(b).

24. As a threshold matter, Alleged Debtors seek dismissal of the Involuntary Petitions because they are not supported by the requisite number and quality of petitioning creditors needed

to commence an involuntary Chapter 7 case under Section 303 of the Bankruptcy Code. Section 303(b)(1) of the Bankruptcy Code which states, in relevant part:

> An involuntary case against a person is commenced by the filing with the bankruptcy court of a petition under chapter 7 or 11 of this title—
>
> (1) by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount, or an indenture trustee representing such a holder, if such noncontingent, undisputed claims aggregate at least $15,775 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims;
>
> (2) if there are fewer than 12 such holders, excluding any employee or insider of such person and any transferee of a transfer that is voidable under section 544, 545, 547, 548, 549, or 724 (a) of this title, by one or more of such holders that hold in the aggregate at least $15,775 of such claims . . . . 11 U.S.C. § 303(b).

25. Section 303(b) contains "very specific requirements concerning the number of entities that are necessary to commence an involuntary filing." 2 COLLIER ON BANKRUPTCY 303.14 (16th rev. ed. 2013). Those requirements are based on the policy of preventing one or more "recalcitrant creditors" from filing an involuntary case to harass a debtor. *Id.*

26. Perhaps the most basic of all requirements is that Section 303(b)(l) requires that when a debtor has twelve or more creditors, an involuntary case may be commenced only by three or more entities. *See In re Tichy Elec. Co., Inc.*, 332 B.R. 364, 372-73 (Bankr. N.D. Iowa 2005) (citations omitted); *Sipple v. Atwood (In re Atwood)*, 124 B.R. 402, 406 (S.D. Ga. 1991) ("If there are twelve or more qualifying claims, excluding voidable claims, the debtor cannot be forced into involuntary bankruptcy by fewer than three of the qualifying creditors."). Where a debtor has twelve or more creditors and there are less than three petitioning creditors, the case must be dismissed—Section 303(b)(l) leaves no room for Court discretion.

27. The Petitioners have the burden of demonstrating that they have satisfied the numerosity requirement under Section 303(b) of the Bankruptcy Code. *Pleas Doyle & Assocs. v. James Plaza Joint Venture (In re James Plaza Joint Venture)*, 67 B.R. 445, 448 (Bankr. S.D. Tex. 1986) ("It is plaintiffs' burden to demonstrate the number of creditors of [the] debtor's estate."); *In re Charon*, 94 B.R. 403, 405-06 (Bankr. E.D. Va. 1988) (petitioner has "burden of proving that it satisfied the jurisdictional requirements of § 303(b)"); 2 COLLIER ON BANKRUPTCY ¶ 303.15, at 76 (15th ed. 1988) ("When fewer than three creditors file an involuntary petition, the alleged debtor has the burden to raise the issue that it has 12 or more creditors by filing a list pursuant to Bankruptcy Rule 1003(b). The petitioning creditor then has the burden to show that the alleged debtor actually has fewer than 12."). Petitioners cannot do so.

28. Here, it is beyond dispute that each Alleged Debtor has twelve or more creditors. Alleged Debtors will each file a statement pursuant to Bankruptcy Rule 1003(b) listing such creditors. Thus, each Alleged Debtor has more than twelve creditors, making clear that three petitioning creditors are required to force Alleged Debtors into bankruptcy pursuant to Section 303(b)(1).

29. As discussed in Section IV(A) hereinabove, the Petitioners in this case are in actuality only one (1) creditor, not more than three (3) as required. Fu has continuously acted on behalf of the Petitioners as one creditor, being pooled investors therein. The Petitioners fail to demonstrate any basis that now Fu's agency and sole right to receive payments should be disregarded and they should be treated as individuals, when prior to the filing the Involuntary Petitions they had acted as one partnership body. For such reasons, the Petitioners have failed to meet the numerosity requirement.

30. Based on the foregoing, the Involuntary Petitions lack the statutorily required number of petitioning creditors and should be dismissed.

**C. The Involuntary Petitions Should be Dismissed Under 11 U.S.C. § 303(b)(1) Because the Claims are Subject to Bona Fide Disputes, Contingent, and Disputed**

31. Alleged Debtors further seek dismissal of the Involuntary Petitions because the Petitioners' claims are subject to bona fide disputes, contingent, and in all manner unliquidated.

32. A bona fide dispute exists pursuant to 11 U.S.C. § 303(b) under Fifth Circuit precedent, as an objective standard as articulated:

> [T]he petitioning creditor must establish a prima facie case that no bona fide dispute exists. Once this is done, the burden shifts to the [alleged] debtor to present evidence demonstrating that a bona fide dispute does exist. Because the standard is objective, neither the debtor's subjective intent nor his subjective belief is sufficient to meet this burden. The court's objective is to ascertain whether a dispute that is bona fide exists; the court is not to actually resolve the dispute. This does not mean that the bankruptcy court is totally prohibited from addressing the legal merits of the alleged dispute; indeed, the bankruptcy court may be required to conduct a limited analysis of the legal issues in order to ascertain whether an objective legal basis for the dispute exists. Finally, because the determination as to whether a dispute is bona fide will often depend ... upon an assessment of witnesses' credibilities and other factual considerations, the bankruptcy court's determination in this regard is a factual finding that may be overturned on appeal only if it is clearly erroneous. *In re Sims*, 994 F.2d 210, 221 (5th Cir. 1993) (quoting *In re Rimell*, 946 F.2d at 1365 (citations omitted)).

33. "[T]he existence of a bona fide dispute must be determined as of the date the petition was filed." *In re Norris*, 114 F.3d 1182, 1997 WL 256808, at *5 (5th Cir. 1997). "Post-BAPCPA cases have recognized that a bona fide dispute merely as to the amount of the debt is now sufficient to deny a creditor standing to bring an involuntary petition." *In re Ebackpack*, 605 B.R. 126, 132 (Bankr. N.D. Tex. 2019). Irrespective of numerosity issues, each of the Petitioners bear the burden of showing that they hold a non-contingent claim, not subject to a bona fide dispute as to liability or amount.

34. "Bankruptcy Courts routinely consider the evidence and character of pending but unresolved litigation as evidence of a bona fide dispute." *In re Hunt*, No. 18-7237, 2019 U.S. Dist. LEXIS 24987, at *7-9 (E.D. La. 2019) (quoting *In re Green Hills Dev. Co.*, 741 F.3d 651, 659 (5th Cir. 2014) (internal citations omitted).

35. Here, there is unresolved pending litigation that the Petitioners are attempting to short-circuit prior to impending, unfavorable orders therein. The Alleged Debtors dispute the liability and the amounts therein. Moreover, the Alleged Debtors therein have similar issues as here. As detailed above, there are true disputes as to the tendering of loaned amounts, whether an event of default has actually occurred, fraudulent and potentially illegal financial practices by Petitioners and/or Fu, and identification of the co-lenders. At the time of the Involuntary Petitions there was no clear result as to the litigation in the State Court case or the disputes at hand. *See In re Ebackpack*, 605 B.R. at 135. In addition, the Alleged Debtors dispute that (i) there are promissory notes supporting Petitioners' claims; (ii) the pooled loans were ever fully funded; and (iii) the Petitioners actually funded the loans or were they funded by some yet undisclosed persons.

36. For such reasons, the Alleged Debtors assert that, under the applicable legal analysis, that all claims asserted by Petitioners are subject to bona fide disputes, and therefore Petitioners lack standing under Section 303(b) to bring these Involuntary Petitions – and they should be dismissed.

**D. This Court Should Dismiss the Involuntary Petitions Under 11 U.S.C. § 303(h) Because the Alleged Debtors are Generally Paying their Respective Debts**

37. The Court should dismiss the Involuntary Petitions under Section 303(h) or refrain from entering an order for relief in the Involuntary Cases. Pursuant to Section 303(h):

> the court shall order relief against the debtor in an involuntary case under the chapter under which the petition was filed, only if . . . the debtor is generally not

paying such debtor's debts as such debts become due unless such debts are subject of a bona fide dispute as to liability or amount. 11 U.S.C. § 303(h)(1).

38. As set forth herein, the alleged debts are in fact subject to bona fide dispute as to liability and amount and are unliquidated. It is not clear from the agreement when and where any amounts are owed. Moreover, the Alleged Debtors are also generally paying their respective debts as they become due and owing. Prior to the filing of the Involuntary Petitions, the Alleged Debtors made substantive efforts to arrange payment to the Petitioners. Alleged Debtors were impaired in doing so by Fu and the Fu Entities for reasons including their failure to provide necessary payment instructions and the outright unwillingness by Fu and the Fu Entities to comply with United States tax withholding laws.

39. Section 303(h)(1) operates as a safeguard against entry of an order of relief where an alleged debtor is generally paying its debt, as is the case here. For such reasons, the Alleged Debtors assert that these Involuntary Cases should be dismissed.

**E. This Court Should Dismiss the Involuntary Petitions Under 11 U.S.C. § 305(a) Because They are not in the Best Interests of Alleged Debtor and Its Creditors**

40. The Court should dismiss the Involuntary Petitions under Section 305(a) as (i) the cases are not in the best interests of Alleged Debtors and their creditors; and (ii) the Petitioners have adequate remedies under state law. *See In re Kass*, 114 B.R. 308, 309 (Bankr. S.D. Fla. 1990); *In re Frailey*, 144 B.R. 972 (Bank. W.D. Penn. 1992). Section 305(a) of the Bankruptcy Code provides that "[t]he court, after notice and a hearing, may dismiss a case under this title, or may suspend all proceedings in a case under this title, at any time if (1) the interests of creditors and the debtor would be better served by such dismissal or suspension . . . ." 11 U.S.C. § 305(a).

41. The movant bears the burden of demonstrating that the interests of creditors and the debtor would benefit from dismissal. *In re Amc Inv'rs, LLC*, 406 B.R. 478, 488 (Bankr. D. Del.

2009). Section 305(a)(1) of the Bankruptcy Code applies to involuntary petitions. *See, e.g., In re CorrLine Int'l, LLC*, 516 B.R. 106, 140 (Bankr. S.D. Tex. 2014); *In re Colonial Ford, Inc.*, 24 B.R. 1014, 1020 (Bankr. Utah 1982) ("Section 305(a)(l) applies in any case, voluntary or involuntary, 'under this title.'").

42. Courts consider numerous factors to gauge the overall best interests of the creditors and the debtor, including:

a. the economy and efficiency of administration;

b. whether another forum is available to protect the interests of both parties or there is already a pending proceeding in state court;

c. whether federal proceedings are necessary to reach a just and equitable solution;

d. whether there is an alternative means of achieving an equitable distribution of assets;

e. whether the debtor and the creditors are able to work out a less expensive out-of-court arrangement which better serves all interests in the case;

f. whether a non-federal insolvency has proceeded so far in those proceedings that it would be costly and time consuming to start afresh with the federal bankruptcy process; and

g. the purpose for which bankruptcy jurisdiction has been sought.

*AMC Investors*, 406 B.R. at 488 (citing, *inter alia*, *In re Paper I Partners, L.P.*, 283 B.R. 661, 679 (Bankr. S.D.N.Y. 2002) and *In re 801 S. Wells St. Ltd. P'ship*, 192 B.R. 718, 723 (Bankr. N.D. Ill. 1996)) (noting that "[w]hile all factors are considered, they are not given equal weight in each case, nor should the court conduct a strict balancing").

43. "Dismissal or suspension of a case may be appropriate when the bankruptcy case constitutes a two-party dispute between the debtor and a single creditor." 2 COLLIER ON BANKRUPTCY ¶ 305.02[2][d] (16th rev. ed. 2013); *see In re 1701 Commerce, LLC*, 477 B.R. 652, 658 n.20 (Bankr. N.D. Tex. 2012) (citations omitted) ("Similar inter-lender and two-party

disputes have been dismissed for cause because of such bad faith."). Courts generally will dismiss the case or abstain in two-party disputes where relief is available in a non-bankruptcy forum. *AMC Investors*, 406 B.R. at 488 ("Courts generally abstain in two-party disputes where relief is available in a non-bankruptcy forum. Resolution of these disputes has the potential to transform the bankruptcy process into a collections device, which it is not.") (citing *In re Mountain Dairies*, 372 B.R. at 634-35; *In re Axi Indus., Inc.*, 127 B.R. 482, 484 (S.D. Fla. 1991) ("The bankruptcy courts generally grant motions to abstain in two-party disputes where the petitioner can obtain adequate relief in a non-bankruptcy forum. Courts consider the motivation of the petitioning creditor as a factor in making such a determination. It is not appropriate to file an involuntary petition in an effort to gain control of the debtor's business.")).

44. The principle that bankruptcy courts are not a proper vehicle to litigate two-party disputes applies equally to voluntary and involuntary bankruptcy filings. Indeed, the court in *In re ELRS Loss Mitigation, LLC*, 325 B.R. 604 (Bankr. N.D. Okla. 2005), stated as follows:

> [W]here a voluntary petition could be dismissed on the basis of a lack of good faith were the debtor to seek resolution of a two-party dispute in bankruptcy court, an involuntary case should be dismissed where similar motivation is found on the part of the petitioning creditors. This Court has not hesitated to dismiss a bankruptcy brought voluntarily by a debtor where the case represents a two-party dispute. What is good for the goose is good for the gander. If a debtor may not seek to resolve its two-party dispute under the auspices of the bankruptcy court, there is no reason to allow a creditor to bring its two-party claim to the same court through the filing of an involuntary petition."). *Id.* at 633 (citations omitted).

45. Courts have dismissed involuntary petitions because bankruptcy courts are not intended to be a forum for trying isolated disputes, nor should creditors be allowed to use the bankruptcy court as a collection device. *See In re Nar-Jor Enters. Corp.*, 6 B.R. 584, 586 (Bankr. S.D. Fla. 1980) ("There are courts of general jurisdiction to which both parties hereto can be

summoned and in which the issues between them can be litigated. The Bankruptcy Court was not designed or intended to be the forum for trying isolated disputed claims. Such a disputed claim standing alone should not be the basis of an involuntary petition . . . . ").

46. Here, it is clear that Petitioners filed the Involuntary Petitions as in a debt collection effort and as a litigation tactic in what is essentially a two-party dispute, presumably in a desperate attempt to move away from the State Court Case. *See In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328, 337-38 (3d Cir. 2015) ("Courts routinely find it improper for creditors to use the bankruptcy courts to gain a personal advantage in other pending actions or as a debt collection device."). These cases have no bankruptcy-related purpose and no other creditors have joined in.

47. Such imposed bankruptcy will assuredly have a dramatically negative impact on the Alleged Debtors' ongoing business operations and ability to satisfy their other obligations. As a result, the Alleged Debtors' other creditors stand to be damaged by having their claims reduced or erased through the unnecessary imposition of expenses and delays caused by this proceeding.

48. There is no basis to find that the Involuntary Petitions were validly filed or that it is in the best interest of the Alleged Debtors and their creditors. Based on the foregoing, dismissal under Section 305(a) is appropriate.

## F. An Award of Compensatory and Punitive Damages and Recovery of Attorneys' Fees is Appropriate Because the Involuntary Petitions Were Filed in Bad Faith

49. This Court should impose sanctions against Petitioners and Fu pursuant to Section 303(i) of the Bankruptcy Code for the bad faith filing of the Involuntary Petitions. Section 303(i) provides for an alleged debtor's recovery of costs incurred in defending against petitioning creditors:

> If the court dismisses a petition under this section other than on consent of all petitioners and the debtor, and if the debtor does not waive the right to judgment under this section, the court may grant

> judgment…against the petitioners and in favor of the debtor for . . . (A) costs; or (B) a reasonably attorney's fee. 11 U.S.C. § 303(i)(l).

50. Section 303(i) further provides that a court may grant judgment:

> against any petition that filed the petition in *bad faith*, for . . . (A) any damages proximately caused by such filing; or (B) punitive damages. 11 U.S.C. § 303(i)(2) (emphasis added).

51. In addition, an allegation of bankruptcy invokes remedies not available to any ordinary debt collection procedures and should not be invoked unadvisedly and contrary to statutory right. *In re Walden*, 781 F.2d 1121, 1123 (5th Cir. 1986). Determination of bad faith filing of an involuntary petition goes to the "totality of the circumstances." *In re TRED Holdings, L.P.*, No. 10-40749, 2010 WL 3516171, at *13 (Bankr. E.D. Texas Sept. 3, 2010). The existence of a two-party dispute is a factor repeatedly considered in such determination, weighing in favor of dismissal for bad faith. *In re Murray*, 543 B.R. 484, 493 (Bankr. S.D.N.Y. 2016). Likewise, the bankruptcy court is not a collection agency. *Id.* at 494 (citing *In re Mountain Dairies, Inc.*, 372 B.R. 623 (Bankr. S.D.N.Y. 2007).

52. As to the totality of the circumstances supporting a finding of bad faith, the Alleged Debtors assert (i) this is a two-party dispute with state court remedies available to all of the Petitioners; (ii) this is, at its core, a collection effort by Petitioners; (iii) there is no imminent threat to the Petitioners' rights or ability to collect any indebtedness; and (iv) there will be considerable and unnecessary interruption and expense caused by the Involuntary Petitions, which will result in a diminution in value of the Alleged Debtors' enterprises and damages to their creditors. The Alleged Debtors have already been damaged by the publicity that the filings caused.

53. Based on the below and foregoing, this Court should find these Bankruptcy Cases to be filed in bad faith and this Court should impose sanctions against Petitioners to compensate Alleged Debtors for defending these bad faith filings, including payments covering Alleged

Debtors' reasonable attorneys' fees, compensatory costs and punitive damages in an amount to be determined by the Court.

**i. The Court Should Award Costs and Reasonable Attorneys' Fees.**

54. Courts in the Northern District of Texas apply a totality of the circumstances approach to requests for costs and fees upon the dismissal of an involuntary petition. *In re Synergistic Techs., Inc.*, 07-31733-SGJ-7, 2007 WL 2264700, at *5 (Bankr. N.D. Tex. Aug. 6, 2007); *In re Allied Riser Commc'ns Corp.*, 283 B.R. 420, 423-24 (Bankr. N.D. Tex. 2002); *cf. In re Clean Fuel Techs. II, LLC*, 544 B.R. 591, 601 (Bankr. W.D. Tex. 2016) (noting that the majority view is that a rebuttable presumption exists in favor of fees for a successful would-be debtor upon the dismissal of an involuntary petition and adopting that presumption); *In re Funnel Sci. Internet Mktg., LLC*, 551 B.R. 262, 274 (E.D. Tex. 2016) (discussing the rebuttable presumption and stating that "[t]he Court will assume without deciding that such a rebuttable presumption applies here").

55. In *Landmark Distribs.*, the court, conducting a totality of the circumstances analysis, awarded costs and attorneys' fees incurred in conjunction with an involuntary petition as damages, in an amount to be determined, based on its conclusion that the filing of that petition was "unreasonable and manifested a callous disregard of the adverse impact of the filing on [the debtor]." 189 B.R. at 307-08. The court reached that finding, highlighting that those petitioning creditors' claims were the subject of a "legitimate business dispute." *Id.*

56. Here, Petitioners and Fu's filing of the Involuntary Petitions likewise were unreasonable. Petitioners and/or Fu had the opportunity to conduct discovery of Alleged Debtors through the State Court Case or other state court forum and, in fact, received financial information in the context of the pending litigation.

57. As a result of Petitioners and Fu's bad faith, Alleged Debtors have incurred significant costs and legal expenses in connection with its defense of these frivolous petitions. Accordingly, Alleged Debtors are entitled to compensation.

**ii. The Court Also Should Award Compensatory and Punitive Damages Because the Involuntary Petitions Were Filed in Bad Faith.**

58. Section 303 gives a bankruptcy court discretion to order relief against a debtor who is not paying its debts. *In re Bates*, 545 B.R. 183, 192 (Bankr. W.D. Tex. 2016) (citing *Forever Green Athletic*, 804 F.3d at 336). However, "even where the statutory criteria for commencing an involuntary suit are satisfied and where the putative debtor is not paying its debts as they become due, bad faith on the part of petitioning creditors provides a basis for dismissing an involuntary bankruptcy petition." *Id.* Pursuant to Section 303(i)(2), bad faith is also a consideration in awarding compensatory and punitive damages.

59. Although the Bankruptcy Code does not define "bad faith" in determining whether a Chapter 7 case has been filed in bad faith, courts consider, among other factors, whether the case was filed as a litigation tactic in a two-party dispute. *In re Tichy Elec. Co.*, 332 B.R. at 373; *In re 1701 Commerce, LLC*, 477 B.R. at 658 n.20 (Bankr. N.D. Tex. 2012) (citations omitted) ("Similar inter-lender and two-party disputes have been dismissed for cause because of such bad faith."); *In re Metrogate, LLC*, Case No. 15-12593, 2017 WL 3150177, at * 13 (Bankr. D. Del. May 26, 2016) ("Although the Petitioning Creditors met the statutory numerosity requirement, the dispute appears to be functionally between two parties. Additionally, there appears to be a single recalcitrant creditor who is more concerned with a collection action than with the alleged debtor's well-being as a going concern."); *Wolinsky v. Oak Tree Imaging, LP*, 362 B.R. 770, 781 (S.D. Tex. 2007) (stating that "[t]he role of the bankruptcy courts is not to adjudicate two-party disputes . . . ") (citing *Am. Telecom Corp. v. Siemens Info. & Commc'ns Network, Inc.*, 04 C 8053, 2005 WL

5705113, at *4 (N.D. Ill. Sept. 7, 2005) (affirming the dismissal of a Chapter 7 case where the case has "no discernable relationship to any true bankruptcy policies" and has "been used as a litigation tactic to frustrate and delay the debtor's opponent in a two-party dispute")).

60. For example, the Third Circuit, in analyzing whether an involuntary petition had been filed in bad faith, under a totality of the circumstances approach, considered factors such as "whether: the creditors satisfied the statutory criteria for filing the petition; the involuntary petition was meritorious; the creditors made a reasonable inquiry into the relevant facts and pertinent law before filing; there was evidence of preferential payments to certain creditors or of dissipation of the debtor's assets; the filing was motivated by ill will or a desire to harass; the petitioning creditors used the filing to obtain a disproportionate advantage for themselves rather than to protect against other creditors doing the same; the filing was used as a tactical advantage in pending actions; the filing was used as a substitute for customary debt-collection procedures; and the filing had suspicious timing." *Forever Green Athletic*, 804 F.3d at 336.

61. Here, each Involuntary Petition satisfies most if not all of these criteria. First, the Involuntary Petitions fail the numerosity and lack of bona fide dispute requirements of Section 303(b) of the Bankruptcy Code. Second, Petitioners and Fu failed to make a reasonable inquiry into the facts and pertinent law, including the basic assessment of whether Alleged Debtors had further creditors. Third, Petitioners and Fu are attempting to use the bankruptcy process as a weapon without any other legitimate purpose. *See In re St. Marie Dev. Corp.*, 334 B.R. 663, 671 (Bankr. D. Mont. 2005) (bad faith exists when petitioning creditors file involuntary to protect their own interest and thereby gain disproportionate advantage); *In re Tichy Elec. Co.*, 332 B.R. at 377 (petitioning union trust funds filed in bad faith because they filed solely to collect debts owed to them: they used bankruptcy process both to obtain disproportionate advantage over all other

creditors and as a weapon to satisfy their claims); *In re Skyworks Ventures, Inc.*, 431 B.R. 573, 579 (Bankr. D.N.J. 2010) (holding petitioner "did not have the interests of other creditors at heart. The petition was not filed in the traditional spirit of collective creditor action; rather, it was an attempt to force [alleged debtor] to settle the disputed claim of [petitioner]"); *In re Silverman,* 230 B.R. 46, 53 (Bankr. D.N.J. 1998) ("Filing an involuntary petition with the intent to gain a strategic advantage, rather than to protect one's interest relative to other creditors or to prevent dissipation of assets, constitutes an improper purpose"). Finally, Petitioners and Fu should not be permitted to burden this Court with a matter that can be extensively litigated in another forum. The State Court is well versed in the factual and legal issues underlying the disputes between the parties and there simply is no reason for these cases to continue where no legitimate bankruptcy purpose would be served.

62. Because there can be no genuine disagreement that Petitioners and Fu filed the Involuntary Petitions in bad faith, Alleged Debtors also are entitled to compensatory and punitive damages. As one court has stated:

> [I]n determining whether [a] creditor has exercised bad faith in filing an involuntary petition in bankruptcy, inquiry may be made into whether the petition was ill advised or improperly motivated, whether the petitioner took affirmative steps to ensure that the petition as filed was proper, and whether the petitioner made sufficient inquiry into the facts and law surrounding the case to determine the total number of claim holders.

*In re Elsub Corp.*, 66 B.R. 189, 196 (Bankr. D.N.J. 1986). The court "must consider whether a reasonable person in the position of the petitioning creditor would have initiated the bankruptcy proceeding" and ascertain "the subjective motivations of a petitioning creditor, which is analogous to the consideration of the ulterior motives of petitioning debtors in voluntary bankruptcy proceedings" *Id*

63. Petitioners and Fu's bad faith is manifest. This Court should award Alleged Debtors compensatory and punitive damages. The Involuntary Petitions were filed by too few petitioning creditors and there is no legitimate concern by Petitioners or Fu for the well-being of the Alleged Debtor's other creditors (none of which have joined the Involuntary Petitions), or for the fair distribution of Alleged Debtor's assets. Rather, Petitioners and Fu had one objective in mind – to gain an advantage in their dispute with Alleged Debtors at a critical time. *See Metrogate*, 2016 WL 3150177, at *17 (dismissing involuntary petition because, among other things, the timing of filing of the involuntary case was "telling" and "appear[ed] to be directly in response to pending state actions"). Petitioners and Fu abused the bankruptcy system and wasted the resources of the Court. Rather than condoning those bad faith efforts, the Court should impose sanctions on Petitioners and Fu in order to compensate Alleged Debtor for the damages suffered.[5]

**G. Petitioners Should be Required to Post a Bond.**

64. Petitioners and Fu should be required to post a bond to indemnify Alleged Debtors for such amounts as the Court may award under Section 303(i). *See* 11 U.S.C. § 303(e) (providing that, after notice and a hearing and for cause, a court may require a petitioner to post a bond to indemnify an alleged debtor for amounts assessed under 11 U.S.C. § 303(i)). The legislative history associated with Section 303(e) indicates that the "bonding requirement is designed to discourage frivolous petitions as well as spiteful petitions, based on a desire to embarrass the debtor or to put the debtor out of business without good cause." *McMillan v. Maestri (In re McMillan)*, 543 B.R. 808, 818 (Bankr. N.D. Tex. 2016) (internal marks omitted) (citing H.R. Rep. No. 95–595, at 323 (1977), *as reprinted in* 1978 U.S.C.C.A.N. 5963, 6279; S. Rep. No. 95–989, at 33 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5787, 5819)). The notice provided in connection with

[5] If the Court is inclined to impose sanctions, Alleged Debtors respectfully request an opportunity to submit evidence of fees, costs, and other damages at a later hearing.

the Motion is sufficient to satisfy the statutory "notice" requirement and the hearing on this Motion satisfies the "hearing" requirement.

65. Here, Petitioners and Fu are individual Chinese nationals who may not be easily reached for recovery of an award under Section 303(i) as China does not as a general practice recognize judgments of United States Courts. As demonstrated above, the Involuntary Petitions were filed in blatant disregard for the Bankruptcy Code and listed the petitioning persons individually in an effort to circumvent the same and obfuscate the truth that this is a two-party dispute. The Alleged Debtors assert that Petitioners filed these cases as purely a litigation and collection tactic.

66. Accordingly, a bond should be imposed in an amount to be determined by the Court based on evidence to be presented by Alleged Debtors, to secure satisfaction of the probable award of Alleged Debtors' accrued and continuing legal fees and related litigation costs.

**H. The Court Should Dismiss this Case under the Abstention Provisions of Under 11 U.S.C. § 305(a)**

67. Dismissal of this Bankruptcy Case in abstention is also appropriate under § 305(a) of the Bankruptcy Code.

68. Section 305, entitled "Abstention," provides, in part:

> The Court after notice and a hearing, may dismiss a case under this title or may suspend all proceedings in a case under this title at any time if-(1) the interests of creditors and debtor would be better served by such dismissal or suspension.

69. As noted by the Court in *In re Spade,* 258 B.R. 221, 228 (Bankr. D. Co. 2001), while the "language enacted by Congress in § 305 is rather simple," certain elements of this provision are not specifically defined. For example, the provision offers no guidance as to what

"interests of the creditors and the debtor" might include, nor does it specify the situations in which these interests would be "better served" by dismissal or suspension."

70. As noted in *Collier on Bankruptcy,* courts have abstained from hearing bankruptcy cases if the debtor's bankruptcy case is really a two party dispute. 2 *Collier on Bankruptcy* f 305.02[c], [d] at p. 305-9 (16th ed.).

71. In *In re Spade,* the Court looked to numerous factors to determine whether to dismiss a debtor's bankruptcy case under § 305(a), including: (i) whether another forum was available to protect the interests of parties or if there was already a pending proceeding in state court; (ii) the economy or efficiency of administration; and (iii) the prejudice to parties. *Id.* At 231. The aforementioned authority supports dismissal of this case under § 305(a).

72. The State Court provides a sufficient and appropriate venue to resolve these disputes in an efficient fashion. It is clearly an alternate forum; however, the Petitioners strategically chose to participate in that forum and then chose not to participate in that forum.

73. The Alleged Debtors are solvent and capable of satisfying their obligations through their continued operations, rendering a Chapter 7 inappropriate and not in the best interest of creditors. Finally, since the Alleged Debtors are limited liability companies, the Alleged Debtors are not entitled to a discharge of indebtedness against it upon the liquidation of their property (11 U.S.C. § 1141(d)(3)), nor will its equity holders necessarily receive a distribution on their equity interests. Hence, the continuation of the cases would not serve the interests of creditors or the Alleged Debtors. Accordingly, the Court should dismiss these cases under Bankruptcy Code § 305(a).

**I. The Court Should Dismiss these Cases for Cause under 11 U.S.C. § 707(a)**

74. Dismissal of these Bankruptcy Cases for cause is also appropriate under § 707(a) of the Bankruptcy Code.

75. Even if each Involuntary Petition meets the statutory requirements of Section 303, a bankruptcy court may still dismiss the case for cause under Section 707(a). *Wilk Auslander LLP v. Murray (In re Murray)*, 900 F.3d 53, 60 (2nd Cir. 2018). Courts must undergo a case-by-case analysis to determine what constitutes sufficient cause to warrant dismissal. *In re Dinova*, 212 B.R. 437, 442 (2nd Cir. BAP 1997). This determination of cause generally focuses on whether dismissal would in the best interests of all parties – including the debtor. *In re Smith*, 507 F.3d 64, 73 (2nd Cir. 2007).

76. Improper use of the bankruptcy system may constitute cause to dismiss. *Wilk Auslander*, 900 F.3d at 58. Factors considered favorable to dismissal for improper use of the bankruptcy system considered in *Wilk Auslander* and also present here include: (i) the bankruptcy court being yet a next step in an existing two-party dispute; (ii) this being a collection effort; (iii) lack of allegations of fraudulent transfers to be avoided; (iv) adequate remedies to enforce claims under non-bankruptcy law; (v) that no assets would be lost or dissipated by dismissal; and (vi) that the debtor neither wants, nor needs a bankruptcy discharge. *Id.*

77. Based on the totality of the issues raised in this Motion, cause exists to dismiss this Bankruptcy Case under Section 707(a) and the Alleged Debtors respectfully request such dismissal.

## V. NOTICE

78. Notice of this Motion has been given to: (i) the United States Trustee; (ii) Petitioners and their counsel, (iii) all parties who have filed notices of appearance in these cases; and (iv) all entities required to be served under the applicable provisions of the Bankruptcy Code,

the Bankruptcy Rules, and the Local Bankruptcy Rules. In light of the nature of the relief requested, Alleged Debtors submit that no further notice is required.

## VI. CONCLUSION

79. Accordingly, for the reasons set forth above, the Court should grant the Motion and (i) substitute Michael Fu for the Petitioners as the real party in interest; (ii) require Petitioners and Fu to post a bond under § 303(e); (iii) dismiss this case under either Bankruptcy Code § 303(b), § 305(a), or under § 707(a) for cause; (iv) award the Alleged Debtors compensatory and punitive damages, including reasonable and necessary attorneys' fees, under § 303(i) from all persons and entities involved in the filing and pursuit of the Involuntary Petitions, including without limitation the Petitioners, Silverland, PIC, and Fu; and (v) grant such other and further relief to which Alleged Debtors may show themselves entitled at law or in equity.

Dated: May 7, 2020.

Respectfully submitted,

*/s/ Joyce W. Lindauer*

Joyce W. Lindauer
State Bar No. 21555700
Jeffery M. Veteto
State Bar No. 24098548
Guy H. Holman
State Bar No. 24095171
Joyce W. Lindauer Attorney, PLLC
1412 Main Street, Suite 500
Dallas, Texas 75202
Telephone: (972) 503-4033
Facsimile: (972) 503-4034
Attorneys for Alleged Debtors

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on May 7, 2020, a true and correct copy of the foregoing *Brief in Support of Motions of Alleged Debtors to Dismiss Involuntary Petitions, Request for Substitution of Real Party-in-Interest, Request for Bond, and Request for Award of Fees, Costs and Damages or in the Alternative to Abstain Under Bankruptcy Code § 305* was served upon all parties that are registered to receive electronic service through the court's ECF notice system in the above cases.

*/s/ Joyce W. Lindauer*
Joyce W. Lindauer

Robert W. Buchholz
420 S. Cesar Chavez Blvd.
Suite 300
Dallas, Texas 75201
214-754-5500
214-754-9100 fax
bob@attorneybob.com
Attorney for Southern Star Capital, LLC d/b/a Reliance Mortgage

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **In re:** | ) | |
| | ) | **Chapter 7** |
| **WALL007, LLC, et al** | ) | |
| | ) | **Case No. 20-31131-HDH** |
| | ) | |
| **Alleged Debtors** | ) | |

**MOTION OF SOUTHERN STAR CAPITAL, LLC**
**d/b/a RELIANCE MORTGAGE COMPANY FOR RELIEF FROM AUTOMATIC STAY**

**<u>NOTICE - RESPONSE REQUIRED</u>**

**PURSUANT TO LOCAL BANKRUPTCY RULE 4001-1(b), A RESPONSE IS REQUIRED TO THIS MOTION, OR THE ALLEGATIONS IN THE MOTION MAY BE DEEMED ADMITTED, AND AN ORDER GRANTING THE RELIEF SOUGHT MAY BE ENTERED BY DEFAULT.**

**ANY RESPONSE SHALL BE IN WRITING AND FILED WITH THE CLERK OF THE UNITED STATES BANKRUPTCY COURT AT**

**Earle Cabell Federal Building**
**1100 Commerce St., Rm. 1254**
**Dallas, TX 75242-1496**

**BEFORE CLOSE OF BUSINESS ON SEPTEMBER 24, 2020, WHICH IS AT LEAST 14 DAYS FROM THE DATE OF SERVICE HEREOF. A COPY SHALL BE SERVED UPON COUNSEL FOR THE MOVING PARTY AND ANY TRUSTEE OR EXAMINER APPOINTED IN THE CASE. ANY RESPONSE SHALL INCLUDE A DETAILED AND COMPREHENSIVE STATEMENT AS TO HOW THE MOVANT CAN BE "ADEQUATELY PROTECTED" IF THE STAY IS TO BE CONTINUED.**

**TO THE HONORABLE HARLAN D. HALE:**

SOUTHERN STAR CAPITAL LLC, d/b/a RELIANCE MORTGAGE COMPANY, a Texas limited liability company ("Movant") files this *Motion for Relief from Stay* (the "**Motion**") against WALL009, LLC ("**Debtor**"), and would respectfully show the Court as follows:

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §157 and §1334.

2. This is a core proceeding. This Motion constitutes a contested matter pursuant to Rule 9014 of the Bankruptcy Rules.

3. Section 362(a) of the Bankruptcy Code provides that the stay comes into effect upon the filing of a petition "under section … 303 of this title." Thus, section 362 applies during the gap period preventing prepetition creditors from commencing or continuing any of the actions set forth in that section. *Musso v. Ostashko (In re Ostashko),* 333 B.R. 625 (E.D.N.Y. 2005); *Hanrahan v. Walterman (In re Walterman Implement Inc.),* 2007 Bankr. LEXIS 186 (Bankr. N.D. Iowa May 22, 2006); *Ostrander v. Gardner (In re Millivision, Inc.),* 331 B.R. 515 (Bankr. D. Mass. 2005). One clear consequence of the stay during the gap period is that a post-filing creditor cannot enforce its claim absent stay relief.

4. This motion is brought pursuant to 11 U.S.C. §§ 105, 361, 362 and Bankruptcy Rule 4001.

5. Movant is the original lender and the current servicer of the holder of a note and deed of trust on a piece of real estate which is legally described in the attached Exhibit 1 which is incorporated herein by reference as if fully copied herein.

6. Movant agreed, on a short-term basis, to extend financing to Debtor secured by the real estate referenced herein.

7. On September 11, 2019, Debtor through Timothy Barton, its President, signed a Promissory Note in the amount of $900,000.00 (the "**Promissory Note**") and executed a Deed of Trust (the "**Deed of Trust**"), which was recorded on September 12, 2019 in the Deed Records of Johnson County, Texas at clerk's file No. 2019-24729. *See* Exhibits "2" and "3". Also, Timothy Barton personally guaranteed the indebtedness to Movant. *See* Exhibit "4".

8. The Promissory Note interest rate was 12.0% and it matured on September 1, 2020. Also, on matured and unpaid amounts the Promissory Note required the lesser of 18% or the Highest Lawful Rate permitted by law.

9. Debtor defaulted under the terms of the Promissory Note **by not making any** of the required payments. The note, by its own terms, matured and became fully due and payable on September 1, 2020. Further, in the deed of trust Debtor agreed to the following waivers:

> *E.19.* Grantor and each surety, endorser, and guarantor of the Obligation waive, to the extent permitted by law, all (a) demand for payment, (b) presentation for payment, (c) notice of intention to accelerate maturity, (d) notice of acceleration of maturity, (e) protest, (f) notice of protest and (g) rights under sections 51.003, 51.004, and 51.005 of the Texas Property Code.

10. Movant originally posted the Property for the May 5, 2020, foreclosure date. *See* Exhibit "5" but was then informed of the pending Bankruptcy Action. Debtor did not proceed with the foreclosure sale after being noticed of the pending bankruptcy action.

11. As of the maturity date of the loan, September 1, 2020, the status of the debt is as follows:

| | | |
|---|---|---|
| a. | Principal Amount Due: | $900,000.00. |
| b. | Total Payments Made: | $0.00. |
| c. | Total interest due as of September 1, 2020: | $108,000.00 |
| | Late Fees Due as of September 1, 2020 | $ 4,950.00 |
| | Total Interest & Late Fees Due as of Sept 1, 2020 | $112,950.00 |
| c. | Additional Collateral held as of September 1, 2020: | CD $90,000.00 |
| | Accrued Interest on CD as of Sept 1, 2020 | $1,654.57 |

12. This balance remains unpaid and is accruing interest and other applicable charges.

13. Movant contends that based on the facts of this case cause exists for the requirements of Bankruptcy Rule 4001(a)(3) to be waived so that Movant may once again post the Property for foreclosure as **Debtor has never made a single payment on the note**.

14. In accordance with the terms of the Deed of Trust Movant would allege that it is entitled to reasonable attorney's fees, including, but not limited to, fees, if any, for the preparation and filing of this Motion for Relief from Stay in the amount of at least $2,500.00.

15. By reason of the foregoing, Movant requests the Court to terminate the stay so Movant may proceed to foreclose in accordance with its Note and Deed of Trust.

16. Debtor has failed to provide adequate protection to Movant which constitutes cause to terminate the automatic stay of 11 U.S.C. § 362(a).

17. Movant reserves the right to assert an 11 U.S.C. § 362(d)(2) Cause of Action, if

appropriate, at the hearing on Movant's Motion for Relief.

18. The provision of Rule 4001 (a) (3) should be waived and Movant be permitted to immediately enforce and implement any order granting relief from the automatic stay.

19. This Motion is supported by the affidavit of Mr. Al Keller which is attached as Exhibit "6".

WHEREFORE, Movant prays that this Court enter an order, after notice and hearing, terminating the automatic stay as to Movant and allowing the posting and sale of the collateral at foreclosure. Movant further prays that the Court waive the provision of Rule 4001 (a) (3) and that Southern Star Capital, LLC d/b/a Reliance Mortgage be permitted to immediately enforce and implement any order granting relief from the automatic stay; that Movant be awarded its reasonable attorney's fees and expenses for this Motion; and, that Movant be granted such other and further relief as is just.

Respectfully submitted,

By: *_/s/ Robert W. Buchholz_*

Robert W. Buchholz
Texas Bar No: 03290600
420 S. Cesar Chavez Blvd., Suite 300
Dallas, Texas 75201
Tel. (214) 754-5500
Fax. (214) 754-9100
Bob@attorneybob.com

## CERTIFICATE OF CONFERENCE

This will certify that the relief sought in this motion was discussed with the attorney for the alleged Debtor Wall 009, LLC, who stated that she is opposed to the relief requested.

By: */s/ Robert W. Buchholz*
______________________________
Robert W. Buchholz

## CERTIFICATE OF SERVICE

I hereby certify that on September 10, 2020, a true and correct copy of the foregoing Motion for Relief from Stay was served via electronic means as listed on the Court's ECF noticing system which includes the Attorney for the Debtors and the U.S. Trustee, and by regular mail to the debtor(s) at:

| | |
|---|---|
| WALL009 LLC, Debtor<br>13901 Midway Rd., Ste. 102<br>Dallas, TX 75244 | VIA US MAIL |
| Joyce W. Lindauer<br>Joyce W. Lindauer Attorney, PLLC<br>1412 Main Street, Suite 500<br>Dallas, TX 75202<br>Attorney for Alleged Debtor | VIA ECF |
| Jiangang Ou<br>Nguyen & Chen LLP<br>11200 Westheimer Road, Suite 120<br>Houston, TX 77042 | VIA ECF |
| Stephen M. Packman<br>Archer & Greiner, P.C.<br>Three Logan Square<br>1717 Arch Street, Suite 3500<br>Philadelphia, PA 19103 | VIA ECF |

| | |
|---|---|
| Parties Having Filed NOA | VIA ECF |
| Office of United States Trustee | VIA ECF |

By: */s/ Robert W. Buchholz*
______________________________
Robert W. Buchholz

# EXHIBIT "A"

## TRACT I

**BEING a 27.262 acre tract of land situated in the John Haigler Survey, Abstract No. 358 and the Absalom Williams Survey, Abstract No. 857, City of Venus, Johnson County, Texas and being a part of that certain called 101.49 acre tract of land described in Special Warranty Deed from Lynco Ventures, LLC to Wall009, LLC and recorded by Document No. 2017-16584 of the Deed Records of Johnson County, Texas, said 27.262 acres of land to be more particularly described by metes and bounds as follows:**

**BEGINNING at a 1/2" capped iron rod found for corner in the southeast line of said 101.49 acre tract of land, same being the northwest line of County Road 501 (60 foot Right-of-Way) and being at the east corner of Venus Ridge Phase IV Addition, an addition to the City of Venus, Johnson County, Texas, according to the Plat thereof recorded in Volume 11, Page 544 of the Plat Records of Johnson County, Texas;**

**THENCE North 30° 13' 50" West with the northeast line of said Addition, a distance of 1,128.01 feet to a 1/2' capped iron rod marked "SANDS" set for corner;**

**THENCE North 59° 46' 10" East across said 101.49 acre tract a distance of 110.00 feet to a 1/2" capped iron rod marked "SANDS" set for corner;**

**THENCE North 30° 13' 50" West, a distance of 5.00 feet to a 1/2" capped iron rod marked "SANDS" set for corner;**

**THENCE North 59° 46' 10" East, a distance of 50.00 feet to a 1/2" capped iron rod marked "SANDS" set for corner;**

**THENCE North 30° 13' 50" West, a distance of 26.19 feet to a 1/2" capped iron rod marked "SANDS" set for corner;**

**THENCE North 59° 46' 10" East, at a distance of 858.80 feet to a 1/2" capped iron rod marked "SANDS" set for corner in the northeast line of said 101.49 acre tract, same being the northeast line of the above referenced John Haigler Survey and being in the southwest line of the above referenced 126.2407 acre tract, same being the southwest line of the above referenced Absalom Williams Survey;**

**THENCE South 30° 13' 50" East with said northeast and southwest lines, a distance of 1,181.38 feet to a 1/2" capped iron rod marked "FORT WORTH SURVEYING" set for corner in the northwest line of the above referenced County Road 501 at the east corner of said 101.49 acre tract;**

**THENCE South 60° 01' 00" West continuing with said County Road and the southeast line of said 101.49 acre tract, a distance of 1,019.04 feet back to the Point of beginning and containing 1,187,549 square feet, or 27.262 acres of land, more or less.**

**TRACT II:**

**BEING a 36.502 acre tract of land situated in the John Haigler Survey, Abstract No. 358 and the Absalom Williams Survey, Abstract No. 857, City of Venus, Johnson County, Texas and being a part of that certain 101.49 acre tract of land described in Special Warranty Deed from Lynco Ventures, LLC to Wall009, LLC and recorded by Document No. 2017-16584 of the Deed Records of Johnson County, Texas, said 27.262 acres of land to me more particularly described by metes and bounds as follows:**

**COMMENCING at a 1/2" capped iron rod found for corner in the southeast line of said 101.49 acre tract of land, same being the northwest line of County Road 501 (60 foot Right-of-Way) and being at the east corner of Venus Ridge Phase IV Addition, an addition to the City of Venus, Johnson County, Texas, according to the plat thereof recorded in Volume 11, Page 544 of the Plat Records of Johnson County, Texas;**

**THENCE North 30° 13' 50" West with the northeast line of said Venus Ridge, Phase IV and southwest line of said 101.19 acre tract, a distance of 1,128.01 feet to a 1/2" capped iron rod set for corner at the Point of Beginning;**

**THENCE continuing with said northeast and southwest lines the following:**

**North 30° 13' 50" West, a distance of 1,063.25 feet to a 1/2" capped iron rod found for corner;**

**North 00° 26' 19" West, a distance of 112.41 feet to a 1/2" capped iron rod found for corner;**

**South 89° 33' 41" West, a distance of 33.74 feet to a 1/2" capped iron rod found for corner at the beginning of a curve to the left;**

**THENCE continuing with said northeast and southwest lines in a Southwesterly direction with said curve to the left having a radius of 270.00 feet, a chord that bears South 74° 39' 55" West, a distance of 138.81 feet for an arc length of 140.39 feet to a 1/2" capped iron rod found for corner;**

**THENCE North 30° 13' 50" West, a distance of 242.77 feet to a 1/2" capped iron rod found for corner;**

**THENCE South 89° 33' 41" West, a distance of 183.97 feet to a 1/2" capped iron rod found for corner in the northwest line of said 101.49 acre tract, the northwest line of said Haigler Survey, same being the southeast line of that certain called 144.38 acre tract of land described in Deed from Wayne Hood and Eleanor Hood and recorded in Volume 2616, Page 156 of said Deed Records, same being the southeast line of the B.B.B. & C. R.R Survey, Abstract No. 92;**

**THENCE North 59° 45' 40" East with said southeast and northwest lines a distance of 1,286.03 feet to a capped iron rod found for corner at the north corner of said 101.49 acre tract of land, same being the north corner of said Haigler Survey, the east corner of said B.B.B. & C. R.R. Survey, and bing in the southwest line of that certain called 62.7 acre**

**tract of land described in Deed to Fielder Farm Partnership, et al and recorded in Volume 4302, Page 538 of said Deed Records, same being the southwest line of the Absolam Williams Survey, Abstract No. 857;**

**THENCE South 30° 13' 50" East with the northeast line of said 101.49 acre tract, same being the northeast line of said Haigler Survey and the southwest line of said 62.7 acre tract, same being the southwest line of said Williams Survey, at a distance of 11,219.39 feet passing a 1/2" capped iron rod found for corner at the south corner of said 62.7 acre tract, same being the west corner of that certain called 128.8645 acre tract of land described in Deed from Anastasia Energy, LLC to DJD Land Partners, LLC and recorded in County Clerk's File No. 2018-18134 of said Deed Records and continuing a total distance of 1,516.42 feet 1/2" capped iron rod found for corner;**

**THENCE across said 101.49 acre tract the following:**

**South 59° 46' 10" West, a distance of 858.80 feet to a 1/2" capped iron rod set for corner;**

**South 30° 13' 50" East, a distance of 26.19 feet to a 1/2" capped iron rod set for corner;**

**South 59° 46' 10" West, a distance of 50.00 feet to a 1/2" capped iron rod set for corner;**

**South 30° 13' 50" East, a distance of 5.00 feet to a 1/2" capped iron rod set for corner;**

**THENCE South 59° 46' 10" West, a distance of 110.00 feet back to the Point of Beginning and containing 1,590,029 square feet or 36.502 acres of land, more or less.**

# Promissory Note

**Date:** September 11, 2019.

**Borrower**: WALL009, LLC, a Texas limited liability company.

**Borrower's Mailing Address:** WALL009, LLC, 1755 Wittington Place, Suite 340, Dallas Texas 75234, attention Tim Barton.

**Lender**: Southern Star Capital, LLC d/b/a Reliance Mortgage Company

**Place for Payment:**

5220 Spring Valley Road, Suite 602
Dallas, Texas 75254.
or any other place that Lender may designate in writing.

**Principal Amount**: Nine Hundred Thousand Dollars, ($900,000.00).

**Annual Interest Rate**: Twelve Percent (12.0%)

**Maturity Date:** September 1, 2020.

**Annual Interest Rate on Matured, Unpaid Amounts**: Eighteen Percent (18%) or the highest lawful rate, whichever is less.

**Terms of Payment (principal and interest):**

The Principal Amount and all accrued and unpaid interest is due and payable on September 1, 2020, and the interest is due and payable monthly as it accrues.

The monthly interest payments are Nine Thousand and 00/100 dollars ($9,000.00) and are due and payable on the first day of each month with the first payment due on October 1, 2019.

**Late Charge:**

If any installment becomes overdue for more than ten days, at Lender's option a late payment charge equal to five percent (5%) of the amount of the late payment may be charged in order to defray the expense of handling the delinquent payment.

**Security for Payment**: This note is secured by a deed of trust and security agreement (the "deed of trust") dated September 11, 2019, WALL009, LLC, a Texas limited liability company to Robert W. Buchholz, trustee on the following described real property.

The property described in the attached Exhibit "A" which is which is incorporated herein by reference.

**Other Security for Payment:**
None.

**Promise to Pay**
Borrower promises to pay to the order of Lender the Principal Amount plus interest at the Annual Interest Rate. This note is payable at the Place for Payment and according to the Terms of Payment. All unpaid amounts are due by the Maturity Date. If any amount is not paid either when due under the Terms of Payment or on acceleration of maturity, Borrower promises to pay any unpaid amounts plus interest from the date the payment was due to the date of payment at the Annual Interest Rate on Matured, Unpaid Amounts.

**Waivers**
Borrower waives, to the extent permitted by law, all (1) demand for payment, (2) presentation for payment, (3) notice of intention to accelerate maturity, (4) notice of acceleration of maturity, (5) protest, (6) notice of protest, (7) rights under sections 51.003, 51.004 and 51.005 of the Texas Property Code, (8) rights under section 17.001 and chapter 43 of the Texas Civil Practice and Remedies Code and rule 31 of the Texas Rules of Civil Procedure.

**Attorney's Fees**
Borrower also promises to pay reasonable attorney's fees and court and other costs if an attorney is retained to collect or enforce the note. These expenses will bear interest from the date of advance at the Annual Interest Rate on Matured, Unpaid Amounts. Borrower will pay Lender these expenses and interest on demand at the Place for Payment. These expenses and interest will become part of the debt evidenced by the note and will be secured by any security for payment.

**Prepayment:** Borrower may prepay this note in any amount at any time before the Maturity Date without penalty or premium.

**Application of Prepayment:** Prepayments will be applied to installments on the last maturing principal, and interest on that prepaid principal will immediately cease to accrue.

**Usury Savings**
It is the intention of the parties hereto to act in strict compliance with "Applicable Law" (hereafter defined). Accordingly, it is agreed that notwithstanding any provision to the contrary in this note, "deed of trust" (defined above), or any other instrument securing or evidencing the indebtedness evidenced by this note, or in any other arrangements or agreements, no such provision shall ever be construed to create a contract to pay, as consideration for use, forbearance or detention of money, "interest," as that term may be defined by Applicable Law, at a rate in excess of the maximum lawful rate of nonusurious interest permitted by Applicable Law. If any excess of interest in such respect is provided for, or shall be adjudicated to be so provided for, in this note, the deed of trust, or in any other instrument securing or evidencing the indebtedness evidenced by this note, then in such event (a) the provisions of this paragraph shall govern and control; (b) neither Borrower nor its successors or assigns or any other party liable for the payment of the indebtedness shall be obligated to pay the amount of such interest to the extent that it is in excess of the maximum lawful amount of nonusurious interest permitted by Applicable Law, and the same shall be construed as a mutual mistake of the parties hereto, and of any legal holder of this note,

and (c) such excess of interest over the maximum lawful rate of nonusurious interest permitted by Applicable Law shall either be applied as credit against the then unpaid principal amount of the indebtedness owed under this note or refunded to Borrower. Any commitment, extension, brokerage, loan or other fees or sums paid pursuant to this note, the loan evidenced hereby, or the deed of trust and which under Applicable Law are deemed to constitute interest shall be treated as interest and taken into account in calculating the maximum lawful rate of nonusurious interest permitted by Applicable Law. If the holder of this note shall ever receive anything of value that is characterized as interest under Applicable Law and that would apart from this provision be in excess of the maximum lawful rate of nonusurious interest permitted by Applicable Law, an amount equal to the amount that would have been excessive interest shall, without penalty, be applied to the reduction of the principal amount owing on the indebtedness evidenced by this note in the inverse order of its maturity and not to the payment of interest, or refunded to Borrower or the other payor thereof if and to the extent such amount, which would have been excessive, exceeds such unpaid principal. The right to accelerate maturity of this note, or any other indebtedness, does not include the right to accelerate any interest that has not otherwise accrued on the date of such acceleration, and the holder hereof does not intend to charge or receive any unearned interest in the event of acceleration. All interest paid or agreed to be paid to the holder hereof shall, to the extent permitted by Applicable Law, be amortized, prorated, allocated, and spread throughout the full stated term (including any renewal or extension) of such indebtedness so that the amount of interest on account of such indebtedness does not exceed the maximum lawful amount of nonusurious interest permitted by Applicable Law. Further, notwithstanding anything to the contrary contained herein, if the indebtedness evidenced by this note or the or the deed of trust is paid in full by Borrower or its successors or assigns prior to the full stated term of this note (as such term may have been extended pursuant to the terms hereof) and the interest received for the actual period of the existence of the indebtedness evidenced by this note exceeds the maximum lawful rate of nonusurious interest permitted by Applicable Law, then Lender, or its successors or assigns, shall refund to Borrower, or its successors or assigns, the amount of the excess of such interest over the maximum amount of nonusurious interest permitted under Applicable Law, and neither Lender, nor its successors or assigns, shall be subject to any of the penalties, if any, provided by Applicable Law for contracting for, charging, or receiving interest in excess of the maximum lawful rate of nonusurious interest permitted by Applicable Law. To the extent that Title 4 of the Texas Finance Code is relevant for purposes of determining the maximum lawful rate of nonusurious interest permitted by Applicable Law, the parties hereby elect to determine the applicable rate ceiling under such article by using the indicated (weekly) rate ceiling from time to time in effect, subject to Lender's right subsequently to change such method in accordance with Applicable Law.

"Applicable Law" shall mean that law (including, without limitation, Texas law), regulation, or judicial determination in effect from time to time and applicable to this note (including future changes in law), which lawfully permits the contracting for, charging and collection of the highest permissible rate of interest on this note and the loan evidenced hereby, including laws, regulations, and judicial determinations of the State of Texas and of the United States of America.

**Other Clauses**

Each Borrower is responsible for all obligations represented by this note.

When the context requires, singular nouns and pronouns include the plural.

A default exists under this note if (1) (a) Borrower or (b) any other person liable on any part of this note or who grants a lien or security interest on property as security for any part of this note (an "Other Obligated Party") fails to timely pay or perform any obligation or covenant in any written agreement between Lender and Borrower or any Other Obligated Party; (2) any representation in this note or in any other written agreement between Lender and Borrower or any Other Obligated Party is materially false when made; (3) a receiver is appointed for Borrower, any Other Obligated Party, or any property on which a lien or security interest is created as security (the "Collateral Security") for any part of this note; (4) any Collateral Security is assigned for the benefit of creditors; (5) a bankruptcy or insolvency proceeding is commenced by Borrower, a partnership of which Borrower is a general partner, or an Other Obligated Party; (6) (a) a bankruptcy or insolvency proceeding is commenced against Borrower, a partnership of which Borrower is a general partner, or an Other Obligated Party and (b) the proceeding continues without dismissal for sixty days, the party against whom the proceeding is commenced admits the material allegations of the petition against it, or an order for relief is entered; (7) any of the following parties is terminated, begins to wind up its affairs, suffers a forfeiture of right to do business, is authorized to terminate or wind up its affairs by its governing body or persons, or any event occurs or condition exists that permits the termination or winding up of the affairs of any of the following parties: Borrower, a partnership of which Borrower is a general partner, or an Other Obligated Party; (8) any Collateral Security is impaired by loss, theft, damage, levy and execution, issuance of an official writ or order of seizure, or destruction, unless it is promptly replaced with collateral security of like kind and quality or restored to its former condition; or (9) any attachment, sequestration or similar writ is levied upon any property of Borrower or Other Obligated Party and is not discharged within a period of thirty days; (10) any final money judgment against Borrower or any Other Obligated Party is not paid within thirty days; (11) Borrower abandons any portion of the property of Borrower; or (12) if Borrower is an individual, the death or disability of Borrower or Other Obligated Party, if Other Obligated Party is an individual.

**BORROWER waives its rights under the Texas Deceptive Trade Practices–Consumer Protection Act, section 17.41 *et seq.* of the Texas Business and Commerce Code, a law that gives consumers special rights and protections. After consultation with an attorney of its own selection, BORROWER voluntarily consents to this waiver.**

If any provision of this note conflicts with any provision of a loan agreement, deed of trust, or security agreement of the same transaction between Lender and Borrower, the provisions of the deed of trust will govern to the extent of the conflict.

Borrower and Lender acknowledge that they were represented by competent counsel in connection with the negotiation, drafting and execution of this Note, deed of trust, and all other documents executed in connection with the same transaction between Lender and Borrower and that this Note, the deed of trust and all other documents executed in connection with the same transaction between Lender and Borrower shall not be subject to the principle of construing their meaning against the party which drafted same.

**BORROWER, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, HEREBY KNOWINGLY, INTENTIONALLY, IRREVOCABLY, UNCONDITIONALLY**

**AND VOLUNTARILY, WITH AND UPON THE ADVICE OF COMPETENT COUNSEL, WAIVES, RELINQUISHES AND FOREVER FORGOES THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, ARISING OUT OF, OR IN ANY WAY RELATING TO THIS NOTE OR ANY CONDUCT, ACT OR OMISSION OF LENDER OR BORROWER, OR ANY OF THEIR DIRECTORS, OFFICERS, PARTNERS, MEMBERS, EMPLOYEES, AGENTS OR ATTORNEYS, OR ANY OTHER PERSONS AFFILIATED WITH LENDER OR BORROWER, IN EACH OF THE FOREGOING CASES, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.**

Borrower warrants to Lender and agrees that the proceeds of the Note will be used primarily for business or commercial purposes and not primarily for personal, family, or household purposes.

This note will be construed under the laws of the state of Texas, without regard to choice-of-law rules of any jurisdiction.

**WALL009, LLC, a Texas limited liability company.**

**BY: ITS MANAGERS:**

TRWF LODGE, LLC, a Texas limited liability company.

____________________________
Tim Barton
Its Managing Member

**and**

CARNEGIE DEVELOPMENT, LLC, a Delaware limited liability company.

____________________________
Tim Barton
Its Managing Member

***Electronically Recorded Document***

# Johnson County

**Becky Ivey**
**Johnson County Clerk**
**Cleburne, TX**

---

**Document Number:** 2019-24729
**Recorded As** : ERX-DEED OF TRUST

**Recorded On:** September 12, 2019
**Recorded At:** 02:49:11 pm
**Number of Pages:** 17

**Recording Fee:** $86.00

**Parties:**
Direct-
Indirect-

**Receipt Number:** 175438
**Processed By:** Linda Bailey

---

***THIS PAGE IS PART OF THE INSTRUMENT***

---

COUNTY COURT
JOHNSON COUNTY, TEXAS

I hereby certify that this instrument was filed on the date and time stamped hereon and was duly recorded in the Volume and Page of the named records in Johnson County, Texas.

Any provision herein which restricts the sale, rental or use of the described Real Estate because of color race is invalid and unenforceable under Federal law.

Becky Ivey
BECKY IVEY, COUNTY CLERK
JOHNSON COUNTY, TEXAS

Sendera Title

GF# 1903359-VVJA

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

# Deed of Trust

## Basic Information

**Date:** September 11, 2019.

**Grantor:** WALL009, LLC, a Texas limited liability company.

**Grantor's Mailing Address:**

1755 Wittington Place, Suite 340
Dallas, Texas 75234
c/o Tim Barton

**Trustee:** Robert W. Buchholz.

**Trustee's Mailing Address:**

420 S. Cesar Chavez Blvd., Suite 300
Dallas, Texas 75201

**Lender:** Southern Star Capital LLC d/b/a Reliance Mortgage Company

**Lender's Mailing Address:**

5220 Spring Valley Road, Suite 602
Dallas, Texas 75254

**Obligation**

Note:
Date: September 11, 2019.
Original principal amount: $900,000.00.
Borrower: WALL009, LLC, a Texas limited liability company.

Lender: Southern Star Capital LLC d/b/a Reliance Mortgage Company
Maturity date: September 1, 2020.
Terms of Payment: As provided in the note.

**Property (including any improvements):**

The property described in the attached Exhibit "A" which is incorporated herein by reference.

**Exceptions to Conveyance and Warranty:**

None.

**A. Granting Clause**

For value received and to secure payment of the Obligation, Grantor conveys the Property to Trustee in trust. Grantor warrants and agrees to defend the title to the Property, subject to the Other Exceptions to Conveyance and Warranty. On payment of the Obligation and all other amounts secured by this deed of trust, this deed of trust will have no further effect, and Lender will release it at Grantor's expense.

**B. Grantor's Obligations**

*B.1.* Grantor agrees to maintain all property and liability insurance coverages with respect to the Property, revenues generated by the Property, and operations on the Property that Lender reasonably requires ("Required Insurance Coverages"), issued by insurers and written on policy forms acceptable to Lender , and as to property loss, that are payable to Lender under policies containing standard mortgage clauses, and deliver evidence of the Required Insurance Coverages in a form acceptable to Lender before execution of this deed of trust and again at least ten days before the expiration of the Required Insurance Coverages.

*B.2* Grantor agrees to-

a. keep the Property in good repair and condition;

b. pay all taxes and assessments on the Property before delinquency, not authorize a taxing entity to transfer its tax lien on the Property to anyone other than Lender, and not request a deferral of the collection of taxes pursuant to section 33.06 of the Texas Tax Code;

c. defend title to the Property subject to the Other Exceptions to Conveyance and Warranty and preserve the lien's priority as it is established in this deed of trust;

d. obey all laws, ordinances, and restrictive covenants applicable to the Property;

e. keep any buildings occupied as required by the Required Insurance Coverages;

f. if the lien of this deed of trust is not a first lien, pay or cause to be paid all prior lien notes and abide by or cause to be abided by all prior lien instruments;

g. notify Lender of any change of address; and

**C. Lender's Rights**

*C.1.* Lender or Lender's mortgage servicer may appoint in writing one or more substitute trustees,

succeeding to all rights and responsibilities of Trustee.

*C.2.* If the proceeds of the Obligation are used to pay any debt secured by prior liens, Lender is subrogated to all the rights and liens of the holders of any debt so paid.

*C.3.* Lender may apply any proceeds received under the property insurance policies covering the Property either to reduce the Obligation or to repair or replace damaged or destroyed improvements covered by the policy. If the Property is Grantor's primary residence and Lender reasonably determines that repairs to the improvements are economically feasible, Lender will make the property insurance proceeds available to Grantor for repairs.

*C.4.* Notwithstanding the terms of the Note to the contrary, and unless applicable law prohibits, all payments received by Lender from Grantor with respect to the Obligation or this deed of trust may, at Lender's discretion, be applied first to amounts payable under this deed of trust and then to amounts due and payable to Lender with respect to the Obligation, to be applied to late charges, principal, or interest in the order Lender in its discretion determines.

*C.5.* If Grantor fails to perform any of Grantor's obligations, Lender may perform those obligations and be reimbursed by Grantor on demand for any amounts so paid, including attorney's fees, plus interest on those amounts from the dates of payment at the rate stated in the Note for matured, unpaid amounts. The amount to be reimbursed will be secured by this deed of trust.

*C.6.* **COLLATERAL PROTECTION INSURANCE NOTICE**

**In accordance with the provisions of Section 307.052(a) of the Texas Finance Code, the Beneficiary hereby notifies the Grantor as follows:**

**(A) the Grantor is required to:**

**(i) keep the collateral insured against damage in the amount the Lender specifies;**

**(ii) purchase the insurance from an insurer that is authorized to do business in the state of Texas or an eligible surplus lines insurer; and**

**(iii) name the Lender as the persons to be paid under the policy in the event of a loss;**

**(B) the Grantor must, if required by the Lender, deliver to the Lender a copy of the policy and proof of the payment of premiums; and**

**(C) if the Grantor fails to meet any requirement listed in Paragraph (A) or (B), the Lender may obtain collateral protection insurance on behalf of the Grantor at the Grantor's expense.**

*C.7.* If a default exists in payment of the Obligation or performance of Grantor obligations and the default continues after any required notice of the default and the time allowed to cure, Lender may-

a. declare the unpaid principal balance and earned interest on the Obligation immediately due;

b. exercise Lender's rights with respect to rent under the Texas Property Code as then in effect;

c. direct Trustee to foreclose this lien, in which case Lender or Lender's agent will cause notice of the foreclosure sale to be given as provided by the Texas Property Code as then in effect; and

d. purchase the Property at any foreclosure sale by offering the highest bid and then have the bid credited on the Obligation.

*C.8.* If Grantor fails to pay any part of principal or interest secured by a prior lien or liens on the Property when it becomes payable or defaults on any prior lien instrument, the entire debt secured by this deed of trust will immediately become payable at the option of Lender.

C.9. Any act or occurrence that would constitute default under the terms of any lien superior to the lien securing the Note will constitute a default under this Deed of Trust securing the Note.

*C.10.* Lender may remedy any default without waiving it and may waive any default without waiving any prior or subsequent default.

**D. Trustee's Rights and Duties**
If directed by Lender to foreclose this lien, Trustee will-

*D.1.* either personally or by agent give notice of the foreclosure sale as required by the Texas Property Code as then in effect;

*D.2.* sell and convey all or part of the Property "AS IS" to the highest bidder for cash with a general warranty binding Grantor, subject to the Prior Liens and to the Other Exceptions to Conveyance and Warranty and without representation or warranty, express or implied, by Trustee;

*D.3.* from the proceeds of the sale, pay, in this order-

a. expenses of foreclosure, including a reasonable commission to Trustee;
b. to Lender, the full amount of principal, interest, attorney's fees, and other charges due and unpaid;
c. any amounts required by law to be paid before payment to Grantor; and
d. to Grantor, any balance; and

*D.4.* be indemnified, held harmless, and defended by Lender against all costs, expenses, and liabilities incurred by Trustee for acting in the execution or enforcement of the trust created by this deed of trust, which includes all court and other costs, including attorney's fees, incurred by Trustee in defense of any action or proceeding taken against Trustee in that capacity.

## E. General Provisions

*E.1.* If any of the Property is sold under this deed of trust, Grantor must immediately surrender possession to the purchaser. If Grantor does not, Grantor will be a tenant at sufferance of the purchaser, subject to an action for forcible detainer.

*E.2.* Recitals in any trustee's deed conveying the Property will be presumed to be true.

*E.3.* Proceeding under this deed of trust, filing suit for foreclosure, or pursuing any other remedy will not constitute an election of remedies.

*E.4.* This lien will remain superior to liens later created even if the time of payment of all or part of the Obligation is extended or part of the Property is released.

*E.5.* If any portion of the Obligation cannot be lawfully secured by this deed of trust, payments will be applied first to discharge that portion.

*E.6.* Grantor assigns to Lender all amounts payable to or received by Grantor from condemnation of all or part of the Property, from private sale in lieu of condemnation, and from damages caused by public works or construction on or near the Property. After deducting any expenses incurred, including attorney's fees and court and other costs, Lender will either release any remaining amounts to Grantor or apply such amounts to reduce the Obligation. Lender will not be liable for failure to collect or to exercise diligence in collecting any such amounts. Grantor will immediately give Lender notice of any actual or threatened proceedings for condemnation of all or part of the Property.

*E.7.* Grantor collaterally assigns to Lender all present and future rent from the Property and its proceeds. Grantor warrants the validity and enforceability of the assignment. Grantor will apply all rent to payment of the Obligation and performance of this deed of trust, but if the rent exceeds the amount due with respect to the Obligation and the deed of trust, Grantor may retain the excess. If a default exists in payment of the Obligation or performance of this deed of trust, Lender may exercise Lender's rights with respect to rent under the Texas Property Code as then in effect. Lender neither has nor assumes any obligations as lessor or landlord with respect to any occupant of the Property. Lender may exercise Lender's rights and remedies under this paragraph without taking possession of the Property. Lender will apply all rent collected under this paragraph as required by the Texas Property Code as then in effect. Lender is not required to act under this paragraph, and acting under this paragraph does not waive any of Lender's other rights or remedies.

*E.8.* Interest on the debt secured by this deed of trust will not exceed the maximum amount of nonusurious interest that may be contracted for, taken, reserved, charged, or received under law. Any interest in excess of that maximum amount will be credited on the principal of the debt or, if that has been paid, refunded. On any acceleration or required or permitted prepayment, any such excess will be canceled automatically as of the acceleration or prepayment or, if already paid, credited on the principal of the debt or, if the principal of the debt has been paid, refunded.

*E.9.* In no event may this deed of trust secure payment of any debt that may not lawfully be secured by a lien on real estate or create a lien otherwise prohibited by law.

*E.10.* When the context requires, singular nouns and pronouns include the plural.

*E.11.* The term *Note* includes all extensions, modifications, and renewals of the Note and all amounts secured by this deed of trust.

*E.12.* Grantor warrants that the extension of credit evidenced by the Note secured hereby is solely for business or commercial purposes, other than agricultural purposes. The Grantor further warrants that the credit transaction evidenced by the Note is specifically exempted under Regulation Z issued by the Board of Governors of the Federal Reserve System and Title I of the Consumer Credit Protection Act and that no disclosures are required to be given under such regulations and federal laws in connection with the above transaction. Grantor does not claim any part of the Property as residential or business homestead. Grantor acknowledges that Lenders rely on the truth of representations in this paragraph in making the Note secured by this deed of trust.

*E.13.* Grantor will furnish to Lender or other holder of the Note annually, before January 31st of each year, copies of tax receipts showing that all taxes on the Property have been paid. Failure to comply with the foregoing for any reason whatsoever shall constitute a default.

If Grantor fails to pay all taxes on the Property prior to January 31st of each year for the tax period covering the preceding calendar year for any reason whatsoever, including, but not limited to, protests of value, processing of tax account split-out requests, or failure of the tax authorities to certify the tax roll or account, at the option of Lender, Grantor shall immediately deposit with Lender, a sum equal to taxes, assessments and charges against the Property in the amount as estimated by Lender.

All such funds shall bear no interest whatsoever, may be mingled with the general funds of Lender and shall be applied by Lender toward the payment of taxes and assessments; provided, however, that, if a Default shall have occurred hereunder, such funds may at Lender's option be applied to the payment of the Obligation in the order determined by Lender in its sole discretion, and that Lender may at any time, in its sole discretion, apply all or any part of such funds toward the payment of any such taxes, assessments, charges, legal fees, penalties or premiums which are past due, together with any penalties or late charges with respect thereto.

Lender shall have the right to rely upon tax information furnished by applicable taxing authorities in the payment of such taxes and assessments and Lender shall have no obligation to make any protest of any such taxes or assessments. Any excess over the amounts required for such purposes shall be held by Lender for future use, applied to the Obligation or refunded to Grantor, at Lender's option, and any deficiency in such funds so deposited shall be made up by Grantor upon demand by Lender.

The conveyance or transfer of Grantor's interest in the Property for any reason (including, without limitation, the foreclosure of a lien or security interest or a transfer by operation of law) shall constitute an assignment or transfer of Grantor's interest in and rights to such funds held by Lender under this subparagraph but subject to the rights of Lender hereunder.

Grantor will annually furnish to Lender or other holder of the Note evidence of current paid-up Required Insurance Coverage naming Lender or other holder of the Note as an insured.

***E.14.* GRANTOR MAY FURNISH ANY INSURANCE REQUIRED BY THIS DEED OF TRUST EITHER THROUGH EXISTING POLICIES OWNED OR CONTROLLED BY GRANTOR OR THROUGH EQUIVALENT COVERAGE FROM ANY INSURANCE COMPANY AUTHORIZED TO TRANSACT BUSINESS IN TEXAS.**

*E.15.* If all or any part of the Property is sold, transferred, or conveyed without the prior written consent of Lender or other holder of the Note, Lender or other holder of the Note may, at its sole option, declare the outstanding principal balance of the Note plus accrued interest immediately due and payable. Lender or other holder of the Note has no obligation to consent to any such sale or conveyance of the Property, and Lender or other holder of the Note is entitled to condition any consent on a change in the interest rate that will thereafter apply to the Note and any other change in the terms of the Note or Deed of Trust that Lender or other holder of the Note in its sole discretion deems appropriate. A lease for a period longer than one year, a lease with an option to purchase, or a contract for deed will be deemed to be a sale, transfer, or conveyance of the Property for purposes of this provision. The creation of a subordinate lien without the consent of Lender or other holder of the Note will be construed as a sale or conveyance of the Property, but any subsequent sale under a subordinate lien to which Lender or other holder of the Note has consented will not be construed as a sale or conveyance of the Property.

*E.16.* Grantor agrees not to grant any lien or security interest in the Property or to permit any junior encumbrance to be recorded or any claim to otherwise become an encumbrance against the Property. If an involuntary encumbrance is filed against the Property, Grantor agrees, within thirty days, to either remove the involuntary encumbrance or provide a bond acceptable to Lender against the involuntary encumbrance.

*E.17.* This deed of trust binds, benefits, and may be enforced by the successors in interest of all parties.

*E.18.* If Grantor and Borrower are not the same person, the term *Grantor* includes Borrower.

*E.19.* Grantor and each surety, endorser, and guarantor of the Obligation waive, to the extent permitted by law, all (a) demand for payment, (b) presentation for payment, (c) notice of intention to accelerate maturity, (d) notice of acceleration of maturity, (e) protest, (f) notice of protest and (g) rights under sections 51.003, 51.004, and 51.005 of the Texas Property Code.

*E.20.* Grantor will have full recourse liability for repayment of the principal and interest of the Note and the performance of all covenants and agreements of Grantor in this Deed of Trust.

*E.21.* Grantor agrees to pay reasonable attorney's fees, trustee's fees, and court and other costs of enforcing Lender's rights under this deed of trust if an attorney is retained for its enforcement.

*E.22.* Grantor agrees to execute, acknowledge, and deliver to Lender any document requested by Lender, at Lender's request from time to time, to

(a) correct any defect, error, omission, or ambiguity in this deed of trust or in any other document executed in connection with the Note or this deed of trust;
(b) comply with Grantor's obligations under this deed of trust and other documents;
(c) subject to and perfect the liens and security interests of this deed of trust and other documents any property intended to be covered thereby; and
(d) protect, perfect, or preserve the liens and the security interests of this deed of trust and other documents against third persons or make any recordings, file any notices, or obtain any consents requested by Lender in connection therewith. Grantor agrees to pay all costs of the foregoing.

*E.23.* Lender, as a matter of right and without regard to the sufficiency of the security for repayment of the Note and performance and discharge of the Obligations, without notice to Grantor and without any showing of insolvency, fraud, or mismanagement on the part of Grantor, and without the necessity of filing any judicial or other proceeding other than the proceeding for appointment of a receiver, shall be entitled to the appointment of a receiver or receivers of the Property or any part thereof, and of the Rents, and Grantor hereby irrevocably consents to the appointment of a receiver or receivers. Any receiver appointed pursuant to the provisions of this subsection shall have the usual powers and duties of receivers in such matters.

*E.24* Grantor shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances on or in the Property. Grantor shall not do, nor allow anyone else to do, anything affecting the Property that is in violation of any Environmental Law. The first sentence of this Section shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to the repair and maintenance of the Property.

Grantor shall promptly give Lender written notice of any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Grantor has actual knowledge. If Grantor learns, or is notified by any governmental or regulatory authority, that any removal or other remediation of Hazardous Substance affecting the Property is necessary, Grantor shall promptly take all necessary remedial actions in accordance with Environmental Law.

As used in this paragraph, "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. As used in this paragraph, "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection.

*E.25.* If any provision of this deed of trust is determined to be invalid or unenforceable, the validity or enforceability of any other provision will not be affected.

*E.26.* The term Lender includes any mortgage servicer for Lender.

*E.27.* Grantor hereby grants Lenders a right of first refusal with respect to Grantor's power to authorize any third party (other than Lenders pursuant to its rights as set forth in this instrument)

to pay ad valorem taxes on the Property and authorize a taxing entity to transfer its tax lien on the Property to that third party. Grantor's authorization to any third party (other than Lenders) to pay the ad valorem taxes and receive transfer of a taxing entity's lien for ad valorem taxes shall be null and void and of no force and effect unless Lenders, within ten days after receiving written notice from Grantor, fail to pay the ad valorem taxes pursuant to Lenders' rights as set forth in this instrument.

*E.28.* Grantor warrants that the execution of this deed of trust shall not impair or affect any other security, which may be given to secure the payment of the Obligation secured hereby, and all such additional security shall be considered as cumulative. The taking of additional security, execution of releases and partial releases of the security (regardless of consideration for the release or partial release) or any extension of time of payment of the Obligation secured hereby shall not diminish the force, effect, or lien of this deed of trust and shall not affect or impair the liability of any maker, surety, or endorser for the payment of said Obligation.

*E.29.* In the event of any conflict between the provisions of this Deed of Trust and the Note, guaranty (if any) and any of the other documents executed in connection with this transaction, it is the intent of the parties hereto that the provisions of this Deed of Trust shall control. The parties hereto acknowledge that they were represented by competent counsel in connection with the negotiation, drafting and execution of the Deed of Trust, the Note, guaranty (if any) and any of the other documents executed in connection with this transaction and that such Deed of Trust, Note, guaranty (if any) and all of the other documents executed in connection with this transaction shall not be subject to the principle of construing their meaning against the party which drafted same.

*E.30.* **GRANTOR AFTER CONSULTATION WITH AN ATTORNEY OF ITS OWN SELECTION (WHICH COUNSEL WAS NOT DIRECTLY OR INDIRECTLY IDENTIFIED, SUGGESTED, OR SELECTED BY THE OTHER PARTY), VOLUNTARILY WAIVES A TRIAL BY JURY OF ANY ISSUE ARISING IN AN ACTION OR PROCEEDING BETWEEN THE PARTIES OR THEIR SUCCESSORS, UNDER OR CONNECTED WITH THIS CONTRACT OR ITS PROVISIONS. GRANTOR AND LENDER ACKNOWLEDGE TO EACH OTHER THAT GRANTOR AND LENDER ARE NOT IN SIGNIFICANTLY DISPARATE BARGAINING POSITIONS.**

*E.31* Additional Definitions used in this paragraph:

"Constituent Party": any (a) shareholder, member, general partner or managing member of Grantor, as applicable, or (b) any signatory to this Deed of Trust that signs on Grantor's behalf that is a corporation, general partnership, limited partnership, limited liability company, joint venture, trust, or other type of business organization, or(c) any Guarantor.

"Loan Documents": The Note, this Deed of Trust, the Guaranty, and any and all other documents now or hereafter executed by Grantor, Guarantor, or any other person or party in connection with the loan evidenced by the Note or in connection with the payment of the Obligation or the performance and discharge of the Obligations.

**GRANTOR SHALL INDEMNIFY, DEFEND, PROTECT AND HOLD HARMLESS**

**LENDER AND TRUSTEE, THEIR RESPECTIVE PARENTS, SUBSIDIARIES, DIRECTORS, OFFICERS, EMPLOYEES, REPRESENTATIVES, AGENTS, MEMBERS, SUCCESSORS, AND ASSIGNS FROM AND AGAINST ANY AND ALL LIABILITY, DAMAGE, LOSS, COST, OR EXPENSE (INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES AND EXPENSES), ACTION, PROCEEDING, CLAIM OR DISPUTE INCURRED OR SUFFERED BY THE FOREGOING PARTIES SO INDEMNIFIED WHETHER OR NOT AS THE RESULT OF THE NEGLIGENCE OF ANY PARTY SO INDEMNIFIED, WHETHER VOLUNTARILY OR INVOLUNTARILY INCURRED OR SUFFERED, IN RESPECT OF THE FOLLOWING:**

**(i) ANY LITIGATION CONCERNING THIS DEED OF TRUST, THE OTHER LOAN DOCUMENTS OR THE PROPERTY, OR ANY INTEREST OF GRANTOR OR LENDER THEREIN, OR THE RIGHT OF OCCUPANCY THEREOF BY GRANTOR OR LENDER, WHETHER OR NOT ANY SUCH LITIGATION IS PROSECUTED TO A FINAL, NON-APPEALABLE JUDGMENT;**

**(ii) ANY DISPUTE, INCLUDING DISPUTES AS TO THE DISBURSEMENT OF PROCEEDS OF THE NOTE NOT YET DISBURSED, AMONG OR BETWEEN ANY OF THE CONSTITUENT PARTIES OR OTHER PARTNERS OR VENTURERS OF GRANTOR IF GRANTOR IS A GENERAL OR LIMITED PARTNERSHIP, OR AMONG OR BETWEEN ANY EMPLOYEES, OFFICERS, DIRECTORS, SHAREHOLDERS, MEMBERS OR MANAGERS OF GRANTOR IF GRANTOR IS A CORPORATION OR LIMITED LIABILITY COMPANY, OR AMONG OR BETWEEN ANY MEMBERS, TRUSTEES OR OTHER RESPONSIBLE PARTIES IF GRANTOR IS AN ASSOCIATION, TRUST OR OTHER ENTITY;**

**(iii) ANY ACTION TAKEN OR NOT TAKEN BY LENDER OR TRUSTEE WHICH IS ALLOWED OR PERMITTED UNDER THIS DEED OF TRUST OR ANY OF THE OTHER LOAN DOCUMENTS RELATING TO GRANTOR, THE PROPERTY, ANY CONSTITUENT PARTIES OR OTHERWISE IN CONNECTION WITH THE LOAN DOCUMENTS, INCLUDING WITHOUT LIMITATION, THE PROTECTION OR ENFORCEMENT OF ANY LIEN, SECURITY INTEREST OR OTHER RIGHT, REMEDY OR RECOURSE CREATED OR AFFORDED BY THIS DEED OF TRUST OR THE OTHER LOAN DOCUMENTS;**

**(iv) ANY ACTION BROUGHT BY LENDER OR TRUSTEE AGAINST GRANTOR UNDER THIS DEED OF TRUST OR THE OTHER LOAN DOCUMENTS, WHETHER OR NOT SUCH ACTION IS PROSECUTED TO A FINAL, NON-APPEALABLE JUDGMENT;**

**(v) ALL CLAIMS, CAUSES OF ACTION, LEGAL PROCEEDINGS, LIABILITY, OR DISPUTES ARISING OUT OF OR IN ANY WAY RELATED TO THE PROPERTY AND ITS IMPROVEMENTS;**

**(vi) ALL CLAIMS, CAUSES OF ACTION, LEGAL PROCEEDINGS, LIABILITY,**

OR DISPUTES ARISING OUT OF OR IN ANY WAY RELATED TO THE SALE AND PURCHASE OF THE PROPERTY AS WELL AS ANY AGREEMENTS RELATED THERETO AS WELL AS ANY SUBSEQUENT RESALE AND/OR TRANSFER OF THE PROPERTY BY GRANTOR; AND

(vii) ANY AND ALL LOSS, DAMAGE, COSTS, EXPENSE, ACTION, CAUSES OF ACTION, OR LIABILITY (INCLUDING ATTORNEYS' FEES AND COSTS) DIRECTLY OR INDIRECTLY ARISING FROM OR ATTRIBUTABLE TO THE USE, GENERATION, MANUFACTURE, PRODUCTION, STORAGE, RELEASE, THREATENED RELEASE, DISCHARGE, DISPOSAL, OR PRESENCE OF A HAZARDOUS SUBSTANCE ON, IN, UNDER OR ABOUT THE PROPERTY, WHETHER KNOWN OR UNKNOWN AT THE TIME OF THE EXECUTION HEREOF, INCLUDING WITHOUT LIMITATION (A) ALL FORESEEABLE CONSEQUENTIAL DAMAGES OF ANY SUCH USE, GENERATION, MANUFACTURE, PRODUCTION, STORAGE, RELEASE, THREATENED RELEASE, DISCHARGE, DISPOSAL, OR PRESENCE, AND (B) THE COSTS OF ANY REQUIRED OR NECESSARY ENVIRONMENTAL INVESTIGATION OR MONITORING, ANY REPAIR, CLEANUP, 13 OR DETOXIFICATION OF THE PROPERTY, AND THE PREPARATION AND IMPLEMENTATION OF ANY CLOSURE, REMEDIAL, OR OTHER REQUIRED PLANS.

LENDER AND/OR TRUSTEE MAY EMPLOY AN ATTORNEY OR ATTORNEYS TO PROTEST OR ENFORCE ITS RIGHTS, REMEDIES AND RECOURSES UNDER THIS DEED OF TRUST AND THE OTHER LOAN DOCUMENTS, AND TO ADVISE AND DEFEND LENDER AND/OR TRUSTEE WITH RESPECT TO ANY SUCH ACTIONS AND OTHER MATTERS. GRANTOR SHALL REIMBURSE LENDER AND/OR TRUSTEE FOR THEIR RESPECTIVE ATTORNEYS' FEES AND EXPENSES (INCLUDING EXPENSES AND COSTS FOR EXPERTS) IMMEDIATELY UPON RECEIPT OF A WRITTEN DEMAND THEREFOR, WHETHER ON A MONTHLY OR OTHER TIME INTERVAL, AND WHETHER OR NOT AN ACTION IS ACTUALLY COMMENCED OR CONCLUDED. ALL OTHER REIMBURSEMENT AND INDEMNITY OBLIGATIONS HEREUNDER SHALL BECOME DUE AND PAYABLE WHEN ACTUALLY INCURRED BY LENDER AND/OR TRUSTEE. ANY PAYMENTS NOT MADE WITHIN FIVE (5) DAYS AFTER WRITTEN DEMAND THEREFOR SHALL BEAR INTEREST AT THE ANNUAL INTEREST RATE ON MATURED, UNPAID AMOUNTS FROM THE DATE OF SUCH DEMAND UNTIL FULLY PAID. THE PROVISIONS OF THIS SECTION E.31 SHALL SURVIVE REPAYMENT OF THE NOTE AND PERFORMANCE OF THE OBLIGATIONS, THE RELEASE OF THE LIEN OF THIS DEED OF TRUST, ANY FORECLOSURE (OR ACTION IN LIEU OF FORECLOSURE), THE TRANSFER BY GRANTOR OF ANY OR ALL OF ITS RIGHT, TITLE AND INTEREST IN OR TO THE PROPERTY AND THE EXERCISE BY LENDER OF ANY AND ALL REMEDIES SET FORTH HEREIN OR IN THE LOAN DOCUMENTS.

*E.32.* GRANTOR WAIVES ITS RIGHTS UNDER THE TEXAS DECEPTIVE TRADE PRACTICES–CONSUMER PROTECTION ACT, SECTION 17.41 ET SEQ. OF THE TEXAS BUSINESS AND COMMERCE CODE, A LAW THAT GIVES CONSUMERS

**SPECIAL RIGHTS AND PROTECTIONS. AFTER CONSULTATION WITH AN ATTORNEY OF ITS OWN SELECTION, GRANTOR VOLUNTARILY CONSENTS TO THIS WAIVER.**

**NOTICE**

**THE WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.**

**THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

**NOTICE OF INDEMNIFICATION: GRANTOR HEREBY ACKNOWLEDGES AND AGREES THAT THIS DEED OF TRUST CONTAINS CERTAIN INDEMNIFICATION PROVISIONS (INCLUDING, WITHOUT LIMITATION, THOSE CONTAINED IN SECTION E.31 HEREOF) WHICH, IN CERTAIN CIRCUMSTANCES, COULD INCLUDE AN INDEMNIFICATION BY GRANTOR OF LENDER FROM CLAIMS OR LOSSES ARISING AS A RESULT OF LENDER'S OWN NEGLIGENCE.**

**WALL009, LLC, a Texas limited liability company.**

**BY: ITS MANAGERS:**

TRWF LODGE, LLC, a Texas limited liability company.

____________________________
Tim Barton
Its Managing Member

**and**

CARNEGIE DEVELOPMENT, LLC, a Delaware limited liability company.

____________________________
Tim Barton
Its Managing Member

**STATE OF TEXAS** §
§
**COUNTY OF DALLAS** §

Before me, the undersigned notary public, on this day personally appeared Tim Barton, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same as the Manager and authorized agent for TRWF LODGE, LLC and CARNEGIE DEVELOPMENT, LLC, for the purposes and consideration therein expressed.

Given under my hand and seal of office this 11 day of September 2019.

Notary Public, State of Texas

NOTARY PUBLIC STATE OF TEXAS
Bella D Khusal
My Commission Expires
09/24/2022
ID No. 131734480

**EXHIBIT "A"**

**TRACT I**

**BEING a 27.262 acre tract of land situated in the John Haigler Survey, Abstract No. 358 and the Absalom Williams Survey, Abstract No. 857, City of Venus, Johnson County, Texas and being a part of that certain called 101.49 acre tract of land described in Special Warranty Deed from Lynco Ventures, LLC to Wall009, LLC and recorded by Document No. 2017-16584 of the Deed Records of Johnson County, Texas, said 27.262 acres of land to be more particularly described by metes and bounds as follows:**

**BEGINNING at a 1/2" capped iron rod found for corner in the southeast line of said 101.49 acre tract of land, same being the northwest line of County Road 501 (60 foot Right-of-Way) and being at the east corner of Venus Ridge Phase IV Addition, an addition to the City of Venus, Johnson County, Texas, according to the Plat thereof recorded in Volume 11, Page 544 of the Plat Records of Johnson County, Texas;**

**THENCE North 30° 13' 50" West with the northeast line of said Addition, a distance of 1,128.01 feet to a 1/2' capped iron rod marked "SANDS" set for corner;**

**THENCE North 59° 46' 10" East across said 101.49 acre tract a distance of 110.00 feet to a 1/2" capped iron rod marked "SANDS" set for corner;**

**THENCE North 30° 13' 50" West, a distance of 5.00 feet to a 1/2" capped iron rod marked "SANDS" set for corner;**

**THENCE North 59° 46' 10" East, a distance of 50.00 feet to a 1/2" capped iron rod marked "SANDS" set for corner;**

**THENCE North 30° 13' 50" West, a distance of 26.19 feet to a 1/2" capped iron rod marked "SANDS" set for corner;**

**THENCE North 59° 46' 10" East, at a distance of 858.80 feet to a 1/2" capped iron rod marked "SANDS" set for corner in the northeast line of said 101.49 acre tract, same being the northeast line of the above referenced John Haigler Survey and being in the southwest line of the above referenced 126.2407 acre tract, same being the southwest line of the above referenced Absalom Williams Survey;**

**THENCE South 30° 13' 50" East with said northeast and southwest lines, a distance of 1,181.38 feet to a 1/2" capped iron rod marked "FORT WORTH SURVEYING" set for corner in the northwest line of the above referenced County Road 501 at the east corner of said 101.49 acre tract;**

**THENCE South 60° 01' 00" West continuing with said County Road and the southeast line of said 101.49 acre tract, a distance of 1,019.04 feet back to the Point of beginning and containing 1,187,549 square feet, or 27.262 acres of land, more or less.**

**TRACT II:**

**BEING a 36.502 acre tract of land situated in the John Haigler Survey, Abstract No. 358 and the Absalom Williams Survey, Abstract No. 857, City of Venus, Johnson County, Texas and being a part of that certain 101.49 acre tract of land described in Special Warranty Deed from Lynco Ventures, LLC to Wall009, LLC and recorded by Document No. 2017-16584 of the Deed Records of Johnson County, Texas, said 27.262 acres of land to me more particularly described by metes and bounds as follows:**

**COMMENCING at a 1/2" capped iron rod found for corner in the southeast line of said 101.49 acre tract of land, same being the northwest line of County Road 501 (60 foot Right-of-Way) and being at the east corner of Venus Ridge Phase IV Addition, an addition to the City of Venus, Johnson County, Texas, according to the plat thereof recorded in Volume 11, Page 544 of the Plat Records of Johnson County, Texas;**

**THENCE North 30° 13' 50" West with the northeast line of said Venus Ridge, Phase IV and southwest line of said 101.19 acre tract, a distance of 1,128.01 feet to a 1/2" capped iron rod set for corner at the Point of Beginning;**

**THENCE continuing with said northeast and southwest lines the following:**

**North 30° 13' 50" West, a distance of 1,063.25 feet to a 1/2" capped iron rod found for corner;**

**North 00° 26' 19" West, a distance of 112.41 feet to a 1/2" capped iron rod found for corner;**

**South 89° 33' 41" West, a distance of 33.74 feet to a 1/2" capped iron rod found for corner at the beginning of a curve to the left;**

**THENCE continuing with said northeast and southwest lines in a Southwesterly direction with said curve to the left having a radius of 270.00 feet, a chord that bears South 74° 39' 55" West, a distance of 138.81 feet for an arc length of 140.39 feet to a 1/2" capped iron rod found for corner;**

**THENCE North 30° 13' 50" West, a distance of 242.77 feet to a 1/2" capped iron rod found for corner;**

**THENCE South 89° 33' 41" West, a distance of 183.97 feet to a 1/2" capped iron rod found for corner in the northwest line of said 101.49 acre tract, the northwest line of said Haigler Survey, same being the southeast line of that certain called 144.38 acre tract of land described in Deed from Wayne Hood and Eleanor Hood and recorded in Volume 2616, Page 156 of said Deed Records, same being the southeast line of the B.B.B. & C. R.R Survey, Abstract No. 92;**

**THENCE North 59° 45' 40" East with said southeast and northwest lines a distance of 1,286.03 feet to a capped iron rod found for corner at the north corner of said 101.49 acre tract of land, same being the north corner of said Haigler Survey, the east corner of said B.B.B. & C. R.R. Survey, and bing in the southwest line of that certain called 62.7 acre**

**tract of land described in Deed to Fielder Farm Partnership, et al and recorded in Volume 4302, Page 538 of said Deed Records, same being the southwest line of the Absolam Williams Survey, Abstract No. 857;**

**THENCE South 30° 13' 50" East with the northeast line of said 101.49 acre tract, same being the northeast line of said Haigler Survey and the southwest line of said 62.7 acre tract, same being the southwest line of said Williams Survey, at a distance of 11,219.39 feet passing a 1/2" capped iron rod found for corner at the south corner of said 62.7 acre tract, same being the west corner of that certain called 128.8645 acre tract of land described in Deed from Anastasia Energy, LLC to DJD Land Partners, LLC and recorded in County Clerk's File No. 2018-18134 of said Deed Records and continuing a total distance of 1,516.42 feet 1/2" capped iron rod found for corner;**

**THENCE across said 101.49 acre tract the following:**

**South 59° 46' 10" West, a distance of 858.80 feet to a 1/2" capped iron rod set for corner;**

**South 30° 13' 50" East, a distance of 26.19 feet to a 1/2" capped iron rod set for corner;**

**South 59° 46' 10" West, a distance of 50.00 feet to a 1/2" capped iron rod set for corner;**

**South 30° 13' 50" East, a distance of 5.00 feet to a 1/2" capped iron rod set for corner;**

**THENCE South 59° 46' 10" West, a distance of 110.00 feet back to the Point of Beginning and containing 1,590,029 square feet or 36.502 acres of land, more or less.**

# Guaranty

## Basic Information

Date: September 11, 2019.

Guarantor: Tim Barton.

Guarantor's Mailing Address: 1755 Wittington Place, Suite 340, Dallas, TX 75234

Borrower: WALL009, LLC, a Texas limited liability company.

Borrower's Mailing Address: 1755 Wittington Place, Suite 340, Dallas, TX 75234

Lender: Southern Star Capital, LLC d/b/a Reliance Mortgage Company

Lender's Mailing Address: 5220 Spring Valley Road, Suite 602, Dallas, Texas 75254.

Guaranteed Indebtedness: The debt evidenced by the note dated September 11, 2019, in the original principal amount of $900,000.00, executed by Borrower and payable to the order of Lender, the obligations under the deed of trust executed in connection with the note and any other document executed by Borrower evidencing or securing the note (collectively, the "Loan Documents"), plus all interest, penalties, expenses, attorney's fees, and other collection costs as provided in the Loan Documents.

## Clauses and Covenants

1. Guarantor agrees to pay, when due or declared due, the Guaranteed Indebtedness to Lender at Lender's Mailing Address.

2. Guarantor waives (a) diligence in preserving liability of any person on the Guaranteed Indebtedness and in collecting or bringing suit to collect the Guaranteed Indebtedness; (b) all rights of Guarantor under chapter 43 of the Texas Civil Practice and Remedies Code, section 17.001 of the Texas Civil Practice and Remedies Code, [and] rule 31 of the Texas Rules of Civil Procedure, and sections 51.003, 51.004, and 51.005 of the Texas Property Code]; (c) protest; (d) notice of extensions, increases, renewals, or rearrangements of the Guaranteed Indebtedness; and (e) notice of acceptance of this guaranty, of creation of the Guaranteed Indebtedness, of failure to pay the Guaranteed Indebtedness as it matures, of any other default, of adverse change in Borrower's financial condition, of release or substitution of collateral, of intent to accelerate, of acceleration, and of subordination of Lender's rights in any collateral, and every other notice of every kind. Guarantor's obligations under this guaranty will not be altered nor will Lender be liable to Guarantor because of any action or inaction of Lender in regard to a matter waived or of which notice is waived by Guarantor in the preceding sentence.

3. Guarantor agrees to pay reasonable attorney's fees and other collection costs if an attorney is retained to enforce this guaranty for collection.

4. This guaranty is an absolute, irrevocable, unconditional, and continuing guaranty of payment and performance and not of collection.

5. Lender need not resort to Borrower or any other person or proceed against collateral before pursuing its rights against Guarantor or any other guarantor. Lender's action or inaction with respect to any right of Lender under the law or any agreement will not alter the obligation of Guarantor hereunder. Lender may pursue any remedy against Borrower or any collateral or under any other guaranty without altering the obligations of Guarantor hereunder and without liability to Guarantor, even though Lender's pursuit of such remedy may result in Guarantor's loss of rights of subrogation or to proceed against others for reimbursement of contribution or any other right.

6. Guarantor will remain liable for the Guaranteed Indebtedness even though the Guaranteed Indebtedness may be unenforceable against or uncollectible from Borrower or any other person because of incapacity, lack of power or authority, discharge, or any other reason.

7. Guarantor consents and acknowledges that Guarantor's obligations will not be released by (a) the renewal, extension, or modification of the Guaranteed Indebtedness or any of the Loan Documents; (b) the insolvency, bankruptcy, liquidation, or dissolution of Borrower or any other obligor; (c) the failure of Lender to properly obtain, perfect, or preserve any security interest or lien in any collateral for the Guaranteed Indebtedness; (d) the release, substitution, or addition of any collateral for the Guaranteed Indebtedness; or (e) the failure of Lender to exercise diligence, commercial reasonableness, or reasonable care in the preservation, enforcement, or sale of any of the collateral.

8. Lender need not notify Guarantor that Lender has sued Borrower, but if Lender gives written notice to Guarantor that it has sued Borrower, Guarantor will be bound by any judgment or decree, to the extent permitted by law.

9. Lender may sue any guarantor without impairing Lender's rights against any other guarantor, with or without making Borrower a party. Lender may settle with Borrower or any other guarantor for such amounts as it may elect or may release Borrower or any guarantor or any collateral securing the Guaranteed Indebtedness without impairing Lender's right to collect the Guaranteed Indebtedness from Guarantor.

10. This guaranty binds Guarantor and Guarantor's heirs, successors, and assigns, and it benefits and may be enforced by Lender and Lender's successors in interest. When the context requires, singular nouns and pronouns include the plural. This guaranty will be construed under the laws of the state of Texas, without regard to choice-of-law rules of any jurisdiction. The provisions of this guaranty are severable. If a court of competent jurisdiction finds that any provision of this guaranty is unenforceable, then the remaining provisions will remain in effect without the unenforceable parts.

11. From time to time, at the request of Lender, Guarantor will (i) promptly correct any defect, error or omission which may be discovered in the contents of this Guaranty or in any other Loan Document executed by Guarantor or in the execution or acknowledgment thereof; (ii) execute, acknowledge, deliver and record or file (or cause to be executed, acknowledged, delivered and recorded or filed) such further documents and instruments and perform such further acts and

provide such further assurances as may be necessary, desirable, or proper, in Lender's opinion, (A) to carry out more effectively the purposes of this Guaranty and the other Loan Documents and the transactions contemplated hereunder and thereunder, (B) to confirm the rights created under this Guaranty and the other Loan Documents, (C) to protect and further the validity, priority and enforceability of this Guaranty and the other Loan Documents and the liens and security interests created thereby, and (D) to subject to the Loan Documents any property of Guarantor intended by the terms of any one or more of the Loan Documents to be encumbered by the Loan Documents; and (iii) pay all costs in connection with any of the foregoing.

12. FINAL AGREEMENT: THIS WRITTEN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

Tim Barton

# The Law Office of Robert W. Buchholz, P.C.

Attorney and Counselor at Law

**Robert W. Buchholz**
**Member:**
**State Bar of Texas**
**Board Certified Civil Trial Law**
**Texas Board of Legal Specialization**
**State Bar of Oklahoma**
**State Bar of Arkansas**
**National Board of Trial Advocacy**
**Civil Trial Law**
**National Board of Civil Pretrial Practice**
**Civil Pretrial Practice Advocate**


April 13, 2020

Via Regular Mail and Certified Mail to the following:

Mr. Tim Barton
WALL009, LLC
1755 Wittington Place, Suite 340
Dallas, Texas 75234.

Mr. Tim Barton
WALL009, LLC
9911 Champa Drive
Dallas, Texas 75218

Re: Notice of foreclosure sale to be conducted on May 5, 2020 by Robert W. Buchholz Trustee of property described in deed of trust dated September 11, 2019, executed by WALL009, LLC, and recorded at Clerks File No. 2019-24729, in the real property records of Johnson County, Texas, securing the obligations therein described (the "Indebtedness").

Dear Mr. Barton:

This letter and the enclosed copy of the Notice of Foreclosure/Trustees Sale are being sent to you as an obligor on the Indebtedness evidenced by the promissory note dated September 11, 2019 in the original principal amount of $900,000.00, executed by WALL009, LLC and payable to the order of Southern Star Capital, LLC d/b/a Reliance Mortgage Company as described in the enclosed notice. Default has occurred under the terms of the Deed of Trust.

Robert W. Buchholz has been named in the Deed of Trust to conduct the foreclosure sale of the property encumbered by the deed of trust.

I am enclosing a copy of the Notice of Trustee's Sale, which is being posted on the public notice board of the Johnson County Courthouse and in accordance with the provisions of the deed of trust. You are informed that the public auction of the property described in the Notice of Foreclosure Sale is scheduled for Tuesday, May 5, 2020, between the hours of 10:00 a.m. and 4:00 p.m. at the Johnson County, Texas, Courthouse. The sale will begin no earlier than 11:00 a.m. or no later than three hours thereafter. The sale will be held at the location described in the Notice of Foreclosure/Trustees Sale.

As of this date the principal amount of $900,000.00 is due on the note together with all unpaid accrued interest thereon and all fees and expenses as allowed by the deed of trust. Interest will continue to accrue on the matured unpaid principal in accordance with the terms of the Indebtedness until this debt is paid. Additionally, the note evidencing the Indebtedness and deed of trust provide for reimbursement to the Noteholder of its reasonable attorney's fees and expenses incurred in collecting this debt. **You may contact me at 420 S. Cesar Chavez Blvd., Suite 300, Dallas, Dallas County, Texas 75201, 214-754-5500 phone, to obtain a complete statement of the balance owed on your debt to the Noteholder and to arrange payment of this debt.**

Demand is hereby made that you pay the Noteholder the Indebtedness now owed that is secured by the deed of trust.

In accordance with the terms of the Deed of Trust you have waived to the extent permitted by law, all (a) demand for payment, (b) presentation for payment, (c) notice of intention to accelerate maturity, (d) notice of acceleration of maturity, (e) protest, (f) notice of protest and (g) rights under sections 51.003, 51.004, and 51.005 of the Texas Property Code.

You will be able to prevent this foreclosure by paying the Noteholder before the foreclosure sale the total amount now owed that is secured by the referenced deed of trust, plus the additional interest that accrues to the date of payment and all attorney's fees and costs incurred by the Noteholder in collecting this Indebtedness. Payment must be made in cash or by cashier's check received by Noteholder or by me before conducting the foreclosure sale. Partial payments will be applied on the Indebtedness but will not prevent the foreclosure sale. If you mail payment and it is received after the sale, it will have been sent too late. To the extent permitted under the terms of the note and applicable law, the obligors on the note will be liable for any deficiency remaining after application of the net foreclosure sale proceeds to the Indebtedness. **You may contact the undersigned about the balance owed on the Indebtedness.**

You are notified that the undersigned is attempting to collect this debt and any information obtained from you will be used for such purpose.

**If you have any questions, please contact me.**

**Assert and protect your rights as a member of the armed forces of the United States. If you are or your spouse is serving on active military duty, including active military duty as a member of the Texas National Guard or the National Guard of another state or as a member of a reserve component of the armed forces of the United States, please send written notice of the active duty military service to the sender of this notice immediately.**

Sincerely yours,

Robert W. Buchholz
420 S. Cesar Chavez Blvd., Suite 300
Dallas, Texas 75201
214-754-5500
214-754-9100 fax
bob@attorneybob.com

**A DESCRIPTION OF THE PROPERTY SUBJECT TO THE FORECLOSURE SALE IS ATTACHED HERETO.**

**EXHIBIT "A"**

**TRACT I**

**BEING a 27.262 acre tract of land situated in the John Haigler Survey, Abstract No. 358 and the Absalom Williams Survey, Abstract No. 857, City of Venus, Johnson County, Texas and being a part of that certain called 101.49 acre tract of land described in Special Warranty Deed from Lynco Ventures, LLC to Wall009, LLC and recorded by Document No. 2017-16584 of the Deed Records of Johnson County, Texas, said 27.262 acres of land to be more particularly described by metes and bounds as follows:**

**BEGINNING at a 1/2" capped iron rod found for corner in the southeast line of said 101.49 acre tract of land, same being the northwest line of County Road 501 (60 foot Right-of-Way) and being at the east corner of Venus Ridge Phase IV Addition, an addition to the City of Venus, Johnson County, Texas, according to the Plat thereof recorded in Volume 11, Page 544 of the Plat Records of Johnson County, Texas;**

**THENCE North 30° 13' 50" West with the northeast line of said Addition, a distance of 1,128.01 feet to a 1/2' capped iron rod marked "SANDS" set for corner;**

**THENCE North 59° 46' 10" East across said 101.49 acre tract a distance of 110.00 feet to a 1/2" capped iron rod marked "SANDS" set for corner;**

**THENCE North 30° 13' 50" West, a distance of 5.00 feet to a 1/2" capped iron rod marked "SANDS" set for corner;**

**THENCE North 59° 46' 10" East, a distance of 50.00 feet to a 1/2" capped iron rod marked "SANDS" set for corner;**

**THENCE North 30° 13' 50" West, a distance of 26.19 feet to a 1/2" capped iron rod marked "SANDS" set for corner;**

**THENCE North 59° 46' 10" East, at a distance of 858.80 feet to a 1/2" capped iron rod marked "SANDS" set for corner in the northeast line of said 101.49 acre tract, same being the northeast line of the above referenced John Haigler Survey and being in the southwest line of the above referenced 126.2407 acre tract, same being the southwest line of the above referenced Absalom Williams Survey;**

**THENCE South 30° 13' 50" East with said northeast and southwest lines, a distance of 1,181.38 feet to a 1/2" capped iron rod marked "FORT WORTH SURVEYING" set for corner in the northwest line of the above referenced County Road 501 at the east corner of said 101.49 acre tract;**

**THENCE South 60° 01' 00" West continuing with said County Road and the southeast line of said 101.49 acre tract, a distance of 1,019.04 feet back to the Point of beginning and containing 1,187,549 square feet, or 27.262 acres of land, more or less.**

**TRACT II:**

**BEING a 36.502 acre tract of land situated in the John Haigler Survey, Abstract No. 358 and the Absalom Williams Survey, Abstract No. 857, City of Venus, Johnson County, Texas and being a part of that certain 101.49 acre tract of land described in Special Warranty Deed from Lynco Ventures, LLC to Wall009, LLC and recorded by Document No. 2017-16584 of the Deed Records of Johnson County, Texas, said 27.262 acres of land to me more particularly described by metes and bounds as follows:**

**COMMENCING at a 1/2" capped iron rod found for corner in the southeast line of said 101.49 acre tract of land, same being the northwest line of County Road 501 (60 foot Right-of-Way) and being at the east corner of Venus Ridge Phase IV Addition, an addition to the City of Venus, Johnson County, Texas, according to the plat thereof recorded in Volume 11, Page 544 of the Plat Records of Johnson County, Texas;**

**THENCE North 30° 13' 50" West with the northeast line of said Venus Ridge, Phase IV and southwest line of said 101.19 acre tract, a distance of 1,128.01 feet to a 1/2" capped iron rod set for corner at the Point of Beginning;**

**THENCE continuing with said northeast and southwest lines the following:**

**North 30° 13' 50" West, a distance of 1,063.25 feet to a 1/2" capped iron rod found for corner;**

**North 00° 26' 19" West, a distance of 112.41 feet to a 1/2" capped iron rod found for corner;**

**South 89° 33' 41" West, a distance of 33.74 feet to a 1/2" capped iron rod found for corner at the beginning of a curve to the left;**

**THENCE continuing with said northeast and southwest lines in a Southwesterly direction with said curve to the left having a radius of 270.00 feet, a chord that bears South 74° 39' 55" West, a distance of 138.81 feet for an arc length of 140.39 feet to a 1/2" capped iron rod found for corner;**

**THENCE North 30° 13' 50" West, a distance of 242.77 feet to a 1/2" capped iron rod found for corner;**

**THENCE South 89° 33' 41" West, a distance of 183.97 feet to a 1/2" capped iron rod found for corner in the northwest line of said 101.49 acre tract, the northwest line of said Haigler Survey, same being the southeast line of that certain called 144.38 acre tract of land described in Deed from Wayne Hood and Eleanor Hood and recorded in Volume 2616, Page 156 of said Deed Records, same being the southeast line of the B.B.B. & C. R.R Survey, Abstract No. 92;**

**THENCE North 59° 45' 40" East with said southeast and northwest lines a distance of 1,286.03 feet to a capped iron rod found for corner at the north corner of said 101.49 acre tract of land, same being the north corner of said Haigler Survey, the east corner of said B.B.B. & C. R.R. Survey, and bing in the southwest line of that certain called 62.7 acre**

**tract of land described in Deed to Fielder Farm Partnership, et al and recorded in Volume 4302, Page 538 of said Deed Records, same being the southwest line of the Absolam Williams Survey, Abstract No. 857;**

**THENCE South 30° 13' 50" East with the northeast line of said 101.49 acre tract, same being the northeast line of said Haigler Survey and the southwest line of said 62.7 acre tract, same being the southwest line of said Williams Survey, at a distance of 11,219.39 feet passing a 1/2" capped iron rod found for corner at the south corner of said 62.7 acre tract, same being the west corner of that certain called 128.8645 acre tract of land described in Deed from Anastasia Energy, LLC to DJD Land Partners, LLC and recorded in County Clerk's File No. 2018-18134 of said Deed Records and continuing a total distance of 1,516.42 feet 1/2" capped iron rod found for corner;**

**THENCE across said 101.49 acre tract the following:**

**South 59° 46' 10" West, a distance of 858.80 feet to a 1/2" capped iron rod set for corner;**

**South 30° 13' 50" East, a distance of 26.19 feet to a 1/2" capped iron rod set for corner;**

**South 59° 46' 10" West, a distance of 50.00 feet to a 1/2" capped iron rod set for corner;**

**South 30° 13' 50" East, a distance of 5.00 feet to a 1/2" capped iron rod set for corner;**

**THENCE South 59° 46' 10" West, a distance of 110.00 feet back to the Point of Beginning and containing 1,590,029 square feet or 36.502 acres of land, more or less.**

**Notice of Foreclosure/Trustee's Sale**

POSTED
837 A.M. ______ P.M.
APR 14 2020
Becky Ivey
County Clerk, Johnson County Texas
BY ____ DEPUTY

**Date:** April 13, 2020.

**Trustee:** Robert W. Buchholz:

**Trustee's Address:**

420 S. Cesar Chavez Blvd., Suite 300
Dallas, Texas 75201
214-754-5500
214-754-9100 fax
bob@attorneybob.com

**Mortgagee:** Southern Star Capital, LLC d/b/a Reliance Mortgage Company.

**Note:** Note dated September 11, 2019 in the principal amount of $900,000.00 payable to Southern Star Capital, LLC d/b/a Reliance Mortgage Company.

**Deed of Trust**

Date: September 11, 2019.

Grantor: WALL009, LLC, a Texas limited liability company

Mortgagee: Southern Star Capital, LLC, d/b/a Reliance Mortgage Company.

Recording information: File No. 2019-24729 of the Deed Records of Johnson County, Texas.

**Property:** **SEE ATTACHED EXHIBIT "A" WHICH IS INCORPORATED HEREIN BY REFERENCE.**

**County:** Johnson County, Texas.

**Date of Sale (first Tuesday of month):** May 5, 2020.

**Time of Sale:** 11:00 a.m. or within three hours thereafter.

**Place of Sale:** Outside the west doors of the Johnson County Historic Courthouse at 2 N. Main Street in Cleburne Texas (exterior steps to the main floor facing Main Street) or, if the preceding area is no longer the designated area, the area most recently designated by the County Commissioner's Court.

Robert W. Buchholz is the Trustee under the Deed of Trust/Mortgage. Mortgagee has instructed Trustee to offer the Property for sale towards the satisfaction of the Note.

Notice is given that on the Date of Sale, Trustee will offer the Property for sale at public auction at the Place of Sale, to the highest bidder for cash, "AS IS." THERE WILL BE NO WARRANTY RELATING TO TITLE, POSSESSION, QUIET ENJOYMENT, OR THE LIKE FOR THE PERSONAL PROPERTY IN THIS DISPOSITION. The sale will begin at the Time of Sale or not later than three hours thereafter.

Robert W Buchholz
420 S. Cesar Chavez Blvd., Suite 300
Dallas, Texas 75201
214-754-5500
214-754-9100 fax
bob@attorneybob.com

Doc-24729

**EXHIBIT "A"**

**TRACT I**

**BEING a 27.262 acre tract of land situated in the John Haigler Survey, Abstract No. 358 and the Absalom Williams Survey, Abstract No. 857, City of Venus, Johnson County, Texas and being a part of that certain called 101.49 acre tract of land described in Special Warranty Deed from Lynco Ventures, LLC to Wall009, LLC and recorded by Document No. 2017-16584 of the Deed Records of Johnson County, Texas, said 27.262 acres of land to be more particularly described by metes and bounds as follows:**

**BEGINNING at a 1/2" capped iron rod found for corner in the southeast line of said 101.49 acre tract of land, same being the northwest line of County Road 501 (60 foot Right-of-Way) and being at the east corner of Venus Ridge Phase IV Addition, an addition to the City of Venus, Johnson County, Texas, according to the Plat thereof recorded in Volume 11, Page 544 of the Plat Records of Johnson County, Texas;**

**THENCE North 30° 13' 50" West with the northeast line of said Addition, a distance of 1,128.01 feet to a 1/2' capped iron rod marked "SANDS" set for corner;**

**THENCE North 59° 46' 10" East across said 101.49 acre tract a distance of 110.00 feet to a 1/2" capped iron rod marked "SANDS" set for corner;**

**THENCE North 30° 13' 50" West, a distance of 5.00 feet to a 1/2" capped iron rod marked "SANDS" set for corner;**

**THENCE North 59° 46' 10" East, a distance of 50.00 feet to a 1/2" capped iron rod marked "SANDS" set for corner;**

**THENCE North 30° 13' 50" West, a distance of 26.19 feet to a 1/2" capped iron rod marked "SANDS" set for corner;**

**THENCE North 59° 46' 10" East, at a distance of 858.80 feet to a 1/2" capped iron rod marked "SANDS" set for corner in the northeast line of said 101.49 acre tract, same being the northeast line of the above referenced John Haigler Survey and being in the southwest line of the above referenced 126.2407 acre tract, same being the southwest line of the above referenced Absalom Williams Survey;**

**THENCE South 30° 13' 50" East with said northeast and southwest lines, a distance of 1,181.38 feet to a 1/2" capped iron rod marked "FORT WORTH SURVEYING" set for corner in the northwest line of the above referenced County Road 501 at the east corner of said 101.49 acre tract;**

**THENCE South 60° 01' 00" West continuing with said County Road and the southeast line of said 101.49 acre tract, a distance of 1,019.04 feet back to the Point of beginning and containing 1,187,549 square feet, or 27.262 acres of land, more or less.**

**TRACT II:**

**BEING a 36.502 acre tract of land situated in the John Haigler Survey, Abstract No. 358 and the Absalom Williams Survey, Abstract No. 857, City of Venus, Johnson County, Texas and being a part of that certain 101.49 acre tract of land described in Special Warranty Deed from Lynco Ventures, LLC to Wall009, LLC and recorded by Document No. 2017-16584 of the Deed Records of Johnson County, Texas, said 27.262 acres of land to me more particularly described by metes and bounds as follows:**

**COMMENCING at a 1/2" capped iron rod found for corner in the southeast line of said 101.49 acre tract of land, same being the northwest line of County Road 501 (60 foot Right-of-Way) and being at the east corner of Venus Ridge Phase IV Addition, an addition to the City of Venus, Johnson County, Texas, according to the plat thereof recorded in Volume 11, Page 544 of the Plat Records of Johnson County, Texas;**

**THENCE North 30° 13' 50" West with the northeast line of said Venus Ridge, Phase IV and southwest line of said 101.19 acre tract, a distance of 1,128.01 feet to a 1/2" capped iron rod set for corner at the Point of Beginning;**

**THENCE continuing with said northeast and southwest lines the following:**

**North 30° 13' 50" West, a distance of 1,063.25 feet to a 1/2" capped iron rod found for corner;**

**North 00° 26' 19" West, a distance of 112.41 feet to a 1/2" capped iron rod found for corner;**

**South 89° 33' 41" West, a distance of 33.74 feet to a 1/2" capped iron rod found for corner at the beginning of a curve to the left;**

**THENCE continuing with said northeast and southwest lines in a Southwesterly direction with said curve to the left having a radius of 270.00 feet, a chord that bears South 74° 39' 55" West, a distance of 138.81 feet for an arc length of 140.39 feet to a 1/2" capped iron rod found for corner;**

**THENCE North 30° 13' 50" West, a distance of 242.77 feet to a 1/2" capped iron rod found for corner;**

**THENCE South 89° 33' 41" West, a distance of 183.97 feet to a 1/2" capped iron rod found for corner in the northwest line of said 101.49 acre tract, the northwest line of said Haigler Survey, same being the southeast line of that certain called 144.38 acre tract of land described in Deed from Wayne Hood and Eleanor Hood and recorded in Volume 2616, Page 156 of said Deed Records, same being the southeast line of the B.B.B. & C. R.R Survey, Abstract No. 92;**

**THENCE North 59° 45' 40" East with said southeast and northwest lines a distance of 1,286.03 feet to a capped iron rod found for corner at the north corner of said 101.49 acre tract of land, same being the north corner of said Haigler Survey, the east corner of said B.B.B. & C. R.R. Survey, and bing in the southwest line of that certain called 62.7 acre**

**tract of land described in Deed to Fielder Farm Partnership, et al and recorded in Volume 4302, Page 538 of said Deed Records, same being the southwest line of the Absolam Williams Survey, Abstract No. 857;**

**THENCE South 30° 13' 50" East with the northeast line of said 101.49 acre tract, same being the northeast line of said Haigler Survey and the southwest line of said 62.7 acre tract, same being the southwest line of said Williams Survey, at a distance of 11,219.39 feet passing a 1/2" capped iron rod found for corner at the south corner of said 62.7 acre tract, same being the west corner of that certain called 128.8645 acre tract of land described in Deed from Anastasia Energy, LLC to DJD Land Partners, LLC and recorded in County Clerk's File No. 2018-18134 of said Deed Records and continuing a total distance of 1,516.42 feet 1/2" capped iron rod found for corner;**

**THENCE across said 101.49 acre tract the following:**

**South 59° 46' 10" West, a distance of 858.80 feet to a 1/2" capped iron rod set for corner;**

**South 30° 13' 50" East, a distance of 26.19 feet to a 1/2" capped iron rod set for corner;**

**South 59° 46' 10" West, a distance of 50.00 feet to a 1/2" capped iron rod set for corner;**

**South 30° 13' 50" East, a distance of 5.00 feet to a 1/2" capped iron rod set for corner;**

**THENCE South 59° 46' 10" West, a distance of 110.00 feet back to the Point of Beginning and containing 1,590,029 square feet or 36.502 acres of land, more or less.**

**AFFIDAVIT OF AL J. KELLER IN SUPPORT OF MOTION FOR RELIEF FROM STAY**

STATE OF TEXAS )

COUNTY OF DALLAS )

BEFORE ME, the undersigned Notary, personally appeared Al J. Keller who after being duly sworn upon his oath, deposed and stated as follows:

1. "My name is Al J. Keller; I am over the age of 18, have never been convicted of a crime involving moral turpitude, and I am otherwise fully competent to testify and to make this affidavit.

2. I am the Chief Financial Officer of Southern Star Capital LLC d/b/a Reliance Mortgage, LLC, which is the servicer for the owner and holder of the Note and Deed of Trust referenced herein and I am authorized to make this affidavit.

3. I have care, custody and control of books, records and files relating to the loan made by Southern Star Capital, LLC, d/b/a Reliance Mortgage Company ("Movant") to Wall009, LLC, ("Debtor"). I have personally worked on said books, records and files and, as to the following facts, I know them to be true of my own personal knowledge or have gained knowledge of them from Movant's books, records and files. Said books, records and files were prepared in the regular course of Movant's business at or near the time of the acts, conditions, or events to which they relate by a person who had personal knowledge of the event being recorded and a business duty to accurately record such event. I have reviewed all of Movant's books and records in connection with this matter. Based upon my review of Movant's books and records, I have personal knowledge of the facts contained herein and, if called upon to testify, I could and would competently testify;

3. At the time of filing the Involuntary Chapter 7 petition, Movant held a Note in the principal amount of $900,000.00 dated September 11, 2019 and was named as the Lender is a certain Deed of Trust of the same date recorded in the Johnson County, Texas Deed Records at Clerk's File No. 2019-24729. These documents were executed by Wall009, LLC.

4. The indebtedness is secured by the Deed of Trust as contained in the documents on the real property described in the Deed of Trust.

5. A true and correct copy of the Legal Description of the Property is attached to the Motion for Lift of Stay as Exhibit "1". A true and correct copy of the Note is attached to the Motion for Lift of Stay as Exhibit "2". A true and correct copy of the Deed of Trust is attached to the Motion for Lift of Stay as Exhibit "3".

6. Debtor is in default on its obligations under the terms of the Note and Deed of Trust in that Debtor has failed to make their payments when due and owing. Debtor has made no payments on the note.

7. The status of the indebtedness as of September 1, 2020 is as follows:

| | | |
|---|---|---|
| a. | Principal Amount Due: | $900,000.00. |
| b. | Total Payments Made: | $0.00. |
| c. | Total interest due as of September 1, 2020: | $108,000.00 |
| | Late Fees Due as of September 1, 2020 | $ 4,950.00 |
| | Total Interest & Late Fees Due as of Sept 1, 2020 | $112,950.00 |
| c. | Additional Collateral held as of September 1, 2020: | CD $90,000.00 |
| | Accrued Interest on C as of Sept 1, 2020 | $1,654.57 |

e. Interest continues to accrue at the default rate of Eighteen Percent Per Annum, or the maximum legal rate as provided for in the note.

8. In accordance with the agreement between the parties Southern Star Capital, LLC d/b/a Reliance Mortgage would state that it is entitled to reasonable post-petition attorney's fees, including, but not limited to, fees, if any, for the preparation and filing of this Motion of Relief from Stay in the amount of at least $2,500.00 plus costs.

9. By failing to make the payments as due, debtor has not provided Movant with adequate protection. Southern Star Capital, LLC d/b/a Reliance Mortgage feels that it does not have adequate protection of its interest in said collateral since the Debtor has made no effort to make any payments under the terms of the note.

FURTHER AFFIANT SAYETH NOT.

Al J. Keller

SUBSCRIBED AND SWORN TO before me the undersigned Notary by the said Al Keller, on this 9th day of September 2020, to certify which witness my official hand and seal of office.

CODY W. OLYNYK
Notary ID #129405339
My Commission Expires
April 29, 2021

Notary Public - State of Texas

Behrooz P. Vida, SBOT No. 20578040
Carla Reed Vida, SBOT No. 16674445
Helenna Bird, SBOT No. 24085205
THE VIDA LAW FIRM, PLLC
3000 Central Drive
Bedford, Texas 76021
Tel: (817) 358-9977
Fax: (817) 358-9988
ATTORNEYS FOR TAMAMOI, LLC and FDRE, INC.

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| IIN RE | § | Chapter 7 |
| WALL007 LLC, *et al.*,[1] | § | Case No. 20-31131 (HDH) |
| Debtor | § | (Jointly Administered) |
| | § | |

---

**AMENDED MOTION FOR**
**RELIEF FROM STAY**

TO THE HONORABLE JUDGE OF THE SAID COURT:

TAMAMOI, LLC, a Delaware limited liability company ("**Tamamoi**") and FDRE, INC., an Oregon corporation ("**FDRE**") (collectively "**Movant**"), file this *Amended Motion for Relief from Stay* (the "**Motion**"), against WALL010, LLC ("**Debtor**"), and would respectfully show the Court as follows:

**NOTICE**

> **RESPONSE REQUIRED.** THE TRUSTEE (IF ONE HAS BEEN APPOINTED) OR THE DEBTOR SHALL FILE A RESPONSE TO ANY MOTION FOR RELIEF FROM THE AUTOMATIC STAY WITHIN 14 DAYS FROM THE SERVICE OF THE MOTION.* THE DEBTOR'S RESPONSE SHALL INCLUDE A DETAILED AND COMPREHENSIVE STATEMENT AS TO HOW THE MOVANT CAN BE "ADEQUATELY PROTECTED" IF THE STAY IS TO BE CONTINUED. IF THE DEBTOR

---

1 The entities to be declared debtors are: WALL007 LLC, WALL009 LLC, WALL010 LLC, WALL011 LLC, WALL012 LLC, WALL016 LLC, and WALL017 LLC.

DOES NOT FILE A RESPONSE AS REQUIRED, THE ALLEGATIONS IN THE CREDITOR'S MOTION FOR RELIEF FROM THE AUTOMATIC STAY SHALL BE DEEMED ADMITTED, UNLESS GOOD CAUSE IS SHOWN WHY THESE ALLEGATIONS SHOULD NOT BE DEEMED ADMITTED, AND AN ORDER GRANTING THE RELIEF SOUGHT MAY BE ENTERED BY DEFAULT.

UNDER BANKRUPTCY RULE 9006(3) SERVICE BY MAIL IS COMPLETE UPON MAILING; UNDER BANKRUPTCY RULE 9006(f), 3 DAYS ARE ADDED TO THE PERIOD FOR FILING A RESPONSE WHEN NOTICE OF THE PERIOD IS SERVED BY MAIL.

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §157 and §1334.

2. This is a core proceeding. This Motion constitutes a contested matter pursuant to Rule 9014 of the Bankruptcy Rules.

3. Section 362(a) of the Bankruptcy Code provides that the stay comes into effect upon the filing of a petition "under section … 303 of this title." Thus, section 362 applies during the gap period, preventing prepetition creditors from commencing or continuing any of the actions set forth in that section. *Musso v. Ostashko (In re Ostashko),* 333 B.R. 625 (E.D.N.Y. 2005); *Hanrahan v. Walterman (In re Walterman Implement Inc.),* 2007 Bankr. LEXIS 186 (Bankr. N.D. Iowa May 22, 2006); *Ostrander v. Gardner (In re Millivision, Inc.)*, 331 B.R. 515 (Bankr. D. Mass. 2005). One clear consequence of the stay during the gap period is that a post-filing creditor cannot enforce its claim absent stay relief.

4. This motion is brought pursuant to 11 U.S.C. §§ 105, 361, 362 and Bankruptcy Rule 4001.

5. Movant is the mortgagee on a piece of real estate which has the following legal description:

LEGAL DESCRIPTION

BEING a 195.4720 acre tract of land situated in the John N. Ely Survey, Abstract No.261, Johnson County, Texas and being all that certain called 195.501 acre tract of land described in Deed from Randolph M. Roten and Lisa Renne Roten to BSAG Properties Ltd. And recorded in Volume 4444, Page 156 of the Real Property Records of Johnson County, Texas.

BEGINNING at a RR Spike set for corner in County Road 506 at the East corner of said 195.501 acre tract of land and being at intersection of the Southwest line of Farm-to-Market Road No. 157 with the Southeast line of said 195.501 acre tract, said corner also being in the in the established Southeast line of said Ely Survey, same being the established Northwest line of the Absalom Williams Survey, Abstract No. 857;

THENCE South 59°40’46” West with said Survey lines and the Southeast line of said 195.501 acre tract a distance of 2,150.64 feet to a RR Spike found for corner at the South comer of said 195.501 acre tract, same being the East corner of a called 0.6 acre save and accept tract from the called 200 acre parent tract recorded in Volume 2170, Page 901 of said Real Property Records;

THENCE North 49°15’24” West across said Ely Survey and with the Southwest line of said 195.502 acre tract a distance of 444.86 feet to a ½" iron rod found for corner at an angle corner in said Southwest line, same being the No1iheast line of a called 124.051 acre tract of land described in Deed from Virginia
D. Rhinehart to Derrell G. Leonard and recorded in Volume 3557, Page 778 of said Real Property Records;

THENCE North 30°22’29” West with said Southwest and Northeast lines at a distance of 2921.20 feet passing a 5" metal corner post found for corner at the North corner of the above referenced 124.051 acre tract of land, same being the East corner of that ce1iain called 12.027 acre tract of land, Tract Two described in Deed from R. Pratt Phillips, et ux to Harper Cattle, L.L.C. and recorded in Volume 2476, Page 646 of said Real Property Records and continuing a total distance of 3,304.29 feet to RR spike found for the West corner of said 195.502 acre tract and being in County Road 507, the established Northwest line of said John N. Ely Survey, same being the Southeast line of the J. W. Harris Survey, Abstract No. 1072;

THENCE North 59°22'28" East with County Road 507, the Northwest line of said 195.502 acre tract and the Northwest line of said Ely Survey, same being the Southeast line of said Harris Survey a distance of 2,329.19 feet to a RR spike found for comer at the North corner of said 195.502 acre tract, same being the established North comer of said Ely Survey and being in the Southwest line of the J. Ware Survey, Abstract No. 913;

THENCE South 30°27’55” East with the Northeast line of said Ely Survey, the

Northeast line of said 195.502 acre tract and the Southwest line of said Ware Survey a distance of 162.69 feet to a ½" iron rod found for comer in the Southwest line of Farm-to-Market Road No. 157 and being at the beginning of a non-tangent curve to the left;

THENCE in a Southeasterly direction with said curve to the left having a radius of 358.31 feet, whose chord bears South 16°46'07" East -169.20 for an arc length of 170.81 feet;

THENCE with the East line of said 195.502 acre tract and the Southwest line of said Farm-to-Market Road the following:

South 30°27'37" East a distance of 454.30 feet to a½" iron rod found for corner;

South 24°44'51" East a distance of 100.50 feet to a ½" iron rod set for corner with cap marked "SANDS";

South 30°27'29" East a distance of 1,400.00 feet to a½" iron rod set for corner with cap marked "SANDS";

South 36°10'07" East a distance of 100.50 feet to a ½" iron rod set for corner with cap marked "SANDS";

THENCE South 30°27'29" East a distance of 1,356.00 feet back to the POINT OF BEGINNING AND CONTAINING 8,514,762 square feet or 195.4720 acres of land more or less

The ("**Property**").

6. Movant agreed on a short-term basis to finance the purchase of the Property for Carnegie Development, LLC, a Delaware limited liability company, ("**Carnegie**").

7. On December 28, 2018, Carnegie through Timothy Barton, its manager, signed a Promissory Note in the amount of $2,000,000.00 (the "**Promissory Note**") and executed a Deed of Trust (the "**Deed of Trust**"), which was recorded on January 4, 2019. *See* Exhibits "A" and "B". Also, Timothy Barton personally guaranteed Carnegie's indebtedness to Movant. *See* Exhibit "C".

8. The Promissory Note interest rate was 11.5% and it matured on June 27, 2020.

Also, on matured and unpaid amounts the Promissory Note required the lesser of 18% or the Highest Lawful Rate permitted by law.

9. Carnegie defaulted under the terms of the Promissory Note. Movant sent to Carnegie its notice of intent to accelerate. *See* Exhibit "D".

10. Movant posted the Property for the July 7, 2020, foreclosure date. *See* Exhibit "E". As of July 7, 2020, the payoff on the indebtedness to Movant was the sum of $2,150,882.15. This balance remains unpaid and is accruing interest and other applicable charges.

11. On July 6, 2020, Joyce Lindauer, Esq., bankruptcy counsel for the Debtor sent a letter to Movant's foreclosure attorney, Ian Ghrist, Esq., contending "[t]he funds used to purchase such Property included the funds of the Alleged Debtor and who has an interest in the Property and as such, the automatic stay that is in place applies to the Property." *See* Exhibit "F".

12. On July 6, 2020, at 9:48 p.m. Joyce Lindauer, Esq., sent an e-mail to Ian Ghrist, Esq., stating: "Need an update or I am told to file bankruptcy petition Thanks Joyce Lindauer". *See* Exhibit "G". Movant pushed for supporting documentation before agreeing to not go through with its scheduled foreclosure on July 7, 2020.

13. On July 7, 2020, at 9:55 a.m., Joyce Lindauer, Esq., took the following position: "If your client does foreclose I am told that a suit for wrongful foreclosure sale and stay violations will be filed So I would consider resetting and working something out". *See* Exhibit "G".

14. On July 7, 2020, for the first time ever, Carnegie and Debtor, through Timothy

Barton and Vance McMurry, Esq., provided the following documents to Movant:

1) Promissory Note allegedly executed between Carnegie and Debtor on July 16, 2018. *See* Exhibit "H".

2) Written Consent in Lieu of Special Meeting of Wall010, LLC, allegedly executed on December 30, 2018. *See* Exhibit "I".

3) _Unrecorded_ Warranty Deed transferring the Property from Carnegie to Debtor allegedly executed on January 14, 2019. *See* Exhibit "J".

15. Movant has never had any contractual relationship with Debtor and therefore is not a creditor. However, Movant has been snagged in the web created by Timothy Barton, Carnegie and Debtor.

16. Despite its grave concerns regarding Exhibits "H" through "J", Movant deemed it prudent to not foreclose on the Property and seek relief from this Court.

17. It seems Carnegie transferred the Property to Debtor for payment of an alleged antecedent debt owed by Carnegie to Debtor because the note, Exhibit "H", was executed on July 16, 2018, and the transfer, Exhibit "J", did not take place until January 14, 2019.

18. Paragraph A.11 of the Deed of Trust specifically provides Carnegie had to "obtain the written consent of [Movant] prior to entering into any pledge, security agreement, mortgage, or deed of trust covering any portion of the Property." Carnegie did not obtain Movant's written consent. *See* Exhibit "B".

19. Paragraph B.9 of the Deed of Trust specifically provides "If [Carnegie] shall sell or convey all or any part of the Property or any interest therein, [Movant] may at [Movant's] option, declare the Note to be immediately due and payable, which option may be

exercised at any time following such sale and/or conveyance." *See* Exhibit "B". Had Movant been aware of the transfer of the Property from Carnegie to Debtor, it would have sought this Court's help much sooner.

20. Should this Court find that Debtor has an interest in the Property, since the Promissory Note has already matured and remains unpaid, Movant asserts failure to pay the full indebtedness is cause for termination of stay pursuant to section 362(d)(1) of the Bankruptcy Code.

21. Movant additionally points out that since entry of Interim Order [ECF No. 152], Movant has discovered that the fair market value of the Property is less than the debt owed. Movant contends the value of the Property is less than $1,600,000.00. Since as of July 7, 2020, the payoff on the indebtedness to Movant was the sum of $2,150,882.15, this means Debtor does not have any equity in the Property. Also, there is no intent to reorganize because the petitioning creditors are seeking to put Debtor in Chapter 7 bankruptcy and liquidate its assets. Therefore, the stay should be terminated pursuant to section 362(d)(2) of the Bankruptcy Code.

22. Should Debtor opt to file Chapter 11 bankruptcy, Movant contends that Debtor's Chapter 11 case would be a single asset real estate case and Movant would move for dismissal of the case based on bad faith due to the contradicting factual and legal positions that Timothy Barton, Carnegie and Debtor have been taking.

23. Debtor has made a representation to this Court in ECF No. 18, Case No. 20-31134, that its creditors are primarily insiders and professionals who are unsecured creditors. Should this Court determine that Debtor has an interest in the Property, then, Movant would be

Debtor's only secured creditor.

24. Movant contends that based on the facts of this case cause exists for the requirements of Bankruptcy Rule 4001(a)(3) to be waived so that Movant may once again post the Property for foreclosure.

WHEREFORE, PREMISES CONSIDERED, Movant prays for an order of the Court granting relief from stay so that it may proceed to take all remedies available to it under Texas law with respect to the Property and for such other and further relief as is just.

Respectfully submitted:

By: /s/ Behrooz P. Vida 10/7/2020
Behrooz P. Vida
State Bar No. 20578040
Carla Reed Vida
State Bar No. 16674445
Helenna Bird
State Bar No. 24085205
THE VIDA LAW FIRM, PLLC
3000 Central Drive
Bedford, Texas 76021
EMAIL: filings@vidalawfirm.com
TEL: (817) 358-9977
FAX: (817) 358-9988

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above and forgoing instrument was served on the date that the instrument was filed electronically. Service was accomplished electronically and/or by first class mail to the parties indicated on the mailing matrix attached to the original certificate filed with the Court.

| | |
|---|---|
| WALL007 LLC, Debtor<br>13901 Midway Rd., Ste. 102<br>Dallas, TX 75244 | VIA US MAIL |
| Jiangang Ou<br>Nguyen & Chen LLP<br>11200 Westheimer Road, Suite 120<br>Houston, TX 77042 | VIA ECF |
| Stephen M. Packman<br>Archer & Greiner, P.C.<br>Three Logan Square<br>1717 Arch Street, Suite 3500<br>Philadelphia, PA 19103 | VIA ECF |
| Joyce W. Lindauer<br>Joyce W. Lindauer Attorney, PLLC<br>1412 Main Street, Suite 500<br>Dallas, TX 75202 | VIA ECF |
| Dee J. Kelly, Jr.<br>Katherine T. Hopkins<br>Joakim G. Soederbaum<br>KELLY HART & HALLMAN LLP<br>201 Main Street, Suite 2500<br>Fort Worth, TX 76102 | VIA ECF |
| Parties Having Filed NOA | VIA ECF |
| Office of United States Trustee | VIA ECF |

/s/ Behrooz P. Vida 10/7/2020
Behrooz P. Vida
Carla R. Vida

# EXHIBIT A

INITIAL:

# PROMISSORY NOTE

| | |
|---|---|
| **DATE:** | December 28, 2018 |
| **BORROWER:** | **Carnegie Development, a Delaware Limited Liability Company** |
| **BORROWER'S MAILING ADDRESS:** | 1201 Orange St #600, Wilmington DE 19899 |
| **LENDER:** | **Tamamoi LLC, a Delaware limited liability company as to a 97.625% interest and FDRE INC, an Oregon corporation, as to a 2.375% interest** |
| **LENDER'S MAILING ADDRESS (PLACE FOR PAYMENT):** | 5060 SW Philomath Blvd #363, Corvallis OR 97333 |
| **PRINCIPAL AMOUNT:** | $2,000,000.00 |
| **ANNUAL INTEREST RATE:** | Eleven and a Half Percent (11.5%) |
| **MATURITY DATE:** | June 27, 2020 |
| **ANNUAL INTEREST RATE ON MATURED, UNPAID AMOUNTS:** | Lesser of: (a) eighteen percent (18%); or (b) the Highest Lawful Rate permitted by law. |

**1.** **TERMS OF PAYMENT (PRINCIPAL AND INTEREST):** Commencing February 1, 2019, monthly installments of accrued but unpaid interest shall be due and payable on the 1st day of each month after the date of this Note; then principal and accrued interest are due and payable on the Maturity Date. On the Maturity Date or upon the earlier maturity hereof, whether by acceleration or otherwise as provided in this Note or the Deed of Trust, any and all unpaid principal, together with all accrued but unpaid interest thereon shall be immediately, finally and fully due and payable. Interest shall begin to accrue on the entire principal balance from the date of execution of the documents.

**2.** **SECURITY FOR PAYMENT:** This Promissory Note (herein referred to as the "Note") is secured by Deed of Trust (herein referred to as the "Deed of Trust") of even date from Borrower to Ian Ghrist, Trustee, both of which cover that certain real property located in Johnson County, Texas, which is more particularly described as:

**Being a 195.4720 acre tract of land situated in the John N. Ely survey, abstract No. 261, Johnson County, Texas and being all that certain called 195.501 acre tract of land described in deed from Randolph M. Roten and Lisa Renne Roten to BSAG Properties Ltd. and recorded in Volume 4444, Page 156 of the Real Property Records of Johnson County, Texas, and further described by metes and bounds in the attached Exhibit A.**

**3.** **OTHER SECURITY FOR PAYMENT:** This loan is additionally secured by a personal guarantee from Timothy L. Barton.

**4.** **PROMISE OF PAYMENT:** Borrower promises to pay to the order of Lender the Principal Amount plus interest at the Annual Interest Rate. This Note is payable at the Place for Payment and according to the Terms of Payment. All unpaid amounts are due by the Maturity Date. After maturity, Borrower promises to pay any unpaid principal balance plus interest at the Annual Interest Rate on Matured, Unpaid Amounts.

**5.** **DEFAULT:** If Borrower defaults in the payment of this Note or in the performance of any obligation in any instrument securing or collateral to this Note, Lender may declare the unpaid principal balance, earned interest, and any other amounts owed on the Note immediately due; provided, however, that the entire principal balance and accrued interest owing thereon shall not be so accelerated unless Borrower fails to cure any such default within ten (10) days, if a monetary default, or, within twenty (20) days if a nonmonetary default, following the receipt of written notice from Lender, or any subsequent holder of this Note, specifying the existence of any such default. Borrower and each surety, endorser, and guarantor waive all demand for payment, presentation for payment, notice of intention to accelerate maturity, notice of acceleration of maturity, protest, and notice of protest, to the extent permitted by law.

**6.** **LATE CHARGE:** At the option of Lender, Borrower shall pay a "late charge" in the amount of five percent (5%) of any installment on this Note when such installment is not

paid within ten (10) days following the date such installment is due, in order to cover the additional expenses involved in handling delinquent payments.

**7.** **SERVICING CHARGE:** Borrower shall pay a $100 per month servicing fee each month for the duration of the loan to a loan servicer chosen by Lender. For each month where Borrower makes a timely payment in full via ACH auto-debit, servicing fee shall be reduced to $40.

I understand and agree to pay the servicing charge. INITIAL:_________

**8.** **ATTORNEY'S FEES:** Borrower also promises to pay reasonable attorney's fees and court and other costs if this Note is placed in the hands of an attorney to collect or enforce the Note. These expenses will bear interest from the date of advance at the Annual Interest Rate on Matured, Unpaid Amounts. Borrower will pay Lender these expenses and interest on demand at the Place for Payment. These expenses and interest will become part of the debt evidenced by the Note and will be secured by any security for payment.

**9.** **PREPAYMENT:** Borrower may prepay this loan at any time without penalty.

**10.** **FURTHER ASSURANCES AND CORRECTIONS:** From time to time, at the reasonable request of Lender, Borrower will: (i) promptly correct any defect, error or omission which may be discovered in the contents of this Note or in any other loan document or in the execution or acknowledgement thereof; (ii) execute, acknowledge, deliver, record and/or file (or cause to be executed, acknowledged, delivered, recorded and/or filed) such further documents and instruments (including, without limitation, further deeds of trust, security agreements, financing statements, continuation statements, and assignments of rents) and perform such further acts and provide further assurances as may be necessary, desirable or proper in Lender's reasonable opinion (a) to carry out more effectively the purposes of this Note and the other loan documents and the transactions contemplated hereunder and thereunder, (b) to confirm the rights created under this Note and the other loan documents, (c) to protect and further the validity, priority and enforceability of this Note and the other loan documents and the liens and security interests created thereby, and (d) to subject to the loan documents any portion of the Property intended by the terms of any one or more of the loan documents to be encumbered by the loan documents; and (iii) pay all costs in connection with any of the foregoing.

**11.** **USURY SAVINGS:** It is expressly provided that in no event shall the aggregate of all interest paid or contracted to be paid to Lender by Borrower ever exceed the maximum amount of interest which may lawfully be charged by Lender on the principal balance of this Note from time to time advanced and remaining unpaid. It is expressly agreed that it is the intent of Lender and Borrower in the execution and delivery of this Note to contract in strict compliance with applicable usury laws. None of the terms of this Note shall ever be construed to create a contract to pay interest at a rate in excess of the Highest Lawful Rate. The term "Highest Lawful Rate" shall mean the maximum non-usurious rate of interest which may lawfully be charged the undersigned by Lender according to: (a) the higher of the "indicated rate ceiling" or the "quarterly ceiling" as of the date of this Note as defined in Chapter 303 of the Texas Finance Code as amended in effect at such time and which would be applicable to the indebtedness evidenced by this Note; or (b) under the laws of the United States, and the regulations promulgated thereunder or under other applicable law. In determining whether the loan any time contracted for, charged, or received from Borrower in connection with the loan evidenced by this Note is usurious under applicable law, all interest shall be amortized, prorated, allocated, and spread in equal parts during the period of the full stated term of the loan. However, in the event that this Note is paid in full by Borrower prior to the end of the term of this Note and in the event the interest received by the holder of this Note for the actual period of the existence of the loan exceeds the Highest Lawful Rate, the holder of this Note shall, either refund to Borrower the amount of such excess or credit the amount of such excess against any amounts owing by Borrower under this Note. In addition, if fulfillment of any provision hereof, at the time performance of such provision shall be due, shall involve transcending the limit of validity prescribed by applicable law, then, ipso facto, the obligation to fulfill shall be reduced to the limit of such validity, and if from any circumstance the holder thereof shall ever receive as interest an amount which would exceed the Highest Lawful Rate, such amount which would be excessive interest shall, at the option of Lender, be refunded to Borrower or be applied to the reduction of the unpaid principal balance due hereunder and not to the payment of interest. The provisions of this paragraph shall supersede all other provisions of this Note.

**12.** **LOAN PAYABLE AT MATURITY. IT IS EXPRESSLY UNDERSTOOD AND AGREED THAT THIS NOTE WILL REQUIRE A "BALLOON" PAYMENT OF ALL UNPAID PRINCIPAL AND ACCRUED BUT UNPAID INTEREST ON THE MATURITY DATE. THE PRINCIPAL INDEBTEDNESS EVIDENCED BY THIS NOTE IS PAYABLE IN FULL AT MATURITY. BORROWER MUST REPAY THE ENTIRE PRINCIPAL BALANCE OF THIS NOTE**

**AND ACCRUED BUT UNPAID INTEREST THEN DUE. LENDER IS UNDER NO OBLIGATION TO REFINANCE THIS NOTE AT THAT TIME**

**13. MISCELLANEOUS:**

(a) Borrower is responsible for all obligations represented by this Note.

(b) When the context requires, singular nouns and pronouns include the plural.

(c) If any provision of this Note conflicts with any provision of any loan agreement, the Deed of Trust, or security agreement of the same transaction between Lender and Borrower, the provisions of the Deed of Trust will govern to the extent of the conflict.

(d) This Note will be construed under the laws of the state of Texas, without regard to choice-of-law rules of any jurisdiction.

**BORROWER:**

**Carnegie Development, LLC,**
**A Delaware Limited Liability Company**

______________________________
By: Timothy L. Barton
Its: Manager

# EXHIBIT B

***Electronically Recorded Document***

# Johnson County

**Becky Ivey**
**Johnson County Clerk**
**Cleburne, TX**

---

**Document Number:** 2019-245

**Recorded As** : ERX-DEED OF TRUST

| | |
|---|---|
| **Recorded On:** | January 04, 2019 |
| **Recorded At:** | 10:23:12 am |
| **Number of Pages:** | 10 |
| **Recording Fee:** | $58.00 |

**Parties:**

Direct-

Indirect-

| | |
|---|---|
| **Receipt Number:** | 150442 |
| **Processed By:** | Linda Bailey |

---

***THIS PAGE IS PART OF THE INSTRUMENT***

COUNTY COURT JOHNSON COUNTY, TEXAS

I hereby certify that this instrument was filed on the date and time stamped hereon and was duly recorded in the Volume and Page of the named records in Johnson County, Texas.

Any provision herein which restricts the sale, rental or use of the described Real Estate because of color race is invalid and unenforceable under Federal law.

Becky Ivey

BECKY IVEY, COUNTY CLERK
JOHNSON COUNTY, TEXAS

NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.

# DEED OF TRUST

Terms

**DATE:** December 28, 2018

**GRANTOR:** **Carnegie Development, a Delaware Limited Liability Company**

**GRANTOR'S MAILING ADDRESS:** 1201 Orange St #600, Wilmington DE 19899

**TRUSTEE:** **IAN GHRIST**

**TRUSTEE'S MAILING ADDRESS:** 2735 Villa Creek Drive, Suite 140, Farmers Branch, Texas 75234

**LENDER:** **Tamamoi LLC, a Delaware limited liability company as to a 97.625% interest and FDRE INC, an Oregon corporation, as to a 2.375% interest**

**LENDER'S MAILING ADDRESS:** 5060 SW Philomath Blvd #363, Corvallis OR 97333

**NOTE:**

Date: December 28, 2018

Original principal amount: $2,000,000.00

Borrower: **Carnegie Development, a Delaware Limited Liability Company**

Lender: **Tamamoi LLC, a Delaware limited liability company as to a 97.625% interest and FDRE INC, an Oregon corporation, as to a 2.375% interest**

Maturity date: June 27, 2020

**PROPERTY (INCLUDING ANY IMPROVEMENTS):**

**Being a 195.4720 acre tract of land situated in the John N. Ely survey, abstract No. 261, Johnson County, Texas and being all that certain called 195.501 acre tract of land described in deed from Randolph M. Roten and Lisa Renne Roten to BSAG Properties Ltd. and recorded in Volume 4444, Page 156 of the Real Property Records of Johnson County, Texas, and further described by metes and bounds in the attached Exhibit A.**

**OTHER EXCEPTIONS TO CONVEYANCE AND WARRANTY:**
This conveyance is made and accepted subject to any and all restrictions, reservations, covenants, conditions, rights of way, easements, municipal and other governmental zoning

laws, regulations and ordinances, if any, of record in said county, to the extent (but not further) the same are valid and subsisting and affect title to the Property.

---

For value received and to secure payment of the Note, Grantor conveys the Property to Trustee in trust. Grantor warrants and agrees to defend the title to the Property, subject to the Other Exceptions to Conveyance and Warranty. On payment of the Note and all other amounts secured by this deed of trust, this deed of trust will have no further effect, and Lender will release it at Grantor's expense.

**Clauses and Covenants**

**A. Grantor's Obligations**

Grantor agrees to:

1. keep the Property in good repair and condition;

2. pay all taxes and assessments on the Property before delinquency, furnish to Lender annually, before taxes become delinquent, copies of tax receipts showing that all taxes on the property have been paid;

3. defend title to the Property subject to the Other Exceptions to Conveyance and Warranty and preserve the lien's priority as it is established in this deed of trust;

4. maintain, in a form acceptable to Lender, an insurance policy that:

   a. covers all improvements for their full insurable value as determined when the policy is issued and renewed, unless Lender approves a smaller amount in writing;

   b. contains an 80 percent coinsurance clause;

   c. provides fire and extended coverage, including windstorm coverage;

   d. protects Lender with a standard mortgage clause;

   e. provides flood insurance at any time the Property is in a flood hazard area; and

   f. contains such other coverage as Lender may reasonably require;

5. comply at all times with the requirements of the 80 percent coinsurance clause;

6. deliver the insurance policy to Lender within ten days of the date of this deed of trust and deliver renewals to Lender at least fifteen days before expiration;

7. furnish to Lender annually evidence of current paid-up insurance naming Lender as an insured;

8. obey all laws, ordinances, and restrictive covenants applicable to the Property;

9. keep any buildings occupied as required by the insurance policy; and

10. if the lien of this deed of trust is not a first lien, pay or cause to be paid all prior lien notes and abide by or cause to be abided by all prior lien instruments,

11. obtain the written consent of Lender prior to entering into any pledge, security agreement, mortgage, or deed of trust covering any portion of the Property.

**B. Lender's Rights**

1. Lender may appoint in writing a substitute trustee, succeeding to all rights and responsibilities of Trustee.

2. If the proceeds of the Note are used to pay any debt secured by prior liens, Lender is subrogated to all the rights and liens of the holders of any debt so paid.

3. Lender may apply any proceeds received under the insurance policy either to reduce the Note or to repair or replace damaged or destroyed improvements covered by the policy. If the Property is Grantor's primary residence and Lender reasonably determines that repairs to the improvements are economically feasible, Lender will make the insurance proceeds available to Grantor for repairs.

4. Notwithstanding note terms to the contrary, and unless applicable law prohibits, all payments received by Lender from Grantor under the Note or this deed of trust may, at Lender's discretion, be applied first to amounts payable under this deed of trust and then to amounts due and payable to Lender under the Note, to be applied to late charges, principal, or interest in the order Lender in its discretion determines.

5. If Grantor fails to perform any of Grantor's obligations, Lender may perform those obligations and be reimbursed by Grantor on demand for any amounts so paid, including attorney's fees, plus interest on those amounts from the dates of payment at the rate stated in the Note for matured, unpaid amounts. The amount to be reimbursed will be secured by this deed of trust.

6. Collateral Protection Insurance Notice: In accordance with the provisions of Section 307.052(a) of the Texas Finance Code, the Lender hereby notifies the Grantor as follows:

a. the Grantor is required to:

i. keep the collateral insured against damage in the amount the Lender specifies;

ii. purchase the insurance from an insurer that is authorized to do business in the state of Texas or an eligible surplus lines insurer; and

iii. name the Lender as the person to be paid under the policy in the event of a loss;

b. the Grantor must, if required by the Lender, deliver to the Lender a copy of the policy and proof of the payment of premiums; and

c. if the Grantor fails to meet any requirement listed in Paragraph (a) or (b), the Lender may obtain collateral protection insurance on behalf of the Grantor at the Grantor's expense.

7. If there is a default on the Note or if Grantor fails to perform any of Grantor's obligations and the default continues after any required notice of the default and the time allowed to cure, Lender may:

a. declare the unpaid principal balance and earned interest on the Note immediately due;

b. direct Trustee to foreclose this lien, in which case Lender or Lender's agent will cause notice of the foreclosure sale to be given as provided by the Texas Property Code as then in effect; and

c. purchase the Property at any foreclosure sale by offering the highest bid and then have the bid credited on the Note.

8. Lender may remedy any default without waiving it and may waive any default without waiving any prior or subsequent default.

9. If Grantor shall sell or convey all or any part of the Property or any interest therein, Lender may at Lender's option, declare the Note to be immediately due and payable, which option may be exercised at any time following such sale and/or conveyance.

**C. Trustee's Rights and Duties**

If directed by Lender to foreclose this lien, Trustee will:

1. either personally or by agent give notice of the foreclosure sale as required by the Texas Property Code as then in effect;

2. sell and convey all or part of the Property "AS IS" to the highest bidder for cash with a general warranty binding Grantor, subject to the Other Exceptions to Conveyance and Warranty and without representation or warranty, express or implied, by Trustee;

3. from the proceeds of the sale, pay, in this order:

a. expenses of foreclosure, including a reasonable commission to Trustee;

b. to Lender, the full amount of principal, interest, attorney's fees, and other charges due and unpaid;

c. any amounts required by law to be paid before payment to Grantor; and

d. to Grantor, any balance; and

4. be indemnified, held harmless and defended by Lender against all costs, expenses, and liabilities incurred by Trustee for acting in the execution or enforcement of the trust created by this deed of trust, which includes all court and other costs, including attorney's fees, incurred by Trustee in defense of any action or proceeding taken against Trustee in that capacity.

**D. General Provisions**

1. If any of the Property is sold under this deed of trust, Grantor must immediately surrender possession to the purchaser. If Grantor fails to do so, Grantor will become a tenant at sufferance of the purchaser, subject to an action for forcible detainer.

2. Recitals in any trustee's deed conveying the Property will be presumed to be true.

3. Proceeding under this deed of trust, filing suit for foreclosure, or pursuing any other remedy will not constitute an election of remedies.

4. This lien will remain superior to liens later created even if the time of payment of all or part of the Note is extended or part of the Property is released.

5. If any portion of the Note cannot be lawfully secured by this deed of trust, payments will be applied first to discharge that portion.

6. Grantor assigns to Lender all amounts payable to or received by Grantor from condemnation of all or part of the Property, from private sale in lieu of condemnation, and from damages caused by public works or construction on or near the Property. After deducting any expenses incurred, including attorney's fees and court and other costs, Lender will either release any remaining amounts to Grantor or apply such amounts to reduce the Note. Lender will not be liable for failure to collect or to exercise diligence in collecting any such amounts. Grantor will immediately give Lender notice of any actual or threatened proceedings for condemnation of all or part of the Property.

7. Grantor assigns to Lender absolutely, not only as collateral, all present and future rent and other income and receipts from the Property. Grantor warrants the validity and enforceability of the assignment. Grantor may as Lender's licensee collect rent and other income and receipts as long as Grantor is not in default under the Note or this deed of trust. Grantor will apply all rent and other income and receipts to payment of the Note and performance of this deed of trust, but if the rent and other income and receipts exceed the amount due under the Note and deed of trust, Grantor may retain the excess. If Grantor defaults in payment of the Note or performance of this deed of trust, Lender may terminate Grantor's license to collect rent and other income and then as Grantor's agent may rent the Property and collect all rent and other income and receipts. Lender neither has nor assumes any obligations as lessor or landlord with respect to any occupant of the Property. Lender may exercise Lender's rights and remedies under this paragraph without taking possession of the Property. Lender will apply all rent and other income and receipts collected under this paragraph first to expenses incurred in exercising Lender's rights and remedies and then to Grantor's obligations under the Note and this deed of trust in the order determined by Lender. Lender is not required to act under this paragraph, and acting under this paragraph does not waive any of Lender's other rights or remedies. If Grantor becomes a voluntary or involuntary debtor in bankruptcy, Lender's filing a proof of claim in bankruptcy will be deemed equivalent to the appointment of a receiver under Texas law.

8. Interest on the debt secured by this deed of trust will not exceed the maximum amount of nonusurious interest that may be contracted for, taken, reserved, charged, or received under law. Any interest in excess of that maximum amount will be credited on the principal of the debt or, if that has been paid, refunded. On any acceleration or required or permitted prepayment, any such excess will be canceled automatically as of the acceleration or prepayment or, if already paid, credited on the principal of the debt or, if the principal of the debt has been paid, refunded. This provision overrides any conflicting provisions in this and all other instruments concerning the debt.

9. In no event may this deed of trust secure payment of any debt that may not lawfully be secured by a lien on real estate or create a lien otherwise prohibited by law.

10. When the context requires, singular nouns and pronouns include the plural.

11. The term *Note* includes all extensions and renewals of the Note and all amounts secured by this deed of trust.

12. This deed of trust binds, benefits, and may be enforced by the successors in interest of all parties.

13. If Grantor and Borrower are not the same person, the term *Grantor* includes Borrower.

14. Grantor and each surety, endorser, and guarantor of the Note waive all demand for payment, presentation for payment, notice of intention to accelerate maturity, notice of acceleration of maturity, protest, and notice of protest, to the extent permitted by law.

15. Grantor agrees to pay reasonable attorney's fees, trustee's fees, and court and other costs of enforcing Lender's rights under this deed of trust if this deed of trust is placed in the hands of an attorney for enforcement.

16. If any provision of this deed of trust is determined to be invalid or unenforceable, the validity or enforceability of any other provision will not be affected.

17. The term *Lender* includes any mortgage servicer for Lender.

18. Grantor represents that this deed of trust and the Note for $2,000,000.00 are given for the following purposes: funds advanced for business purposes only by Lender at Grantor's request to used in payment of the purchase price of the Property.

**THIS DEED OF TRUST REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES**

**GRANTOR:**

Carnegie Development,
a Delaware Limited Liability Company

By:____________________
Timothy L. Barton
Its: Manager

**ACKNOWLEDGMENT**

STATE OF TEXAS §
COUNTY OF DALLAS §

BEFORE ME, the undersigned authority, on this day personally appeared Timothy L. Barton known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed, in his capacity as manager of Carnegie Development, a Delaware Limited Liability Company

Given under my hand and seal of office this 28th day of December, 2018.

NOTARY PUBLIC, STATE OF TEXAS

Bella D Khusal
My Commission Expires
09/24/2022
ID No. 131734480
NOTARY PUBLIC STATE OF TEXAS

Printed Name: BELLA D. KHUSAL

My Commission Expires: 09/24/2022

**AFTER RECORDING RETURN TO:**
FDRE INC
5060 SW Philomath Blvd #363
Corvallis OR 97333

EXHIBIT "A"

LEGAL DESCRIPTION

BEING a 195.4720 acre tract of land situated in the John N. Ely Survey, Abstract No.261, Johnson County, Texas and being all that certain called 195.501 acre tract of land described in Deed from Randolph M. Roten and Lisa Renne Roten to BSAG Properties Ltd. And recorded in Volume 4444, Page 156 of the Real Property Records of Johnson County, Texas.

BEGINNING at a RR Spike set for corner in County Road 506 at the East corner of said 195.501 acre tract of land and being at intersection of the Southwest line of Farm-to-Market Road No. 157 with the Southeast line of said 195.501 acre tract, said corner also being in the in the established Southeast line of said Ely Survey, same being the established Northwest line of the Absalom Williams Survey, Abstract No. 857;

THENCE South 59°40'46" West with said Survey lines and the Southeast line of said 195.501 acre tract a distance of 2,150.64 feet to a RR Spike found for corner at the South corner of said 195.501 acre tract, same being the East corner of a called 0.6 acre save and accept tract from the called 200 acre parent tract recorded in Volume 2170, Page 901 of said Real Property Records;

THENCE North 49°15'24" West across said Ely Survey and with the Southwest line of said 195.502 acre tract a distance of 444.86 feet to a ½" iron rod found for corner at an angle corner in said Southwest line, same being the Northeast line of a called 124.051 acre tract of land described in Deed from Virginia D. Rhinehart to Derrell G. Leonard and recorded in Volume 3557, Page 778 of said Real Property Records;

THENCE North 30°22'29" West with said Southwest and Northeast lines at a distance of 2921.20 feet passing a 5" metal corner post found for corner at the North corner of the above referenced 124.051 acre tract of land, same being the East corner of that certain called 12.027 acre tract of land, Tract Two described in Deed from R. Pratt Phillips, et ux to Harper Cattle, L.L.C. and recorded in Volume 2476, Page 646 of said Real Property Records and continuing a total distance of 3,304.29 feet to RR spike found for the West corner of said 195.502 acre tract and being in County Road 507, the established Northwest line of said John N. Ely Survey, same being the Southeast line of the J. W. Harris Survey, Abstract No. 1072;

THENCE North 59°22'28" East with County Road 507, the Northwest line of said 195.502 acre tract and the Northwest line of said Ely Survey, same being the Southeast line of said Harris Survey a distance of 2,329.19 feet to a RR spike found for corner at the North corner of said 195.502 acre tract, same being the established North corner of said Ely Survey and being in the Southwest line of the J. Ware Survey, Abstract No. 913;

THENCE South 30°27'55" East with the Northeast line of said Ely Survey, the Northeast line of said 195.502 acre tract and the Southwest line of said Ware Survey a distance of 162.69 feet to a ½" iron rod found for corner in the Southwest line of Farm-to-Market Road No. 157 and being at the beginning of a non-tangent curve to the left;

THENCE in a Southeasterly direction with said curve to the left having a radius of 358.31 feet, whose chord bears South 16°46'07" East -169.20 for an arc length of 170.81 feet;

THENCE with the East line of said 195.502 acre tract and the Southwest line of said Farm-to-Market Road the following:

South 30°27'37" East a distance of 454.30 feet to a ½" iron rod found for corner;

South 24°44'51" East a distance of 100.50 feet to a ½" iron rod set for corner with cap marked "SANDS";

South 30°27'29" East a distance of 1,400.00 feet to a ½" iron rod set for corner with cap marked "SANDS";

South 36°10'07" East a distance of 100.50 feet to a ½" iron rod set for corner with cap marked "SANDS";

THENCE South 30°27'29" East a distance of 1,356.00 feet back to the POINT OF BEGINNING AND CONTAINING 8,514,762 square feet or 195.4720 acres of land more or less

# EXHIBIT C

# GUARANTY

## Basic Information

| | |
|---|---|
| **DATE:** | December 28, 2018 |
| **GUARANTOR:** | **Timothy L. Barton** |
| **GUARANTOR'S MAILING ADDRESS:** | 13901 Midway Rd #102 Dallas TX 75244 |
| **BORROWER:** | **Carnegie Development, a Delaware Limited Liability Company** |
| **BORROWER'S MAILING ADDRESS:** | 1201 Orange St #600, Wilmington DE 19899 |
| **LENDER:** | **Tamamoi LLC, a Delaware limited liability company as to a 97.625% interest and FDRE INC, an Oregon corporation, as to a 2.375% interest** |
| **LENDER'S MAILING ADDRESS:** | 5060 SW Philomath Blvd #363, Corvallis OR 97333 |

**GUARANTEED INDEBTEDNESS:** The debt evidenced by a certain promissory note dated December 28, 2018, covering the property at **Being a 195.4720 acre tract of land situated in the John N. Ely survey, abstract No. 261, Johnson County, Texas and being all that certain called 195.501 acre tract of land described in deed from Randolph M. Roten and Lisa Renne Roten to BSAG Properties Ltd. and recorded in Volume 4444, Page 156 of the Real Property Records of Johnson County, Texas, and further described by metes and bounds in the attached Exhibit A** in the original principal amount of **$2,000,000.00**, executed by Borrower and payable to the order of Lender, the obligations under the deed of trust executed in connection with the note and any other document executed by Borrower evidencing or securing the note (collectively, the "Loan Documents"), plus all interest, penalties, expenses, attorney's fees, and other collection costs as provided in the Loan Documents.

**CLAUSES AND COVENANTS:**

1. Guarantor agrees to pay, when due or declared due, the Guaranteed Indebtedness to Lender at Lender's Mailing Address.

2. Guarantor waives (a) diligence in preserving liability of any person on the Guaranteed Indebtedness and in collecting or bringing suit to collect the Guaranteed Indebtedness; (b) all rights of Guarantor under chapter 43 of the Texas Civil Practice and Remedies Code, section 17.001 of the Texas Civil Practice and Remedies Code, and rule 31 of the Texas Rules of Civil Procedure, and sections 51.003, 51.004, and 51.005 of the Texas Property Code; (c) protest; (d) notice of extensions, increases, renewals, or rearrangements of the Guaranteed Indebtedness; and (e) notice of acceptance of this guaranty, of creation of the Guaranteed Indebtedness, of failure to pay the Guaranteed Indebtedness as it matures, of any other default, of adverse change in Borrower's financial condition, of release or substitution of collateral, of intent to accelerate, of acceleration, and of subordination of Lender's rights in any collateral, and every other notice of every kind. Guarantor's obligations under this guaranty will not be altered nor will Lender be liable to Guarantor because of any action or inaction of Lender in regard to a matter waived or of which notice is waived by Guarantor in the preceding sentence.

3. Guarantor agrees to pay reasonable attorney's fees and other collection costs if an attorney is retained to enforce this guaranty for collection.

4. This guaranty is an absolute, irrevocable, unconditional, and continuing guaranty of payment and performance and not of collection.

5. Lender need not resort to Borrower or any other person or proceed against collateral before pursuing its rights against Guarantor or any other guarantor. Lender's action or inaction with respect to any right of Lender under the law or any agreement will not alter the obligation of Guarantor hereunder. Lender may pursue any remedy against Borrower or any collateral or under any other guaranty without altering the obligations of Guarantor hereunder and without liability to Guarantor, even though Lender's pursuit of such remedy may result in Guarantor's loss of rights of subrogation or to proceed against others for reimbursement of contribution or any other right.

6. Guarantor will remain liable for the Guaranteed Indebtedness even though the Guaranteed Indebtedness may be unenforceable against or uncollectible from Borrower or any other person because of incapacity, lack of power or authority, discharge, or any other reason.

7. Guarantor consents and acknowledges that Guarantor's obligations will not be released by (a) the renewal, extension, or modification of the Guaranteed Indebtedness or any of the Loan Documents; (b) the insolvency, bankruptcy, liquidation, or dissolution of Borrower or any other obligor; (c) the failure of Lender to properly obtain, perfect, or preserve any security interest or lien in any collateral for the Guaranteed Indebtedness; (d) the release, substitution, or addition of any collateral for the Guaranteed Indebtedness; or (e) the failure of Lender to exercise diligence, commercial reasonableness, or reasonable care in the preservation, enforcement, or sale of any of the collateral.

8. Lender need not notify Guarantor that Lender has sued Borrower, but if Lender gives written notice to Guarantor that it has sued Borrower, Guarantor will be bound by any judgment or decree, to the extent permitted by law.

9. Lender may sue any guarantor without impairing Lender's rights against any other guarantor, with or without making Borrower a party. Lender may settle with Borrower or any other guarantor for such amounts as it may elect or may release Borrower or any guarantor or any collateral securing the Guaranteed Indebtedness without impairing Lender's right to collect the Guaranteed Indebtedness from Guarantor.

10. This guaranty binds Guarantor and Guarantor's heirs, successors, and assigns, and it benefits and may be enforced by Lender and Lender's successors in interest. When the context requires, singular nouns and pronouns include the plural. This guaranty will be construed under the laws of the state of Texas, without regard to choice-of-law rules of any jurisdiction. The provisions of this guaranty are severable. If a court of competent jurisdiction finds that any provision of this guaranty is unenforceable, then the remaining provisions will remain in effect without the unenforceable parts.

11. FINAL AGREEMENT: THIS WRITTEN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

**Signature on following page**

**GUARANTOR:**

Timothy L. Barton
SSN:

# EXHIBIT D

GHRIST LAW

April 11, 2020

Carnegie Development
1201 Orange St #600
Wilmington DE 19899
Sent Via Regular Mail and CMRR# 7019 1640 0001 9056 6290

Re: *NOTICE OF INTENT TO ACCELERATE AND NOTICE TO CURE*

Property: Being a 195.4720 acre tract of land situated in the John N. Ely survey, abstract No. 261, Johnson County, Texas and being all that certain called 195.501 acre tract of land described in deed from Randolph M. Roten and Lisa Renne Roten to BSAG Properties Ltd. and recorded in Volume 4444, Page 156 of the Real Property Records of Johnson County, Texas (address of collateral secured by note) – Default on Note Secured by Deed of Trust Recorded in the Real Property Records of Johnson County, Texas Under Instrument Number 2019-245

Greetings,

Ghrist Law Firm represents FDRE, Inc, your loan servicing company, and Tamamoi, LLC and FDRE, Inc., the noteholder on the note and the beneficiary of the deed of trust (collectively referred to herein as "Lender"). We have been authorized by the foregoing to initiate legal proceedings in connection with the collection of a debt associated with the deed of Trust (the "Debt"). This letter is formal notice of the following:

The noteholder has declared this account to be in default. **If default has not been cured within twenty-four (24) days, then the Mortgagee intends to accelerate the maturity date of the Note evidencing the loan and to declare all sums and installments thereunder immediately due and payable**. The property will then be scheduled for foreclosure sale according to the terms of the Deed of Trust and the laws of the State of Texas. Notwithstanding anything else herein to the contrary, this notice shall serve as proper notice under Texas Property Code § 51.002(d) and debtor shall have the full cure period opportunity provided for by the Texas Property Code.

To avoid acceleration, foreclosure, and further legal proceedings related to default, you must timely cure all default, including but not limited to the following defaults:

GHRIST LAW

- Payment default must be cured on this account and on the accounts of all senior lienholders, if any.

- If cure of the foregoing default(s) is not timely made, then the noteholder secured by the Deed of Trust referenced above intends to accelerate the note and to commence foreclosure proceedings.

- The presence of default necessitated the placement of this note for collections with Ghrist Law Firm PLLC to commence legal proceedings **for which a legal fee of $257.00 was incurred and has been added to your account**. Further legal fees will accrue as additional notices are sent and the account is prepared for a foreclosure auction.

Because the amount of interest and other charges may vary from day to day, the amount due on the day that you pay may vary. Please contact FDRE, Inc for current arrearage numbers good through the date that you intend to cure payment default. This account will accrue additional legal fees for posting of foreclosure notices and for the foreclosure itself. The lender intends to foreclose upon the property due to the default.

PLEASE BE ADVISED THAT THIS FIRM IS A DEBT COLLECTOR ATTEMPTING TO COLLECT THE ABOVE-REFERENCED DEBT. ANY INFORMATION OBTAINED FROM YOU WILL BE USED FOR THAT PURPOSE.

You may contact us here:

Ghrist Law Firm
2735 Villa Creek Drive, Suite 140
Farmers Branch, Texas 75234
(817) 778-4136
ian@ghristlaw.com

ASSERT AND PROTECT YOUR RIGHTS AS A MEMBER OF THE ARMED FORCES OF THE UNITED STATES. IF YOU ARE OR YOUR SPOUSE IS SERVING ON ACTIVE MILITARY DUTY, INCLUDING ACTIVE MILITARY DUTY AS A MEMBER OF THE TEXAS NATIONAL GUARD OR THE NATIONAL GUARD OF ANOTHER STATE OR AS A MEMBER OF A RESERVE COMPONENT OF THE ARMED FORCES OF THE UNITED STATES, PLEASE SEND WRITTEN NOTICE OF THE ACTIVE MILITARY SERVICE TO THE SENDER OF THIS NOTICE IMMEDIATELY.

GHRIST LAW

In this communication, you have been provided with the name of the creditor or creditor's agent to whom the debt is owed, and the address of that creditor or creditor's agent. Unless, within thirty days after receipt of this notice, the debtor hereunder disputes the validity of the debt, or any portion thereof, the debt will be assumed to be valid. If the debtor notifies the undersigned in writing within the thirty-day period that the debt, or any portion thereof, is disputed, then we will obtain verification of the debt and a copy of such verification will be mailed to the consumer. Upon the consumer's written request within the thirty-day period, the debt collector will provide the consumer with the name and address of the original creditor, current creditor, creditor's agents, current amount of debt, or such other information as the consumer may reasonably request. Please make the foregoing requests in writing to the undersigned.

Sincerely,

Ghrist Law Firm

By: [signature]
Ian Ghrist
Attorney

**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

7019 1640 0001 9056 6290

**For delivery information, visit our website at *www.usps.com®*.**

**OFFICIAL USE**

Certified Mail Fee
$

Extra Services & Fees *(check box, add fee as appropriate)*
- ☐ Return Receipt (hardcopy) $ ______
- ☐ Return Receipt (electronic) $ ______
- ☐ Certified Mail Restricted Delivery $ ______
- ☐ Adult Signature Required $ ______
- ☐ Adult Signature Restricted Delivery $ ______

Postage
$

**Total Postage and Fees**

NOI

Postmark
Here

**Carnegie Development**
**1201 Orange St #600**
**Wilmington DE 19899**

**APPELLANT 578**

## Certified Mail service provides the following benefits:

- A receipt (this portion of the Certified Mail label).
- A unique identifier for your mailpiece.
- Electronic verification of delivery or attempted delivery.
- A record of delivery (including the recipient's signature) that is retained by the Postal Service™ for a specified period.

### *Important Reminders:*

- You may purchase Certified Mail service with First-Class Mail®, First-Class Package Service®, or Priority Mail® service.
- Certified Mail service is *not* available for international mail.
- Insurance coverage is *not* available for purchase with Certified Mail service. However, the purchase of Certified Mail service does not change the insurance coverage automatically included with certain Priority Mail items.
- For an additional fee, and with a proper endorsement on the mailpiece, you may request the following services:
  - Return receipt service, which provides a record of delivery (including the recipient's signature). You can request a hardcopy return receipt or an electronic version. For a hardcopy return receipt, complete PS Form 3811, *Domestic Return Receipt;* attach PS Form 3811 to your mailpiece; for an electronic return receipt, see a retail associate for assistance. To receive a duplicate return receipt for no additional fee, present this USPS®-postmarked Certified Mail receipt to the retail associate.
  - Restricted delivery service, which provides delivery to the addressee specified by name, or to the addressee's authorized agent.
  - Adult signature service, which requires the signee to be at least 21 years of age (not available at retail).
  - Adult signature restricted delivery service, which requires the signee to be at least 21 years of age and provides delivery to the addressee specified by name, or to the addressee's authorized agent (not available at retail).
- To ensure that your Certified Mail receipt is accepted as legal proof of mailing, it should bear a USPS postmark. If you would like a postmark on this Certified Mail receipt, please present your Certified Mail item at a Post Office™ for postmarking. If you don't need a postmark on this Certified Mail receipt, detach the barcoded portion of this label, affix it to the mailpiece, apply appropriate postage, and deposit the mailpiece.

APPELLANT 579

**IMPORTANT: Save this receipt for your records.**

PS Form **3800,** April 2015 *(Reverse)* PSN 7530-02-000-9047

# EXHIBIT E

POSTED
_______A.M. 4 28 P.M.

JUN 08 2020

Becky Ivey
County Clerk, Johnson County Texas
BY______ DEPUTY

Tamamoi, LLC and FDRE, Inc., Noteholder
FDRE, Inc, Loan Servicing Company
Ghrist Law Firm PLLC (hereinafter "Attorney")

Carnegie Development
1201 Orange St #600, Wilmington DE 19899
Sent via regular mail and CMRR # 7019 1640 0001 9056 4654 on June 8, 2020

## NOTICE OF TRUSTEE'S SALE

WHEREAS Carnegie Development executed a Deed of Trust conveying to the initial trustee, the real estate hereinafter described, in payment of a debt therein described. The Deed of Trust was filed in the real property records of Johnson County, Texas and is recorded under Clerk's File/Instrument Number 2019-245, to which reference is made for all purposes.

WHEREAS, default has occurred in the payment of said indebtedness, and the same is now wholly due, and the owner and holder has requested to sell said property to satisfy said indebtedness;

WHEREAS, the undersigned has been, will be, or is hereby appointed Substitute Trustee in the place of the said original Trustee, upon contingency and in the manner authorized by said Deed of Trust; and

NOW, THEREFORE, NOTICE IS HEREBY GIVEN of the following:

1. Date, Place, and Time of Sale:

   Date: Tuesday, the 7th day of July 2020

   Time: The sale shall begin no earlier than 11:00 o'clock AM or no later than three hours thereafter.

   Place: The foreclosure sale will be conducted at public venue in the area designated by the Johnson County Commissioners Court pursuant to Section 51.002 of the Texas Property Code as the place where foreclosure sales are to take place, or if no place is designated by the Commissioner's Court, the sale will be conducted at the area immediately adjacent to the location where the Notice of Trustee's Sale (this notice) was posted.

2. Property to be Sold:

   BEING a 195.4720 acre tract of land situated in the John N. Ely Survey, Abstract No.261, Johnson County, Texas and being all that certain called 195.501 acre tract of land described in Deed from Randolph M. Roten and Lisa Renne Roten to BSAG Properties Ltd. And recorded in Volume 4444, Page 1 56 of the Real Property Records of Johnson County, Texas. BEGINNING at a RR Spike set for corner in County Road 506 at the East corner of said 195.501 acre tract of land and being at intersection of the Southwest line of Farm-to-Market Road No. 157 with the Southeast line of said 195.501 acre tract, said corner also

being in the in the established Southeast line of said Ely Survey, same being the established Northwest line of the Absalom Williams Survey, Abstract No. 857; THENCE South 59 040'46" West with said Survey lines and the Southeast line of said 195.501 acre tract a distance of 2, 150.64 feet to a RR Spike found for corner at the South corner of said 195.501 acre tract, same being the East corner of a called 0.6 acre save and accept tract from the called 200 acre parent tract recorded in Volume 2170, Page 901 of said Real Property Records; THENCE North 49 0 15 124" West across said Ely Survey and with the Southwest line of said 195.502 acre tract a distance of 444.86 feet to a 1/2" iron rod found for corner at an angle corner in said Southwest line, same being the Northeast line of a called 124.051 acre tract of land described in Deed from Virginia D. Rhinehart to Derrell G. Leonard and recorded in Volume 3557, Page 778 of said Real Propelty Records; THENCE North 30 0 22'29" West with said Southwest and Northeast lines at a distance of 2921.20 feet passing a 5" metal corner post found for corner at the North corner of the above referenced 124.051 acre tract of land, same being the East corner of that certain called 12.027 acre tract of land, Tract Two described in Deed from R. Pratt Phillips, et ux to Harper Cattle, L.L.C. and recorded in Volume 2476, Page 646 of said Real Property Records and continuing a total distance of 3,304.29 feet to RR spike found for the West corner of said 195.502 acre tract and being in County Road 507, the established Northwest line of said John N. Ely Survey, same being the Southeast line of the J. W. Hal-ris Survey, Abstract No. 1072; THENCE North 59 022' 28" East with County Road 507, the Northwest line of said 195.502 acre tract and the Northwest line of said Ely Survey, same being the Southeast line of said Harris Survey a distance of 2,329.19 feet to a RR spike found for corner at the North corner of said 195.502 acre tract, same being the established North corner of said Ely Survey and being in the Southwest line of the J. Ware Survey, Abstract No. 913; THENCE South 300271 55" East with the Northeast line of said Ely Survey, the Northeast line of said 195.502 acre tract and the Southwest line of said Ware Survey a distance of 162.69 feet to a h" iron rod found for corner in the Southwest line of Farm-to-Market Road No. 157 and being at the beginning of a non-tangent curve to the left; THENCE in a Southeasterly direction with said curve to the left having a radius of 358.31 feet, whose chord bears South 16046'07" East -169.20 for an arc length of 170.81 feet; THENCE with the East line of said 195.502 acre tract and the Southwest line of said Farm-to-Market Road the following: South 30 0 27'37" East a distance of 454.30 feet to a 1/2" iron rod found for corner; South 24 0 44'51 " East a distance of 100.50 feet to a 1/2" iron rod set for corner with cap marked "SANDS"; South 30 0 2729" East a distance of I ,400.00 feet to a 1/2" iron rod set for corner with cap marked "SANDS"; South 36 0 10 1 07" East a distance of 100.50 feet to a 1/2" iron rod set for corner with cap marked "SANDS"; THENCE South 30 0 2729" East a distance of 1,356.00 feet back to the POINT OF BEGINNING AND CONTAINING square feet or 195.4720 acres of land more or less

3. Name and Address of Sender of Notice:

Ghrist Law Firm, PLLC, Ian Ghrist, 2735 Villa Creek Drive, Suite 140, Farmer's Branch, Texas 75234

Pursuant to Section 51.009 of the Texas Property Code, the property will be sold in "as is, where is" condition, without any express or implied warranties, except as to the warranties of title (if any) provided for under the deed of trust.

ASSERT AND PROTECT YOUR RIGHTS AS A MEMBER OF THE ARMED FORCES OF THE UNITED STATES. IF YOU ARE OR YOUR SPOUSE IS SERVING ON ACTIVE MILITARY DUTY, INCLUDING ACTIVE MILITARY DUTY AS A MEMBER OF THE TEXAS NATIONAL GUARD OR THE NATIONAL GUARD OF ANOTHER STATE OR AS A MEMBER OF A RESERVE COMPONENT OF THE ARMED FORCES OF THE UNITED STATES, PLEASE SEND WRITTEN NOTICE OF THE ACTIVE MILITARY SERVICE TO THE SENDER OF THIS NOTICE IMMEDIATELY.

Pursuant to Section 51.0025 of the Texas Property Code, the mortgage servicer or Attorney are entitled to administer the foreclosure due to the fact that the servicer, noteholder or Lender, and Attorney have entered into an agreement granting authority to service the mortgage and administer foreclosure proceedings.

Ghrist Law Firm PLLC

Ian Ghrist, Substitute Trustee
2735 Villa Creek Drive, Suite 140
Farmer's Branch, Texas 75234
(817) 778-4136

**Becky Ivey**

Johnson County Clerk
2 N. Main St, Room 131
Cleburne, TX 76033

**Main:** (817)556-6310

**Receipt:** 20200608000175
**Date:** 06/08/2020
**Time:** 04:28PM
**By:** Leslie S
**Station:** ccl83
**Status:** ORIGINAL COPY

| Seq | Item | Document Description | Number | Number Of | Amount | Serial Number |
|---|---|---|---|---|---|---|
| 1 | Foreclosure - Clerk Posting | NOF | 96 | 2 | $15.00 | |
| 2 | Credit Card Fee | | | 1 | $0.75 | |

**Order Total** (2) $15.75

| Seq | Payment Method | Transaction Id | Comment | Total |
|---|---|---|---|---|
| 1 | Credit Card | 1730263355 | | $15.75 |

**Total Payments** (1) $15.75

**Change Due** $0.00

GHRIST LAW FIRM

**For more information about the County Clerk's office and to search property records online, please visit http://www.johnsoncountytx.org/government/county-clerk**

# EXHIBIT F

**JOYCE W. LINDAUER ATTORNEY, PLLC**
Attorney & Mediator
1412 Main Street, Suite 500
Dallas, Texas 75202
Email: joyce@joycelindauer.com
Email: dian@joycelindauer.com

Telephone No.
(972) 503-4033

Facsimile No.
(972) 503-4034

July 6, 2020

**VIA EMAIL**
ian@ghristlaw.com

Ian Ghrist, Substitute Trustee
Ghrist Law Firm PLLC
2735 Villa Creek Drive, Suite 140
Farmers Branch, TX 75234

**VIA EMAIL**
3739966@gmail.com

David Campbell
Tamamoi, LLC
5060 SW Philomath Blvd., Suite 363
Corvallis, OR 97333

Re: *WALL010 LLC*

Gentlemen:

This letter is being sent in response to your Notice of Trustee's Sale sent to Carnegie Development, LLC related to the loan from Tamamoi, LLC and Deed of Trust on 195.4720 acres as described therein ("Property") and recorded as File number 2019-245 in the real property records of Johnson County, Texas and shall serve as written notice that any attempts to foreclose on the Property will be in violation of the automatic stay that is in place related to the involuntary bankruptcy petition filed against Wall010, LLC ("Alleged Debtor") in the Northern District of Texas (Case No. 20-31134-bjh7). The funds used to purchase such Property included the funds of the Alleged Debtor and who has an interest in the Property and as such, the automatic stay that is in place applies to the Property.

Any and all further correspondence must be directed to our office and not our client directly. Thank you.

Sincerely,

Joyce W. Lindauer

# EXHIBIT G

**From:** Ian Ghrist
**To:** David Campbell (david@hasslefreecashflowinvesting.com); Jim Richardson; Behrooz Vida; tamsyn@hasslefreecashflowinvesting.com
**Subject:** FW:
**Date:** Tuesday, July 7, 2020 9:56:12 AM

---

-----Original Message-----
From: Joyce Lindauer <joyce@joycelindauer.com>
Sent: Tuesday, July 7, 2020 9:55 AM
To: Ian Ghrist <Ian@ghristlaw.com>
Cc: Vance McMurry <vance_mcmurry@hotmail.com>
Subject: RE:

I saw several he sent you last night in an email Check your emails again If your client does foreclose I am told that a suit for wrongful foreclosure sale and stay violations will be filed So I would consider resetting and working something out
Thanks

-----Original Message-----
From: Ian Ghrist <Ian@ghristlaw.com>
Sent: Tuesday, July 7, 2020 9:51 AM
To: Joyce Lindauer <joyce@joycelindauer.com>
Subject: RE:

Good morning,

I was told that I would be getting some documentation explaining how a bankruptcy of Wall010 could affect the borrower on the loan?

The only email I got from Mr. McMurray said that he didn't have his documents with him. So, I assume he would be trying to get them?

-Ian

-----Original Message-----
From: Joyce Lindauer <joyce@joycelindauer.com>
Sent: Monday, July 6, 2020 9:48 PM
To: Ian Ghrist <Ian@ghristlaw.com>
Subject:

Need an update or I am told to file bankruptcy petition Thanks Joyce Lindauer

Sent from my iPhone

# EXHIBIT H

# PROMISSORY NOTE

**$1,350,239.57** **July 16, 2018**

**FOR VALUE RECEIVED**, the undersigned **CARNEGIE DEVELOPMENT, LLC**, a Delaware limited liability company (hereinafter referred to as "Maker"), promises to pay to **WALL 010, LLC**, a Texas limited liability company, (hereinafter referred to as "Payee"; Payee, and any subsequent holder(s) hereof, being hereinafter referred to collectively as "Holder"), in which Maker is the managing member of, at the office of Payee or at such other place as Holder may designate to Maker in writing from time to time, the principal sum of **One Million Three Hundred Fifty Thousand Two Hundred Thirty-Nine and 57/100 Dollars ($1,350,239.57)** together with interest thereon, or so much thereof as is from time to time outstanding and unpaid, at the rates hereinafter set forth, in lawful money of the United States of America, which shall at the time of payment be legal tender in payment of all debts and dues, public and private, such principal and interest to be paid in the following manner:

1. Interest Accrual. Interest shall accrue on the unpaid principal balance at the rate equal to three (3%) percent per annum (the "Regular Interest Rate").

2. Maturity Date. Notwithstanding anything in the Note to the contrary, the absolute maturity date (the "Maturity Date") of the loan evidenced by this Note shall be the later of the second anniversary of the date of this Note. Upon such Maturity Date, Maker shall pay all accrued and outstanding interest and all of the outstanding principal balance. Any payments made shall first be applied to accrued but unpaid interest and then to the unpaid principal amount of this Note.

3. INTENTIONALLY OMITTED.

4. Prepayment. Maker may prepay all or any portion of the unpaid principal balance of this Note in cash or other immediately available funds at any time prior to the Maturity Date.

5. Events of Default. For purposes of this Note, each of the following events shall constitute an "Event of Default" hereunder: (i) failure of Maker to pay the principal amount or interest when due hereunder; (ii) failure of Maker to pay when due the principal amount or interest on any of the other Partner Notes; (iii) the commencement of a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to Maker or Maker's debts under the federal bankruptcy laws, as now constituted or hereafter amended, or under any other bankruptcy, insolvency, or similar law now or hereafter in effect; (iv) the commencement of an involuntary case or other proceeding seeking liquidation, reorganization or other relief with respect to Maker or Maker's debts under the federal bankruptcy laws, as now constituted or hereafter amended, or under any other bankruptcy, insolvency or similar law now or hereafter in effect, and such case or other proceeding shall not be vacated or dismissed within sixty (60) days after its commencement; (v) the entry of an order for relief by any court having jurisdiction in any involuntary bankruptcy case filed against Maker under the federal bankruptcy laws, as now constituted or hereafter amended; or (vi) the appointment of a receiver, trustee, liquidator or custodian for Maker or for all or a significant portion of Maker's assets or affairs. In the event of an Event of Default, (i) the principal indebtedness evidenced hereby, together with all unpaid interest accrued thereon, shall, at the option of Holder and upon written notice to Maker, at once become due and payable and may be collected forthwith, regardless of the stipulated Maturity Date and (ii) the

outstanding principal balance hereunder shall thereafter bear interest at a per annum interest rate equal to the Regular Interest Rate plus six percent (6%) per annum.

6. INTENTIONALLY OMITTED.

7. Usury Savings Clause. If from any circumstances whatsoever, fulfillment of any provision of this Note or of any other instrument evidencing or securing the indebtedness evidenced hereby, at the time performance of such provision shall be due, shall involve transcending the limit of validity presently prescribed by any applicable usury statute or any other applicable law, with regard to obligations of like character and amount, then ipso facto, the obligation to be fulfilled shall be reduced to the limit of such validity, so that in no event shall any exaction be possible under this Note or under any other instrument evidencing or securing the indebtedness evidenced hereby, that is in excess of the current limit of such validity, but such obligation shall be fulfilled to the limit of such validity.

8. Waiver. Presentment for payment, demand, protest and notice of demand, protest and non-payment and all other notices are hereby waived by Maker.

9. Time. Time is of the essence.

10. Governing Law. This Note is intended as a contract under and shall be construed and enforceable in accordance with the laws of the State of Texas, without regard to it conflict of laws provisions with venue and forum being in Dallas County, Texas.

11. Parties. As used herein, the terms "Maker" and "Holder" shall be deemed to include their respective heirs, successors, legal representatives and assigns, whether by voluntary action of the parties or by operation of law.

12. Binding. This Note shall be binding on the parties hereto and their respective heirs, legal representatives, executors, successors and assigns.

13. Modification. Neither this Note nor any provision hereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by Maker and Holder.

14. Severability. Any provision of this Note held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

**MAKER**

CARNEGIE DEVELOPMENT, LLC

_______________________________
Tim Barton, President

# EXHIBIT I

**Written Consent in Lieu of Special Meeting of
Wall 010, LLC**

12 / 30, 2018

Effective as of the date above, the undersigned, holding then necessary voting membership interests of the Company of Wall 010, LLC, a Texas limited liability company (the "Company"), do hereby, pursuant to company agreement consent to the following which shall have the same force and effect as a vote by the undersigned at a special meeting of the Members.

WHEREAS the Company entered into certain Agency and Loan Agreements with certain Chinese co-lenders as serviced by Platinum Investment Corporation ("PIC") for a loan to ("Loan") be used as part of the acquisition and development of certain property as described therein ("Original Property").

WHEREAS Company loaned to its managing member, Carnegie Development, LLC, $1,35,239.57 ("Note") which were used towards the acquisition and development of certain property consisting of 195.5 acres in Venus, Johnson County, Texas ("Replacement Property") including approximately $1,500,000 which shall be used as an Earnest Money Deposit.

WHEREAS the development of the Original Property was not feasible and Company seeks to replace the Original Property with the Replacement Property.

WHEREAS the Company and its Managing Member agree that the Managing Member will contribute the Replacement Property to the Company in exchange for the termination of the Note.

BE IT RESOLVED, that, the undersigned consents to the contribution of the Replacement Property to the Company in exchange the Note and all obligations related thereto are terminated.

IN WITNESS WHEREOF, the undersigned has executed this Written Consent in Lieu of Special Meeting.

**Managing Member**

Carnegie Development, LLC

________________________
Timothy Barton
President

# EXHIBIT J

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

# SPECIAL WARRANTY DEED

STATE OF TEXAS § KNOW ALL MEN BY THESE PRESENTS:

COUNTY OF DALLAS §

THAT **Carnegie Development, LLC**, a Delaware limited partnership ("Grantor"), for and in consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration to Grantor, in hand paid by **Wall010, LLC a** Texas limited liability company ("Grantee"), the receipt and sufficiency of which is hereby acknowledged by Grantor has GRANTED, SOLD AND CONVEYED, and by these presents does hereby GRANT, SELL AND CONVEY unto Grantee, the real property situated in Johnson County, Texas and legal described on the attached Exhibit "A" which is incorporated herein as if fully set forth at length, together with (i) all rights, title and interests of Grantor in and to any easements, leases, rights-of-way, rights of ingress or egress or other interests in, on or to any land, highway, street, road or avenue, open or proposed, in, on, in front of, abutting, adjoining or benefitting the Land, and (ii) all rights, title and interests of Grantor in and to all utilities, sewage treatment capacity and water capacity, if any, to serve or which will serve the Land (the Land and all of the foregoing set forth in the above in sub-clauses (i) and (ii) are hereinafter collectively referred to as the "Property").

This conveyance is made by Grantor and accepted by Grantee subject to any easements, restrictions and other matters of record which are incorporated herein by reference (collectively, the "Permitted Exceptions").

**GRANTOR'S SPECIAL WARRANTY OF TITLE SET FORTH IN THIS DEED, GRANTEE ACKNOWLEDGES AND AGREES THAT GRANTOR HAS NOT MADE, DOES NOT MAKE AND SPECIFICALLY NEGATES AND DISCLAIMS, AND GRANTEE IS NOT RELYING ON, ANY REPRESENTATIONS, WARRANTIES, PROMISES, COVENANTS, AGREEMENTS OR GUARANTIES OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, OF, AS TO, CONCERNING OR WITH RESPECT TO (A) THE VALUE, NATURE, QUALITY OR CONDITION OF THE**

PROPERTY, INCLUDING, WITHOUT LIMITATION, THE WATER, SOIL AND GEOLOGY, (B) THE INCOME TO BE DERIVED FROM THE PROPERTY, (C) THE SUITABILITY OF THE PROPERTY FOR ANY AND ALL ACTIVITIES AND USES WHICH GRANTEE MAY CONDUCT THEREON, (D) THE COMPLIANCE OF OR BY THE PROPERTY OR ITS OPERATION WITH ANY LAWS, RULES, ORDINANCES OR REGULATIONS OF ANY APPLICABLE GOVERNMENTAL AUTHORITY OR BODY, (E) THE HABITABILITY, MERCHANTABILITY, MARKETABILITY, PROFITABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF THE PROPERTY, (F) THE MANNER OR QUALITY OF THE CONSTRUCTION OR MATERIALS, IF ANY, INCORPORATED INTO THE PROPERTY, (G) THE MANNER, QUALITY, STATE OF REPAIR OR LACK OF REPAIR OF THE PROPERTY, (H) THE STATUS OF GRANTOR'S TITLE TO THE PROPERTY OR THE ACCURACY OF ANY SURVEY, OR (I) ANY OTHER MATTER WITH RESPECT TO THE PROPERTY, AND SPECIFICALLY, THAT GRANTOR HAS NOT MADE, DOES NOT MAKE, AND SPECIFICALLY DISCLAIMS ANY REPRESENTATIONS REGARDING COMPLIANCE WITH ANY ENVIRONMENTAL PROTECTION, POLLUTION OR LAND USE LAWS, RULES, REGULATIONS, ORDERS OR REQUIREMENTS, OR THE DISPOSAL OR EXISTENCE, IN OR ON THE PROPERTY, OF ANY HAZARDOUS MATERIALSGRANTEE FURTHER ACKNOWLEDGES AND AGREES THAT HAVING BEEN GIVEN THE OPPORTUNITY TO INSPECT THE PROPERTY, AND EXCEPT AS EXPRESSLY SET FORTH IN THE CONTRACT, GRANTEE IS RELYING SOLELY ON ITS OWN INVESTIGATION OF THE PROPERTY AND NOT ON ANY INFORMATION PROVIDED OR TO BE PROVIDED BY GRANTOR UNLESS SUCH INFORMATION IS EXPRESSLY INCORPORATED INTO THE REPRESENTATIONS AND WARRANTIES OF GRANTOR SET FORTH IN THE CONTRACT. GRANTEE AND ITS SUCCESSORS AND ASSIGNS ACKNOWLEDGE THAT ADVERSE MATTERS, INCLUDING, BUT NOT LIMITED TO, ADVERSE PHYSICAL AND ENVIRONMENTAL CONDITIONS, MAY NOT HAVE BEEN REVEALED BY GRANTEE'S INSPECTIONS AND INVESTIGATIONS. GRANTEE FURTHER ACKNOWLEDGES AND AGREES THAT ANY INFORMATION PREPARED BY THIRD PARTIES PROVIDED WITH RESPECT TO THE PROPERTY WAS PROVIDED OR MADE AVAILABLE AS A COURTESY ONLY AND WAS OBTAINED FROM A VARIETY OF SOURCES AND THAT GRANTOR HAS NOT MADE ANY INDEPENDENT INVESTIGATION OR VERIFICATION OF SUCH INFORMATION AND MAKES NO REPRESENTATIONS OR WARRANTIES AS TO THE ACCURACY OR COMPLETENESS OF SUCH INFORMATION. EXCEPT AS EXPRESSLY SET FORTH IN THE CONTRACT, GRANTOR SHALL NOT BE LIABLE OR BOUND IN ANY MANNER BY ANY VERBAL OR WRITTEN STATEMENTS, REPRESENTATIONS OR INFORMATION PERTAINING TO THE PROPERTY, OR THE OPERATION THEREOF, PREPARED OR FURNISHED BY ANY REAL ESTATE BROKER, AGENT, EMPLOYEE, SERVANT, CONTRACTOR OR THIRD PARTY. GRANTEE FURTHER ACKNOWLEDGES AND AGREES THAT, EXCEPT AS EXPRESSLY

**SET FORTH IN THE CONTRACT, THE SALE OF THE PROPERTY AS PROVIDED FOR HEREIN IS MADE ON AN "AS IS" CONDITION AND BASIS WITH ALL FAULTS. IT IS UNDERSTOOD AND AGREED THAT THE PURCHASE PRICE HAS BEEN ADJUSTED BY PRIOR NEGOTIATION TO REFLECT THAT ALL OF THE PROPERTY IS SOLD BY GRANTOR AND PURCHASED BY GRANTEE SUBJECT TO THE FOREGOING. THE PROVISIONS OF THIS PARAGRAPH SHALL SURVIVE THE CLOSING AND SHALL NOT MERGE INTO THE INSTRUMENTS OF CLOSING.**

TO HAVE AND TO HOLD the above described premises, together with all and singular the rights and appurtenances thereof in anywise belonging unto Grantee, its successors and assigns forever, and Grantor does hereby bind itself, its successors and assigns to WARRANT AND FOREVER DEFEND, all and singular such premises unto Grantee, its successors and assigns, against every person whomsoever lawfully claiming or to claim the same or any part thereof, by, through, or under the Grantor, but not otherwise.

Whenever used, the singular number shall include the plural, and the plural the singular.

[Signatures appears on the following page]

EXECUTED this 14 day of January, 2019.

**GRANTOR:**

**Carnegie Development, LLC**

By: ______________________
Name: Tim Barton
Its: President

STATE OF TEXAS §
§
COUNTY OF DALLAS §

This instrument was acknowledged before me on the 14 day of JANUARY 2019 by Tim Barton as President of Carnegie Development, LLC.

Bella D Khusal
My Commission Expires
09/24/2022
ID No. 131734480

______________________
Notary Public in and for the State of Texas

# Exhibit "A"
# Legal Description of Property

BEING a 195.4720 acre tract of land situated in the John N. Ely Survey, Abstract No.261, Johnson County, Texas and being all that certain called 195.501 acre tract of land described in Deed from Randolph M. Roten and Lisa Renne Roten to BSAG Properties Ltd. And recorded in Volume 4444, Page 156 of the Real Property Records of Johnson County, Texas.

BEGINNING at a RR Spike set for corner in County Road 506 at the East corner of said 195.501 acre tract of land and being at intersection of the Southwest line of Farm-to-Market Road No. 157 with the Southeast line of said 195.501 acre tract, said corner also being in the in the established Southeast line of said Ely Survey, same being the established Northwest line of the Absalom Williams Survey, Abstract No. 857;

THENCE South 59°40'46" West with said Survey lines and the Southeast line of said 195.501 acre tract a distance of 2,150.64 feet to a RR Spike found for corner at the South corner of said 195.501 acre tract, same being the East corner of a called 0.6 acre save and accept tract from the called 200 acre parent tract recorded in Volume 2170, Page 901 of said Real Property Records;

THENCE North 49°15'24" West across said Ely Survey and with the Southwest line of said 195.502 acre tract a distance of 444.86 feet to a ½" iron rod found for corner at an angle corner in said Southwest line, same being the Northeast line of a called 124.051 acre tract of land described in Deed from Virginia D. Rhinehart to Derrell G. Leonard and recorded in Volume 3557, Page 778 of said Real Property Records;

THENCE North 30°22'29" West with said Southwest and Northeast lines at a distance of 2921.20 feet passing a 5" metal corner post found for corner at the North corner of the above referenced 124.051 acre tract of land, same being the East corner of that certain called 12.027 acre tract of land, Tract Two described in Deed from R. Pratt Phillips, et ux to Harper Cattle, L.L.C. and recorded in Volume 2476, Page 646 of said Real Property Records and continuing a total distance of 3,304.29 feet to RR spike found for the West corner of said 195.502 acre tract and being in County Road 507, the established Northwest line of said John N. Ely Survey, same being the Southeast line of the J. W. Harris Survey, Abstract No. 1072;

THENCE North 59°22'28" East with County Road 507, the Northwest line of said 195.502 acre tract and the Northwest line of said Ely Survey, same being the Southeast line of said Harris Survey a distance of 2,329.19 feet to a RR spike found for corner at the North corner of said 195.502 acre tract, same being the established North corner of said Ely Survey and being in the Southwest line of the J. Ware Survey, Abstract No. 913;

THENCE South 30°27'55" East with the Northeast line of said Ely Survey, the Northeast line of said 195.502 acre tract and the Southwest line of said Ware Survey a distance of 162.69 feet to a ½" iron rod found for corner in the Southwest line of Farm-to-Market Road No. 157 and being at the beginning of a non-tangent curve to the left;

THENCE in a Southeasterly direction with said curve to the left having a radius of 358.31 feet, whose chord bears South 16°46'07" East -169.20 for an arc length of 170.81 feet;

THENCE with the East line of said 195.502 acre tract and the Southwest line of said Farm-to-Market Road the following:

South 30°27'37" East a distance of 454.30 feet to a ½" iron rod found for corner;

South 24°44'51" East a distance of 100.50 feet to a ½" iron rod set for corner with cap marked "SANDS";

South 30°27'29" East a distance of 1,400.00 feet to a ½" iron rod set for corner with cap marked "SANDS";

South 36°10'07" East a distance of 100.50 feet to a ½" iron rod set for corner with cap marked "SANDS";

THENCE South 30°27'29" East a distance of 1,356.00 feet back to the POINT OF BEGINNING AND CONTAINING 8,514,762 square feet or 195.4720 acres of land more or less

Behrooz P. Vida, SBOT No. 20578040
Carla Reed Vida, SBOT No. 16674445
Helenna Bird, SBOT No. 24085205
THE VIDA LAW FIRM, PLLC
3000 Central Drive
Bedford, Texas 76021
Tel: (817) 358-9977
Fax: (817) 358-9988
ATTORNEYS FOR TAMAMOI, LLC and FDRE, INC.

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| IIN RE | § | Chapter 7 |
| WALL007 LLC, *et al.*,[1] | § | Case No. 20-31131 (HDH) |
| Debtor | § | (Jointly Administered) |
| | § | |

---

**MOVANT'S AFFIDAVIT IN SUPPORT OF ITS MOTION FOR RELIEF FROM AUTOMATIC STAY**

| | |
|---|---|
| STATE OF OREGON | )( |
| COUNTY OF BENTON | )( |

James Richardson, being duly sworn according to law, deposes and says:

1. I am over the age of eighteen and authorized to make this affidavit.

2. I have care, custody and control of books, records and files relating to the loan made by FDRE, Inc., and Tamamoi, LLC, (collectively "Movant") to Carnegie Development, LLC ("Carnegie"). I have personally worked on said books, records and files and, as to the following facts, I know them to be true of my own personal knowledge or have gained knowledge of them from Movant's books, records and files. Said books, records and files were prepared in the regular course of Movant's business at or near the time of the acts, conditions, or events to which they relate by a person who had personal knowledge of the event being recorded and a business duty to accurately record such event. I have reviewed all of Movant's books and records in connection with this matter. Based upon my review of Movant's books and records, I have personal knowledge of the facts contained herein and, if called upon to testify, I could and would competently testify

1 The entities to be declared debtors are: WALL007 LLC, WALL009 LLC, WALL010 LLC, WALL011 LLC, WALL012 LLC, WALL016 LLC, and WALL017 LLC.

thereto.

3. I have reviewed the Motion for Relief from Stay to be filed in this proceeding and it contains the appropriate legal description for the Property the subject of the motion.

4. Movant agreed on a short-term basis to finance the purchase of the Property for Carnegie.

5. On December 28, 2018, Carnegie through Timothy Barton, its manager, signed a Promissory Note in the amount of $2,000,000.00 (the "Promissory Note") and executed a Deed of Trust (the "Deed of Trust"), which was recorded on January 4, 2019. Also, Timothy Barton personally guaranteed Carnegie's indebtedness to Movant.

6. The Promissory Note interest rate was 11.5% and it matured on June 27, 2020.

7. Before the maturity date of the Promissory Note, Carnegie defaulted under the terms of the Promissory Note.

8. Movant sent to Carnegie its notice of intent to accelerate.

9. Movant posted the Property for the July 7, 2020, foreclosure date.

10. As of July 7, 2020, the payoff on the indebtedness to Movant was the sum of $2,150,882.15. This balance remains unpaid and is accruing interest and other applicable charges.

11. On July 7, 2020, for the first time ever, Carnegie and WALL010, LLC ("Debtor"), through Timothy Barton and Vance McMurry, Esq., provided the following documents to Movant: (a) Promissory Note executed between Carnegie and Debtor on July 16, 2018, (b) Written Consent in Lieu of Special Meeting of Wall010, LLC, executed on December 30, 2018, (c) Unrecorded Warranty Deed transferring the Property from Carnegie to Debtor executed on January 14, 2019.

12. Movant has never had any contractual relationship with Debtor.

13. Paragraph A.11 of the Deed of Trust specifically provides Carnegie had to "obtain the written consent of [Movant] prior to entering into any pledge, security agreement, mortgage, or deed of trust covering any portion of the Property." Carnegie did not obtain Movant's written consent.

14. Paragraph B.9 of the Deed of Trust specifically provides "If [Carnegie] shall sell or convey all or any part of the Property or any interest therein, [Movant] may at [Movant's] option, declare the Note to be immediately due and payable, which option may be exercised at any time following such sale and/or conveyance."

15. Had Movant been aware of the transfer of the Property from Carnegie to Debtor, it would have sought this Court's help much sooner.

Further affiant says nothing.

James Richardson

Subscribed and sworn to before me the undersigned authority on July 16, 2020 after review of photographic identification.

OFFICIAL STAMP
NEIL STEPHEN ABREW
NOTARY PUBLIC - OREGON
COMMISSION NO. 986055
MY COMMISSION EXPIRES APRIL 07, 2023

Notary Public - State of Oregon

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>WALL007 LLC, *et al.*,[1]<br><br>Alleged Debtors. | Chapter 7<br><br>Case No. 20-31131 (HDH)<br>(Jointly Administered) |

**PETITIONING CREDITORS' MOTION TO COMPEL RESPONSES TO PETITIONING CREDITORS' FIRST REQUEST FOR PRODUCTION OF DOCUMENTS AND FIRST SET OF INTERROGATORIES**

Jun Li, Yunding Kang, Cunxiang Ji, Jin Wang, Peng Guo, Lin Zhou, Qu Chen, Kai Tian, Yijing Wu, Xuegeng Gong, Jin Wang, Weijia Kong, Heng Zhang, Hong Guo, Pei Guan, Yue Xu, Mai Ye, Chenchen Jiang, Qiuying Li, Ruinian Wu, Lin Zhou, Liying Yang, Yan Zhang, Wenjun Wang, Ying Zhou, Lin Li, Li Jiang, Rufeng Ding, Cunxiang Ji, Lin Gao, Qiao Qin, Yue Zhang, Xiaodong Hao, Tianqing Song, Li Jiang, Weisi Wang, Xiaoquan Dai, Feng Yan, Heng Zhang, Ou Jiang, Jinzhe Wu, Yadan Liu, Wanwan Li, Wenjuan Yin, Jiancheng Chen, Yi Tang, Ying Zhang, Pengfei Dong, Kangying Mao, Yijing Wu, Li Jiang, Qin Chu, Yulan Chen, Sicheng Zhan, Pei Guan, Jingqiu Tang, Di Tang, Jun Zeng, Kui Wang, Yue Zhang, Jun Wang, Xiaomin Fan, Di Tang, Jialin Hu, Qin Chu, Jiaxiang Lu, Fuqing Chen, Hanjiang Fu, Aiguo Luo, Fang Ding, Xiangdong Zhu, Wai Ying, Yuan Yuan, Chao Xu, Guoqin Zhou, Yijing Wu, (collectively, the "Petitioning Creditors"), by and through their counsel, hereby submit this motion (the "Motion"), pursuant to Rule 7037 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Federal Rule of Civil Procedure 37, for entry of an order, substantially in the form attached hereto as Exhibit "E" (the "Proposed Order"), compelling the Alleged

[1]The Alleged Debtors in these cases are: WALL007 LLC, WALL009 LLC, WALL010 LLC, WALL011 LLC, WALL012 LLC, WALL016 LLC, WALL017 LLC. The Alleged Debtors' federal tax identification numbers are unknown to the Petitioning Creditors sat this time.

Debtors, WALL007 LLC, WALL009 LLC, WALL010 LLC, WALL011 LLC, WALL012 LLC, WALL016 LLC, WALL017 LLC's (collectively, the "Alleged Debtors") responses ("Responses") to Petitioning Creditors' First Request for Production of Documents and First Set of Interrogatories ("Document Requests" and "Interrogatories") (collectively, the "Requests"). In further support of the Motion, the Petitioning Creditors respectfully represent as follows:

## PRELIMINARY STATEMENT[2]

1. The Petitioning Creditors file this Motion to compel production as a result of the Alleged Debtors' failure to adequately and fully respond to the Requests.

2. Despite the Alleged Debtors' general, vague and misplaced objections, Responses sought by the Petitioning Creditors to their Requests are quite relevant to the Petitions and the first "Motions to Dismiss" filed by the Alleged Debtors pending before the Court for hearing on August 17, 2020.

3. The fact that the Alleged Debtors are refusing to provide non-privileged, clearly relevant discovery is telling. The Petitioning Creditors can only conclude that the Alleged Debtors do not want the Court to discover the truth, that the Alleged Debtors are seemingly nothing more than shells with little or no assets. Certainly, the Alleged Debtors do not want the Petitioning Creditors to find out what happened to approximately $20,000,000 in loan proceeds from the Petitioning Creditors. Why else would they refuse to produce basic financial documents for the Alleged Debtors to the Petitioning Creditors?

4. The general excuse the Alleged Debtors interpose (through their counsel) in their Responses is that the Requests are not relevant to the Court making a determination on the Petitions.

[2] Capitalized terms not defined in this section are defined in a later section of the Motion.

5. The Alleged Debtors' parroted relevancy objections without substance are untenable, particularly given the Fifth Circuit's broad interpretation of the relevancy standard. Coughlin v. Lee, 946 F.2d 1152, 1159 (5th Cir. 1991).

## JURISDICTION AND VENUE

6. The Court has jurisdiction over the subject matter of this proceeding pursuant to 28 U.S.C. §§ 157, 1331 and 1334.

7. This proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

8. Venue of this action is proper in this Court pursuant to 28 U.S.C. § 1409.

## RELEVANT PROCEDURAL AND FACTUAL BACKGROUND

9. The Petitioning Creditors filed involuntary chapter 7 bankruptcy petitions (collectively, the "Petitions") against each Alleged Debtor on April 8, 2020. See [Dkt. No. 1 in 20-31131]; [Dkt. No. 1 in 20-31133]; [Dkt. No. 1 in 20-31134]; [Dkt. No. 1 in 20-31135]; [Dkt. No. 1 in 20-31136]; [Dkt. No. 1 in 20-31138]; and, [Dkt. No. 1 in 20-31139].

10. On April 24, 2020, this Court entered an Order granting the Petitioning Creditors' motion to jointly administer the bankruptcy cases (the "Cases") under the lead case WALL007 LLC [Dkt. No. 11 in 20-31131] (the "Lead Case").

11. On May 7, 2020, each Alleged Debtor filed Motions to Dismiss. See [Dkt. Nos. 18–19 in 20-31131]; [Dkt. Nos. 15–16 in 20-31133]; [Dkt. Nos. 14–15 in 20-31134]; [Dkt. Nos. 14–15 in 20-31135]; [Dkt. Nos. 14–15 in 20-31136]; [Dkt. Nos. 14–15 in 20-31138]; and, [Dkt. Nos. 14–15 in 20-31139] (collectively, the "Motions to Dismiss").

12. The Motions to Dismiss seek dismissal of the Petitions alleging, *inter alia*, that: (1) there are an insufficient number of Petitioning Creditors to support the filing of the Petitions against the Alleged Debtors; (2) the Petitioning Creditors' claims are in bona fide dispute; (3) the

Alleged Debtors are generally paying their respective debts; and (4) the Petitions are not in the best interests of each of the Alleged Debtors and its creditors. See Motions to Dismiss.

13. On June 1, 2020, the Petitioning Creditors sent Requests to each of the Alleged Debtors. Attached as Exhibit "A" is a true and correct copy of the Requests propounded upon the Alleged Debtors.

14. On June 20, 2020, the Court entered a Joint Discovery Plan setting forth, among other matters, discovery deadlines.

15. On July 6, 2020, the Alleged Debtors provided their Responses. Attached as Exhibit "B" is a true and correct copy of the Responses.

16. Initially, no documents were produced and the Alleged Debtors objected rather generally to the majority of the Requests. See Exhibit "B."

17. On July 10, 2020, at the repeated requests of counsel for the Petitioning Creditors, the Petitioning Creditors' and the Alleged Debtors' counsel discussed the Responses in a failed attempt to amicably resolve the Petitioning Creditors' objections to the Responses.

18. The Alleged Debtors' counsel did indicate that they would be producing documents responsive to the Requests.

19. Later, in the evening of July 10, 2020, the Petitioning Creditors' counsel received minimal documents from the Alleged Debtors. Attached as Exhibit "C" is a copy of the letter sent to the Alleged Debtors detailing the deficiencies of their Responses. Attached as Schedule A to this letter is a list setting forth the few documents produced by the Alleged Debtors.

20. The Alleged Debtors did not receive any formal or other meaningful response to the Deficiency Letter other than a subsequent, belated email from Ms. Lindauer indicating that no additional Responses would be forthcoming as, in Ms. Lindauer's view, the Petitioning

Creditors allegedly did not comply with another Order of this Court relating to the "wet signatures" of the Petitioning Creditors. Attached as Exhibit "D" is email correspondence from the Alleged Debtors' counsel indicating they would not be producing any additional responses and documents to the Requests.

21. Even if these allegations (about the wet signatures) were true, which they are not, such allegations do not permit the Alleged Debtors to refuse to respond to the Requests.

22. The Alleged Debtors simply do not want to comply with the Requests as set forth herein.

## LEGAL ARGUMENTS

23. "The purpose of discovery is to ascertain the truth." In re Certain Asbestos Cases, 112 F.R.D. 427, 432 n. 8 (N.D. Tex. 1986) (Fitzwater, J.); see also Batson v. Neal Spelce Assocs., Inc., 112 F.R.D. 632, 642 (W.D. Tex. 1986) ("Mutual knowledge of all of the relevant facts gathered by both parties is essential to proper litigation."). This is why the Federal Rules permit parties to "obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense," without regard to whether the information will be ultimately admissible at trial, so long as the request "appears reasonably calculated to lead to the discovery of admissible evidence." FED. R. CIV. P. 26(b)(1). These liberal discovery provisions are meant to encourage full vetting of the issues and facts prior to trial, and to "remove surprise," prevent sandbagging, and avoid a favorable trial outcome based on the disfavored practice of "trial by ambush." Super Future Equities, Inc. v. Wells Fargo Bank Minn., N.A., 2007 WL 441037, at *8 (N.D. Tex. Dec. 14, 2007).

24. The Petitioning Creditors are entitled to "discovery regarding any matter . . ., which is relevant to the subject matter in the pending action." FED. R. CIV. P. 26(b). The Fifth Circuit has held that "relevance" is to be construed broadly—information is relevant as long as it

"encompass[es] any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." Coughlin v. Lee, 946 F.2d 1152, 1159 (5th Cir. 1991). Additionally, relevancy is not limited to admissible evidence. Id.

25. Failure by one party to fulfill its obligation to produce requested documents opens the door to a motion to compel production. FED. R. CIV. P. 37(a)(3)(B); Curtis v. Metropolitan Life Ins. Co., 2016 WL 687164, at *2 (N.D. Tex. Feb. 19, 2016) (Horan, J.). For purposes of a motion to compel, "an evasive or incomplete ... response must be treated as a failure to respond." FED. R. CIV. P. 37(a)(4).

26. It is the burden of the party resisting discovery to "show how each discovery request is not relevant or [is] otherwise objectionable." Carr v. State Farm Mut. Auto. Ins., Co., 312 F.R.D. 459, 463 (N.D. Tex. 2015) (Horan, J.) (citing McLeod, Alexander, Powel & Apffel, P.C. v. Quarles, 894 F.2d 1482, 1485 (5th Cir. 1990). This burden includes the obligation of demonstrating the applicability of a claimed privilege. Id. (citing In re Santa Fe Int'l Corp., 272 F.3d 705, 710 (5th Cir. 2001)). If the party objecting to a discovery request fails to sufficiently "urge and argue in support of [its] objection to a request," such objection is waived and production must be compelled. Id.

### *A. The Requests Seeks Documents and Information Relevant to the Petitions and Motions to Dismiss filed by the Alleged Debtors.*

27. The Petitioning Creditors Requests are directly relevant to the defenses pled by the Alleged Debtors in their Motions to Dismiss. See Motions to Dismiss. From the Alleged Debtors' own pleading:

> As an initial matter, dismissal of the Involuntary Petitions is warranted (i) because the jurisdictional requirements of Section 303 of the Bankruptcy Code have been disregarded; (ii) Michel Fu ("Fu"), who was doing business as Silverland Financial Ltd. ("Silverland") and Platinum Investment Corporation ("PIC"), is the real party-in-interest and he is using the Petitioners as his pawns in

> this proceeding; and (iii) because the Alleged Debtors have an ongoing dispute with each Petitioner– meaning they do not meet the requirements of Section 303(b)(1) of the Bankruptcy Code. Further the Alleged Debtors contend that they are generally paying their undisputed noncontingent and liquidated debts as they come due. The claims being asserted by the Petitioners are subject to bona fide dispute as to liability and amount.

See Motions to Dismiss, ¶ 2.

28. The Alleged Debtors' also requested dismissal of the Petitions as they "[are] not in the best interest of the Alleged Debtor[s'] creditors or the Alleged Debtor[s]. See Motions to Dismiss, ¶ 40–48.

29. Many of the Requests deal with very routine, basic information that most companies, who claim they have an ongoing business and/or assets, would have in their possession (or available to them) in the ordinary course—i.e. (i) documents that might demonstrate whether a business is paying its debts when due (which the Alleged Debtors assert is true in their Motions to Dismiss); (ii) documents reflecting the current assets and liabilities of the Alleged Debtors which might support defenses and assertions by the Alleged Debtors that the Petitioning Creditors' claims are subject to bona fide dispute or that they have real assets and liabilities (ie., they are real, not sham companies) and, therefore, that the Petitions are allegedly not in the best interests of their estates and the creditors (which they assert as defenses); and (iii) documents relating to the loan agreements and the Petitioning Creditors' claims which are at the heart of the Petitions and defenses thereto (i.e. the claims are subject to bona fide dispute).

30. The Court is respectfully directed to the following table:

| | | | |
|---|---|---|---|
| **REQUEST NO. 5:** All communications between the Alleged Debtors or their Representatives and the Petitioning Creditors or their Representatives during the Applicable Time Period. | **REQUEST NO. 9:** All Documents that support the Alleged Debtors' contention that the Alleged Debtors are generally paying their debts as they come due.<br>**RESPONSE:** Alleged Debtors object to this Request | **REQUEST NO. 20:** All Documents evidencing the Alleged Debtors' memorialization of the Loans, or otherwise related to the Loans, including, but not limited to, Loan Agreements, security agreements, notes, | **REQUEST NO. 21:** All minutes, resolutions, approvals and other Documents pertaining to Board of Director(s) or Board of Manager(s) (or equivalent governing body of Alleged Debtors) meetings for the |

| | | | |
|---|---|---|---|
| **<u>RESPONSE</u>:** Alleged Debtors object to this Request on the grounds that it seeks communications that the Petitioning Creditors, as a party to such communications, has equal, if not better access, to and as such are already in Plaintiffs 'possession, custody, or control.<br>**<u>OBJECTION</u>:** This is an improper response. The Petitioning Creditors are not required to guess which documents are in the possession of the Alleged Debtors which are responsive to this Request. The Alleged Debtors have an obligation to search through their documents and provide responsive documents to this Request…<br><br>**<u>REQUEST NO. 8</u>:** All Documents that support the Alleged Debtors' contention that the Alleged Debtors each have more than 12 creditors.<br>**<u>RESPONSE</u>:** Alleged Debtors shall each produce its List of Creditors in response to this Request.<br>**<u>OBJECTION</u>:** The Alleged Debtors provided a production on July 10. The production of documents did not contain a response to this request despite the Alleged Debtors' response indicating that a "List of Creditors" would be produced… | as being overly broad, not reasonably tailored in scope, unduly burdensome, potentially targeted at the harassment of the Alleged Debtors, and is not proportional to the needs of the case…<br>**<u>OBJECTION</u>:** There is nothing improper about this request as the Alleged Debtors make this contention in their pleadings to dismiss the Petitions. Since that is the case, the Alleged Debtors must produce all financial documents in their possession demonstrating that they are in fact paying their debts as due (ie., payable agings and other accounting records such as bank statements)…<br><br>**<u>REQUEST NO. 16</u>:** All Documents which support the Alleged Debtors' contention that the Alleged Debtors' have suffered damages as a result of the Petitions.<br>**<u>RESPONSE</u>:** Alleged Debtors shall provide the Motion to Dismiss, the aforementioned Brief in Support, and the List of Remitters. Also pertinent to support of such contention is the June 25, 2020 deposition testimony of Jiang Haibo. Alleged Debtors reserve the right to supplement this Response. Further the deposition of Michael Fu will support this response.<br>**<u>OBJECTION</u>:** The Alleged Debtors failed to provide documents that support their contention that they have sustained damages as a result of the Petitions… | collateralization documents, receipts (including Loan proceeds receipts), acknowledgments and confirmations.<br>**<u>RESPONSE</u>:** Alleged Debtors shall provide the Motion to Dismiss, the aforementioned Brief in Support, and the List of Remitters. Also pertinent to support of such contention is the June 25, 2020 deposition testimony of Jiang Haibo. Alleged Debtors reserve the right to supplement this Response. Further the deposition of Michael Fu will support this response.<br>**<u>OBJECTION</u>:** The Alleged Debtors did not provide any documents relevant to the Loans including those requested by way of examples. There are over 70+ Petitioning Creditors, collectively, of the Alleged Debtors. It is hard to believe that the Alleged Debtors do not have documentation responsive to this Request… | Alleged Debtors during the Applicable Time Period which relate to the Loans and/or the Projects.<br>**<u>RESPONSE</u>:** Alleged Debtors object as such documents are not relevant to any issues before the Court at this time.<br>Alleged Debtors reserve the right to supplement this Response.<br>**<u>OBJECTION</u>:** The Alleged Debtors are allegedly duly formed limited liability companies. Generally, such companies have business records that they are able to produce to substantiate that they are actual businesses…<br><br>**<u>REQUEST NO. 30</u>:** All Documents which are Financials and/or related to Financials of the Alleged Debtors during the Applicable Time Period.<br>**<u>RESPONSE</u>:** Alleged Debtors object to this Request on the grounds that such documents are not relevant to any issue before the Court at this time....<br>**<u>OBJECTION</u>:** The Alleged Debtors are limited liability companies. Generally, companies have business records and/or financial documents. Such documents would be relevant to the underlying Petitions and relevant documents should be produced by the Alleged Debtors. The Alleged Debtors have asserted that they have legitimate businesses and assets which are being interrupted and incurring damages as a result of the Petitions. They further allege that the Petitions are not in the best interests of the Alleged Debtors or the creditors… |

See Exhibit "D."

31. Some of the Requests simply ask for basic litigation responses such as whether declarations or admissions have been made which might be against the interests of the Alleged Debtors or the Petitioning Creditors or which are otherwise relevant to this litigation.

32. The Responses are, at times, nonsensical as the Court can glean from the following table:

| |
|---|
| **INTERROGATORY 7:** Do you contend that any declaration against interest with regard to the issues in this lawsuit have been made by any party hereto or by a director, officer, agent and/or employee of any party hereto?<br>**ANSWER:** Alleged Debtors object to this Interrogatory as it requires them to make a conclusion of law as such relates to any potential objection based on hearsay lodged by any party…<br>**OBJECTION:** In an attempt to clarify and resolve same, please provide any declarations against interest from parties or third-parties which the Alleged Debtors may seek to introduce as evidence in this proceeding in support of their defense…<br><br>**INTERROGATORY 9:** Do you contend that any admissions with regard to the issues in this matter have been made by any party hereto or by any director, officer, agent and/or employee of any party hereto?<br>**ANSWER:** Alleged Debtors object to this Interrogatory since no Requests for Admissions have yet been served on Alleged Debtors or their counsel. Alleged Debtors further object to this Interrogatory… [this] is merely a fishing expedition.<br>**OBJECTION:** Request for admissions on critical issues, including admissions against a party's interest, are standard interrogatory requests in virtually every litigation (as are the majority of Petitioner's requests which the Alleged Debtors have objected to) and have nothing to do with whether or not Petitioning Creditors served separate requests for admissions…<br><br>**INTERROGATORY NO. 14:** Set forth in detail the factual basis for each and every denial of, objection or opposition to any of the allegations contained in the Petitions.<br>**ANSWER:** Alleged Debtors object to this Interrogatory to the extent it is general and seeks to require it to marshal all evidence that may be offered at trial, which is not a permissible form of discovery, and is merely a fishing expedition… To the extent that Alleged Debtors are compelled to respond notwithstanding their objections and without waiving such, Debtors have already produced, and Petitioning Creditors are already in possession of such responses.<br>**OBJECTION:** … The Alleged Debtors failed to provide any factual basis for contesting the filing of the Petitions. Petitioning Creditors are not required to guess what facts the Petitioning Creditors may rely upon at the time of trial in support of their defense(s) to the Petition… |

See Exhibit "D."

33. The Petitioning Creditors require such Responses, to prepare for litigation, including in order to adequately respond to the arguments made in the Motions to Dismiss and to support their Petitions at the hearing presently scheduled before this Court on August 17, 2020.

34. The Petitioning Creditors can only conclude that Alleged Debtors are refusing to respond as they do not want anyone to discover the truth, that the Alleged Debtors may not be legitimate business but very well could be nothing more than shells with little or no assets.

35. Certainly, the Alleged Debtors do not want the Petitioning Creditors to find out what happened to the $33,000,000 in loan proceeds extended by the Petitioning Creditors and other lenders to the Alleged Debtors. Why else would they refuse to answer simple questions such as who maintains the Alleged Debtors' financial books and records or produce basic corporate and financial documents to the Petitioning Creditors?

36. The Alleged Debtors' relevancy objections are untenable, particularly given the Fifth Circuit's broad interpretation of the relevancy standard. Coughlin v. Lee, 946 F.2d 1152, 1159 (5th Cir. 1991).

37. The Alleged Debtors also failed to verify the responses to the Interrogatories as required by Federal Rule of Civil Procedure 33 (as adopted by Federal Rule of Bankruptcy Procedure 9032). Without verification, the Petitioning Creditors cannot ascertain whether the Responses are true, complete and accurate.

***B. The Petitioning Creditors Are Entitled to Recover Attorney's Fees Incurred in Connection with this Motion.***

38. Federal Rule of Civil Procedure 37(a)(5)(A) provides that, if a motion to compel is granted, "the court must, after giving an opportunity to be heard, require the party . . . whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees," except that "the court must not order this payment if: (i) the movant filed the motion before attempting in good faith to obtain the disclosure or discovery without court action; (ii) the opposing party's nondisclosure, response, or objection was substantially justified; or (iii) other circumstances make an award of expenses unjust." FED. R. CIV. P. 37(a)(5)(A).

39. Attorney's fees are required here. The Petitioning Creditors made repeated requests for the information sought to be compelled and have conferred with opposing counsel

on multiple occasions. Nevertheless, the Alleged Debtors have refused to produce responsive documents without any legitimate justification, thereby creating delay and imposing costs upon the Petitioning Creditors. Under these circumstances, Rule 37(a)(5)(A) mandates that this Court award the Petitioning Creditors their fees and expenses in making this Motion.

## CONCLUSION

40. Based on the foregoing, the Petitioning Creditors request that this Court enter an order: (i) requiring the Alleged Debtors to produce all documents responsive to the Petitioning Creditors' First Requests; (ii) granting attorney's fees, expenses and costs of court incurred by the Petitioning Creditors in connection with this Motion and for any hearing thereon; and (iii) granting any other relief that is just and proper.

Dated: July 23, 2020

/s/ *Stephen M. Packman*

Jiangang Ou
Nguyen & Chen LLP
11200 Westheimer Road Suite 120
Houston, TX 77042
(832) 767-0339
Fax : (832) 767-0669
Email: jou@nguyen-chen.com

Stephen M. Packman
Archer & Greiner, P.C.
Three Logan Square
1717 Arch St., Suite 3500
Philadelphia, PA 19103
215-246-3147
Email: spackman@archerlaw.com

*Counsel for the Petitioning Creditors*

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that, on July 23, 2020, a true and correct copy of the foregoing document was served on all parties requesting service via the Court's ECF system.

/s/ Stephen M. Packman
Stephen M. Packman

**CERTIFICATE OF CONFERENCE**

I hereby certify that on July 23, 2020, I conferred by e-mail with counsel to the Alleged Debtors regarding the relief requested in this Motion. The Alleged Debtors indicated it would not produce additional Responses to the Petitioning Creditors' Requests.

*/s/ Stephen M. Packman*
Stephen M. Packman

218971193v1

# Exhibit "A"

ARCHER
ATTORNEYS AT LAW

**Stephen M. Packman**
*Fellow of INSOL*
*Also Member of Pennsylvania and New York Bar*
spackman@archerlaw.com
215-246-3147 (Ext. 5147) Direct

Archer & Greiner, P.C.
Three Logan Square
1717 Arch Street, Suite 3500
Philadelphia, PA 19103-2739
215-963-3300 Main
215-963-9999 Fax
www.archerlaw.com

June 1, 2020

**VIA EMAIL**

Joyce W. Lindauer, Esq.
Joyce W. Lindauer Attorney, PLLC
1412 Main St., Ste. 500
Dallas, TX 75202

Re: In re WALL007, LLC, et al.[1]
Chapter 7 Bankruptcy Case No. 20-31131 (HDH) (Bankr. N.D. Tex.)
Our File No. WAL347-00961

Dear Ms. Lindauer:

Enclosed please find the following:

- Petitioning Creditors' First Set of Interrogatories to the Alleged Debtors; and
- Petitioning Creditors' First Request for Production of Documents Upon the Alleged Debtors.

Very truly yours,

*/s/ Stephen M. Packman*
STEPHEN M. PACKMAN

SMP:jg
Enclosures

218624468v1

[1] The Alleged Debtors in these cases are: WALL007 LLC, WALL009 LLC, WALL010 LLC, WALL011 LLC, WALL012 LLC, WALL016 LLC, WALL017 LLC.

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>WALL007 LLC, *et al.*,[1]<br><br>Alleged Debtors. | Chapter 7<br><br>Case No. 20-31131 (HDH) |

**PETITIONING CREDITORS FIRST SET OF INTERROGATORIES TO THE ALLEGED DEBTORS**

Jun Li, Yunding Kang, Cunxiang Ji, Jin Wang, Peng Guo, Lin Zhou, Qu Chen, Kai Tian, Yijing Wu, Xuegeng Gong, Jin Wang, Weijia Kong, Heng Zhang, Hong Guo, Pei Guan, Yue Xu, Mai Ye, Chenchen Jiang, Qiuying Li, Ruinian Wu, Lin Zhou, Liying Yang, Yan Zhang, Wenjun Wang, Lan Ji, Ying Zhou, Lin Li, Li Jiang, Rufeng Ding, Cunxiang Ji, Lin Gao, Qiao Qin, Yue Zhang, Xiaodong Hao, Tianqing Song, Li Jiang, Weisi Wang, Xiaoquan Dai, Feng Yan, Heng Zhang, Ou Jiang, Jinzhe Wu, Yadan Liu, Wanwan Li, Wenjuan Yin, Jiancheng Chen, Yi Tang, Ying Zhang, Pengfei Dong, Kangying Mao, Yijing Wu, Li Jiang, Qin Chu, Yulan Chen, Sicheng Zhan, Pei Guan, Jingqiu Tang, Di Tang, Jun Zeng, Kui Wang, Yue Zhang, Jun Wang, Xiaomin Fan, Di Tang, Jialin Hu, Qin Chu, Jiaxiang Lu, Fuqing Chen, Hanjiang Fu, Aiguo Luo, Fang Ding, Xiangdong Zhu, Wai Ying, Yuan Yuan, Chao Xu, Guoqin Zhou, Yijing Wu, (collectively, the "Petitioning Creditors"), by and through their undersigned counsel, pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure (the "Federal Rules"), as made applicable herein by Rules 7026, 7033, and 9014(c) of the Federal Rules of Bankruptcy

[1] The Alleged Debtors in these cases are: WALL007 LLC, WALL009 LLC, WALL010 LLC, WALL011 LLC, WALL012 LLC, WALL016 LLC, WALL017 LLC. The Alleged Debtors' federal tax identification numbers are unknown to the Petitioning Creditors at this time.

Procedure (the "Bankruptcy Rules"), hereby propound this First Set of Interrogatories ("First Set") upon the Alleged Debtors to be answered fully within thirty (30) days after service hereof.

Dated: June 1, 2020

/s/ *Jiangang Ou*
Jiangang Ou
Nguyen & Chen LLP
11200 Westheimer Road Suite 120
Houston, TX 77042
(832) 767-0339
Fax : (832) 767-0669
Email: jou@nguyen-chen.com

Stephen M. Packman
Archer & Greiner, P.C.
Three Logan Square
1717 Arch St., Suite 3500
Philadelphia, PA 19103
215-246-3147
Email: spackman@archerlaw.com

*Counsel for the Petitioning Creditors*

## DEFINITIONS

1. "Affiliates" means an entity or person as defined in 11 U.S.C. 101(2).

2. "All" and "any" mean both each and every.

3. "Alleged Debtor" refers individually to, and "Alleged Debtors" means, collectively, WALL007 LLC (Case No. 20-31131), WALL009 LLC (Case No. 20-31133), WALL010 LLC (Case No. 20-31134), WALL011 LLC (Case No. 20-31135), WALL012 LLC (Case No. 20-31136), WALL016 LLC (Case No. 20-31138), WALL017 LLC (Case No. 20-31139).

4. "And" means "and," "or" or "and/or" whenever interpretation would result in the broadest or most liberal interpretation which would cause the greatest production of documents.

5. "Applicable Time Period" means all dates beginning January 1, 2017, through the Petition Date.

6. "Assets" means all property that would constitute property of the Alleged Debtors' bankruptcy estates, as of the Petition Dates pursuant to 11 U.S.C. 541.

7. "Bankruptcy Cases" means the bankruptcy cases: WALL007 LLC (Case No. 20-31131), WALL009 LLC (Case No. 20-31133), WALL010 LLC (Case No. 20-31134), WALL011 LLC (Case No. 20-31135), WALL012 LLC (Case No. 20-31136), WALL016 LLC (Case No. 20-31138), WALL017 LLC (Case No. 20-31139), filed by the Petitioning Creditors against the Alleged Debtors in the Bankruptcy Court.

8. "Bankruptcy Court" means the United States Bankruptcy Court for the Northern District of Texas.

9. "Communication" or "communications" mean any contact or act by which any information or knowledge is transmitted or conveyed between two or more persons and shall include, without limitation, written contact by such means as letters, notifications, emails, text

messages, instant messaging, voicemails, notes of face to face meetings and telephone conversations, memoranda, correspondence, notifications, telegrams, telex, or by any document, and oral contact by such means as face-to-face meetings and telephone conversations.

10. "Concerning" means in whole or in part and directly or indirectly referring to, relating to, connected with, commenting on, responding to, showing, describing, analyzing, reflecting, evidencing or constituting.

11. "Control" means the person or persons requested to produce documents herein who have the right to secure the documents, or a copy thereof, from another person or public entity or private entity which as actual, physical possession of the original document.

12. "Document" or "Documents" means all written, reported, recorded or graphic matter within the scope of the Federal Rules of Civil Procedure as incorporated in the Bankruptcy Rules. The term Documents expressly includes "Communications" as defined herein. Documents is used in its customary and broadest sense and includes every tangible thing, recording or reproduction of any visual or auditory information including, without limitation, all of the following items regardless of origin or location, whether printed or recorded, filmed or reproduced by any other mechanical process, or written or produced by hand, however produced or reproduced, whether or not claimed to be privileged against discovery on any ground, and whether an original, master or copy, now or at any time in Your possession, custody or control: (1) memoranda; (2) notes; (3) letters, e-mails, notifications, or communication (as defined in paragraph three above); (4) envelopes; (5) messages; (6) contracts; (7) agreements; (8) communications; (9) correspondence; (10) cablegrams; (11) radiograms; (12) telegrams; (13) facsimile cover sheets; (14) express delivery airbills; (15) delivery receipts; (16) notes/records of telephone conversations, meetings and/or conferences; (17) summaries, appraisals and

valuations; (18) records of personal conversations or interviews; (19) books, articles, manuals, magazines, newspapers, pamphlets, brochures, booklets, publications and/or diaries; (20) laboratory and engineering reports and notebooks; (21) charts, plans, sketches and/or drawings; (22) photographs; (23) photostatic microfilm; (24) reports and/or summaries of negotiations and/or investigations; (25) opinions and reports of consultants; (26) circulars, bulletins, notices, instructions; (27) stenographic or handwritten notes; (28) records; (29) accounts; (30) pictures, films, (31) voice recordings, tape recordings; (32) maps; (33) work papers; (34) arithmetic computations; (35) minutes of all other communications; (36) purchase orders; (37) questionnaires, surveys; (38) punch cards, magnetic tape, disc data, printouts, and other data computations from which information can be obtained; (39) patents, applications for patent appraisals and/or patentability or validity searches and studies; (40) sales records, including purchase orders and invoices; (41) financial reports and/or statements; (42) catalogs catalog sheets; (43) advertisements; (44) trade letters; (45) press, publicity, trade and produce releases; (46) draft, original or preliminary notes on, and marginal comments appearing on, any documents; (47) copies of all of the foregoing upon which notations in writing have been made which do not appear on the original; and any other Documents in the possession, custody or control of you and your, representatives, consultants, attorneys or other persons subject to your control or representing You in any capacity or for any purposes.

13. "Financials" means all financial statements, tax returns, and other documents reflecting the Assets and Liabilities of the Debtor and/or its business operations (and value thereof) including, but not limited to, cash flow, profit and loss statements, quarterly and year-end financial statements and internal financial records such as account receivable and payable ledgers, cash payment and receipt journals, deposit slips, loan documents, loan statements, wire

confirmations, bank statements, ACH transactions, inter-company transfers, appraisals, valuations, reports, analysis, environmental studies, business plans, projections, models, forecasts, prospectus and any financial document or schedule filed in these Bankruptcy Cases or referred to in any filing by the Alleged Debtors.

14. "First Motions to Dismiss" means those certain motions to dismiss the Petitions filed by each of the Alleged Debtors on May 7, 2020.

15. "Insider" means an entity or person as defined in 11 U.S.C 101(31).

16. "Liabilities" means all debts and obligations of the Alleged Debtors.

17. "Loan Agreements" means the loan agreements entered into between the Petitioning Creditors on one hand, and the Alleged Debtors on the other hand.

18. "Loans" means those loans made by the Petitioning Creditors to the Alleged Debtors evidenced by the Loan Agreements.

19. "Petition Date(s)" means April 8, 2020.

20. "Other Motions" means those additional motions (to the First Motions to Dismiss) filed by the Alleged Debtors on May 7, 2020.

21. "Petitioning Creditors" means, collectively, the individual creditors in the each of the Bankruptcy Cases of the Alleged Debtors.

22. "Petitions" means those involuntary petitions filed by the Petitioning Creditors.

23. "Projects" means those real estate acquisition and "horizontal" development projects referenced in the Loan Agreements and the Alleged Debtors First Motions to Dismiss.

24. "Regarding" means anything of any kind concerning, pertaining, describing, referring, or relating, directly or indirectly, in whole or in part, to the subject matter of each request.

25. "Relate to," "Refer to," or "Evidencing" (or a form thereof) means constituting, reflecting, respecting, supporting, contradicting, referring to, stating, describing, recording, noting, embodying, containing, mentioning, studying, analyzing, discussing or evaluating.

26. Representatives means a parties employee, agent, professional, broker, or other person acting on behalf of such party.

27. "Second Motions to Dismiss" means those certain motions to dismiss the Petitions filed by each of the Alleged Debtors on May 14, 2020.

28. "You" or "Your" means the Alleged Debtors.

## INSTRUCTIONS

1. Reproduce each interrogatory in full before each answer.

2. Each interrogatory is to be answered separately. When an interrogatory has several parts, answer each part and/or sub-part separately.

3. If you cannot provide a full and complete answer to an interrogatory, answer as much of the interrogatory as possible and state why you cannot provide a full and complete answer.

4. Where exact information cannot be furnished, estimated information is to be supplied. Where an estimate is used, it should be identified as such, and an explanation given as to the basis on which the estimate was made and the reason exact information cannot be furnished.

5. These interrogatories are to be deemed continuing so as to require modified and/or supplemental answers in the event that you obtain information pertinent thereto between the time answers are served and the time the above-captioned action is concluded.

6. If in responding, you or your counsel either withhold the production of any document or refuse to disclose the substance of any oral communication on the grounds of a claim of privilege, confidentiality or the work product doctrine, please state with respect to any such documents or information, the request to which the document or oral communication is responsive, whether the document exists, the date of the document or oral communication, the type of document (i.e., three-page letter, one-paragraph memorandum) or oral communication (e.g., meeting, telephone call, etc.), the subject matter or title of the document or the nature of the oral communication, each person who authored the document or who participated in the oral communication and his or her business title or position, all intended recipients of the document and all persons or organizations who have reviewed or at any time possessed the document, the

location of the original and all copies of the document, and the nature of and basis for the privilege or immunity claimed.

7. When required to “identify” a person or to provide the “identify” of a person, state the person’s (a) full name (first, middle, last), (b) present or last known residence and business address, and (c) present or last known residence and business telephone numbers.

8. When required to “identify” an entity, such as a corporation, partnership, firm, or other organization, state the entity’s (a) full name, (b) present or last known address, (c) full name and business address during the time period during which information is inquired, and (d) the type of business conducted by the entity.

9. When required to “identify” a document, state its (a) date, (b) author(s), (c) recipient(s) and addressee(s), (d) type of document (e.g.: letter, memorandum, telegram, chart, photograph, sound reproduction, etc.) (e) present or last known location, and (f) present or last known custodian(s). If the above information is not available, state some other means of identifying the document. If any document was, but is no longer in your possession, or subject to your control, or in existence, state whether it is (a) missing or lost, (b) has been destroyed, (c) has been transferred voluntarily or involuntarily to others, or (d) otherwise disposed of, and in each instance, explain the circumstances surrounding the authorization for such disposition thereof and state the date or approximate date thereof.

10. When required to “identify” a communication, state (a) by whom and (b) to whom each such communication was made, (c) the date it was made, (d) the place(s) at which it was made, and (e) the subject matter and substance thereof.

11. When you are required to provide the “basis” of an allegation, assertion, belief, conclusion or contention then (a) state all of the underlying facts, information, reasons and/or

analyses upon which the allegation, assertion, belief, conclusion or contention is based, and (b) identify each document and /or oral communication upon which the allegation, assertion, belief, conclusion or contention is based.

12. If, with respect to any interrogatory or part or subpart thereof, you produce business records in lieu of otherwise answering such interrogatory, the following information must be provided and the following procedures employed: (a) specify all documents from which the answer to such interrogatory may be derived or ascertained, and (b) produce such documents separately and designate the interrogatory to which each such document relates.

## INTERROGATORIES

1. For each of the Alleged Debtors set forth:

   (a) A current primary business address;

   (b) Its current registered agent;

   (c) Its members, officers, managers and directors.

   (d) The number of employees, their names and their positions.

**ANSWER:**

2. Identify:

   (a) All persons having knowledge of the facts related to the allegations of the Petitions, the First and Second Motions to Dismiss, the Loans and the Projects, or otherwise which may relate to this litigation and your defenses thereto; and with regard to each individual so named, set forth a current home and email address and phone number for such person and provide a narrative description of the facts or factual areas as to which he or she is knowledgeable.

**ANSWER:**

3. Identify each person whom you expect to call at trial as an expert witness, stating the subject matter on which he/she is expected to testify, his/her field of expertise and the full and detailed qualifications, training, professional and practical experience, education and degree obtained by each person.

**ANSWER:**

4. As to each person named in the answer to Interrogatory No. 3, state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion. Attach to the answers to these interrogatories copies of all written reports

submitted to you (or detailed resume if reports were oral) of each person named in the answer to Interrogatory No. 3.

**ANSWER:**

5. State whether or not there are any other reports in existence from the particular experts named, either written or oral. If the answer is in the affirmative, attach to the answers to these interrogatories clear copies of all such reports. If any such report, either written or oral, subsequently becomes known to you or becomes available, submit copies thereof in supplemental answers to these interrogatories.

**ANSWER:**

6. Set forth the names, addresses and fields of expertise of any person, other than those named in the answer to Interrogatory No. 3, who has been retained, specifically employed or consulted by you in anticipation of litigation or preparation for trial and who is not expected to be called as a witness at trial and the subject matter on which said person was consulted.

**ANSWER:**

7. Do you contend that any declaration against interest with regard to the issues in this lawsuit have been made by any party hereto or by a director, officer, agent and/or employee of any party hereto?

**ANSWER:**

8. If the answer to Interrogatory No. 7 is in the affirmative, set forth the exact words, if known, and if not known, the substance of each such declaration against interest, the name and address of the person making the declaration against interest, the names and addresses of all persons present when the declaration against interest was made, the place where and the time

when the declaration against interest was made. If the declaration against interest was reduced to writing, annex a copy hereto.

**ANSWER:**

9. Do you contend that any admissions with regard to the issues in this matter have been made by any party hereto or by any director, officer, agent and/or employee of any party hereto?

**ANSWER:**

10. If the answer to Interrogatory No. 9 is in the affirmative, set forth the exact words, if known, and if not known, the substance of each such admission, the name and address of the person making the admission, the names and addresses of all persons present when the admission was made. If the admission was reduced to writing, annex a copy hereto.

**ANSWER:**

11. Did you receive any statement, either written or oral, from any person relating in any way to this litigation? If the answer to this interrogatory is in the affirmative, as to each such statement, please set forth: (a) the date on which the statement was obtained, (b) the person who provided the statement, (c) the substance of the statement, (d) the identity of each and every person who was present when the statement was received. If the statement was in writing, annex to these answers to interrogatories a clear copy of the statement.

**ANSWER:**

12. Identify and state the present location and custodian of any and all documents which have any bearing on the facts at issue in this matter. This answer should correspond with the definition of “document” and “identify” appearing in the foregoing definitions and instructions.

**ANSWER:**

13. If you intend to rely upon any statute, regulation, or ordinance in support of your objections, defenses or claims related to the Petitions, state the exact title and section or other citation.

**ANSWER:**

14. Set forth in detail the factual basis for each and every denial of, objection or opposition to any of the allegations contained in the Petitions.

**ANSWER:**

15. Designate for each and every interrogatory answered herein which of such information is not within the personal knowledge of the person certifying these answers and as to that information, state the name and address of every person from whom it was received, or, if the source of the information is documentary, a full description including the location thereof.

**ANSWER:**

16. Identify by name, address and title each individual who either supplied information used for, or participated in the drafting of these answers to interrogatories. For each person identified (a) if that individual assisted in the drafting of an answer, identify by interrogatory number each answer which the individual assisted in drafting, (b) if that individual supplied information which was used in preparation of an interrogatory answer, state by interrogatory number, each answer for which the individual supplied information and identify the information supplied. If the source of the information was documentary, identify in detail the documents from which the information was obtained.

**ANSWER:**

**CERTIFICATION**

I hereby certify that the foregoing statements made by me are true; that the copies of the reports annexed hereto rendered by proposed expert witnesses are exact copies of the entire report or reports rendered by them; and that the existence of other reports of said expert, either written or oral are unknown to me.

I further certify that these Interrogatories shall be deemed continuing until the time of trial and that any responsive information becoming known to me subsequent to the filing of answers hereto shall be supplied by supplemental answers, together with existence of any experts' reports later discovered or becoming available.

I further certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment for contempt of Court.

Dated:

______________________________
Print Name:
Print Title:

218607253v1

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>WALL007 LLC, *et al.*,[1]<br><br>Alleged Debtors. | Chapter 7<br><br>Case No. 20-31131 (HDH) |

**PETITIONING CREDITORS FIRST REQUEST FOR PRODUCTION OF DOCUMENTS UPON THE ALLEGED DEBTORS**

Jun Li, Yunding Kang, Cunxiang Ji, Jin Wang, Peng Guo, Lin Zhou, Qu Chen, Kai Tian, Yijing Wu, Xuegeng Gong, Jin Wang, Weijia Kong, Heng Zhang, Hong Guo, Pei Guan, Yue Xu, Mai Ye, Chenchen Jiang, Qiuying Li, Ruinian Wu, Lin Zhou, Liying Yang, Yan Zhang, Wenjun Wang, Lan Ji, Ying Zhou, Lin Li, Li Jiang, Rufeng Ding, Cunxiang Ji, Lin Gao, Qiao Qin, Yue Zhang, Xiaodong Hao, Tianqing Song, Li Jiang, Weisi Wang, Xiaoquan Dai, Feng Yan, Heng Zhang, Ou Jiang, Jinzhe Wu, Yadan Liu, Wanwan Li, Wenjuan Yin, Jiancheng Chen, Yi Tang, Ying Zhang, Pengfei Dong, Kangying Mao, Yijing Wu, Li Jiang, Qin Chu, Yulan Chen, Sicheng Zhan, Pei Guan, Jingqiu Tang, Di Tang, Jun Zeng, Kui Wang, Yue Zhang, Jun Wang, Xiaomin Fan, Di Tang, Jialin Hu, Qin Chu, Jiaxiang Lu, Fuqing Chen, Hanjiang Fu, Aiguo Luo, Fang Ding, Xiangdong Zhu, Wai Ying, Yuan Yuan, Chao Xu, Guoqin Zhou, Yijing Wu, (collectively, the "Petitioning Creditors"), by and through their undersigned counsel, pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure (the "Federal Rules"), as made applicable herein by Rules 7026, 7033, and 9014(c) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), hereby propound this First Set of Requests for Production

---

[1] The Alleged Debtors in these cases are: WALL007 LLC, WALL009 LLC, WALL010 LLC, WALL011 LLC, WALL012 LLC, WALL016 LLC, WALL017 LLC. The Alleged Debtors' federal tax identification numbers are unknown to the Petitioning Creditors at this time.

of Documents ("First Request") upon the Alleged Debtors to be answered fully within thirty (30) days after service hereof.

Dated: June 1, 2020

/s/ *Jiangang Ou*
Jiangang Ou
Nguyen & Chen LLP
11200 Westheimer Road Suite 120
Houston, TX 77042
(832) 767-0339
Fax : (832) 767-0669
Email: jou@nguyen-chen.com

Stephen M. Packman
Archer & Greiner, P.C.
Three Logan Square
1717 Arch St., Suite 3500
Philadelphia, PA 19103
215-246-3147
Email: spackman@archerlaw.com

*Counsel for the Petitioning Creditors*

## DEFINITIONS

1. "Affiliates" means an entity or person as defined in 11 U.S.C. 101(2).

2. "All" and "any" mean both each and every.

3. "Alleged Debtor" refers individually to, and "Alleged Debtors" means, collectively, WALL007 LLC (Case No. 20-31131), WALL009 LLC (Case No. 20-31133), WALL010 LLC (Case No. 20-31134), WALL011 LLC (Case No. 20-31135), WALL012 LLC (Case No. 20-31136), WALL016 LLC (Case No. 20-31138), WALL017 LLC (Case No. 20-31139).

4. "And" means "and," "or" or "and/or" whenever interpretation would result in the broadest or most liberal interpretation which would cause the greatest production of documents.

5. "Applicable Time Period" means all dates beginning January 1, 2017, through the Petition Date.

6. "Assets" means all property that would constitute property of the Alleged Debtors' bankruptcy estates, as of the Petition Dates pursuant to 11 U.S.C. 541.

7. "Bankruptcy Cases" means the bankruptcy cases: WALL007 LLC (Case No. 20-31131), WALL009 LLC (Case No. 20-31133), WALL010 LLC (Case No. 20-31134), WALL011 LLC (Case No. 20-31135), WALL012 LLC (Case No. 20-31136), WALL016 LLC (Case No. 20-31138), WALL017 LLC (Case No. 20-31139), filed by the Petitioning Creditors against the Alleged Debtors in the Bankruptcy Court.

8. "Bankruptcy Court" means the United States Bankruptcy Court for the Northern District of Texas.

9. "Communication" or "communications" mean any contact or act by which any information or knowledge is transmitted or conveyed between two or more persons and shall include, without limitation, written contact by such means as letters, notifications, emails, text

messages, instant messaging, voicemails, notes of face to face meetings and telephone conversations, memoranda, correspondence, notifications, telegrams, telex, or by any document, and oral contact by such means as face-to-face meetings and telephone conversations.

10. "Concerning" means in whole or in part and directly or indirectly referring to, relating to, connected with, commenting on, responding to, showing, describing, analyzing, reflecting, evidencing or constituting.

11. "Control" means the person or persons requested to produce documents herein who have the right to secure the documents, or a copy thereof, from another person or public entity or private entity which as actual, physical possession of the original document.

12. "Document" or "Documents" means all written, reported, recorded or graphic matter within the scope of the Federal Rules of Civil Procedure as incorporated in the Bankruptcy Rules. The term Documents expressly includes "Communications" as defined herein. Documents is used in its customary and broadest sense and includes every tangible thing, recording or reproduction of any visual or auditory information including, without limitation, all of the following items regardless of origin or location, whether printed or recorded, filmed or reproduced by any other mechanical process, or written or produced by hand, however produced or reproduced, whether or not claimed to be privileged against discovery on any ground, and whether an original, master or copy, now or at any time in Your possession, custody or control: (1) memoranda; (2) notes; (3) letters, e-mails, notifications, or communication (as defined in paragraph three above); (4) envelopes; (5) messages; (6) contracts; (7) agreements; (8) communications; (9) correspondence; (10) cablegrams; (11) radiograms; (12) telegrams; (13) facsimile cover sheets; (14) express delivery airbills; (15) delivery receipts; (16) notes/records of telephone conversations, meetings and/or conferences; (17) summaries, appraisals and

valuations; (18) records of personal conversations or interviews; (19) books, articles, manuals, magazines, newspapers, pamphlets, brochures, booklets, publications and/or diaries; (20) laboratory and engineering reports and notebooks; (21) charts, plans, sketches and/or drawings; (22) photographs; (23) photostatic microfilm; (24) reports and/or summaries of negotiations and/or investigations; (25) opinions and reports of consultants; (26) circulars, bulletins, notices, instructions; (27) stenographic or handwritten notes; (28) records; (29) accounts; (30) pictures, films, (31) voice recordings, tape recordings; (32) maps; (33) work papers; (34) arithmetic computations; (35) minutes of all other communications; (36) purchase orders; (37) questionnaires, surveys; (38) punch cards, magnetic tape, disc data, printouts, and other data computations from which information can be obtained; (39) patents, applications for patent appraisals and/or patentability or validity searches and studies; (40) sales records, including purchase orders and invoices; (41) financial reports and/or statements; (42) catalogs catalog sheets; (43) advertisements; (44) trade letters; (45) press, publicity, trade and produce releases; (46) draft, original or preliminary notes on, and marginal comments appearing on, any documents; (47) copies of all of the foregoing upon which notations in writing have been made which do not appear on the original; and any other Documents in the possession, custody or control of you and your, representatives, consultants, attorneys or other persons subject to your control or representing You in any capacity or for any purposes.

13. "Financials" means all financial statements, tax returns, and other documents reflecting the Assets and Liabilities of the Debtor and/or its business operations (and value thereof) including, but not limited to, cash flow, profit and loss statements, quarterly and year-end financial statements and internal financial records such as account receivable and payable ledgers, cash payment and receipt journals, deposit slips, loan documents, loan statements, wire

confirmations, bank statements, ACH transactions, inter-company transfers, appraisals, valuations, reports, analysis, environmental studies, business plans, projections, models, forecasts, prospectus and any financial document or schedule filed in these Bankruptcy Cases or referred to in any filing by the Alleged Debtors.

14. "First Motions to Dismiss" means those certain motions to dismiss the Petitions filed by each of the Alleged Debtors on May 7, 2020.

15. "Insider" means an entity or person as defined in 11 U.S.C 101(31).

16. "Liabilities" means all debts and obligations of the Alleged Debtors.

17. "Loan Agreements" means the loan agreements entered into between the Petitioning Creditors on one hand, and the Alleged Debtors on the other hand.

18. "Loans" means those loans made by the Petitioning Creditors to the Alleged Debtors evidenced by the Loan Agreements.

19. "Petition Date(s)" means April 8, 2020.

20. "Other Motions" means those additional motions (to the First Motions to Dismiss) filed by the Alleged Debtors on May 7, 2020.

21. "Petitioning Creditors" means, collectively, the individual creditors in the each of the Bankruptcy Cases of the Alleged Debtors.

22. "Petitions" means those involuntary petitions filed by the Petitioning Creditors.

23. "Projects" means those real estate acquisition and "horizontal" development projects referenced in the Loan Agreements and the Alleged Debtors First Motions to Dismiss.

24. "Regarding" means anything of any kind concerning, pertaining, describing, referring, or relating, directly or indirectly, in whole or in part, to the subject matter of each request.

25. "Relate to," "Refer to," or "Evidencing" (or a form thereof) means constituting, reflecting, respecting, supporting, contradicting, referring to, stating, describing, recording, noting, embodying, containing, mentioning, studying, analyzing, discussing or evaluating.

26. "Representatives" means a party's employee, agent, professional, broker, or other person acting on behalf of such party.

27. "Second Motions to Dismiss" means those certain motions to dismiss the Petitions filed by each of the Alleged Debtors on May 14, 2020.

28. "You" or "Your" means the Alleged Debtors.

## INSTRUCTIONS

1. Each of the following requests shall be deemed a continuing request up to and until the time of trial.

2. To the extent that a term is not specifically defined, you should use give the meaning typically prescribed to that word in common parlance.

3. In the event that you refuse to produce any Document called for by these requests on the grounds of privilege, or for any other reason, you must identify such Document and disclose in detail the grounds for such claimed privilege or such other refusal to produce.

4. Your refusal to produce any Document or the objection to any request in no way excuses you from timely production of all other Documents requested herein.

**DOCUMENTS REQUESTED**

1. All Documents which relate to the First Motions to Dismiss.

2. All Documents which relate to the Second Motions to Dismiss.

3. All Documents which relate to the Other Motions.

4. All Documents which the Alleged Debtors contend support their request for dismissal of the Petitions.

5. All communications between the Alleged Debtors or their Representatives and the Petitioning Creditors or their Representatives during the Applicable Time Period.

6. All Communications between the Alleged Debtors or their Representatives and Michael Fu or any of his Representatives and/or Affiliates.

7. All Documents which support the Alleged Debtors' contention that Michael Fu should be deemed the Petitioning Creditor.

8. All Documents that support the Alleged Debtors' contention that the Alleged Debtors each have more than 12 creditors.

9. All Documents that support the Alleged Debtors' contention that the Alleged Debtors are generally paying their debts as they come due.

10. All Documents which support the Alleged Debtors' contention that the Petitioning Creditors are not creditors of the Alleged Debtors.

11. All Documents which support the Alleged Debtors' contention that the Petitioning Creditors' claims are contingent in nature.

12. All Documents that support the Alleged Debtors' contention that the Petitioning Creditors' claims are subject to a bona fide dispute as to liability.

13. All Documents that support the Alleged Debtors' contention that the Petitioning Creditors' claims are subject to a bona fide dispute as to amount.

14.

15. All Documents which support the Alleged Debtors' contention that the Petitions were filed in bad faith.

16. All Documents which support the Alleged Debtors' contention that the Alleged Debtors' have suffered damages as a result of the Petitions.

17. All Documents which support the Debtors' contention that they are entitled to punitive damages against the Petitioners.

18. All Documents which support the Alleged Debtors' contention that the Petitions are not in the best interests of the Alleged Debtors and its Creditors.

19. All Documents which the Alleged Debtors contend support their contention that the Court should abstain under 11 U.S.C. 305.

20. All Documents evidencing the Alleged Debtors' memorialization of the Loans, or otherwise related to the Loans, including, but not limited to, Loan Agreements, security agreements, notes, collateralization documents, receipts (including Loan proceeds receipts), acknowledgments and confirmations.

21. All minutes, resolutions, approvals and other Documents pertaining to Board of Director(s) or Board of Manager(s) (or equivalent governing body of Alleged Debtors) meetings for the Alleged Debtors during the Applicable Time Period which relate to the Loans and/or the Projects.

22. All Documents evidencing that any of Alleged Debtors is not ultimately controlled by Timothy Barton.

23. All Document evidencing the ownership of the Alleged Debtors and, if the owners are not persons, then all Documents evidencing ownership of any entity(ies) which own any of the Alleged Debtors and so forth until such entity(ies) are owned by a person(s).

24. All Documents maintained by the Alleged Debtors relating to any payments received by the Alleged Debtors on the Loans.

25. All Documents relating to the Alleged Debtors' contention that they attempted to repay the Loans or any part thereof.

26. All Documents relating to the Alleged Debtors' contention that any land was purchased with the Loans or otherwise funded.

27. All Documents relating to the Alleged Debtors' contention that the Projects were funded by the Loans or otherwise funded.

28. All Documents relating to all Assets of the Alleged Debtors during the Applicable Time Period.

29. All Documents relating to all Liabilities of the Alleged Debtors during the Applicable Time Period.

30. All Documents which are Financials and/or related to Financials of the Alleged Debtors during the Applicable Time Period;

31. All Documents relating to any transfer of Assets from or on behalf of any of the Alleged Debtors to Carnegie Development Inc. or JMJ Development LLC or Steve Wall or Timothy Barton or Sada Cumber or Michael Fu, or Affiliates or Insiders.

32. All Documents relating to the debts listed on the Payables Report (Exhibit "A" to Alleged Debtors' List of Creditors).

33. All other Documents not produced pursuant to the requests above which the Alleged Debtors intend to rely upon in support of their opposition to the Petitions or otherwise at trial of this matter.

218590020v2

# Exhibit "B"

**JOYCE W. LINDAUER ATTORNEY, PLLC**
Attorney & Mediator
1412 Main Street
Dallas, Texas 75202
Email: joyce@joycelindauer.com
Email: paul@joycelindauer.com

Telephone No.
(972) 503-4033

Facsimile No.
(972) 503-4034

July 6, 2020

**VIA ELECTRONIC AND FIRST-CLASS MAIL**

Stephen M. Packman
Archer & Greiner, P.C.
Three Logan Square
1717 Arch St., Suite 3500
Philadelphia, PA 19103
spackman@archerlaw.com

**RE: In the U.S. Bankruptcy Court for the Northern Division of Texas, Dallas Division**
***In re* WALL007 LLC, et al., Case No. 20-31131**
**OBJECTIONS TO PENDING DISCOVERY**

Dear Stephen:

With reference to the Joint Discovery Plan filed in the above-captioned matter on June 17, 2020, please be advised we are serving our responses to the Petitioning Creditors Interrogatories and Requests for Production of Documents propounded on June 1, 2020. We are prepared to discuss the objections prior to the deadline.

Very truly yours,

Joyce Lindauer, Esq.

cc: James Ou, Esq.
Khudabuksh K. Walji, Esq.

Joyce W. Lindauer
State Bar No. 21555700
Guy H. Holman
State Bar No. 24095171
Paul B. Geilich
State Bar No. 07792500
Joyce W. Lindauer Attorney, PLLC
1412 Main St., Suite 500
Dallas, Texas 75202
Telephone: (972) 503-4033
Facsimile: (972) 503-4034
**ATTORNEYS FOR ALLEGED DEBTORS**

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| **In re:**<br><br>**WALL007, et al**<br><br>**Alleged Debtors.** | **Case No. 20-31131**<br>**Chapter 7** |

**ALLEGED DEBTORS' OBJECTIONS AND RESPONSES TO PETITIONING CREDITORS' FIRST SET OF REQUEST FOR PRODUCTION**

TO: Jun Li, Yunding Kang, Cunxiang Ji, Jin Wang, Peng Guo, Lin Zhou, Qu Chen, Kai Tian, Yijing Wu, Xuegeng Gong, Jin Wang, Weijia Kong, Heng Zhang, Hong Guo, Pei Guan, Yue Xu, Mai Ye, Chenchen Jiang, Qiuying Li, Ruinian Wu, Lin Zhou, Liying Yang, Yan Zhang, Wenjun Wang, Lan Ji, Ying Zhou, Lin Li, Li Jiang, Rufeng Ding, Cunxiang Ji, Lin Gao, Qiao Qin, Yue Zhang, Xiaodong Hao, Tianqing Song, Li Jiang, Weisi Wang, Xiaoquan Dai, Feng Yan, Heng Zhang, Ou Jiang, Jinzhe Wu, Yadan Liu, Wanwan Li, Wenjuan Yin, Jiancheng Chen, Yi Tang, Ying Zhang, Pengfei Dong, Kangying Mao, Yijing Wu, Li Jiang, Qin Chu, Yulan Chen, Sicheng Zhan, Pei Guan, Jingqiu Tang, Di Tang, Jun Zeng, Kui Wang, Yue Zhang, Jun Wang, Xiaomin Fan, Di Tang, Jialin Hu, Qin Chu, Jiaxiang Lu, Fuqing Chen, Hanjiang Fu, Aiguo Luo, Fang Ding, Xiangdong Zhu, Wai Ying, Yuan Yuan, Chao Xu, Guoqin Zhou, Yijing Wu, (collectively, the "Petitioning Creditors"), by and through their attorneys of record, **Jiangang Ou**, Nguyen & Chen LLP, 11200 Westheimer Road, Suite 120, Houston, Texas 77042 and **Stephen M. Packman**, Archer & Greiner, P.C., Three Logan Square, 1717 Arch Street, Suite 3500, Philadelphia, Pennsylvania 19103.

Alleged Debtors Wall007, LLC, et al. ("Alleged Debtors") serve the following objections and responses to Petitioning Creditors' *First Set of Request for Production.* All

responses and any documents, electronically stored information, and tangible things delivered concurrently with these objections and responses are produced in accordance with Rules 26 and 34 of the FEDERAL RULE OF CIVIL PROCEDURE, as made applicable herein, by Rules 7026, 7034, and 9014(c) of the FEDERAL RULES OF BANKRUPTCY PROCEDURE.

## I. OBJECTIONS AND RESPONSES TO REQUESTS FOR PRODUCTION OF DOCUMENTS

REQUEST FOR PRODUCTION NO. 1: All Documents which relate to the First Motions to Dismiss.

*RESPONSE: All documents responsive to this Request shall be provided; such documents consist of the Declaration of Timothy Barton, the List of Creditors, certain loan agreements, all petitions, proofs of wire transfers, a list of banks identified as receiving and sending funds, and a copy of the content of the English version of Michael Fu's website.*

*Alleged Debtors reserve the right to supplement this Response.*

REQUEST FOR PRODUCTION NO. 2: All Documents which relate to the Second Motions to Dismiss.

*RESPONSE: Alleged Debtors object to this Request to the extent that Plaintiff has equal, if not better access, to documents requested since the Documents referenced in the Second Motions to Dismiss exist and are already in Plaintiffs' possession, custody, or control or may be accessible from another source.*

*Alleged Debtors reserve the right to supplement this Response.*

REQUEST FOR PRODUCTION NO. 3: All Documents which relate to the Other Motions.

*RESPONSE: Debtors object to this Request because Petitioning Creditors fail to identify the "Other Motions" to which this Request is related. To the extent Alleged Debtors are compelled to respond, and without waiving its objections to this Request, Alleged Debtors have no documents responsive to this Request.*

*Alleged Debtors reserve the right to supplement this Response.*

REQUEST FOR PRODUCTION NO. 4: All Documents which the Alleged Debtors contend support their request for dismissal of the Petitions.

*RESPONSE: All documents responsive to this Request shall be provided; such documents consist of the Declaration of Timothy Barton, the List of Creditors, certain loan agreements, all petitions, proofs of wire transfers, a list of banks identified as receiving and sending funds, and a copy of the content of the English version of Michael Fu's website.*

*Alleged Debtors reserve the right to supplement this Response.*

REQUEST FOR PRODUCTION NO. 5: All Communications between the Alleged Debtors or their Representatives and the Petitioning Creditors or their Representatives during the Applicable Time Period.

> *RESPONSE: Debtor objects to this Request on the grounds that it seeks communications that the Petitioning Creditors, as a party to such communications, has equal, if not better access, to and as such are already in Plaintiffs' possession, custody, or control.*
>
> *Alleged Debtors reserve the right to supplement this Response.*

REQUEST FOR PRODUCTION NO. 6: All Communications between the Alleged Debtors or their Representatives and Michael Fu or any of his Representatives and/or Affiliates.

> *RESPONSE: Debtor objects to this Request on the grounds that it seeks communications from Michael Fu, a.k.a. Hanjiang Fu, one of the parties listed as a "Petitioning Creditors," as a party to such communications, has equal, if not better access, to and as such are already in Plaintiffs' possession, custody, or control.*
>
> *Alleged Debtors reserve the right to supplement this Response.*

REQUEST FOR PRODUCTION NO. 7: All Documents which support the Alleged Debtors' contention that Michael Fu should be deemed the Petitioning Creditor.

> *RESPONSE: Debtor shall produce a copy of the "Brief in Support of the Motions of Alleged Debtors to Dismiss Involuntary Petitions, Request for Substitution of Real Party in Interest, Request for Bond, and Request for Award of Fees, Cost and Damages, or in the Alternative to Abstain under Bankruptcy Code § 305" (the "Brief in Support").*
>
> *Alleged Debtors reserve the right to supplement this Response. Also Alleged Debtors reserve the right to include the deposition of Michael Fu and any exhibits thereto once it is taken.*

REQUEST FOR PRODUCTION NO. 8: All Documents that support the Alleged Debtors' contention that the Alleged Debtors each have more than 12 creditors.

> *RESPONSE: Alleged Debtors shall each produce its List of Creditors in response to this Request.*

REQUEST FOR PRODUCTION NO. 9: All Documents that support the Alleged Debtors' contention that the Alleged Debtors are generally paying their debts as they come due.

> *RESPONSE: Alleged Debtors object to this Request as being overly broad, not reasonably tailored in scope, unduly burdensome, potentially targeted at the harassment of the Alleged Debtors, and is not proportional to the needs of the case; Alleged Debtors particularly object to the use of the term "all" which as defined therein, if construed strictly, is global and overly broad, such that this Request is not reasonably tailored in scope. Generally the Alleged Debtors contend they had payment arrangements with their creditors.*

*Alleged Debtors reserve the right to supplement this Response.*

REQUEST FOR PRODUCTION NO. 10: All Documents which support the Alleged Debtors' contention that the Petitioning Creditors are not creditors of the Alleged Debtors.

*RESPONSE: Alleged Debtors shall provide the Motion to Dismiss, the aforementioned Brief in Support, and the List of Remitters. Also pertinent to support of such contention is the June 25, 2020 deposition testimony of Jiang Haibo.*

*Alleged Debtors reserve the right to supplement this Response. Further the deposition of Michael Fu will support this response.*

REQUEST FOR PRODUCTION NO. 11: All Documents which support the Alleged Debtors' contention that the Petitioning Creditors' claims are contingent in nature.

*RESPONSE: Alleged Debtors shall provide the Motion to Dismiss, the aforementioned Brief in Support, and the List of Remitters. Also pertinent to support of such contention is the June 25, 2020 deposition testimony of Jiang Haibo.*

*Alleged Debtors reserve the right to supplement this Response. Further the deposition of Michael Fu will support this response.*

REQUEST FOR PRODUCTION NO. 12: All Documents that support the Alleged Debtors' contention that the Petitioning Creditors' claims are subject to a bona fide dispute as to liability.

*RESPONSE: Alleged Debtors shall provide the Motion to Dismiss, the aforementioned Brief in Support, and the List of Remitters. Also pertinent to support of such contention is the June 25, 2020 deposition testimony of Jiang Haibo.*

*Alleged Debtors reserve the right to supplement this Response. Further the deposition of Michael Fu will support this response.*

REQUEST FOR PRODUCTION NO. 13: All Documents that support the Alleged Debtors' contention that the Petitioning Creditors' claims are subject to a bona fide dispute as to amount.

*RESPONSE: Alleged Debtors shall provide the Motion to Dismiss, the aforementioned Brief in Support, and the List of Remitters. Also pertinent to support of such contention is the June 25, 2020 deposition testimony of Jiang Haibo.*

*Alleged Debtors reserve the right to supplement this Response. Further the deposition of Michael Fu will support this response.*

REQUEST FOR PRODUCTION NO. 14: NO REQUEST MADE.

*RESPONSE*: NO RESPONSE IS REQUIRED.

REQUEST FOR PRODUCTION NO. 15: All documents which support the Alleged Debtors' contention that the Petitions were filed in bad faith.

*RESPONSE: Alleged Debtors shall provide the Motion to Dismiss, the aforementioned Brief in Support, and the List of Remitters. Also pertinent to support of such contention is the June 25, 2020 deposition testimony of Jiang Haibo.*

*Alleged Debtors reserve the right to supplement this Response. Further the deposition of Michael Fu will support this response.*

REQUEST FOR PRODUCTION NO. 16: All Documents which support the Alleged Debtors' contention that the Alleged Debtors' have suffered damages as a result of the Petitions.

*RESPONSE: Alleged Debtors shall provide the Motion to Dismiss, the aforementioned Brief in Support, and the List of Remitters. Also pertinent to support of such contention is the June 25, 2020 deposition testimony of Jiang Haibo.*

*Alleged Debtors reserve the right to supplement this Response. Further the deposition of Michael Fu will support this response.*

REQUEST FOR PRODUCTION NO. 17: All Documents which support the Debtors' contention that they are entitled to punitive damages against the Petitioners.

*RESPONSE: Alleged Debtors shall provide the Motion to Dismiss, the aforementioned Brief in Support, and the List of Remitters. Also pertinent to support of such contention is the June 25, 2020 deposition testimony of Jiang Haibo.*

*Alleged Debtors reserve the right to supplement this Response. Further the deposition of Michael Fu will support this response.*

REQUEST FOR PRODUCTION NO. 18: All Documents which support the Alleged Debtors' contention that the Petitions are not in the best interests of the Alleged Debtors and its Creditors.

*RESPONSE: Alleged Debtors shall provide the Motion to Dismiss, the aforementioned Brief in Support, and the List of Remitters. Also pertinent to support of such contention is the June 25, 2020 deposition testimony of Jiang Haibo.*

*Alleged Debtors reserve the right to supplement this Response. Further the deposition of Michael Fu will support this response.*

REQUEST FOR PRODUCTION NO. 19: All Documents which the Alleged Debtors contend support their contention that the Court should abstain under 11 U.S.C. § 305.

*RESPONSE: Alleged Debtors shall provide the Motion to Dismiss, the aforementioned Brief in Support, and the List of Remitters. Also pertinent to support of such contention is the June 25, 2020 deposition testimony of Jiang Haibo.*

*Alleged Debtors reserve the right to supplement this Response. Further the deposition of Michael Fu will support this response.*

REQUEST FOR PRODUCTION NO. 20: All Documents evidencing the Alleged Debtors' memorialization of the Loans, or otherwise related to the Loans, including, but not limited to, Loan Agreements, security agreements, notes, collateralization documents, receipts (including Loan proceeds receipts), acknowledgments and confirmations.

*RESPONSE: Alleged Debtors shall provide the Motion to Dismiss, the aforementioned Brief in Support, and the List of Remitters. Also pertinent to support of such contention is the June 25, 2020 deposition testimony of Jiang Haibo.*

*Alleged Debtors reserve the right to supplement this Response. Further the deposition of Michael Fu will support this response.*

REQUEST FOR PRODUCTION NO. 21: All minutes, resolutions, approvals and other Documents pertaining to Board of Director(s) or Board of Manager(s) (or equivalent governing body of Alleged Debtors) meetings for the Alleged Debtors during the Applicable Time Period which relate to the Loans and/or the Projects.

*RESPONSE: Alleged Debtors object as such documents are not relevant to any issues before the Court at this time.*

*Alleged Debtors reserve the right to supplement this Response.*

REQUEST FOR PRODUCTION NO. 22: All Documents evidencing that any of Alleged Debtors is not ultimately controlled by Timothy Barton.

*RESPONSE: Alleged Debtors object to this Request on the grounds that such documents are not relevant to any issue before the Court at this time.*

*Alleged Debtors reserve the right to supplement this Response.*

REQUEST FOR PRODUCTION NO. 23: All Documents evidencing the ownership of the Alleged Debtors and, if the owners are not persons, then all Documents evidencing ownership of any entity(ies) which own any of the Alleged Debtors and so forth until such entity(ies) are owned by a person(s).

RESPONSE: Such information has been filed with the Court regarding ownership of the Alleged Debtors.

REQUEST FOR PRODUCTION NO. 24: All Documents maintained by the Alleged Debtors relating to any payments received by the Alleged Debtors on the Loans.

*RESPONSE: Alleged Debtors object to this Request on the grounds that such documents are not relevant to any issue before the Court at this time. Further the Request as formulated makes no sense as Alleged Debtors would not receive payments on loans.*

*Alleged Debtors reserve the right to supplement this Response.*

REQUEST FOR PRODUCTION NO. 25: All Documents relating to the Alleged Debtors' contention that they attempted to repay the Loans or any part thereof.

*RESPONSE: Alleged Debtors object to this Request on the grounds that such documents are not relevant to any issue before the Court at this time.*

*Alleged Debtors reserve the right to supplement this Response.*

REQUEST FOR PRODUCTION NO. 26: All Documents relating to the Alleged Debtors' contention that any land was purchased with the Loans or otherwise funded.

*RESPONSE: Alleged Debtors object to this Request on the grounds that such documents are not relevant to any issue before the Court at this time.*

*Alleged Debtors reserve the right to supplement this Response.*

REQUEST FOR PRODUCTION NO. 27: All Documents relating to the Alleged Debtors' contention that the Projects were funded by the Loans or otherwise funded.

*RESPONSE: Alleged Debtors object to this Request on the grounds that such documents are not relevant to any issue before the Court at this time.*

*Alleged Debtors reserve the right to supplement this Response.*

REQUEST FOR PRODUCTION NO. 28: All Documents relating to all Assets of the Alleged Debtors during the Applicable Time Period.

*RESPONSE: Alleged Debtors object to this Request on the grounds that it is overly broad, not reasonably tailored in scope, unduly burdensome, potentially targeted at the harassment of the Defendants, and is not proportional to the needs of the case; Alleged Debtors particularly object to the use of the term " all" which as defined therein, if construed strictly, is global and overly broad, such that this Request is not reasonably tailored in scope.*

REQUEST FOR PRODUCTION NO. 29: All Documents relating to all Liabilities of the Alleged Debtors during the Applicable Time Period.

*RESPONSE: Alleged Debtors have filed a list of creditors in each case.*

REQUEST FOR PRODUCTION NO. 30: All Documents which are Financials and/or related to Financials of the Alleged Debtors during the Applicable Time Period.

*Alleged Debtors object to this Request on the grounds that such documents are not relevant to any issue before the Court at this time.*

*Alleged Debtors reserve the right to supplement this Response.*

REQUEST FOR PRODUCTION NO. 31: All Documents relating to any transfer of Assets from or on behalf of any of the Alleged Debtors to Carnegie Development Inc. or JMJ Development LLC or Steve Wall or Timothy Barton or Sada Cumber or Michael Fu, or Affiliates or Insiders.

*Alleged Debtors object to this Request on the grounds that such documents are not relevant to any issue before the Court at this time.*

*Alleged Debtors reserve the right to supplement this Response.*

REQUEST FOR PRODUCTION NO. 32: All Documents relating to the debts listed on the Payables Report (Exhibit "A" to Alleged Debtors' List of Creditors).

*RESPONSE: Alleged Debtors shall produce all documents in their possession responsive to this request.*

REQUEST FOR PRODUCTION NO. 33: All other Documents not produced pursuant to the requests above which the Alleged Debtors intend to rely upon in support of their opposition to the Petitions or otherwise at trial of this matter.

*RESPONSE: Alleged Debtors object to this Request to the extent it is general and seeks to require it to marshal all evidence that may be offered at trial, which is not a permissible form of discovery, and is merely a fishing expedition.*

Respectfully submitted,

*/s/ Joyce W. Lindauer*

Joyce W. Lindauer
State Bar No. 21555700
Paul B. Geilich
State Bar No. 07792500
Guy H. Holman
State Bar No. 24095171
Joyce W. Lindauer Attorney, PLLC
1412 Main Street, Suite 500
Dallas, Texas 75201
Telephone: (972) 503-4033
Facsimile: (972) 503-4034
Email: joyce@joycelindauer.com
guy@joycelindauer.com
paul@joycelindauer.com
**ATTORNEYS FOR DEFENDANTS**

CERTIFICATE OF SERVICE

I certify that on July 6, 2020, I served this document on all counsel of record via email.

*/s/ Joyce W. Lindauer*

Joyce W. Lindauer

Joyce W. Lindauer
State Bar No. 21555700
Paul B. Geilich
State Bar No. 07792500
Guy H. Holman
State Bar No. 24095171
Joyce W. Lindauer Attorney, PLLC
1412 Main St., Suite 500
Dallas, Texas 75202
Telephone: (972) 503-4033
Facsimile: (972) 503-4034
**ATTORNEYS FOR PLAINTIFF**

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| **In re:** | |
| **WALL007, et al** | **Case No. 20-31131**<br>**Chapter 7** |
| **Alleged Debtors.** | |

# ALLEGED DEBTORS' OBJECTIONS AND RESPONSES TO PETITIONING CREDITORS' FIRST SET OF INTERROGATORIES

TO: Jun Li, Yunding Kang, Cunxiang Ji, Jin Wang, Peng Guo, Lin Zhou, Qu Chen, Kai Tian, Yijing Wu, Xuegeng Gong, Jin Wang, Weijia Kong, Heng Zhang, Hong Guo, Pei Guan, Yue Xu, Mai Ye, Chenchen Jiang, Qiuying Li, Ruinian Wu, Lin Zhou, Liying Yang, Yan Zhang, Wenjun Wang, Lan Ji, Ying Zhou, Lin Li, Li Jiang, Rufeng Ding, Cunxiang Ji, Lin Gao, Qiao Qin, Yue Zhang, Xiaodong Hao, Tianqing Song, Li Jiang, Weisi Wang, Xiaoquan Dai, Feng Yan, Heng Zhang, Ou Jiang, Jinzhe Wu, Yadan Liu, Wanwan Li, Wenjuan Yin, Jiancheng Chen, Yi Tang, Ying Zhang, Pengfei Dong, Kangying Mao, Yijing Wu, Li Jiang, Qin Chu, Yulan Chen, Sicheng Zhan, Pei Guan, Jingqiu Tang, Di Tang, Jun Zeng, Kui Wang, Yue Zhang, Jun Wang, Xiaomin Fan, Di Tang, Jialin Hu, Qin Chu, Jiaxiang Lu, Fuqing Chen, Hanjiang Fu, Aiguo Luo, Fang Ding, Xiangdong Zhu, Wai Ying, Yuan Yuan, Chao Xu, Guoqin Zhou, Yijing Wu, (collectively, the "Petitioning Creditors"), by and through their attorneys of record, **Jiangang Ou**, Nguyen & Chen LLP, 11200 Westheimer Road, Suite 120, Houston, Texas 77042 and **Stephen M. Packman**, Archer & Greiner, P.C., Three Logan Square, 1717 Arch Street, Suite 3500, Philadelphia, Pennsylvania 19103.

Alleged Debtors Wall007, LLC, et al. ("Alleged Debtors") serve the following objections and responses to Petitioning Creditors' *First Set of Interrogatories.* All responses

and any documents, electronically stored information, and tangible things delivered concurrently with these objections and responses are produced in accordance with Rules 26 and 33 of the FEDERAL RULE OF CIVIL PROCEDURE, as made applicable herein, by Rules 7026, 7033, and 9014(c) of the FEDERAL RULES OF BANKRUPTCY PROCEDURE.

## I. OBJECTIONS AND RESPONSES TO INTERROGATORIES

INTERROGATORY NO. 1: For each of the Alleged Debtors set forth:

a. A current primary business address;
b. Its current registered agent;
c. Its members, officers, managers and directors.
d. The number of employees, their names and their positions.

*ANSWER: No additional employees beyond those officers listed work for any of the following Alleged Debtors.*

*Wall007 LLC*

*a. 13901 Midway Rd, Suite 102-243 Dallas, TX 75244*
*b TRWF Lodge LLC*
*c. Manager- Carnegie Development LLC*
*Timothy Barton-President*
*Saskya Bedoya- Treasurer and Secretary*

*Wall009 LLC*

*a. 13901 Midway Rd, Suite 102-243 Dallas, TX 75244*
*b ONE Agent Texas, LLC*
*c. Manager- Northstar PM, LLC*
*Timothy Barton-President*
*Saskya Bedoya- Treasurer and Secretary*

*Wall010 LLC*

*a. 13901 Midway Rd, Suite 102-243 Dallas, TX 75244*
*b TRWF Lodge LLC*
*c. Manager- Carnegie Development LLC*
*Timothy Barton-President*
*Saskya Bedoya- Treasurer and Secretary*

*Wall011 LLC*

*a. 13901 Midway Rd, Suite 102-243 Dallas, TX 75244*
*b TRWF Lodge LLC*
*c. Manager- Carnegie Development LLC*
*Timothy Barton-President*
*Saskya Bedoya- Treasurer and Secretary*

*Wall012 LLC*

a. *13901 Midway Rd, Suite 102-243 Dallas, TX 75244*
b *TRWF Lodge LLC*
c. *Manager- TRWF LLC*
*Timothy Barton-President*
*Saskya Bedoya- Treasurer and Secretary*

*Wall016 LLC*

a. *13901 Midway Rd, Suite 102-243 Dallas, TX 75244*
b *TRWF Lodge LLC*
c. *Manager- TRWF LLC*
*Timothy Barton-President*
*Saskya Bedoya- Treasurer and Secretary*

*Wall017 LLC*

a. *13901 Midway Rd, Suite 102-243 Dallas, TX 75244*
b *TRWF Lodge LLC*
c. *Manager- Carnegie Development LLC*
*Timothy Barton-President*
*Saskya Bedoya- Treasurer and Secretary*

INTERROGATORY NO. 2: Identify:

a. All persons having knowledge of the facts related to the allegations of the Petitions, the First and Second Motions to Dismiss, the Loans and the Projects, or otherwise which may relate to this litigation and your defenses thereto; and with regard to each individual so named, set forth a current home and email address and phone number for such person and provide a narrative description of the facts or factual areas as to which he or she is knowledgeable.

*ANSWER: The Alleged Debtors object to this Interrogatory as being compound, overly broad, not reasonably tailored in scope, unduly burdensome, potentially targeted at the harrassment of the Alleged Debtors, and is not proportional to the needs of the case. Alleged Debtors further object to this Interrogatory to the extent it is general and seeks to require it to marshal all evidence that may be offered at trial, which is not a permissible form of discovery, and is merely a fishing expedition. Without waiving the foregoing objections, persons with knowledge responsive to such Interrogatory are identified as Timothy Barton, Saskya Bedoya, Michael Fu, and Jiang Haibo, Tidy Fan, Lynn Zhou, Allan Zhang, Jin Wang, Petitioning Creditors, Steve Wall.*

INTERROGATORY NO. 3: Identify each person whom you expect to call at trial as an expert witness, stating the subject matter on which he/she is expected to testify, his/her field of expertise and the full and detailed qualifications, training, professional and practical experience, education and degree obtained by each person.

*ANSWER: Alleged Debtors have not identified any person expected to be called as an expert witness at trial. Alleged Debtors shall amend its response if and when such person or persons are identified.*

INTERROGATORY NO. 4: As to each person named in the answer to Interrogatory No. 3, state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion. Attach to the answers to these interrogatories copies of all written reports submitted to you (or detailed resume if reports were oral) of each person named in the answer to Interrogatory No. 3.

*ANSWER: Alleged Debtors have not identified any person expected to be called as an expert witness at trial. Alleged Debtors shall amend its response if and when such person or persons are identified.*

INTERROGATORY NO. 5: State whether or not there are any other reports in existence from the particular experts named, either written or oral. If the answer is in the affirmative, attach to the answers to these interrogatories clear copies of all such reports. If any such report, either written or oral, subsequently becomes known to you or becomes available, submit copies thereof in supplemental answers to these interrogatories.

*ANSWER: Alleged Debtors have not identified any person expected to be called as an expert witness at trial. Alleged Debtors shall amend its response if and when such person or persons are identified.*

INTERROGATORY NO. 6: Set forth the names, addresses and fields of expertise of any person, other than those named in the answer to Interrogatory No. 3, who has been retained, specifically employed or consulted by you in anticipation of litigation or preparation for trial and who is not expected to be called as a witness at trial and the subject matter on which said person was consulted.

*ANSWER: Alleged Debtors object to this Interrogatory as violative of Rule 26(b)(4)(D) of the FEDERAL RULES OF CIVIL PROCEDURE regarding discovery dealing with consulting experts.*

INTERROGATORY NO. 7: Do you contend that any declaration against interest with regard to the issues in this lawsuit have been made by any party hereto or by a director, officer, agent and/or employee of any party hereto?

*ANSWER: Alleged Debtors object to this Interrogatory as it requires them to make a conclusion of law as such relates to any potential objection based on hearsay lodged by any party. Alleged Debtors further object to this Interrogatory to the extent it is general and seeks to require it to marshal all evidence that may be offered at trial, which is not a permissible form of discovery, and is merely a fishing expedition.*

INTERROGATORY NO. 8: If the answer to Interrogatory No. 7 is in the affirmative, set forth the exact words, if known, and if not known, the substance of each such declaration against

interest, the name and address of the person making the declaration against interest, the names and addresses of all persons present when the declaration against interest was made, the place where and the time when the declaration against interest was made. If the declaration against interest was reduced to writing, annex a copy hereto.

*ANSWER: Alleged Debtors object to this Interrogatory as it requires them to make a conclusion of law as such relates to any possible objection based on hearsay. Alleged Debtors further object to this Interrogatory to the extent it is general and seeks to require it to marshal all evidence that may be offered at trial, which is not a permissible form of discovery, and is merely a fishing expedition.*

INTERROGATORY NO. 9: Do you contend that any admissions with regard to the issues in this matter have been made by any party hereto or by any director, officer, agent and/or employee of any party hereto?

*ANSWER: Alleged Debtors object to this Interrogatory since no Requests for Admissions have yet been served on Alleged Debtors or their counsel. Alleged Debtors further object to this Interrogatory to the extent it is general and seeks to require it to marshal all evidence that may be offered at trial, which is not a permissible form of discovery, and is merely a fishing expedition.*

INTERROGATORY NO. 10: If the answer to Interrogatory No. 9 is in the affirmative, set forth the exact words, if known, and if not known, the substance of each such admission, the name and address of the person making the admission, the names and addresses of all persons present when the admission was made. If the admission was reduced to writing, annex a copy hereto.

*ANSWER: Alleged Debtors object to this Interrogatory since no Requests for Admissions have yet been served on Alleged Debtors or their counsel. Alleged Debtors further object to this Interrogatory to the extent it is general and seeks to require it to marshal all evidence that may be offered at trial, which is not a permissible form of discovery, and is merely a fishing expedition.*

INTERROGATORY NO. 11: Did you receive any statement, either written or oral, from any person relating in any way to this litigation? If the answer to this interrogatory is in the affirmative, as to each such statement, please set forth: (a) the date on which the statement was obtained, (b) the person who provided the statement, (c) the substance of the statement, (d) the identity of each and every person who was present when the statement was received. If the statement was in writing, annex to these answers to interrogatories a clear copy of the statement.

*ANSWER: Alleged Debtors object to this Interrogatory as being overly broad, not reasonably tailored in scope, unduly burdensome, potentially targeted at the harassment of the Defendants, and is not proportional to the needs of the case. Alleged Debtors particularly object to use of the term "any" as such relates to the undefined terms "statement" and "person," which as defined therein, if construed*

*strictly, is itself global and overly broad, such that this Request is not reasonably tailored in scope. Alleged Debtors further object to this Interrogatory to the extent it is general and seeks to require them to marshal all evidence that may be offered at trial, which is not a permissible form of discovery, and is merely a fishing expedition.*

INTERROGATORY NO. 12: Identify and state the present location and custodian of any and all documents which have any bearing on the facts at issue in this matter. This answer should correspond with the definition of "document" and "identify" appearing in the foregoing definitions and instructions.

> *ANSWER: Alleged Debtors object to use of the term "any and all" which as defined therein, if construed strictly, is itself global and overly broad, such that this Request is not reasonably tailored in scope. To the extent that the Alleged Debtors are compelled to respond notwithstanding their objections and without waiving such, they refer Petitioning Creditors to their responses in Interrogatory No. 1, question c. for each Alleged Debtor.*

INTERROGATORY NO. 13: If you intend to rely upon any statute, regulation, or ordinance in support of your objections, defenses or claims related to the Petitions, state the exact title and section or other citation.

> *ANSWER: Alleged Debtors object to this Interrogatory to the extent it is general and seeks to require it to marshal all evidence that may be offered at trial, which is not a permissible form of discovery, and is merely a fishing expedition. Alleged Debtors further object to the use of the term "any" which as defined therein, if construed strictly, is global and overly broad, such that this Interrogatory is not reasonably tailored in scope. Alleged Debtors further object to this Interrogatory to the extent it seeks a legal conclusion.*

INTERROGATORY NO. 14: Set forth in detail the factual basis for each and every denial of, objection or opposition to any of the allegations contained in the Petitions.

> *ANSWER: Alleged Debtors object to this Interrogatory to the extent it is general and seeks to require it to marshal all evidence that may be offered at trial, which is not a permissible form of discovery, and is merely a fishing expedition. Alleged Debtors further object to the use of the term "each and every" which as defined therein, if construed strictly, is global and overly broad, such that this Interrogatory is not reasonably tailored in scope. To the extent that Alleged Debtors are compelled to respond notwithstanding their objections and without waiving such, Debtors have already produced, and Petitioning Creditors are already in possession of, such responses.*

INTERROGATORY NO. 15: Designate for each and every interrogatory answered herein which of such information is not within the personal knowledge of the person certifying these answers and as to that information, state the name and address of every person from whom it

was received, or, if the source of the information is documentary, a full description including the location thereof.

> *ANSWER: Alleged Debtors object to the use of the term "each and every" which as defined therein, if construed strictly, is global and overly broad, such that this Interrogatory is not reasonably tailored in scope. To the extent that Alleged Debtors are compelled to respond notwithstanding their objections and without waiving such, Alleged Debtors shall provide the appropriate verification and/or certification of their responses from the responsible individuals identified in Interrogatory No. 1, question c. for each Alleged Debtor in accordance with Rule 33(b)(5) of the FEDERAL RULES OF CIVIL PROCEDURE.*

INTERROGATORY NO. 16: Identify by name, address and title each individual who either supplied information used for, or participated in the drafting of these answers to interrogatories. For each person identified (a) if that individual assisted in the drafting of an answer, identify by interrogatory number each answer which the individual assisted in drafting, (b) if that individual supplied information which was used in preparation of an interrogatory answer, state by interrogatory number, each answer for which the individual supplied information and identify the information supplied. If the source of the information was documentary, identify in detail the documents from which the information was obtained.

> *ANSWER: All responses to these interrogatories were prepared by Tim Barton, President of each of the Alleged Debtors. His address is 13901 Midway Rd, Suite 102-243 Dallas, TX 75244. He was assisted by his legal counsel, Joyce W. Lindauer, Joyce W. Lindauer, PLLC, 1412 Main Street, Suite 500, Dallas, Texas 75202.*

Respectfully submitted,

*<u>/s/ Joyce W. Lindauer</u>*

Joyce W. Lindauer
State Bar No. 21555700
Paul B. Geilich
State Bar No. 07792500
Guy H. Holman
State Bar No. 24095171
Joyce W. Lindauer Attorney, PLLC
1412 Main Street, Suite 500
Dallas, Texas 75201
Telephone: (972) 503-4033
Facsimile: (972) 503-4034
Email: joyce@joycelindauer.com
guy@joycelindauer.com
paul@joycelindauer.com
**ATTORNEYS FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

I certify that on July 6, 2020, I served this document on all counsel of record via the ECF system and/or email.

*/s/ Joyce W. Lindauer*
Joyce W. Lindauer

# Exhibit “C”

ARCHER
ATTORNEYS AT LAW

**Stephen M. Packman**
*Fellow of INSOL*
*Member of New Jersey, Pennsylvania and New York Bars*
spackman@archerlaw.com
215-246-3147 (Ext. 5147) Direct

Archer & Greiner, P.C.
Three Logan Square
1717 Arch Street, Suite 3500
Philadelphia, PA 19103-2739
215-963-3300 Main
215-963-9999 Fax
www.archerlaw.com

July 14, 2020

**VIA EMAIL**

Joyce W. Lindauer, Esq.
Joyce W. Lindauer Attorney, PLLC
1412 Main St., Ste. 500
Dallas, TX 75202
joyce@joycelindauer.com

Re: In re WALL007, LLC, et al.[1]
Chapter 7 Bankruptcy Cases No. 20-31131 (HDH) (Bankr. N.D. Tex.)
Our File No. WAL347-00961

Dear Ms. Lindauer:

On June 1, 2020, the Petitioning Creditors sent discovery requests ("Interrogatories" and "Document Requests") (collectively, the "Requests") to you as counsel to each of the Alleged Debtors. On July 6, 2020, you provided responses (the "Responses") on behalf of the Alleged Debtors. Initially, no documents were produced and the Alleged Debtors objected to the majority of the Requests. Late Friday, July 10, we received some documents from you on behalf of the Alleged Debtors. The attached Schedule A identifies generally the documents received from you last Friday.

This letter is being sent to you per our phone call on July 10, 2020, wherein we discussed the Responses and tried to reach some accord on the Alleged Debtors' objections to no avail. This letter shall serve as the Petitioning Creditors' objections (the "Objections") to the Responses pursuant to the Joint Discovery Plan entered by the Court on June 20, 2020.

[1] The Alleged Debtors in these cases are: WALL007 LLC, WALL009 LLC, WALL010 LLC, WALL011 LLC, WALL012 LLC, WALL016 LLC, WALL017 LLC.

**1. Objections to Responses to Interrogatories**

**INTERROGATORY NO. 2:** Identify:

(a) All persons having knowledge of the facts related to the allegations of the Petitions, the First and Second Motions to Dismiss, the Loans and the Projects, or otherwise which may relate to this litigation and your defenses thereto; and with regard to each individual so named, set forth a current home and email address and phone number for such person and provide a narrative description of the facts or factual areas as to which he or she is knowledgeable.

**ANSWER:** The Alleged Debtors object to this Interrogatory as being compound, overly broad, not reasonably tailored in scope, unduly burdensome, potentially targeted at the harassment of the Alleged Debtors, and is not proportional to the needs of the case. Alleged Debtors further object to this Interrogatory to the extent it is general and seeks to require it to marshal all evidence that may be offered at trial, which is not a permissible form of discovery, and is merely a fishing expedition. Without waiving the foregoing objections, persons with knowledge responsive to such Interrogatory are identified as Timothy Barton, Saskya Bedoya, Michael Fit, and Jiang Haibo, Tidy Fan, Lynn Zhou, Allan Zhang, Jin Wang, Petitioning Creditors, Steve Wall.

**OBJECTION:** The Petitioning Creditors object to the Alleged Debtors' answer to Interrogatory No. 2. The Alleged Debtors provided the names of individuals that have "knowledge" responsive to the interrogatory, but failed to identity the type of knowledge these individuals have relative to the Petitions, the First and Second Motions to Dismiss, the Loans and the Projects. The Alleged Debtors also failed to provide the contact information for the individuals referenced by the Alleged Debtors in its answer.

In a further attempt to resolve same, please provide the Petitioning Creditors with the required information by no later than July 20, 2020.

**INTERROGATORY 7:** Do you contend that any declaration against interest with regard to the issues in this lawsuit have been made by any party hereto or by a director, officer, agent and/or employee of any party hereto?

**ANSWER:** Alleged Debtors object to this Interrogatory as it requires them to make a conclusion of law as such relates to any potential objection based on hearsay lodged by any party. Alleged Debtors further object to this Interrogatory to the extent it is general and seeks to require it to marshal all evidence that may be offered at trial, which is not a permissible form of discovery, and is merely a fishing expedition.

**OBJECTION:** The Petitioning Creditors object to the Alleged Debtors' answer to Interrogatory No. 7. In an attempt to clarify and resolve same, please provide any declarations against interest from parties or third-parties which the Alleged Debtors may seek to introduce as evidence in this proceeding in support of their defense. Please provide such response by no later than July 20, 2020.

**INTERROGATORY 8:** If the answer to Interrogatory No. 7 is in the affirmative, set forth the exact words, if known, and if not known, the substance of each such declaration against interest, the name and address of the person making the declaration against interest, the names and addresses of all persons present when the declaration against interest was made, the place where and the time when the declaration against interest was made. If the declaration against interest was reduced to writing, annex a copy hereto.

**ANSWER:** Alleged Debtors object to this Interrogatory as it requires them to make a conclusion of law as such relates to any possible objection based on hearsay. Alleged Debtors further object to this Interrogatory to the extent it is general and seeks to require it to marshal all evidence that may be offered at trial, which is not a permissible form of discovery, and is merely a fishing expedition.

**OBJECTION:** Please see Petitioning Creditors' response above and provide such Response by no later than July 20, 2020.

**INTERROGATORY 9:** Do you contend that any admissions with regard to the issues in this matter have been made by any party hereto or by any director, officer, agent and/or employee of any party hereto?

**ANSWER:** Alleged Debtors object to this Interrogatory since no Requests for Admissions have yet been served on Alleged Debtors or their counsel. Alleged Debtors further object to this Interrogatory to the extent it is general and seeks to require it to marshal all evidence that may be offered at trial, which is not a permissible form of discovery, and is merely a fishing expedition.

**OBJECTION:** The Petitioning Creditors object to the Alleged Debtors' answer to Interrogatory No. 9. The Alleged Debtors objection is nonsensical. Request for admissions on critical issues, including admissions against a party's interest, are standard interrogatory requests in virtually every litigation (as are the majority of Petitioner's requests which the Alleged Debtors have objected to) and have nothing to do with whether or not Petitioning Creditors served separate requests for admissions. Please see Petitioning Creditors' responses to Nos. 7 and 8 above and provide such Response by no later than July 20, 2020.

**INTERROGATORY 10:** If the answer to Interrogatory No. 9 is in the affirmative, set forth the exact words, if known, and if not known, the substance of each such admission, the name and address of the person making the admission, the names and addresses of all persons present when the admission was made. If the admission was reduced to writing, annex a copy hereto.

**ANSWER:** Alleged Debtors object to this Interrogatory since no Requests for Admissions have yet been served on Alleged Debtors or their counsel. Alleged Debtors further object to this Interrogatory to the extent it is general and seeks to require it to marshal all evidence that may be offered at trial, which is not a permissible, form of discovery, and is merely a fishing expedition.

**<u>OBJECTION</u>:** The Petitioning Creditors object to the Alleged Debtors' answer to Interrogatory No. 10. Please see Petitioning Creditors' responses to Nos. 7 -9 above and provide such Response by no later than July 20, 2020.

**<u>INTERROGATORY NO. 11</u>:** Did you receive any statement, either written or oral, from any person relating in any way to this litigation? If the answer to this interrogatory is in the affirmative, as to each such statement, please set forth: (a) the date on which the statement was obtained, (b) the person who provided the statement, (c) the substance of the statement, (d) the identity of each and every person who was present when the statement was received. If the statement was in writing, annex to these answers to interrogatories a clear copy of the statement.

**<u>ANSWER</u>:** Alleged Debtors object to this Interrogatory as being overly broad, not reasonably tailored in scope, unduly burdensome, potentially targeted at the harassment of the Defendants, and is not proportional to the needs of the case. Alleged Debtors particularly object to use of the term "any" as such relates to the undefined terms "statement" and "person," which as defined therein, if construed strictly, is itself global and overly broad, such that this Request is not reasonably tailored in scope. Alleged Debtors .further object to this Interrogatory to the extent it is general and seeks to require them to marshal all evidence that may be offered at trial, which is not a permissible form of discovery, and is merely a fishing expedition.

**<u>OBJECTION</u>:** The Petitioning Creditors object to the Alleged Debtors' answer to Interrogatory No. 11. In an attempt to clarify and resolve same, please provide any statements from parties or third-parties which the Alleged Debtors may seek to introduce as evidence in this proceeding in support of their defense, including but not limited to alleged statements against interest. Please provide such response by no later than July 20, 2020.

**<u>INTERROGATORY NO. 14</u>:** Set forth in detail the factual basis for each and every denial of, objection or opposition to any of the allegations contained in the Petitions.

**<u>ANSWER</u>:** Alleged Debtors object to this Interrogatory to the extent it is general and seeks to require it to marshal all evidence that may be offered at trial, which is not a permissible form of discovery, and is merely a fishing expedition. Alleged Debtors further object to the use of the term "each and every" which as defined therein, if construed strictly, is global and overly broad, such that this Interrogatory is not reasonably tailored in scope. To the extent that Alleged Debtors are compelled to respond notwithstanding their objections and without waiving such, Debtors have already produced, and Petitioning Creditors are already in possession of such responses.

**<u>OBJECTION</u>:** The Petitioning Creditors object to the Alleged Debtors' answer to Interrogatory No. 14. The Alleged Debtors failed to provide any factual basis for contesting the filing of the Petitions. Petitioning Creditors are not required to guess what facts the Petitioning Creditors may rely upon at the time of trial in support of their defense(s) to the Petition.

In an effort to resolve the matter, please set forth concise statements of all facts which support any and all defenses which the Alleged Debtors have asserted to date or intend to assert

at the time of trial in this matter in opposition to the Petitions. Please provide your answers by no later than July 20, 2020.

Petitioning Creditors also demand that the Alleged Debtors certify or verify their answers to the Interrogatories as required by Federal Rules of Civil Procedure 33 (as adopted by Federal Rule of Bankruptcy Procedure 9032.

**2. Objections to Responses to the Requests for Production**

**REQUEST NO. 4:** All Documents which the Alleged Debtors contend support their request for dismissal of the Petitions.

**RESPONSE:** All documents responsive to this Request shall be provided; such documents consist of the Declaration of Timothy Barton, the List of Creditors, certain loan agreements, all petitions, proofs of wire transfers, a list of banks identified as receiving and sending funds, and a copy of the content of the English version of Michael Fu's website. Alleged Debtors reserve the right to supplement this Response.

**OBJECTION:** The Petitioning Creditors object to the Alleged Debtors' response to Request No. 4 as the production is incomplete. As evidenced by Schedule A, the Alleged Debtors have provided very few documents in response to the Requests. Please provide complete responsive documents to this Request by July 20, 2020.

**REQUEST NO. 5:** All communications between the Alleged Debtors or their Representatives and the Petitioning Creditors or their Representatives during the Applicable Time Period.

**RESPONSE:** Alleged Debtors object to this Request on the grounds that it seeks communications that the Petitioning Creditors, as a party to such communications, has equal, if not better access, to and as such are already in Plaintiffs 'possession, custody, or control.

**OBJECTION:** The Petitioning Creditors object to the Alleged Debtors' response to Request No. 5. This is an improper response. The Petitioning Creditors are not required to guess which documents are in the possession of the Alleged Debtors which are responsive to this Request. The Alleged Debtors have an obligation to search through their documents and provide responsive documents to this Request. Please provide the responsive documents by July 20, 2020.

**REQUEST NO. 6:** All Communications between the Alleged Debtors or their Representatives and Michael Fu or any of his Representatives and/or Affiliates.

**RESPONSE:** Debtor objects to this Request on the grounds that it seeks communications from Michael Fu, a.k.a. Hanjiang Fu, one of the parties listed as a "Petitioning Creditors," as a party to such communications, has equal, if not better access, to and as such are already in Plaintiffs 'possession, custody, or control.

**OBJECTION:** The Petitioning Creditors object to the Alleged Debtors' response to Request No. 6. The Alleged Debtors indicate that "Michael Fu" is listed as one of the Petitioning Creditors. That is factually incorrect. Mr. Fu is not a Petitioning Creditor. Moreover, the Alleged Debtors indicate that "the Petitioning Creditors, as a party to such communications, has equal, if the not better access" to documents. This is an improper response. The Petitioning Creditors are not required to guess which documents are in the possession of the Alleged Debtors which are responsive to this Request. The Alleged Debtors have an obligation to search through their documents and provide responsive documents to this Request. Please provide the responsive documents by July 20, 2020.

**REQUEST NO. 8:** All Documents that support the Alleged Debtors' contention that the Alleged Debtors each have more than 12 creditors.

**RESPONSE:** Alleged Debtors shall each produce its List of Creditors in response to this Request.

**OBJECTION:** The Petitioning Creditors object to the Alleged Debtors' response to Request No. 8. The Alleged Debtors provided a production on July 10. The production of documents did not contain a response to this request despite the Alleged Debtors' response indicating that a "List of Creditors" would be produced. Therefore, such documents should be produced by the Alleged Debtors. Please produced same by July 20, 2020.

**REQUEST NO. 9:** All Documents that support the Alleged Debtors' contention that the Alleged Debtors are generally paying their debts as they come due.

**RESPONSE:** Alleged Debtors object to this Request as being overly broad, not reasonably tailored in scope, unduly burdensome, potentially targeted at the harassment of the Alleged Debtors, and is not proportional to the needs of the case; Alleged Debtors particularly object to the use of the term "all" which as defined therein, if construed strictly, is global and overly broad, such that this Request is not reasonably tailored in scope. Generally the Alleged Debtors contend they had payment arrangements with their creditors. Alleged Debtors reserve the right to supplement this Response.

**OBJECTION:** The Petitioning Creditors object to the Alleged Debtors' response to Request No. 9. There is nothing improper about this request as the Alleged Debtors make this contention in their pleadings to dismiss the Petitions. Since that is the case, the Alleged Debtors must produce all financial documents in their possession demonstrating that they are in fact paying their debts as due (ie., payable agings and other accounting records such as bank statements). Alleged Debtors indicate that "the Debtors contend they had payment arrangements with their creditors." However, the Alleged Debtors failed to produce any documents that support this assertion. Please produce all documents responsive to this Request by July 20, 2020.

**REQUEST NO. 16:** All Documents which support the Alleged Debtors' contention that the Alleged Debtors' have suffered damages as a result of the Petitions.

**RESPONSE:** Alleged Debtors shall provide the Motion to Dismiss, the aforementioned Brief in Support, and the List of Remitters. Also pertinent to support of such contention is the June 25, 2020 deposition testimony of Jiang Haibo.

Alleged Debtors reserve the right to supplement this Response. Further the deposition of Michael Fu will support this response.

**OBJECTION:** The Petitioning Creditors object to the Alleged Debtors' response to Request No. 16. The Alleged Debtors failed to provide documents that support their contention that they have sustained damages as a result of the Petitions. Moreover, demand is hereby made again for the Alleged Debtors to produce all financial books and records supporting their contention that the Alleged Debtors even have ongoing businesses or assets which could be damaged. Please provide all documents by no later than July 20, 2020.

**REQUEST NO. 20:** All Documents evidencing the Alleged Debtors' memorialization of the Loans, or otherwise related to the Loans, including, but not limited to, Loan Agreements, security agreements, notes, collateralization documents, receipts (including Loan proceeds receipts), acknowledgments and confirmations.

**RESPONSE:** Alleged Debtors shall provide the Motion to Dismiss, the aforementioned Brief in Support, and the List of Remitters. Also pertinent to support of such contention is the June 25, 2020 deposition testimony of Jiang Haibo.

Alleged Debtors reserve the right to supplement this Response. Further the deposition of Michael Fu will support this response.

**OBJECTION:** The Petitioning Creditors object to the Alleged Debtors' response to Request No. 20. The Alleged Debtors did not provide any documents relevant to the Loans including those requested by way of examples. There are over 70+ Petitioning Creditors, collectively, of the Alleged Debtors. It is hard to believe that the Alleged Debtors do not have documentation responsive to this Request. Please produce all responsive documents by no later than July 20, 2020.

**REQUEST NO. 21:** All minutes, resolutions, approvals and other Documents pertaining to Board of Director(s) or Board of Manager(s) (or equivalent governing body of Alleged Debtors) meetings for the Alleged Debtors during the Applicable Time Period which relate to the Loans and/or the Projects.

**RESPONSE:** Alleged Debtors object as such documents are not relevant to any issues before the Court at this time.

Alleged Debtors reserve the right to supplement this Response.

**OBJECTION:** The Petitioning Creditors object to the Alleged Debtors' response to Request No. 21. The Alleged Debtors are allegedly duly formed limited liability companies.

Generally, such companies have business records that they are able to produce to substantiate that they are actual businesses. This goes directly to the defense by the Alleged Debtors that the Petitions are not in the best interests of the Alleged Debtors and their creditors. If such documents do not exist, then the Alleged Debtors should indicate that as part of its response to this Request. If they do exist, please produce them by no later than July 20, 2020.

**REQUEST NO. 24:** All Documents maintained by the Alleged Debtors relating to any payments received by the Alleged Debtors on the Loans.

**RESPONSE:** Alleged Debtors object to this Request on the grounds that such documents are not relevant to any issue before the Court at this time. Further the Request as formulated makes no sense as Alleged Debtors would not receive payments on loans.

Alleged Debtors reserve the right to supplement this Response.

**OBJECTION:** The Petitioning Creditors hereby clarify and correct the Request at issue. The Request should read "any Loan proceeds received by the Alleged Debtors." This Request is directly relevant to defenses asserted by the Alleged Debtors including that the Petitioning Creditor's claims are subject to bona fide dispute. Please produce all documents responsive to this Request by no later than July 20, 2020.

**REQUEST NO. 25:** All Documents relating to the Alleged Debtors' contention that they attempted to repay the Loans or any part thereof.

**RESPONSE:** Alleged Debtors object to this Request on the grounds that such documents are not relevant to any issue before the Court at this time.

Alleged Debtors reserve the right to supplement this Response.

**OBJECTION:** The Petitioning Creditors object to the Alleged Debtors' response to Request No. 25. The Alleged Debtors have indicated to the Petitioning Creditors numerous times that they have attempted to "repay" the loans to the Petitioning Creditors and that such actions would resolve the underlying issues that led to the filing of the Petitions. In their production of documents on July 10, the Alleged Debtors submitted what appears to be an affidavit seeking a signature and information from apparent creditors of the Alleged Debtors However, it is unclear how this is responsive to this request. Therefore, if documents and/or communications exist that the Alleged Debtors tried to pay back money owed to the Petitioning Creditors, then such documents and writings should be produced by the Alleged Debtors. Please produce all such responsive documents by July 20, 2020.

**REQUEST NO. 27:** All Documents relating to the Alleged Debtors' contention that the Projects were funded by the Loans or otherwise funded.

**RESPONSE:** Alleged Debtors object to this Request on the grounds that such documents are not relevant to any issue before the Court at this time.

Alleged Debtors reserve the right to supplement this Response.

**OBJECTION:** The Petitioning Creditors object to the Alleged Debtors' response to Request No. 27. The Alleged Debtors have asserted that they have legitimate businesses which own assets (land and certain improvements) which are being interrupted and incurring damages as a result of the Petitions. They further allege that the Petitions are not in the best interests of the Alleged Debtors or the creditors. The Loans from Petitioning Creditors were made so that the Alleged Debtors could acquire the land and make certain improvements for the projects. These documents are highly relevant to the Petitions and the defenses asserted. Please produce all such documents by July 20, 2020.

**REQUEST NO. 28:** All Documents relating to all Assets of the Alleged Debtors during the Applicable Time Period.

**RESPONSE:** Alleged Debtors object to this Request on the grounds that it is overly broad, not reasonably tailored in scope, unduly burdensome, potentially targeted at the harassment of the Defendants, and is not proportional to the needs of the case; Alleged Debtors particularly object to the use of the term " all" which as defined therein, if construed strictly, is global and overly broad, such that this Request is not reasonably tailored in scope.

**OBJECTION:** The Petitioning Creditors object to the Alleged Debtors' response to Request No. 28. The Alleged Debtors are limited liability companies. Generally, companies have business records relating to their assets. The Petitioning Creditors contend that the Alleged Debtors received loan funds (which would thus be considered assets of the Alleged Debtors once transferred), but were never paid back. The Alleged Debtors have asserted that they have legitimate businesses and assets which are being interrupted and are incurring damages as a result of the Petitions. They further allege that the Petitions are not in the best interests of the Alleged Debtors or the creditors. The Loans from Petitioning Creditors were made so that the Alleged Debtors could acquire the land and make certain improvements for the projects. These documents are highly relevant to the Petitions and the defenses asserted. Please produce all such documents by July 20, 2020.

**REQUEST NO. 30:** All Documents which are Financials and/or related to Financials of the Alleged Debtors during the Applicable Time Period.

**RESPONSE:** Alleged Debtors object to this Request on the grounds that such documents are not relevant to any issue before the Court at this time. Alleged Debtors reserve the right to supplement this Response.

**OBJECTION:** The Petitioning Creditors object to the Alleged Debtors' response to Request No. 30. The Alleged Debtors are limited liability companies. Generally, companies have business records and/or financial documents. Such documents would be relevant to the underlying Petitions and relevant documents should be produced by the Alleged Debtors. The Alleged Debtors have asserted that they have legitimate businesses and assets which are being interrupted and incurring damages as a result of the Petitions. They further allege that the

Petitions are not in the best interests of the Alleged Debtors or the creditors. The Loans from Petitioning Creditors were made so that the Alleged Debtors could acquire the land and make certain improvements for the projects. The Alleged Debtors contend that they are paying their debts as and when due. The Alleged Debtors also dispute the claims of Petitioning Creditors. The financial documents requested are highly relevant to the Petitions and the defenses asserted. Please produce all such documents by July 20, 2020.

**REQUEST NO. 31:** All Documents relating to any transfer of Assets from or on behalf of any of the Alleged Debtors to Carnegie Development Inc. or JMJ Development LLC or Steve Wall or Timothy Barton or Sada Cumber or Michael Fu, or Affiliates or Insiders.

**RESPONSE:** Alleged Debtors object to this Request on the grounds that such documents are not relevant to any issue before the Court at this time.

Alleged Debtors reserve the right to supplement this Response.

**OBJECTION:** The Petitioning Creditors object to the Alleged Debtors' response to Request No. 31. The Alleged Debtors have asserted that they have legitimate businesses which are being interrupted and incurring damages as a result of the Petitions. They further allege that the Petitions are not in the best interests of the Alleged Debtors or the creditors. The Loans from Petitioning Creditors were made so that the Alleged Debtors could acquire the land and make certain improvements for the projects. If any of the Alleged Debtors assets were transferred and/or Loan proceeds from Petitioning Creditors diverted, these facts would be highly relevant to the Alleged Debtors' allegations that they have ongoing businesses which are being damaged by the Petitions and that the Petitions are not in the best interests of the Alleged Debtors and their creditors. These documents are also relevant to the Petitioning Creditors' claims that the Alleged Debtors are in breach of the Loan Agreements. These Requests are highly relevant to the Petitions and the defenses asserted. Please produce all such documents by July 20, 2020.

Note: All objections and positions by Petitioning Creditors herein are without waiver of, prejudice to or limitation of other or additional grounds which they might assert in support of their Requests and their objections to the Alleged Debtors' responses in objection thereto. Please provide supplemental Responses by July 20, 2020. Otherwise, Petitioning Creditors will have no choice but to proceed in Court with a Motion to Compel Responses.

Very truly yours,

*/s/ Stephen M. Packman*
STEPHEN M. PACKMAN

cc: Petitioning Creditors
Jiangang (James) Ou, Esq.

218906053v6

## Schedule A

"Response to Request No. 6":

- Email from vance@mcmurrylegal.com to Joyce Lindauer with subject line: RE: Yding Website.

"Response to Request No. 10":

- Names of individuals under the heading "Remitted by" with monetary amounts not identified.

"Response to Request No. 15":

- Complaint, Cause No. DC-19-18361, captioned *Silverland Finance LTD., Platinum Investment Corporation, Lin Zhou, Jin Wang, and Ji Lu v. Wall007, LLC, Wall009, LLC, Timothy Barton, Sada Cumber, and Carnegie Development Inc*

"Response to Request No. 25":

- Apparent draft of an Affidavit

"Response to Request No. 33":

- Master Loan Agreement dated February 15, 2017 between Platinum Investment Corporation and Wall007, LLC (UNSIGNED)

# Exhibit "D"

**Garcia, Jorge**

---

| | |
|---|---|
| **From:** | Packman, Stephen |
| **Sent:** | Monday, July 20, 2020 1:17 PM |
| **To:** | Garcia, Jorge |
| **Subject:** | FW: Wall Entities - Response I like below |

---

**From:** Packman, Stephen
**Sent:** Monday, July 20, 2020 1:09 PM
**To:** 'Joyce Lindauer' <joyce@joycelindauer.com>
**Cc:** Jiangang (James) Ou (jou@nguyen-chen.com) <jou@nguyen-chen.com>
**Subject:** RE: Wall Entities - Response I like below

Your response is wholly unacceptable. We will file our motion to compel. Also, if you intend to depose anyone of our clients, we will required significant advance notice. If you fail to provide that notice, you do so at your clients' own risk.

---

**From:** Joyce Lindauer <joyce@joycelindauer.com>
**Sent:** Monday, July 20, 2020 1:02 PM
**To:** Packman, Stephen <spackman@archerlaw.com>
**Subject:** [EXT MAIL] FW: Wall Entities - Response I like below

In order to respond before your noon deadline we would state the following in response to your email this morning.

1. Since we have not heard from you further, we assume the Alleged Debtors will not be responding further today (as demanded) to our discovery requests, as further clarified by our lengthy written responses to your objections.

**Response:** The Petitioning Creditors have not met their burden to provide the Wet Signatures (except for one). Their signatures are a variation of DocuSign by changing the font - that does not meet the Wet Signature requirement! Moreover, you held these DocuSign signatures out to be actual Wet Signatures. As such, we do not intend to provide any further discovery until the Wet Signatures issue is fully resolved via a Motion to Compel.

2. If that is not the case, please let me know by noon Central time today when we can expect your responses and which ones you still object to so we can tailor our motion to compel.

**Response:** It is our position the Petitioning Creditors must first meet the threshold requirement of providing their Wet Signatures which have been last due since the Court-ordered deadline of July 7, 2020.

3. As far as depositions, what is the status of your rescheduled deposition of Mr. Fu? Your clients were in a rush early in this case to depose him and have now gone silent. If you intend to take his deposition, please reschedule it with input from me, Mr. Ou and Mr. Ridulfo. If not, I am sure Mr. Ridulfo would like to let Mr. Fu know that he can take his trip back to China.

**Response:** Pursuant to the communications with Mr Ridulfo, Mr Fu's Deposition is scheduled now on July 23rd and/or July 24th. Given the suspicious technical difficulties which arose on Mr. Jiang's deposition (taken from Mr. Fu's residence), we will be discussing with Mr. Ridulfo to have Mr. Fu appear in person at a deposition location in Houston which meets all the COVID-19 precautions. Let me now if those dates are an issue. Mr. Fun intends to leave for China the next week.

4. If you intend to depose anyone else prior to trial, we would like to know that this week as well so we can plan accordingly. We will work with you to schedule additional video depositions but that will not be possible if you send us notices “last minute.”

**Response:** We intend to take depositions of certain Petitioning Creditors and Remitters in-person in Dallas, and not by Video Deposition, with sufficient notice to you so that your clients can arrive in Dallas.

5. We intend to take video depositions of 30(b)(6) designee(s) for the Alleged Debtors, for Carnegie Development, for TRWF LLC, and for Northstar PM, LLC ; Mr. Barton; Mr. Cumber, Mr. Bedoya; Mr. Wall; Ling Zhong; M. Venkat; Yang Jiang; and the Alleged Debtors outside accountant (s). This is without limitation or prejudice to additional depositions as needed. We need the name of the Alleged Debtors outside accountant(s). For now, please provide me with five available days (if possible) for the depositions. If not consecutive, then as close together as possible over the next few weeks. Some will be longer than others but none more than half a day. If you cannot produce any of the foregoing, or assist us in securing their appearance for deposition, let us know so we can subpoena them directly.

**Response:** We will work with your dates for these depositions.

## PLEASE NOTE OUR NEW ADDRESS IN DOWNTOWN DALLAS

*Joyce Lindauer*

Joyce W. Lindauer Attorney, PLLC
1412 Main Street
Suite 500
Dallas, TX 75202
PH 972-503-4033
FAX 972-503-4034
CEL 214-957-8039

# Exhibit "E"

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 7 |
| WALL007 LLC, *et al.*,[1] | Case No. 20-31131 (HDH)<br>(Jointly Administered) |
| Alleged Debtors. | |

**ORDER COMPELLING RESPONSES TO PETITIONING CREDITORS FIRST REQUEST FOR PRODUCTION OF DOCUMENTS AND FIRST SET OF INTERROGATORIES**

Upon the motion (the "Motion") of Jun Li, Yunding Kang, Cunxiang Ji, Jin Wang, Peng Guo, Lin Zhou, Qu Chen, Kai Tian, Yijing Wu, Xuegeng Gong, Jin Wang, Weijia Kong, Heng Zhang, Hong Guo, Pei Guan, Yue Xu, Mai Ye, Chenchen Jiang, Qiuying Li, Ruinian Wu, Lin Zhou, Liying Yang, Yan Zhang, Wenjun Wang, Ying Zhou, Lin Li, Li Jiang, Rufeng Ding, Cunxiang Ji, Lin Gao, Qiao Qin, Yue Zhang, Xiaodong Hao, Tianqing Song, Li Jiang, Weisi Wang, Xiaoquan Dai, Feng Yan, Heng Zhang, Ou Jiang, Jinzhe Wu, Yadan Liu, Wanwan

[1]The Alleged Debtors in these cases are: WALL007 LLC, WALL009 LLC, WALL010 LLC, WALL011 LLC, WALL012 LLC, WALL016 LLC, WALL017 LLC. The Alleged Debtors' federal tax identification numbers are unknown to the Petitioning Creditors sat this time.

Li, Wenjuan Yin, Jiancheng Chen, Yi Tang, Ying Zhang, Pengfei Dong, Kangying Mao, Yijing Wu, Li Jiang, Qin Chu, Yulan Chen, Sicheng Zhan, Pei Guan, Jingqiu Tang, Di Tang, Jun Zeng, Kui Wang, Yue Zhang, Jun Wang, Xiaomin Fan, Di Tang, Jialin Hu, Qin Chu, Jiaxiang Lu, Fuqing Chen, Hanjiang Fu, Aiguo Luo, Fang Ding, Xiangdong Zhu, Wai Ying, Yuan Yuan, Chao Xu, Guoqin Zhou, Yijing Wu, (collectively, the "Petitioning Creditors") for entry of an order, pursuant to Rule 7037 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Federal Rule of Civil Procedure 37, compelling the Alleged Debtors, WALL007 LLC, WALL009 LLC, WALL010 LLC, WALL011 LLC, WALL012 LLC, WALL016 LLC, WALL017 LLC's (collectively, the "Alleged Debtors") responses to Petitioning Creditors' First Request for Production of Documents and First Set of Interrogatories ("Document Requests" and "Interrogatories") (collectively, the "Requests"), as set forth in the Motion; and after due deliberation and sufficient cause appearing therefore:

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1. The Motion is **GRANTED**, as set forth herein.

2. The Alleged Debtors are directed to produce full and complete responses to the Petitioning Creditors Requests no later than _____ business days following the entry of this Order.

3. The Alleged Debtors will provide a verification along with the responses to the Requests.

4. The Petitioning Creditors' will submit an affidavit of fees and costs (the "Affidavit") no later than _____ business days ("Attorney's Fees") from the entry of this Order.

5. The Alleged Debtors will reimburse the Petitioning Creditors' counsel for Attorney's Fees no later than _____ business days after the submission of the Affidavit.

6. The terms and conditions of this Order are immediately effective and enforceable upon its entry.

7. The Petitioning Creditors are authorized to take all actions necessary to effectuate the relief granted pursuant to this order in accordance with the Motion.

8. This Court shall retain jurisdiction over any and all matters arising from or related to the interpretation or implementation of this order.

### End of Order ###

Submitted by:

Jiangang Ou
Nguyen & Chen LLP
11200 Westheimer Road Suite 120. Houston, TX 77042
(832) 767-0339 | Email: jou@nguyen-chen.com

Stephen M. Packman
Archer & Greiner, P.C.
Three Logan Square
1717 Arch St., Suite 3500. Philadelphia, PA 19103
(215)246-3147 | Email: spackman@archerlaw.com

*Counsel for the Petitioning Creditors*

218960880v1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

IN RE: ) BK. NO: 20-31131-HDH-7
)
WALL007 LLC )
D E B T O R. )

* * * * * * * * * *

TRANSCRIPT OF PROCEEDINGS

* * * * * * * * * *

BE IT REMEMBERED, that on the 17th day of August, 2020, before the HONORABLE HARLIN D. HALE, United States Bankruptcy Judge at Dallas, Texas, the above styled and numbered cause came on for hearing, and the following constitutes the transcript of such proceedings as hereinafter set forth:

P R O C E E D I N G S

THE COURT: Good morning. I'll take appearances in Wall007 LLC.

MS. LINDAUER: Your Honor, Joyce Lindauer for the alleged debtors.

THE COURT: Welcome.

MS. LINDAUER: Thank you, Your Honor.

MR. PACKMAN: Good morning, Your Honor. Stephen Packman, Archer Greiner, and James Ou for the petitioning creditors.

THE COURT: Welcome to you.

MR. METZGER: Your Honor, Steve Metzger on behalf of interested party Timothy Barton, Hang Lin, as well.

THE COURT: Welcome.

MR. WALJI: Good morning, Your Honor, Khudabuksh Walji, counsel for Carnegie Development, Inc., the managing member for the Wall entities.

Thank you.

THE COURT: Welcome.

Anyone else wish to make an appearance?

MR. OU: Yes, Your Honor, James Ou, co-counsel for the petitioning creditors.

THE COURT: Welcome to you.

MR. OU: Thank you, Your Honor.

THE COURT: We have a lot of things on the

docket this morning. I think what I would like to do is hear generally from both sides on what it is you're actually wanting, what it is you think that I can do. And my intentions are then to recess the hearing. My law clerks and I will get together. And then we're going to come up with a plan of action for you that gets you toward a resolution of your disputes. So there's no magic in the order.

So, Lindauer, why don't you go first --

MS. LINDAUER: Sure.

THE COURT: -- and Packman go second.

But, you know, you have a whole slew of things on the docket. It's really unclear to me what all it is that you're wanting, what it is that you think I can do, how this further the ball down the court, what our goal is, how we're going to get this resolved, things like that. So you go first and Mr. Packman can go second. Again, there's no magic to the first and second on this.

MS. LINDAUER: Okay. Well, thank you, Your Honor.

We did file -- I know your clerk has probably had a chance to look at it, you may have, as well, a status report.

THE COURT: I have. I've had a chance to look at it.

MS. LINDAUER: Okay.

And we tried to -- because you're right, there are a

number of things pending. We tried to sort of boil it down into kind of what we view as the major disagreements here. The parties moved forward with discovery, both sides, written discovery. There has been exchanges of documents on both sides. There were answers provided to written discovery. Obviously our written discovery was a lot more extensive than their's, just because of the number of people involved on their side. You've got some 66 petitioning creditors. So obviously we had a lot more requests for information.

After doing the written discovery, I think both sides felt that the responses were somewhat inadequate, and so that's what launched sort of these motions to compel. We have since provided further discovery. I think they've provided some further discovery. But we're still missing what we view as some critical paper documents, in particular, from the petitioning creditors. While they've provided receipts that they claim of funds that were sent in, they have never provided us with, I don't think, the underlying actual transfer of funds from whatever account in China that the funds came from. We haven't been provided with complete information on each of these petitioning creditors, such as passports and identification of each of these people.

And then, as well, there were some communications provided, but we don't think as many as should have been provided, in particular, communications between the

petitioning creditors and a gentleman named Michael Fu, who has claimed to be the agent for the petitioning creditors. We've seen very little documentation on that.

As a result of exchanging written discovery, we did take two depositions. We took Michael Fu's and Mr. Yang's depositions. And then Mr. Packman scheduled some depositions of people on our side, and then we scheduled some depositions of people on their side. And what it boiled down to, Your Honor, is that with regard to the people on our side, Mr. Packman indicated that he did not want to go forward with depositions of people on our side, unless he could take, what he calls, I think a complete deposition. And what I mean by that is he wanted to get into not only questions about the involuntary requirements, disputed claims, unliquidated claims, those issues, but also questions about the finances of each of the alleged debtors. It was at that point that we drew the line and said, wait a minute. We view the determination of whether these petitioning creditors are actually proper creditors for the filing of an involuntary to be a fundamental issue that should be decided first, before we start launching into what I would view as sort of fishing expeditions on the finances of each of these entities.

THE COURT: Hey, can I --

MS. LINDAUER: So we --

THE COURT: Can I just stop you here?

MS. LINDAUER: Sure.

THE COURT: And I don't want to step on. But do finances include whether the debtors are generally paying their debts as they become due?

MS. LINDAUER: I think that that information is available. I think we didn't draw a line on that. What we drew a line on is, is we would like balance sheets. We would like to see profit and loss statements. We'd like to see, you know, any kind of valuation information, those kinds of things. And that's where we sort of drew the line and said, wait a minute, we don't think this should be a fishing expedition on finances. As far as paying your bills as they come due, you know, those are fair questions to ask. And so, I mean, I do think they have the right to make that inquiry, Your Honor. But whether, in fact, we actually -- if you read some of their discovery it was like, let's talk about fraudulent transfers. Let's talk about preferences. Let's talk about those kinds of things. And I think those are not open for discussion at this point. So, you know, did our money go to another entity, that kind of thing. So those questions we thought really were not appropriate at this stage. They may be appropriate at some point in the future. But at least not at this stage.

So we said, look, you know, we'll produce people for depositions. But we don't think that they should have to

talk about things beyond the involuntary petition requirements. And the first requirement we believe is for you to establish that you're actually creditors of these entities. And, in fact, valid creditors with liquidated, non-contingent, non-disputed claims. So that's one box, if you will, of issues that arose was this question about what finances are the alleged debtors required to provide.

The second big issue that came up was our request to determine the validity and extent of the claims of the petitioning creditors, because we did get some written discovery. But I can tell you, we've analyzed that written discovery pretty careful and provided, you know, charts and things. But without getting into the minutia on that bottom line is, we didn't feel that we had adequate information from the petitioning creditors in order to analyze things like disputed, contingent, unliquidated, those types of issues. So we asked to take some depositions. And that's where the wheels fell of.

The alleged debtors' position, Your Honor, is that if you come to the United States and you file an involuntary petition in bankruptcy, you need to present yourself for a deposition in the United States. Every bit of research that we have done to date, and we've provided the Court with a lot of this information, leads us to conclude that taking depositions in China is likely illegal. And the other

problem we run into is simply, Chinese persons, Chinese nationals don't follow our rules of litigation. So asking them to swear to the truth of the matters that they're going to testify about, we're not certain what that really means. How are you going to enforce that as far as those people who do show up? But we've told Mr. Packman over and over that we believe that his clients -- and we've narrowed the pool. There's about, I think, 10 or 12 of them that we've asked to depose. For particular reasons we've selected those. And we've asked that they be required to come to the United States. And I know that's problematic with COVID and all of the other things going on in the world. But maybe this just isn't the time to file an involuntary bankruptcy, if you can't make your people available to be asked questions.

Let me explain why asking those questions becomes important. We've raised questions about their signatures, whether their signatures are, in fact, authentic. Whether they actually signed a number of these pieces of paper that are relevant to this case. And we, to date, have not been satisfied that that information has really been accurate, correct, and fully vetted to really move forward in this case. So that's one issue.

The second issue, Your Honor, is our records seem to indicate that some of this money that came into the United States exceeded the limits provided by law, which means

that -- you're limited to $50,000, and some of these people transferred way, way more than 50,000. The problem is is that the money, in many instances, did not come from the people who actually signed loan agreements, we believe. And, in fact, in some instances, we have no dollars attached to a loan agreement. So there are questions about who actually sent the money, whose money is this, and who the actual borrower, if you will, really is, because we believe it may not be the person on the loan agreement.

When we took Mr. Fu's deposition, the other thing we found out was that Mr. Fu, in some instances, kept some of the money coming in on these loans to apply against a commission he claimed he was due. And that may explain in part why some of these loans have zero money funded to them. But, again, the only way we're going to get the real answer to some of those questions is to ask these people who funded the money, did you fund the money, or did somebody else fund the money? And if somebody else funded the money, then that's a bigger problem, because we have no loan agreement with that someone else. So a lot of our time, and you can see based on the attachments, has been spent trying to determine who the petitioners are, are they actually creditors, is someone else actually the creditor and not these people.

So the other big issue is taking of depositions and how

we're going to do that with regard to the petitioning creditors. And the other piece of that is their request to take depositions, as I mentioned. We do have two people that they've asked to depose that have particular issues. I don't believe Mr. Bencat (phonetic) has ever been served with his subpoena, so that's an issue. Mr. Metzger represents Mr. Barton and Mr. Lin. And then there's a woman named Saskia Badoya (phonetic) who has worked for JMJ Development, which is an underlying company. And she is now 7 1/2 months pregnant. She's had two prior miscarriages. And she's under a doctor's care. So we told Mr. Packman, we don't feel comfortable presenting her for a deposition, given her health situation. We don't want to be responsible for causing any kind of problem with her health. So those are the four witnesses they've asked for at this point. Two of them are available. Two of them have some issues.

THE COURT: Which two are available?

MS. LINDAUER: Mr. Barton and Mr. Lin.

Now, let me bring up an issue, or I'll let Mr. Metzger bring it up, but I can mention it. The Court's heard some of this previously where there's been these claims that people have threatened each other. Apparently, Mr. Lin believes his family in China has been threatened, as a result of this case and the taking of his deposition. So he has some additional concerns about actually giving his deposition and what might

happen. And I'll let -- Mr. Metzger has actually visited with him and he can probably explain this in better detail than I can. But apparently Mr. Lin has some concerns about appearing because of some threats that have been made to his family in China. And some of these people that we're dealing with in the United States do have family back in China, so there are some connections there.

So I think at the end of the day, I wanted to kind of hit the high points, which are the things that we're most concerned about, which is dealing with depositions, dealing with who these people are that we're dealing with, and then this question of finances of the alleged debtors. If you boil down all of the papers that have been filed, I think for the most part they fall into one of those categories that I've covered with the Court.

So Mr. Packman and I have done a fairly decent job of trying to exchange things and work together. But we just hit an impasse on these issues, and so that's why we asked to go ahead and go forward with the hearing this morning. Because I do think we need some direction from the Court how we proceed on these issues.

THE COURT: Okay.

MS. LINDAUER: And so that's why we're here.

THE COURT: I'm hoping that in a day or so, I can provide that to you.

Mr. Packman, why don't you go next, Mr. Packman. This is fresh off from Lindauer.

MR. PACKMAN: Thank you, Your Honor. Can you hear me?

THE COURT: I can hear you fine. Thank you.

MR. PACKMAN: Your Honor, in terms of the discovery requests by the petitioning creditors, we have some written discovery requests that have yet to be responded to, both in terms of document production, as well as answers to interrogatories. And we've detailed that probably more than the Court would care to read in our papers, which consists of the motion to compel. And then there's probably reference to it in responses to the alleged debtors' motions, including the motions to compel, which I'll get to in a second, and the motion to quash.

I think the responses to the interrogatories should be fairly simple, Your Honor. And I'm not going to repeat each of the requests that we feel have not been sufficiently responded to or which they didn't respond to at all. But, essentially, they're litigation questions to help us prepare for trial, such as, have any requests for -- have any admissions been made against interests? Have there been any statements against interests? Have you taken any statements from anyone? These are typical litigation questions, which I think they should answer. I don't think there's any

difficult in answering those. And to the extent there are any such statements or declarations, they should just say so.

So moving to the request for production of documents. I think that Ms. Lindauer is sort of glossing over the issue of certain of these documents that we're requesting. We are not seeking to do a deep 2004 dive, yet, into the alleged debtors and their assets and business. However, to the extent that the alleged debtors are maintaining now, after having acknowledged receipt of the loan proceeds from these petitioning creditors without exception, that for some reason there's a discrepancy as to whether they are now legitimate lenders, again, after having taken their loan money and used it, or allegedly used it for the stated purpose of the loan agreements, which is to purchase land for each of the alleged debtors and to horizontally develop the land to the point where it could be sold, that we are entitled to delve into that in our discovery, including depositions of the president, of the treasurer/secretary, which is Ms. Badoya, and of these third-party witnesses who either worked for the debtor, Mr. Lin, who worked for the debtor recently or for one of the entities on behalf of the debtor, and Mr. Bencat, who has done, I believe, financial work for the debtors, and may still do so.

So we want to delve into these questions about where did the loan proceeds go? Once you took the petitioning

creditors' money, alleged debtors, what did you do with it and why do you now dispute that these debts, these loan claims are legitimate? Why are you now saying, after you took $33 million, including $20 million from the petitioning creditors, that there is a dispute -- and acknowledging receipt of those funds by Mr. Barton in writing, that there is now a dispute as to whether these debts are owed? Whether they're contingent or not, whether there's some bona fide dispute, and why it is that it is not in the best interest of the alleged debtors and the petitioning creditors to have a Chapter 7 Trustee look at what it is that happened with these loan proceeds. Because I can tell you, Your Honor, what's going to come out in the evidence is that not all of these entities, the alleged debtors, owned the land they said they were going to purchase.

And I think you've seen some of that in one of the motions for stay relief from one of the lenders. And that we believe that these loan proceeds may not even be with the alleged debtors. We don't even know if they came in properly to the alleged debtors and now they want to say that these petitions are not -- it's their defense, Your Honor -- that these petitions are not in the best interest of the alleged debtors and the creditors, but, you petitioning creditors cannot ask us questions about any of these topics during the depositions of the president of the debtor, Mr. Barton; the

treasurer or secretary, Ms. Badoya; the financial controller or outside person auditor, Mr. Bencat; Mr. Lin, who had communications with a lot of these petitioning creditors, you cannot delve into any of this. All you can ask them about are the topics that we, alleged debtors, raised in our motion to dismiss where we dispute, now, that you are real lenders or creditors. And we don't even think you exist, even though all of those petitioning creditors have provided copies of those passports to Mr. Lin. But you can't ask any questions of these witnesses about these topics. We think that is grossly improper and unfair.

Thank you.

THE COURT: Thank you.

Why don't you address the ability of your approach to be deposed, just as Ms. Lindauer did in her's. She's saying she needs 10 to 12 depositions.

MR. PACKMAN: And we're happy to provide those by video, Your Honor. I do not believe, based on COVID and the restrictions on travel both from China and into the United States, which would require a 14-day quarantine, that we can do these depositions live in the United States. If we could, we would. We think it's a little bit overkill to have 11 or 12 of these petitioning creditors to have to travel here. But if we would, we could -- if we could, we would. We can only produce them now --

THE COURT: Yeah. What is the travel situation in China? I just know enough to be dangerous, just from reading in the paper. Are we still under a travel quarantine from China? I don't know what the status is right now.

MR. PACKMAN: Your Honor, based on what the most current information we have from the U.S. government website, there appears to still be a 14-day quarantine requirement for a Chinese national coming into the United States.

THE COURT: Uh-huh.

MR. PACKMAN: So I do agree with Ms. Lindauer that it's a predicament. It would be very expensive and costly for these petitioning creditors to come here. But I don't disagree with Ms. Lindauer that they have some right to ask them questions and prepare for the trial. I don't disagree with that. I just don't know what else to do right now. I just don't know what else to do.

THE COURT: Okay.

MR. PACKMAN: But we will make them available by video.

THE COURT: All right. Okay.

Mr. Metzger, I see you on my screen. I'm picking out names right now. Why don't you go next.

MR. METZGER: Your Honor, what I would like to

really report to you is on behalf of Mr. Lin, who I represent. He is a young fellow who essentially had the job of interpretation from Chinese, Mandarin Chinese to English in connection with all of this. He really only spoke with, according to him, folks who were located in China, but who had a relationship to Michael Fu. And I don't know whether they worked for him or what. But they communicated on behalf of Michael Fu information.

Mr. Lin, when this originally came up and he was served with a subpoena, he and I talked and he was happy to testify. The next weekend, on Sunday, he spoke with his mother, who is still in China along with others of his family, Mr. Lin being currently a permanent resident of the United States, advised me that he was now quite concerned, because his mother had apparently received certain information -- he did not tell me how -- that indicated that Mr. Lin best testify in a manner favorable to the petitioners, or his family is at risk in China.

THE COURT: Where is Mr. Lin? Is he in Houston?

MR. METZGER: No, Your Honor. He is -- he resides in Frisco.

THE COURT: Frisco, okay.

MR. METZGER: Yes, sir.

THE COURT: All right. And then on Barton's

deposition, the scope that Lindauer described, that's the problem that you all have with his, right? Barton is available for deposition, right?

MR. METZGER: He can be made available for deposition. He also had a scheduling problem with the original date. He had an invitation from another Court to do something else at the same time.

THE COURT: That's a very nice way of describing things, Mr. Metzger, an invitation.

Well, I would -- you and Mr. Packman can find a date, I think, just depending on how we're going to handle this.

Anything else you want to tell me?

MR. METZGER: No, Your Honor. I'm fine with that. And I'm sure we can find a date.

THE COURT: Yeah. Let me ask, before we return -- I'm going to let Lindauer and Packman have a second bite at the apple. But anyone else on the call want to tell me anything about discovery process, that sort of thing? Because, as I said, we're going to recess this hearing for a day or so and then I'm going to come back with some guidance for everyone.

Okay. Ms. Lindauer, hearing none, you get to go second. This will be your last pass, though. Okay?

MS. LINDAUER: Fine, Your Honor.

One document I will call the Court's attention to, it's

on your docket, it's docket 64, the declaration of Tim Barton dated June 15th. That declaration addresses the receipt issue that Mr. Packman has raised. And specifically it says that -- Mr. Barton says that he believes that Mr. Fu, who I know you've heard that name. You'll hear it a lot more, I'm sure, before we're done. That Mr. Fu may have provided some misleading and false information regarding the information provided on the receipts.

So this whole situation right now with the economic situation we're facing is problematic for a lot of reasons, as the Court is gathering. The relationships between the United States and China are not particularly good right now. As well as the COVID-19 situation.

You know, our suggestion, Your Honor, is this case isn't going anywhere real quick. And it may be in everybody's best interest, frankly, just to slide things off a while and see if things get better. I am concerned about taking depositions with people in China. I do think -- I really don't want the State Department coming to my office to talk to me about why we may have broken Chinese law, as well as U.S. law right now. So we've tried to provide you some information on those issues in the briefing that we've done, Your Honor, so you can see what the concerns are. But -- and I hate to be mean to Mr. Packman but, you know, honestly, Chinese investors in the United States face a lot of hurdles.

And one of them right now, unfortunately, is the inability, perhaps, to come to the United States to support their claims.

The problem that we have with their claims, multiple problems, but one are signatures; two, identity of these people; three, how do you swear them in under U.S. law to tell the truth, nothing but the truth, so help you God, when they don't recognize our U.S. laws. So granted you can say, well, you know, maybe that falls on them and maybe their case gets dismissed, but it does create some troubling situations for us in trying to identify these people.

Let me give you a practical problem. So by law, you can transfer $50,000 to the United States, right? That's the limit. And what we have in this situation is we have some of these people that transferred hundreds of thousands of dollars, a few millions of dollars to the United States. And what we discovered in the depositions we have taken is that in many instances, they did that using the identity of other people, because that's the only way they could do it. So while you have a $50,000 limit, you might have to have six or seven people involved in transferring that money to the United States.

Now, as a U.S. company, the flip side is, is when we go to pay it back, we're supposed to pay it back to the account the money came from. And the problem we face there is, if

the money didn't come from the people that signed the loan agreements, it's not their banks that the money came from, then you can see the problem.

The other problem we ran into, and Mr. Fu was very good about describing this for us, is you have IRS issues when you transfer money back, and withholding money, and having proper accounting for those dollars. Again, another huge, big problem. So there are reasons to ask these people some questions about what they did, how they did it, who these people are, and in some instances, some of these people we show no receipts at all, which means that I think what happened was maybe Mr. Fu took their money for a commission.

So, again, when you're -- if this were a typical voluntary case, I'm not sure you would have all of these problems. But with an involuntary case where the fundamental question is, is are these undisputed, non-contingent, liquidated claims that are being asserted to support these filings to put these companies into bankruptcy, we get to, unfortunately, you have to delve into these types of questions. Are these legitimate creditors, or is the person that actually put up the money in China, the actual creditor? And so we have a myriad of those problems.

When we started to dig into questions about signatures, verifications, again, more questions popped up. So counsel went and got an affidavit from -- their paralegal went and

got an affidavit saying, yes, these are wet signatures. The problem with that affidavit is we don't know what the people were shown. Some of the responses are in Chinese.

And what's a little troubling is some of the return email addresses were to Mr. Fu and not to some other person, somebody at Mr. Fu's office. And so the Court knows, Mr. Fu was the Chinese person who raised a lot of this money and then took a several million dollar commission off of raising the money. A lot of the money was funneled through illegally his accounts. And so there's all of those issues. Now, we've deposed him. He was in Houston and we deposed him. I believe he's gone back to China now. But he was here and we were able to get some information from him. But needless to say, I think our biggest issue is trying to depose these people and get some answers.

And we've even toyed with sending them written questions for depositions. Again, you run into all of the same problems, is identifying these people who -- we raised this with Mr. Packman. You know, granted you say, well, I got these emails from these people saying, yes, I gave a wet signature. You know, we don't know who is on the other end of that email. I don't know if that was actually that person or someone else. I mean, so again, you get into all of these very technical issues which if these were voluntary cases, we probably wouldn't be going down this road. But with an

involuntary where you're talking about Chinese nationals putting American companies into bankruptcy, you know, I feel like they have an obligation, if they want to go down -- lest you forget, lest everyone forget, there was state court litigation here. And one of the things we did file with our motion to dismiss was a request to abstain. They may have a better remedy in state court than they have in bankruptcy court. Maybe they don't have to get into all of the unliquidated, non-contingent, non-disputed issues that you run into with bankruptcy. But the problem that we have is because of the requirements for an involuntary -- and an involuntary petition, as the Court knows, is a harsh remedy, putting a company in bankruptcy. So that being said, that's why all of this discovery, at least from our standpoint, becomes very, very important. And like I said, maybe the answer is is that we simply push all of this off until a time when maybe we can better do what we're asking to do.

With regard to our people's discovery and particularly Mr. Barton, Mr. Metzger addressed some of this, is some of those questions we just think are not appropriate at this juncture; whether there's been fraudulent transfers, whether funds were transferred to other companies, where the money went. We're focused on where did the money come from originally. They're wanting to focus on where did the money go. And to me that's not what you do on an involuntary. On

an involuntary you've got to establish there's a reason to put these people in bankruptcy first. Then once you prove that, then you get to the questions of fraudulent transfers, or whatever else might exist out there.

And personally, I don't know. I haven't traced the dollars, because it just doesn't become an issue yet. I don't think it's an issue. I think we have to get through the fundamental requirements of bankruptcy requirements first.

What we had suggested, Your Honor, and I don't think Mr. Packman is in agreement, though, is if we get passed the discovery issues that we're dealing with right now, is looking at maybe bifurcating this case a bit to say, okay, let's deal with these standing issues. Let's deal with who are these people that have put these companies into bankruptcy. Can they sustain motions to dismiss? Now, you've got, you know, what, seven or eight companies here. So maybe you get one, maybe you don't get the other one. Maybe you get two, I don't know. I don't know how ultimately it shakes out. Some of these have more petitioning creditors than others. But at the end of the day, I think we get through the fundamental standing questions first and then we deal with things like, okay, we've met that obligation. Now, are you paying your bills as they come due? Is this in the best interest of the creditors, assuming you are a creditor?

And those types of issues. And those, to me, seem to come second.

And then, Your Honor, you have the whole big issue of if we prevail and have the cases dismissed, what damages are we entitled to receive as the result of the dismissal of the case? So we had suggested, and I still think it's a good position, to maybe bifurcate this thing a little bit and deal with standing. Whether these, in fact, are truly creditors and ge that issue out there, before we go down the road with, you know, other fraudulent transfers or these other types of issues.

So I want to be sure I've hit everything. But I would call the Court's -- there's been several declarations filed by different people on the record. I'm looking at those. It might be worth some time to go back and read some of those. I think the Court would get a flavor. They're not just our's. They filed some, too. But get a flavor for some of the back and forth on some of these issues.

So I will tell you this is a unique case. I don't think I've seen anything like this. I don't know if the Court's seen anything like this. Especially with what we're dealing with right now. But our suggestion, Your Honor, maybe -- and I don't think anybody is prejudiced by this -- is possibly pushing some things off. We can get a little further down the road and hopefully maybe some of these COVID

issues settle down a bit. I think once we get past the election, things may change quite a bit, as to some of these problems that we're dealing with now.

So in any event, those are the issues. I think both of us have put them out there for you, Your Honor. They were the things that we couldn't resolve just working with each other, which is why we brought them to you.

THE COURT: Okay. Thank you.

MS. LINDAUER: Thank you, Your Honor.

THE COURT: Thank you.

Mr. Packman, you get the last word.

MR. PACKMAN: Thank you, Your Honor.

We're kind of confused by the explanation from Ms. Lindauer as to the dispute regarding the petitioning creditors' claims. On the one hand what I heard was that the alleged debtors don't know who to pay back and that there may or may not be tax withholding issues when they go to pay back the money. So to me, that's the quintessential problem here with their defense.

On the one hand what they say is, well, you know, we do owe the money to someone, but we're just not sure we owe it to the petitioning creditors who signed the loan agreements that we accepted, who we sent documents to, or a document that said, we've received your money and presumably we're going to use it for what we told you we were going to use it

for. And, more so, we don't want you to look at our books and records to see how we booked your loan, to see whether we booked it under your name or not. Now, I understand they want to say that when there's other participants in a loan that somehow, according to Ms. Lindauer, that renders the loan agreement invalid. I don't agree with that. I've been involved in many cases where there's a loan agreement and there's a lender, or more than one, and there's other participants who contribute to the loan, but there's one lender that gets paid back. So if it's a matter of who they need to pay back, I think we could deal with that. If it's a matter of whether they want release, global releases when they pay the money back, we can deal with that.

But what I think is going on here is, they're trying to delay this as long as possible, Your Honor, so they don't have to maybe ever pay the money back because they don't want to explain where the money went. And I do agree with Ms. Lindauer that there is some -- some of these issues are for a Chapter 7 Trustee, not for the petitioning creditors or Your Honor to decide. But to suggest that there should be some limitation on discovery to get to the bottom here of how the debtors booked these loans and whether or not they paid back interest payments on some of the early loans, which they did, and how their books and records reflect that, that goes to the heart of these matters and their defenses, as well as

the petitioning creditors' claims that Your Honor, I think, respectfully needs to hear at the time of trial on this matter.

Your Honor, we're going to try and short-circuit this case by filing a summary judgment motion immediately after these depositions. But we would like to take these depositions.

As far as the petitioning creditors' depositions. We will do everything possible to make them available for depositions so they can answer whatever relevant questions Ms. Lindauer has. But as I said, they are just not permitted to travel here at this moment, without being quarantined for at least two weeks. I think that would be unfair to require them to do that.

That's all I have, Your Honor. Thank you.

THE COURT: Thank you.

All right. So I get a sense of both sides. We're going to get together in my chambers -- by the way, we had looked at everything before I came out here. Obviously you know your stuff better than I do, but we had a chance to look at everything. So expect for us either to reconvene or send you something in the next day or so.

Thank you very much. We'll be in recess.

(End of Proceedings.)

C E R T I F I C A T E

I, CINDY SUMNER, do hereby certify that the foregoing constitutes a full, true, and complete transcription of the proceedings as heretofore set forth in the above-captioned and numbered cause in typewriting before me.

CINDY SUMNER, CSR #5832
Expires 10-31-2022
Cindy Sumner, CSR
5001 Vineyard Lane
McKinney, Texas 75070
214 802-7196

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

IN RE: ) BK. NO: 20-31131-HDH
)
WALL007 LLC )
D E B T O R. )

* * * * * * * * * *

TRANSCRIPT OF PROCEEDINGS

* * * * * * * * * *

BE IT REMEMBERED, that on the 19th day of August, 2020, before the HONORABLE HARLIN D. HALE, United States Bankruptcy Judge at Dallas, Texas, the above styled and numbered cause came on for hearing, and the following constitutes the transcript of such proceedings as hereinafter set forth:

P R O C E E D I N G S

THE COURT: Let me take appearances in WALL007 LLC, and then I'll read the ruling into the record.

MR. PACKMAN: Good morning, Your Honor. Stephen Packman for the petitioning creditors.

THE COURT: Welcome back.

MR. PACKMAN: Thank you.

MS. LINDAUER: Your Honor, Joyce Lindauer for the alleged debtors.

THE COURT: Welcome back to you.

MS. LINDAUER: Thank you, Your Honor.

MR. METZGER: Your Honor, Steve Metzger on behalf of Timothy Barton, individually, and Hung Fang Lin.

THE COURT: Welcome back to you.

MR. METZGER: Thank you.

MR. WALJI: Good morning, Your Honor, Khudabuksh Walji on behalf of the Carnegie Development.

THE COURT: Welcome back to you.

MR. WALJI: Thank you, sir.

THE COURT: I guess before I start the ruling -- well, let me go ahead and preface this. This is my oral ruling in WALL007, et al. Case number 20-31131. I was just visiting with my law clerks behind the scenes.

We always struggle with these discovery issues that you have, because Courts aren't 100 percent sure what's going on

in your litigation, and we struggle to figure out what's important and what's not important. And we always try to come up with something that's fair within the rules. And the ruling I'm about to give is going to be disappointing, I think, to both sides. But it is with my intent to be fair, but to also comport with the Federal Rules of Civil Procedure and the Bankruptcy Rules. So with that, let me read this into the record. Just to warn you, it's 2 1/2 single-spaced pages, so it's going to take a little while. Also, there's no need to take copious notes on this. We'll send you -- my law clerk will send you, after the second hearing is over, we'll just send you this transcript. It's the unofficial transcript, but there's going to be some order drafting by you all. So that way you don't have to just write down everything that I say.

Before the Court are a number of discovery motions. During the hearing on August 17, the Court asked the parties to narrow down the issues so that it could hopefully provide a clearer path for this case. The Court will address each discovery dispute by topic, starting with what the Court believes to be the biggest issue so far.

With respect to the process and manner of depositions, the alleged debtors contend that conducting video depositions with the deponents abroad would violate Chinese law and, accordingly, certain petitioning creditors currently noticed

for deposition should be required to sit for depositions in the United States. Along these lines, the alleged debtors maintain there is a serious dispute over the identity of the petitioning creditors and the authenticity of their wet signatures. The alleged debtors argue that requiring in-person depositions would address some of these concerns.

The petitioning creditors did not really respond to alleged debtors' legality argument. Instead, the petitioners claim that the difficulties associated with the COVID-19 crisis should excuse them from traveling to the United States for in-person depositions. During the hearing, counsel for the petitioners did not specifically say there was a travel ban on Chinese nationals entering the United States. Rather, counsel argued that his clients would have to quarantine for 14 days upon entry to the United States and that doing so would be a great inconvenience.

The Court understands the great difficulty travel poses during the current pandemic. However, the Court also believes that litigants who seek the benefit of the United States law must follow its process. And here, a serious concern has been raised that taking video depositions would violate Chinese law. While traveling to the U.S. may be a great inconvenience and difficulty at this time, the Court believes it is necessary in this case to address both the legality issues and the identity concerns raised by the

alleged debtors. Accordingly, the motion to quash at docket number 133 is granted in part to require the petitioning creditors' depositions to be taken in-person, in the United States, at a time and place agreeable to the parties.

Because the willingness of the petitioning creditors to attend in-person depositions will affect several threshold issues, including the ability of the petitioning creditors to carry their evidentiary burdens and the identity concerns raised by the alleged debtors, the Court will require that there is an agreement signed by counsel for the petitioning creditors that the petitioning creditors will appear for live depositions in the United States before any other discovery or motion practice will continue. The depositions do not need to have been completed before other matters may continue, but the agreement I just described must be signed and filed with the Court.

With respect to the content of discovery being conducted at this stage, the Court does not believe the topics should be bifurcated so that only questions about standing are allowed. The Court believes the petitioning creditors have the right to discovery pertaining to all elements of Section 303 of the Bankruptcy Code and the relevant factors under Section 305(a) and 707(a) that were raised by the alleged debtors; for example, questions as to whether the alleged debtors are generally paying their debts

as they become due are appropriate. That said, the petitioners are not entitled to seek written discovery or ask questions in depositions that delve into issues beyond the scope of Sections 303, 305(a), and 707(a). Along those lines, I do not see how the use of the loan proceeds received by the alleged debtors is relevant to these issues unless there is an allegation that their use gave rise to a preference or fraudulent transfer cause of action. Accordingly, the motion to quash at docket number 133 is denied in this respect.

As to the motion to compel certain depositions filed by the petitioning creditors at docket number 129, that is granted in part. There were four individuals discussed in the motion. Counsel for the alleged debtors argued that requiring Ms. Bedoya to sit for a deposition, even a video deposition, would pose an undue risk to her health at this time. The Court will excuse Ms. Bedoya from sitting for a deposition if she is able to provide the petitioning creditors with a note from her doctor stating that doing so, even by video, would be unsafe. If a note is not provided or there are any issues with the content of the note, the petitioning creditors may re-urge their motion.

Counsel did indicate, however, that both Mr. Lin and Mr. Barton are available for depositions. There was a suggestion during the hearing that Mr. Lin's family may have

been threatened, but there was very little detail and no evidence provided. Accordingly, the depositions of Mr. Lin and Mr. Barton must be taken at a time and place agreeable to the parties, with the scope of the depositions as I've just described.

A fourth individual, Mr. Venkat, was also discussed in the motion, but since he is an individual who has not been served with a subpoena, the Court will not order him to appear for a deposition, at this time.

Turning to document requests and interrogatory responses, both the petitioning creditors and the alleged debtors have filed a number of motions to compel.

During the hearing, counsel for the alleged debtors argued that while she has received a large production of documents, she seeks additional document production from the petitioning creditors concerning (1) the underlying transfer of funds to the alleged debtors from the Chinese accounts (2) communications between the petitioning creditors and Mr. Fu. The Court believes this is within the reasonable scope of production and, accordingly, the debtors' motion to compel at docket number 105 is granted in part as to these requests.

In accordance with the Federal Rules of Civil Procedure, and in light of some of the identity concerns that have been raised, the Court believes that the petitioners should sign their answers to interrogatories with wet

signatures as opposed to the signature of their counsel. These signatures, along with the signatures that have already been produced, should further address the identity issue raised by the alleged debtors. Any other relief sought in the alleged debtors' motions to compel at docket number 101 and 105 is denied. I want to be clear that the denial of the remaining relief sought in docket number 101 is based on the requirement of wet signatures for interrogatories and representations from Mr. Packman in paragraph 53 of docket number 140 that the alleged debtors are currently in possession of passports for all petitioning creditors and also that passports for all petitioning creditors can be submitted to the Court for in-camera inspection upon request.

The petitioning creditors have supplemented the discovery requests in their motion to compel at docket number 129. While the petitioners have received some additional documents from the alleged debtors, they seek production of a number of documents, including the alleged debtors' financials, books and records, corporate documents, et cetera. As I just discussed, the Court will not bifurcate the issues as the alleged debtor requests, and many of these document requests fall within the proper scope of discovery at this time. Accordingly, the petitioners' motion to compel is granted as to those additional, outstanding document requests, and to the extent the parties still need additional

guidance on specific requests, even after this guidance, we'll just have to come back and specify which requests are still in dispute.

I might parenthetically say that that's not really encouraged, so you all ought to be able to work some of this out.

With respect to interrogatories, the Court is not entirely clear which interrogatories remain outstanding. But it appears the petitioners still seek answers to interrogatories from requests made in their earlier motion to compel at docket number 92. The Court disagrees that these requests were straightforward and routine and denies the motion to compel as to Interrogatories 7, 8, 9, 10, 11, and 12 as written. They appear quite broad and burdensome. Interrogatory Number 2 should be answered more fully by the alleged debtors if they have not already done so.

My hope is that this ruling provides you all with the guidance for how to move forward from here, and that you will be able to work out another joint discovery plan to get this production in order. But if you need the Court's assistance, please let us know.

If counsel for both sides would upload orders on their pending motions after circulating to each other, I will sign them upon receipt.

Like I said, this was a long ruling with a lot of

subparts to it. We'll go ahead and send it out after this second 9:00 hearing is done. And that should, I think, help you in preparation of your orders.

Thank you very much.

(End of Proceedings.)

C E R T I F I C A T E

I, CINDY SUMNER, do hereby certify that the foregoing constitutes a full, true, and complete transcription of the proceedings as heretofore set forth in the above-captioned and numbered cause in typewriting before me.

______________________________

CINDY SUMNER, CSR #5832
Expires 10-31-2022
Cindy Sumner, CSR
5001 Vineyard Lane
McKinney, Texas 75070
214 802-7196

Behrooz P. Vida, SBOT No. 20578040
Carla Reed Vida, SBOT No. 16674445
Helenna Bird, SBOT No. 24085205
THE VIDA LAW FIRM, PLLC
3000 Central Drive
Bedford, Texas 76021
Tel: (817) 358-9977
Fax: (817) 358-9988
ATTORNEYS FOR TAMAMOI, LLC and FDRE, INC.

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| IIN RE | § | Chapter 7 |
| WALL007 LLC, *et al.*,[1] | § | Case No. 20-31131 (HDH) |
| Debtor | § | (Jointly Administered) |
| | § | |

**OPPOISITION TO MOTION TO CONTINUE**

TO THE HONORABLE JUDGE OF THE SAID COURT:

TAMAMOI, LLC, a Delaware limited liability company ("**Tamamoi**") and FDRE, INC., an Oregon corporation ("**FDRE**") (collectively "**Creditor**"), file this *Opposition to Motion to Continue* (the "**Motion**"), against WALL010, LLC ("**Debtor**"), and would respectfully show the Court as follows:

1. Creditor admits paragraph 1 of Debtor's Motion.

2. Creditor admits paragraph 2 of Debtor's Motion.

3. Creditor admits paragraph 3 of Debtor's Motion.

4. In response to paragraph 4 of Debtor's Motion, Creditor points out that this Court entered its Interim Order [ECF No. 152], authorizing Creditor to amend its original motion for

1 The entities to be declared debtors are: WALL007 LLC, WALL009 LLC, WALL010 LLC, WALL011 LLC, WALL012 LLC, WALL016 LLC, and WALL017 LLC.

relief from stay. It is preposterous for Debtor to fain surprise and argue that it had no idea the value of the property made the subject of Creditor's relief from stay (the "**Property**"), which was transferred to Debtor via a shell game, would not be an issue in a final hearing when it had been ordered by this Court to pay $30,000 in adequate protection payments. By claiming that the amended motion for relief was not set for a hearing, Debtor is misrepresenting the fact that on October 8, 2020 a notice of hearing was filed advising Debtor that the amended motion for relief from stay would be heard on the same day and at the same time as the original motion for relief from stay. [ECF No. 180]. Debtor had notice and knowledge that it was set for a final hearing on October 19, 2020. Creditor points out that affidavits are only attached for preliminary hearings and not final hearings, therefore, there was no need to prepare and file an affidavit. *See* L.B.R. 4001-1(e).

5. In response to paragraph 5 of Debtor's Motion, Creditor points out that Creditor complied with its obligation, in this contested matter, in accordance with L.B.R. 4001-1(d). Continuously, Debtor has chosen to rely on Timothy Barton and his opinion as to the value of the Property in order to argue that there was equity in the property and the stay should not be lifted. *See* ECF Nos. 121, 123 and 186-3]. After seeing the appraisal report made an exhibit on Creditor's list of exhibits, now Debtor wants to delay, change course and move away from reliance on Timothy Barton. If Debtor was so unsure of what issues would be litigated at the final hearing, it should have sought expedited discovery under L.B.R. 4001-1(c), but it chose not to do. Also, it did not contact Creditor's counsel to discuss the final hearing.

6. In response to paragraph 6 of Debtor's Motion, Creditor points out that Creditor complied with its obligation, in this contested matter, in accordance with L.B.R. 4001-1(d).

7. In response to paragraph 7 of Debtor's Motion, Creditor points out that Creditor complied with its obligation, in this contested matter, in accordance with L.B.R. 4001-1(d), however, Debtor is attempting to impose duties on Creditor that are non-existent under the Bankruptcy Code, the bankruptcy rules or the local rules.

8. In response to paragraph 8 of Debtor's Motion, Creditors points out that Debtor misstates the standard for granting a motion for continuance by limiting the outcome to a benefit to be received by Debtor and its estate, and completely ignoring the prejudice to Creditor whose mortgage note (a) fully matured almost four months ago, (b) has been in default for more than six months on monetary basis, (c) has been in default for more than ten months on non-monetary basis and (d) who never extended a loan to Debtor but has been snagged in an involuntary bankruptcy due to a shell game played by Carnegie Development, LLC and Debtor, who are both managed by Timothy Barton.

9. Creditors requests that Debtor's motion for continuance be denied and that the final hearing on the motion for relief from stay be heard on October 19, 2020 as scheduled.

WHEREFORE, PREMISES CONSIDERED, Movant prays for an order of the Court denying the motion for continuance and for such other and further relief as is just.

Respectfully submitted:

By: /s/ Behrooz P. Vida 10/17/2020

Behrooz P. Vida
State Bar No. 20578040
Carla Reed Vida
State Bar No. 16674445
Helenna Bird
State Bar No. 24085205
THE VIDA LAW FIRM, PLLC
3000 Central Drive
Bedford, Texas 76021

EMAIL: filings@vidalawfirm.com
TEL: (817) 358-9977
FAX: (817) 358-9988

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on October 16, 2020, a true and correct copy of the foregoing document was served via email pursuant to the Court's ECF system upon the parties listed below.

Robert W. Buchholz
bob@attorneybob.com

Darrell Wayne Cook on behalf of Creditor Fargo Consultants, Inc.
dwcook@attorneycook.com; all@attorneycook.com

Katherine T. Hopkins
katherine.thomas@kellyhart.com

Joyce W. Lindauer
joyce@joycelindauer.com; dian@joycelindauer.com; ina@joycelindauer.com

Steven C. Metzger
smetzger@pmklaw.com

Jiangang Ou
jou@nguyen-chen.com; ahuber@archerlaw.com

Stephen M. Packman
spackman@archerlaw.com; jgarcia@archerlaw.com; ahuber@archerlaw.com

Michael P. Ridulfo
mridulfo@krcl.com; dtrevino@krcl.com; mridulfo@ecf.courtdrive.com

Patrick D. Sullivan
sullivan@hooverslovacek.com

United States Trustee
Ustpregion06.da.ecf@usdoj.gov

Behrooz P. Vida
filings@vidalawfirm.com; legalprokirstin@gmail.com; bkfilings@yahoo.com

/s/ Behrooz P. Vida 10/17/2020
Behrooz P. Vida

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| IIN RE | § | Chapter 7 |
| WALL007 LLC, *et al.*,[1] | § | Case No. 20-31131 (HDH) |
| Debtor | § | (Jointly Administered) |
| | § | |

**ORDER DENYINMG MOTION TO CONTINUE**

Came to be considered the *Motion to Continue* (the "**Motion**"), filed by WALL010, LLC ("**Debtor**"). TAMAMOI, LLC, a Delaware limited liability company ("**Tamamoi**") and FDRE, INC., an Oregon corporation ("**FDRE**") (collectively "**Creditor**"), opposed the Motion.

1 The entities to be declared debtors are: WALL007 LLC, WALL009 LLC, WALL010 LLC, WALL011 LLC, WALL012 LLC, WALL016 LLC, and WALL017 LLC.

After having considered the Motion, the Court is of the opinion that the Motion should be denied.

**IT IS THEREFORE ORDERD** that the Motion is denied.

**###END OF ORDER###**

Behrooz P. Vida, SBOT No. 20578040
Carla Reed Vida, SBOT No. 16674445
Helenna Bird, SBOT No. 24085205
THE VIDA LAW FIRM, PLLC
3000 Central Drive
Bedford, Texas 76021
Tel: (817) 358-9977
Fax: (817) 358-9988
ATTORNEYS FOR TAMAMOI, LLC and FDRE, INC.

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed June 4, 2020**

**United States Bankruptcy Judge**

---

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>WALL007 LLC, *et al.*,[1]<br><br>Alleged Debtors. | Chapter 7<br><br>Case No. 20-31131 (HDH)<br>(Jointly Administered) |

**ORDER GRANTING, IN PART, THE PETITIONING CREDITORS' EMERGENCY MOTION (I) TO QUASH OR MODIFY THE ALLEGED DEBTORS' RULE 45 SUBPOENAS UPON PETITIONING CREDITORS, JIN WANG AND YIJING WU AND THIRD PARTIES; (II) FOR AN ORDER SCHEDULING A DISCOVERY CONFERENCE AND SETTING A DISCOVERY SCHEDULE; (III) REQUIRING THE ALLEGED DEBTORS TO ABIDE BY THE DISCOVERY ORDER AND ADJOURN DEPOSITIONS OF THIRD PARTY WITNESSES AND (IV) FOR SANCTIONS AGAINST COUNSEL FOR THE ALLEGED DEBTORS AND TIMOTHY BARTON FOR VIOLATIONS OF DISCOVERY RULES AND WITNESS INTIMIDATION**

Jun Li, Yunding Kang, Cunxiang Ji, Jin Wang, Peng Guo, Lin Zhou, Qu Chen, Kai Tian, Yijing Wu, Xuegeng Gong, Jin Wang, Weijia Kong, Heng Zhang, Hong Guo, Pei Guan, Yue Xu,

---

[1]The Alleged Debtors in these cases are: WALL007 LLC, WALL009 LLC, WALL010 LLC, WALL011 LLC, WALL012 LLC, WALL016 LLC, WALL017 LLC. The Alleged Debtors' federal tax identification numbers are unknown to the Petitioning Creditors sat this time.

Mai Ye, Chenchen Jiang, Qiuying Li, Ruinian Wu, Lin Zhou, Liying Yang, Yan Zhang, Wenjun Wang, Lan Ji, Ying Zhou, Lin Li, Li Jiang, Rufeng Ding, Cunxiang Ji, Lin Gao, Qiao Qin, Yue Zhang, Xiaodong Hao, Tianqing Song, Li Jiang, Weisi Wang, Xiaoquan Dai, Feng Yan, Heng Zhang, Ou Jiang, Jinzhe Wu, Yadan Liu, Wanwan Li, Wenjuan Yin, Jiancheng Chen, Yi Tang, Ying Zhang, Pengfei Dong, Kangying Mao, Yijing Wu, Li Jiang, Qin Chu, Yulan Chen, Sicheng Zhan, Pei Guan, Jingqiu Tang, Di Tang, Jun Zeng, Kui Wang, Yue Zhang, Jun Wang, Xiaomin Fan, Di Tang, Jialin Hu, Qin Chu, Jiaxiang Lu, Fuqing Chen, Hanjiang Fu, Aiguo Luo, Fang Ding, Xiangdong Zhu, Wai Ying, Yuan Yuan, Chao Xu, Guoqin Zhou, Yijing Wu, (collectively, the "Petitioning Creditors") filed *The Petitioning Creditors' Emergency Motion (I) To Quash Or Modify The Alleged Debtors' Rule 45 Subpoenas Upon Petitioning Creditors, Jin Wang And Yijing Wu And Third Parties; (II) For An Order Scheduling A Discovery Conference And Setting A Discovery Schedule; (III) Requiring The Alleged Debtors To Abide By The Discovery Order And Adjourn Depositions Of Third Party Witnesses And (IV) For Sanctions Against Counsel For The Alleged Debtors And Timothy Barton For Violations Of Discovery Rules And Witness Intimidation* [Docket No. 38] (the "Motion to Quash"); and the Court having jurisdiction to consider the Motion to Quash and having considered the arguments of counsel at a hearing conducted on June 3, 2020:

IT IS HEREBY ORDERED THAT

1. The Motion to Quash is GRANTED, IN PART.

2. Counsel for the Petitioning Creditors shall submit the last draft version of the parties' Joint Discovery Plan ("Plan") to the Court for consideration.

3. The third-party Rule 45 Subpoena's ("Third-Party Subpoenas") served by the Alleged Debtors upon third-parties, Haibo Jiang and Haoqiang Fu a/k/a Michael Fu ("Third-Parties") are still in full force and affect and the Third-Parties have not been released from such

subpoenas. Such Third-Party Subpeonas are hereby modified, per the Court's ruling, such that they shall be held in abeyance for two weeks and until June 17, 2020 after which time they may be reset.

4. Co-Counsel for the Petitioning Creditors shall use their best efforts to assist the Alleged Debtors' counsel in facilitating the appearances of Mr. Fu and Mr. Jiang for depositions, subject to provisions of this Order and the Joint Discovery Plan.

5. The Rule 45 Subpoenas relative to Petitioning Creditors ("Party Subpoenas") are hereby quashed without prejudice to any right which the Alleged Debtors may have to conduct such depositions, or any objection the Petitioning Creditors may raise, under the Joint Discovery Plan once it is approved by the Court and counsel for the Petitioning Creditors shall cooperate in making such persons available for deposition.

6. Mr. Timothy Barton shall have no further contact with the Petitioning Creditors and all communications shall be through the Alleged Debtors counsel to the Petitioning Creditors' counsel.

7. The Parties and their counsel shall cooperate to the fullest extent possible prior to bringing further discovery disputes before the Court and will file a certification under Local Rule 7007-1(b) prior to filing any pleadings with the Court regarding discovery disputes.

8. The Petitioning Creditor's request for sanctions is hereby denied.

# # # End of Order # # #

Submitted by:

Jiangang Ou
Nguyen & Chen LLP
11200 Westheimer Road Suite 120. Houston, TX 77042
(832) 767-0339 | Email: jou@nguyen-chen.com

Stephen M. Packman
Archer & Greiner, P.C.
Three Logan Square
1717 Arch St., Suite 3500. Philadelphia, PA 19103
(215)246-3147 | Email: spackman@archerlaw.com

*Co-Counsel for the Petitioning Creditors*

218649715v4

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>WALL007 LLC, *et al.*,[1]<br><br>Alleged Debtors. | Chapter 7<br><br>Case No. 20-31131 (HDH)<br>(Jointly Administered) |

**MOTION FOR AN ORDER (I) HOLDING TIMOTHY BARTON IN CONTEMPT FOR FAILURE TO COMPLY WITH THE COURT'S ORDER (II) IMPOSING SANCTIONS AGAINST TIMOTHY BARTON AND AWARDING THE PETITIONING CREDITORS ATTORNEY'S FEES AND (III) REQUIRING BARTON TO APPEAR BEFORE THE COURT CONCERNING THE IMPOSITION OF ADDITIONAL SANCTIONS AGAINST HIM AND/OR THE DEBTOR**

Jun Li, Yunding Kang, Cunxiang Ji, Jin Wang, Peng Guo, Lin Zhou, Qu Chen, Kai Tian, Yijing Wu, Xuegeng Gong, Jin Wang, Weijia Kong, Heng Zhang, Hong Guo, Pei Guan, Yue Xu, Mai Ye, Chenchen Jiang, Qiuying Li, Ruinian Wu, Lin Zhou, Liying Yang, Yan Zhang, Wenjun Wang, Lan Ji, Ying Zhou, Lin Li, Li Jiang, Rufeng Ding, Cunxiang Ji, Lin Gao, Qiao Qin, Yue Zhang, Xiaodong Hao, Tianqing Song, Li Jiang, Weisi Wang, Xiaoquan Dai, Feng Yan, Heng Zhang, Ou Jiang, Jinzhe Wu, Yadan Liu, Wanwan Li, Wenjuan Yin, Jiancheng Chen, Yi Tang, Ying Zhang, Pengfei Dong, Kangying Mao, Yijing Wu, Li Jiang, Qin Chu, Yulan Chen, Sicheng Zhan, Pei Guan, Jingqiu Tang, Di Tang, Jun Zeng, Kui Wang, Yue Zhang, Jun Wang, Xiaomin Fan, Di Tang, Jialin Hu, Qin Chu, Jiaxiang Lu, Fuqing Chen, Hanjiang Fu, Aiguo Luo, Fang Ding, Xiangdong Zhu, Wai Ying, Yuan Yuan, Chao Xu, Guoqin Zhou, Yijing Wu, (collectively, the "Petitioning Creditors"), by and through their undersigned counsel, hereby moves for an order (i) Holding Timothy Barton In Contempt For Failure To Comply With The Court's Order (ii)

[1]The Alleged Debtors in these cases are: WALL007 LLC, WALL009 LLC, WALL010 LLC, WALL011 LLC, WALL012 LLC, WALL016 LLC, WALL017 LLC. The Alleged Debtors' federal tax identification numbers are unknown to the Petitioning Creditors sat this time.

Imposing Sanctions Against Timothy Barton And Awarding The Petitioning Creditors Attorney's Fees And (iii) Requiring Barton To Appear Before The Court Concerning The Imposition Of Additional Sanctions Against Him And/Or The Debtor (the "Motion"), and respectfully allege as follows:

**PRELIMINARY STATEMENT**

1. The Petitioning Creditors file this Motion to due to Barton's continued, numerous attempts to contact Petitioning Creditors in violation of the Court's *Order Granting, In Part, The Petitioning Creditors' Emergency Motion (I) To Quash Or Modify The Alleged Debtors' Rule 45 Subpoenas Upon Petitioning Creditors, Jin Wang And Yijing Wu And Third Parties; (Ii) For An Order Scheduling A Discovery Conference And Setting A Discovery Schedule; (Iii) Requiring The Alleged Debtors To Abide By The Discovery Order And Adjourn Depositions Of Third Party Witnesses And (Iv) For Sanctions Against Counsel For The Alleged Debtors And Timothy Barton For Violations Of Discovery Rules And Witness Intimidation* [Dkt. No. 48] (the "Order").

2. The Order specifically states that Barton is not to contact the Petitioning Creditors directly but that such communications should go through counsel [Dkt. No. 48].

3. Despite the Order, Mr. Barton has two of his agents contacting the Petitioning Creditors directly requesting, *inter alia*, that they withdraw as Petitioning Creditors.

4. It has become apparent, based on the continued conduct of Barton and his agents, that Barton does not intend to comply with this court's orders and he will not stop communicating with the Petitioning Creditors directly unless the Court enforces the Order by holding him in contempt thereof.

## JURISDICTION AND VENUE

5. The Court has jurisdiction over the subject matter of this proceeding pursuant to 28 U.S.C. §§ 157, 1331 and 1334.

6. This proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

7. Venue of this action is proper in this Court pursuant to 28 U.S.C. § 1409.

## LEGAL ARGUMENT

### I. Violation of the Order

8. A bankruptcy court may issue civil contempt orders. In re Terrebonne Fuel & Lube, Inc., 108 F.3d 609, 612–13 (5th Cir. 1997); see also 11 U.S.C. § 105(a) (Bankruptcy courts may impose contempt sanctions when "necessary or appropriate" to enforce their own orders).

9. "[C]onsideration by a bankruptcy court of a civil contempt motion will encompass only two issues: whether the alleged contemnor knew of the order and whether he complied with it. Decision of these two issues would involve no determination of private rights under non-bankruptcy law. On the other hand, the issue of whether the alleged contemnor substantially complied with the underlying order may well raise questions as to the nature, contents, and meaning of the underlying order, whether the alleged contemnor knew of it, and whether his conduct complied with it, which questions are well within the special knowledge and expertise of the bankruptcy court." In re Layer, 2007 WL 2229624, at *9 (Bankr. N.D. Tex. July 31, 2007).

10. In order for civil contempt to be found, the court must determine by clear and convincing evidence that (a) a court order was in effect; (b) the order required certain conduct by the respondent; and (c) that the respondent failed to comply with the order. In re LATCL & F, Inc., 2001 WL 984912, at *3 (N.D. Tex. 2001) (citing Petroleos Mexicanos v. Crawford Enterprises, Inc., 826 F.2d 392, 400 (5th Cir. 1987)).

11. "An alleged contemnor must have had knowledge of the order on which civil contempt is to be based. The level of knowledge required, however, is not high. Intent or good faith is irrelevant." Kellogg v. Chester, 71 B.R. 36, 38 (N.D. Tex. 1987). "[I]ntent is not an element in civil contempt matters. Instead, the basic rule is that all orders and judgments of courts must be complied with promptly." In re Unclaimed Freight of Monroe, Inc., 244 B.R. 358, 366 (Bankr.W.D.La.1999).

12. For civil contempt of a court order, there need not be a showing that the conduct was willful so long as the contemnor actually failed to comply with the court's order. In re All Trac Transp., Inc., 306 B.R. 859, 875 (Bankr. N.D. Tex. 2004).

13. Here, there is no question that Mr. Barton knew about the contents of the Order. The Order states that: "Mr. Timothy Barton shall have no further contact with the Petitioning Creditors and all communications shall be through the Alleged Debtors' counsel to the Petitioning Creditors' counsel." [Dkt. No. 48].

14. Moreover, Mr. Barton attended the hearing on June 3, 2020, in which counsel for the Petitioning Creditors told the Court that Mr. Barton had been threatening Petitioning Creditors directly via a third-party messaging app [Dkt. No. 44]. Petitioning Creditors requested that all communication with Petitioning Creditors going forward be conducted by and between counsel.

15. Judge Hale spoke to Mr. Barton directly about his improper communication with the Petitioning Creditors and told him that he would have no qualms about holding Mr. Barton in contempt should his conduct continue.

16. Mr. Barton has a notarized and signed Power of Attorney ("POA") appointing Ling Zhong as his agent. See Declaration of Jiangang Ou, Exhibit "1."

17. Based on information and belief, Yang Jiang works with Mr. Zhong.

18. Despite a clear directive by the Court, on or about June 9, 2020, Mr. Barton's agents, Ling Zhong and Yang Jiang, reached out to twenty-four (24) Petitioning Creditors directly via the WeChat messaging app. See Declaration of Jiangang Ou, Exhibits "2–3; 7." The WeChat conversation, which is translated to English from Mandarin Chinese, is as follows:

09:32 June 9

Yang Jiang: Hello everyone, long time no communications! Apologize! We had a meeting today:1. Mr. Ling Zhong will continue to do the Phase I Work, preparing two proposals(reinvestment or repayment) for the 35 individuals who don't participate in the joint [petitioning]; 2. As to the matter of hearing on June 19, we have a 90% chance to win [based on] the message that came back from Judge today); 3. The second and third settlement proposals for the 65 individuals who are participating in the [petitioning] are being discussed.

09:38

Yang Jiang: Tim will never make any compromise to the Petitioners, the counterclaim has been initiated.

09:51

AMBER: @Yang Jiang We purchased in 2019, have not yet received the interest this year, the loan will expire in April next year, we all want to exit and refund, how to do this?

Ling Zhong: I have received the second proposal, I'm trying to get better and additional terms and conditions for the 35 individuals.

Group of Dallas Investors (51)

June 21 21:37

"HuaXiangRong" invited "ljj" into the group

June21 22:07

"LiWanWan" invited "Zheng--"into the group

10:31 (June 28)

Yang Jiang: The negotiations on Project 019 has been done today. Upon the consent of the four individuals of this Project next week and the execution of the legal documents drafted by lawyers, they will be separated from the (Michael) Fu financing dispute system and have nothing to do with the bankruptcy case! Congratulations to all of these four investors of Project 019 today. May lose some money and time, but their investment money will be transferred per their own choices!

19. The improper communications by Barton's agents with Petitioning Creditors, included a PDF document attachment, which requested that the Petitioning Creditors "check" certain boxes that apply in order to receive a form of "reinvestment" or "repayment" opportunity from Barton:

**WALL _________ , LLC**
**个人声明**

| | | |
|---|---|---|
| I did not agree to a bankruptcy being filed for Wall _______ .<br>本人未曾同意对本人参与的 Wall 项目呈递破产申请。 | Yes ☐<br>是 | NO ☐<br>否 |
| I did not sign by DocuSign a petition to file such bankruptcy.<br>本人未曾作为原告请愿人在呈递的破产申请上做过电子签名。 | Yes ☐<br>是 | NO ☐<br>否 |
| I withdraw any consent to a bankruptcy being filed for Wall _______ .<br>本人撤回任何对 Wall 项目破产申请的同意书。 | Yes ☐<br>是 | NO ☐<br>否 |

Group of Dallas Investors (47)

Ling Zhong: SignOutPetition for WALL Personal Statement.pdf

Ling Zhong: Details for the SignOutPetition Personal Statement, all of the three sentences must be ticked ☑,regardless of whether or not you have been petitioners. The Witness listed below means you need two person who witness your signature to sign. Then send to MVenkat@jmjdevelopment.com a scanned copy and a photo of yourself and the Statement before (US Central Time) Friday 7/3.
08:32 (July 1,2020)

Ling Zhong: Some will be transferred to the group of Real Estate Claims.

*See* Declaration of Jiangang Ou, Exhibits "4–6."

20. Mr. Barton is the managing member of JMJ Development, which is an entity referenced in Ling Zhong's messages to the Petitioning Creditors.

21. Mr. Barton did not advise Petitioning Creditors' counsel of this communication beforehand and the Petitioning Creditors did not consent to Mr. Barton's agents' unsolicited communications.

22. These communications are in direct violation of the Order and the directive Judge Hale gave Mr. Barton at the June 3, 2020 hearing.

23. Mr. Barton should not be permitted to hind behind his agents and continue to harass and confuse the Petitioning Creditors in this case.

24. Mr. Barton should be held in contempt by this Court for his failure to comply with the Order.

## II. Sanctions for Violating Order

25. In determining what sort of sanctions should be imposed for civil contempt, the court should consider (a) the harm from noncompliance; (b) the probable effectiveness of the sanction; (c) the financial resources of the contemnor and the burden the sanctions may impose; and (d) the willfulness of the contemnor in disregarding the court's order." Lamar Financial Corp. v. Adams, 918 F.2d 564, 567 (5th Cir. 1990); see also United States v.. United Mine Workers, 330 U.S. 258 (1947) ("Where the purpose of a civil sanction is to make a party comply, the court must exercise its discretion in determining the proper sanction, considering the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired.").

26. Here, Mr. Barton was informed multiple times—first directly by Petitioning Creditors' counsel; then by Court Order and Judge Hale directly—not to contact Petitioning Creditors. Despite this clear directive, Mr. Barton willfully and knowingly violated the Order by having his agents contact the Petitioning Creditors. See Declaration of Jiangang Ou, Exhibits "1–7."

27. Petitioning Creditors have incurred additional costs due to the bad faith of Mr. Barton including attorney's fees.

28. Mr. Barton should be held responsible for the unnecessary costs resulting from the Defendant's bad faith. These unnecessary costs include the costs and fees for bringing this Motion. See Crescent Publishing Group, Inc. v. Playboy Enterprises, Inc., 246 F.3d 142, 147 (2d Cir. 2001) ("[T]he decision to award fees rests in the court's equitable discretion.").

29. The Petitioning Creditors submit that under the circumstances, an award of attorney's fees to Petitioning Creditors is an appropriate sanction.

30. In addition, Petitioning Creditors request that the Court require Mr. Barton to appear before it to explain why he has clearly and knowingly violated the Order and why he and/or the Debtors should not be subjected to such further sanctions as the Court may thereafter deem appropriate.

## CONCLUSION

**WHEREFORE**, for the foregoing reasons, the Petitioning Creditors respectfully request that this Court grant the Motion and enter an order (i) holding Barton in contempt; (ii) imposing sanctions against Barton including the award of attorney fees; (iii) requiring Barton to appear before the Court; and (iv) granting such other and further relief that this Court deems just and proper under the circumstances.

Dated: July 2, 2020

/s/ *Jiangang Ou*
Jiangang Ou
Nguyen & Chen LLP
11200 Westheimer Road Suite 120
Houston, TX 77042
(832) 767-0339
Fax : (832) 767-0669
Email: jou@nguyen-chen.com

Stephen M. Packman
Archer & Greiner, P.C.
Three Logan Square
1717 Arch St., Suite 3500
Philadelphia, PA 19103
215-246-3147
Email: spackman@archerlaw.com

*Counsel for the Petitioning Creditors*

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that, on July 2, 2020, a true and correct copy of the foregoing document was served on all parties requesting service via the Court's EFC system.

/s/ Stephen M. Packman
Stephen M. Packman

218839696v1

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 7 |
| WALL007 LLC, *et al.*,[1] | Case No. 20-31131 (HDH) |
| Alleged Debtor. | |

**DECLARATION OF JIANGANG OU, ESQUIRE**

1. I, Jiangang Ou, an attorney at Nguyen & Chen, LLP, counsel for the Petitioning Creditors, hereby declare as follows:

2. I am fluent in written Mandarin Chinese and English.

3. Attached hereto as Exhibit "1" is a true and correct copy of the Power of Attorney agreement signed and notarized between Timothy Barton and Ling Zhong which appoints Mr. Zhong and Mr. Barton's agent.

4. Attached hereto as Exhibit "2" is a true and correct copy of the WeChat group chat with messages in Mandarin Chinese between Timothy Barton's agents, Ling Zhong and Yang Jiang and the Petitioning Creditors.

5. Attached hereto as Exhibit "3" is a true and correct English translation of the WeChat group chat with messages in Mandarin Chinese between Timothy Barton's agents Ling Zhong and Yang Jiang and the Petitioning Creditors.

6. Attached hereto as Exhibit "4" is a true and correct copy of the WeChat group chat with messages in Mandarin Chinese between Timothy Barton's agent Ling Zhong and the Petitioning Creditors.

7. Attached hereto as Exhibit "5" is a true and correct English translation of the WeChat group chat with messages in Mandarin Chinese between Timothy Barton's agent Ling Zhong and the Petitioning Creditors.

8. Attached hereto as Exhibit "6" is a true and correct copy of the PDF document sent by Ling Zhong to the Petitioning Creditors.

9. Attached hereto as Exhibit "7" is a true and correct list of all parties on the WeChat group chat, including Petitioning Creditors.

---

[1] The Alleged Debtors in these cases are: WALL007 LLC, WALL009 LLC, WALL010 LLC, WALL011 LLC, WALL012 LLC, WALL016 LLC, WALL017 LLC. The Alleged Debtors' federal tax identification numbers are unknown to the Petitioning Creditors at this time.

10. I declare under penalty of perjury, that the foregoing is true and correct.

Dated: July 2, 2020

/s/ *Jiangang Ou*
Jiangang Ou
Nguyen & Chen LLP
11200 Westheimer Road Suite 120
Houston, TX 77042
(832) 767-0339
Fax : (832) 767-0669
Email: jou@nguyen-chen.com

*Counsel for the Petitioning Creditors*

# Power of Attorney

I, Tim Barton ("Declarant"), President of Wall Entities, hereby appoint Ling Zhong of 1005 Robin Road, Blacksburg, VA 24060, USA, holding Chinese Passport# E05269609, and is also a co-lender in Wall019 LLC, as my attorney-in-fact ("Agent") to exercise the powers and discretions described below.

My Agent shall have the full power and authority to talk to the any or all of the co-lenders from China, who signed up the loan agreement with the Wall Entities so as to explain

a. The details of the court cases what Michael FU and/or PIC, the business entity of Michael FU with offices in China, and/or petitioners from China, against the Wall entities
b. The implications of the court cases mentioned in para a above. Here, both the Declarant as well as the Agent are aware that both of us are not legal experts to discuss the legal implications in in its entirety, whereas the Agent being a Chinese and is also a co-lender in Wall019 LLC, is in a better position to discuss and explain from the Chinese point of view
c. Agent is fully aware of the communication from the Wall entities on 31st March 2020 about the loan forbearance and the related extension. While some co-lenders understood the loan forbearance and the related extensions as a "force majeure" event, many of the co-lenders require explanations. Agent understands the details and would like to reach out all the co-lenders for explaining the details, as perceived by the Agent. While the Agent can explain the perceptions to each and every co-lender, it does not necessarily be the viewpoint of the Declarant. However, the work of the Agent is valuable and can be wetted by the legal team for finalizing the negotiations, before being agreed and signed by the related parties
d. While explaining the details, Agent agrees to verify the each and every co-lender as per KYC rules
e. Agent also agrees to comply with the rule of convincing each and every lender to receive the settlement to the same bank account where from the money was sent to the Wall entities as per the loan agreement as a Co-lender. For any deviation, the Agent agrees to follow the extra verification procedures and/or the payment methods such as using the negotiable instruments, as recognized by law. Here, the Agent shall follow the guidelines and instructions from the legal team as well as the administrative team of the Declarant
f. Agent is fully aware of the IRS rules and regulations and hence agrees to obtain the consent of each and every Co-lender for the tax withholdings, for which the Declarant agrees to provide the detailed procedures as evolved by a team of tax experts
g. Agent agrees to do all the negotiations, but at the same time, the Agent agrees to consult and take prior approvals of the Declarant
h. The basic purpose of entrusting the negotiations with the Agent is to make sure that all the settlements are in compliance and no contravention of law and/or the rules, is permitted
i. The Agent can not appoint any one for carrying on the activities mentioned above
j. The Agent can not deal with any of the related properties
k. The Declarant agrees to provide reports and other documents, as may be permitted by the legal team, dealing with the court cases

This Power of Attorney shall be construed broadly as a Power of Attorney for the specified purposes. Accordingly, the powers are restricted

Any power or authority granted to my Agent under this document shall be limited to the extent necessary to prevent this Power of Attorney from causing: (i) my income to be taxable to my Agent, (ii) my assets to be subject to a general power of appointment by my Agent, or (iii) my Agent to have any incidents of ownership with respect to any life insurance policies that I may own on the life of my Agent.

My Agent shall not be liable for any loss that results from a judgment error that was made in good faith. However, my Agent shall be liable for willful misconduct or the failure to act in good faith while acting under the authority of this Power of Attorney.

No person who relies in good faith on the authority of my Agent under this instrument shall incur any liability to my estate, my personal representative or me. I authorize my Agent to indemnify and hold harmless any third party who accepts and acts under this document. If any part of any provision of this instrument shall be invalid or unenforceable under applicable law, such part shall be ineffective to the extent of such invalidity only, without in any way affecting the remaining parts of such provision or the remaining provisions of this instrument.

My Agent is not entitled to any compensation for any services provided as my Agent. My Agent is not entitled to reimbursement of any expense incurred as a result of carrying out any provision of this Power of Attorney.

My Agent shall provide an accounting for all funds handled and all acts performed as my Agent, but only if I so request or if such a request is made by any authorized personal representative or fiduciary acting on my behalf.

This Power of Attorney shall become effective immediately, and shall not be affected by my disability or lack of mental competence, except as may be provided otherwise by an applicable state statute. This is a Durable Power of Attorney. This Power of Attorney shall continue effective until my death. This Power of Attorney may be revoked by me at any time by providing written notice to my Agent.

Ling Zhang Date: 5/6/2020 Agent (phone / email): 540-[illegible]-3693, [illegible]@gmail.com
Agent (signature)

Witness #1: Signature: [signature] Full Legal Name: CEN ZHANG

Address: 1005 Robin Rd. Blacksburg, VA, 24060

Witness #2: Signature: LI LIN Full Legal Name: LI LIN

Address: 1005 ROBIN RD. BLACKSBURG, VA, 24060

[signature] Date: ________ Declarant (phone / email): ________
Declarant (signature)

While the signature of the Agent is attested by the two witnesses, the Declarant signed the foregoing instrument before me on 5/6/2020, and the Declarant, Tim Barton, is personally known to me or has produced DRIVERS LICENSE as identification.

[signature]
Signature of Notary taking acknowledgment

Date of Expiration: 09/24/2020

[Notary stamp: illegible]

达拉斯投资人群(48)

蒋阳

大家好：很久没联系各位了！对不起！今天我们开了个会：1、钟灵先生继续做第一阶段工作，为没参加联合的35个人准备二个方案（续投、退款）；2、6月19号的州开庭之事，我们已经90%胜算了（今天法官传回的消息）；3、参加上诉的65个人第二、第三批解决方案正在讨论中。

09:38

蒋阳

Tim决对不会向起诉方妥协的，反诉已经开始了。

09:51

AMBER

@蒋阳 我们2019年买的，今年利息没有给，明年4月到期，我们都想退出来，想退款，怎么办？

钟灵

我已经收到了二个方案，我正在为35个人争取更好、更多的合同条件。

达拉斯投资人群(48)

理解决的二个方案。

蒋阳

下周会有结果，文件与大家见面。

5月24日 上午09:48

行者无疆

拭目以待

5月28日 上午07:26

蒋阳

6月19日开庭，要等开庭后出来（二个）方案。

09:32

蒋阳

大家好：很久没联系各位了！对不起！今天我们开了个会：1、钟灵先生继续做第一阶段工作，为没参加联合的35个人准备二个方案（续投、退款）；2、6月19号的州开庭之事，我们已经90%胜算了（今天法官传回的消息）；3、参加上诉的65个人第二、第三批解决方案正在讨论中。

达拉斯投资人群(48)

JMJ 公司正在研究为中国第的投资者，提供投资款的解决方案。第一批次的人数不会很多。

钟灵

希望所有投资者都能够进群。

5月24日 凌晨00:59

蒋阳

受 tim 委托的钟灵先生，一直在努力与 JMJ 的律师团及公司领导层沟通，处理解决的二个方案。

蒋阳

下周会有结果，文件与大家见面。

5月24日 上午09:48

行者无疆

拭目以待

07:26

蒋阳

6 月 19 日开庭，要等开庭后出来（二个）方案。


达拉斯投资人群(51)
6月21日 晚上21:37
"花想容"邀请"ljj"加入了群聊
6月21日 晚上22:07
"李弯弯"邀请"郑🐷"加入了群聊
昨天 21:39
GF
美国怎么处理大学录取造假？FBI出动，最高判65年，道歉撤职不顶用
10:31
蒋阳
今天完成了019项目的谈判。下周该项目的四个人同意后，大家签署律师起稿的法律文件后，即脱离傅先生融资的纠纷体系，与破产官司无关了！今天预恭喜019整个项目的4位投资者。可能损失了一点钱和时间，但是投资款已经可以自选转移了！

Ex. 3 English Translation of Ex. 2

----------------------English Translation of WeChat Chatting starts----------

Group of Dallas Investors (48)

Ling Zhong: Hope that all investors will join the group.

00:59 May 24

Yang Jiang: Mr. Ling Zhong, the representative of Tim, has been working hard on communicating with JMJ's legal team and management, on two plans dealing with and solving [ ].

Yang Jiang: There will be an answer next week, we will see the documents.

09:48 AM May 24

XingZheWuJiang: Let's wait and see.

07:26 June 9

Yang Jiang: A court hearing on June 19, and [we] will have (two) proposals after that.

09:32 June 9

Yang Jiang: Hello everyone, long time no communications! Apologize! We had a meeting today:1. Mr. Ling Zhong will continue to do the Phase I Work, preparing two proposals(reinvestment or repayment) for the 35 individuals who don't participate in the joint [petitioning]; 2. As to the matter of hearing on June 19, we have a 90% chance to win [based on] the message that came back from Judge today); 3. The second and third settlement proposals for the 65 individuals who are participating in the [petitioning] are being discussed.

09:38

Yang Jiang: Tim will never make any compromise to the Petitioners, the counterclaim has been initiated.

09:51

AMBER: @Yang Jiang We purchased in 2019, have not yet received the interest this year, the loan will expire in April next year, we all want to exit and refund, how to do this?

Ling Zhong: I have received the second proposal, I'm trying to get better and additional terms and conditions for the 35 individuals.

Group of Dallas Investors (51)

June 21 21:37

“HuaXiangRong” invited “ljj” into the group

June21 22:07

“LiWanWan” invited “Zheng--”into the group

10:31 (June 28)

Yang Jiang: The negotiations on Project 019 has been done today. Upon the consent of the four individuals of this Project next week and the execution of the legal documents drafted by lawyers, they will be separated from the (Michael) Fu financing dispute system and have nothing to do with the bankruptcy case! Congratulations to all of these four investors of Project 019 today. May lose some money and time, but their investment money will be transferred per their own choices!

----------------------English Translation WeChat Chatting ends----------


中国移动 4.39K/s 08:33
达拉斯投资人群(47)
钟灵
SignOutPetition for WALL 个人声明.pdf
48.4 KB
PDF
钟灵
详细关于那个SignOutPetition个人声明，三句都要做出勾选☑，无论是否曾是petitioners。下面Witness见证人就是需要两个看着本人签字的人签字。
然后在（美国中部时间）周五7/3之前将 扫描件 和 一张本人与声明的合照发给
MVenkat@jmjdevelopment.com
08:32
钟灵
一部分人会转入债权房产群。

Ex. 5- English Translation of Ex. 4

Group of Dallas Investors (47)

Ling Zhong: SignOutPetition for WALL Personal Statement.pdf

Ling Zhong: Details for the SignOutPetition Personal Statement, all of the three sentences must be ticked , regardless of whether or not you have been petitioners. The Witness listed below means you need two person who witness your signature to sign. Then send to MVenkat@jmjdevelopment.com a scanned copy and a photo of yourself and the Statement before (US Central Time) Friday 7/3.

08:32 (July 1,2020)

Ling Zhong: Some will be transferred to the group of Real Estate Claims.

WALL _________ , LLC

个人声明

| | | |
|---|---|---|
| I did not agree to a bankruptcy being filed for Wall _______ .<br>本人未曾同意对本人参与的 Wall 项目呈递破产申请。 | Yes ☐<br>是 | NO ☐<br>否 |
| I did not sign by DocuSign a petition to file such bankruptcy.<br>本人未曾作为原告请愿人在呈递的破产申请上做过电子签名。 | Yes ☐<br>是 | NO ☐<br>否 |
| I withdraw any consent to a bankruptcy being filed for Wall _______ .<br>本人撤回任何对 Wall 项目破产申请的同意书。 | Yes ☐<br>是 | NO ☐<br>否 |

Print Name: ____________________________

姓名中英文印刷体

Signature 签名: _________________________

Date 日期: _____________________________

Witnessed By: __________________________

见证人签名

Witnessed By: __________________________

见证人签名

Date 日期: _____________________________

| 微信名 | Name | Lender of Which Entity | Petitioning Creditor (Y or N) |
|---|---|---|---|
| 蒋阳 | jiang yang | Barton's agent | N |
| Yalena | lin yao hua's daughter | WALL012 | N |
| mei | | | |
| 花想容 | yang shu ping | WALL012 | N |
| simian | zhou ying | WALL011 | Y |
| 糖糖 | tang yi | WALL012 | Y |
| 钟灵 | zhong ling | WALL019 (Barton's Agent) | N |
| shufang | luo shu fang | WALL019 | N |
| 徐刚_G | xu gang | WALL009/WALL012/WALL017 | N |
| 愚公 | | | |
| 郝晓东 | hao xiao dong | WALL011 | Y |
| 深圳~ | zhang shun | WALL018 | Y |
| □缘 | fan xiao min | WALL018 | Y |
| 华 | lin yao hua | WALL012 | N |
| 孙（Bryan） | sun nan jin | WALL018 | N |
| 行者无疆 | li jun | WALL007 | Y |
| Hong | chen hong | WALL018 | N |
| 月永 | ye mai | WALL009 | Y |
| 季岚 | ji lan | WALL010 | Y |
| 晨曦Yue | zhang yue | WALL011/WALL016 | Y |
| 深圳~ | xu chao | WALL017 | Y |
| 林 | | | |
| 大智若愚 | ji cun xiang | WALL007/WALL011/WALL018 | Y |
| 海天一色 | tang di | WALL016/WALL017 | Y |
| GF | gao fei | WALL017 | N |
| nacee | zhou guo qin | WALL017 | Y |
| 成 | chen jian cheng | WALL012 | Y |
| Linda | xu hai ming's wife | WALL016 | N |
| 唐子富 | tang jin qiu | WALL016 | Y |
| 石头 | lu jia xiang | WALL017 | Y |
| 雨过天晴 | zou jie | WALL009/WALL011 | N |
| 李弯弯 | li wan wan | WALL012 | Y |
| 骆斌 | luo bin behalf of Jiang chen ch | WALL009 | Y |
| 山海 | xiao rui ling | WALL017 | N |
| 逸猪 | wang jun | WALL016 | Y |
| 王❀ | wang kui | WALL016 | Y |
| AMBER | bian li wen | WALL018 | not yet |
| Lily | mao li ying | WALL010 | N |
| FREEMAN | ying wai's husband | WALL017 | Y |
| 桃之夭夭 | deng min | WALL009 | N |
| qiuying | li qiu ying | WALL009 | Y |
| 褚琴 | chu qin | WALL016/WALL017 | Y |
| 风 | feng zhong guo | WALL017 | N |
| 白云 | feng zhong guo's wife | WALL017 | N |
| Lily.L | | | |
| 小小 | gao huai zhen | WALL012 | N |
| 游 | wu dan | WALL009 | |
| Wendy | yan feng | WALL012 | Y |




工作表1

218839931v1

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>WALL007 LLC, *et al.*,[1]<br><br>Alleged Debtors. | Chapter 7<br><br>Case No. 20-31131 (HDH)<br>(Jointly Administered) |

**ORDER (I) HOLDING TIMOTHY BARTON IN CONTEMPT FOR FAILURE TO COMPLY WITH THE COURT'S ORDER (II) IMPOSING SANCTIONS AGAINST TIMOTHY BARTON AND AWARDING THE PETITIONING CREDITORS ATTORNEY'S FEES AND (III) REQUIRING BARTON TO APPEAR BEFORE THE COURT CONCERNING THE IMPOSITION OF ADDITIONAL SANCTIONS AGAINST HIM AND/OR THE DEBTOR**

Jun Li, Yunding Kang, Cunxiang Ji, Jin Wang, Peng Guo, Lin Zhou, Qu Chen, Kai Tian, Yijing Wu, Xuegeng Gong, Jin Wang, Weijia Kong, Heng Zhang, Hong Guo, Pei Guan, Yue Xu, Mai Ye, Chenchen Jiang, Qiuying Li, Ruinian Wu, Lin Zhou, Liying Yang, Yan Zhang, Wenjun

[1]The Alleged Debtors in these cases are: WALL007 LLC, WALL009 LLC, WALL010 LLC, WALL011 LLC, WALL012 LLC, WALL016 LLC, WALL017 LLC. The Alleged Debtors' federal tax identification numbers are unknown to the Petitioning Creditors sat this time.

Wang, Lan Ji, Ying Zhou, Lin Li, Li Jiang, Rufeng Ding, Cunxiang Ji, Lin Gao, Qiao Qin, Yue Zhang, Xiaodong Hao, Tianqing Song, Li Jiang, Weisi Wang, Xiaoquan Dai, Feng Yan, Heng Zhang, Ou Jiang, Jinzhe Wu, Yadan Liu, Wanwan Li, Wenjuan Yin, Jiancheng Chen, Yi Tang, Ying Zhang, Pengfei Dong, Kangying Mao, Yijing Wu, Li Jiang, Qin Chu, Yulan Chen, Sicheng Zhan, Pei Guan, Jingqiu Tang, Di Tang, Jun Zeng, Kui Wang, Yue Zhang, Jun Wang, Xiaomin Fan, Di Tang, Jialin Hu, Qin Chu, Jiaxiang Lu, Fuqing Chen, Hanjiang Fu, Aiguo Luo, Fang Ding, Xiangdong Zhu, Wai Ying, Yuan Yuan, Chao Xu, Guoqin Zhou, Yijing Wu, (collectively, the "Petitioning Creditors") filed a *Motion For An Order (I) Holding Timothy Barton In Contempt For Failure To Comply With The Court's Order (Ii) Imposing Sanctions Against Timothy Barton And Awarding The Petitioning Creditors Attorney's Fees And (Iii) Requiring Barton To Appear Before The Court Concerning The Imposition Of Additional Sanctions Against Him And/Or The Debtor* (the "Motion"); and the Court having jurisdiction to consider the Motion:

IT IS HEREBY ORDERED THAT

1. The Motion is GRANTED;

2. Petitioning Creditors' counsel shall submit to the Court a Declaration of fees and costs incurred in connection with this Motion and, upon the Court's determination of the reasonableness of such fees and costs, Timothy Barton is hereby directed to pay to the Petitioning Creditors, within three (3) days of the entry of this Order, the costs and fees of the Petitioning's Creditors counsel in connection with this Motion and any hearing(s) thereon;

3. Mr. Barton shall appear before this Court on ____________, 2020, at which time the Court shall determine whether to impose additional sanctions against Barton and/or the Debtors;

4. The Court shall retain jurisdiction with respect to all matters arising from or related to the implementation of this Order.

# # # End of Order # # #

Submitted by:

Jiangang Ou
Nguyen & Chen LLP
11200 Westheimer Road Suite 120. Houston, TX 77042
(832) 767-0339 | Email: jou@nguyen-chen.com

Stephen M. Packman
Archer & Greiner, P.C.
Three Logan Square
1717 Arch St., Suite 3500. Philadelphia, PA 19103
(215)246-3147 | Email: spackman@archerlaw.com

*Counsel for the Petitioning Creditors*

218837656v1